# EXHIBIT

# "14"

EXHIBIT "14"



# FIBROMYALGIA
# POSITION STATEMENTS AND GUIDELINES

## Table of Contents

| I | Introduction to our Proposed Guidelines on Fibromyalgia | page 3 |
|---|---|---|
| II | Our Current Position Statements on Fibromyalgia | page 4 |
| III | A 2003 Understanding of Fibromyalgia | page 5 |
| IV | Some Notable Quotes on Fibromyalgia | page 14 |
| V | References/Bibliography | page 17 |
| VI | A Fibromyalgia Process Proposal | page 20 |
| VII | Tools which may be helpful in addressing functional capacities and mental limitations in reported cases of Fibromyalgia | page 23 |
| VIII | Contributors | page 30 |
| | Appendix - Templates | page 31 |

# FIBROMYALGIA
## POSITION STATEMENTS AND GUIDELINES
(7-29-2002)

## I. INTRODUCTION

- The following is intended only to be a guideline. Each claim is unique and needs to be addressed on it's own individual merits

- Please note that although these guidelines have been written for fibromyalgia, considerable overlap exists between fibromyalgia and other defined syndromes of medically unexplained symptoms (such as chronic fatigue syndrome).

- Unum Provident's Customer Care Philosophy:
  - To provide a thorough, fair, and objective evaluation of all claims
  - To pay all valid claims with high degree of customer service
  - To assist our claimants in their return to work efforts
  - To defend the company against invalid claims

- The intent of these guidelines are:
  - To provide a basic outline on what is currently known in respect to the defined syndrome of fibromyalgia.
  - To provide a list of references to support the opinions and statements expressed in the above outline
  - To provide a Fibromyalgia Process Proposal in an effort to better leverage the return to work features in our office contracts and to better utilize the expertise of our physicians, psychologist, nurses, and rehabilitation professionals.
  - To provide an outline of some of the tools which may be helpful in addressing functional capabilities and claimed limitations, and give an understanding of how they might be utilized in some reported cases of fibromyalgia.

- Our ambition in our Fibromyalgia Process Proposal is to improve and enhance our effectiveness as enablers of wellness rather then of illness. It is certainly understandable to have compassion for a patient's reported suffering, but harm is done when that compassion allows one to become less functional.

- Our position statements and guidelines on fibromyalgia have been reviewed by three nationally recognized medical experts in rheumatology. It is expected that these guidelines will be updated and revised as advances in medicine require.

## II.   OUR CURRENT POSITION STATEMENTS ON FIBROMYALGIA

- Fibromyalgia is a defined syndrome; one that represents a patient population experiencing a constellation of medically unexplained symptoms.

- Current evidence does not allow one to conclude that fibromyalgia is a physical disease- its etiology remains unknown and to date no pathophysiological process has been established.

- Psychological factors may exist in a significant portion of individuals labeled with fibromyalgia.

- Treatment plans, which include cognitive behavioral therapy and a graded low impact aerobic, conditioning program, have been shown to improve symptoms in some fibromyalgia patients.

- The vast majority of individuals labeled with fibromyalgia have no physical impairment; they are on a physical basis able to return to work (especially with appropriate care). Generally, continued activity (including work) is of value even in the face of symptoms.

## III.   A CURRENT UNDERSTANDING OF FIBROMYALGIA

Introduction – History

1.  Unexplained chronic widespread body pain has been a source of confusion and bewilderment since the advent of medicine. Over the years, this problem has been given various names. The two best known and remembered are neurasthenia in the nineteenth century and fibrositis in the twentieth century. Today we call it fibromyalgia.

Beginning in the late 1970s and nineteen eighties, there has been a concerted effort to find new answers to this age-old problem. The formulation of the 1990 American College of Rheumatology (ACR) Classification Criteria gave further impetus to this effort,   yielding numerous valuable clinical research studies, which have greatly advanced our understanding of this major problem.

Before presenting a summary of the more important new data from these studies, it is necessary to present and explain an unforeseen negative result coming from a misunderstanding of the purpose of the 1990 ACR Classification Criteria for Fibromyalgia.

The classification criteria were established and intended primarily for the clinical and epidemiologic research of patients with the symptom of widespread musculoskeletal pain. The purpose of the criteria was to provide research scientists a uniform patient selection guide for the study of patients with widespread body pain.

Unfortunately, the use of the classification criteria i.e., the proper uniform selection of study patients, was misunderstood by some physicians in the day-to-day clinical practice, as a criterion for the diagnosis of individual patients presenting in their office with chronic widespread pain. Meeting the classification criteria is not equivalent to making a diagnosis in an individual patient.[1]

This initial misinterpretation soon expanded and escalated for many, both in clinical practice and medicolegal contexts, to the greater misunderstanding prevalent today. Many now view persons who satisfy the classification criterion as having a rheumatic disease, some even view them as having a chronic incurable disabling disease. Not all diagnoses are diseases.[2]

_____

[1]

[2]

Two mindsets have developed. One acknowledges, as per their original intent, the classification criteria as a valuable tool for the selection of patients for research, the other inappropriately views persons satisfying the criteria as having a disease, that is, for some, a chronic progressive incurable disabling disease.

For our community of claims reviewers to provide a thorough, fair, and objective evaluation of fibromyalgia claims, it is mandatory for us to understand the genesis and evolution of the misinterpretation of the classification criteria.

Since the publication of the 1990 fibromyalgia classification criteria, it is claimed that more research papers have been written on this problem than any other medical condition. Although most of the research data directly address the problems of this unexplained widespread pain syndrome, its cause or causes, pathophysiology, pathology and treatment, many papers deal with the misunderstandings surrounding the classification criteria, the label fibromyalgia, the definition of syndrome, the value of tender points, and the question of physical disability.

### Summary of the current state of the art regarding fibromyalgia

- *Current thoughts concerning the 1990 ACR Classification Criteria for Fibromyalgia:*
  1. Classification criteria are necessary for the proper conduct of clinical trials and epidemiologic studies. They are useful for teaching purposes. They are, however, explicitly proscribed for diagnosis. Satisfying the criteria does not necessarily mean that an individual has fibromyalgia.
  2. The use of classification criteria for labeling certain conditions that do not meet the definition of disease (fibromyalgia) has been severely criticized. Such diagnostic labels, in themselves, may induce illness behavior.[3]
  3. The process of illness description needs to be dynamic with addition or changes to classification criteria as more is learned about these illnesses. Classification criteria are not illness, only descriptions that change as new knowledge is acquired.[4]
- *Current thoughts concerning "syndrome"*
  1. There are two kinds of syndromes. The first kind represents a grouping of symptoms resting on pathology and an underlying disease.
  2. The second kind of syndrome represents a grouping of unexplained symptoms with no known pathology and underlying disease.

---

[3]
[4]
[5]

3. Fibromyalgia is a grouping of unexplained symptoms without demonstrable pathology or underlying disease; such groupings of unexplained symptoms are now termed by some authors "functional somatic syndromes".[6]

4. Functional somatic syndromes are not restricted to and limited to the medical specialties which gave them birth; rather, they overlap. A patient often presents with several such syndromes, or parts of syndromes.[7]

5. Such syndromes often present with concomitant underlying psychological distress.

6. The fibromyalgia syndrome, when viewed as one of the many functional somatic syndromes, is seen as presenting with more than widespread body pain and tender points accompanied by fatigue, disturbed sleep, poor memory and decreased concentration. It is now appreciated that the syndrome may present with any combination of symptoms from the following three symptom categories.

   (i) Other unexplained somatic symptoms:
      i. Tenderness, fatigue, sleep disorder, memory impairment, cognitive loss, short attention span, paresthesias, dizziness, anxiety, depression, dry mouth, feeling of swelling of the hands and feet

   (ii) Other symptoms from overlapping functional somatic syndromes
      i. Irritable bowel syndrome, irritable bladder syndrome, tension headaches, migraine headaches, TMJ syndrome, myofascial pain syndrome, allergies, sick building syndrome, dysmenorrhea

   (iii) Psychological symptoms
      i. Anxiety, depression, personality disorders, illness behavior, somatization.[8]

● **Current thoughts** concerning the diagnostic **label "fibromyalgia"**
   1. The label itself of fibromyalgia or indeed fibromyalgia. It is merely another name for chronic widespread somatic idiopathic pain as related with other functional symptoms.

   2. Fibromyalgia is not a disease or illness.

   3. Some fibromyalgia experts argue that the **labeling of fibromyalgia may be harmful.**[9]

_____

6
7
8
9

- *Current findings and reflections concerning "tender points"*
  1. Recent studies show that there are no convincing reproducible structural or biophysiological abnormalities demonstrable at the sight of tender points.

  2. Studies reveal that tender points are a common finding. Although found in small numbers, they are present in healthy individuals. They are a common finding in many functional somatic syndromes, and found in large numbers in patients with psychological distress.

  3. Documented studies report a high correlation between high tender point scores and the level of distress, anxiety, depression, somatization and illness behavior.[10]

  4. Many physicians in clinical practice are thought to examine patients with tender points incorrectly, applying pressure in the wrong areas, applying too much pressure or too little pressure.[ ]

  5. The reliability of tender points in the medicolegal setting of disability is unclear.[12]

  6. Recent data show that the emphasis on tender points does not adequately define the pain that people with fibromyalgia feel.

  7. People with fibromyalgia are more sensitive to musculoskeletal pain throughout their entire body, perhaps as a sign of a lower pain threshold.[ ]

- *Current findings on "objective symptoms"*
  1. Recent data indicate that most but not all fibromyalgia research experts believe that fibromyalgia patients present mainly with subjective symptoms.
  2. There are no generally accepted objective fibromyalgia illness markers.[14]

- *Current findings on "treatment"*
  1. The research data show no evidence that most therapies usually employed in FM have any substantial long-term benefit. Myriad treatment programs have sprung up. There is little scientific rationale

---

[10]
[11]
[12]
[13]
[14]

and research support for most of these interventions, and it seems clear that many FM treatments initiatives promote medicalization and **prolonged illness**"[15]

2. Narcotics are generally not recommended to treat pain in fibromyalgia patients.

3. It is necessary for patients with **chronic** pain to understand their condition. This requires **willingness** on the part of treating **physicians** to be generous with their time spent with the patient to explain the newest of insights **in the condition** so as to obtain maximum cooperation in the proposed treatment program.

4. A recent editorial proposed that "it may well be better not to treat patients with our well known but hardly effective armamentarium **of drugs**". "In many patients with FM the problem is not so much FM, but psychosocial issues, **inappropriate pain behavior and sometimes somatization**".[16]

5. Aerobic exercise is effective in **preventing** physical deconditioning brought about by inappropriate forced inactivity.

6. **Cognitive behavioral** therapy when indicated appears to show promise.

- Chronic myalgia and "disability"

1. It is estimated that between 10 - 12% of the general population experience chronic widespread body pain. Most do not see a physician for this symptom and proceed with the business of daily life.[17]

2. The majority of fibromyalgia experts are presently in agreement that fibromyalgia patients are not physically disabled.

3. Conversely, if chronic pain in patients with fibromyalgia not only plays a significant role but the more severe psychological impairment.

4. Physicians should discourage inactivity **and disability** in fibromyalgia patients because, if these are prolonged there is a detrimental effect on the prognosis".[18]

5. " We must limit the trend to label patients **with FM as disabled, and we must interfere with the** peculiar trend toward encouragement **of the disability** concept".[18]

- Current findings on the "etiology" **of unexplained** chronic body pain

1. No definitive cause for this nonexplained somatic pain symptom, as well as for other unexplained somatic symptom syndromes has been found, but investigators now postulate a common pathophysiologic pathway **or pathways**.[19]

15
16
17
18

2. They may view these unexplained **symptoms/syndromes** as the result of a "process" of interrelated and interconnected influences.

3. These interrelated and interconnected **influences** come from the environment, mind, brain and organ systems. Each interacts and **influences** the others. Authors refer to this etiology of illness as the Biopsychosocial Model of Illness.[21]

4. The old model of cause and effect, the **BioMedical Model**, which still applies to many diseases, has been discounted for this group of unexplained, subjective, functional symptoms/syndromes.

5. Patients with either a genetic predilection or cultural determinants, (stressors) or both, for emotional vulnerability and fragility are the more likely candidates for the expression of their psychological distress as physical symptoms.[22]

6. The physical expression of psychological **distress**, most often brought on by a variety of stressors is referred to by the psychological community as "somatization," and thought by the medical community (some physiologists) to be **the result** of altered CNS function, the exact pathophysiology of which remains unresolved at this time.[23]


## SOME STATEMENTS AND REFLECTIONS GLEANED FROM RECENT FIBROMYALGIA LITERATURE:

1. Chronic widespread musculoskeletal pain (fibromyalgia) is seen as a continuum existing in the general population. The pain is within most individuals and does not require involvement with the muscles of over pain.[?]

2. The end of this continuum is composed of individuals with moderate to severe pain often accompanied by tenderness, fatigue, **poor sleep** and symptoms of concomitant **psychological distress**.[?]

3. Tender areas in several regions of the **body (tender points)** do not adequately define the pain of fibromyalgia. These individuals are **more sensitive** to musculoskeletal pain throughout their entire body and are victims of their lowered **pain threshold**.[?]

---

20
21
22
23
24

4. Upon agreement with the medical community, the label of fibromyalgia is most often attached to these individuals to describe their widespread body pain. This label does not define a physical disease condition.

5. Fibromyalgia is best interpreted as a syndrome of functional symptoms. Each medical specialty has at least one of these medically unexplained or functional syndromes, not adequately explained by physical disease processes.

6. Recent studies in neurophysiology addressing stress induced changes in CNS chemical mediators, and studies in psychology addressing heightened somatization show encouraging results in a proper diagnosis and coordination of functional somatic syndromes.

7. "Education about the nature of this disorder is of paramount importance. Some patients who present with symptoms of FM want only to be told that this is a non-progressive condition that is not causing damage or inflammation in the body". The remainder need to have this explained to them.

8. Appropriate management of fibromyalgia patients consists of attention to all potential aspects of this diagnosis, including:
   i. Identification and amelioration of psychological and environmental physical stressors.
   ii. Identification of the nature and severity of all aspects of psychological distress underlying this syndrome and their appropriate treatment with pharmaceutical agents and professional consultation whenever necessary.
   iii. Physical and occupational therapy and rehabilitation attention as necessary.

Treatment with a primary care physician, in this case, or a rheumatologist attending to all the aspects of the illness suffices in most cases. In cases presenting with severe psychological symptoms, a psychological consultation for diagnosis and treatment is in order.

9. Fibromyalgia, when recognized, approached and treated in this fashion affords the patient the best chance for leading a happier and productive life.

## Conclusion

Much has been accomplished in fibromyalgia research in the last ten years, and much remains to be done. Today, most would agree, we have more answers that we did not have yesterday. More answers will come tomorrow. It is the duty of

all of us who deal those with fibromyalgia claimants to stay current with the latest findings. All of us at UnumProvident, claims consultants, nurses, vocational rehab resources, psychologists, and physicians, need to acquaint ourselves with every new finding so as to better serve our fibromyalgia claimants. Only in this way are we able to assist them and their physicians in their return to wellness.

## REFERENCES

1. **Hunder GG**. Editorial: The Use and Misuse of Classification and Diagnostic Criteria for Complex Diseases. Ann Intern Med 1997;

2. Ibid

3. Gabriel SE. Classification Of Rheumatic Diseases. In: Klippel JH, Dieppe PA, eds. Rheumatology, 2nd ed. London: Mosby, 1998;13.1/4

4. Ibid

5. Hunder GG. The Use and Misuse

6. Barsky AJ, Borus JF. Functional Somatic Syndromes. Ann Intern Med 1999;56:910-21.

7. Aaron LA, Buchwald D. A Review of the Evidence for Overlap Among Unexplained Clinical Conditions. Ann Intern Med 2000;134 Supplement part 2:868/81

8. Clauw DJ. Musculoskeletal Pain and Evaluation. In: Ruddy S, ed. Kelley's Textbook of Rheumatology, 6th ed. Philadelphia: Saunders, 2001.

9. Hadler, NM. Fibromyalgia, Chronic Fatigue and other Iatrogenic Diagnostic Algorithms: Do labels escalate illness in vulnerable patients? Postgrad Med 1997;102:161

10. Clauw DJ. Give Rheumatologic Basis of FMS and Related Syndromes. Cleve Clin J Med 2000;68

11. Clauw DJ. Quertions and th Barges in the Diagnosis of Fibromyalgia Syndrome. Journal of Musculoskeletal Medicine 1995.

12. Ibid

13. Mikkelsson M, et al. Muscle and Bone Pressure Pain Threshold and Pain Tolerance in Fid Patients. Arch Phys Med Rehabil 1992

14. Goldenberg DL. Fibromyalgia: Why Such Controversy? Ann Rheum Dis 1995

15. Wolfe F. Editorial: The Fibromyalgia Problem. J Rheumatol 1997;24:1247-49

16. Ibid

16. Goldenberg DL. Fibromyalgia Syndrome a Decade Later

17. Ibid

18. Wolfe F. The Fibromyalgia Problem

19. Winfield JB. Pain in Fibromyalgia. Rheumatic Disease Clinic of North America 1999;25: ___-___.

20. Engel GL. The Need for a New Model: A Challenge for Biomedicine. Science 1977;196:___-___.

21. Barsky AJ, Borus JF. Functional Somatic Syndromes. Ann Intern Med 1999;130:910-21.

22. Winfield JB. Does Pain in Fibromyalgia Reflect Somatization? Arthritis and Rheum 2001;44:___-___.

23. Goldenberg DL. Soft Tissue, Fibromyalgia and Related Syndromes. In: Klippel JH, Dieppe PA, eds. Rheumatology 2nd ed. London: Mosby, 1998 ___-___.

24. Clauw, Daniel J. Elusive Syndromes

25. Cranees G, Littlejohn G. Pressure Pain Threshold in FM Syndrome. Arch Phys Med Rehabil 1992;73:___-___.

26. Clauw, Daniel J. Musculoskeletal Pain and Evaluation

28. Sharpe M, et al. Innovations in Symptoms Management. Ann Intern Med 2001;134 Part 2 Supplement: ___-___.

IV.    SOME NOTABLE QUOTES ON FIBROMYALGIA

- Dr. George E. Ehrlich, in his review of The Oxford Textbook of Rheumatology Vol. I & II, 2nd ed. "I am pleased that Brian Hazleman sees fit to end his discussion of fibromyalgia approvingly citing Simon Carette."

(Dr. Simon Carette states) "Physicians have taken an entity that existed for centuries, given it a new name and created a major health issue by elevating it in importance and suggesting it deserves disability coverage."

Dr. Ehrlich comments on it thus:
"This echoes statements in the Klippel-Dieppe (Rheumatology) Text I recently reviewed. Perhaps if enough texts address this contentious and subversive issue, the mischief caused by physicians who champion the painful syndromes as incurable and compensable disease and contrive causal relationships to trauma and childhood abuse can be mitigated."

Ehrlich, George E. Reviewer, JAMA, October ?, 1998, Vol.280, No.13, pp.1198-1199

- Dr. Sherine E. Gabriel notes (in her chapter on Classification of Rheumatic Diseases in the 2nd edition of Rheumatology edited by John Klippel & Paul Dieppe) that Cohen and Quintner have challenged the usefulness of the diagnostic criteria for fibromyalgia and notes that they feel that the diagnostic criteria "convey no pathophysiological insight and thereby have been validated via a circular argument in which the evidence on which the construct is based is taken as proof of its veracity."

Cohen M., Quintner J. Fibromyalgic Syndrome: a Problem of Tautology. Lancet. 1993; 342: 906-909

- Dr. Milton L. Cohen states:
"No distinctive tissue pathology, pathophysiology or psychopathology has been found."

Cohen, Milton L. & Quintner John L. Fibromyalgia, A Problem of Tautology. The Lancet. 1993;342: 906-908

- Dr. Arthur J. Barsky states:
"Somatic distress and medically unexplained symptoms have always been endemic to daily life, but the social and cultural characteristics of each era shape the expression, interpretation, and attribution of these symptoms.

Patients who have these symptoms today differ from their predecessors by being less relieved by negative findings...and less responsive to explanation, reassurance, and palliative treatment."

Barsky, Arthur J., Borus, Jonathan F. Functional Somatic Syndromes. Annals of Internal Medicine. 1999;130 (11): 910-921

- Dr. Warren D. Blackburn states:
"There is no evidence that fibromyalgia is a crippling or incapacitating disorder or is a prodrome for a more serious illness."

Blackburn, Warren D. Fibromyalgia. Southern Medical Association – Southern Medicine. 1998; 85(2): 3-5.



- Dr. Frederick Wolfe comments: On tender points... **"A notorious unreliable an manipulable exercise."**

  On patients with fibromyalgia... "There is mounting **evidence** that many patients have major affective, somatization, and personality disorders."

  On fibromyalgia... "There is little evidence to support that FM (fibromyalgia) is a disease, and many of us who helped develop the FM construct still **consider it a syndrome.**"

  On treatment...."It seems clear that many FM treatment initiatives promote medicalization and prolong illness."

  The Fibromyalgia Problem. Frederick, Wolfe, *The Journal of Rheumatology.* 1997: 24(7): 1247-1249

- Dr. Nortin Hadler comments:
  On tender points... "I have serious reservations about asserting that tender points can be used to define a discrete pathological entity. Many patients **with all sorts of chronic illness – and some** healthy persons – find the pressure of the examining **finger uncomfortable.**"

  On fibromyalgia... "The debate rages as to whether **the illness is a** consequence of an underlying somatodysthymia, this is a form of illness behavior magnified by the medical model for care. I am of the latter school."

  Fibromyalgia, Chronic Fatigue and Other Iatrogenic **Diagnostic Algorithms.** Hadler, Nortin M. *Postgraduate Medicine.* 1997: Vol. 102, No. 2, 161-176

- Dr. Ioana Smith comments:
  "We agree with Wolfe that the tender points can be **manipulated up or down.**  Also, I fear that he may be correct, in that detection of exaggeration... requires so much effort it almost will never be done."

  "I am every day ... with ineffective treatment. It is our **money** that is being used for wrongful claims and for the two industries of invalid assessments and subsidized but **ineffective therapies.**"

  Fibromyalgia: Can the Clinician L... Keep Staggering? More **Work Needed; More Tools Supplied.** Smyth, Hugh. *The Journal of Rheumatology.* 2000: 27(11): 2536-2539

- Dr. David Glass comments:
  On treatment... "Patients should be counseled on **the non-destructive nature of this** condition, as well as the fact that meaningful improvement rarely **occurs without** active participation on their part."



Other therapies for fibromyalgia... "Cognitive behavioral therapy (CBT) has generally been shown to be successful in treating patients with chronic pain syndromes such as fibromyalgia, since it helps to modify maladaptive or maladaptive behaviors and substitutes more effective mechanisms for managing symptoms and improving function."

"An exercise program for fibromyalgia patients needs to be designed with the goal of physical tolerance and long term compliance..." "The occurrence of post-exertional worsening of symptoms is reduced by utilizing low-impact conditioning programs, initiated at a slow pace (sometimes beginning at only 5 minutes per day) that is gradually increased over time."

Fibromyalgia Syndrome: An Update On Current Understanding And Medical Management. Clauw, Daniel J. Rheumatology Grand Rounds. 2000: 3(4)1-9

## V. BIBLIOGRAPHY/REFERENCES OF FIBROMYALGIA

The following bibliographic sources are not intended to represent a comprehensive review of all of the current literature on fibromyalgia, but rather are intended to provide support for the opinions/comments expressed in our position statements and our 2002 Understanding of Fibromyalgia.

1. Patients Who Amplify Bodily Sensations
   Barsky H. Arthur J. *Annals of Internal Medicine.* 1979;91:63-70.

2. 1990 Criteria For The Classification Of Fibromyalgia
   Wolfe, Frederick & Smythe, Hugh, et al. The *American College of Rheumatology.* 1990: 33(2): 160-172.

3. The American College of Rheumatology 1990 Criteria for the Classification of Fibromyalgia, Wolfe, Frederick. *Arthritis & Rheumatism.* 1990;33. 160-172.

4. Fibromyalgia Syndrome, A Problem of Tautology
   Cohen, Milton L, et al. *The Lancet.* 1993;342:906-909.

5. Fibromyalgia 20 Years Later: What Have We Really Accomplished?
   Dr. Crunsley. *The Journal of Rheumatology.* 1993; 590-593.

6. Fibromyalgia Syndrome and Myofascial Pain Syndrome: Do They Exist?
   Bohr, Thomas W. *Neurologic Clinics.* 1995;13(2): 365-384.

7. Is Fibromyalgia Caused by a Glycolytic Insult?
   Rudin, Norman M. *Cleveland Clinic Journal of Medicine.* 1996;63 (1): 85-27.

8. The Fibromyalgia Syndrome: A Consensus Report on Fibromyalgia and Disability.
   Wolfe, Fred. *The Journal of Rheumatology.* 1996; 23(3): 534-539.

9. What is the Future of Fibromyalgia?
   Goldenberg, Don L. *Rheumatic Disease Clinics of North America.* 1996; 22(2): 393-407.

10. Fibromyalgia and the Disability Dilemma.
    Bennett, Robert. *Arthritis & Rheumatism.* 1996;39(10): 1627-1632.

11. If You Have Chronic Pain, FM, You Can Stay Well.
    Hadler, Norm. *SPINE.* 1996; 21(20): 2397-2430.

12. The Relation Between Tender Points And Fibromyalgia Symptom Variables: Evidence That Fibromyalgia Is Not A Discrete Disorder In The Clinic
    Wolfe, Frederick. *Annals of Rheumatic Diseases.* 1997;56:268-271.

13. The Fibromyalgia Problem
    Wolfe, Frederick. *Journal of Rheumatology.* 1997;24(7):1247-1249.

14. Fibromyalgia Status of Long-term Care.

Gordon, Duncan A. *The Journal of Rheumatology*. 1997: 24, 1247

**15.** If A, Wheeler GM. Men With Somatic Complaints.
Beatty, Richard. *Clinical Cornerstone*. 1997: 998(8): 673-679

**16.** Fibromyalgia, Chronic Fatigue, And Other Iatrogenic Diagnostic Algorithms.
Hadler, Nortin M. *Postgraduate Medicine*. 1997: Vol. 102, No. 2, 161-176

**17.** Chronic Fatigue And Its Syndromes
Wessely, S., Hotopf, M., & Sharpe, M., et al. *Oxford University Press*. 1998

**18.** Fibromyalgia by Fred Rothstein
*The Oxford Textbook of Rheumatology*, Madisor, P.J., et al., 2nd ed. 1998

**19.** Chronic Pain Other Local Disease
Graven, Blaine E. *Rheumatology, Volume 1*. Klippel, J. & Dieppe, P. 2nd education. 1998: Section 1:
3-14

**20.** Fibromyalgia
Blackburn, Warren D. *SMJ Southern Medicine*. 1998:85 (2): 3-5

**21.** Work Disability And Soft Tissue Rheumatism
Reilly, Paul *The Journal of Rheumatology*. 1998:25(8): 1454-1455

**22.** Is Fibromyalgia A Distinct Clinical Entity? The Disapproving Rheumatologists's Evidence. Cohen, Milton.
*Baillieres Clinical Rheumatology*. 1998, Vol. 12, No. 3, pp. 421-425.

**23.** Functional Disability Forum.
Bradley, Russell J., et al. *American College of Physicians – American Society of Internal Medicine*. 1999:130
(11): 910-921.

**24.** Pain in Fibromyalgia
Winfield, John B. *Rheumatic Disease Clinics of North America*. 1999: 25(1): 55-79

**25.** Functional Somatic Syndromes.
Barsky, Arthur J. & Borus Jonathan F. *Annals of Internal Medicine*. 1999: 130(11): 910-921.

**26.** Questions and Challenges in the Diagnosis of Fibromyalgia Syndrome.
Clauw, Daniel J. *The Journal of Musculoskeletal Medicine 1999; June Supplement*. S7-S12

**27.** How Can I Manage Fibromyalgia?
Reilly, Paul A. *Annals of Rheumatic Diseases*. 1999: 125-126.

**28.** Hurting All Over
Grierson, Bruce. *The New York Times*. November 13, 2000: 78-82

**29.** Fibromyalgia Syndrome: An Update On Current Understanding And Medical Management. Clauw, Daniel
J. *Rheumatology Grand Rounds*. 2000.

**30.** 29. Fibromyalgia: Can Not Distinguish Between Simulation? An Observer-Blind Controlled Study.

Rheumatism, Russ et al. *The Journal of Rheumatology.* 2000: 27(11) 2671-2676

**31.** Smith "Stand And Deliver For You Are A Bold Deceiver": Faking Fibromyalgia
Wolfe, Fred et al. *Journal of Rheumatology.* 2000; 27(11):2534-2535

**32.** Fibromyalgia — Can It Be Distinguish It From Malingering? More Work Needed; More Tools Supplied.
Smythe, H. et al. *The Journal of Rheumatology.* 2000: 27(11): 2536-2539

**33.** Primary Care Rheumatology. Harris, Edward D. & Genovese, Mark C. *W.B. Saunders Company,*
Philadelphia, 2000.

**34.** Primary Care Rheumatology
Harris, Edward D. & Genovese, Mark C. MD. *W.B. Saunders Company, Philadelphia, 2000.*

**35.** A Clinical Approach to Count Of Fibromyalgia Tender Points (London Study)
Wolfe, Frederick, *The Journal of Rheumatology.* 2000: 27

**36.** What Use Is Fibromyalgia, What Use Is It?
Croft, Peter. *The Journal of Rheumatology.* 2000: 27

**37.** Fibromyalgia And Compensable Disability — Debate Over Medical, Socioeconomic, and Personal
Ramifications.  Clauw, Daniel J., & Nadler, Nortin M. *Medical Crossfire.* 2000: Vol 2, No.2, 50-61

**38.** Fibromyalgia and Other Forms of
*Textbook of Rheumatology,* Kelly, VI, 6th ed. s 801. pp 417-425

**39.** The Prevalence Of Widespread Pain and the Characteristics of Chronic Widespread Pain.
Macfarlane, Gary J., & Benjamin, Sidney & Silman, Alan J. et al. *Arthritis & Rheumatism.*
Vol 41, No. 9, 2001, 1397-1404 September 1998

**40.** Effort Testing in Patients with Fibromyalgia and Disability Incentives
Gervais, Roger O., Gerald M. Rosen, L. Russell, Paul Green, Lyle M. Allen III, Robert Ferrari, and Stephanie D.
Russell. *The Journal of Rheumatology, Vol. 28,* pp 1892-1899, 2001.

**41.** Drug Effects in the Treatment of Fibromyalgia
O'Malley, Heather et al. *Physical Medicine and Rehabilitation Clinics of North America, Vol 12, Number
3, August 2001,* pp 000-00

**42.** The Effect of Strength Training, Stretching and Aerobic Exercise on Muscle Strength and Cardiovascular
Function in Patients with Fibromyalgia: A Pilot Study.
Valim, V., Oliveira, LM., Et al. Natour J. *Arthritis Rheum.* 2002 Feb. 47(1): 22-8

## VI.    [illegible] PROCESS PROPOSAL

If felt to be appropriate (is each claim is unique and is **handled on its own merit**) it may be helpful to initiate a partner[illegible] with the insured and the insured's **attending physician** (and when appropriate with the insured [illegible] just [illegible] so that proper attention is being directed toward maximizing the insured's poten[illegible] for return [illegible] [illegible] above that the **treatment plan addresses appropriate return to work issues**

It is our belief that any such partnering attempts will be most successful if initiated as soon as possible (i.e. as soon as [illegible] of disability, is claimed or projected on the basis of documentation). If after a period of time (determined appropriate for that specific case) the return to work partnering attempt fails within the determined approved method of disbursement then initiate a review to determine why the partnering attempt failed (See 'Tool which may be helpful in addressing functional capabilities and claimed limitations in some reported cases of fibromyalgia.").

**Day** [illegible]

- [illegible] [illegible] from [illegible] Case *Specialist* (CCS)
  (See initial **Call Template in Appendix**)
  * Purpose: Information gathering, expectation setting
  — Please note: each claim is unique and should be handled on its own

**Day 6 -- Day** [illegible]

- [illegible] [illegible] nurse, and **nurse makes call to office**
  (See Nurse to Physician's Office Call Template in Appendix)
  * [illegible] [illegible]

- [illegible] [illegible] [illegible] attained to this point, the CCS will make a call to the physician
  (See Employer Call Template in Appendix)
  * Purpose: Convey information regarding claim handling and gather information regarding return to work (RTW) possibilities

- [illegible] [illegible] from appropriate treating providers as identified by calls to claimant [illegible] [illegible] [illegible] [illegible] by nurse using attached physician / psychologist template letters.
  * Purpose [illegible] [illegible] regarding the RTW where appropriate and validation.



**Day 11 – Day 15**

- CCS to touch base to discuss activities to date (i.e., conversations thus far, records ordered and if necessary, touching base and assist with the gathering of records). During this call, CCS will get any updates for claim handling process or decisions regarding claim handling, RTW plan where appropriate.
  - Purpose – Expectation setting

**Day 15 – Receipt of Medical Records**

- Follow up if needed to obtain all records ordered
- Call claimant if necessary to intervene if records not forthcoming

**After Receipt of Medical Records**

- Consult internal, or contract physician / psychologist
  - Purpose – To evaluate degree of impairment and identify RTW partnering potential

**After receipt of Medical Records**

- Physician / psychologist to determine if a physician peer to peer call is appropriate
  - Purpose – To clarify appropriate restrictions and limitations (R&L's) with treating provider and / or appropriate RTW plan
- Multi-specialty roundtable review of information on claim to date
  - Purpose – Treatment plan vs. Return to Work process vs. evaluation / validation
  - (determine appropriate claim direction)

  At this point the claim may be identified as one in which we will partner with claimant, employer and / or physician to effect an appropriate RTW or one which will primarily be managed with additional evaluation / validation activities. Multi-specialty roundtable conferences may be conducted with physician / psychologist in attendance. In the multi-specialty conference, if it is determined that partnering / RTW is not available, an evaluation / validation activity plan will be discussed using vocational, clinical and consultant input. <u>Claims identified as primarily psych and not supported with a physical disability will be transferred at this point to the appropriate impairment unit.</u>

- CCS should have regular phone contact with the claimant – at a minimum, once a month and preferably every two weeks.
  - Purpose – Drive claim to successful resolution

**TEAM Process for Fibromyalgia Claims[1]**
**[1]Fibromyalgia is a condition that, if alone, should be handled on its own merit[1]**

**Fibromyalgia** – claims with a co-morbid issue will be handled in the TEAM process. These claims will often have some co-existing diagnosis of illness.

- A claimant who is motivated to return to work in the near future.
- An actively engaged claimant who is supportive of a return to work plan
- The claimant is actively engaging in their care plan, participating in exercise, cognitive behavioral therapy, etc.

- An employer's active support of a return to work plan through a willingness to accommodate as required by the plan.

**Managing the return to the RTW process will provide for:**

- A follow-up process to carefully monitor the appropriate care and the clinical progress of the claimant
- A forum for discussing the claimant's RTW progress with the claimant, physician and employer
- A successful return to work generally within 1-3 months from the implementation of the return to work plan (varies under multiple scenarios)
- An active approach if necessary and resources to work with the employee to preserve most, if not all, RTW benefits
- Frequent contact status with the claimant by the Team nurse and CCS to insure the return to work plan is successfully implemented and providing the desired outcomes (No more than 2 weeks without a call)

If RTW does not occur within an appropriate timeframe, initiate steps to determine the underlying reason(s) of the failed RTW plan. This might include an evaluation and validation of the claimant's medical restrictions and an assessment of the claimed degree of limitations.

**IV.** TOOLS WHICH MAY BE HELPFUL **IN ADDRESSING FUNCTIONAL** CAPABILITIES AND CLAIMED LIMITATIONS **IN SOME REPORTED CASES OF** FIBROMYALGIA

- In order to most appropriately address an insured's claimed degree of limitations and functional capabilities, an understanding of the specific activities which the insured feels that he / she is incapable of performing and an understanding of the reason why they insured feels incapable of performing any such activities is needed. It is also helpful to have understanding of the activities an insured continues to feel capable of performing. This information is also needed to most appropriately utilize any of the following tools.

- The first tool is most useful in addressing claimed limitations and functional capabilities **and** which would be used for a failed return to work partnering attempt.
    - Clarifying actual daily activities
    - Appropriately focused Functional Capacity Evaluations (FCE's)
    - More psychological testing evaluations
    - Independent medical evaluations (IME's) (From a medical / physical standpoint or from a psych / neuro-psych standpoint)
    - Panel IME's (multi-specialty) consisting of a combination of medical and or psych specialists

- ... each and every claim and need needs to be addressed on its own individual merits. It is helpful to run through the process to utilize one, more, or a combination of the following tools

- **Clarifying Actual Daily Activities**

    Clarifying one's actual daily activities provides us with an understanding of what the claimant is "at best" doing and the minimal that is being performed. the "minimum" at which that claimant would be ... if a claimant was performing at minimal capacity of doing ... FCE would be inaccurate for that claimant to perform at a lower level than a FCE. This also information may be helpful in determining whether one's claimed or reported limitations are consistent with reality.

- **Appropriately focused Functional Capacity Evaluation (FCE's) with appropriate validity/credibility checks**

### FUNCTIONAL CAPACITY EVALUATIONS OF PATIENTS WITH FIBROMYALGIA AND/OR OTHER MEDICALLY UNEXPLAINED SYMPTOMS (SUCH AS CHRONIC FATIGUE SYNDROME)

The decision whether or not to include a standardized functional capacity evaluation in the overall assessment of a claimant with a diagnosis of fibromyalgia is based on careful medical analysis of the data in the file. Because many patients with the classic symptoms included in the fibromyalgia construct (pain and fatigue) will self-limit and not perform with full voluntary effort, the results may be significantly low on physical findings and may only be invalid. Suboptimal effort on physical activity, symptom magnification and a cognitive belief system that they should not physically exert themselves if accompanied by pain frequently distorts the actual physical capacity findings.

Because there is a great deal of data about actual physical capacity that can be obtained from a detailed description and analysis of daily activities and the degree of self-limitation, an FCE may not contribute a great deal of additional data unless the claimant is motivated to return to work and is therefore likely to give a complete effort when required to assess actual physical capacity. A sub-optimal exam with low credibility and validity does not support a conclusion of the actual capacity rather it will describe a described physical capacity of less capacity than demonstrated.

Functional performance measures on claimants who have symptoms of fatigue and pain such as those diagnosed with fibromyalgia pose a special challenge, especially in the context of "impairment and Disability". Therefore, professionals performing a functional capacity evaluation (FCE) should have a strong clinical knowledge of musculoskeletal, neurological, and psycho-social evaluations, including ways of testing for validity, maximal effort, and symptom magnification. A physical therapist or occupational therapist group of persons the evaluation rather than other examiners. If a complex upper extremity evaluation is required, an occupational therapist with additional training as a certified hand therapist is preferred.

The results of standard physical capacity and grip activities that cannot be linked in add or loss is the **final** determination of disability.

A standard FCE, based upon work with chronic pain patients in general, should use the approach of an examination of joint, measures of strength, lifting capacity, grip strength.

A determination to establish validity should be performed early in the testing procedure if the evaluator is in question gets a credibility from early in completing the test evaluation. To verify, the evaluator needs to observe the activities of the person when not requested. Observation of the patient's activities during a security show of subject activities may assist in supporting validity.

Musculoskeletal validity and credibility testing should include:

- pulse/heart rate in pre change testing (looking for bell shaped curve)

- heart rate response to activities (noting change of heart rate with difficult activities or pain)

- correlation of pain behaviors with activities being performed

**Other** validity testing normally performed during various FCE protocols will assist in establishing validity, current level of function, and areas in need of rehabilitation.

**A well-performed FCE** will assist in establishing current functional status and current recommended **restrictions** and limitations.

FCE must be provide observed activities as well as a detailed musculoskeletal and neurological evaluation.

FCE providers should use in place their own **Validity and Reliability measures**. Raw data should be included and the test techniques used in regard to these Validity and Reliability.

- Gervais, R. O. FCE Testing in Patients with Fibromyalgia and Disability Incentives   J Rheum 2001, 28: 1315.

- Vanhoudenhove B. Fibromyalgia and Fatigue in Pain Critical Perspectives. Guilford Press, 1999

- Neuropsychological Testing / Evaluation:

The neuropsychological evaluation / testing assesses specific, cognitive skills. In summary, the neuropsychological evaluation / testing is most useful when there are specific complaints of cognitive dysfunction, when there are strong suggestions of cognitive dysfunction even without explicit claims, or when there is a need to determine whether or not there is a likely neurological condition underlying the claimant's complaints. Relevant review, formal testing for motivation and effort, and formal assessment of overall psychological functioning should routinely be included along with a formal assessment of neurocognitive capabilities. Recommendations for cognitive rehabilitation, if appropriate, would ideally be a part of the report.

In cases in which a diagnosis of medically unexplained symptoms is considered or when there are symptoms of medically unexplained symptoms, two types of neuropsychological batteries are proposed:

1. A screening or consulting battery would be useful in cases where cognitive complaints are made either by an informed party testing provider but these are not supported by formal neuropsychological/neuropsychological evaluation. In this case, we might want to obtain our own brief neuropsychological, abbreviated evaluation. This battery should include the relevant areas of cognitive functioning, as well as comprehensive assessing effort/motivation and emotional/personality functioning. This battery would consist of the basic WMS-III along with an abbreviated WAIS-III (including the Digit Symbol subtests of the two scales); a test of motor speed (either Finger Tapping Connors CPT-II); and two measures of frontal/executive functioning (Trail Making and either the Category test of Wisconsin Card sorting Test). Additionally, two comprehensive tests of cognitive symptom validity (a CARB, WMT, CARB, Victoria, VIP) and either the MMPI-2 or PAI would be included. The time needed for this battery should be substantially less than that required for the full neuropsychological evaluation. This battery is intended to serve as a means for determining objectively all related measurement or assisting in determining the direction of appropriate treatment. The screening battery should require about one-third to one-half that administration, scoring and interpretation of a full battery.

2. The full neuropsychological evaluation battery may be used as a follow-up to the screening battery and would also be employed in cases in which a treatment provider has submitted a formal cognitive assessment that was not sufficient or adequate for our evaluation of the claimed condition. The full neuropsychological evaluation battery does not always need to be done as a follow-up to the above screening battery. The full battery specifically includes The Wechsler Adult Intelligence Scales (WAIS-III), The Wechsler Memory Scale (WMS-III), The Halstead-Reitan Battery, comprehensive evaluation of emotional/personality functioning (MMPI-2, MCMI-III or PAI), and two comprehensive tests of cognitive symptom validity (WMT, CARB, Victoria, VIP). These tests and batteries have been used for a number of years to provide both statistical interpretations and also individual indices as well as more specific tests or subtest scores.

- Independent Medical Evaluations (IME's) and Panel IME's

In cases where it raises an is claimed on the basis of fibromyalgia or other syndromes of medically unexplained symptoms such as chronic fatigue syndrome, it is often helpful to discuss the file in a multi-specialty roundtable type process with combined medical/physical and psych/neuropsych input.

The combined medical / psych multi-specialty **approach** is helpful in determining whether any additional information may be needed from **either a medical /physical standpoint or from a psych/neuro-psych standpoint.** Furthermore, the above type of multi-specialty discussion helps ensured the most appropriate utilization of any one or combination of above tools.

How to handle cases in which there are both physical and psychological complaints: regarding defined conditions with unexplained physical symptoms such as fibromyalgia or chronic fatigue syndrome

As the term suggests, a defined condition with **medically unexplained** symptoms is characterized by reports of symptoms and the individual's perceived suffering that may or may not be accompanied by reports of associated signs or medical diagnoses (e.g., depression, anxiety, adjustment disorders) and/or complaints of cognitive dysfunction (e.g., disrupted concentration, memory, or attention). Sometimes, either the claimant's treating physicians or the in-house medical reviewers will have suggested a possible somatoform disorder. Because of these issues, such conditions (e.g., Fibromyalgia and Chronic Fatigue Syndrome) have also been termed "**Functional Somatic Syndromes**".

The critical issue for health care plans, supporting these population is to establish a partnership in which the assessment tools are used in a manner sequenced in a cost-effective, clinically correct, manner. An evaluation and selection of evaluation requirements may be needed during this process or if this collaborative process is not possible. One potential means of validation is the Independent Medical evaluation. In health care plans, psychological and/or cognitive components are assessed basis for disability, or when impaired is apparent and the implications and resources and/or extent of based on psych issue at hand, the formal psychological tool may be necessary.

- The emphasis on a psychological **role** is on psychological functioning and the impact of emotional issues on functional capacity. In the psychological tools the emphasis is on emotional components with a screening assessment of cognitive capacities, as compared to the neuropsychological tools with an emphasis is on cognitive evaluation and cognitive functioning, there is more of an emphasis on memory. Therefore, a comprehensive neuropsychological evaluation. The psychological tools should include records review and formal psychological testing in addition to the clinical interview. Recommendations, for example, for psychological testing such as inappropriate suggestions for psychotherapy, would usually be part of the report. The tools and test batteries usually used in this type of evaluation might include the Minnesota Multiphasic Personality Inventory, Million Behavioral Medicine Diagnostic, Beck Depression Inventory, etc. A psychological evaluation is usually accomplished via a comprehensive record review and a more indepth clinical interview. If a more in-depth cognitive evaluation is needed, consider the use of the Neuropsychological tools below.

1. If cognitive symptoms are a prominent and disclosed source of impairment, and particularly if there is any documentation to that effect (e.g. reports, testing or mental status evaluations) that support the claimed impairment, then cognitive testing will probably be most appropriate next.

2. If psychiatric symptoms are a prominent and disclosed source of impairment, and particularly when the psychiatric diagnosis is currently questionable, psychological testing and clinical data to determine the extent of functional disability should be included, but if used as the dominant focus of the examiner's evaluation assessing the need for further assessment.

3. Sometimes a combination of a medical/physical and psychiatric IME may be optimal. This is particularly true when there are significant reports of a combination of cognitive, physical and credibility. Most evaluators usually suggest a consultation first with the psychiatrist, who is the lead evaluator.

4. When a combination of a medical/physical and psychiatric IME evaluation is needed, the discrepancies between reported complaints and observed behavior.

5. If further evaluation is warranted on an IME basis from a medical/physical standpoint, then such input (in cases of fibromyalgia) best obtained by one or a number of appropriate medical specialists. Such an evaluation might include a rheumatologist, a neurologist, an internist, an occupational medicine specialist, and the specific.

6. A Functional Capacity Evaluation (FCE) is best obtained the dominant nature of the physical impairment reported, an appropriate physical specialist.

7. A medical (physical IME) assessed might be combined with a psych or neuro-psych IME component in certain situations depending on the nature and circumstances of the particular circumstances of the IME. An illustrative example might be to discuss the case in a multi-disciplinary type conference (with combined medical/physical and psych/neuro-psych input). The above multi-specialty approach may be useful in selecting the most appropriate specialties for a panel type IME. Such an approach may also be helpful in assuring that our concerns are appropriately conveyed to the IME, and that the IME receives all of the information required to adequately address our questions regarding the insured's condition and functional capabilities.



## CONTRIBUTORS

Edward C. Alvino, MD
Robert N. Anfield, MD, JD
Nancy Ball, MD
Norman Bress, MD
Alan Cusher, PhD
Marianne Justin
Les Kertay, PhD
Paul Matia, MD
Burton McDaniel, MD
Thomas McLeary, PhD

# APPENDIX – FIBROMYALGIA PROCESS PROPOSAL

- Customer Care Specialist Material

  - Fibromyalgia Initial Call Template
  - Employer Call Template

- Claim Material

  - Nurse to Physician's Office Call Template
  - Physician Peer to Peer Call Template

CCS-FIBROMYALGIA INITIAL CALL

Hello Mr(s). _____. My name is _____ and I will be the Customer Care Specialist handling your claim for Long-Term Disability benefits. If it is o.k. with you, I would like to take a few minutes in order to obtain an understanding of your current medical condition and discuss how we can assist you with returning to work.

As your Customer Care Specialist, I am responsible for obtaining an understanding of your current ability to return to work. During this evaluation, I will be partnering with you along with our medical and vocational resources as well as your treatment providers and (if appropriate) your employer in order to pursue a plan that will allow you to have a smooth transition back into the work force. Additionally please be aware that while we are pursuing your return to work, we will also be evaluating your eligibility for benefits according to the provisions of the policy under which you are covered.

Following our discussion of your medical condition, I will explain to you the applicable policy provisions in your policy and allow you to ask any questions you may have regarding your policy.

HISTORY

- To the best of your recollection, what were your first symptoms and when did they begin? (Consider getting records from that point; such records may be)
- What physicians have treated you for this condition and how were they diagnosed?
- How have your symptoms progressed since being diagnosed?
- What is your understanding of this condition?
- How did you come to the decision to stop working?
- How has the progression of your symptoms affected your ability to perform your occupation?
- If you were to return to work today, what parts of your job would you be able to do? What parts would be difficult for you? Can you think of any accommodations that your employer could make that would help you be able to work at your job?
- Did you ask for or did your employer make any accommodations for you while you were still at work? If so what were they and if which were they made?
- Can you think of any accommodations, which could be made in order to allow you to continue working? Have you discussed these with your employer?
- Tell me about other medical conditions that you are receiving treatment for.
- Have these conditions ever required you to miss work for an extended period of time?
- Are you able to drive? (esp. if cognitive deficits are claimed)

TREATMENT PLAN

- What is your physician's treatment plan? Have you and your physician discussed a return to work plan?
- What parts of your treatment plan seem to be helping the most?
- Based on your treatment, have you noticed any improvement in your condition?
- How is your returning to work being incorporated into this plan?
- When do you anticipate this return to work occurring?

- Which treatment providers have you seen and which are you currently seeing?
- Whom would you consider as your main/primary doctor? Would this be the doctor who would be responsible for your return to work plan?
- When was your most recent doctor's visit(s)? What visits do you have planned in the near future?
- Are you exercising regularly or doing physical therapy as part of your treatment plan?
- What medications including any herbal medicines or supplements are you currently taking? How long have you been taking these medications and have there been any recent changes? Who is prescribing these medications?
- Have you been referred to a psychologist, psychiatrist, counselor, or pastor for counseling or for testing?
- Have you received Cognitive Behavioral Therapy or discussed Cognitive Behavioral Therapy with your doctor?
- What testing has been completed or is planned to be completed? What were the findings of these tests?


EMPLOYMENT

- Can you please explain to me your usual duties of your occupation?
- Have there been any changes in your duties within the last two years?
- Did you enjoy your job? What part of your job did you enjoy the most and what part did you find the most challenging?

SOCIAL

- How do you spend your day? Can you please describe how these activities have changed?
- What parts of your regular household duties are you still able to do and what parts have become more challenging?
- Do you have children? (ages) Are you the sole caregiver for your children?
- Does someone currently assist you with your household duties? What assistance do they provide?

- Have you applied for or are you receiving any other disability benefits?
- Is there any activity that energizes you or makes you feel better?
- Are you involved in any outside activities such as social groups or support groups? How often do these activities?
- Do you have friends with whom you speak regularly about your condition?

# FIBROMYALGIA – EMPLOYER CALL

## Setting Expectations with the Employer

**Gather Information**
- Clarify the insured's occupational duties as described by the insured in the initial telephone call
- Ask if there have been any recent job changes/responsibilities
- Ask if the insured is still employed
- Ask if the job description we have in our file accurately describes the duties of the insured
- Performance Issues
- Ask if there have been any visible changes in productivity and if so, when did they start?
- Ask if the insured has experienced any personal conflicts at work – i.e., issues with coworkers or supervisors

**Discuss Return to Work Options**
- Establish employer's willingness to accommodate
- Ask if employer is/has allowed the insured return to work
- Discuss and verify any suggested accommodations required for the insured to return to work
- Ask if insured has indicated to the employer that he wants to return to work and his plans for doing so

NURSE TO PHYSICIAN'S OFFICE CALL

In order that we may obtain a more complete understanding of our insured condition, our Clinical resources will be contacting the treating physicians office for medical information regarding our Fibromyalgia claimants current diagnosis, treatment, medications, restrictions and limitations and prognosis.  We anticipate that this call will help determine where the claimants are in their treatment plan (or lack of) and prognosis.

- How long has (patient's name) been seeing (physician's name)?
  - What is the frequency of treatment?
  - Last appt?
  - Next appt?

- What are the current diagnoses/complaints cited in the records?

- What medication is the patient currently taking?

- What other physicians, health care professionals, exercise or physical therapists, etc. has the patient been referred to?

- Have you performed any functional stress examinations?

  - Did it reveal any abnormalities?

- Are you aware of any evaluation or treatment by a psychiatrist, psychologist or counselor?

  - Are you aware of any formal psychological or neuropsychological testing that has been done?
  - Are you aware of any referrals for evaluation or treatment along these lines?

- Does the claimant complain of depression, anxiety, panic attacks, insomnia, trouble eating, and memory problems, problems with concentration or in another cognitive functions?

- From the copies of record showing (diagnostic testing) i.e., MRI, CT scans, EMG, EEG, EKG, NCS, x-rays, etc.

- Do it indicate the need of a program using a treadmill, or suggesting?

- And since we have you could we could offer to (insured's name) which would assist in returning (insured's name) to his pre-disability functional capabilities?

Please add any additional information that you believe would be helpful.

## PHYSICIAN PEER TO PEER CALLS

**CLASSIFICATION OF FUNCTIONALITY**

**Are you open a discussion on how we might work together to help return your patient to work?**

**In what way is the patient functionally impaired?**

1. What is their activity level?
   - Can they work? Can they work in their occupation?
   - Soon?
   - Travel?
   - Volunteer activities?
   - Care for children?
   - Care for pets?

2. What object, if any, has there been on patient's ADL's?

3. What objective measurements have been obtained to support impairment?

4. Has there been graded exercise testing either on **a treadmill** or a cycle-ergometer to determine maximum oxygen consumption?

5. If there is range of motion impairment noted in **the file**, has the ROM impairment been measured (e.g., with a goniometer)? "Pain with no ROM limitation constitutes no impairment." (article in Journal Of Insurance Medicine 2000, volume 32:176-182)

**COGNITIVE ISSUES**

**Has the insured** complained of problems with memory, concentration, or other cognitive functions? **Have you observed problems in these areas?**

1. How have they been documented?
2. Formal Mental Status Examination? If so, what were the results?
3. Formal neuropsychological testing? If so, what were the results, or can you tell us who did the testing? Will this alter your clinical reasoning in any way?

**Has the** patient complained of or exhibited signs of depression, anxiety, appetite changes, sleep disturbance, **or any** other somatic symptoms?

1. How have you addressed these?
2. Has there been a psychiatric referral?
3. A referral for psychotherapy or counseling?
4. To what extent do you think these issues impact **the insured's symptoms?**
5. To what extent there are emotional issues that **impact the symptoms, such as your motivation, symptom exaggeration, secondary gain, job-site or home stress, or a tendency to express emotional issues through physical complaints?**
6. If the patient wanted to return to work, would **you support this?**

## THERAPY

1. What therapy has been tried?
2. What has been the response?
3. How about non-pharmacological intervention?
4. Cognitive behavioral therapy?
5. [illegible] and the next?
6. [illegible] in his study?
7. What was attempted?

## RETURN TO WORK

**If the patient wanted to return to work, would you support this in his/her occupation?**

1. Discuss the benefits of a return to work on patient's overall health and well being.
2. Discuss corporate wellness return to work philosophy and how we are willing to commit clinical and [illegible] with the treating **provider** and employer to help patient/claimant return to [illegible].
3. [illegible]

# EXHIBIT

# "15"

EXHIBIT "15"

## BEFORE THE INSURANCE COMMISSIONER
## OF THE STATE OF CALIFORNIA

In the Matter of the
   Certificates of Authority of

UNUM LIFE INSURANCE COMPANY
OF AMERICA,

PROVIDENT LIFE AND ACCIDENT
INSURANCE COMPANY, and

THE PAUL REVERE LIFE INSURANCE
COMPANY,

               Respondents.

DECISION AND ORDER OF INSURANCE
COMMISSIONER UPON SETTLEMENT

File No. DISP05045984

File No. DISP05045985

File No. DISP05045986

WHEREAS, the Insurance Commissioner ordered an investigation be conducted into the business practices of Respondents, including an on-site examination of Respondents' claims, rating and underwriting practices; and

WHEREAS, Respondents acknowledge receipt of a copy of the Accusation in the above-entitled matter; and

WHEREAS, Respondents neither admit nor concede any actual or potential fault, wrongdoing or liability in connection with the allegations contained in the Accusation; and

WHEREAS, the Department of Insurance contends that the violations alleged in the Accusation, if heard and proved, would constitute grounds for the Insurance Commissioner to suspend Respondents' Certificates of Authority, impose civil penalties and issue an order prohibiting Respondents from engaging in the conduct at issue; and

WHEREAS, Respondents and the Department of Insurance have undertaken extensive discussions to resolve the issues in this proceeding, without either party admitting the other's

contentions, through compromise settlement without litigating the issues; and

WHEREAS, Respondents and the Department of Insurance have executed the California Settlement Agreement (CSA) attached hereto and incorporated by reference herein, and

WHEREAS, the terms of the CSA and the provisions of Section 12921(b)(1) of the Insurance Code require the Insurance Commissioner to approve the settlement of this matter, and

WHEREAS, this Decision and Order constitutes the approval of the Insurance Commissioner of the settlement of this matter upon the terms and conditions set forth in the CSA;

NOW THEREFORE, the Insurance Commissioner hereby approves the CSA and finds, without Respondents having had the opportunity to defend at a hearing, that Respondents, in certain instances, either individually or collectively, during the period with respect to which they were investigated by the Department of Insurance, engaged in the following acts or practices in violation of Sections 700 and 704 of the California Insurance Code:

- Knowingly applying a definition of "disability" in claims handling in a manner inconsistent with the definition of "total disability" set forth in California case law;
- Mischaracterizing the claimant's occupation and/or its duties in determining whether the claimant is disabled from performing with reasonable continuity the substantial and material duties of his or her own occupation;
- Selectively using independent medical examinations (IMEs) to Respondents' own advantage;
- Selectively using portions of medical records and IME findings to Respondents' own advantage;
- Overruling the opinion of the attending physician after Respondents' in-house medical personnel have conducted a "paper review" of the medical file;

- Overruling the opinion of in-house medical personnel who supported a finding of disability or the need for specific objective testing;

- Failing to train claims personnel adequately or correctly on the California legal definition of "disability," on how properly to evaluate a claimant's occupational duties, and on other policy provisions relevant to conducting a fair, thorough, objective claim investigation;

- Mischaracterizing nonsedentary nursing occupations as sedentary, then requiring nurses disabled from performing nonsedentary occupations to find work in sedentary nursing occupations (e.g., as a utilization review nurse) during the "own occupation" coverage period;

- Targeting certain types of claims for "resolution" (i.e., denial or termination of benefits) in the interest of improving "net termination ratios" – that is, for reasons other than the merits of individual claims or fair, thorough, objective investigations into those claims, such claims generally arising out of high benefit, noncancellable long term disability income policies previously heavily marketed, which had become costly for the company through increasing claims;

- Determining predominantly through an analysis of billing records that medical specialists are able to perform his or her 'own occupation' even though unable to perform with reasonable continuity the substantial and material duties of the specialty itself (e.g., surgery, delivering babies, chiropractic, etc.);

- Misapplying the partial and/or residual disability provisions in the policy;

- Inappropriately using aggressive surveillance on a claimant and misusing the results;

- Characterizing certain disabling conditions as "self-reported" (e.g., pain, limited range of motion, weakness), then accepting only objective test results to support disability resulting from these conditions even though no policy provision requires objective test results;

- Failing to request that the IME perform objective testing that could support a finding of disability resulting from a "self-reported condition," or ignoring objective test results from the IME that do support a finding of disability;

- Discounting objective test results by imputing the physiologically disabling condition to a "psychological component," thus triggering the "mental or nervous condition" limitation;
- Utilizing a policy provision limiting the "mental and nervous conditions" benefit to 24 months to unreasonably limit the time in which benefits are paid for physiologically-based disabilities, disabling on their own, which may or may not be accompanied by a psychological component;
- Including language in group policies that excludes coverage for pre-existing conditions "caused by, contributed to [by], or related to the disabling condition" or for "symptoms for which diagnostic treatment was performed or symptoms for which a prudent person would have sought treatment," so that a disabling condition would not have to have been diagnosed, treated or even in existence during the policy's pre-existing condition period for it to be excluded from coverage;
- Misapplying the "pre-existing condition" clause to deny meritorious claims, e.g., characterizing obesity as the pre-existing condition for a previously asymptomatic, undiagnosed and untreated musculoskeletal, cardiovascular, peripheral vascular, pulmonary or orthopedic disability;
- Offsetting for benefits it is only estimated the claimant might receive, instead of offsetting only for those benefits actually received by the claimant and appropriately offset under the law;
- Stating in correspondence to the claimant that the claimant must apply for Social Security Disability Income (SSDI) benefits in order to receive an unreduced benefit, when the policy contained no such duty;
- Failing to document claim files adequately regarding the so-called "roundtable" sessions at which substantive claims decisions were made;
- Failing to refer the claimant to the Department of Insurance in the event the claimant believes his or her claim has been denied or benefits have been terminated unfairly;

- Continuing to seek additional information where claimants have provided adequate proof of disability, thus unfairly shifting the burden of investigation to the claimant;

- Communicating to claimants under individual or government employer-sponsored group policies (i.e., policies not covered by ERISA) in a manner that could mislead the claimant into believing ERISA would apply, thus limiting a claimant's rights on appeal (among other things);

- Having an insured under an individual policy agree to make premium payments by payroll deduction/salary allotment, with the policy having no other connection to the employer, then asserting that the policy is employer-sponsored or employer-endorsed, therefore governed by ERISA;

- Paying a claim under a reservation of rights for extended periods of time, then terminating benefits and notifying the claimant of the company's intent to recover the benefits paid;

- Failing to disclose to the claimant additional benefits that might be available under the policy, e.g., a waiver of premium, a cost of living endorsement, a seat belt benefit;

- Compelling a claimant to accept an unreasonably low settlement offer through the above means and others, or resort to litigation.

## ORDER

The Insurance Commissioner hereby approves the CSA attached hereto and issued simultaneously herewith.

The Insurance Commissioner hereby approves the policy forms referenced in the CSA attached hereto.

Respondents are hereby ordered to fulfill each and every term and obligation set forth in the CSA, at the time and in the manner set forth therein.

Respondents are prohibited from engaging in the conduct set forth in the Findings enumerated above.

Respondents shall pay a civil penalty in the amount of $8,000,000.00.

Respondents shall pay the costs of the Department of Insurance in bringing the enforcement action herein, in the amount of $598,503.00.

Respondents shall pay all reasonable future costs of the Department of Insurance to ensure Respondents' compliance with the terms of the CSA. Respondents shall pay such costs within thirty (30) days of the receipt of an itemized invoice. Invoices for costs shall be issued on a quarterly basis, commencing on January 1, 2006.

Respondents shall pay that total sum of $8,598,503.00 to the Department of Insurance within thirty (30) days of Respondents' receipt of an invoice for said amount.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal this 3rd day of October, 2005.

        /s/
JOHN GARAMENDI
Insurance Commissioner

# EXHIBIT

# "16"

EXHIBIT "16"

Report of the

# Targeted Multistate Market Conduct Examination

As of December 31, 2002 ("Initial Review") and
February 29, 2004 ("Follow-Up Review")

For

## Maine Bureau of Insurance

## Massachusetts Division of Insurance

## Tennessee Department of Commerce and Insurance

And

**Forty-Nine Participating Jurisdictions:** Alabama, Alaska, American Samoa, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin and Wyoming

Of

## Unum Life Insurance Company of America
NAIC Company #62235
Portland, Maine

## The Paul Revere Life Insurance Company
NAIC Company #67598
Worcester, Massachusetts

## Provident Life and Accident Insurance Company
NAIC Company #68195
Chattanooga, Tennessee

## NAIC Group # 0565

## November 18, 2004

Contents

| Topic | Page |
|---|---|
| Salutation | 1 |
| Foreword | 2 |
| Background and Scope of Examination | 2 |
| Profile of the Companies | 4 |
| Claim Selection Methodology | 5 |
| Areas of Concern | 6 |
| Plan of Corrective Action | 10 |
| Report Submission | 14 |
| Exhibit A | |
| Exhibit B | |
| Exhibit C | |
| Exhibit D | |
| Exhibit E | |
| Exhibit F | |

## RACKEMANN, SAWYER & BREWSTER

PROFESSIONAL CORPORATION
COUNSELLORS AT LAW
ESTABLISHED 1886

ONE FINANCIAL CENTER
BOSTON, MASSACHUSETTS 02111-2659
TELEPHONE 617-542-2300
FACSIMILE 617-542-7437
www.rackemann.com

November 18, 2004

Honorable Alessandro A. Iuppa
Superintendent
State of Maine
Bureau of Insurance
124 Northern Avenue
Gardiner, ME  04345

Honorable Julianne M. Bowler
Commissioner of Insurance
Commonwealth of Massachusetts
One South Station
Boston, MA 02110

Honorable Paula A. Flowers
Commissioner
State of Tennessee
Department of Commerce and Insurance
500 James Robertson Parkway - 5th Floor
Davy Crockett Tower
Nashville, TN  37243-1162

To:    The Chief Insurance Regulator of Each of the Jurisdictions Participating in the
Targeted (Disability Income) Multistate Examination

Dear Superintendent Iuppa, Commissioner Bowler, Commissioner Flowers and the Chief
Insurance Regulators of the Participating States:

Pursuant to the authority granted by Section 24-A *Maine Revised Statutes
Annotated*, Chapter 175 *Massachusetts General Laws* Section 4 and *Tenn. Code Ann.* §
56-1-408, your instructions, and in accordance with the *NAIC Handbook on Market
Conduct Examinations*, a targeted multistate examination has been conducted of the
disability income claim handling practices of:

**Unum Life Insurance Company of America ("Unum")**
**The Paul Revere Life Insurance Company ("Revere")**
**Provident Life and Accident Insurance Company ("Provident")**
(collectively, the "Companies")

The report of examination is herewith respectfully submitted.

RACKEMANN, SAWYER & BREWSTER
November 18, 2004
Page 2

## Foreword

The report on the targeted multistate market conduct examination of the

Companies is provided pursuant to the *NAIC Market Conduct Examiner's Handbook,*

*Chapter VI.* This report is made by exception, i.e. it omits discussion of those claim files

reviewed during the examination that did not show improprieties.

## Background and Scope of Examination

On January 7, 2003, the Massachusetts Division of Insurance initiated a targeted

market conduct examination of the individual disability income ("IDI") claims handling

practices of Revere. That examination was organized into two phases. The first phase

involved the review of Revere's IDI policy forms, claim administration manuals, claim

training manuals, claim administration and organizational charts. The second phase of

the examination involved the review of a random sample of 100 IDI claim files, the

selection methodology for which is described in further detail below.

The Tennessee Department of Commerce and Insurance had initiated a market

conduct examination of Provident's disability income business as part of its financial

examination as of December 31, 2000. The market conduct examination focused on

litigated disability income claims. The resulting examination report did not refer to

market conduct issues due to the initiation of the multistate examination described below.

RACKEMANN, SAWYER & BREWSTER
November 18, 2004
Page 3

On September 2, 2003, a multistate targeted market conduct examination was commenced by the Maine Bureau of Insurance, the Massachusetts Division of Insurance and the Tennessee Department of Commerce and Insurance concerning, respectively, Unum, Revere and Provident. Each domiciliary state acted as the Lead State (as defined in the *Market Conduct Examiners Handbook* adopted by the National Association of Insurance Commissioners ("NAIC")) for its respective domiciled company, and the other two Lead State chief regulators were Active Participants. All fifty states, the District of Columbia and American Samoa chose to act as Participating States in the multistate examination.

The multistate examination addressed claims handling practices for both IDI and group long term disability ("LTD") policies. The first phase of the multistate examination involved the review of policy forms, claim administration manuals, claim training manuals, claim administration and organizational charts. The second phase of the multistate examination involved the review of a random sample of 200 Provident and Unum claim files, the selection methodology for which is described in further detail below. After the completion of the second phase of the multistate examination, an update review of a random sample of 75 additional Provident, Revere and Unum claim files was performed, as further described below.

The purpose of the multistate examination was to determine if the disability income claims handling practices of the Companies reflected systemic "unfair claim settlement practices" as defined in the *NAIC Unfair Methods of Competition and Unfair and Deceptive Acts and Practices in the Business of Insurance Model Act* (1972) or *NAIC*

RACKEMANN, SAWYER & BREWSTER
November 18, 2004
Page 4

*Claims Settlement Practices Model Act* (1990) (collectively, the "Model Act"), and

particularly, as defined in ME. REV. STAT. ANN. tit. 24-A, § 2164-D(3), (4) & (5); MASS.

GEN. LAWS ch. 176D, § 3; and TENN. CODE ANN. § 56-8-104(8). The claim file reviews

were conducted in the Worcester, Massachusetts and Glendale, California offices of the

Companies during the months of June, November and December 2003 and April 2004.

### Profile of the Companies

Unum, Revere and Provident are subsidiaries of UnumProvident Corporation

("the Parent Company"), a Delaware corporation. The Parent Company is the result of a

merger between Unum Corporation and Provident Companies, Inc. on June 30, 1999.

Previously, on March 27, 1997, Provident Companies, Inc. had acquired The Paul Revere

Corporation. The four primary operations centers for the Companies are located in

Chattanooga, Tennessee, Portland, Maine, Worcester, Massachusetts and Glendale,

California.

Unum, a Maine corporation, primarily markets short term disability and group

and individual long term disability insurance as well as long term care insurance and

group life insurance. It is licensed to transact business in the District of Columbia and all

states, except New York. Revere, a Massachusetts corporation, primarily markets

individual long term disability insurance. Revere is licensed to transact business in all

fifty states and the District of Columbia. Provident, a Tennessee corporation, primarily

markets individual long term disability insurance as well as life insurance through an

employee-paid voluntary benefits program. It is licensed to transact business in the

District of Columbia and all states, except New York.

RACKEMANN, SAWYER & BREWSTER
November 18, 2004
Page 5

The Parent Company uses common management and processes in the administration of the business for Unum, Revere and Provident as well as for its New York subsidiary, First Unum Life Insurance Company.   Specifically, the UnumProvident Companies adjust claims for each member insurer from common locations using common procedures.  The issues identified by the Multistate Examination are therefore assumed to also be present for each member company.  The Companies and their New York affiliate are ranked first in market share—based on annual premium—in both IDI and LTD insurance and in group short term disability insurance, according to the 2003 JHA U.S. Group Disability Market Survey and the JHA 2003 U.S. Individual Disability Market Survey published in April 2004.

### Claim Selection Methodology

The multistate examination team requested the Companies to provide a comprehensive database including all claims closed during 2002.  Initially, 300 claim files randomly selected from IDI and LTD claims closed during 2002, or for which benefit determinations were appealed or litigated during 2002, or claims open as of year-end 2002 were reviewed (the "Initial Review").  The Initial Review comprised 100 claims each for Unum, Revere and Provident. The proportion of selected IDI and LTD claims was based on the relative reported reserves for each company as of December 31, 2002.  Based upon representations by the Companies that a number of changes in claim administration were implemented during 2003, the examination team subsequently reviewed 75 claim files (25 each for Unum, Revere and Provident) which were randomly selected from the Companies' IDI and LTD claims for which benefit determinations were

RACKEMANN, SAWYER & BREWSTER
November 18, 2004
Page 6

first appealed during the period of December 2003 through February 2004 ("the Follow-

up Review"). Exhibit "A" depicts the distribution of such claims by company, by line of

business and by category for both the Initial Review and the Follow-up Review,

including the total number of claims in the population, and the claims randomly selected

for review. Exhibit "B" depicts the distribution of the claims included in the Initial

Review by the state of residence of the claimant. Exhibit "C" depicts the distribution of

the claims included in the Follow-up Review by the state of residence of the claimant.

### Areas of Concern

The Initial Review of 299 claim files (the Companies were not able to locate one

claim file which had been selected for review) noted several general areas of concern,

which applied to the Companies' handling of both IDI and LTD claims. The

examination team identified no material differences in claim handling among the

individual companies or among their claim offices. The general areas of concern

included the following:

     1.    <u>Excessive reliance upon in-house medical professionals</u>: The Companies

have invested significant resources in the creation of a staff of physicians and nurses

whose function is to provide support to and education of claim handling personnel.

These in-house medical professionals include both full-time and part-time employees.

The Companies also use the services of medical professionals who are independent

contractors. These medical professionals review medical records of claimants and

provide interpretation and analysis of such records to the claim staff who are ultimately

RACKEMANN, SAWYER & BREWSTER
November 18, 2004
Page 7

responsible for making the claims decisions.   In certain instances, in-house medical

professionals will interact by telephone or by correspondence with attending physicians

or other treatment providers of the claimants.   In so doing, their objective is to determine

whether sufficient medical evidence exists for restrictions and/or limitations which will

be used to determine if the claimant meets the policy's definition for total, partial or

residual disability.   In-house medical professionals do not examine or otherwise interact

with claimants directly.   The Companies' insurance contracts generally allow the

Companies to require claimants to submit to an independent medical examination

("IME") conducted by a physician of the Companies' choice.   The examination team

identified numerous instances in which the Companies relied heavily upon the analysis of

their in-house medical professionals, and refrained from securing an IME.   In many such

instances, the Companies discounted or disputed the opinions of claimants' attending

physicians, but chose not to invoke the requirement that the claimant attend an IME.

Where there is conflicting medical evidence or conflicting medical opinions with respect

to a claimant's eligibility for benefits, the Companies have the ability to invoke the policy

provision and obtain an IME, and should do so.

      2.   <u>Unfair construction of attending physician or IME reports</u>: The

Companies' excessive reliance upon in-house medical professionals also suggests the

Companies' employment of such professionals often resulted in a Company bias and the

inappropriate interpretation or construction of medical reports, to the detriment of

claimants. In certain instances, this bias was reflected in the interpretation of attending

physicians' statements or medical records supplied by attending physicians.  In other

RACKEMANN, SAWYER & BREWSTER
November 18, 2004
Page 8

instances in which the Companies had obtained an IME, the reports supplied by the IME providers were narrowly or even incorrectly construed. The bias of the in-house medical professionals was also reflected in attempts to focus upon any apparent inconsistencies in the medical records or other information supplied by claimants, rather than attempt to derive a thorough understanding of the claimant's medical condition.

3.    <u>Failure to evaluate the totality of the claimant's medical condition</u>:  The examination team identified instances in which claimants who suffered from multiple medical conditions were denied benefits as a result of the Companies' apparent failure to properly evaluate the cumulative effects of such conditions.  In some instances, the Companies' failure to properly evaluate such "co-morbid" conditions appeared to stem from an excessively narrow focus upon the specific medical condition for which benefits had originally been sought by the claimant. By way of example, certain claimants exhibited a psychological "overlay" which was related to or may have resulted from an underlying medical condition. Although the Companies' claim handling may have included an evaluation of each separate condition, there was an insufficient effort made to assess the disabling effects of the conditions cumulatively.

4.    <u>Inappropriate burden placed on claimants to justify eligibility for benefits</u>: The examination team identified a significant number of instances in which benefits were denied by the Companies on the grounds that the claimant had failed to provide "objective evidence" of a disabling condition.  The Companies' policy forms do not require the claimant to provide such evidence.  Alternatively, the Companies in certain instances denied eligibility for benefits on the grounds that the claimant had failed to

RACKEMANN, SAWYER & BREWSTER
November 18, 2004
Page 9

submit particular medical test results which were deemed by the Companies to be critical

to an evaluation of the claim.    In such instances, the Companies could have obtained

such test results by ordering an IME and requesting that such tests be performed by the

IME provider.  In general, the examination team found evidence of the Companies' effort

to "shift" the burden of responsibility to the claimant to provide medical or other records

in support of the claim, rather than obtain such records through the use of authorizations

executed by the claimant.  These practices are particularly of concern for claimants

whose medical conditions may be interfering with their ability to interact with the

Companies' staff in the handling of their claims.

Following completion of the Initial Review, representatives of the Lead States and

the examination team met with representatives of the Companies in February 2004 to

review the foregoing areas of concern as they related to specific claims which had been

identified for discussion.    After additional explanation was provided by the Companies,

the examiners and the Lead States concluded that the level of claim handling errors

identified was sufficient to merit further review and regulatory action.

Following that meeting, the Lead States concluded that the examination team

should perform the Follow-up Review.  The objective of the Follow-up Review was to

assess the impact of claim administration changes reportedly implemented by the

Companies during 2003, specifically with respect to the areas of concern.  For that

reason, 75 claim files were randomly selected from the population of claims for which a

first appeal of an adverse claim determination had been filed during the three month

period from December 1, 2003 – February 29, 2004.  Following completion of the

RACKEMANN, SAWYER & BREWSTER
November 18, 2004
Page 10

Follow-up Review, representatives of the Lead States and the examination team again met with representatives of the Companies to review areas of concern as they related to specific claims which had been identified for discussion. After additional explanation was provided by the Companies, the examiners and the Lead States concluded that the level of claim handling errors identified was sufficient to merit further regulatory action.

After consultation with the Companies' senior management and the Board of Directors of the Parent Company, agreement in principle was reached between the Lead States and the Companies on the Plan of Corrective Action described below. This agreement obviated the need for additional investigation, review of a larger claim sample, specific claim findings or reaching a formal conclusion concerning the examination objective, thereby assuring, for the benefit of the Companies' policyholders, prompt implementation of a reassessment plan, changes in corporate governance and changes in claim handling procedures. All of these steps are described in greater detail in the attached Regulatory Settlement Agreement and implementing Consent Orders.

**Plan of Corrective Action**

The Lead States have designed a Plan of Corrective Action ("the Plan") with the Companies and their New York affiliate, to address the concerns raised by the examination. The Plan will be implemented through a regulatory settlement agreement or consent orders (collectively, "Agreement") entered into by each of the Companies with its Lead State regulator and subscribed to by at least two-thirds of the Participating States, unless a lesser number is agreed to by the Companies, and the United States Department of Labor. (Once the Agreement becomes effective, the Lead States are thereafter referred to as Lead

RACKEMANN, SAWYER & BREWSTER
November 18, 2004
Page 11

Regulators and the subscribing Participating States as Participating Regulators.)  In addition, the Companies' New York affiliate, First Unum Life Insurance Company, will enter into a similar agreement with the New York Superintendent of Insurance.  This Agreement is supported by the Office of the Attorney General of the State of New York.  The Agreement is included herewith as Exhibits "D", "E' and "F".  The Agreement provides for a penalty of $15,000,000, will provide for the assessment of substantial additional fines or other significant regulatory action should the Companies fail to comply with their terms, including the accomplishment of specified improvements in claim administration established in such Agreement.  The Lead Regulators will monitor the Companies' (including their New York affiliate) compliance with the terms of the Agreement at the Companies' cost through an established framework of quarterly reports and meetings as well as periodic examination of the reassessment process or general claim handling, and will conduct a full re-examination of the issues addressed by this examination within twenty-four months of the Implementation Date of the Agreement.

The most significant provisions of the Agreement are the following:

A.     Claim Reassessment Process:  The Companies will form a new Claim Reassessment Unit located primarily in their Worcester, Massachusetts and Portland, Maine offices (IDI and LTD claims, respectively), for the purpose of providing a "de novo" review of claims previously denied or terminated pursuant to a review procedure approved by the Lead Regulators.  Written notice of this reassessment process will be provided to eligible claimants (as outlined in the Agreement), representing approximately 215,000 claims, whose IDI or LTD insurance claims were denied or whose benefits were

RACKEMANN, SAWYER & BREWSTER
November 18, 2004
Page 12

terminated on or after January 1, 2000 and prior to the Implementation Date (as defined

in the Agreement).  The reassessment process will be open to eligible claimants who

elect to participate, as well as any other claimants who indicate an interest in participation

provided that the claim denial or termination of benefits took place no earlier than

January 1, 1997.  The Companies' performance will be subject to regulatory scrutiny and

monitoring, and the claim reassessment process will be subjected to further independent

review by agents of the Lead Regulators.

     B.    <u>Changes in Claim Organization and Procedures</u>:  The Companies will

implement changes to its claim organization and claim procedures with the following

objectives:

- The engagement of experienced claim personnel at the earliest possible stage of claim reviews

- Increased emphasis upon claim staff accountability for compliance with the terms of insurance policies and applicable law

- Increased involvement of higher levels of claim management staff in each claim denial or claim termination decision

- Creation of a separate compliance/accountability function at the claim denial and claim termination level

- Assurance that co-morbid conditions are properly evaluated at every level of claim review

- Increased utilization of IME's

- Additional compliance training for all claim staff, with emphasis upon the results of the multistate examination, the Plan, and the NAIC Unfair Claim Settlement Practices Act; and

RACKEMANN, SAWYER & BREWSTER
November 18, 2004
Page 13

- Additional training for group policyholder human resources personnel so as to better facilitate the process for LTD claims

C.    <u>Changes in corporate governance</u>:    The Companies will address regulatory concerns regarding corporate control issues by implementation of the following changes:

- The Board of Directors of the Parent Company will be expanded by three members, each of which will have significant insurance industry or insurance regulatory experience (two will have regulatory experience); each candidate will be approved by the Lead States

- The Audit Committee of the Board of Directors will be expanded by one member; at least one of the new members of the Board of Directors will be appointed to the Audit Committee

- The Board of Directors will establish a new Regulatory Compliance Committee, comprised of two of the new members of the Board, and three existing independent directors; the Regulatory Compliance Committee will have responsibility for monitoring compliance with the Plan and other compliance-related oversight functions; and

- The Companies will create a Regulatory Compliance Unit, which will report directly to the Regulatory Compliance Committee; the Regulatory Compliance Unit will monitor compliance with the Plan (including the functions of the Claim Reassessment Unit) through the performance of periodic audits, provide assistance to claimants to ease and facilitate the claim submission process, and gather data for the Lead States' ongoing monitoring of compliance with the Plan

D.    <u>Quarterly Meetings between the Lead Regulators and the Companies</u>:

The Lead Regulators and the DOL will meet separately with the Regulatory Compliance Committee of the Parent Company and with senior management of the Companies on a quarterly basis, to evaluate compliance with the Plan.   Participating States will be updated quarterly by the Lead Regulators, through the NAIC.

RACKEMANN, SAWYER & BREWSTER
November 18, 2004
Page 14

## Report Submission

The report of examination is herewith respectfully submitted.

Sincerely,

*[signature]*

J. David Leslie
Rackemann, Sawyer & Brewster, P.C.

Examiners:

*Rackemann, Sawyer & Brewster, P.C.*
Ronald S. Duby, Esq.
Margaret L. Hayes, Esq.
Fannie I. Minot, Esq.

*Monarch Life Insurance Company*
Kevin J. McAdoo, Special Deputy Receiver
John S. Coulton, Esq.
Claudia J. Reed, Esq.
Daniel T. Wright, Esq.

Acknowledgement

The assistance of Richard Kelly, an examiner appointed by the State of Nevada, in reviewing certain claim files during the Initial Review, is hereby acknowledged with appreciation.

Exhibit A

## UNUMPROVIDENT CLAIM SUMMARY BY COMPANY

### UNUM LIFE INSURANCE COMPANY OF AMERICA
**Initial Review**

| Line of Business | Category | Claims for Period | Reviewed |
|---|---|---|---|
| Group LTD | Litigated | 693 | 19 |
| | Pending | 70,319 | 19 |
| | Closed | 65,200 | 20 |
| | Appeals | 9,502 | 19 |
| | Sub-total | 145,714 | 77 |
| Individual DI | Litigated | 258 | 6 |
| | Pending | 6,087 | 6 |
| | Closed | 2,232 | 5 |
| | Appeals | 217 | 6 |
| | Sub-total | 8,794 | 23 |
| **TOTALS** | | **154,508** | **100** |

### UNUM LIFE INSURANCE COMPANY OF AMERICA
**Follow-up Review**

| Line of Business | Category | Claims for Period | Reviewed |
|---|---|---|---|
| Group LTD | Litigated | | |
| | Pending | | |
| | Closed | | |
| | Appeals | 1,292 | 19 |
| | Sub-total | 1,292 | 19 |
| Individual DI | Litigated | | |
| | Pending | | |
| | Closed | | |
| | Appeals | 20 | 6 |
| | Sub-total | 20 | 6 |
| **TOTALS** | | **1,312** | **25** |

### Provident Life and Accident Insurance Company
**Initial Review**

| Line of Business | Category | Claims for Period | Reviewed |
|---|---|---|---|
| Group LTD | Litigated | 186 | 5* |
| | Pending | 9,049 | 5 |
| | Closed | 4,872 | 5 |
| | Appeals | 1,406 | 5 |
| | Sub-total | 15,513 | 20 |
| Individual DI | Litigated | 369 | 20* |
| | Pending | 10,445 | 20 |
| | Closed | 7,549 | 20 |
| | Appeals | 364 | 20 |
| | Sub-total | 18,727 | 80 |
| **TOTALS** | | **34,240** | **100** |

### Provident Life and Accident Insurance Company
**Follow-up Review**

| Line of Business | Category | Claims for Period | Reviewed |
|---|---|---|---|
| Group LTD | Litigated | | |
| | Pending | | |
| | Closed | | |
| | Appeals | 118 | 5 |
| | Sub-total | 118 | 5 |
| Individual DI | Litigated | | |
| | Pending | | |
| | Closed | | |
| | Appeals | 52 | 20 |
| | Sub-total | 52 | 20 |
| **TOTALS** | | **170** | **25** |

* 25 Litigated files taken from 50 files provided in the 2002 Tennessee financial and market conduct exam

| *Paul Revere Life Insurance Company* | | | |
|---|---|---|---|
| **Initial Review** | | | |
| **Line of Business** | **Category** | **Claims for Period** | **Reviewed** |
| Group LTD | Litigated | | |
| | Pending (Open) | | |
| | Closed | | |
| | Appeals | | |
| | Sub-total | 0 | 0 |
| Individual DI | Litigated | 284 | 25 |
| | Pending (Open) | 7,750 | 25 |
| | Closed | 3,859 | 25 |
| | Appeals | 200 | 25 |
| | Sub-total | 12,093 | 100 |
| | | | |
| **TOTALS** | | **12,093** | **100** |

| *Paul Revere Life Insurance Company* | | | |
|---|---|---|---|
| **Follow-up Review** | | | |
| **Line of business** | **Category** | **Claims for Period** | **Reviewed** |
| Group LTD | Litigated Closed | | |
| | Pending (Open) | | |
| | Closed | | |
| | Appeals | 58 | |
| | Sub-total | 58 | 0 |
| Individual DI | Litigated Closed | | |
| | Pending (Open) | | |
| | Closed | | |
| | Appeals | 34 | 25 |
| | Sub-total | 34 | 25 |
| | | | |
| **TOTALS** | | **92** | **25** |

Exhibit B

## Distribution of UnumProvident Claim Selections by State (Initial Claim Review)

| State | Code | Revere - Individual | Unum- Individual | Unum - Group | Provident – Individual | Provident - Group | Provident - Litigation | Total |
|---|---|---|---|---|---|---|---|---|
| ALABAMA | AL | 0 | | 1 | 2 | | 1 | 4 |
| ALASKA | AK | 0 | | | | | | 0 |
| ARIZONA | AZ | 1 | | 1 | 2 | | | 4 |
| ARKANSAS | AR | 0 | | | | | | 0 |
| CALIFORNIA | CA | 9 | 1 | 9 | 4 | 1 | 5 | 29 |
| COLORADO | CO | 3 | | | 1 | 1 | | 5 |
| CONNECTICUT | CT | 1 | | 1 | 1 | | | 3 |
| DELAWARE | DE | 3 | | | | | | 3 |
| DISTRICT OF COL | DC | 1 | | 1 | | | | 2 |
| FLORIDA | FL | 8 | 4 | 5 | 7 | 1 | 5 | 30 |
| GEORGIA | GA | 3 | | 4 | 4 | 1 | | 12 |
| HAWAII | HI | 1 | | | | | | 1 |
| IDAHO | ID | 0 | | | | | | 0 |
| ILLINOIS | IL | 5 | | 2 | | | 1 | 8 |
| INDIANA | IN | 0 | | 3 | | | | 3 |
| IOWA | IA | 2 | | | | | | 2 |
| KANSAS | KS | 1 | | 1 | | | | 2 |
| KENTUCKY | KY | 2 | | 2 | 1 | 1 | 1 | 7 |
| LOUISIANA | LA | 2 | 1 | 1 | 2 | | | 6 |
| MAINE | ME | 0 | | 7 | | | 1 | 8 |
| MARYLAND | MD | 1 | | 1 | 1 | 1 | 1 | 5 |
| MASSACHUSETTS | MA | 4 | | 2 | 2 | 1 | | 9 |
| MICHIGAN | MI | 0 | 1 | 2 | 6 | 1 | 1 | 11 |
| MINNESOTA | MN | 0 | 1 | | | | | 1 |
| MISSISSIPPI | MS | 1 | | | | | | 1 |
| MISSOURI | MO | 1 | | | 1 | | 1 | 3 |
| MONTANA | MT | 0 | | 1 | | | | 1 |
| NEBRASKA | NE | 0 | | 2 | | | | 2 |
| NEVADA | NV | 1 | | 1 | | | | 2 |
| NEW HAMPSHIRE | NH | 0 | | 2 | | | | 2 |
| NEW JERSEY | NJ | 10 | 4 | 1 | 3 | | | 18 |
| NEW MEXICO | NM | 1 | | | | | | 1 |
| NEW YORK | NY | 11 | | 2 | | 2 | | 15 |
| NORTH CAROLINA | NC | 4 | | 2 | | 2 | 2 | 10 |
| NORTH DAKOTA | ND | 0 | | | | | | 0 |
| OHIO | OH | 3 | | 4 | 1 | | | 8 |
| OKLAHOMA | OK | 1 | | | 2 | | | 3 |
| OREGON | OR | 1 | 2 | | | | | 3 |
| PENNSYLVANIA | PA | 3 | 4 | 4 | 2 | 1 | 1 | 15 |
| RHODE ISLAND | RI | 2 | 1 | | 1 | | | 4 |
| SOUTH CAROLINA | SC | 1 | | 4 | 1 | 1 | | 7 |
| SOUTH DAKOTA | SD | 0 | | | | | | 0 |
| TENNESSEE | TN | 5 | 1 | 2 | 5 | 1 | 3 | 17 |
| TEXAS | TX | 0 | 1 | 6 | 6 | | | 13 |
| UTAH | UT | 0 | | | 1 | | | 1 |
| VERMONT | VT | 0 | 1 | | 1 | | | 2 |
| VIRGINIA | VA | 2 | | | 1 | | 1 | 4 |
| WASHINGTON | WA | 2 | 1 | 1 | 1 | | 1 | 6 |
| WEST VIRGINIA | WV | 2 | | | | | | 2 |
| WISCONSIN | WI | 2 | | 2 | 1 | | | 5 |
| WYOMING | WY | 0 | | | | | | 0 |
| **Total** | | 100 | 23 | 77 | 60 | 15 | 25 | 300 |

Exhibit C

***Distribution of UnumProvident Claim Selections by State (Follow-Up Claim Review)***

| State | Code | Revere - Individual | Unum - Individual | Unum - Group | Provident - Individual | Provident - Group | Total |
|---|---|---|---|---|---|---|---|
| ALABAMA | AL | | | | | | 1 |
| ALASKA | AK | | | | 1 | | 0 |
| ARIZONA | AZ | | | | | | 0 |
| ARKANSAS | AR | | | | | | 0 |
| CALIFORNIA | CA | 3 | 1 | 2 | 2 | | 8 |
| COLORADO | CO | | | | | | 0 |
| CONNECTICUT | CT | 1 | | 1 | | | 2 |
| DELAWARE | DE | | | 1 | | | 1 |
| DISTRICT OF COL | DC | | | 1 | | | 1 |
| FLORIDA | FL | 3 | | 1 | 1 | 1 | 6 |
| GEORGIA | GA | | | | | | 0 |
| HAWAII | HI | | | | | | 0 |
| IDAHO | ID | | | | 1 | | 1 |
| ILLINOIS | IL | 3 | 1 | | | | 4 |
| INDIANA | IN | | | | 1 | | 1 |
| IOWA | IA | | | 1 | | | 1 |
| KANSAS | KS | | | | | | 0 |
| KENTUCKY | KY | 1 | | 1 | 2 | | 4 |
| LOUISIANA | LA | | | 1 | | | 1 |
| MAINE | ME | 1 | 2 | | | | 3 |
| MARYLAND | MD | | | | | | 0 |
| MASSACHUSETTS | MA | 1 | | | 1 | | 2 |
| MICHIGAN | MI | 1 | | | 2 | 1 | 4 |
| MINNESOTA | MN | | | 1 | | | 1 |
| MISSISSIPPI | MS | | | | | | 0 |
| MISSOURI | MO | | | | | | 0 |
| MONTANA | MT | | | | | | 0 |
| NEBRASKA | NE | | | | | | 0 |
| NEVADA | NV | | | | | | 0 |
| NEW HAMPSHIRE | NH | | | | | | 0 |
| NEW JERSEY | NJ | 1 | | 1 | 1 | 1 | 4 |
| NEW MEXICO | NM | | | | | | 0 |
| NEW YORK | NY | 2 | 2 | 1 | 2 | | 7 |
| NORTH CAROLINA | NC | 1 | | 1 | 1 | | 3 |
| NORTH DAKOTA | ND | | | | | | 0 |
| OHIO | OH | 1 | 2 | | 1 | | 4 |
| OKLAHOMA | OK | | | | | | 0 |
| OREGON | OR | | | | | | 0 |
| PENNSYLVANIA | PA | 3 | | 1 | | | 4 |
| RHODE ISLAND | RI | | | | | | 0 |
| SOUTH CAROLINA | SC | | | 1 | | | 2 |
| SOUTH DAKOTA | SD | | | | | 1 | 0 |
| TENNESSEE | TN | 1 | | 1 | 1 | | 3 |
| TEXAS | TX | 1 | | 1 | | | 2 |
| UTAH | UT | | | | | | 0 |
| VERMONT | VT | | | | | | 0 |
| VIRGINIA | VA | | | | | | 0 |
| WASHINGTON | WA | 1 | | | | 1 | 1 |
| WEST VIRGINIA | WV | | | | 3 | | 4 |
| WISCONSIN | WI | | | | | | 0 |
| WYOMING | WY | | | | | | 0 |
| **Total** | | **25** | **6** | **19** | **20** | **5** | **75** |