# EXHIBIT

# "17"

EXHIBIT "17"

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

**Page 1**

1  IN THE UNITED STATES DISTRICT COURT
2  FOR THE MIDDLE DISTRICT OF ALABAMA
3  NORTHERN DIVISION
4
5  CASE NUMBER: 2:05-CV-1217-MEF
6  Betty Bullard,
7      Plaintiff,
8      vs.
9  UnumProvident Corporation, et al.,
10     Defendants.
11
12      S T I P U L A T I O N
13  IT IS STIPULATED AND AGREED by and
14  between the parties through their respective
15  counsel, that the deposition of Betty
16  Bullard may be taken before Sara Mahler,
17  CSR, at the offices of Beasley, Allen, Crow,
18  Methvin, Portis & Miles, at 272 Commerce
19  Street, Montgomery, Alabama 36103, on the
20  8th day of March, 2006.
21
22      DEPOSITION OF BETTY BULLARD
23          46798

**Page 2**

1      IT IS FURTHER STIPULATED AND
2  AGREED that the signature to and the reading
3  of the deposition by the witness is not
4  waived, the deposition to have the same
5  force and effect as if full compliance had
6  been had with all laws and rules of Court
7  relating to the taking of depositions.
8      IT IS FURTHER STIPULATED AND
9  AGREED that it shall not be necessary for
10  any objections to be made by counsel to any
11  questions except as to form or leading
12  questions, and that counsel for the parties
13  may make objections and assign grounds at
14  the time of the trial, or at the time said
15  deposition is offered in evidence, or prior
16  thereto.
17      IT IS FURTHER STIPULATED AND
18  AGREED that the notice of filing of the
19  deposition by the Commissioner is waived.
20
21      * * * * * * * * * * * * *
22
23

**Page 3**

1      * * * * * * * * * * * * *
2          I N D E X
3      EXAMINATION
4              PAGE
5  By Mr. Fink ........................ 8
6  By Mr. Sinclair ................... 361
7  EXAMINATION CONTINUED
8              PAGE
9  By Mr. Fink ....................... 365
10  DEFENDANT'S EXHIBITS
11              PAGE
12  Ex. 1 - Notice of deposition ....... 22
13  Ex. 2 - A copy of the complaint .... 48
14  Ex. 3 - A copy of the LTD 111604
15      long-term policy ......... 49
16  Ex. 4 - A copy of life insurance
17      policy number 552580 ..... 51
18  Exs. 4.1 and 4.2 - 9/1 and 9/9/04
19      letters to Ms. Young ..... 61
20  Ex. 4.3 - 4/6/05 letter to
21      Ms. Bullard .............. 62
22  Ex. 4.4 - 2/22/05 letter to
23      Mr. Vergot from

**Page 4**

1      Dr. McKinney ............. 63
2  Ex. 4.5 - 3/7/05 letter to
3      Ms. Bullard from Unum
4      Life .................... 65
5  Ex. 4.6 - 3/4/05 fax letter from
6      Ms. Bullard to Unum
7      Life .................... 65
8  Ex. 4.7 - 7/22/02 office note
9      from Ms. Whitesell ...... 102
10  Ex. 4.8 - 6/17/04 Clinical
11      Interview Report from
12      Mr. Downs ............... 103
13  Ex. 4.9 - 1/7/03 annual salary
14      report .................. 105
15  Ex. 5 - 3/25/04 claim form for
16      disability benefits ..... 106
17  Ex. 5.1 - 10/25/04 letter from
18      Ms. McKinney ............ 123
19  Ex. 6 - A copy of the employer's
20      statement ............... 125
21  Ex. 7 - State Board of Missions
22      job description ......... 131
23  Ex. 8 - Attending Physician's

1 (Pages 1 to 4)

Page 49

1 marked for identification
2 purposes.)
3 **Q. Okay. Let me ask you to take**
4 **a look at what I've marked as Exhibit 2 to**
5 **your complaint. It's a copy of your**
6 **complaint that you filed in this case. Have**
7 **you seen that before?**
8 A. Yes.
9 **Q. In paragraph eleven of that**
10 **complaint, you state that you were employed**
11 **by ABSBC, that's the Annuity Board of the**
12 **Southern Baptist Convention; correct?**
13 A. Yes.
14 (Defendant's Exhibit 3 was
15 marked for identification
16 purposes.)
17 **Q. You say: You were employed by**
18 **ABSBC at all times relevant hereto.**
19 **Plaintiff obtained a long-term disability**
20 **policy and life insurance policy during her**
21 **period of employment with ABSBC.**
22 **ABSBC files no documents with**
23 **Department of Labor, et cetera. Regarding**

Page 50

1 **those two policies referenced there, the**
2 **long-term disability policy and the life**
3 **insurance policy, if you flip over in your**
4 **complaint to paragraph seventy-one, they are**
5 **more particularly identified as: Policies**
6 **numbered LTD 11604 and life 552580.**
7 **What I'm going to do is show**
8 **you Exhibit 3, which is a long-term**
9 **disability policy baring policy number**
10 **111604, and ask you if that's the disability**
11 **policy to which you refer in your complaint?**
12 **That's not a trick. I haven't snuck any**
13 **extra pages in there or anything. That's as**
14 **I received it.**
15 MR. SINCLAIR: You're not
16 going to be able to identify every page of
17 it.
18 A. I was just trying to get to
19 them.
20 MR. SINCLAIR: Can't you just
21 answer his question?
22 A. That's what I was looking for.
23 MR. SINCLAIR: Do you know

Page 51

1 what the question was?
2 A. Could you repeat it.
3 **Q. (By Mr. Fink) I just want to**
4 **confirm that that's the policy you referred**
5 **to in your complaint?**
6 A. Yes.
7 **Q. And what I really want to do**
8 **is make sure you're not going to say: Oh,**
9 **no, no, no, this isn't what I'm talking**
10 **about at all. I meant some other thing.**
11 (Defendant's Exhibit 4 was
12 marked for identification
13 purposes.)
14 **Q. Same thing with Exhibit 4.**
15 **This is a life insurance policy, and it**
16 **bears the number 552580, which I'll**
17 **represent to you are the same numbers**
18 **referenced in paragraph seventy-one of your**
19 **complaint. Is that the life insurance**
20 **policy which you refer in your complaint?**
21 A. Yes.
22 **Q. Okay. Who paid the premiums**
23 **on these policies?**

Page 52

1 A. I did.
2 **Q. You paid them out of your own**
3 **pocket?**
4 A. They came out of my salary.
5 **Q. Okay. How did that work? Was**
6 **there a payroll deduction?**
7 A. I'm not sure how they -- They
8 present it to us as part of our package.
9 **Q. Uh-huh.**
10 A. And, I mean, it is told that
11 it's part -- You know, we don't get our
12 salary, especially the secretaries, it's not
13 a high salary. So this is something that is
14 offered to us. Kind of it compensates
15 because it's something that we all want and
16 need. And it's kind of a compensation
17 toward not having as much of a salary.
18 **Q. Okay.**
19 A. It's a package.
20 **Q. I'm going to jump ahead on my**
21 **exhibits here, in light of your answer, and**
22 **I'm going to show you Exhibit 6, which is an**
23 **Employment Statement that was submitted to**

13 (Pages 49 to 52)

Page 53

1  Unum Life by your employer.  And there on
2  question number six it indicates that a
3  hundred percent of the premiums are paid by
4  the employer.
5      A.    Well, but to us --
6          MR. SINCLAIR:  Let him ask a
7  question and then answer his question.
8          THE WITNESS:  Okay.  I'm
9  sorry.
10     Q.    Do you see where I'm talking
11 about there on number six, on Exhibit 6?
12     A.    Yes.
13     Q.    Do you contend that that's
14 inaccurate?
15     A.    In the way it's represented to
16 me, it is part of my salary.  It comes --
17     Q.    Okay.  But you're not -- It's
18 not your testimony that you actually had to
19 pay either on a weekly or a monthly basis
20 that you had to write a check for the
21 premium for either the disability or life
22 insurance?
23     A.    No.

Page 54

1      Q.    Nor is it your understanding
2  that there was a specified amount through a
3  payroll deduction that was taken out of your
4  check to cover those premiums?
5      A.    No.
6      Q.    You just understood it to be a
7  benefit of your employment; correct?
8      A.    Correct.
9      Q.    Okay.
10     A.    But because of this, it means
11 my salary is not as much as if I was not
12 getting the benefits.  If I was not taking
13 this, then my salary would be more.  So I
14 consider it really is part of my salary.
15     Q.    Okay.  Did you ever receive
16 any documentation from the Annuity Board
17 that stated that?
18     A.    We always -- Every year we are
19 given, and it shows in one section where if
20 we -- you know, with the benefits as part of
21 our package, as part of my salary, what it
22 entails, what the bottom line is, and if we
23 were not getting those benefits what it

Page 55

1  would be.
2      Q.    Okay.  Did you have the option
3  of electing disability and life insurance or
4  declining?
5      A.    I understood I did.
6      Q.    Okay.  Were you ever -- Did
7  you ever receive any documentation that said
8  you had that option?
9      A.    I had to sign saying that I
10 wanted it.  So I assumed if I didn't sign --
11     Q.    Were you ever given any
12 documentation that told you that your salary
13 would increase if you decided not to have
14 these coverages?
15     A.    I don't recall having
16 documentation, being told that other than
17 the -- I'm not sure what they call it, every
18 year that they give us stating, like I said,
19 it shows the two.
20     Q.    Did you keep those?  Do you
21 still have them?
22     A.    I'm not sure.  I believe I do.
23 Could we take a break.

Page 56

1      Q.    Absolutely.
2          (Off-the-Record discussion
3          was held.)
4      Q.    Do you recall when Unum Life
5  began providing coverage to employees of the
6  Annuity Board at the Southern Baptist
7  Convention?
8      A.    No.
9      Q.    Do you know when Unum Life
10 provided that coverage prior to the
11 effective dates noted on these policies,
12 January, 2001 on Exhibit 4, and January,
13 2002 on Exhibit 3?
14     A.    Could you say that again?
15     Q.    Sure.  Do you know whether
16 Unum Life provided either disability or life
17 insurance coverage to employees of the
18 Annuity Board prior to, let's just say
19 January of 2001?
20     A.    Yes.
21     Q.    You believe they did?
22     A.    Yes.
23     Q.    Okay.  Do you recall whether

Page 145

1  Q.   Did your sickness or any of
2  your injuries keep you from typing?
3       MR. SINCLAIR:  Go ahead.  I'm
4  sorry.
5       A.   Arthritis.  Well, arthritis
6  and the neck.
7       Q.   Okay.
8       A.   Arthritis and the neck, the
9  back and neck, because it made it hurt worse
10 from using my hands and arms.
11      Q.   Did it actually keep you from
12 typing or did it cause you pain while you
13 were typing?
14      A.   Well, it was enough pain that
15 if there was times -- Well, it caused a lot
16 of pain while I was typing.
17      Q.   Okay.  Under -- Well, we've
18 covered that.  You've told me a little bit
19 about your office environment.  Was there a
20 kitchen or a break area nearby?
21      A.   No.
22      Q.   Okay.  You said that you often
23 ate lunch with secretaries.  Did you leave

Page 146

1  the building to eat lunch?
2       A.   No.  But it was -- We were on
3  the second floor and it was in the basement.
4       Q.   Okay.  There was a break area
5  in the basement?
6       A.   In the basement.  Not nearby.
7       Q.   Were there restroom facilities
8  nearby, near your desk?
9       MR. SINCLAIR:  Object to the
10 form.
11      A.   I have -- What do you mean by
12 nearby?
13      Q.   Well, you tell me.  How close
14 were the closest restroom facilities that
15 you were allowed to use?
16      A.   It was like a hall and a half
17 of a hall away.  Almost two halls away.
18      Q.   Okay.  By two halls away,
19 describe for me what you mean.  You had to
20 go down a hall and make an L and go another
21 half a hall?
22      A.   Correct.
23      Q.   Okay.  Do you know, roughly,

Page 147

1  how many feet or yards that would have been
2  from your office area?
3       A.   Oh, gosh.  I'm not good with
4  measurements like that.  I'm really not
5  sure.
6       MR. SINCLAIR:  Are you at a
7  stopping point?
8       MR. FINK:  Yes.  We can stop.
9       (Recess taken.)
10      Q.   (By Mr. Fink) We're right back
11 after lunch.  And as your attorney just
12 pointed out, I'll probably ask you what
13 medication you just took.
14      A.   Adderall.
15      Q.   Adderall.  And what do you
16 take Adderall for, Ms. Bullard?
17      A.   Narcolepsy.
18      Q.   Okay.  Just before lunch we
19 were looking at Exhibit 7, which is a job
20 description of a secretary with the State
21 Board of Missions.  And it lists -- It says
22 seven, but, actually there are eight,
23 because seven is duplicated, or the numeral

Page 148

1  seven is duplicated, essential duties and
2  responsibilities.  Are these the material
3  and substantial duties of a secretary with
4  the State Board of Missions?
5       MR. SINCLAIR:  Objection to
6  the form.
7       A.   I believe I had answered it
8  before that with the exception of, you know,
9  the events that I have to do more standing
10 and heavy lifting.
11      Q.   When you're getting -- You
12 said when you're getting ready for
13 conferences three to four times a year.
14      A.   And work at conferences.  And
15 we actually go in and work at conferences.
16      Q.   But you said you haven't done
17 that in 2003 or 2004?
18      A.   I think that's correct.  If I
19 remember correctly.
20      Q.   All right.  What I'd like you
21 to do is, I'd like to talk about each one of
22 these eight items, each of these eight
23 duties, and ask you what you actually did in

37 (Pages 145 to 148)

Page 169

1  your house?
2      A.    Eight or nine miles.
3      Q.    How long did it take you to
4  get there in the morning?
5      A.    With traffic, thirty minutes.
6      Q.    Looking at those duties that
7  you've told me about on Exhibit 7, are you
8  able to perform any of those duties today?
9  Let's just go through them.  Number one:
10  Prepare office correspondence as directed by
11  the office director and associates.
12      A.    I would not be able to type.
13      Q.    Can you type at all?
14      A.    Not enough, not near enough,
15  no.  I mean, I could a type very small -- I
16  really don't know.  I haven't tried since
17  I've been gone.
18      Q.    But you maintain that you
19  couldn't?
20      A.    But I had got to that point
21  that I was not able to function enough to
22  stay awake, to stay out of the bathroom, you
23  know, the pain in my hands, my neck, all of

Page 170

1  it together.  I got to the point I could not
2  do it.
3      Q.    Do you have a computer at your
4  home?
5      A.    I have one, yes.
6      Q.    Do you use it?
7      A.    Not for typing.  My son and I
8  both use it for, like, e-mails sometimes, I
9  mean, just to check, but not a lot of typing
10  or anything like that.  But my son uses it
11  more than I do.
12      Q.    How much time a day do you
13  spend on it?
14      A.    Oh, gosh.  I probably don't
15  spend fifteen minutes.
16      Q.    Okay.  Do you have a modem or
17  do you have a faster connection than that?
18      A.    Yes.  It is does -- My son had
19  a modem put in, yeah.  I had a dial up, but
20  when he was there he had a modem.
21      Q.    You have, like, Comcast?
22  Do you have DSL?  Do you know what you have?
23      A.    I mean, it's through Knology.

Page 171

1  It's a DSL type of thing.
2      Q.    And you use it about fifteen
3  minutes a day, to check e-mails you said?
4      A.    Yeah.  My daughter might send
5  me something, you know, or, like, she sends
6  me pictures, you know.  She sent me two
7  pictures last night.
8      Q.    You don't spend time surfing
9  the Internet?
10      A.    Oh, no.
11      Q.    Back to the duties.  Prepare
12  for conferences related to the office that
13  include material preparation and promotion.
14  Are you able to do that, as you sit here
15  today?
16      A.    Excuse me.  Which number?
17      Q.    Number two.
18      A.    No, I would not be able to
19  type and put together the packets and things
20  that I did.
21      Q.    Why couldn't you do that?
22      A.    Because of standing and
23  lifting, and a lot of these packets we're

Page 172

1  talking might have a hundred pieces in it.
2  And you'd have to, you know, be able to pick
3  up and put it all in there and do this for a
4  while, and stand for a long period of time.
5      Q.    A hundred pieces of paper?
6      A.    Yes.
7      Q.    Number three:  Prepare weekly
8  requisitions in keeping with accounting
9  office guidelines and maintaining financial
10  records for the office.  Could you do that
11  today?
12      A.    Again, the typing would be
13  hard.
14      Q.    It would be hard, but could
15  you do it?
16      A.    I do not think I could do it,
17  no, I do not.
18      Q.    Anything else, aside from the
19  typing, that would keep you from performing
20  that duty?
21      A.    The copy on that one might be
22  bad.
23      Q.    Number four:  Serve as a point

43 (Pages 169 to 172)

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 173

1  of contact for guests entering the office by
2  telephone or in person. Could you do that?
3      A.    I would not be able to sit and
4  hold the phone like I did before.
5      Q.    Okay. What would prevent you
6  from sitting and holding the phone?
7      A.    My back, my hips, the
8  arthritis in my back and hips and
9  degenerative joints in my back and hips.
10     Q.    Okay. How do you spend most
11 of your day presently? Do you spend it in a
12 seated position? Do you stand? Do you
13 alternate a good bit?
14     A.    I alternate a lot.
15     Q.    Okay. If you had to say, I
16 mean, there are only so many positions you
17 can be in, you could be standing, sitting,
18 or, I guess, lying down. Would you agree
19 with me on that?
20         MR. SINCLAIR:  Objection to
21 the form.
22     A.    Yes.
23     Q.    In a twenty-four hour period,

Page 174

1  how much time do you say you spend lying
2  down?
3      A.    It varies, again, because I'm
4  up and down, even during the night. I might
5  -- I mean --
6      Q.    I understand that,
7  Ms. Bullard, I mean, that's a fairly simple
8  thing to say, you know: I spend so many
9  hours lying down or I spend so many hours
10 sitting or standing.
11         And my question remains: If
12 you had to give an answer, how many hours,
13 roughly, do you spend, in a twenty-four hour
14 day, in a lying down position?
15         MR. SINCLAIR:  She already
16 gave the answer to that. She didn't know.
17     Q.    Do you lie down to sleep?
18     A.    Excuse me?
19     Q.    Do you lie down to sleep?
20     A.    When I try to sleep, yes.
21     Q.    How many hours a day do you
22 lie down and try to sleep?
23     A.    Again, that varies.

Page 175

1      Q.    Do you spend half your day
2  lying in bed?
3      A.    No.
4      Q.    Okay. Do you spend a third of
5  your bed lying in bed?
6      A.    No, I would not say a third.
7      Q.    Less than a third?
8      A.    Probably. I'm up and down,
9  I'm in the recliner, I'm in the bed, I'm
10 walking, I'm standing.
11     Q.    Do you think you spend more or
12 less than a third of your day standing,
13 which would include walking?
14     A.    Again, it would vary, but it
15 would be hard to say.
16     Q.    Okay. I can appreciate that
17 it would be hard to say. But if you had to
18 say more or less than eight hours a day in
19 an average day, how much time do you spend
20 standing, more or less than eight hours?
21     A.    Less.
22     Q.    Would you say more or less
23 than four hours?

Page 176

1      A.    Less.
2      Q.    Less than four hours standing.
3  Would you say more or less than two --
4      A.    Are you talking about -- You
5  said walking, also. I'm trying --
6      Q.    Including standing, too, and I
7  include walking.
8      A.    I would still say it would be
9  less than four hours.
10     Q.    Okay. Could you say that it
11 would be more or less than two hours?
12     A.    No. It would be more than
13 that. Again, it's going to vary.
14     Q.    I understand. With regard to
15 sitting, would you say you spend more or
16 less than eight hours a day in a seated, as
17 opposed to a lying position?
18     A.    Less than eight hours. It
19 varies. I really cannot put -- on this. I
20 mean --
21     Q.    You feel on a balance on an
22 average day you spend less than eight hours
23 sitting?

44 (Pages 173 to 176)

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 177

1    A.    You know, when I hurt, if I'm
2  hurting when I'm sitting, I get up and walk
3  around. It just varies. I don't count the
4  time. I do what I feel like I have to do at
5  the time.
6    Q.    Do you have wide fluctuations
7  in a given day or a week as to the amount of
8  pain that you're experiencing?
9    A.    A wide?
10    Q.    Yes, ma'am.
11        MR. SINCLAIR: Go ahead. You
12  already picked that up. Objection to the
13  form.
14    A.    Can you specify what you mean
15  by wide?
16    Q.    Sure. You said that if you're
17  in pain, it may affect it. Are you in
18  constant pain?
19    A.    Yes.
20    Q.    Okay. Does your pain vary
21  from day to day?
22    A.    Some.
23    Q.    Okay. How much does it vary,

Page 178

1  from what to what?
2    A.    Some days it could -- It could
3  be a wide range sometimes. Sometimes it can
4  be excruciating, sometimes I can manage to
5  get comfortable for just a few minutes at a
6  time, and some days I can't manage to get
7  comfortable at all.
8    Q.    Okay. On those days when you
9  can get comfortable for a period of time, do
10  you spend less time lying down?
11    A.    I would say yes.
12    Q.    On those days where you have
13  excruciating pain, are you spending your
14  whole day in bed?
15    A.    No.
16    Q.    Okay. You're still getting up
17  and performing activities?
18    A.    I'm trying to move around. I
19  try everything.
20    Q.    Do your activities change a
21  lot from day to day?
22    A.    Again, that varies. It's
23  going to vary.

Page 179

1    Q.    Do you remember the Social
2  Security report that you filled out about
3  your activities of living? There you took
4  an average; right?
5    A.    I don't remember that, I mean,
6  exactly. I mean, I answered their questions
7  the way they asked them.
8    Q.    You got pretty specific about
9  what you did in a given day. Do you
10  remember that? And what I'm asking you is
11  what you do in a given day?
12        How much of your time do you
13  spend lying, versus, sitting, versus
14  standing? And I understand that it may vary
15  from day to day, and that there will be some
16  variations, but what I'm asking you for is,
17  on average, how much of your time you spend
18  in a given day lying down, how much of your
19  time you spend in a given day, in a seated
20  position, and how much of your time you
21  spend in a given day standing?
22        MR. SINCLAIR: Don't guess,
23  but if you know, please answer.

Page 180

1    A.    I don't know.
2    Q.    My point is that no one would
3  know better than you.
4    A.    But, again, because it varies,
5  I can't put that kind of a specific.
6    Q.    Okay. Let's talk about
7  yesterday, March the 7th of 2006. What did
8  you do -- What time did you -- Well, let's
9  start at midnight or twelve o'clock in the
10  morning, were you in your bed at twelve
11  o'clock yesterday morning?
12    A.    Twelve o'clock a.m. in the
13  morning?
14    Q.    Yes, ma'am. Let's use 12:01
15  to make it easier. 12:01 a.m. on March the
16  7th, were you in bed?
17    A.    You know I really don't look
18  at the clock. I mean, I am up and down.
19    Q.    I understand.
20    A.    I don't know.
21    Q.    Did you arise at some point
22  yesterday morning from a sleep?
23    A.    Yes. I arose several times

45 (Pages 177 to 180)

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 189

1  do, but it never happens. And sometimes I
2  might not sleep at all. I may be up more
3  than I'm sleeping. And until, like I say,
4  maybe five o'clock, I may ease off and I may
5  fall asleep and, therefore, I may not get up
6  until nine or ten o'clock. Because I
7  finally got eased off enough that I did
8  sleep. But that happens on occasion.
9            I don't always get up at seven
10  o'clock. I don't have a set time when I'm
11  -- you know, if I don't have to. When I'm
12  just -- I just -- If I can ease off enough
13  and fall asleep, I fall asleep. If I wake
14  up and I hurt, I get up.
15        Q.    Back to trying to get some
16  idea of what you do in an average day, let's
17  look at the past month. And let me ask you
18  how many times you typically -- Strike that.
19            In the last month, do you
20  leave -- have you left the house an average
21  of more than one time a day?
22        A.    Leave the house?
23        Q.    Yes.

Page 190

1        A.    There's a lot of times I don't
2  leave the house maybe one or two times a
3  week. A lot of days I never leave the house
4  unless to walk out the get the mail or,
5  you know, walk in the yard to just walk
6  around for a minute. Get some air, but as
7  far as going somewhere.
8        Q.    Going somewhere sometimes.
9  You only go somewhere one or two times a
10  week?
11        A.    Correct. Most of the time I
12  don't --
13        Q.    Most of the time you only go
14  somewhere one or two times a week?
15        A.    Yes.
16        Q.    And where do you go those one
17  or two times a week?
18        A.    To the grocery store, the post
19  office, occasionally I do have --
20        Q.    Doctor's office visits?
21        A.    Yeah. I have the doctor's
22  office visits.
23        Q.    Is there anywhere that you

Page 191

1  regularly go, aside from the grocery store
2  or the post office or the doctor's visits?
3        A.    No. On occasion, I might go
4  get something to eat with a friend for an
5  hour, just to eat, but that doesn't --
6  That's very rare. I don't go to church
7  anymore because I can't sit through the
8  service.
9        Q.    When did you last regularly
10  attend church services?
11        A.    It's probably been three years
12  since I was regular.
13        Q.    Okay. What church did you
14  attend?
15        A.    Pinedale Baptist Church.
16        Q.    Are you still a member there?
17        A.    Yes.
18        Q.    Okay. Do you ever run out and
19  grab something to eat by yourself?
20        A.    No.
21        Q.    How often do you eat out with
22  a friend?
23        A.    Maybe once a month, at the

Page 192

1  most. It's not very often.
2        Q.    Who do you go out and eat
3  with?
4        A.    It varies. Someone that I
5  used to work with, someone from the church.
6        Q.    In the last year, that you can
7  recall, who have you gone out to eat with?
8        A.    Names?
9        Q.    Yes, ma'am.
10        A.    Well, let's see. I've went
11  out with Joanne Farmer.
12        Q.    Okay.
13        A.    I went out with Annette
14  Sutton. She's retired from the program.
15        Q.    Anyone else that you can
16  recall?
17        A.    Yes. I'm sorry. Is that what
18  you said, is that all I could recall?
19        Q.    That's all you can recall?
20        A.    Yes.
21        Q.    Okay. We were talking about
22  your duties, and I was asking you whether or
23  not you could perform these today. We had

48 (Pages 189 to 192)

Page 193

1  gotten up to number four. So let me go
2  forward with number five: Assist in
3  preparing materials for meetings that are
4  office related. Could you still do that
5  today?
6      A.    No.
7      Q.    And why not?
8      A.    Because, again, there would be
9  a lot of standing and lifting, making the
10 packets. And these are the things that they
11 take with them. It would be a lot of
12 standing and lifting.
13     Q.    How much lifting did you have
14 to do?
15     A.    We did a good bit.
16     Q.    What exactly were you lifting?
17 You mentioned a hundred sheets of paper;
18 right?
19     A.    Right. We would do packets
20 with those. We would put them in the boxes.
21 They may have -- You know, sometimes they
22 may have a thirty-people conference.
23 Sometimes they may have seventy or a

Page 194

1  hundred, and we would have to prepare
2  materials for all of them, packets. And we
3  would have to lift that and have boxes of
4  envelopes and things that we would have to
5  move.
6      Q.    That's, roughly, a hundred
7  sheets of paper right there?
8      A.    Uh-huh.
9      Q.    Is that, roughly, what you put
10 in a packet?
11     A.    We have at times. Some of
12 them aren't that big, but a lot of them are.
13     Q.    Okay. And that's about
14 three-quarters of an inch to an inch.
15     A.    And we've -- A lot of times we
16 have to take them and have them -- And we
17 bind them because they wouldn't fit in the
18 folders.
19     Q.    Okay. And you're not
20 contending that you'd be incapable of
21 lifting a hundred sheets of paper at a time?
22     A.    No. I'm saying that we would
23 have it spread out and you'd have to stand

Page 195

1  and collate and put it all together in a
2  certain -- and you'd have to do that, you
3  know, a hundred times or fifty times.
4      Q.    So, it's the walking to take a
5  sheet from this stack, a sheet from this
6  stack and a sheet from this stack that
7  caused you the problem?
8          MR. SINCLAIR: Objection to
9  the form.
10     A.    The standing and the walking.
11 The reaching, the lifting.
12     Q.    As far as the lifting it, it
13 wasn't the weight of the lift that you
14 contend -- you say would have prevented you
15 from performing that task, it was the mere
16 act of reaching over to pick something up;
17 is that what you're referring to?
18         MR. SINCLAIR: Objection to
19 the form.
20     A.    Well, the weight could be
21 because as you box -- you're fixing the
22 packages, you're putting them in a box and
23 you have to move the boxes to fix another

Page 196

1  box.
2      Q.    Okay. Did you have people in
3  the office to assist with lifting, runners
4  and things of that nature?
5      A.    No.
6      Q.    Okay. No assistance for that
7  purpose?
8      A.    There were two maintenance men
9  that if it were a piece of furniture or a
10 heavy piece, they would, but as far as
11 boxes, and things like that, no.
12     Q.    Okay. Number six: Maintain a
13 database. Could you do that today?
14     A.    No.
15     Q.    And why not?
16     A.    Typing. There's a lot of
17 typing. And it's like that injury kind of
18 with that.
19     Q.    And you contend that your
20 arthritis in your back and neck problems
21 would prevent you from typing; correct?
22     A.    Correct. My hands, neck,
23 back.

49 (Pages 193 to 196)

Page 213

1  is.
2      A.    Moon.
3      Q.    Is it Moon?
4      A.    Yes.
5      Q.    Who is Dr. Moon?
6      A.    He was another GP that --
7  around the time of Karst.  I just -- Well,
8  to be honest, the reason that Karst --
9  Dr. Karst smoked, and I could smell smoke.
10  That's one reason.  And I was looking for a
11  doctor.  I tried Dr. Moon, but he found
12  Dr. Whitesell and then Dr. McKinney.
13      Q.    You said Dr. Karst smoked?
14      A.    Yes.  And I had never saw him
15  smoke, but you could smell smoke on him, and
16  that just bothered me.  To have my doctor to
17  smell like smoke.
18          MR. SINCLAIR:  It doesn't
19  bother you if your lawyer smells that way,
20  does it?
21          THE WITNESS:  No.
22      Q.    How about Dr. Moon, why did
23  you stop seeing him?

Page 214

1      A.    Like I said, I was trying
2  doctors.  I had tried him, but then someone
3  recommended Dr. Whitesell.  And when I went
4  to her, I liked her better, so I stayed with
5  her.
6      Q.    The second page of that says:
7  You've had headaches, jaw pain, neck pain,
8  ear pain and face pain for twenty years;
9  right?
10      A.    At that time, yes, but this
11  has been a while.  It's longer now.
12      Q.    Longer now?
13      A.    Because this was in '98.
14      Q.    It says:  At that point the
15  pain was pretty much constant; right?
16      A.    Yes.
17      Q.    You filled out this form,
18  didn't you?
19      A.    Yes.
20      Q.    The second page?
21      A.    Yes.
22      Q.    Is everything on here
23  accurate, or was it accurate at the time you

Page 215

1  filled it out?
2      A.    Yes.
3          (Defendant's Exhibit 16
4          was marked for
5          identification purposes.)
6      Q.    Okay.  Exhibit 16 is a
7  7/28/03, office note from Dr. McKinney.  It
8  says halfway through:  The patient has also
9  been recently diagnosed with ulcerative
10  colitis by Dr. Jackson per her.  We do not
11  have anything back from him yet.
12          However, she is on Asacol 400
13  milligram, two PO TID.  She states that she
14  is unhappy with the care she has gotten at
15  his office, as she tried to make a follow-up
16  appointment to get more information about
17  ulcerative colitis and was not allowed to
18  schedule an appointment.
19          She states that she was told
20  that she had ulcerative colitis by his
21  receptionist and was unable to ask any
22  questions to him about this.
23          The patient also states that

Page 216

1  she has worsening nausea with eating, and
2  will occasionally have right, upper quadrant
3  abdominal pain after eating.  Have I read
4  that correctly?
5      A.    Yes.
6      Q.    What is ulcerative colitis?
7      A.    It's inflammation of the
8  colon.  It's --
9      Q.    Is the Dr. Jackson that you
10  refer to there Alto Jackson, Junior?
11      A.    It is.
12      Q.    Did he ever -- Did you ever
13  speak to him further about his diagnosis of
14  ulcerative colitis?
15      A.    No.
16      Q.    Okay.  Is he the only one who
17  has ever diagnosed you with ulcerative
18  colitis?
19      A.    No.  I had another colonoscopy
20  by a Dr. Anderson and he said the same.
21      Q.    In the documents that were
22  produced by your attorney, there's a
23  document from Dr. A. L. Jackson, Junior

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 245

```
 1    Q.   Barranco?
 2    A.   Uh-huh.
 3    Q.   B-A-R-R-A-N-C-O?
 4    A.   Uh-huh.
 5    Q.   How many times have you seen
 6  Dr. Barranco?
 7    A.   One time.
 8    Q.   Any other gastroenterologist
 9  that you've seen in the last two years?
10    A.   No.
11           (Defendant's Exhibit 20
12           was marked for
13           identification purposes.)
14    Q.   Exhibit Number 20.  This is a
15  patient history from Dr. Paul.  Did you fill
16  that out in June of 2004?  Is that your
17  signature and handwriting?
18    A.   Yes.
19    Q.   Where it asks if you have an
20  orthopedic surgeon, you list in addition to
21  Richardson a Dr. Ryan.  And a Patrick Ryan
22  whom you -- who did your neck surgery?
23    A.   Yes.
```

Page 246

```
 1    Q.   And his office is here in
 2  Montgomery; correct?
 3    A.   Correct.
 4    Q.   And you're still seeing him as
 5  needed?
 6    A.   As needed.
 7    Q.   Okay.  This also references a
 8  Dr. Jakes.  We talked about him?
 9    A.   Yes.
10    Q.   The same Jakes?
11    A.   Yes.
12    Q.   Okay.  Have you seen a
13  Dr. Roger Kemp?
14    A.   Yes.
15    Q.   Who is that?
16    A.   Pain management doctor.
17    Q.   When did you start seeing
18  Roger Kemp?
19    A.   I finally went to him -- I
20  went maybe once or twice.  Dr. McKinney, I
21  believe it was, sent me to him.  But I
22  started also seeing Dr. Paul right after
23  that.  And he was giving me injections in my
```

Page 247

```
 1  back and she -- Dr. Paul asked that I quit
 2  that because we were going to start the
 3  Remicade, and she didn't want me having the
 4  injections.
 5    Q.   When did you last see
 6  Dr. Kemp?
 7    A.   I don't remember the date.
 8  It's been a year, two years.  It's been a
 9  while.
10    Q.   Do you think Exhibit 20 is
11  about the time you first started seeing
12  Dr. Paul, since that's when you filled out a
13  patient history form?
14    A.   Yes.
15    Q.   Would that have been about the
16  time you stopped seeing Dr. Kemp?
17    A.   Yes.
18         MR. SINCLAIR:  Are you
19  guessing?
20         THE WITNESS:  Yes.  I'm
21  guessing, but, I mean, you know, just --
22    Q.   That makes sense, based on
23  what you've just told me; correct?
```

Page 248

```
 1    A.   It would have been close to
 2  that time, somewhere around that time.
 3    Q.   Sure.  And his records
 4  obviously would show exactly when you last
 5  saw him.  I'm just trying to get some feel.
 6         We've talked about Dr. Mark
 7  Anderson, too; right?
 8    A.   Yes.
 9    Q.   And he's the -- Is he a
10  gastro?
11    A.   Yes.
12    Q.   Okay.  When did you last see
13  him?
14    A.   It's been about -- As I
15  remember, about two years, a year and a
16  half, two years.
17    Q.   You don't plan to see him
18  again?
19    A.   No.
20    Q.   We've talked about a whole lot
21  of doctors and treatment providers.
22    A.   Yes.
23    Q.   Any others that you can recall
```

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 249

1 that we haven't talked about?
2 A. I've been to so many. They
3 continuously send me to so many.
4 Q. I didn't know if you were just
5 sitting there waiting for me to ask you
6 about one that I haven't asked you about
7 yet.
8 A. There's probably some in there
9 but I don't remember them. I mean, I put
10 the ones that --
11 Q. None that comes to mind, as
12 you sit here today?
13 A. Yeah. None comes to mind.
14 Q. Fair enough.
15 (Off-the-Record discussion
16 was held.)
17 Q. Ms. Bullard, did you truly and
18 accurately describe your condition and your
19 activities to Unum Life on all documents
20 that you sent to them?
21 MR. SINCLAIR: Objection to
22 the form.
23 A. Yes.

Page 250

1 Q. Okay. Your claim form,
2 Exhibit 5, lists your injuries and
3 sicknesses, and we've read them.
4 Narcolepsy, sleep apnea, ulcerative colitis,
5 high blood pressure, surgery on the neck for
6 herniated disk, Surgery on both feet. And
7 still need surgery. You mentioned two
8 bulging disks in your back that hurt.
9 Arthritic, bursitis, TMJ and fibromyalgia.
10 Regarding the still needing
11 surgery on your feet. What's -- You've had
12 pins placed in your feet?
13 A. Yes. I've had bunionectomy
14 and a hammertoe repaired on both feet.
15 Q. And that involved one pin per
16 foot?
17 A. Two.
18 Q. Two pins per foot. And you
19 say you still need further surgery?
20 A. Yes. The right one did not
21 take like it should. It did not work, and
22 it's gone back. The bunion and hammertoe
23 and everything is coming back, and where the

Page 251

1 pins are, my foot is sinking in.
2 Q. Okay. Do you contend that
3 each of these problems that I've just read
4 off to you from your claim forms presently
5 prevent you from performing the duties of a
6 secretary?
7 MR. SINCLAIR: Is the
8 question, does she contend each one
9 individually does?
10 Q. Do you contend that each of
11 these problems presently prevent you from
12 performing the duties of a secretary?
13 MR. SINCLAIR: Objection to
14 the form.
15 Q. Okay. Let me just -- I'll ask
16 it separately, and then I'll ask you if --
17 combined or a combination deal. Do you
18 contend that your narcolepsy, standing
19 alone, prevents you from performing the
20 duties of a secretary?
21 A. It's getting closer to that.
22 I think it's age, and the medicine doesn't
23 work as well. It's hard for me to say, but

Page 252

1 I feel that it's getting close to.
2 Q. Do you feel that your
3 narcolepsy is a progressive problem?
4 A. I do.
5 Q. Has it gotten worse in the
6 last five years?
7 A. Yes.
8 Q. How about sleep apnea? Do you
9 feel that your problems with sleep apnea
10 prevent you from performing your duties as a
11 secretary?
12 A. Yes. Because I'm not getting
13 proper sleep. I'm not going into the
14 correct cycles, therefore, I'm very tired.
15 I'm very -- It makes me ache and hurt and I
16 can't concentrate.
17 Q. Do you contend that your
18 problems with sleep apnea are progressive
19 and have gotten worse in the last five
20 years?
21 A. Yes.
22 Q. Have you seen any improvement
23 in either your narcolepsy or sleep apnea

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 253

1  through any treatment that you've been
2  provided?
3      A.    No.
4      Q.    Okay.  How about your
5  ulcerative colitis?  Do you contend that
6  that, standing alone, prevents you from
7  performing the duties of a secretary?
8      A.    I think that has improved with
9  Remicade.
10     Q.    Okay.  So, you wouldn't say
11 that your ulcerative colitis alone keeps you
12 from performing the duties of a secretary?
13     A.    Not alone.
14     Q.    And that basically caused you
15 to -- required for you to take frequent
16 bathroom breaks; correct?
17     A.    Correct.  Which you're also in
18 pain, a lot of pain.  It's hard to
19 concentrate when you're cramping and have a
20 lot of pain.  But you also have to stay
21 close to a bathroom and you're there a lot.
22     Q.    But you feel that's pretty
23 well managed right now with medication;

Page 254

1  correct?
2      A.    Correct.
3      Q.    Do you still have regular
4  flares, even on the medication?
5      A.    Yes.
6      Q.    How often do you have flares?
7      A.    Could I change it?
8      Q.    Yes.
9      A.    I felt like that this is
10 flares, but Dr. Barranco, the doctor I just
11 saw, seems to think that what I'm feeling
12 now, that the colitis is better, what I'm
13 feeling is just a spastic colon.  I did have
14 blood, a lot of blood, and that it was
15 harder to determine that that was the
16 diverticulitis at the time or the colitis.
17     Q.    Okay.  Do you contend that
18 your diverticulitis, standing alone,
19 prevents you from performing the duties of a
20 secretary?
21     A.    Not standing alone.
22     Q.    Okay.  Are your problems with
23 diverticulitis better on medication?

Page 255

1      A.    The diet -- I mean, watching,
2  you know, what I eat and taking a fiber-type
3  medicine.  And then when I have flare-ups,
4  they give me antibiotics.  Yes, if I do all
5  of that, it's better.
6      Q.    Okay.  How about your problems
7  with high blood pressure?  Do you contend
8  that the problems with high blood pressure
9  prevent you from performing the duties of a
10 secretary?
11     A.    Not alone.
12     Q.    Okay.  Do they play any role
13 in the combinations of that?  What problems
14 do you have with high blood pressure?
15     A.    I have high blood pressure.
16 I'm on medication for it.
17     Q.    How does that affect your
18 ability to perform the duties of a
19 secretary?
20         MR. SINCLAIR:  Objection to
21 the form.
22     A.    Because you can -- I mean, I
23 even had to leave work one day and go to the

Page 256

1  doctor's office because -- and they had to
2  give me nitroglycerin and things because you
3  could have a heart attack, I mean, it had
4  gotten so high.
5      Q.    Okay.  Is that something you
6  are able to control with medication and
7  treatment?
8      A.    I had been, but just Monday,
9  it was high again.  Lately it has been
10 erratic.  It's been high with medication.
11     Q.    You mentioned surgery on the
12 neck for herniated disks.  You've had
13 surgery; correct?
14     A.    Yes, on the neck.
15     Q.    Do you contend that your neck
16 problems, standing alone, prevent you from
17 performing the duties of a secretary?
18     A.    Not alone.
19     Q.    Did you have improvement with
20 your neck problems following the surgery?
21     A.    To an extent, yes.
22     Q.    What problems do you presently
23 have with your neck?

64 (Pages 253 to 256)

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 257

1    A.    I still have some stiffness
2  and soreness, which is hard to determine if
3  it's just, you know -- I'm -- Probably both,
4  TMJ and the disk.
5    Q.    Okay. Do you presently plan
6  any surgeries for either your neck problems
7  or for your TMJ?
8    A.    The neck has actually -- The
9  surgery that they have done has been done.
10 But the TMJ, like I said, the insurance will
11 not pay for it.
12   Q.    If you could afford it, would
13 you do it?
14   A.    Yes.
15   Q.    How about your feet problems?
16 Do you feet problems, standing alone,
17 prevent you from performing the duties of a
18 secretary?
19   A.    Not standing alone.
20   Q.    What problems do you presently
21 have with your feet that might preclude you
22 from performing secretarial duties?
23   A.    I can't stand very long. You

Page 258

1  know, it -- I can't walk a lot. I can't do
2  stairs. I mean, like I said, alone it
3  wouldn't, but, you know --
4    Q.    Where you worked, you were on
5  the second floor?
6    A.    Yes.
7    Q.    Did you have an elevator?
8    A.    Yes.
9    Q.    Two bulging disks in back that
10 hurt.
11   A.    But, now, from the last test
12 they did, there's four.
13   Q.    Okay. You've got four bulging
14 disks?
15   A.    Basically degenerative disk
16 disease.
17   Q.    Has any doctor recommended
18 surgery?
19   A.    Not yet. They would prefer,
20 with arthritis, you know, to not do that if
21 we can --
22   Q.    What treatment are you getting
23 for that presently?

Page 259

1    A.    I have a back brace that I
2  alternate, I can use. I --
3    Q.    Are you wearing one now?
4    A.    I am.
5    Q.    Okay.
6    A.    I have a Tens Machine.
7    Q.    Is that an electric impulse?
8    A.    Right. I have one of those at
9  home that I use.
10   Q.    How often do you use that?
11   A.    Several times a day. And I
12 alternate and use heat and sometimes ice, I
13 alternate.
14   Q.    Who prescribed the Tens Unit;
15 is that Dr. Paul?
16   A.    Yes.
17   Q.    Arthritis. Do your problems
18 with arthritis, standing alone, prevent you
19 from performing the duties of a secretary?
20   A.    Yes. I have real bad
21 arthritis in my hips and in my hands, and,
22 you know, a lot of my joints. But my hips,
23 that's one of the reasons, between my back

Page 260

1  and the hips, to sit for a very long time, I
2  cannot sit. And, of course, my hands.
3  Typing, it's just gotten very hard. I just
4  cannot hold out to type.
5    Q.    So, you contend that the
6  arthritis alone prevents you from performing
7  the duties of a secretary?
8    A.    I think it does, yes.
9    Q.    How about the two bulging
10 disks in your back, I didn't ask you that,
11 do those, standing alone, prevent you?
12   A.    Four.
13   Q.    Four. Excuse me. Do those,
14 standing alone, prevent you from performing
15 your duties of a secretary?
16   MR. SINCLAIR: When you say
17 contend -- I'm sorry. This is your
18 deposition, I don't mean to butt in. You
19 can ask her if she's contending that,
20 because I don't want her getting into saying
21 whether or not she's medically capable of
22 it.
23   MR. FINK: Sure. I don't mind

65 (Pages 257 to 260)

Page 261

asking her that.

Q.     (By Mr. Fink) Do you contend that the four bulging disks in your back presently prevent you from performing the duties of a secretary, standing alone?

A.     That, I don't know.

Q.     Do you contend that your problems with bursitis, standing alone, prevent you from performing the duties of a secretary?

A.     Not standing alone.

Q.     What problems -- Well, what is bursitis, first of all, in your own words?

A.     It's an inflammation of the bursa. It's like a tendon. That's what I understand it is. They call it the bursa.

Q.     It's in your right shoulder?

A.     Well, you have them in -- But that's where the main -- that I've had the injections for was in my right.

Q.     Who's treating you for that?

A.     The pain management doctors had treated me. Dr. Kemp, I believe it was,

Page 262

or Dr. Peden. It might have been Dr. Peden. But, again, since the Remicade, she doesn't want me having injections.

Q.     Have your problems with your bursitis improved since the Remicade?

A.     Some.

Q.     Have your problems with your bulging disks in your back improved since the Remicade?

A.     No. I can't tell any difference in that.

Q.     Have the problems with your feet improved since the Remicade?

A.     I can't tell a difference with that.

Q.     Have your problems with your arthritis improved?

A.     Some. Not much.

Q.     TMJ. Do you contend that your problems with TMJ prevent you from performing the duties of a secretary?

A.     Not alone.

Q.     Okay. And TMJ -- TMJ is

Page 263

1     actually the joint; right?
2     A.     Yes.
3     Q.     And it's the disorder of the
4     TMJ that causes you trouble; correct?
5     A.     Correct.
6     Q.     When did you last seek
7     treatment for a disorder of your TMJ?
8     A.     Whenever it was I saw
9     Dr. Farha and Dr. -- the oral surgeon.
10     Q.     Foy?
11     A.     Yes. Those doctors, because,
12     you know, they had determined -- Dr. Farha
13     said it was too far -- my joints were too
14     far gone for the mouth pieces to help. He
15     couldn't help me anymore. And then when the
16     insurance wouldn't pay for the surgery, I
17     didn't see him anymore.
18     Q.     Fibromyalgia. Do you contend
19     that your problems with fibromyalgia prevent
20     you from performing your duties of a
21     secretary?
22     A.     Not alone.
23     Q.     Do you contend that all of

Page 264

1     these problems in combination prevent you
2     from performing the duties of a secretary?
3     A.     Yes.
4     Q.     The afore mentioned problems
5     are for physical disability; right?
6     A.     Yes.
7     Q.     You don't claim that you're
8     mentally incapable of performing the duties
9     of your occupation as a secretary; correct?
10          MR. SINCLAIR:  Objection to
11     the form. Answer to the best of your
12     ability.
13          MR. FINK:  I thought we had a
14     stipulation on that, that she doesn't
15     contend that her -- or that she's mentally
16     incapable of performing the duties of her
17     occupation as a secretary and that her
18     claims are for physical problems?
19          MR. SINCLAIR:  Would lack of
20     ability to concentrate fall within what
21     you're asking her about?
22          MR. FINK:  Well, if she
23     contends that her lack of ability to

66 (Pages 261 to 264)

# EXHIBIT

# "18"

EXHIBIT "18"

**UNUMPROVIDENT.**

2/7/05
Dr. McKinney
Fax 334-265-5574

I am a physician at Betty Bullard's's disability insurance carrier, Unum Provident. I tried to call you on 2/7/05 to discuss [his-her] claim, but did not reach you. It would be much appreciated if you would please contact this office at your earliest convenience to schedule a telephone appointment. Our toll-free telephone number is 1-800-633-7479 and my direct extension is 43341.

The purpose of this call was to gain a better understanding of your medical opinion and discuss questions we had regarding our interpretation of the medical data available. So that you may prepare for our conversation, I have listed my questions regarding Betty Bullard's condition below:

Although Dr. Thorbury, Dr.Richardson, and Dr. Foy did not list any restrictions/limitations for Ms. Bullard, I felt the following Restrictions/Limitations were supported with Ms. Bullard's co-morbid conditions:

- **avoid repetitive bending/twisting at the waist**
- **avoid prolong standing/walking**
- **change position as needed for comfort**
- **avoid above the shoulders work**
- **close and readily available restroom facilities**
- **occasional lifting up to 20 pounds**
- **frequent lifting up to 10 pounds**
- **no lifting above shoulders**
- **avoid lifting while bending at the waist**
- **avoid fine articulate movements of the hands when arthritis flares in hands**

Do you agree with the above limitation for Betty Bullard?

Are there any other R/L's that you feel are supported? If so, based on what physical findings?

Alternatively, you may respond to our questions in writing. Please respond within 15 days to ensure that your response is included in our evaluation. If you prefer, you may fax your written response to me at 423-785-2803.

We very much appreciate your time in providing this information and analysis to assist in our claim

evaluation efforts. We will be happy to reimburse you for your time on a pro-rata basis at your customary

**#22**

Claimant Name: Betty W Bullard    Claim #: 1358453

office consultation rate. Please attach a statement including to whom the check should be made payable, as well as the tax ID number.

Thank you for your time and assistance.

Susy L. L. Vergot, DO
VP Medical Director
Board Certified Family Practice
Licensed in TN., GA.
Unum Provident Corp.

# EXHIBIT

# "19"

EXHIBIT "19"

Feb.24. 2005  9:11AM   HANDEY WHITESELL                    No.5882   P. 2/2

# JACKSON FAMILY PRACTICE

*In Affiliation with Jackson Hospital*

George M. Handey, M.D.             Janise H. Whitesell, M.D.          Rachel M. McKinney, M.D.

QUALITY PERFORMANCE SUPPORT

MAR 0 1 2005

February 22, 2005

Dr. Vergot:

I am writing you regarding Betty Bullard. I feel that you have adequately listed her limitation from her ulcerative colitis and her rheumatoid arthritis. Ms. Bullard states that her fatigue from her narcolepsy and fibromyalgia is such that she is unable to stay awake at work even for a part time job. As this is not my area of expertise, I am unable to give an opinion on her true limitation from these diagnoses. You may benefit from discussion with her rheumatologist, Dr. Donna Paul, or her sleep specialist, Dr. Reuben Richardson. I do not really have anything further to add to your assessment.

Sincerely,

Rachel M. McKinney, MD

1801 Pine Street • Suite 301 • Montgomery, AL • 36106 • (334) 265-5577

#23

Claimant Name: Betty W Bullard        Claim #: 1358453

# EXHIBIT

## "20"

EXHIBIT "20"

CINDY SCHNEIDER, M.D.

VS.

UNUMPROVIDENT CORPORATION;
PAUL REVERE LIFE INSURANCE
COMPANY; BEVERLY J. PETERSON
AND DOES 1 THROUGH 10

---

VIDEO DEPOSITION OF SUSAN N. ROTH

MARCH 24, 2003

---

CATHY H. KERLEY, RPR
HALL & ASSOCIATES
1010 MARKET STREET, SUITE 402
CHATTANOOGA, TENNESSEE  37402
423-267-4328

**Deposition of Susan N. Roth, 3/24/03**
**Cindy Schneider, M.D. vs. UnumProvident Corporation, et al**

Sheet (1) of (16)                    Case Compress

---

**Page 1**

```
1        IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2            IN AND FOR THE COUNTY OF MARICOPA

3   _____

4   CINDY SCHNEIDER, M.D.,            )
                                      )
5            Plaintiff,               )
                                      )
6        vs.                          )  NO. CV2001-018780
                                      )
7   UNUMPROVIDENT CORPORATION;        )
    PAUL REVERE LIFE INSURANCE        )
8   COMPANY; BEVERLY J. PETERSON      )
    AND DOES 1 THROUGH 10,            )
9                                     )
             Defendants.             )
10  _____

11

12                MARCH 24, 2003

13

14

15      VIDEO DEPOSITION OF SUSAN N. ROTH

16

17

18

19

20

21

22

23              CATHY H. KERLEY, RPR
24             HALL AND ASSOCIATES
         1010 MARKET STREET, SUITE 402
25       CHATTANOOGA, TENNESSEE  37402
                 423-267-4328
```

---

**Page 2**

```
1   APPEARING FOR THE PLAINTIFF:

2   RICHARD W. LANGERMAN, ESQUIRE
    LAW OFFICES OF RICHARD LANGERMAN
3   350 EAST VIRGINIA AVENUE, SUITE 100
    PHOENIX, ARIZONA  85004

4
    APPEARING FOR UNUMPROVIDENT CORPORATION
5   AND PAUL REVERE LIFE INSURANCE COMPANY:

6   GREG COMO, ESQUIRE
    LEWIS AND ROCA, LLP
7   40 N. CENTRAL
    PHOENIX, ARIZONA  85004
8
    EDWARD CORRIGAN, ESQUIRE
9   UNUMPROVIDENT CORPORATION
    18 CHESTNUT STREET
10  WORCESTER, MASSACHUSETTS  01608

11  APPEARING FOR BEVERLY J. PETERSON:
    (VIA TELEPHONE)
12
    ROBERT GAFFNEY, ESQUIRE
13  MYLES P. HASSETT, P.C.
    3030 N. CENTRAL, SUITE 1002
14  PHOENIX, ARIZONA  85012

15  Also Present:  Lee Lusk, Videographer

16

17

18

19

20

21

22

23

24

25
```

---

**Page 3**

```
1              I N D E X

2   Deposition of SUSAN N. ROTH          Page
3     Direct Examination by Mr. Langerman   6

4

5              EXHIBITS

6   No.     Description               Page

7    1    Form B Insurance Holding
          Company System Annual
8         Registration Statement       56

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

---

**Page 4**

```
1         The video deposition of SUSAN N. ROTH,
2   called as a witness at the instance of the
3   Plaintiff, for use pursuant to the Arizona Rules
4   of Civil Procedure, taken by notice on the 24th
5   day of March 2003, at the offices of Hall and
6   Associates, 1010 Market Street, Suite 402,
7   Chattanooga, Tennessee.
8         S T I P U L A T I O N S
9         Deposition is being taken by agreement
10  of counsel for the plaintiff and the defendants.
11  It is agreed that the deposition shall be taken in
12  machine shorthand by Cathy H. Kerley, Notary
13  Public and Court Reporter, that the signature of
14  the witness to the completed deposition is not
15  waived, and that the witness may be sworn by the
16  said Notary Public.
17         It is further agreed that all
18  formalities as to caption, notice, certificate and
19  mode of transmission are waived, and that the
20  deposition is taken subject to the usual
21  exceptions as to irrelevancy, incompetency and
22  immateriality, which are reserved to the hearing
23  of the cause, except as to the form of the
24  question.
25
```

---

**Deposition of Susan N. Roth, 3/24/03**
**Cindy Schneider, M.D. vs. UnumProvident Corporation, et al**

Case Compress

---

**5**

1    VIDEOGRAPHER: This is the videotaped
2  deposition of Susan Roth taken in the matter Cindy
3  Schneider, M.D. versus UnumProvident Corporation,
4  Paul Revere Life Insurance Company, Beverly J.
5  Peterson and Does 1 through 10.
6        This deposition is being held in the
7  offices of Hall and Associates, 1010 Market
8  Street, Suite 402, at the time and date indicated
9  on the video screen.
10       The court reporter's name is Cathy
11  Kerley from the firm Hall and Associates.
12       The videotape specialist was
13  identified on the front of the videotape.
14       Counsel will now introduce
15  themselves.
16       MR. LANGERMAN: My name is Richard
17  Langerman. I represent Dr. Cindy Schneider, the
18  plaintiff.
19       MR. COMO: Greg Como and Ed Corrigan
20  on behalf of UnumProvident Corporation and Paul
21  Revere Life Insurance Company.
22       MR. GAFFNEY: Bob Gaffney
23  representing defendant Bev Peterson.
24       VIDEOGRAPHER: The court reporter
25  will now administer the oath.

**6**

1        SUSAN N. ROTH,
2  called as a witness at the instance of the
3  Plaintiff, having been first duly sworn, was
4  examined and testified as follows:
5        DIRECT EXAMINATION
6  BY MR. LANGERMAN:
7  Q        Can you please state your full name
8  for the record?
9  A        Susan Nance Roth.
10  Q       Ms. Roth, how many times have you had
11  your deposition taken?
12  A       I'd say probably six or seven times.
13  Q       In September you were here in this
14  office being deposed in the Avner case. Do you
15  recall that?
16  A       I recall being in this office. I
17  don't recall which case it was.
18  Q       In approximately September?
19  A       In the fall.
20  Q       Have you had your deposition taken
21  since that time?
22  A       I don't recall if I have. I don't
23  think so.
24  Q       In preparation for your deposition
25  today, did you review any documents?

**7**

1  A        I looked at the General Services
2  Agreement.
3  Q        Any other documents that you reviewed
4  in preparation for your deposition today?
5  A        No.
6  Q        Did you meet with anyone in
7  preparation for your deposition today?
8  A        Yes.
9  Q        With whom did you meet?
10  A       Counsel.
11  Q       That would be Mr. Como?
12       MR. COMO: Greg Como.
13       THE WITNESS: And Mr. Corrigan.
14  BY MR. LANGERMAN:
15  Q       When did you met with Mr. Como and
16  Mr. Corrigan?
17  A       This morning.
18  Q       What time was that meeting?
19  A       It was originally scheduled at 8:30,
20  but, I guess, it ended up being around 11.
21  Q       How long did you meet with counsel?
22  A       My guess is 15 minutes.
23  Q       During your meeting with counsel, did
24  you review any documents?
25  A       Not to my -- not that I recall.

**8**

1  Q        Other than the meeting this morning,
2  have you met with anyone regarding the Schneider
3  case?
4  A        There was another person who was
5  being deposed today who was in the meeting with
6  Mr. Como and Mr. Corrigan, Catheryn Konsavage.
7  Q        That wasn't my question. Other than
8  your meeting today, have you met with anyone about
9  the Schneider case?
10  A       No.
11  Q       Have you spoken with anyone prior to
12  today about the Schneider case?
13  A       I've spoken with paralegals to tell
14  me the time, the date. And I spoke with Mr. Como
15  a few days ago about the upcoming of the time and
16  date.
17  Q       How long was your conversation with
18  Mr. Como last week?
19  A       I don't recall, five or ten minutes.
20  Q       You have a jurist doctorate degree?
21  A       Yes.
22  Q       When did you obtain that?
23  A       1983.
24  Q       From what institution?
25  A       Cornell.

---

Deposition of Susan N. Roth, 3/24/03
Cindy Schneider, M.D. vs. UnumProvident Corporation, et al
Sheet (3) of (16)                                    Case Compress

**9**

1  Q        Since obtaining your J.D., have you
2  had any other schooling?
3  A        No.
4  Q        What was your first job after
5  obtaining your J.D.?
6  A        I was in private practice with a law
7  firm called Miller and Martin.
8  Q        What type of practice did you have
9  with Miller and Martin?
10  A        It's a law firm which as an
11  associate, you sort of rotate in different
12  practices, but primarily bankruptcy, some
13  litigation, some corporate, some securities, some
14  commercial law.
15  Q        What was your next job after Miller
16  and Martin?
17  A        United States Bankruptcy Court.
18  Q        You were a government employee?
19  A        Yes, I was.
20  Q        What was your next job after that?
21  A        Provident Life and Accident Insurance
22  Company.
23  Q        You began with Provident Life and
24  Accident Insurance Company in January of 1989?
25  A        That's right.

**10**

1  Q        When you first started with
2  Provident, what was your job title?
3  A        I'd have to recall.  I think it was
4  either assistant counsel or associate counsel, I
5  believe.
6  Q        What were your duties and
7  responsibilities as an assistant counsel at
8  Provident?
9  A        I went primarily to do work-outs in
10  bankruptcy for real estate commercial mortgage
11  loans.
12  Q        How long did you hold that job title?
13  A        I don't recall.  Probably a year, a
14  year or two.
15  Q        What was your next job title?
16  A        It was counsel.
17  Q        And that would have been some time
18  around 1990 or '91?
19  A        Probably.
20  Q        What were your duties and
21  responsibility as counsel for Provident?
22  A        I moved over to work on securities
23  and corporate law side.
24  Q        What was your next job title after
25  that?

**11**

1  A        I think it was counsel and corporate
2  secretary.
3  Q        When did you become counsel and
4  corporate secretary for Provident Life and
5  Accident Insurance Company?
6  A        I believe that would have been in
7  1996.  I don't recall the exact date.
8  Q        At the time that you became the
9  corporate secretary for Provident, right before
10  that time were your duties still limited to the
11  securities and corporate law issues you described
12  previously?
13  A        Primarily.  Occasionally I was with
14  an insurance company and I would do some insurance
15  work other than bankruptcy questions, but the bulk
16  of my work would have been corporate and
17  securities work.
18  Q        When you become the corporate
19  secretary, what were your duties and
20  responsibilities in that role?
21  A        To act as the corporate secretary for
22  the company in meeting with the board of
23  directors, maintaining minutes, corporate records
24  for the company.
25  Q        Have you regularly attended the board

**12**

1  of directors meetings of Provident Life and
2  Accident Insurance Company since 1996?
3  A        Yes.
4  Q        In 1996 did you have any
5  responsibilities for Provident Companies, Inc.?
6  A        Yes.  I would have been a corporate
7  secretary for it in 1996.
8  Q        Did you also attend the board of
9  directors meetings for Provident Companies, Inc.
10  beginning in 1996?
11  A        Yes.
12  Q        Are you the custodian of records,
13  corporate records, for Provident Life and Accident
14  Insurance Company?
15  A        For some of the corporate records,
16  yes.
17  Q        Which records are you currently the
18  custodian of for Provident Life and Accident
19  Insurance Company?
20  A        It would be minutes, materials
21  provided to the board.  And then my area is
22  responsible for filing, making different filings
23  with the state insurance departments.  So I would
24  also have those records as far as the holding
25  company statements and things of that nature.

Deposition of Susan N. Roth, 3/24/03
Cindy Schneider, M.D. vs. UnumProvident Corporation, et al

Case Compress

| 13 | 15 |
|---|---|
| 1  Q        How about the annual reports filed | 1  you also become a vice president of Paul Revere |
| 2  with the departments of insurance by Provident | 2  Life Insurance Company? |
| 3  Life and Accident Insurance Company? | 3  A        I don't recall if -- when I became a |
| 4  A        Are you referring to what we call the | 4  vice president, if it was before or after the |
| 5  statutory blue books as opposed to an annual | 5  merger with Paul Revere.  So I don't -- I don't |
| 6  report to a shareholder? | 6  know if it was at the same time or not. |
| 7  Q        Actually I think they're called | 7  Q        After Provident Companies, Inc. |
| 8  annual statements and they are filed with -- | 8  acquired Paul Revere Corporation, did you become a |
| 9  A        Annual statements instead of annual | 9  vice president of Paul Revere Life Insurance |
| 10  reports.  Those -- those are actually -- I have | 10  Company? |
| 11  copies, but they're also prepared primarily in our | 11  A        Yes, I would say. |
| 12  financial reporting area. | 12  Q        Did you also become a vice president |
| 13  Q        In the last year or two did you | 13  of Paul Revere Corporation? |
| 14  serve as the custodian of records for similar | 14  A        Yes. |
| 15  types of documents for Paul Revere Life Insurance | 15  Q        Are you currently a vice president of |
| 16  Company? | 16  Paul Revere Life Insurance Company? |
| 17  A        When you refer to similar type | 17  A        Yes, I am. |
| 18  documents, you mean minutes and -- | 18  Q        Are you currently a vice president of |
| 19  Q        Minutes of the board, materials | 19  Provident Life and Accident Insurance Company? |
| 20  submitted to the board, regulatory filings | 20  A        Yes, I am. |
| 21  including the holding company statements filed | 21  Q        Are you currently a vice president of |
| 22  with departments of insurance? | 22  UnumProvident Corporation? |
| 23  A        Yes, I did. | 23  A        Yes. |
| 24  Q        So the minutes of the board of | 24  Q        When you became the assistant general |
| 25  directors for Paul Revere are maintained here in | 25  counsel, did you acquire any new duties and |

| 14 | 16 |
|---|---|
| 1  Chattanooga? | 1  responsibilities that you did not previously have |
| 2  A        We have copies here and then also, I | 2  in your role as counsel? |
| 3  believe, they keep copies in Worcester, but the | 3  A        Yes, I did. |
| 4  originals would be here. | 4  Q        What new duties and responsibilities |
| 5  Q        What was your next job title after | 5  did you -- were assigned to you at that time? |
| 6  counsel and corporate secretary? | 6  A        Management responsibilities for our |
| 7  A        Assistant general counsel and | 7  investment attorneys. |
| 8  corporate secretary and I'm also a vice president | 8  Q        Any others? |
| 9  of the company. | 9  A        Not that I can think of. |
| 10  Q        Did you get all of those titles at | 10  Q        What duties and responsibilities do |
| 11  the same time? | 11  you have as vice president of Provident Life and |
| 12  A        I don't recall when.  I think I was | 12  Accident Insurance Company? |
| 13  made a vice president prior to the assistant | 13  A        I act as in-house counsel for the |
| 14  general counsel title.  The assistant general | 14  company providing legal advice and services |
| 15  counsel title came in 1999. | 15  primarily in corporate and securities matter and |
| 16  Q        When did you become a vice president | 16  then, as I said, I also manage other corporate |
| 17  of the corporation? | 17  securities lawyers and investment lawyers. |
| 18  A        I don't recall. | 18  Q        Do you also provide similar services |
| 19  Q        When you became a vice president of | 19  to Paul Revere Life Insurance Company? |
| 20  Provident Life and Accident Insurance Company, did | 20  A        Yes, I do. |
| 21  you also become a vice president of Provident | 21  Q        Do you provide similar services to |
| 22  Companies, Inc. or its successor? | 22  UnumProvident Corporation? |
| 23  A        Yes. | 23  A        Yes, I do. |
| 24  Q        When you became a vice president of | 24  Q        Do you prepare time slips? |
| 25  Provident Life and Accident Insurance Company, did | 25  A        No, I do not. |

Deposition of Susan N. Roth, 3/24/03
**Cindy Schneider, M.D. vs. UnumProvident Corporation, et al**
Case Compress

### 17

1  Q      Since you became the secretary of
2  Paul Revere Life Insurance Company, how frequently
3  has the board of directors of Paul Revere Life
4  Insurance Company met?
5  A      I don't recall the exact number.
6  Sometimes they act by -- in meetings and sometimes
7  they act through written consents.
8  Q      In calendar year 2002 were there any
9  meetings of the board of directors of Paul Revere
10  Life Insurance Company?
11  A      I don't recall any meetings. I know
12  that there were consents, written consents, that
13  were prepared.
14  Q      The written consents that were
15  prepared, do you maintain copies of those?
16  A      Yes, I do.
17  Q      How about in 2001 were there any
18  meetings of the Paul Revere board of directors?
19  A      I believe there was.
20  Q      When was that?
21  A      I believe it was in May of 2001, but
22  I don't recall exactly.
23  Q      Was that a regularly scheduled
24  meeting?
25  A      I believe it was the meeting where we

### 18

1  typically handled the -- you know, the -- on an
2  annual basis elections of officers, shareholder
3  acts and elect directors for the year, things of
4  that nature.
5  Q      Were minutes prepared for that
6  meeting?
7  A      They typically would be. I would
8  think so.
9  Q      Did you prepare minutes for the May
10  2001 meeting of the board of directors of
11  Provident Life and Accident Insurance Company?
12  A      I thought a minute ago we're talking
13  about Paul Revere. Is this a Provident Life and
14  Accident?
15  Q      Did I say Provident?
16         MR. COMO: I didn't catch what your
17  last question was.
18         MR. LANGERMAN: Let me --
19         MR. COMO: Why don't you just
20  rephrase it, then.
21  BY MR. LANGERMAN:
22  Q      In case I said it incorrectly, did
23  you prepare any minutes for the May 2001 meeting
24  of the board of directors of Paul Revere Life
25  Insurance Company?

### 19

1  A      That would be my practice. I don't
2  recall specifically doing it, but I could make
3  available what we have.
4  Q      Did you attend that meeting?
5  A      Yes.
6  Q      Where did that meeting occur?
7  A      2001. I don't recall. Let's see. I
8  believe that one was in Chattanooga.
9  Q      Did the board of directors of Paul
10  Revere Life Insurance Company have any meetings in
11  the year 2000?
12  A      I don't recall. I believe it had --
13  yes. I believe it did have a meeting in Portland.
14  Q      Did you attend that meeting?
15  A      Yes.
16  Q      Did the board of Paul Revere hold any
17  meetings in calendar year 1999?
18  A      I don't recall if they did in the
19  last -- we didn't acquire. We merged. I'm sorry.
20  You're talking about Paul Revere instead of Unum.
21  I don't recall.
22  Q      Any meetings that were held of the
23  board of Paul Revere Life Insurance Company, those
24  minutes would be maintained by your office here in
25  Chattanooga; correct?

### 20

1  A      That is correct.
2  Q      Do you attend meetings of the board
3  of directors of UnumProvident Corporation?
4  A      Yes, I do.
5  Q      Have you been attending those
6  meetings since UnumProvident Corporation was
7  formed?
8  A      It was originally formed as Provident
9  Companies, Inc. So is your question --
10  Q      Well, let's focus on the time, I
11  believe, it was late spring of 1999 that Provident
12  Companies, Inc. changed its name to UnumProvident
13  Corporation; is that correct?
14  A      June 30, 1999.
15  Q      Since June 30th, 1999, have you been
16  attending the meetings of the board of directors
17  of UnumProvident Corporation?
18  A      Yes, I have.
19  Q      Are you the person responsible for
20  taking the minutes of the meetings of the board of
21  directors of UnumProvident Corporation?
22  A      Yes.
23  Q      Have you ever attended a meeting of
24  the compensation committee of the UnumProvident
25  board of directors?

Cathy H. Kerley, RPR                    **Hall & Associates**                    Page 17 to Page 20
                                        **(423) 267-4328**

Deposition of Susan N. Roth, 3/24/03
**Cindy Schneider, M.D. vs. UnumProvident Corporation, et al**

Case Compress

**21**

1  A    I have not recently attended a
2  compensation committee meeting. There have been
3  times further in the past and I don't recall the
4  last one that I would have attended compensation
5  committee meetings.
6  Q    If you were attending a meeting of
7  the compensation committee of the board of
8  UnumProvident Corporation, would you be
9  responsible for taking minutes of that meeting?
10  A    At times in the past I've been
11  responsible for taking those minutes. More
12  recently they are kept by -- let me just clear
13  this up a little bit.
14       UnumProvident Corporation has a
15  number of committees and because the board members
16  are on different -- can be on different
17  committees, there are some committees which would
18  have no overlap and those meet concurrently
19  typically.
20       Typically I don't attend the
21  compensation committee meetings. That is handled
22  by our general counsel. I attend the finance
23  committee meetings. Although, there have been
24  times in the past where if there was not a
25  conflict, I would have attended some compensation

**22**

1  committee meetings.
2  Q    If you are not attending a
3  compensation committee meeting, then general
4  counsel would be attending the meeting?
5  A    Yes.
6  Q    That would be Mr. Copeland?
7  A    Yes.
8  Q    If Mr. Copeland was attending a
9  compensation committee meeting, who would be
10  responsible for taking the minutes of that
11  meeting?
12  A    I believe he prepares the minutes for
13  those meetings.
14  Q    Where are the minutes of the
15  compensation committee of UnumProvident currently
16  maintained?
17  A    Here in Chattanooga.
18  Q    In your office?
19  A    In what we call our records room.
20  Q    Is that near your office?
21  A    It's near my office.
22  Q    UnumProvident Corporation is an
23  insurance holding company; correct?
24  A    It's a general business corporation
25  that has insurance subsidiaries.

**23**

1  Q    Well, it files disclosures with
2  various departments of insurance in which it
3  identifies itself as an insurance holding company
4  pursuant to the various insurance holding company
5  acts of those states; correct?
6  A    As the -- in a holding company
7  system, correct.
8  Q    One of the insurance subsidiaries of
9  UnumProvident Corporation is Paul Revere Life
10  Insurance Company; correct?
11  A    Yes. It's an indirect wholly owned
12  subsidiary.
13  Q    One of the insurance subsidiaries of
14  UnumProvident Corporation is Provident Life and
15  Accident Insurance Company; correct?
16  A    That's correct.
17  Q    UnumProvident Corporation was
18  previously known as Provident Companies, Inc.;
19  correct?
20  A    That's correct.
21  Q    Provident Companies, Inc. changed its
22  name to UnumProvident Corporation on June 30,
23  1999; correct?
24  A    That's right.
25  Q    Provident Companies, Inc. was

**24**

1  established in the spring of 1995; is that
2  correct?
3  A    That's right. March of 1995.
4  Q    And in December of 1995 Provident
5  Companies, Inc. became the holding company for
6  Provident Life and Accident Insurance Company;
7  correct?
8  A    In December it became the ultimate
9  parent, but it did not become the direct parent
10  until March of 1996 is my recollection.
11  Q    You're familiar with the term
12  ultimate controlling person?
13  A    Yes, I am.
14  Q    That's a term used in the Insurance
15  Holding Company Acts of various states in the
16  United States?
17  A    That's correct.
18  Q    It's your understanding that in
19  December of 1999 Provident Companies, Inc. became
20  the ultimate controlling person as that term is
21  used in the Insurance Holding Company Act for
22  Provident Life and Accident Insurance Company?
23  A    No. In December of 1996. It was
24  incorporated in 1990 -- I'm sorry. It was
25  incorporated in 1995 and in December of 1995 it

Deposition of Susan N. Roth, 3/24/03
**Cindy Schneider, M.D. vs. UnumProvident Corporation, et al**

Case Compress

### 25

1  entered into a share exchange with the entity that
2  was then the ultimate controlling person of
3  Provident Life and Accident. And then in March of
4  1996 the intervening holding company went away and
5  became the direct parent corporation of Provident
6  Life and Accident.
7  Q      So March of 1996 is when Provident
8  Companies, Inc. became the ultimate controlling
9  person of Provident Life and Accident Insurance
10  Company?
11  A      No. It would have originally have
12  occurred in December it would have been the
13  ultimate controlling person, but you understand
14  there was an intervening holding company at that
15  point is the only point I'm trying to make.
16  Q      So in December of 1995, Provident
17  Companies, Inc. was the ultimate controlling
18  person of Provident Life and Accident Insurance
19  Company.
20  A      That's right.
21  Q      In the spring of 1996 Provident Life
22  and Accident Insurance Company announced a
23  proposed acquisition of Paul Revere Life Insurance
24  Company?
25  A      Can you read that back? I think he

### 26

1  said Provident Life and Accident. I think he
2  meant Provident Companies, Inc.
3  Q      Well, I didn't actually. Okay.
4  A      Sorry.
5  Q      Let me rephrase it so that you'll be
6  more comfortable with it. The announcement was
7  made in the spring of 1996 about this proposed
8  acquisition; correct?
9  A      There was an announcement in the
10  spring of 1996 about the acquisition or a proposed
11  acquisition of Paul Revere Corporation by
12  Provident Companies, Inc.
13  Q      The acquisition of Paul Revere
14  Corporation by Provident Companies, Inc. was
15  finalized in March of 1997; correct?
16  A      That's correct.
17  Q      After the acquisition of Paul Revere
18  Corporation by Provident Companies, Inc., did the
19  Paul Revere employees become employees of
20  Provident Life and Accident Insurance Company?
21  A      No.
22  Q      Did the Paul Revere employees become
23  employees of Provident Companies, Inc.?
24  A      At a later date. Not immediately
25  following you understand. Not immediately

### 27

1  following the acquisition, but in 1998 they became
2  employees of Provident Companies, Inc.
3  Q      Was that in March or April of 1998?
4  A      It was either March or April. One
5  was in March and one was in April.
6  Q      Since April of 1998 Paul Revere Life
7  Insurance Company has no employees; correct?
8  A      I believe that's correct.
9  Q      Since April of 1998 Provident Life
10  and Accident Insurance Company has had no
11  employees; correct?
12  A      At one point there were, I believe, a
13  few employees, a handful of employees, still at
14  Provident Life and I don't recall when that
15  stopped, but essentially all but a very few
16  employees became employees of Provident Companies,
17  Inc.
18  Q      And after June of 1999 all of those
19  employees became employees of UnumProvident
20  Corporation.
21  A      Well, there's been no change in the
22  corporation. It's just a change in the name. So
23  they didn't become employees. They continued to
24  be employees, but they're employees of a company
25  with a different name.

### 28

1  Q      In calendar year 1999 Paul Revere
2  Life Insurance Company had no employees; correct?
3  A      That's -- I believe that's correct.
4  Q      In calendar year 2000 Paul Revere
5  Life Insurance Company had no employees; correct?
6  A      That's correct.
7  Q      Since the spring of 1998 all of the
8  functions of Paul Revere Life Insurance Company
9  have been performed either by UnumProvident
10  employees or by outside vendors retained by
11  UnumProvident employees; correct?
12  A      I am not certain of who the vendor's
13  relationship is with. I don't know if Paul Revere
14  has contracts with outsiders on its own.
15  Q      Well, let's put it this way. None of
16  the work was done by Paul Revere Life Insurance
17  Company employees; correct?
18  A      That's correct.
19  Q      Let me show you what's been -- well,
20  let's back up.
21  We had noticed a deposition for
22  earlier today of the person most knowledgeable
23  regarding the General Services Agreement between
24  Paul Revere Life Insurance Company and
25  UnumProvident Corporation including the services

Cathy H. Kerley, RPR                 **Hall & Associates**                 Page 25 to Page 28
                                      **(423) 267-4328**

Deposition of Susan N. Roth, 3/24/03
Cindy Schneider, M.D. vs. UnumProvident Corporation, et al

Sheet (8) of (16)      Case Compress

### 29

1 to be rendered, the -- Greg, can I borrow yours?
2      MR. COMO: Yeah.
3 BY MR. LANGERMAN:
4 Q      Three -- three particular things:
5 The services to be rendered by UnumProvident
6 employees, the oversight authority of Paul Revere,
7 and the compensation to be paid to UnumProvident.
8      At that time we were told that
9 Ms. Konsavage was the person most knowledgeable
10 regarding the compensation to be paid, but that
11 you were the person most knowledgeable regarding
12 the scope of the duties to be performed and the
13 oversight authority of Paul Revere.
14      First of all, are you the person most
15 knowledgeable on those two subjects?
16 A      As far as I know.
17 Q      Let me hand you what was marked as
18 Exhibit 1 to Ms. Konsavage's deposition.  I assume
19 you've seen that document before?
20 A      Yes, I have.
21 Q      Did you play any part in drafting the
22 General Services Agreement between Paul Revere
23 Life Insurance Company and Provident Companies,
24 Inc.?
25 A      I didn't draft the document.  I

### 30

1 provided comments on the document when it was
2 originally prepared.
3 Q      To whom did you provide those
4 comments?
5 A      Outside counsel.
6 Q      Which would have been whom?
7 A      The firm was called Alston and Bird.
8 Q      Where are they located?
9 A      Well, they've got offices many
10 locations, but the one we were dealing with was in
11 Atlanta.
12 Q      Ultimately -- well, let me back up.
13      What's the name of that firm?
14 A      A-L-S-T-O-N and B-I-R-D.
15 Q      Alston and Bird.  Which of the
16 companies was Alston and Bird representing in late
17 '97, early '98 as part of the drafting of the
18 General Services Agreement?
19 A      I don't recall which of the companies
20 hired them.  I believe it was Provident Companies,
21 Inc.
22 Q      Did Paul Revere Life Insurance
23 Company hire its own attorneys as part of the
24 drafting of the General Services Agreement?
25 A      No, it did not.

### 31

1 Q      The General Services Agreement was
2 signed on April 17, 1998; is that correct?
3 A      I don't recall.  I can look and see
4 what the document says.
5      MR. COMO: Page 13.
6      THE WITNESS: Yes.  That's what it
7 states.
8 BY MR. LANGERMAN:
9 Q      Provident Companies, Inc. -- well,
10 the contract was signed by Ralph Rogers on behalf
11 of Provident Companies, Inc.; correct?
12 A      Correct.
13 Q      He was a senior vice president and
14 treasurer of Provident Companies, Inc. at that
15 time?
16 A      Yes.
17 Q      The General Services Agreement was
18 signed by Harold Chandler on behalf of Paul Revere
19 Life Insurance Company?
20 A      Yes.
21 Q      Mr. Chandler was the chief executive
22 officer of Paul Revere Life Insurance Company at
23 that time?
24 A      Yes, he was.
25 Q      Was he also the chairman of the board

### 32

1 of Paul Revere Life Insurance Company?
2 A      Yes.
3 Q      In April of 1998 Mr. Chandler was
4 also the chief executive officer of Provident
5 Companies, Inc.; correct?
6 A      Yes.
7 Q      He was also the chairman of the board
8 of Provident Companies, Inc.; correct?
9 A      That's correct.
10 Q      The -- paragraph three of the
11 contract deals with the term or length of the
12 contract; correct?
13 A      That's correct.
14 Q      The initial term of the General
15 Services Agreement was one year; correct?
16 A      That's right.
17 Q      Paragraph 3.01 of the contract
18 provides that the agreement will be automatically
19 renewed for a one-year period unless either party
20 notifies the other in writing at least 60 days
21 before the annual expiration date that such party
22 declines to so renew; correct?
23 A      Yes.
24 Q      Is it your understanding that the
25 General Services Agreement that was signed in

Cathy H. Kerley, RPR          Hall & Associates          Page 29 to Page 32
                              (423) 267-4328

Deposition of Susan N. Roth, 3/24/03
Cindy Schneider, M.D. vs. UnumProvident Corporation, et al
Sheet (9) of (16)                                    Case Compress

**33**

1  April of 1998 has been automatically renewed since
2  then?
3  A       Yes, it is.
4  Q       Is it your understanding that the
5  General Services Agreement that was entered into
6  in April of 1998 is still in effect between Paul
7  Revere Life Insurance Company and UnumProvident
8  Corporation?
9  A       Yes.
10  Q       Was a similar General Services
11  Agreement entered into between Paul Revere --
12  pardon me, Provident Life and Accident Insurance
13  Company and UnumProvident Corp. or Provident
14  Companies, Inc.?
15  A       Yes, there was.
16  Q       At roughly the same time?
17  A       Yes.
18  Q       Can you turn to paragraph nine.
19  Paragraph nine of the contract deals with
20  amendments to the contract; correct?
21  A       Correct.
22  Q       Has the General Services Agreement
23  that was entered into in April of 1998 between
24  Paul Revere Life Insurance Company and
25  UnumProvident Corporation ever been amended to

**34**

1  your knowledge?
2  A       Not to my knowledge.
3  Q       Appendix A to the General Services
4  Agreement provides a list of services to be
5  rendered by Provident Companies, Inc. to Paul
6  Revere; correct?
7  A       That's correct.
8  Q       Has Appendix A ever been amended
9  since this contract was signed in April of 1998?
10  A       Not to my knowledge.
11  Q       Can you turn to the back -- to the
12  first page of the General Services Agreement.  The
13  whereas provisions, there's a bunch of them --
14  A       Uh-huh.
15  Q       -- describe, among others things, the
16  purposes of the General Services Agreement between
17  Paul Revere Life Insurance Company and Provident
18  Companies, Inc.; correct?
19  A       That's correct.
20  Q       One of the purposes was to improve
21  the operations of the companies; correct?
22  A       Yes.
23  Q       One of the purposes was to utilize
24  the personnel and resources of the companies more
25  effectively?

**35**

1  A       Yes.
2  Q       One of the purposes of the agreement
3  was to better monitor the performance of the
4  employees and the companies?
5  A       To better monitor performance in
6  various job functions of the employees.
7  Q       The first page indicates that
8  Provident Companies, Inc. has assumed the
9  employment of certain personnel; is that correct?
10  A       Yes.
11  Q       Would that have been all of the
12  employees of Paul Revere Life Insurance Company?
13  A       It's my understanding that it would
14  have been all the employees who were still
15  employees as of this date.
16  Q       After the General Services Agreement
17  became effective, all of the Paul Revere Life
18  Insurance Company employees became employees of
19  Provident Companies, Inc.?
20  A       That's correct.
21  Q       They still had their same job
22  functions; correct?
23  A       It would have depended.  People were
24  moving around some at that point.  So for some
25  people, yes, it would be the same job functions.

**36**

1  For other people, they may have moved to a
2  different area or different function.
3  Q       That would have included product
4  development employees; correct?
5  A       That's correct.
6  Q       It would have included actuarial
7  department employees?
8  A       I don't know that we have something
9  called an actuarial department, but it would have
10  included actuaries.
11  Q       It would have included sales and
12  marketing personnel?
13  A       Correct.
14  Q       It would have included customer
15  service personnel?
16  A       Yes.
17  Q       It would have included accounting
18  personnel?
19  A       Yes.
20  Q       It would have included finance
21  personnel?
22  A       Yes.
23  Q       It would have included government
24  regulatory affairs personnel?
25  A       Yes.

Cathy H. Kerley, RPR                    Hall & Associates                    Page 33 to Page 36
                                        (423) 267-4328

Deposition of Susan N. Roth, 3/24/03
**Cindy Schneider, M.D. vs. UnumProvident Corporation, et al**
Case Compress

**37**

1  Q    It would have included human
2  resources personnel?
3  A    Yes.
4  Q    It would have included claim
5  department operations personnel?
6  A    Yes.
7  Q    In paragraph one of the General
8  Services Agreement, paragraph 1.01 states that
9  Provident Companies, Inc. agrees to provide the
10  services listed in Appendix A; is that correct?
11  A    That's correct.
12  Q    Can you turn to Appendix A. Appendix
13  A is a seven-page list of various services to be
14  rendered by Provident Companies, Inc. on behalf
15  of Paul Revere Life Insurance Company; correct?
16  A    That's correct.
17  Q    Are there any other activities or
18  conduct of Paul Revere Life Insurance Company that
19  are not identified in Appendix A to the General
20  Services Agreement?
21  A    Can I take a moment? There's many
22  areas in this.
23  Q    You can take as many moments as you
24  need.
25  A    Yes. There's an area that's not

**38**

1  included in the General Services Agreement because
2  it's provided by a different entity and that's the
3  investments of Paul Revere Life Insurance Company.
4  There's an investment management agreement between
5  Paul Revere and Provident Investment Management,
6  LLC. And so the services that are rendered in
7  connection with the investments of Paul Revere are
8  provided by that entity instead of PCI.
9  Q    Is Provident Investment Management,
10  LLC a subsidiary of UnumProvident Corporation?
11  A    Yes, it is.
12  Q    So other than the investment function
13  which is provided by a subsidiary of UnumProvident
14  Corporation, the rest of the activities of Paul
15  Revere Life Insurance Company are performed by
16  UnumProvident Corporation employees?
17  A    That would be true except to the
18  extent that they're provided by third-party vendor
19  relationships.
20  Q    Can you turn back to paragraph one of
21  the General Services Agreement. That first
22  sentence which I was reading that Provident
23  Companies, Inc. agrees to provide the services
24  listed in Appendix A as required by Paul Revere
25  Life Insurance Company in accordance with

**39**

1  specifications and requirements of Paul Revere
2  Life Insurance Company as communicated from time
3  to time and it goes on; correct?
4  A    Yes.
5  Q    What is your understanding of the
6  portion of this contract that says that the
7  services shall be rendered in accordance with the
8  specifications and requirements of Paul Revere
9  Life Insurance Company?
10  A    I'm sorry. Could you repeat the
11  question?
12  Q    No, but Cathy probably can.
13        (Thereupon, the requested portion of
14  the record was read back as follows:
15        "Question: What is your
16  understanding of the portion of this contract that
17  says that the services shall be rendered in
18  accordance with the specifications and
19  requirements of Paul Revere Life Insurance
20  Company?")
21  A    It's my understanding that it would
22  apply to the service provided in this contract.
23  Q    Are you aware of any specifications
24  and requirements prepared by Paul Revere Life
25  Insurance Company and communicated to

**40**

1  UnumProvident Corporation pursuant to paragraph
2  1.01 of the General Services Agreement?
3  A    I'm not aware of anything that has
4  been specifically prepared.
5  Q    What oversight authority does Paul
6  Revere Life Insurance Company have regarding the
7  services being provided on its behalf by
8  UnumProvident Corporation?
9  A    It has the oversight for the services
10  through the officers of the company.
11  Q    So the Paul Revere officers do
12  perform oversight of the services being provided
13  by UnumProvident Corporation on behalf of Paul
14  Revere Life Insurance Company?
15  A    That would be my understanding.
16  Q    How did you reach that understanding?
17  A    In connection with discussions where,
18  you know, for example, on financials or for
19  expenses, if we have a quarter where it might
20  say -- it might look like, say, you know, Paul
21  Revere looked like its expenses were high this
22  month or its expenses were low or something like
23  that, that's been discussed before with officers
24  of the company, the controller, and, I believe,
25  the CFO.

Deposition of Susan N. Roth, 3/24/03
Cindy Schneider, M.D. vs. UnumProvident Corporation, et al

Case Compress

**41**

1  Q        Who is the CFO of Paul Revere Life
2  Insurance Company?
3  A        Robert Greving.
4  Q        Who is the CFO of UnumProvident
5  Corporation?
6  A        Robert Greving.
7  Q        So Mr. Greving in his position as the
8  CFO of Paul Revere Life Insurance Company may
9  express some concerns to UnumProvident Corporation
10  if he had any concerns?
11  A        There have been times when
12  Mr. Greving would have worked with the people in
13  the area to say let's look into this and make
14  adjustments if they were needed.
15  Q        Are there any -- let me rephrase
16  that.
17            In 1999 or 2000 were there any
18  officers of Paul Revere Life Insurance Company who
19  did not hold similar positions with UnumProvident
20  Corporation?
21  A        Not to my knowledge.
22  Q        Is the same thing true today that all
23  of the officers of Paul Revere Life Insurance
24  Company hold similar positions with UnumProvident
25  Corporation?

**42**

1  A        That's true.
2  Q        If there were specifications and
3  requirements prepared by Paul Revere Life
4  Insurance Company and communicated to
5  UnumProvident Corporation in writing, would you
6  maintain a copy of such a document as the
7  corporate secretary of those two entities?
8  A        I don't recall having seen a written
9  list of specs.
10  Q        If there were such a document, would
11  you as the corporate secretary of Paul Revere Life
12  Insurance Company maintain a copy of it?
13  A        I would expect to.
14  Q        Would you expect that as the
15  corporate secretary of UnumProvident Corporation,
16  you would also be maintaining a copy of any
17  specifications and requirements provided pursuant
18  to paragraph 1.01 of the General Services
19  Agreement by Paul Revere Life Insurance Companies?
20  A        Yes, I would.
21  Q        Can you turn to Appendix A and in
22  particular page A-6.  One of the categories of
23  services provided by UnumProvident Corporation on
24  behalf of Paul Revere Life Insurance Company is
25  comprehensive claim management services; correct?

**43**

1  A        Yes.
2  Q        This would include reviewing claims
3  filed by Paul Revere Life Insurance Company
4  insureds; correct?
5  A        Yes.
6  Q        It would also include the
7  determination of whether claims made by Paul
8  Revere Life Insurance Company insureds are
9  payable; correct?
10  A        That's correct.
11  Q        Can you go back to paragraph 1.03 of
12  the General Services Agreement.  Paragraph 1.03 of
13  the agreement indicates that Provident Companies,
14  Inc. has agreed that it would satisfy any
15  standards established by Paul Revere and
16  communicated to Provident Companies, Inc.
17  regarding the services to be rendered on behalf of
18  Paul Revere Life Insurance Company; correct?
19  A        Yes.
20  Q        You've already indicated that you're
21  not aware of any written specifications and
22  requirements prepared by Paul Revere.  Are you
23  aware of any written standards prepared by Paul
24  Revere and communicated to Provident Companies,
25  Inc. pursuant to paragraph 1.03 of the General

**44**

1  Services Agreement?
2  A        There's one area I'm unsure of and
3  that is, I believe, there are claims procedures,
4  but I don't recall if those are in writing and if
5  they are, how they're delivered from one company
6  to the other.
7  Q        The claim procedures that you're
8  referring to are on the UnumProvident Corporation
9  intranet; is that correct?
10  A        I don't know.
11  Q        What is your understanding of the
12  claim procedures that you were referencing a
13  moment ago?
14  A        I've just heard people in the claims
15  area talk about, you know, I think they call it
16  the claims manual or the claims procedures, but I
17  don't have that document.
18  Q        What have you heard about the claims
19  manual or claims procedures?
20  A        I've just heard them refer to it.
21  Q        Do you know one way or another
22  whether that is the claims manual that currently
23  exists on the UnumProvident Corporation intranet?
24  A        I don't know that one does exist on
25  the intranet.

Cathy H. Kerley, RPR                Hall & Associates                Page 41 to Page 44
                                    (423) 267-4328

**Deposition of Susan N. Roth, 3/24/03**
**Cindy Schneider, M.D. vs. UnumProvident Corporation, et al**
Sheet (12) of (16)
Case Compress

---

**45**

1  Q        And whatever does exist, you don't
2  know which of the companies originally generated
3  those procedures or that manual; correct?
4  A        That's correct.
5  Q        Are you aware of any oral
6  communications from Paul Revere Life Insurance
7  Company to UnumProvident Corporation regarding
8  standards to be applied by claim department
9  employees pursuant to paragraph 1.03 of the
10 General Services Agreement?
11 A        Not to -- I don't recall any.
12 Q        Paragraph 1.03 also indicates that
13 Provident Companies, Inc. has agreed to comply
14 with all applicable federal, state, and local laws
15 which are applicable to it or to Paul Revere in
16 connection with providing the services outlined in
17 the General Services Agreement; correct?
18 A        That's right.
19 Q        That would include insurance
20 regulatory measures applicable to claim department
21 employees handling claims arising under Paul
22 Revere insurance policies; correct?
23 A        It would appear to, yes.
24 Q        So if Paul Revere was required to
25 comply with certain laws regulating the handling

---

**46**

1  of claims arising under policies issued by the
2  company, Provident Companies, Inc. agreed that it
3  would comply with those laws and regulations when
4  it handled the claims submitted by Paul Revere
5  insureds; correct?
6  A        That's correct.
7  Q        Paragraph 1.04 of the General
8  Services Agreement indicates that the right to
9  direct and control UnumProvident Corporation --
10 let me start over.
11          Paragraph 1.04 of the General
12 Services Agreement provides that the right to
13 direct and control Provident Companies, Inc.
14 employees would be the exclusive right of
15 Provident Companies, Inc.; correct?
16 A        That's correct.
17 Q        Paragraph 1.05 of the agreement
18 states that the parties had agreed that the
19 services being provided by Provident Companies,
20 Inc. would be subject to the direction and control
21 of the board of directors of Paul Revere Life
22 Insurance Company; correct?
23 A        That's right.
24 Q        Are you aware of any communications
25 from the board of directors of Paul Revere Life

---

**47**

1  Insurance Company to Provident Companies, Inc. or
2  its successor regarding the services being
3  provided under the General Services Agreement?
4  A        Provident Companies, Inc. doesn't
5  have a successor, but aside from that, I'm not
6  aware of a communication from the --
7          THE REPORTER:  From who?  I'm sorry,
8          THE WITNESS:  From the board,
9  communication from the board.
10 BY MR. LANGERMAN:
11 Q        Can you turn to paragraph five of the
12 General Services Agreement.  Paragraph five of the
13 General Services Agreement deals with the subject
14 of indemnification; is that correct?
15 A        That's correct.
16 Q        Paragraph 5.01 of the agreement
17 states that Provident Companies, Inc. will
18 indemnify Paul Revere for any liabilities
19 determined to arise out of any act or omission of
20 Provident Companies, Inc. in performing the
21 services under the General Services Agreement;
22 correct?
23 A        As -- as, you know, conditioned by
24 the phrases that follow that.
25 Q        So if Paul Revere was found liable

---

**48**

1  for wrongfully failing to pay benefits under one
2  of its insurance policies because of the acts or
3  omissions of Provident Companies, Inc. employees,
4  then Provident Companies, Inc. has agreed to
5  indemnify Paul Revere for that liability; correct?
6  A        If the acts are determined to
7  constitute one of the specified criteria.
8  Q        And the specified criteria are set
9  forth on page seven?
10 A        That's correct.
11 Q        The first one is the failure of
12 Provident Companies, Inc. to perform its
13 obligations under the General Services Agreement.
14 That's one of the criteria; correct?
15 A        Uh-huh.
16 Q        Is that a yes?
17 A        Yes.  I'm sorry.
18 Q        The second criteria is if the
19 liability arises from the negligence of Provident
20 Companies, Inc. employees, if such negligence has
21 a material adverse consequence to Paul Revere Life
22 Insurance Company; correct?
23 A        Correct.
24 Q        Also if there is a finding of gross
25 negligence or willful misconduct by Provident

---

Deposition of Susan N. Roth, 3/24/03
Cindy Schneider, M.D. vs. UnumProvident Corporation, et al

Case Compress

## 49

1 Companies, Inc. employees, then under that
2 circumstances it has agreed to indemnify Paul
3 Revere for any liability based on those acts or
4 omissions; correct?
5 A      That's correct.
6 Q      So if the jury in this case finds
7 that UnumProvident employees breached the duty of
8 good faith and fair dealing which Paul Revere owed
9 to Dr. Schneider and finds that Paul Revere is
10 liable for damages to Dr. Schneider as a result of
11 the breach of the duty of good faith and fair
12 dealing, those damages are to be paid by
13 UnumProvident Corporation; correct?
14      MR. COMO:  Object to the form of the
15 question, foundation also.
16      Susan, my objections are for the
17 record only.  If you understand the question, you
18 still need to answer.
19      THE WITNESS:  If you could read it
20 back, please.
21      (Thereupon, the requested portion of
22 the record was read back as follows:
23      "Question:  So if the jury in this
24 case finds that UnumProvident employees breached
25 the duty of good faith and fair dealing which Paul

## 50

1 Revere owed to Dr. Schneider and finds that Paul
2 Revere is liable for damages to Dr. Schneider as a
3 result of the breach of the duty of good faith and
4 fair dealing, those damages are to be paid by
5 UnumProvident Corporation; correct?")
6      THE WITNESS:  My understanding would
7 be that under the agreement Paul Revere could make
8 a claim against UnumProvident if it felt that the
9 finding in the scenario you outlined constituted a
10 breach of the obligation to perform under the
11 agreement or met one of the other two standards
12 that are set forth in 5.01.
13 BY MR. LANGERMAN:
14 Q      Can you turn to the next page of the
15 General Services Agreement.  This page is the
16 beginning of paragraph six of the agreement;
17 correct?
18 A      Yes.
19 Q      That's the paragraph dealing with
20 insurance?
21 A      That's correct.
22 Q      Paragraph 6.02 of the General
23 Services Agreement provides that Provident
24 Companies, Inc. shall carry certain types of
25 insurance related to its work under the General

## 51

1 Services Agreement; correct?
2 A      That's correct.
3 Q      One of the types of insurance that
4 Provident Companies, Inc. agreed to provide is
5 commercial general liability coverage to cover any
6 contractual liability assumed under the General
7 Services Agreement; correct?
8 A      Yes.
9 Q      Would that type of insurance cover
10 any liability that UnumProvident Corporation might
11 have for the -- any liability that UnumProvident
12 Corporation might have for Dr. Schneider's claims
13 in this case?
14      MR. COMO:  Objection to form and
15 foundation.
16      THE WITNESS:  That's not how I would
17 read it, but --
18 BY MR. LANGERMAN:
19 Q      Well, didn't UnumProvident
20 Corporation assume responsibility for any
21 violation of applicable federal, state or local
22 laws dealing with the services under this contract
23 including the claim handling services?
24 A      Yes.  What I'm looking at is I don't
25 recall the definition of contractual liability.

## 52

1 And 6.02 A appears to be commercial general
2 liability.  I don't believe that type of coverage
3 is typically what you're referring to as far as a
4 claims matter.
5 Q      How about 6.02 D, professional errors
6 and omissions insurance, would it cover that sort
7 of liability?
8 A      My understanding is that's the type
9 of coverage that would be more likely to involve
10 that type of liability.
11 Q      Do you know whether UnumProvident
12 Corporation carries professional errors and
13 omissions liability insurance as required by
14 paragraph 6.02 D of the General Services Agreement
15 with Paul Revere Life Insurance Company?
16 A      It's my understanding that they do.
17 Q      In the amount of $25 million?
18 A      I don't recall the amount.
19 Q      Would the excess umbrella liability
20 coverage specified in paragraph 6.02 E be an
21 umbrella over the professional errors and
22 omissions liability insurance specified in 6.02 D?
23 A      I don't know.
24 Q      Do you know whether UnumProvident
25 Corporation has any umbrella liability coverage as

Deposition of Susan N. Roth, 3/24/03
Cindy Schneider, M.D. vs. UnumProvident Corporation, et al

Sheet (14) of (16)

Case Compress

### 53

1 specified in paragraph 6.02 E of the General
2 Services Agreement?
3 A        I don't recall whether it does or
4 does not.
5 Q        Can you explain for our jury what a
6 Form A registration statement is?
7 A        Yes.  Under various states' holding
8 company's acts when an entity or a person is going
9 to acquire more than ten percent or ten percent or
10 more of the stock or control of an insurance
11 company, then a Form A is required to be filed by
12 the -- typically the domiciliary states and then
13 you file with some other states as well, but the
14 primary place is the state of domicile of the
15 insurance company that's being -- that control is
16 being acquired of.
17 Q        In 1996 Provident Companies, Inc.
18 filed a Form A registration regarding its proposed
19 acquisition of control of Paul Revere Life
20 Insurance Company; correct?
21 A        That's correct.
22 Q        One of those Form A registrations was
23 filed with the Massachusetts Division of
24 Insurance; correct?
25 A        That's right.

### 54

1 Q        Was your office responsible for
2 preparing any part of the Form A registration that
3 was filed with respect to the acquisition of
4 control of Paul Revere Life Insurance Company by
5 Provident Companies, Inc.?
6 A        We would have assisted in preparing
7 that filing, but we were not the sole or primary
8 drafters of that.
9 Q        Who would have been the primary
10 department responsible for the drafting of the
11 Form A registration statement?
12 A        Outside counsel, LeBoeuf, Lamb.
13 Q        The acquisition of control of Paul
14 Revere Life Insurance Company by Provident
15 Companies, Inc. was approved by the Massachusetts
16 Division of Insurance; correct?
17 A        That's correct.
18 Q        Subsequent to the regulatory
19 approval, the merger or the acquisition of Paul
20 Revere Corporation by Provident Companies, Inc.
21 was completed; correct?
22 A        I'm sorry.  Can you read that again?
23 Q        After the regulatory approval was
24 given by the Massachusetts Division of Insurance,
25 the acquisition of Paul Revere Corporation was

### 55

1 completed by Provident Companies, Inc.
2 A        That's correct.
3 Q        And since that time Provident
4 Companies, Inc. has controlled Paul Revere Life
5 Insurance Company within the meaning of the
6 Insurance Holding Company Act; correct?
7 A        That's correct.
8 Q        Can you explain to the jury what a
9 Form B registration statement is?
10 A        Yes.  A Form B is an annual statement
11 that's required by various states in which the --
12 for a holding company system, an insurance holding
13 company system files, and it essentially sets out
14 the companies that are in the holding company
15 system and then provides certain information
16 required by the states with respect to officers,
17 directors, transactions among affiliates, the
18 organizational chart, things of that nature.
19 Q        Form B registration statements are
20 filed annually?
21 A        Yes, they are.
22 Q        One of the pieces of information
23 that's disclosed in a Form B registration is who
24 the ultimate controlling person is of the insurer
25 within the meaning of the Insurance Holding

### 56

1 Company Act?
2 A        That's correct.
3 Q        I would like to mark something as an
4 exhibit if I can find it.  We're going to have to
5 go off the record because I don't have a copy so
6 we're going to have to make one.
7        VIDEOGRAPHER:  We're off record.
8        (Thereupon, a brief recess was taken.)
9        (Thereupon, Form B
10        Insurance Holding Company
        System Annual Registration
        Statement was marked
11        Exhibit No. 1 to the
        deposition of Susan Roth
        and filed herein.)
12
13        VIDEOGRAPHER:  Back on record 4:35.
14        MR. LANGERMAN:  Robert, you there?
15        MR. GAFFNEY:  Ready to go.
16 BY MR. LANGERMAN:
17 Q        Ms. Roth, let me hand you what's been
18 marked as Exhibit No. 1.  Can you take a moment
19 and glance through that document?
20 A        Okay.
21 Q        Are you familiar with this document?
22 A        Yes, I am.
23 Q        Is this the Form B registration
24 statement filed by UnumProvident Corporation for,
25 among other insurers, the Paul Revere Life

Deposition of Susan N. Roth, 3/24/03
Cindy Schneider, M.D. vs. UnumProvident Corporation, et al

Case Compress

### 57

1  Insurance Company for calendar year 2002?
2  A       Let me clarify on this. It's filed
3  in 2002. It reflects what occurred in 2001.
4  Q       Okay. But it is a Form B
5  registration statement; correct?
6  A       Yeah.
7  Q       It was filed by UnumProvident
8  Corporation; correct?
9  A       Uh-huh.
10  Q       Was that a yes?
11  A       Yes.
12  Q       And it does reflect that
13  UnumProvident Corporation -- well, we'll get there
14  in a moment.
15       On page 13 there's a signature of
16  Mr. Greving; correct?
17  A       That's correct.
18  Q       He identifies himself as the vice
19  president of finance of UnumProvident Corporation;
20  correct?
21  A       Senior vice president, that's
22  correct.
23  Q       He also is the senior vice president
24  of finance for the Paul Revere Life Insurance
25  Company?

### 58

1  A       That's correct.
2  Q       To the left underneath his signature
3  is your signature; correct?
4  A       That's correct.
5  Q       Can you turn to the first page of the
6  Form B registration statement. About halfway down
7  the page the Form B registration statement
8  indicates that on March 27th, 1997, Provident
9  Companies, Inc. acquired control of Paul Revere
10  Corporation and each of its insurance
11  subsidiaries; correct?
12  A       That's correct.
13  Q       At that time Provident Companies,
14  Inc. became the ultimate controlling person of
15  Paul Revere Life Insurance Company; correct?
16  A       That's correct.
17  Q       The Form B registration statement
18  indicates that on June 30, 1999, Provident
19  Companies, Inc. changed its name to UnumProvident
20  Corporation; correct?
21  A       That's right.
22  Q       Today Provident Companies, Inc. is
23  known as UnumProvident Corporation; correct?
24  A       That's right.
25  Q       Those are the same companies?

### 59

1  A       Yes.
2  Q       On the next page, page two of the
3  Form B registration, one of the items that needs
4  to be disclosed is who the ultimate controlling
5  person is of the insurance company; correct?
6  A       That's right.
7  Q       The Form B registration filed by
8  UnumProvident Corporation in February of 2002
9  indicates that UnumProvident Corporation is the
10  ultimate controlling person of Paul Revere Life
11  Insurance Company; correct?
12  A       That's right.
13       MR. LANGERMAN: I have no further
14  questions at this time.
15       MR. COMO: Robert, do you have any
16  questions?
17       MR. GAFFNEY: No, I don't. Thank
18  you.
19       MR. COMO: Okay. We'll read and
20  sign. That's it.
21       VIDEOGRAPHER: This concludes the
22  deposition 4:40.
23       FURTHER THIS DEPONENT SAITH NOT.
24
25

### 60

1
2       WITNESS CERTIFICATE
3
4       I, SUSAN N. ROTH, do hereby certify:
5       That I have read and examined the
   contents of the foregoing pages of record of
   testimony as given by me at the time and place
   herein aforementioned;
6       And that to the best of my knowledge and
   belief the foregoing pages are a complete and
   accurate record of all the testimony given by me
   at said time, except as noted on the errata sheet
   attached hereto.
7
8
9       I have ____ or have not ____ made
   corrections to be attached.
10
11
12                        _____
13  STATE OF TENNESSEE    )    SUSAN N. ROTH
14  COUNTY OF HAMILTON    )
                          )
15       I, _____, Notary Public for
   the County of _____, State of _____,
16  hereby certify:
17       That the herein above named personally
   appeared before me this ____ day of _____,
18  2003, and that I personally witnessed the
   execution of this document for the intents and
19  purpose herein above described.
20       Sworn to and subscribed before me this
21  ____ day of _____, 2003.
22                        _____
                              NOTARY PUBLIC
23       My commission expires: _____.
24
25

Cathy H. Kerley, RPR

**Hall & Associates**
**(423) 267-4328**

Page 57 to Page 60

**Deposition of Susan N. Roth, 3/24/03**
**Cindy Schneider, M.D. vs. UnumProvident Corporation, et al**
Case Compress

Sheet (16) of (16)

```
                                                            61
 1              The witness, SUSAN N. ROTH, requests the
 2      following changes to be made in the transcript of
 3      the deposition which was taken on March 24, 2003.
 4         PAGE      LINE      CHANGE
 5         ____      ____      _____
 6         ____      ____      _____
 7         ____      ____      _____
 8         ____      ____      _____
 9         ____      ____      _____
10         ____      ____      _____
11         ____      ____      _____
12         ____      ____      _____
13         ____      ____      _____
14         ____      ____      _____
15         ____      ____      _____
16         ____      ____      _____
17         ____      ____      _____
18
19
20                              _____
                                    SUSAN N. ROTH
21      _____
        Notary Public
22
23      My commission expires:  _____.
24
25
```

```
                                                            62
 1                  REPORTER'S CERTIFICATE
 2
 3      STATE OF TENNESSEE  :
                            :
 4      COUNTY OF HAMILTON  :
 5
 6              I, Cathy H. Kerley, the officer
        before whom the foregoing deposition was taken, do
 7      hereby certify that the witness whose testimony
        appears in the foregoing deposition was duly sworn
 8      by me;
 9              That the testimony of said witness
        was taken by me in machine shorthand and
10      thereafter reduced to typewriting; that the said
        deposition is a true record of testimony given by
11      said witness;
12              That I am neither counsel for,
        related to, nor employed by any of the parties to
13      the action in which this deposition was taken, and
        further that I am not a relative or employee of
14      any attorney or counsel employed by the parties
        hereto, nor financially or otherwise interested in
15      the outcome of the action;
16              That the said deposition has in no
        manner been changed or altered since same was
17      given by said witness, but that the same has
        remained in my possession up to the time of
18      delivery.
19              In witness whereof, I have hereunto
        set my hand this _____ day of _____, 2003.
20
21
22                      _____
                        CATHY H. KERLEY, Registered
23                      Professional Reporter.
                        Notary Public in and for the
24                      State of Tennessee at Large.
                        My commission expires
25                      May 7, 2003
```

Cathy H. Kerley, RPR

**Hall & Associates**
**(423) 267-4328**

Page 61 to Page 62