IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| PAUL D. WHARTON, ) | |
| Plaintiff, ) | |
| ) | Case No. CV-01-TMP-2013-S |
| vs. ) | |
| ) | |
| UNUMPROVIDENT CORPORATION, ) | |
| PROVIDENT LIFE AND ACCIDENT ) | |
| INSURANCE COMPANY, et al., ) | |
| ) | |
| Defendants ) | |

## DISCOVERY ORDER REGARDING LeBOEUF REPORT

Plaintiff has moved the court for entry of an order requiring defendants to produce the so-called LeBoeuf report as a document relating to defendants' disability claims handling and review procedures and protocol since 1997. Pursuant to the court's order of August 12, 2002, defendants produced to the court, for *in camera* review, the entire LeBoeuf report. Having carefully reviewed and read the entire report, the court is persuaded that the motion to compel its production is due to be denied.

Certain background information is important to an understanding of the court's ruling. Plaintiff has filed suit alleging that defendants have breached their contract of disability insurance with him, and have done so in bad faith. In particular, plaintiff alleges that from 1998 to 2000, he received disability benefits from defendants under a policy of disability insurance he purchased from them. In 2000, defendants notified plaintiff that he no longer qualified for benefits under the policy, and in May 2000, the benefits were terminated. Although not entirely clear, documents filed by plaintiff suggest that he claims to be disabled by a condition identified as Post-traumatic



Hypersomnia,[1] which prevents him from engaging in his occupation as a financial planner and insurance agent. Thus described, plaintiff's condition is physiological in nature, not psychological or emotional, being the somatic consequences of a physical brain injury. After benefits were terminated, plaintiff filed suit, alleging breach of contract and bad faith failure to pay, which was removed to this court by defendants.

The particular discovery sought by plaintiff is encompassed in his interrogatories 9, 10, 11, and 13. As noted previously, however, briefing focused on two particular documents, one of which is the so-called LeBoeuf report. The LeBoeuf report is a 95-page report containing recommendations regarding a number of subjects, compiled and presented in 1993 by the law firm of LeBoeuf, Lamb, Greene & MacRae, L.L.P. The court has read the entire report *in camera* to assess defendants' assertion that it is protected from disclosure by the attorney-client privilege.

At the outset, it is apparent that large portions of the LeBoeuf report are entirely unrelated and irrelevant to the issues presented in this action. For example, sections of the report deal with

---

[1] Hypersomnia is defined by the International Classification of Sleep Disorders as follows: "[I]diopathic hypersomnia is defined as a disorder of presumed central nervous system (CNS) cause that is associated with excessive sleepiness consisting of prolonged sleep episodes of non–rapid eye movement (NREM) sleep." Another website describes post-traumatic hypersomnia this way:

> Post-traumatic hypersomnia - This type of hypersomnia may arise from a head injury or a traumatic incident involving the central nervous system. It is usually associated with related symptoms such as headaches, fatigue, memory impairment, as well as difficulty concentrating. Hypersomnia is more commonly seen immediately after the accident, however, in some cases, symptoms are delayed more than a year. Duration of symptoms may last only a short time, can continue for months or years, or can remain indefinitely.

www.talkaboutsleep.com/disorders/hypersomnia/hypersomnia_intro2.htm.

2

such proprietary matters as record-keeping, training, structuring the relationships between various internal departments, and the relationship between defendants and outside counsel representing them in litigation. Clearly none of this sheds any light on the legitimacy of defendants' decision to terminate plaintiff's disability benefits. Likewise, sections of the report recommending changes in the language of future policies to be offered by defendants are irrelevant. The court, therefore, will focus its analysis of the attorney-client privilege only on those portions of the report that are "reasonably calculated to lead to admissible evidence."

Because the rule of decision in this diversity case is supplied by Alabama state law, the law of privileges also comes from state law. See FRE 501. The Alabama law regarding the attorney-client privilege now is embodied in Rule 502 of the *Alabama Rules of Evidence*. The committee comments following the rule state that "This rule, consequently, supersedes the preexisiting statute." Nevertheless, much of the case law that developed under the common law first and, then, the statute remains instructive when interpreting the scope and substance of Rule 502.

The statement of the privilege found in Rule 502 is the following:

> A client has a privilege to refuse to disclose and to prevent any other person from disclosing a confidential communication made for the purpose of facilitating the rendition of professional legal services to the client, (1) between the client or a representative of the client and the client's attorney or a representative of the attorney, or (2) between the attorney and a representative of the attorney, (3) by the client or a representative of the client or the client's attorney or a representative of the attorney to an attorney or representative of an attorney of another party concerning a matter of common interest, (4) between representatives of the client and between the client and a representative of the client resulting from the specific request of, or at the express direction of, an attorney, or (5) among attorneys and their representatives representing the same client.

*Alabama Rule of Evidence* 502(b). To be privileged against disclosure, therefore, a communication between a lawyer and a person must meet several criteria; not every communication between a

3

lawyer and another person is privileged. Hunt v. State, 642 So.2d 999, 1033 (Ala. Crim. App. 1994). First, there must exist an attorney-client relationship, that is, there must be an understanding between the parties to the communication that the lawyer has assumed certain legal responsibilities to advise and guide the client on *legal* matters. See Bassett v. Newton, 658 So.2d 398, 402 (Ala. 1995); Ex parte Clark, 630 So.2d 493, 496-7 (Ala. Crim. App. 1993). Second, there must be a communication. The mere delivery of documents to an attorney by a client, for example, does not shield the documents behind the attorney-client privilege. Third, the communication must be intended to be confidential; communications that are themselves intended to be further communicated to others outside the privilege or which must be publicly disclosed as part of the attorney's duty to the client are not privileged. Ex parte Griffith, 278 Ala. 344, 350-51, 178 So.2d 169, 176-77 (1965), *cert. denied*, 382 U.S. 988, 86 S.Ct. 548, 15 L.Ed.2d 475 (1966); Ex parte Clark, 630 So.2d 493, 495 (Ala. Crim. App. 1993). The burden of proving that a particular communication comes within the privilege rests on the party asserting the privilege, not on the party seeking the information.

There is little question that an attorney-client relationship was formed between defendants and the LeBoeuf law firm for purpose of allowing the law firm to offer guidance to defendants, both on legal and business issues. Certainly advice on *business* issues, even if supplied by an attorney, is not within the privilege because it is not related to the role of counsel as a legal (as distinct from a business) advisor. The line separating legal from business advice, however, is not precise and is often difficult to define.[2]

---

[2] "Business communications by and to an attorney are not necessarily protected, United States v. Puckett, 692 F.2d 663 (10th Cir.1982); Young v. Taylor, 466 F.2d 1329, 1333 (10th Cir.1972), but business positions may be communicated to an attorney for legal action or advice. See Motley v. Marathon Oil Co., 71 F.3d 1547 (10th Cir.1995) (matters for attorney preparation were not for business advice and the Court could not say the communication was not within the

4

There is also little question that the report constitutes a "communication" from counsel to defendants, which defendants intended to remain confidential— it is prominently stamped with a claim of both attorney-client and work-product privilege.[3] Thus, on its face, it appears that the report meets all the criteria for protection under the privilege. The only difficulty lies in determining whether parts of the report are in the nature of "business" advice, rather than legal advice.

For several reasons the court concludes that production of the LeBoeuf report is not necessary or appropriate. First, plainly legal advice is scattered throughout the report, intermixed on almost every page with what can best be characterized as business advice. As a practical matter, the report cannot be redacted or parsed into legal and non-legal subjects for disclosure purposes without rendering it largely unreadable and meaningless. Second, there is very little in the report relevant or ever arguably relevant to the issues in this lawsuit. While it is extensive, it deals with internal business structures and procedures, training, re-alignment of departments and personnel, and re-writing policy language. Although the report deals with how to organize a claims department and how to utilize personnel efficiently to process claims, there is little specific information about claims procedures or philosophies, and what little there is involves legal advice within the privilege. Finally, there is little evidence that the LeBoeuf report ever had any impact upon defendants' actual procedures. Counsel represented at the hearing that the report was never adopted by defendants, but,

---

Attorney/Client privilege)." Lifewise Master Funding v. Telebank, 206 F.R.D. 298, 301 (D.Utah, 2002). See also Royal Surplus Lines Ins. Co. v. Sofamor Danek Group, Inc., 190 F.R.D. 505 (W.D.Tenn. 1999).

[3] To be sure, defendants cannot succeed on a claim of work product privilege because there is no suggestion that the LeBoeuf report was prepared in connection with or in anticipation of some reasonably identifiable and concrete prospect of litigation.

5

in any event, there is no evidence either way on that point. Even if some or all of it did make its way into defendants' day-to-day procedures and protocol, such would be competitively sensitive. While not particularly helpful to the plaintiff, the information in the report, if in fact it is now being used by defendants, could place them at a competitive disadvantage. Thus, most of the report either is irrelevant to this lawsuit or so competitively sensitive as not to warrant disclosure.

The court concludes, therefore, that plaintiff's motion to compel the LeBoeuf report is due to be and hereby is DENIED. To be clear, however, if there are other documents responsive to the request for information about claims procedures and protocol in interrogatories 9, 10, 11, and 13 (aside from the LeBoeuf report) defendants remain under an obligation to locate those documents and produce them appropriately for inspection.

To preserve it for appellate review, the Clerk is DIRECTED to file the attached LeBoeuf report UNDER SEAL.

DONE this 27th day of August, 2002.

T. MICHAEL PUTNAM
CHIEF MAGISTRATE JUDGE

6