# EXHIBIT

# "1"

EXHIBIT "1"

Westlaw.

Slip Copy                                                                    Page 1

Slip Copy, 2006 WL 2917343 (N.D.Ind.)
**(Cite as: Slip Copy)**

Briefs and Other Related Documents
Ralston v. Suiza Dairy Group, L.P.N.D.Ind.,2006.Only the Westlaw citation is currently available.
United States District Court,N.D. Indiana,Fort Wayne Division.
Marvin RALSTON, Plaintiff,
v.
SUIZA DAIRY GROUP, L.P., Defendant.
**No. 1:05-CV-341-TS.**

Oct. 10, 2006.

Bridget L. O'Ryan, Law Office of Bridget O'Ryan, Indianapolis, IN, for Plaintiff.
Mark E. Schmidtke, Schmidtke Hoeppner Consultants LLP, Robert L. Clark, Hoeppner Wagner and Evans LLP, Valparaiso, IN, for Defendant.

**ORDER**
THERESA L. SPRINGMANN, District Judge.
*1 This matter is before the Court on the Defendant's Motion for Summary Judgment [DE 16], filed on June 1, 2006, the Plaintiff's Motion for Judicial Notice [DE 21], filed on July 3, 2006, and the magistrate judge's Report and Recommendation [DE 28], dated September 18, 2006, making the recommendation that the Court deny the Motion for Judicial Notice and grant summary judgment for the Defendant.

A judge may refer a dispositive matter to a magistrate judge for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B), Federal Rule of Civil Procedure 72(b), and Northern District of Indiana Local Rule 72.1(d)(1). On August 28, 2006, this Court assigned Magistrate Judge Roger Cosbey to prepare a report and recommendation on the pending motions.

This Court's review of the Magistrate's Report and Recommendation is governed by 28 U.S.C. § 636(b)(1)(C) which provides in part:
A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings and recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings and recommendations made by the magistrate. The judge may also receive further evidence or recommit the matter to the magistrate with instructions.

The statute also requires objections to the Magistrate's Report and Recommendations to be made within ten days of service of a copy of the Report. *Id.* § 636(b)(1)(C).

Because the Plaintiff has not filed any objections to the Magistrate's Report, de novo review is not required. This Court finds that the Magistrate has correctly resolved the issues raised by the parties' motions. Therefore, the Court accepts the Magistrate's Report and Recommendations on the Defendant's Motion for Summary Judgment and the Plaintiff's Motion for Judicial Notice.

**CONCLUSION**

For the foregoing reasons, the Magistrate's Report and Recommendation [DE 28] is ACCEPTED, and the Plaintiff's Motion for Judicial Notice [DE 21] is DENIED and the Defendant's Motion for Summary Judgment [DE 16] is GRANTED. The Clerk will enter judgment in favor of the Defendant and against the Plaintiff.

SO ORDERED on October 10, 2006.
ROGER B. COSBEY, Magistrate Judge.

***REPORT AND RECOMMENDATION***

**I. INTRODUCTION**

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                   Page 2

Slip Copy, 2006 WL 2917343 (N.D.Ind.)
**(Cite as: Slip Copy)**

Plaintiff Marvin Ralston brought this suit against Defendant Suiza Dairy Group, L.P., under the Federal Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.,* claiming that he was wrongly denied long term disability ("LTD") benefits for which he was eligible through his employment with Suiza. (Compl.¶¶ 1, 19.) Suiza now moves for summary judgment on all of Ralston's claims, contending that the denial of LTD benefits to Ralston was neither arbitrary nor capricious.[FN1] (Docket # 16.) The motion was referred to the undersigned Magistrate Judge on August 28, 2006, by District Judge Theresa Springmann for the issuance of a Report and Recommendation. (Docket # 27.)

> FN1. Also pending is a Motion for Court to Take Judicial Notice of Multi-State Market Conduct Examination (Docket # 21) filed by Ralston.

**\*2** Having reviewed the record and pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1(d)(1), the undersigned Magistrate Judge recommends that Suiza's motion for summary judgment be GRANTED. This Report and Recommendation is based on the following facts and principles of law.

## II. FACTS AND PROCEDURAL HISTORY

*A. Suiza's LTD Benefit Plan*

The parties agree that Suiza's employee disability plan is funded, at least in part, by a group policy of LTD insurance issued by Unum Life Insurance Company ("Unum") and that Suiza's disability plan grants Unum express discretionary authority to determine eligibility for benefits and to interpret the terms of the plan.[FN2] (*See* Mem. in Supp. of Def.'s Mot. for Summ. J. at 1; Pl.'s Resp. to Def.'s Mot. for Summ. J. at 1, 10; R. at 508.)

> FN2. Unum's claim file, which it represents contains all of the information and evidence that was before Unum at the

time of its final decision, is authenticated by the Affidavit of Warren Diegel, a Disability Benefits Consultant for Unum, and was filed under seal. (*See* Mem. in Supp. of Def.'s Mot. for Summ. J. at 2 n. 1, Ex. 1.) The claim file is numbered in descending numerical order, and its documents are referred to herein as "R. at. ----" The Court has thoroughly reviewed all 994 pages of the administrative record.

To be "totally disabled" under the plan, an employee must be "in a continuous state of incapacity due to illness" which:
1. while it continues throughout the Elimination Period and during the following 24 months of incapacity, prevents him from performing all of the material duties of his Regular Occupation;[FN3] and

> FN3. Under the policy, the Elimination Period begins with the employee's first day of Disability and ends after an uninterrupted Disability period of six months. (R. at 515.)

2. while it continues thereafter, prevents him from engaging in any occupation for which he is or becomes reasonably qualified by education, training or experience.
(R. at 518-19.) An employee's "Regular Occupation" is defined as the "profession, trade, work or the means of earning a living in which the Employee was primarily engaged immediately prior to commencement of Disability." (R. at 518.)

*B. Ralston's Medical Evidence*

On February 23, 2002, Ralston, who was fifty-three years old at the time, stopped working at his job at Suiza due to abdominal pain. (Compl. ¶ 6; R. at 444, 526.) During his six years as an employee of Suiza, his responsibilities included driving a semi-truck for the dairy, delivering milk, and loading and unloading the semi-truck. (Compl.¶¶ 6, 8.) However, due to a work-related back injury in 2001, Ralston was performing light duty at the time

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 3

Slip Copy, 2006 WL 2917343 (N.D.Ind.)
**(Cite as: Slip Copy)**

he stopped working. (R. at 290.) Prior to his employment with Suiza, Ralston worked for eighteen years as a semi-truck driver for a grain company. (Compl.¶ 7.)

On February 25, 2002, Ralston underwent surgery to remove his gallbladder. (R. at 251.) While the surgery alleviated his abdominal pain, Ralston began to experience shortness of breath and soon returned to the hospital. (R. at 143, 251, 359.) Ralston's shortness of breath was primarily attributed to a pulmonary embolism, which was treated with Coumadin. (R. at 143, 251, 359.)

At the time of his gall bladder surgery, Ralston's family practitioner was Glenn Glogas, M.D. Ralston visited Dr. Glogas numerous times in 2002, both before and after his gall bladder surgery, complaining of a variety of maladies, including shortness of breath, radiating pain in his neck and jaw, anxiety, abdominal and rib pain, memory loss, back pain, and fatigue. (R. at 629-45, 643-47.) As a result, Dr. Glogas referred Ralston for a variety of tests and to numerous specialists. (R. at 629-45, 643-47.)

**\*3** On April 23, 2002, Ralston visited Barbara Nohinek, M.D., an infectious disease specialist, by referral of Dr. Glogas. (R. at 60-61.) Dr. Nohinek noted that Ralston had "extreme shortness of breath and dyspnea on exertion, with walking any distance, even when moving from an exam table to a chair." (R. at 60-61.) She further opined that "[o]verall, he is better than he was initially but certainly has not improved enough to have any meaningful day to day activity[,] and due to his breathing problems, he cannot sustain any physical exertion." (R. at 60-61.) She recommended that Ralston seek further evaluation for his shortness of breath. (R. at 60-61.)

On May 15, 2002, Ralston visited John Fouts, M.D., a pulmonologist, by referral of Dr. Glogas, for his complaints of shortness of breath on exertion. (R. at 355-57, 359.) Dr. Fouts noted that Ralston's pulmonary function studies from March 2002 showed "mild obstruction with improvement after inhaled bronchodilator." (R. at 356.) Dr. Fouts opined that Ralston's "current complaints are out of proportion to abnormalities that have been noted by

testing at this point," recommending that Ralston return for a follow-up visit and repeat pulmonary function testing in several weeks. (R. at 356.)

On May 22, 2002, Ralston visited Andrew Katz, M.D., concerning a liver abscess. (R. at 306.) At the appointment Ralston complained of a poor appetite and maldigestive symptoms. (R. at 306.)

On June 19, 2002, Ralston underwent an MRI of his cervical spine, which showed degenerative disc disease "with minimal disc nuclear collapse at C5 and C6" and "anterior partial subligementous disc protrusion with overhanging marginal spurs." (R. at 304.)

On July 12, 2002, Ralston returned to Dr. Fouts for a re-evaluation of his pulmonary status. (R. at 358, 360.) Dr. Fouts observed that Ralston was " generally feeling better," although he displayed anxiety and some tremors. (R. at 360.) Ralston expressed concern to Dr. Fouts that his former job had been eliminated and that he thought he would probably be "fired from that position." (R. at 360.) Upon clinical examination, Dr. Fouts noted that Ralston's lungs were clear, that his chest x-ray was normal, and that spirometry showed minimal obstruction with no change after bronchodilation. (R. at 360.) Dr. Fouts stated that Ralston likely had minimal reactive airway disease that was being appropriately treated, opining that his "pulmonary status at this point is quite stable." (R. at 358.) Dr. Fouts deferred to Dr. Glogas regarding Ralston's potential return to work, but emphasized that he did "not think that he should be limited due to his pulmonary status." (R. at 358.)

On July 17, 2002, Ralston underwent a CT scan of his abdomen and pelvis, which showed an eight-millimeter "stable indeterminate low density lesion." (R. at 297.)

On July 24, 2002, Ralston returned to Dr. Glogas and underwent a stress treadmill procedure, after which Dr. Glogas opined:
**\*4** Talked at length about potential disability. I said I have no objective evidence that there is any physical reason that he can't do work other than his prior injury with his back and lung field capacity

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                              Page 4

Slip Copy, 2006 WL 2917343 (N.D.Ind.)
**(Cite as: Slip Copy)**

limitations from his prior Workman's Comp injury. He did well on the stress treadmill. He had a normal echo. I reaffirmed that he never had heart failure even though he was diagnosed with it in the hospital after his GB. It was pulmonary edema secondary to pulmonary emboli. His respiratory status is not that severe. I think probably long term, he can work with possible retraining. He is going to get a disability attorney and they are going to talk about long term, what they need to do to get him stabilized and hopefully get back to work.

(R. at 643.)

On July 30, 2002, Ralston visited Bryon J. Stephens, M.D., a surgical specialist, for a follow-up from his gall bladder surgery. (R. at 283.) After examination, Dr. Stephens opined: "From my point of view [Ralston] has recovered from his cholecystectomy and is free to go back to work without restrictions." (R. at 283.)

On August 16, 2002, Jerry Davis, Ph.D., who had seen Ralston once or twice a month since January 2002, completed a Report of Psychiatric Status at the request of the Disability Determination Bureau. (R. at 330-37.) He reported that Ralston was " nervous and moody," that his consciousness was " clouded," and that he has "some lapse in memory." (R. at 330-37.) Dr. Davis further indicated that Ralston experienced restlessness, fatigue, muscle tension, difficulty concentrating, difficulty sleeping, difficulty with remembering daily events and what he reads, depressed mood, diminished interests, loss of appetite, and some slurred speech. (R. at 335.) He opined that Ralston would be unable to do simple tasks at work due to his lack of concentration, low energy, and shortness of breath. (R. at 332.) Overall, Dr. Davis concluded that Ralston's physical condition exacerbated his depression and anxiety and that his progress was " not significant due to physical deterioration." (R. at 332.)

On August 22, 2002, Ralston visited Robert Shugart, M.D., an orthopaedic surgeon, for a second opinion about his work-related back injury. (R. at 288-92.) Dr. Shugart ordered an MRI to rule out any pathology and released Ralston to return to

work with the "same permanent restrictions" identified in his functional capacity evaluation.[FN4] (R. at 288-92.)

> FN4. Dr. Shugart does not elaborate as to the nature of Ralston's permanent restrictions, and the functional capacity evaluation does not appear to be included in Unum's claim file.

On August 28, 2002, Ralston returned to Dr. Glogas, complaining of memory loss and shortness of breath. (R. at 286.) Dr. Glogas attributed Ralston's shortness of breath to "possible mild asthma" with a "possible anxiety component." (R. at 286.)

On September 1, 2002, Ralston underwent a spirometry and lung volume study, which showed a "moderate degree of obstructive as well as restrictive pattern." (R. at 416.)

On September 5, 2002, Ralston returned to Dr. Shugart to discuss the results of his MRI, which showed "degenerative changes" that contribute to " mild degrees of spinal and foraminal narrowing at the lumbar region, but without demonstration of secondary nerve root compression/displacement." (R. at 279, 284.) Dr. Shugart concluded that all of the clinical findings were degenerative in nature, rather than arising from an injury, and that he did " not really have a lot to offer him." (R. at 279.)

*5 On October 8, 2002, shortly after Ralston's claim for LTD benefits was first denied, Dr. Glogas penned a letter asserting that Ralston could not return to work until his pulmonary problems were further evaluated and resolved. (R. at 345.) Dr. Glogas also completed a supplemental statement that asserted Ralston was limited to sedentary work, assigning him the following restrictions: "no exposure to humidity or fumes, extreme temperatures or changes in temperature, [and] no significant exertion." (R. at 349.)

Soon thereafter, Dr. Glogas referred Ralston to T.D. James, M.D., a pulmonologist, for a second opinion about his pulmonary status, as Ralston was unhappy

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 5

Slip Copy, 2006 WL 2917343 (N.D.Ind.)
**(Cite as: Slip Copy)**

with Dr. Fouts. (R. at 644.) On November 11, 2002, Dr. James opined that Ralston was unable to work due to chronic obstructive pulmonary disease (" COPD"), emphysema, obesity, and history of pulmonary embolism, stating that Ralston's activity was "limited by exertional respiratory distress." (R. at 413.) He referred Ralston to pulmonary rehabilitation for ten weeks. (R. at 413.)

On April 10, 2003, Ralston was seen by Thomas Banas, M.D., per referral of Dr. Glogas, for a consultation concerning mild cognitive deficits. (R. at 673.) He noted that Ralston had a "high degree of anxiety" and restless leg syndrome. (R. at 673.) Ralston admitted that he felt anxious, that he was having trouble sleeping, and that he was having difficulty communicating with his wife, but that he was undergoing counseling. (R. at 673.) Dr. Banas concluded that "[i]t is difficult to read cognitive deficits with the degree of anxiety and personality traits that are histrionic in character," and prescribed medication designed to calm Ralston. (R. at 673.)

On June 6, 2003, Ralston underwent a CT scan of his abdomen and pelvis, which confirmed a "small stable benign appearing lesion within the right lobe of the liver" and an enlarged prostate. (R. at 677-78.) The study was negative in all other respects. (R. at 677-78.)

On June 27, 2003, Ralston visited Dr. Glogas, complaining of short-term memory problems, abdominal pain, and urinary frequency. (R. at 690.) Dr. Glogas stated: "[A]ll labs were completely normal including CBC. No evidence of recurrent abscess in the liver on CT scan.... He has a lot of constipation.... Doesn't sleep too well. A lot of anxiety." (R. at 690.) Dr. Glogas further opined that Ralston's abdominal pain was likely "a benign process, likely irritable bowel." (R. at 690.) Dr. Glogas then adjusted Ralston's medication. (R. at 690.)

In January and February 2004, Ralston visited Dr. Glogas several times, complaining of various symptoms such as sharp back pain and numbness in his leg and foot, as well as stiffness, right upper quadrant pain, and wheezing. (R. at 778-81.)

On February 18, 2004, Ralston underwent a CT scan of his abdomen and pelvis, which revealed tiny bilateral renal calculi, an enlarged prostate, and a small, stable "liver lesion not significantly changed as compared to a prior study dated 6/6/03." (R. at 791, 819 .)

*6 On February 26, 2004, Ralston visited Jaime Salomon, M.D., a staff physician in the Veterans Administration health system ("VA"), complaining of recurrent right side rib pain and a lack of appetite. (R. at 853.)

On March 5, 2004, Dr. James reported Ralston's COPD as "stable" and encouraged Ralston to pursue a weight reduction diet and regular exercise. (R. at 764-66.)

In March and April 2004, Ralston visited Sushil Jain, M.D., complaining of constipation and right upper quadrant abdominal pain. (R. at 807-12.) Dr. Jain noted no evidence of an abscess, prescribed medication for Ralston's complaints, and scheduled a colonoscopy, the results of which were normal. (R. at 807-12.)

On April 7, 2004, Ralston underwent a pulmonary function test, which revealed a "mild degree of obstructive pattern." (R. at 768.) The findings from the test were "compatible with the diagnosis of chronic bronchitis with mild obstructive pattern and obesity." (R. at 768.)

In 2003 and 2004, Ralston visited Avelina Vitug, M.D., a psychiatrist at the VA, who diagnosed him with "adjustment order with depression," noting that he experienced sleep difficulties, some memory loss, and anxiety. (R. at 851-52.) Dr. Vitug, who saw Ralston approximately once every three months, indicated that Ralston had fair judgment and insight and that he was coping well with medication. (R. at 851-52.)

On May 20, 2004, Ralston returned to Dr. Salomon, complaining of right upper quadrant pain. (R. at 853-55.) Dr. Salomon noted that Ralston's upper quadrant pain was of "unclear etiology" and that he had normal cardiac function. (R. at 853-55.)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                            Page 6

Slip Copy, 2006 WL 2917343 (N.D.Ind.)
**(Cite as: Slip Copy)**

*C. Unum's Response to Ralston's Claim for LTD Benefits*

On March 8, 2002, Ralston filed his claim with Unum for short term disability ("STD") benefits and began receiving STD benefits effective March 3, 2002. (R. at 346.)

On June 17, 2002, Anne Roza, R.N., reviewed Ralston's file on behalf of Unum, concluding that his medical records appeared to support impairments of dyspnea, pulmonary embolism, possible reactive airway disease, chronic back pain, anxiety, and probable sleep apnea. (R. at 66-67.) She noted that Ralston was scheduled for repeat pulmonary function testing and a neurological evaluation and requested that updated records be provided. (R. at 66-67.)

On July 19, 2002, Deby Hazelwood, R.N., reviewed Ralston's file on behalf of Unum, noting that (1) Ralston continued to report dyspnea with exertion and remained in treatment for irritable bowel syndrome, hypothyroidism, and chronic back/neck pain with nonspecific tremor; (2) his liver abscesses were resolved; and (3) Unum was waiting for updated pulmonary information. (R. at 93-95.) She opined that Ralston "remains supported for inability to safely drive a commercial truck through 8/30/02, and possibly beyond that date." (R. at 93.) Three days later, Unum extended Ralston's STD benefits through August 25, 2002, and referred his case for LTD benefits review. (R. at 97.)

*7 On August 8, 2002, Ann Marie Germain, R.N., reviewed Ralston's file on behalf of Unum, concluding that his medical records appeared to support impairments of pulmonary embolism, possible reactive airway disease, chronic back pain, anxiety, and probable sleep apnea. (R. at 117-18.) She opined that Ralston's record supported limitations that would prevent him from walking more than fifty feet, carrying more than fifteen pounds, lifting more than fifteen pounds, or concentrating for extended periods of time. (R. at 117-18.)

On September 5, 2002, Bradford Sturman, R.N., reviewed Ralston's updated medical record on behalf of Unum, including Dr. Glogas's release of Ralston to return to work from a pulmonary standpoint in July and several other negative test results. (R. at 254-58.) Sturman noted that Ralston had pulmonary emboli and a liver abscess following his gall bladder removal, but clarified that the Coumadin therapy Ralston received for his pulmonary emboli would not preclude his return to work. (R. at 254-58.) He further opined that Ralston's pulmonary and cardiac testing indicated that he is capable of returning to work without any restrictions or limitations. (R. at 254-58.) Thus, Sturman advised Unum that based on the most recent medical information, Ralston was not disabled beyond July 24, 2002, from his regular occupation. (R. at 254-258.)

On September 26, 2002, Laird Caruthers, M.D., reviewed Ralston's entire file on behalf of Unum, stating that "[t]here is zero evidence of a work capacity impairment beyond July 24, 2002, and both claimant's primary care physician and his pulmonologist concur." (R. at 259.) As a result, on October 1, 2002, Unum issued a letter to Ralston denying him LTD benefits. (R. at 266-69.)

Soon thereafter, Ralston appealed Unum's denial of LTD benefits. (R. at 374-76.) On October 29, 2002, Dr. Caruthers again reviewed Ralston's file on behalf of Unum, concluding that Dr. Glogas had "flip-flopped" his opinion between his July 24 progress note, which stated that Ralston's "respiratory status is not that severe," and his October 8 letter, which stated that Ralston could not return to work until his pulmonary problems were resolved. (R. at 366-67.) Dr. Caruthers concluded that Ralston was "doctor-shopping" for pulmonologists, opining that "[t]here is still zero evidence of a significant work capacity impairment in the medical documentation." (R. at 366-67.)

On November 14, 2002, Larry Ianetti, Ph.D., reviewed Ralston's record on behalf of Unum. (R. at 409.) He noted that Ralston experienced a "moderate range of difficulty" and a "moderate degree of clinical distress" with respect to his depression and anxiety, opining that his symptoms "would have an adverse impact on his performance and on his ability to safely navigate." (R. at 409.)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                          Page 7

Slip Copy, 2006 WL 2917343 (N.D.Ind.)
**(Cite as: Slip Copy)**

He suggested that Ralston's updated medical records be obtained and that another review be performed in four-to-six months. (R. at 409.) One week later, Sandra Tilley, R.N., performed an additional medical review on behalf of Unum, noting that Ralston was currently enrolled in pulmonary rehabilitation and concluding that a diagnosis of COPD was appropriate. (R. at 420.) On December 3, 2002, Unum approved LTD benefits for Ralston. (R. at 425.)

**\*8** On May 28, 2003, Christopher Murphy, R.N., reviewed Ralston's medical file and recommended that Ralston's medical and psychological records be updated, particularly the records of his new pulmonologist, Dr. James, and the records from his pulmonary rehabilitation. (R. at 400.)

On August 5, 2003, Ralston phoned Unum to inquire whether it offered vocational assistance, explaining that he was currently studying computer science through the Indiana State Rehab Program. (R. at 651.) As a result, on September 8, 2003, Susan Kern, a vocational rehabilitation consultant, conducted a vocational rehabilitation initial review with Ralston, noting that he was "excited about the prospects of a career change." (R. at 665-67.) Ralston reported that he had completed three classes toward an associate degree in computer science at Ivy Tech during the last two semesters and had earned a 4.0 grade point average, stating that he would like to earn a four-year degree. (R. at 665-67.) In her documentation, Kern stated that Unum could not complete a vocational assessment until Ralston's medical condition was stabilized, all updated medical information was obtained, and permanent restrictions and limitations were assigned. (R. at 665-67.)

On November 26, 2003, Thomas Hashway, M.D., a specialist in cardiovascular disease and internal medicine, reviewed Ralston's updated medical file on behalf of Unum, concluding that although Ralston's pulmonary function test results varied, his exertional capacity remained intact and there was no basis for any further impairment. (R. at 693-95.)

On June 24, 2004, Shirley Yeager, R.N., conducted a clinical review of Ralston's file on behalf of Unum

and concluded that Ralston appeared to be "stable" in all diagnoses. (R. at 892-93.) She noted that Dr. Davis's and Dr. Vitug's records reflected that Ralston was coping well with his depression through medication and that his small liver lesion was stable. (R. at 892-93.) She further observed that while Dr. James diagnosed Ralston with chronic bronchitis with mild obstruction, he also indicated that Ralston needed to exercise and lose weight. (R. at 892-93.) She further indicated that Ralston's pulmonary function test of April 2004 was "really good," though Dr. James recommended that Ralston participate in a reconditioning program prior to returning to work. (R. at 892-93.) She also noted that Ralston was currently attending school. (R. at 892-93.) Yeager concluded that Ralston's file did not support continuing restrictions and limitations from any occupation. (R. at 892-93.)

On July 13, 2004, after the collection of additional medical records, Dr. Hashway performed another review of Ralston's medical file on behalf of Unum. (R. at 895-96.) While he noted that Ralston had a poorly consolidated sleep pattern that may cause daytime fatigue and that Ralston was undergoing counseling for psychological and marital issues, Dr. Hashway concluded that "[t]here is no chronic physical issue ... that rises to the level of total and permanent occupational incapacity." (R. at 895-96.) He also reviewed Dr. James's suggestion that Ralston undergo reconditioning and responded that " resumption of work will help to reverse deconditioning." (R. at 895-96.) Dr. Hashway then concluded that no restrictions or limitations were supported. (R. at 895-96.) On July 20, 2004, Unum notified Ralston that it was terminating his LTD benefits as of August 22, 2004. (R. at 910-17.)

**\*9** On August 20, 2004, Ralston filed an appeal to Unum's denial of LTD benefits. (R. at 923, 927.) As a result, on October 18, 2004, Woolson Doane, M.D., a specialist in internal medicine and board eligible in pulmonary disease, conducted a review of Ralston's medical record on behalf of Unum, succinctly summarizing Ralston's medical history as follows:
This 56 yr.-old male truck driver whose job was eliminated sometime near LDW stopped work on 2/21/02 for elective cholecystectomy. The post

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

.

Slip Copy

Slip Copy, 2006 WL 2917343 (N.D.Ind.)
**(Cite as: Slip Copy)**

operative recovery was complicated by multiple small pulmonary emboli and liver abscesses. The claimant responded to antibiotic and anticoagulant therapy and by 7/24/02 was able to perform heavy exercise during an exercise test. The claimant was treated for depression with antidepressants and was seeing a psychiatrist at the VA and a counselor at a Family Counseling center for situational adjustment disorder. The claimant continued to consult his AP for complaints of abdominal discomfort and exertional dyspnea for which the claimant's AP performed multiple tests and sent the claimant to multiple consultants. Other than irritable bowel syndrome/constipation and mild COPD, the evaluation of the claimant's somatic complaints did not yield evidence of an impairing disease process. Likewise, the intensity of treatment as of 2/26/04 for the claimant's situational disorder with anxiety/depressive symptoms would not support impaired functional capacity as of 8/22/04 and thereafter.

(R. at 954-55.) Dr. Doane concluded that Ralston was not restricted from a sustained eight-hour workday of medium to heavy work, specifically opining as follows:On 7/24/02 following completion of the graded exercise test demonstrating the capacity to perform 10.2 METS of exercise capacity, Dr. Glogas stated: "I said (to the claimant) I have no objective reason that he can't work other than his prior injury (workers compensation back injury 4/23/01 with aggravation on 9/17/01) with his back and lung field capacity limitation from his prior Workers Comp injury." Dr. Glogas noted "he could work with retraining." Dr. Shugart discharged the claimant following an 8/29/02 MRI of the thoracic and lumbar spine combined with his clinical examination on 8/22/02 that did not reveal evidence of neuromuscular dysfunction which would impair work capacity. PFTs performed by Dr. James on 4/7/04 were improved over those of 9/18/02 or 3/18/02. There was evidence of COPD based on the abnormal FEF25-75, airway resistance and residual volume changes indicating peripheral airway obstruction compatible with early emphysematous changes. However, based on demonstrated exercise capacity during Pulmonary Rehabilitation in 2002 and 2003 as well as exercise tests, the impact of the

COPD would not preclude sustained work capacity at a 4-5 MET (general heavy labor, operating heavy equipment lifting and carrying 50 pounds or less) level for an 8 hour day. There is no medical evidence in the file after 8/22/04 to indicate a change in that exercise capacity or change in mental status.

**\*10** (R. at 955.) Dr. Doane did, however, opine that "[r]estricting [Ralston's] exposure to known allergens, if any, and excess levels of dust, chemical fumes and mists or smoke is reasonable." (R. at 954.)

On October 27, 2004, Unum denied Ralston's appeal for LTD benefits, explaining that the available medical data did not support restrictions and/or limitations that would prevent Ralston from performing the duties of his "regular occupation" and that the records clearly reflected that he had the functional capacity to perform a "medium to heavy occupation." (R. at 968-74.)

### III. STANDARD OF REVIEW

"Although the parties' motions are summary judgment motions, the motions actually seek administrative review of the decision to deny benefits, with the composition of the administrative record being the essential uncontested fact." *Shyman v. Unum Life Ins. Co. of Am.,* No. 01 C 7366, 2004 WL 609280, at \*2 (N.D.Ill. March 25, 2004), *aff'd,* 427 F.3d 452 (7th Cir.2005). " Evidence outside the administrative record is appropriate to consider only to the extent that it goes to procedural issues, such as whether the [p]olicy is an ERISA benefit plan or whether the arbitrary and capricious review applies." *Id.*

Benefit determinations in ERISA cases arising under 29 U.S.C. § 1132(a)(1)(B) are reviewed under an arbitrary-and-capricious standard, provided that the terms of the employee benefit plan afford the plan administrator "broad discretion to interpret the plan and determine benefit eligibility." [FN5] *Davis v. Unum Life Ins. Co. of Am.,* 444 F.3d 569, 575 (7th Cir.2006), *petition for cert. filed,* 75 U.S.L.W. 3035 (U.S. Jul. 14, 2006) (No. 06-70);

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                               Page 9

Slip Copy, 2006 WL 2917343 (N.D.Ind.)
**(Cite as: Slip Copy)**

*see also Sisto v. Ameritech Sickness & Accident Disability Benefit Plan,* 429 F.3d 698, 700 (7th Cir.2005). Under the arbitrary-and-capricious standard, the reviewing court "do[es] not ask whether the administrator reached the correct conclusion or even whether it relied on the proper authority." *Kobs v. United Wisconsin Ins. Co.,* 400 F.3d 1036, 1039 (7th Cir.2005). Rather, the question before a reviewing court is whether the administrator's decision has "rational support in the record." *Davis,* 444 F.3d at 576 (quoting *Leipzig v. AIG Life Ins. Co.,* 362 F.3d 406, 409 (7th Cir.2004) ). "Put simply, an administrator's decision will not be overturned unless it is 'downright unreasonable.' " *Id.* (quoting *Sisto,* 429 F.3d at 700).

FN5. If the terms of the benefit plan do not vest discretionary authority in the plan administrator, the benefit determinations are reviewed by the court *de novo. Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115 (1989). Here, the parties agree that Suiza's benefit plan vested discretionary authority in Unum and that the arbitrary-and-capricious standard applies. (Mem. in Supp. of Def .'s Mot. for Summ. J. at 1; Pl.'s Resp. at 10.)

**IV. DISCUSSION**[FN6]

FN6. Ralston filed a Motion for Court to Take Judicial Notice of Multi-State Market Conduct Examination (Docket # 21) in response to Suiza's motion for summary judgment, requesting that the Court take judicial notice of a Report of the Targeted MultiState Market Conduct Examination (" Report") submitted by Ralston. Per Ralston, the Report was commenced by the Maine Bureau of Insurance, the Massachusetts Division of Insurance, and the Tennessee Department of Commerce and Insurance, with all fifty states choosing to act as participating states in the examination, and addressed claims handling practices for group LTD policies issued by Unum for the purpose of

determining whether the disability income claims handling practices reflected systemic "unfair claim settlement practices. " (Mot. for Ct. to Take Judicial Notice of Multi-State Market Conduct Examination ¶¶ 2-4.) Suiza opposes Ralston's motion, asserting that the Report is not admissible under ERISA, is not relevant to Ralston's claim, and fails to meet the criteria necessary for judicial notice. (Def.'s Cross-Mot. to Deny Judicial Notice and Resp. to Pl.'s Mot. for Judicial Notice of Multi-State Market Conduct Examination at 2-8.)

Suiza's arguments are persuasive. First, the Court is limited in its review to the information that was before Unum at the time of its decision, and the Report is not part of Ralston's claim file. *See Perlman v. Swiss Bank Corp. Comprehensive Disability Prot. Plan,* 195 F.3d 975, 982 (7th Cir.1999). Second, the Report, which reviewed 299 randomly-selected claim files and identified "several general areas of concern" but reached no conclusions (Report at 6, 10), is seemingly irrelevant to this Court's determination whether Unum acted arbitrarily and capriciously in Ralston's case. Third, Rule 201 of the Federal Rules of Evidence permits judicial notice of an "adjudicative fact that is both ' not subject to reasonable dispute' and either 1) 'generally known within the territorial jurisdiction of the trial court' or 2) 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.' " *Gen. Elec. Capital Corp. v. Lease Resolution Corp.,* 128 F.3d 1074, 1081 (7th Cir.1997) (quoting Fed.R.Evid. 201(b) ). Here, the "general areas of concern" expressed in the Report hardly rise to the level of findings of fact, as a plan of corrective action agreed upon by the parties and set forth in the Report, which appears in essence to be a settlement agreement, "obviated the need for ... specific claim findings or reaching a formal conclusion concerning the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                              Page 10

Slip Copy, 2006 WL 2917343 (N.D.Ind.)
**(Cite as: Slip Copy)**

examination objective ." (Report at 10); *see General Electric,* 128 F.3d at 1084 (" A settlement agreement has none of the indicia of trustworthiness found in a public record or well-established treatise like Gray's Anatomy.") Moreover, the Seventh Circuit Court of Appeals has stated that " courts generally cannot take notice of findings of fact from other proceedings for the truth asserted therein because these findings are disputable and usually are disputed." *General Electric,* 128 F.3d at 1082 n. 6.

Therefore, for the foregoing reasons, the Court will recommend that Ralston's motion to take judicial notice be denied.

Ralston contends that Unum acted arbitrarily and capriciously when denying his claim for LTD benefits by: (1) failing to have Ralston undergo an independent medical examination, instead relying on reviews of his medical record by Unum's in-house physicians; (2) selectively relying on evidence that was unfavorable to Ralston's claim and purportedly neglecting to consider the opinions of his treating physicians; (3) failing to accord greater deference to the opinions of Ralston's treating physicians, rather than Unum's in-house reviewing physicians; and (4) failing to produce evidence, such as a functional capacity evaluation, that indicated Ralston was able to "perform his job, or any other, for eight hours a day." FN7 (Pl.'s Resp. to Def.'s Mot. for Summ. J. at 12-17.) While Ralston's arguments will each be discussed in turn, none of them are ultimately successful.

> FN7. While Ralston also sets forth an argument in his response brief entitled " The Plaintiff Has Proven His Entitlement to Benefits," this argument does not merit a separate discussion, as it articulates no specific theory and merely rehashes various points already articulated in his other arguments. (*See* Pl.'s Resp. at 17-20.)

*A. Unum Did Not Act Arbitrarily and Capriciously by Foregoing an Independent Medical Examination*

*11 First, Ralston argues, albeit unsuccessfully, that Unum acted arbitrarily and capriciously by relying on the in-house physicians' review of his medical records, rather than performing an independent medical examination. Ralston's argument appears two-fold: (1) that Unum should have conducted its own examination of Ralston, rather than relying on reviews of his medical records; and (2) that Unum should have secured physicians who were not in-house with Unum to examine Ralston and/or review his medical record.

In *Davis v. Unum Life Insurance Company of America,* 444 F.3d at 577, the Seventh Circuit Court of Appeals squarely addressed Ralston's first assertion-that Unum acted unreasonably by relying on reviews of Ralston's medical records, rather than directly examining him. It ultimately discarded the argument as follows:
[N]either the district court nor [plaintiff] has cited, and our research has not disclosed, any authority that generally prohibits the commonplace practice of doctors arriving at professional opinions after reviewing medical files. In such file reviews, doctors are fully able to evaluate medical information, balance the objective data against the subjective opinions of the treating physicians, and render an expert opinion without direct consultation. It is reasonable, therefore, for an administrator to rely on its doctors' assessments of the file and to save the plan the financial burden of conducting repetitive tests and examinations.FN8

> FN8. Suiza's LTD benefit plan states that Unum "may" require a claimant to be examined by a medical expert of Unum's choice. (R. at 484.)

*Id.* Clearly, the first prong of Ralston's argument falls flat.

The second component of Ralston's argument-that Unum unreasonably relied upon in-house physicians in reaching its determination-also fails. The plaintiff in *Davis* also advanced this argument, but to no avail. 444 F.3d at 575. The Seventh Circuit opined:
[W]hether a doctor is in-house or not is an

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                              Page 11

Slip Copy, 2006 WL 2917343 (N.D.Ind.)
**(Cite as: Slip Copy)**

irrelevant distinction in this context.... When an administrator ... opts to investigate a claim by obtaining an expert medical opinion-independent of its own lay opinion and that of the claimant's doctors-the administrator is going to pay a doctor one way or another. Thus, whether the administrator retains in-house doctors (arguably reducing overhead costs for the benefit of the plan's participants and beneficiaries) or pays for freelance doctors makes no difference in this conflict analysis. Paying for a legitimate and valuable service in order to evaluate a claim thoroughly does not create a view-altering conflict.

*Id.* at 575 (internal citations omitted). The Seventh Circuit further clarified that if the plan administrator gives the in-house physicians some specific stake in the outcome of the case, such as paying them more if a claim is denied, then the plaintiff may have some validity to his argument. *Id.* However, a mere theoretical argument that in-house doctors have an inherent conflict in every case is insufficient. *Id.* at 576 ("The singular fact of working in-house does not disqualify a doctor from rendering an independent medical opinion any more than does paying an outside doctor to do the same....").

**\*12** Thus, contrary to Ralston's assertion, Unum did not act arbitrarily and capriciously by relying on its in-house physicians' review of Ralston's medical record in reaching its determination, rather than performing an independent medical examination.

*B. Unum's Review of Ralston's Medical Evidence Was Not "Downright Unreasonable"*

Ralston also contends that Unum acted arbitrarily and capriciously by selectively reviewing the medical records in his claim file that support a finding of not disabled and ignoring those that were favorable to his claim. This argument, however, is not a winner for Ralston either.

To elaborate, Ralston asserts that Unum " completely ignored the plethora of medical evidence substantiating [Ralston's] disability." (Pl.'s Resp. at 14.) However, the closest Ralston approaches to making a specific assertion is his

contention that "Dr. Doane *completely neglected* to consider the opinions of [Ralston's] treating physicians and the medical evidence supporting his disability." (Pl.'s Resp. at 13 (emphasis added).)

In contrast to Ralston's assertion, the "plethora" of evidence indicates quite the opposite-that Unum's review of Ralston's medical file was not "downright unreasonable." First, as to Ralston's criticism of Dr. Doane, in his review Dr. Doane *expressly articulated* his consideration of the records of Dr. Glogas, Dr. Shugart, Dr. James, Dr. Davis, Dr. Salomon, and Dr. Vitug. Likewise, Dr. Doane specifically considered the results of Ralston's 2004 pulmonary function test and 2003 sleep study, as well as the findings, which were all normal, of his echocardiogram, an abdominal CT scan, a chest CT scan, and a colonoscopy. Clearly, Ralston's contention that Dr. Doane "completely neglected to consider the opinions of [Ralston's] treating physicians and the medical evidence supporting his disability" is completely unfounded.

Moreover, Ralston's bald assertion that Unum " completely ignored the plethora of medical evidence substantiating [Ralston's] disability" and that "Unum's decision to terminate [Ralston's] benefits has *no* support in the record" is without merit. (Pl.'s Resp. at 14, 17 (emphasis added).) Contrary to Ralston's contention, the record is replete with evidence that Unum's nurses, psychologists, and physicians performed a reasonable review of the evidence in his medical file.[FN9] In fact, Unum at times extended Ralston's disability benefits pending its receipt of Ralston's updated medical information. (R. at 66-67, 93-95.)

> FN9. To elaborate, Anne Roza's June 2002 review included medical records from Dr. Glogas, Dr. Stephens, and Dr. Nohinek. (R. at 67.) Deby Hazelwood's July 2002 review included medical records from Dr. Katz, Dr. Allina, and Dr. Glogas, as well as the results of a cervical MRI and an upper extremity EMG. (R. at 93-94.) Ann Marie Germain's August 2002 review included medical records from the Fort Wayne Neurological Center, Dr. Glogas,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                        Page 12

Slip Copy, 2006 WL 2917343 (N.D.Ind.)
**(Cite as: Slip Copy)**

Dr. Schumosyl, Dr. Stephens, Dr. Katz, and Dr. Davis. (R. at 117-18.) Bradford Sturman's September 2002 review included records from Dr. Glogas, Dr. Schomogyi, Dr. Katz, Dr. Nohinek, Dr. Fouts, Dr. Allina, and Dr. Banas, as well as the results of Ralston's chest x-ray, echocardiogram, pulmonary function testing, and CT scans. (R. at 254-57.) Dr. Caruthers's September 2002 review included Ralston's "entire file," and his October 2002 review included the records of Dr. Fouts, Dr. Stephens, Dr. Shugart, and Dr. Glogas, as well as the results of a CT scan and a Report of Psychiatric Status. (R. at 259, 366-67.) Dr. Iannetti's November 2002 review included Ralston's 2002 mental health treatment records. (R. at 409.) In November 2003, Dr. Hashway reviewed Christopher Murphy's summary of the updated records of Dr. Glogas, as well as Ralston's January 2003 discharge summary from pulmonary rehabilitation and an April 2003 letter from Dr. Banas. (R. at 693-94.) Shirley Yeager's and Dr. Hashway's June 2004 reviews included the 2004 records of Dr. Glogas and Dr. James. (R. at 892-93.) Dr. Doane's August 2004 review included "the entire paper file as well as the entire content of the electronic file," which included medical records from Dr. Glogas, Dr. Fouts, Dr. James, Dr. Jain, Dr. Vitug, Dr. Shugart, and Dr. Davis. (R. at 955.)

Thus, Unum's review of Ralston's medical records was clearly not "downright unreasonable," and thus Ralston's second argument is unpersuasive.

*C. Unum Was Not Required to Accord Greater Deference to Ralston's Treating Physicians*

Ralston next asserts that Unum acted arbitrarily and capriciously by failing to accord greater deference to his treating physicians than to Unum's reviewing physicians. However, this argument by Ralston also fails right out of the gate.

*13 The Seventh Circuit has emphasized that, in contrast to the Social Security context, "ERISA does not require plan administrators to accord special deference to the opinions of treating physicians." *Kobs,* 400 F.3d at 1039; *see also Nord v. Black & Decker Disability Plan,* 538 U.S. 822, 825, 831 (2003) ("Nothing in [ERISA] itself ... suggests that plan administrators must accord special deference to the opinions of treating physicians."); *Davis,* 444 F.3d at 578. Here, as emphasized *supra,* Unum clearly considered the opinions of the treating physicians in their numerous reviews of Ralston's medical file. In fact, some treating physicians' opinions, such as Dr. Stephens and Dr. Fouts, were not necessarily inconsistent with Unum's determination. *See generally Davis,* 444 F.3d at 577.

Furthermore, Unum's decision to give less weight to Dr. Glogas's opinion had rational support in the record, considering that his opinion concerning Ralston's pulmonary and return-to-work status seemingly "flip-flopped" between July and October 2002. *See id.* at 578 (concluding that a treating physician was acting "more as an advocate than a doctor rendering objective opinions" when he rendered inconsistent opinions); *Shyman,* 2004 WL 609280 at *19 (discounting the credibility of a claimant's treating physician due to inconsistent statements). Moreover, in rejecting Dr. James's opinion that Ralston should undergo a reconditioning program prior to returning to work, Unum relied upon the opinions of Dr. Hashway and Dr. Doane, who stated that returning to work was sufficient reconditioning; Unum's resolution of a mere difference in medical opinion is not "downright unreasonable."

Thus, contrary to Ralston's contention, Unum did not act arbitrarily and capriciously by failing to accord greater deference to Ralston's treating physicians in making its determination.

*D. Unum's Decision That Ralston Could Return to His "Regular Occupation" or a "Medium to Heavy Occupation" Was Not Arbitrary and Capricious*

Finally, Ralston contends that Unum acted

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                       Page 13

Slip Copy, 2006 WL 2917343 (N.D.Ind.)
**(Cite as: Slip Copy)**

arbitrarily and capriciously in denying Ralston's LTD benefits because "there is little evidence on Unum's part that indicated [he] was able to perform his job, or any other, for eight hours a day." (Pl.'s Resp. at 16.) Contrary to Ralston's contention, substantial evidence in Ralston's medical record supports Unum's decision, and thus its determination was not "downright unreasonable."

In determining that Ralston could return to his regular occupation or a medium-to-heavy occupation, Dr. Doane cited Ralston's January 2003 pulmonary rehabilitation records, which reflected that Ralston could walk three-tenths of a mile and perform sixty minutes of aerobic exercise achieving 90-94% of predicted maximum heart rate without experiencing adverse physiological consequences, " reinforcing the ability to sustain 8 hours of moderate to heavy work." (R. at 942.) Dr. Doane further explained that the results of Ralston's graded exercise test of July 2002 were compatible with GOLD class 1 COPD, which was the *same level* demonstrated by Ralston in a September 2000 exercise test when he was still working full-time. [FN10]

> FN10. Dr. Doane explains in his review of Ralston's file that a GOLD (Global Initiative on Obstructive Lung Disease) class 1 rating encompasses "primarily physiological changes without impaired functional abilities." (R. at 941.)

**\*14** Additionally, as to Ralston's neuromuscular status, Dr. Doane emphasized that his graded exercise test results of July 2002 did not support the existence of a neuromuscular impairment, explaining that "individuals with significant conditions impairing neuromuscular function of the back and legs cannot achieve 10 METS of exercise capacity on a treadmill using the Bruce protocol without symptoms." (R. at 954.) As to Ralston's mental status, Dr. Doane observed that while the mental health professionals opined that Ralston experienced generalized anxiety and some memory problems, Ralston at the same time demonstrated fair judgment and insight, was working toward a degree in computer science earning a 4.0 grade

point average, and was considered to be coping well with his situational adjustment disorder through medication. [FN11]

> FN11. While Dr. James did recommend that Ralston undergo reconditioning prior to returning to work, Dr. Hashway and Dr. Doane disagreed, opining that Ralston's return to work would be "reconditioning" in itself. Unum's reliance on the opinions of Dr. Hashway and Dr. Doane in this respect, rather than the opinion of Dr. James, is not arbitrary and capricious, as Unum was not required to accord greater deference to the opinion of Ralston's treating physician. *See, e.g., Kobs,* 400 F.3d at 1039.

In *Quinn v. Blue Cross and Blue Shield Association,* 161 F.3d 472, 476 (7th Cir.1998), the Seventh Circuit Court of Appeals explained that a plan administrator is "under no obligation to undergo a full-blown vocational evaluation of [the claimant's] job, but she was under a duty to make a reasonable inquiry into the types of skills [the claimant] possesses and whether those skills may be used at another job...." *See also O'Reilly v. Hartford Life & Accident Ins. Co.,* 272 F.3d 955, 961 (7th Cir.2001) . In *Quinn,* the plan administrator's representative by deposition admitted that she "did not know what [the claimant's] job duties entailed, what her exertional requirements were, any training and experience she possessed, or any transferable skills she may have obtained." *Id.* The Court concluded that the plan administrator had acted arbitrarily and capriciously "[b]y not even performing the *slightest inquiry* into the matter...." *Id.* (emphasis added).

In contrast to the plan administrator in *Quinn,* Unum had a sufficient basis upon which to make its determination that Ralston could perform his regular occupation or a medium-to-heavy occupation. Here, Unum was quite knowledgeable about Ralston's exertional capacity through Dr. Doane's and Dr. Hashway's review of Ralston's pulmonary function testing and graded exercise test. Furthermore, in contrast to *Quinn* where no physician stated whether or not the claimant had

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 14

Slip Copy, 2006 WL 2917343 (N.D.Ind.)
**(Cite as: Slip Copy)**

any limitations, Dr. Doane and Dr. Hashway both affirmatively stated that Ralston had *no* restrictions or limitations which would prevent him from performing his regular occupation or a medium-to-heavy occupation. [FN12] Stated another way, Dr. Doane and Dr. Hashway both concluded that Ralston's occupational capacity *had not significantly changed* since the date he originally filed his claim for disability as a result of his gall bladder surgery and pulmonary emboli.

> FN12. In their documentation, both Dr. Glogas and Dr. Shugart refer briefly to the existence of certain pre-existing restrictions related to Ralston's work-related back injury, which preceded his February 2002 disability filing. (*See* R. at 955, 970.) However, neither a copy of the restrictions nor the functional capacity evaluation, which apparently gave rise to the restrictions, are included in Unum's claim file. Even if these restrictions do indeed exist, Unum did not act arbitrarily and capriciously in failing to consider them, since Ralston bears the burden of proving he is disabled under the Suiza plan and he never submitted any information describing these pre-existing limitations. (*See* R. at 490); *see generally Tolle v. Carroll Touch, Inc.,* 23 F.3d 174, 179 (7th Cir.1994) (emphasizing that the employee must establish that he has satisfied the conditions necessary to award benefits under the plan); *Wallace v. Reliance Standard Life Ins. Co.,* No. 01-C-0714-C, 2002 WL 32345607, at *7 (W.D. Wis. June 21, 2002). Here, the information in the 994-page claim file, described *supra* in Section II, was not an insufficient basis upon which Unum could make a reasonable decision. *See O'Reilly,* 272 F.3d at 961 ("Before denying benefits, administrators of ERISA plans are required to have enough evidence to allow them to make a reasonable decision."); *see generally Quinn,* 161 F.3d at 475 (emphasizing that under the arbitrary and capricious standard, the court "will only

look at whether the [plan administrator] acted unreasonably, not whether she merely made a mistake").

Furthermore, Dr. Doane emphasized in his opinion that "individuals with significant conditions impairing neuromuscular function of the back and legs cannot achieve 10 METS of exercise capacity on a treadmill using the Bruce protocol without symptoms" and that the results of Ralston's cervical and lumbar MRIs reflected only "degenerative changes of the discs and facets commonly seen in *asymptomatic* individuals in [Ralston's] age group." (R. at 953-54 (emphasis added).) Thus, it can be reasonably inferred that Dr. Doane did not believe that Ralston warranted back restrictions based on the medical evidence.

Moreover, unlike the plan administrator in *Quinn,* Unum did indeed conduct a vocational interview with Ralston to explore his education, training, and experience. Since Ralston ultimately was not assigned any restrictions or limitations as a result of the medical concerns that served as the basis for his February 2002 disability filing, it was not unreasonable that Unum did not complete a "full-blown vocational evaluation." In fact, there ultimately was *no need* for a vocational assessment, since Dr. Doane and Dr. Hashway opined that Ralston had the capacity to perform the regular occupation that he was performing at the time he originally filed for disability. *See Schaub v. Consol. Freightways, Inc. Extended Sick Pay Plan,* 895 F.Supp. 1136, 1145 (S.D.Ind.1995) (articulating that there "may be no need for vocational evidence" where there is no indication of impairment and the claimant can resume his normal occupation).

**\*15** Therefore, based on the medical evidence available to it, Unum's decision that Ralston could return to his regular occupation or a medium-to-heavy occupation was not arbitrary and capricious, and thus Ralston's final argument is unavailing.

### V. CONCLUSION

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                          Page 15

Slip Copy, 2006 WL 2917343 (N.D.Ind.)
**(Cite as: Slip Copy)**

For the foregoing reasons, the undersigned Magistrate Judge recommends that the Defendant's motion for summary judgment (Docket # 16) be GRANTED.[FN13]

> FN13. Additionally, the undersigned Magistrate Judge recommends that the Plaintiff's Motion for Court to Take Judicial Notice of Multi-State Market Conduct Examination (Docket # 21) be DENIED and that Suiza's Cross-Motion to Deny Judicial Notice (Docket # 26) be GRANTED.

The Clerk is directed to send a copy of this Report and Recommendation to counsel for the parties. NOTICE IS HEREBY GIVEN that within ten days after being served with a copy of this recommended disposition a party may serve and file specific, written objections to the proposed findings and/or recommendations. Fed.R.Civ.P. 72(b). FAILURE TO FILE OBJECTIONS WITHIN THE SPECIFIED TIME WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER. *See* N.D. Ind. L.R. 72.1(d)(2); *see also Thomas v. Arn,* 474 U.S. 140 (1985); *Lerro v. Quaker Oats Co.,* 84 F.3d 239, 241-42 (7th Cir.1996).

N.D.Ind.,2006.
Ralston v. Suiza Dairy Group, L.P.
Slip Copy, 2006 WL 2917343 (N.D.Ind.)

Briefs and Other Related Documents (Back to top)

• 1:05cv00341 (Docket) (Sep. 20, 2005)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT

## "2"

EXHIBIT "2"

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| **BETTY BULLARD,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) CIVIL ACTION NO.: 2:05-cv-1217-MEF |
| | ) |
| | ) |
| **UNUMPROVIDENT CORPORATION;** | ) |
| **UNUM LIFE INSURANCE COMPANY** | ) |
| **OF AMERICA;** | ) |
| **GENEX SERVICES, INC.;** | ) |
| | ) |
| **Defendants.** | ) |

## NOTICE OF DEPOSITION

To:                     Douglas W. Fink, Esquire
                        Hand Arendall, LLC
                        107 St. Francis Street, Suite 3000
                        Mobile, AL

Deponent:               Don Stephens, M.Ed., CRC

Date, Time & Location:  To be determined.

Please take notice that Plaintiff will take the deposition of the deponent named above, upon oral examination, at the date, time and location set out above, pursuant to the Federal Rules of Civil Procedure, and will be used for evidence, or for any other purpose of discovery, and shall be taken before a court reporter authorized to administer oaths under the laws of the United States and shall continue from day to day until complete.

You should bring with you to the deposition the documents requested in Attachment "A" to this deposition notice.

_Jenifer Champ Wallis_

One of the Attorneys for Plaintiff

1

Thomas O. Sinclair (SIN018)
Jenifer Champ Wallis (WAL191)
**CAMPBELL, WALLER & POWER**
2100-A South Bridge Parkway, Suite 450
Birmingham, AL  35209
205-803-0051
Fax:  205-803-0053

## CERTIFICATE OF SERVICE

    I hereby certify that on the 17th day of November, 2006, a true and correct copy of the foregoing has been mailed, postage prepaid, to the following:

Douglas W. Fink
Henry T. Morrissette
**HAND ARENDALL, LLC**
Post Office Box 123
Mobile, AL 36601

John S. Johnson
**HAND ARENDALL, LLC**
1200 Park Place Tower
2001 Park Place North
Birmingham, AL  35203

Of Counsel

2

**EXHIBIT "A"**

Any and all documents referring or relating to Ms. Betty Bullard.  For case of reference, attached is correspondence authored by you in regard to Ms. Bullard.

**Vocational Rehabilitation Service**



**Alabama Department of**
# REHABILITATION SERVICES



**Bob Riley**
GOVERNOR

**Steve Shivers**
COMMISSIONER

To Whom It May Concern,

Re: Ms. Betty Bullard

Based on conversations with Ms. Bullard, reviewing her treating physician's statements and considering her past job duties, this counselor certifies that Ms. Bullard has permanent disabilities that will prevent her from returning to work. She has been unable to work for well over 12 months and there is no expected improvement for her conditions anytime in the immediate future.

As noted in the medical and psychological documentation, Ms. Bullard has been diagnosed with several disabling conditions. Due to the combination of all of the disabilities along with side effects from the treatment that she is receiving, she has severe limitations to performing any work tasks. Both exertional and non-exertional capacities have been greatly impaired. She is unable to perform jobs that have <u>any</u> physical requirements. She is restricted from meeting the seven strength demands of jobs (sitting, standing, walking, lifting, carrying, pushing, and pulling), and she experiences extreme, chronic fatigue and exhaustion. She is not capable of performing sedentary jobs, even with her extensive work experience. She has irregular sleeping patterns due to both pain and the narcolepsy. Again, the fatigue and exhaustion factors interfere with concentration, memory loss and proper interaction with co-workers, supervisors and others. It should be noted that all of these problems also interfere with her activities of daily living and have limited her independence and quality of life.

In this counselor's opinion, Ms. Bullard's disabilities prevent her from working on a regular and continuing basis and from performing any substantial gainful activity.

With Ms. Bullard's permission, please contact me with any further questions.

Sincerely,

Don Stephens, M.Ed., CRC
Counselor
Vocational Rehabilitation Service

---

## PROVIDING SERVICES TO ALABAMIANS WITH DISABILITIES

2127 East South Boulevard ■ Montgomery, AL 36116-2456 ■ 334-288-0220 ■ 1-800-441-7578
■ Fax: 334-281-1388 ■ www.rehab.state.al.us

*and provided*
*before Ws*

BUL-857
*Mar 8, 2006*
*in resp to their req's*

AO88 (Rev. 1/94) Subpoena in a Civil Case

## Issued by the
# UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF ALABAMA

BETTY BULLARD

V.

**SUBPOENA IN A CIVIL CASE**

UNUMPROVIDENT CORPORATION, et al.

Case Number:[1] 2:05-cv-1217-MEF

TO:    DON STEPHENS, M.Ed., CRC, AL Rehab Services
2127 East South Blvd., Montgomery, AL 36116-2456

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | |
| | DATE AND TIME |
| | |

☑ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| AT A PLACE TO BE DETERMINED | TO BE SET |

☑ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

SEE EXHIBIT "A" TO NOTICE OF DEPOSITION.

| PLACE | DATE AND TIME |
|---|---|
| AT A PLACE TO BE DETERMINED | TO BE SET |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| Jenifer Champ Wallis | 11/17/06 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER

Jenifer Champ Wallis, Campbell, Waller & Poer, L.L.C.
2100-A SouthBridge Parkway, Suite 450, Birmingham, AL 35209, (205) 803-0051

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

AO88 (Rev. 1/94) Subpoena in a Civil Case

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|

| SERVED BY (PRINT NAME) | TITLE |
|---|---|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
                              DATE

_____
SIGNATURE OF SERVER

_____
ADDRESS OF SERVER

# EXHIBIT

## "3"

EXHIBIT "3"

Westlaw.

224 F.R.D. 169                                                              Page 1

224 F.R.D. 169
**(Cite as: 224 F.R.D. 169)**

**H**
Briefs and Other Related Documents
Saldi v. Paul Revere Life Ins. Co.E.D.Pa.,2004.
United States District Court,E.D. Pennsylvania.
Thomas SALDI,
v.
PAUL REVERE LIFE INS. CO., et al.
**No. CIV.A. 99-6563.**

Aug. 13, 2004.

**Background:** Insured brought action against
insurers, alleging wrongful termination of disability
benefits. Insurers objected to magistrate judge's
discovery orders and moved for protective order.

**Holdings:** The District Court, Surrick, J., held that:

(1) evidence regarding alleged bad faith business
policies was discoverable;

(2) evidence regarding relationships among insurers
was discoverable;

(3) court would allow depositions, affidavits and
depositions of personnel involved in handling
insured's claim;

(4) court would allow interrogatories relating to
rehabilitation plans;

(5) court would not allow discovery regarding
insurers' involvement in remote litigation;

(6) court would allow requests for admission
regarding authenticity of documents; and

(7) court would allow interrogatories relating to
reinsurance.

Orders affirmed; motion granted in part, and denied

in part.
West Headnotes
**[1] Federal Civil Procedure 170A ⇌1271**

170A Federal Civil Procedure
     170AX Depositions and Discovery
          170AX(A) In General
               170Ak1271 k. Proceedings to Obtain.
Most Cited Cases
Party wishing to obtain protective order has burden
of demonstrating that good cause exists for order.
Fed.Rules Civ.Proc.Rule 26(c), 28 U.S.C.A.

**[2] Federal Civil Procedure 170A ⇌1271**

170A Federal Civil Procedure
     170AX Depositions and Discovery
          170AX(A) In General
               170Ak1271 k. Proceedings to Obtain.
Most Cited Cases
Good cause for protective order is established on
showing that disclosure will work clearly defined
and serious injury to party seeking closure; such
injury must be shown with specificity. Fed.Rules
Civ.Proc.Rule 26(c), 28 U.S.C.A.

**[3] Federal Civil Procedure 170A ⇌1271**

170A Federal Civil Procedure
     170AX Depositions and Discovery
          170AX(A) In General
               170Ak1271 k. Proceedings to Obtain.
Most Cited Cases
Broad allegations of harm, unsubstantiated by
specific examples or articulated reasoning, do not
support good cause showing for protective order.
Fed.Rules Civ.Proc.Rule 26(c), 28 U.S.C.A.

**[4] Damages 115 ⇌179**

115 Damages
     115IX Evidence
          115k164 Admissibility
               115k179 k. Intent, Malice, or Motive of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

224 F.R.D. 169                                                                          Page 2

224 F.R.D. 169
**(Cite as: 224 F.R.D. 169)**

Defendant. Most Cited Cases
Evidence of lawful out-of-state conduct of civil
defendant may be probative when it demonstrates
deliberateness and culpability of defendant's action
in state where it is tortious, so long as conduct had
nexus to specific harm suffered by plaintiff.

**[5] Damages 115 ☞91.5(1)**

115 Damages
    115V Exemplary Damages
        115k91.5 Grounds for Exemplary Damages
            115k91.5(1) k. In General. Most Cited
Cases
        (Formerly 115k91(1))
Defendant's dissimilar acts, independent from acts
upon which liability was premised, may not serve as
basis for punitive damages.

**[6] Insurance 217 ☞3336**

217 Insurance
    217XXVII Claims and Settlement Practices
        217XXVII(C) Settlement Duties; Bad Faith
            217k3334 In General
                217k3336 k. Reasonableness of
Insurer's Conduct in General. Most Cited Cases

**Insurance 217 ☞3381(5)**

217 Insurance
    217XXVII Claims and Settlement Practices
        217XXVII(C) Settlement Duties; Bad Faith
            217k3378 Actions
                217k3381 Evidence
                    217k3381(5) k. Weight and
Sufficiency. Most Cited Cases
Recovery for bad faith pursuant to Pennsylvania
insurance statute requires plaintiff to show by clear
and convincing evidence that: (1) insurer did not
have reasonable basis for denying coverage under
policy, and (2) insurer knew of or recklessly
disregarded its lack of reasonable basis in denying
claim. 42 Pa.C.S.A. § 8371.

**[7] Federal Civil Procedure 170A ☞1581**

170A Federal Civil Procedure
    170AX Depositions and Discovery

        170AX(E) Discovery and Production of
Documents and Other Tangible Things
            170AX(E)3 Particular Subject Matters
                170Ak1581 k. In General. Most Cited
Cases
In action alleging wrongful termination of disability
benefits, district court would properly allow
discovery of evidence relating to profitability of
own-occupation disability policies, policy drafting
information and knowledge of profitability problem,
since requests were relevant to provide evidence
that insurers had financial incentive to develop
alleged bad faith business policy, and that insurers
knew that such incentive existed.

**[8] Federal Civil Procedure 170A ☞1581**

170A Federal Civil Procedure
    170AX Depositions and Discovery
        170AX(E) Discovery and Production of
Documents and Other Tangible Things
            170AX(E)3 Particular Subject Matters
                170Ak1581 k. In General. Most Cited
Cases
In action alleging wrongful termination of disability
benefits, district court would properly allow
discovery of evidence relating to discussions of goal
of terminating own-occupation disability policies,
studies conducted of claims management processes
and results of strategies, since requests were
relevant to insured's allegations that such methods
were used against him, and that insurers were
culpable.

**[9] Federal Civil Procedure 170A ☞1581**

170A Federal Civil Procedure
    170AX Depositions and Discovery
        170AX(E) Discovery and Production of
Documents and Other Tangible Things
            170AX(E)3 Particular Subject Matters
                170Ak1581 k. In General. Most Cited
Cases
In action alleging wrongful termination of disability
benefits, district court would properly allow
discovery of evidence relating to document
retention and file documentation policies, subject to
limitation for policies in effect beginning when
insured applied for benefits, since such evidence

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

224 F.R.D. 169

224 F.R.D. 169
(Cite as: 224 F.R.D. 169)

was relevant to insurers' purported intent to disregard their own standards.

**[10] Federal Civil Procedure 170A ⟨⟩1272.1**

170A Federal Civil Procedure
   170AX Depositions and Discovery
     170AX(A) In General
      170Ak1272 Scope
        170Ak1272.1 k. In General. Most Cited Cases
In action alleging wrongful termination of disability benefits, district court would properly allow discovery of evidence relating to post-merger relationships among insurers, since such information was relevant to allocation of fault.

**[11] Federal Civil Procedure 170A ⟨⟩1403**

170A Federal Civil Procedure
   170AX Depositions and Discovery
     170AX(C) Depositions of Parties and Others Pending Action
      170AX(C)4 Scope of Examination
        170Ak1403 k. Relevancy and Materiality. Most Cited Cases
In action alleging wrongful termination of disability benefits, district court would properly allow depositions or affidavits of employees or their supervisors who handled insured's claim, regarding their involvement in other cases alleging bad faith, unfair claim practices, consumer fraud, or breach of covenant of good faith and fair dealing, since there was sufficient nexus between such involvement and alleged harm to insured.

**[12] Federal Civil Procedure 170A ⟨⟩1325**

170A Federal Civil Procedure
   170AX Depositions and Discovery
     170AX(C) Depositions of Parties and Others Pending Action
      170AX(C)1 In General
        170Ak1323 Persons Whose Depositions May Be Taken
        170Ak1325 k. Officers and Employees of Corporations. Most Cited Cases
In action alleging wrongful termination of disability benefits, district court would properly allow

depositions or subpoena duces tecum of corporate designees, counsel and relevant employees, since information regarding training of employees who handled insured's claim and claims process was relevant to bad faith allegations.

**[13] Witnesses 410 ⟨⟩222**

410 Witnesses
   410II Competency
     410II(D) Confidential Relations and Privileged Communications
      410k222 k. Evidence as to Nature and Circumstances of Communication or Other Subject-Matter. Most Cited Cases
Under Pennsylvania state law, party asserting attorney-client privilege has initial burden of proving that privilege is properly invoked.

**[14] Witnesses 410 ⟨⟩198(1)**

410 Witnesses
   410II Competency
     410II(D) Confidential Relations and Privileged Communications
      410k197 Communications to or Advice by Attorney or Counsel
        410k198 In General
        410k198(1) k. In General. Most Cited Cases
Under Pennsylvania law, party resisting discovery pursuant to attorney-client privilege must demonstrate that: (1) asserted holder of privilege is or sought to become client; (2) person to whom communication was made is member of bar of court or his subordinate, and is acting as lawyer in connection with communication; (3) communication relates to fact of which attorney was informed by client without presence of strangers for purpose of securing primarily either opinion of law, legal services, or assistance in some legal proceeding, and not for purpose of committing crime or tort; and (4) privilege has been claimed and not waived by client.

**[15] Federal Civil Procedure 170A ⟨⟩1503**

170A Federal Civil Procedure
   170AX Depositions and Discovery

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

224 F.R.D. 169

Page 4

224 F.R.D. 169
**(Cite as: 224 F.R.D. 169)**

170AX(D) Written Interrogatories to Parties
170AX(D)2 Scope
170Ak1503 k. Relevancy and
Materiality. Most Cited Cases
In action alleging wrongful termination of disability
benefits, district court would properly allow
interrogatories requesting statistical information
relating to authorization and/or institution of
rehabilitation plans under insurers' policies, since
such information was relevant to insurers' possible
trial strategy of claiming that, when they terminate
benefits, many of their insureds return to work.

**[16] Federal Civil Procedure 170A ☞1588**

170A Federal Civil Procedure
170AX Depositions and Discovery
170AX(E) Discovery and Production of
Documents and Other Tangible Things
170AX(E)3 Particular Subject Matters
170Ak1588 k. Corporations, Records
of in General. Most Cited Cases
In action alleging wrongful termination of disability
benefits, district court would properly allow
discovery of insurer's board meeting minutes, since
such information was relevant to relationships
among defendant insurers and potential allocation
of liability.

**[17] Federal Civil Procedure 170A ☞1581**

170A Federal Civil Procedure
170AX Depositions and Discovery
170AX(E) Discovery and Production of
Documents and Other Tangible Things
170AX(E)3 Particular Subject Matters
170Ak1581 k. In General. Most Cited
Cases
In action alleging wrongful termination of disability
benefits, district court would properly allow
discovery of documents regarding insurers' setting
of termination goals and their tracking of their own
progress meeting those goals, since such
information was relevant to insured's allegation that
insurers had bad faith policy of terminating claims
in order to save money.

**[18] Federal Civil Procedure 170A ☞1272.1**

170A Federal Civil Procedure
170AX Depositions and Discovery
170AX(A) In General
170Ak1272 Scope
170Ak1272.1 k. In General. Most
Cited Cases
In action alleging wrongful termination of disability
benefits, district court would properly allow
discovery regarding insurers' involvement in bad
faith litigation during time that insured was
requesting benefits, since such evidence was
relevant to insurers' purported misconduct and
recidivism, but would not allow discovery regarding
insurers' involvement in litigation remote from
instant case.

**[19] Federal Civil Procedure 170A ☞1673.1**

170A Federal Civil Procedure
170AX Depositions and Discovery
170AX(G) Admissions on Request
170Ak1673 Subject Matter
170Ak1673.1 k. In General. Most
Cited Cases
In action alleging wrongful termination of disability
benefits, district court would properly allow
insured's requests for admissions by insurers,
relating to authenticity of documents that insured
had obtained through other litigation, since insurers
failed to establish that such requests were overbroad
or unduly burdensome.

**[20] Federal Civil Procedure 170A ☞1503**

170A Federal Civil Procedure
170AX Depositions and Discovery
170AX(D) Written Interrogatories to Parties
170AX(D)2 Scope
170Ak1503 k. Relevancy and
Materiality. Most Cited Cases
In action alleging wrongful termination of disability
benefits, district court would properly allow
insured's interrogatories relating to reinsurance and
lawfulness of benefits delays, since, if insured's
policy was reinsured and insurers had
non-confidential communications regarding their
state of mind concerning insured's request for
disability benefits, such information was relevant to
insured's claim.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

224 F.R.D. 169                                                      Page 5

224 F.R.D. 169
**(Cite as: 224 F.R.D. 169)**

**\*172** Alan H. Casper, Philadelphia, PA, Jeffrey K. Rubin, Kenneth R. Friedman, Richard Friedman, Friedman, Rubin & White, Anchorage, AK, for Plaintiff.

Andrew F. Susko, James M. Dunn, White & Williams LLP, John F. Barrett, Rawle & Henderson LLP, Philadelphia, PA, for Defendants.

### MEMORANDUM AND ORDER

SURRICK, District Judge.

Plaintiff, Thomas Saldi, ("Plaintiff") commenced this action against Defendants Paul Revere Life Insurance Company, Provident Companies, Inc., Provident Life and Accident Insurance Company of America and Affiliates, and UnumProvident Corporation (collectively, "Defendants"), alleging that Defendants' termination of Plaintiff's disability benefits was unreasonable and in bad faith, constituting a breach of Plaintiff's insurance contract (Count 1), a breach of the covenant of utmost fair dealing (Count 2), a violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 PA. STAT. ANN. § 201-1, *et seq.* (Count 3), and a violation of Pennsylvania's Bad Faith statute, 42 PA. CONS. STAT. ANN. § 8371 (Count 4). Presently before the Court are Defendants' Objections (Doc. Nos. 52 and 59) to Magistrate Judge Arnold C. Rapoport's Orders dated January 3, 2001 and March 6, 2001 (Doc. Nos. 49 and 57) pursuant to 28 U.S.C. § 636(b)(1)(A), and Defendants' fifth Motion for a Protective Order (Doc. No. 80), which requests a protective order with respect to Plaintiff's Fourth Set of Requests for Production of Documents, Plaintiff's Third Set of Requests for Admissions, and Plaintiff's Fourth Set of Interrogatories pursuant to Federal Rule of Civil Procedure 26(c). *See* LOCAL R. CIV. P. 72.1(IV)(a). For the following reasons, we will affirm the Discovery Orders (Doc. Nos. 52 and 59) as modified herein and we will grant the Fifth Motion for Protective Order (Doc. No. 80) in part and deny it in part as provided herein.

### I. Factual and Procedural Background [FN1]

FN1. We provide this brief summary of the facts as they are alleged in Plaintiff's Amended Complaint (Doc. No. 14) and Plaintiff's Response to Defendant's Motion for a Protective Order (Doc. No. 19).

Plaintiff alleges that he purchased an "own occupation" private long-term disability insurance policy from Paul Revere Insurance Company ("Paul Revere") in 1990. (Pl.Compl.¶¶ 19-20.) At that time, Plaintiff was the general manager of Bucks County Roses, a large, commercial rose grower. (*Id.* ¶ 21.) In or about January of 1992, Plaintiff was diagnosed with multiple sclerosis ("MS"), a progressive, degenerative disease of the central nervous system. (*Id.* ¶ 25.) On or about April of 1996, Plaintiff stopped working at Bucks County Roses, allegedly because his MS prevented him from working in the elevated temperature and humidity of the greenhouse. *Id.* ¶ 26. On or about June 6, 1996, Plaintiff applied for long-term disability benefits under his policy, claiming that he was totally disabled in his own occupation. (*Id.* ¶ 27.) Paul Revere determined that he was entitled to such benefits and began payments. (*Id.* ¶ 28.) Provident Companies ("Provident") acquired Paul Revere and completed its merger with Paul Revere in March 1997.[FN2] *Id.* ¶ 5. In 1998, Unum Life Insurance Company of America acquired and merged with Provident to create Defendant UnumProvident Corporation ("UnumProvident"). (*Id.* ¶ 11.) After approximately seventeen months of paying benefits, Plaintiff's benefits were terminated on or about February 17, 1998. (*Id.* ¶ 31.)

FN2. Provident is the parent company of Defendant Provident Life and Accident Insurance Companies of America and Affiliates ("PL & A").

**\*173** Plaintiff alleges that the decision to terminate his benefits was made by Paul Revere, Provident and PL & A, acting jointly as part of a national pattern and practice to boost corporate profitability by terminating valid disability benefits for pretextual reasons. (*Id.* ¶ 38.) At the time, Defendants explained that they based their decision on an investigation by Genex Services, Inc. ("Genex

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

224 F.R.D. 169                                                                            Page 6

224 F.R.D. 169
**(Cite as: 224 F.R.D. 169)**

"), which concluded that Plaintiff was no longer totally disabled because his doctor had said that he was capable of performing all of the duties of his occupation. (*Id.* ¶¶ 31-32.) Plaintiff alleges that Genex is a wholly owned subsidiary of Provident and UnumProvident, and that the Genex investigation was replete with factual inaccuracies and material misrepresentations that the Defendants either knew about or recklessly disregarded.[FN3] ( *Id.* ¶¶ 33-34.) Specifically, Plaintiff argues that the Genex investigator misrepresented the temperature and humidity of the greenhouse and the amount of time Plaintiff had to spend in the greenhouse in order to establish that Plaintiff was able to return to his former occupation, despite his doctor's insistence that he could not work in elevated temperatures. (*Id.* ¶ 35.)

> FN3. Plaintiff provided a copy of UnumProvident's "Letter to Our Shareholders" from its 1999 Annual Statement in which the chief executive officer indicates that Genex is a subsidiary of UnumProvident that is involved in return-to-work programs and lost-time management for employers. (Pl. Mem. of Law, Doc. No. 19, Ex. "GG".)

In his submissions, Plaintiff alleges that in the late 1990s Defendants' profits were suffering due to poor management decisions in their past pricing and structuring of insurance policies. (Pl. Resp., Doc. No. 19, at 8.) Plaintiff explains that from the mid 1980s to the early 1990s, insurance companies, including Provident and Paul Revere, were involved in an intense competition for the sale of individual disability policies, and had "poorly underwritten and underpriced" their non-cancelable, guaranteed renewable, own occupation policies, such as Plaintiff's policy. (*Id.*) Those insurance companies found that after a peak in 1990, their profits began to fall because claims were being made and depleting their reserves. (*Id.*) Plaintiff alleges that as a result, companies started redesigning and repricing their policies, as well as changing their claims processes. (*Id.* at 8-9.) Plaintiff alleges that Provident went from a "claim payment" orientation to a "claim management" orientation, meaning that

Provident set a budget for claim payments and focused on terminating claims in order to keep payments within the budget. (*Id.* at 9.) Plaintiff supports these assertions of the underpricing of policies and its effects by providing this Court with a number of documents obtained from Provident in other similar litigation. (*Id.*)

Plaintiff also cites evidence obtained through other litigation that Provident attempted to increase claim terminations by brainstorming grounds for termination at "roundtables" and by shifting its use of Independent Medical Examinations ("IME") from their previous role of evaluating claims fairly to a new role as part of the claim termination process. (*Id.* at 10.) Plaintiff also alleges that Provident attempted to terminate Plaintiff's policy by redefining Plaintiff's occupation to an occupation that Plaintiff was still capable of performing. (*Id.*) Plaintiff has offered evidence that Provident attempted this same technique to terminate another individual's disability benefits. *See Brosnan v. Provident Life and Accident Ins. Co.,* 31 F.Supp.2d 460, 464 (E.D.Pa.1998) (considering Provident's argument that the plaintiff, who had applied for benefits as a anesthesiologist, was not totally disabled because he could still work as a general practitioner to be "disingenuous at best").

Following correspondence with Defendants and the apparent decline of Plaintiff's health [FN4], Plaintiff filed the instant lawsuit on December 27, 1999. Defendants reinstated Plaintiff's benefits "subject to a reservation of rights" in June of 2000. On June 30, 2000, Defendants' counsel informed the Court during a hearing that the only reservation was that Plaintiff undergo an independent physician**174** examine to determine that he was totally disabled under the policy. (Hearing Trans. at 26-7, Doc. No. 31.) Counsel has represented that Plaintiff is currently receiving benefits; however, Plaintiff's counsel alleges that Defendants still reserve their rights to dispute those payments at trial and, ultimately, to have a jury determine whether Plaintiff is required to pay back Defendants for the payments received.

> FN4. In August of 1999, Plaintiff

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

224 F.R.D. 169                                                          Page 7

224 F.R.D. 169
**(Cite as: 224 F.R.D. 169)**

submitted Medical Reports from a December 1, 1999 Neuropsychological Evaluation and a July 12, 1999 doctor's visit that state that Plaintiff's cognitive ability had become impaired and that Plaintiff's cerebral MRI showed an " increased lesion burden." (Pl.Com pl.¶ 43-45.)

Defendants filed their First Motion for a Protective Order (Doc. No. 17) on May 5, 2000, objecting to Plaintiff's First and Second Requests for Admission and First Request for Production of Documents. That Motion objected to 179 of the 184 requests for documents. Defendants filed their Second Motion for a Protective Order (Doc. No. 23) on June 5, 2000, objecting to Plaintiff's Second Request for Production of Documents. In that Motion, Defendants objected to thirty-nine of the forty requests for documents. Defendants filed their Third Motion for a Protective Order (Doc. No. 28) on June 28, 2000, objecting to Plaintiff's Notices of Deposition. On June 30, 2000, the Court held a hearing, in which the parties agreed to submit their discovery disputes to a magistrate judge. The discovery motions were referred to Magistrate Judge Arnold C. Rapoport on October 20, 2000. On November 14, 2000, Defendants filed their Fourth Motion for a Protective Order (Doc. No. 42), objecting to Plaintiff's Third Set of Interrogatories.

After reviewing the original briefs and hearing oral argument, Magistrate Judge Rapoport ruled on these Motions in two orders. On January 3, 2001, Judge Rapoport denied Defendants' First, Second, and Third Motions for a Protective Order (Doc. No. 49). Pursuant to Defendants' request, Judge Rapoport reconsidered his decision on the First, Second, and Third motions, permitting the parties to submit briefs and hearing reargument. Judge Rapoport denied Defendants' Motion for Reconsideration on March 6, 2001 (Doc. No. 56). Also on March 6, 2001, after reviewing the briefs and hearing oral argument, Judge Rapoport denied Defendants' Fourth Motion for a Protective Order (Doc. No. 57).

Defendants filed objections to Judge Rapoport's

January 3, 2001 and March 6, 2001 orders (Doc. Nos. 52 and 59). After the Supreme Court issued its opinion in *State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003), the parties had oral argument and supplied the Court with supplemental briefs addressing the effect of the decision on the discovery dispute. In addition, Defendants have filed a fifth Motion for a Protective Order (Doc. No. 80) to prevent the discovery requested in Plaintiff's Fourth Set of Requests for Production of Documents, Plaintiff's Third Set of Requests for Admissions, and Plaintiff's Fourth Set of Interrogatories.

## II. Legal Standard

### A. Review of Magistrate's Decision

Pursuant to the Federal Magistrates Act, a district court may only reconsider a magistrate judge's decision on a non-dispositive pretrial issue such as a discovery order when the magistrate judge's decision is "clearly erroneous or contrary to law." See 28 U.S.C. § 636(b)(1)(A). When a magistrate judge's decision is on a highly discretionary matter, courts in this district have determined that the clearly erroneous standard implicitly becomes an abuse of discretion standard. *See Conway v. State Farm Fire & Cas. Co.,* Civ. A. No. 98-0832, 1998 WL 961365, *1 (E.D.Pa. Dec.11, 1998) (applying a standard of abuse of discretion to a magistrate judge's discovery order in an insurance bad faith claim); *Scott Paper Co. v. United States,* 943 F.Supp. 501, 502 (E.D.Pa.1996) ("The Court may overrule a decision of the Magistrate Judge involving a nondispositive discovery dispute only if the decision is clearly erroneous or contrary to law, or if the Magistrate Judge abused his discretion.").

### B. Discovery Protective Orders

Federal Rule of Civil Procedure 26(b)(1) states that "[p]arties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party .... Relevant information

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

224 F.R.D. 169

Page 8

224 F.R.D. 169
**(Cite as: 224 F.R.D. 169)**

need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." However, courts *175 have the discretion to limit relevant discovery:

The frequency or extent of use of the discovery methods otherwise permitted under these rules and by any local rule shall be limited by the court if it determines that: (i) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity by discovery in the action to obtain the information sought; (iii) the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues.

Fed. R. Civ. P. 26(b)(2).

[1][2][3] It is well established that the party wishing to obtain a protective order has the burden of demonstrating that "good cause" exists for the order. *Pansy v. Borough of Stroudsburg,* 23 F.3d 772, 786 (3d Cir.1994); Fed. R. Civ. P. 26(c). " ' Good cause is established on a showing that disclosure will work a clearly defined and serious injury to the party seeking closure. The injury must be shown with specificity.'... 'Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning,' do not support a good cause showing." *Pansy,* 23 F.3d at 786 (internal citations omitted).

The Third Circuit has adopted a general balancing test for courts to apply when considering whether to grant confidentiality orders:

[T]he court ... must balance the requesting party's need for information against the injury that might result if uncontrolled disclosure is compelled. When the risk of harm to the owner of [a] trade secret or confidential information outweighs the need for discovery, disclosure [through discovery] cannot be compelled, but this is an infrequent result. Once the court determines that the discovery

policies require that the materials be disclosed, the issue becomes whether they should "be disclosed only in a designated way," as authorized by the last clause of Rule 26(c)(7) .... Whether this disclosure will be limited depends on a judicial balancing of the harm to the party seeking protection (or third persons) and the importance of disclosure to the public. Courts also have great deal of flexibility in crafting the contents of protective orders to minimize the negative consequences of disclosure and serve the public interest simultaneously.

*Id.* at 787 (quoting Arthur R. Miller, *Confidentiality, Protective Orders, and Public Access to the Courts,* 105 Harv. L. Rev. 427, 432-33 (1991)). Most commonly, courts condition discovery of confidential documents by preventing the party obtaining the documents from sharing that document with others and by using that document for any use, other than the present litigation. *Id.* Courts are given broad discretion in evaluating the competing interests in discovery disputes so that they have the necessary flexibility to "justly and properly consider the factors of each case." *Id.* at 789.

### III. Discussion

The parties dispute whether Plaintiff is permitted broad discovery related to the Defendants' business practices, procedures and policies in order to find evidence to support Plaintiff's argument that Defendants terminated Plaintiff's claim as part of a bad faith pattern and practice of terminating valid claims to improve Defendants' profits. In support of Plaintiff's argument that these documents are relevant to the instant case, Plaintiff has identified a number of documents obtained through similar litigation against Defendants, which allegedly are evidence of Defendants' bad faith policies and practices regarding the same type of insurance policies as Plaintiff's. From these documents, Plaintiff argues, the Court can infer that other, relevant evidence as to Defendants' bad faith practices exists. In addition, such evidence of Defendants' national policy of bad faith practices in its management of insurance policies like Plaintiff's would be relevant evidence of Defendants' motive,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

224 F.R.D. 169                                                          Page 9

224 F.R.D. 169
(Cite as: 224 F.R.D. 169)

intent, knowledge, common plan or scheme, *176 absence of mistake or ratification of misconduct when Defendants' denied Plaintiff's claim.

Defendants argue that Plaintiff's requests are merely a fishing expedition and are unconnected to Plaintiff's underlying claim. Defendants argue that discovery should be limited to issues that pertain to the facts of the specific case in order to avoid being unduly burdensome and interfering with Defendants' confidential internal practices.[FN5]

> FN5. Defendants also state that these requests seek information that is cumulative or duplicative of information that is available from some other source that is more convenient, less burdensome or less expensive and is already in possession of Plaintiff. Due to the highly relevant nature of many of these requests, we conclude that it is permissible to burden the Defendants with this discovery, especially in light of the fact that it appears Defendants have already had to produce much of this discovery in earlier litigation.
> However, to the extent appropriate, we have addressed Defendants' concerns throughout our specific discussion of the discovery requests.

Defendants cite cases from this district in which courts have decided to limit discovery of bad faith claims to the individualized circumstance of the case. *See, e.g., Dombach v. Allstate Ins. Co.,* Civ. A. No. 98-1652, 1998 WL 695998, *6 (E.D.Pa. Oct.7, 1998) (generally limiting discovery of personnel files, other cases, bonuses and incentives, claims manuals and instructional materials to whether defendants had been knowingly or recklessly unreasonable in that particular case despite allegation that insurer had corporate policy of encouraging unfairly low settlements); *Garvey v. Nat'l Grange Mut. Ins. Co.,* 167 F.R.D. 391, 396 (E.D.Pa.1996) (protecting discovery of claims manual because the internal standards within the manual were trade secrets, were not related to plaintiff's claim about whether his loss was covered under the insurance contract, and because straying

from internal procedures does not establish bad faith).

Defendants further argue that this broad-based discovery is prohibited by the aforementioned Supreme Court decision in *State Farm,* 123 S.Ct. 1513. In *State Farm,* the Supreme Court struck down a $145 million jury verdict against an insurance company because it concluded from the evidence and arguments offered at trial that the jury's verdict intended to punish the insurance company for being an "unsavory" business instead of for the harm it caused to the specific plaintiff. *Id.* at 1523. Defendants argue that *State Farm* requires that in order for evidence of an insurance company's other acts to be considered relevant, and therefore admissible in Plaintiff's case, Plaintiff must show that there is a nexus between the insurer's other actions and the specific harm suffered by the Plaintiff. Defendants allege that there is no such nexus between Defendants' general national practices and the denial of Plaintiff's disability benefits claim. Instead, Defendants argue that the claims handlers individually considered Plaintiff's claim and testified in depositions about their case-specific reasons for denying Plaintiff's claim. According to Defendants, any information about the denial of Plaintiff's claim should be obtained either from the claims handlers' testimony or Plaintiff's claims file, and Plaintiff should not be entitled to investigate Defendants' businesses in an attempt to discover non-existent materials that raise questions about the accounts of the claims handlers and the Plaintiff's claims file.

[4][5] While there are some courts that have chosen to limit discovery in bad faith insurance cases after considering individual circumstances, we disagree with Defendant's assertion that the case law broadly limits discovery in all of such cases. Rather, we conclude that courts have consistently held that when a bad faith policy or practice of an insurance company is applied to the specific plaintiff, the plaintiff is entitled to discover and ultimately present evidence of that policy or practice at trial in order to prove that the insurer intentionally injured the plaintiff and to show the insurer's reprehensibility and recidivism in order to assist the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

224 F.R.D. 169

224 F.R.D. 169
(Cite as: 224 F.R.D. 169)

Page 10

jury in calculating appropriate punitive damages. *Id.* at 1523. As the Supreme Court explained in *State Farm,* evidence of the lawful out-of-state conduct of the defendant "may be probative when it demonstrates the deliberateness and culpability of the defendant's action in the State where it is tortious " so long as the "conduct had a nexus to the specific harm suffered by the plaintiff." *Id.* at 1522. The \*177 Court's main interest was to prevent the due process problems created when the jury punished the defendant for conduct that "bore no relation to the [plaintiff's] harm. A defendant's dissimilar acts, independent from the acts upon which liability was premised, may not serve as the basis for punitive damages." *Id.* Contrary to Defendants' assertions, the Court in *State Farm* did not establish a requirement that the plaintiff provide specific types of evidence to show that there is a sufficient nexus between the actions of the defendant and the specific harm to the plaintiff. Instead, the Court appears to have entrusted the lower courts with determining how to prevent juries from punishing defendants for unrelated prior transgressions. [FN6]

> FN6. The Supreme Court specifically instructed that when determining whether the defendant's prior transgressions are evidence of recidivism that should be punished more harshly, "the court must ensure the conduct in question replicates the prior transgressions." *Id.* at 1523.

Even before *State Farm,* Pennsylvania courts recognized that evidence of the defendants' prior acts can be probative when it is related to the harm to an individual plaintiff. For example, the court in *Hyde Athletic Indus. Inc. v. Cont'l Cas. Co.,* 969 F.Supp. 289, 307 (E.D.Pa.1997), indicated that the focus of the bad faith statute is on "whether insurers acted recklessly or with ill will in a particular case, not whether its business practices are reasonable." *Id.* at 307. As *Hyde* explains, the Pennsylvania Insurance Commissioner should be the sole arbiter of what constitutes a reasonable set of business practices for the investigation and evaluation of claims. Defendants argue that the distinctive role of the Pennsylvania Insurance Commissioner prevents juries from considering the reasonableness

of insurance business practices. However, even *Hyde* recognizes that evidence of the use of an objectionable business practice in the handling of an individual claim is directly probative of whether that defendant violated the bad faith statute. *Id.* at 307 n. 18; *See also Kosierowski v. Allstate Ins. Co.,* 51 F.Supp.2d 583, 594 (E.D.Pa.1999) (discussing a similar debate over the appropriateness of considering broader industry practice in the context of a bad faith claim and concluding that evidence of an objectionable business practice "would go directly to the problems the bad faith statute intended to redress"). In addition, *Garvey's* admonition that straying from internal procedures does not establish bad faith does not mean that straying from internal procedures is never probative evidence of bad faith. *See Kaufman v. Nationwide Mut. Ins. Co.,* Civ. A. No. 97-1114, 1997 WL 703175, \*2 n. 2 (E.D.Pa. Nov.12, 1997).

[6] In the instant case, the main issue that we are faced with is whether the requested discovery will produce relevant evidence that is potentially admissible in the instant action, and whether the likely benefit of that evidence is outweighed by the burden or expense to the Defendants. Because the nature of a discovery determination requires each court to perform an individual determination based on the specific facts of each case, we will hereinafter conduct our own individual balancing evaluation, pursuant to *Pansy,* to determine the relevance of and the need to limit each of the hundreds of discovery requests. In determining what information is relevant to Plaintiff's instant claim, it is helpful to review the requirements of Pennsylvania's bad faith insurance practices statute. A recovery for bad faith pursuant to Pennsylvania's insurance statute requires that the plaintiff show by clear and convincing evidence that (1) the insurer did not have a reasonable basis for denying coverage under the policy and that (2) the insurer knew of or recklessly disregarded its lack of a reasonable basis in denying the claim. *See Kosierowski,* 51 F.Supp.2d at 588; 42 Pa. Cons. Stat. AnnN. § 8371. The burden on a plaintiff in a bad faith claim is substantial because the plaintiff must show the intentional or reckless behavior of the insurer and must negate the possibility of mere negligence. To establish this, a review of the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

policies and procedures of the companies in order to determine whether those policies instructed claims handlers to act in bad faith or provided them with an incentive structure that led to bad faith actions is necessary.

As the courts in *State Farm*, *Hyde*, and *Kosierowski* have explained, however, for any evidence of Defendants' actions outside *178 of the instant case to be relevant and potentially admissible in the instant case, there must be some nexus or connection between those actions and the instant case. Here, Plaintiff has submitted a number of documents obtained in similar litigation that provide a proffer of evidence of Defendants' bad faith actions. In addition, it is interesting to note that a plaintiff in California who had the same type of insurance policy from the Paul Revere Life Insurance Company has been successful in establishing to the satisfaction of a California jury that the company denied his disability claim in bad faith by implementing the same national policy that is alleged in the instant case.[FN7] *See Hangarter v. Paul Revere Life Ins. Co.*, 236 F.Supp.2d 1069 (N.D.Cal.2002). The evidence proffered by Plaintiff provides support for the instant allegations of a pattern and practice of bad faith and supports further investigation into Defendants' internal business practices and policies. Based on this evidence, we find that Plaintiff's requests for more information about Defendants' policies and practices regarding own-occupation insurance policies are reasonably likely to produce relevant information that could contradict Defendants' proffered reasons for denying Plaintiff's disability claim in the instant case.

FN7. Defendants are defending a number of these cases throughout the country. Undoubtedly Defendants have already gathered and produced much of the requested discovery, somewhat lessening the burden of these requests on Defendants.

We recognize that courts are reluctant to open up insurance companies to broad discovery of their internal practices and policies without some kind of prima facie showing that there is a valid reason for the discovery. Often, this reluctance forces plaintiffs to wait until after they depose a number of employees before they can provide evidence of the relevance of this discovery. *See Hall v. Harleysville Ins. Co.*, 164 F.R.D. 406, 408 (E.D.Pa.1996) (requiring defendants to compile and produce information about how many times they had requested consumer credit reports only after depositions of claims handlers showed that defendants had obtained such credit reports). However, as above mentioned, Plaintiff has already provided the Court with sufficient evidence to open the door to discovery. While it is true that the depositions to date of those employees who handled Plaintiff's claim have not produced statements by those employees that they were implementing the insurance companies bad-faith policy to deny valid claims, we agree with Plaintiff that blatant admissions of wrongdoing are not required in order to establish a nexus for discovery. Rather, Plaintiff should be permitted to obtain the requested discovery before continuing with the depositions.

Based on the foregoing, we will affirm Judge Rapoport's decision to deny Defendants' first four requests for protective orders. Judge Rapoport's decision was reasonable and not an abuse of discretion or contrary to law. However, in order to address concerns about trade secrets, confidentiality, and overbroad requests, we will modify Judge Rapoport's decision by including instructions limiting the use and extent of some of the discovery. Specifically, we will limit Plaintiff's requests to cover only the time period after Plaintiff filed his first claim for benefits, in June of 1996. We consider this time period generally adequate for discovery purposes because it will reveal all of Defendants' claims-handling policies and practices that were in place at the time that Defendants were handling Plaintiff's claims. An exception to this time limit will be made for any discovery concerning the formation of Plaintiff's policy. In addition, we will permit discovery in order to explain some pre-1996 documents that Plaintiff has obtained from other cases and to explain some of the development of the current alleged policies. Recognizing that the requested information is about Defendants' business practices and almost always involves information that is proprietary in nature,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

224 F.R.D. 169                                          Page 12

224 F.R.D. 169
(Cite as: 224 F.R.D. 169)

we will require as a general rule that Plaintiff not exchange or disclose this information to anyone not associated with the case. If Plaintiff seeks to use specific information obtained through these requests for any other purpose, we will require that Plaintiff make such a request to the court at that time.

## *179 A. Defendants' First and Second Motions for a Protective Order

Defendants have objected to Judge Rapoport's January 3, 2001 order denying their First and Second Motions for a Protective Order as they pertain to Plaintiff's First and Second Set of Requests for Production of Documents. Specifically, Defendants object to Questions 5-7, 10-11, and 13-184 in the first set and Questions 185-208, 210-218, and 220 in the second set. Defendants represent that they have already responded to Questions 209 and 219. We will address these requests in groups by subject matter.

### (1) Bad Faith Business Policy and Practices Regarding Own-Occupation Disability Policies

Plaintiff alleges that Defendants had a policy to terminate valid claims for disability insurance benefits pursuant to their private own-occupation long-term disability benefits policy in order to boost corporate profitability. Plaintiff alleges that Defendants applied this policy when it unreasonably and in bad faith terminated Plaintiff's disability insurance benefits. In order to prove the existence of this policy and that it was applied to Plaintiff, Plaintiff seeks information regarding the development and the existence of the alleged bad faith policy. In *Hangarter*, supra, the court denied Defendant's motion for new trial and for judgment as a matter of law, upholding a jury verdict based upon evidence that Paul Revere and Unum Provident had a comprehensive system of targeting expensive "own-occupation" long-term disability insurance claims with the goal of terminating benefits. *Hangarter*, 236 F.Supp.2d at 1083-86. The evidence established that as part of that system for termination, Paul Revere exhibited bias by selecting a biased independent medical examiner,

by not providing the examiner with the plaintiff's description of her work, by discussing the plaintiff's claim in roundtable groups with the purpose of brainstorming how to terminate the claim, and by not including notes of the roundtable discussions in the plaintiff's claim file. *Id.* Testimony at the California trial revealed that Provident executive Ralph Mohney introduced these policies, which included the goal of achieving a "net termination ratio" [FN8] to Provident, and brought the policies to Paul Revere. *Id.* Evidence was presented that the increasing net termination goals, from 90 percent in 1996 to 104 percent in 1997, provided an incentive for the insurance companies to terminate expensive claims. *Id.* Plaintiff seeks to find similar evidence to prove that this policy existed and that it was applied by Defendants when they terminated Plaintiff's disability benefits. This information would certainly appear to be relevant to Plaintiff's claim.

> FN8. A "net termination ratio" is the ratio of the value of terminated claims compared with new claims.

Generally, Defendants object to these requests as being unrelated to Plaintiff's claim at issue, overly burdensome, and calculated to harass Defendants and generate undue expenses. Defendants also claim that these requests seek information that is part of Defendants' business strategy and is, therefore, confidential and proprietary. We disagree. The information about the development and substance of Defendants' alleged bad faith policy is relevant to Plaintiff's claim and permitting this discovery will not cause undue hardship to Defendants. Plaintiff wants to use this information concerning the termination of own-occupation disability insurance policies to show that Plaintiff's claim was terminated due to this policy. There is a direct connection between the information that is requested and the specific harm to Plaintiff. In order to protect the proprietary nature of these documents, we will require that Plaintiff not exchange or disclose this information to anyone not associated with this case.

Furthermore, notwithstanding the fact that many of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

224 F.R.D. 169                                                                            Page 13

224 F.R.D. 169
(Cite as: 224 F.R.D. 169)

the documents referred to by Plaintiff existed before the merger of Paul Revere with the other Defendants, Plaintiff's allegation of a nexus between the pre-merger policies and the post-merger actions of Paul Revere is sufficient for discovery of the material. Therefore, except in those specific instances where we have limited the time *180 frame for discovery, we will permit the discovery of pre-merger policies.

### a. Development of the Alleged Policy

[7] Plaintiff contends that the reason for Defendants' denial of his claim was that Defendants were attempting to make their corporations more profitable after issuing too many expensive disability policies like Plaintiff's. The following requests are relevant to provide evidence that the Defendants had a financial incentive to develop this alleged bad faith policy and that the Defendants knew that such an incentive existed.

### i. Profitability

Plaintiff has requested any profitability analyses with respect to the type of policy that Plaintiff owned as well as other information regarding "cash flow underwriting," interest rate projections, or the relationship between investment income and premiums charged for individual policies. (Requests 199-200, 215-218.) Plaintiff explains that this information is relevant to show that Defendants knew at the time or learned later that the past pricing structure was not profitable unless they either terminated valid claims or engaged in post-claim underwriting. Plaintiff requests this information from 1990 until the present because he claims that if Paul Revere knew that it was acting in bad faith at the time it sold the policy, that knowledge will affect the jury's punitive damages award.

Defendants argue that this information is irrelevant, proprietary, privileged and confidential information that is at the heart of Defendants' internal business practices. Based on Plaintiff's submissions that show that Provident has acknowledged these past

problems with the profitability of insurance policies like Plaintiff's, we consider this profitability information to be relevant to Defendants' state of mind. We find Judge Rapoport's denial of the protective order as to this information to be reasonable and not contrary to law or an abuse of discretion.

### ii. Policy Drafting Information

Plaintiff has requested information regarding the drafting of the type of policy issued to Plaintiff. (Requests 210-214.) Plaintiff alleges that this information is relevant to show whether or not Paul Revere at the time the policy was drafted knew or should have known that it would have profitability problems with the policy later. Plaintiff contends that this information will assist a jury in determining a punitive damage award.

Defendants argue that the formation of the policy is irrelevant because Plaintiff has not alleged a problem related to the form of the policy, such as that the policy has been altered, the language violates Pennsylvania law or that he did not receive the policy he thought that he was receiving. In their specific objections, Defendants do not allege that the information about the drafting of the policy is proprietary or confidential.

Based on Plaintiff's submissions that indicate evidence of a flaw in the original policy structure of Plaintiff's policy, we consider this information relevant and discoverable. We find Judge Rapoport's denial of the protective order as to this information to be reasonable and not contrary to law or an abuse of discretion.

### iii. Knowledge of the Profitability Problem

Plaintiff has requested documents that show that Defendants had knowledge of the lack of profitability of the own-occupation disability policies. (Requests 57-59.) Plaintiff contends that documents by Defendants that acknowledge the profitability problem establish the reason for Defendants' termination of valid disability claims.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

224 F.R.D. 169

224 F.R.D. 169
**(Cite as: 224 F.R.D. 169)**

Plaintiff asserts that he already has a Provident internal memorandum from Tom Heys to Harold Chandler, dated August 9, 1995, that refers to the own occupation policies issued in the 1980s and early 1990s as the "bad block." We are satisfied that the requested documents are likely to produce relevant evidence. Therefore, we find Judge Rapoport's denial of the protective order as to this information to be reasonable and not contrary to law or an abuse of discretion.

### b. Documents Describing Alleged Policy

[8] Plaintiff seeks documents that describe the alleged bad faith policy of Defendants*181 and the different methods that Defendants used to apply the policy to its own-occupation disability policy holders in order to obtain evidence showing that such methods were used against Plaintiff and that Defendants were culpable. We find this information relevant and potentially related to the harm suffered by Plaintiff.[FN9]

> FN9. Upon a close examination of the individual discovery requests, there remain a number of requests for which Plaintiff has not established the relevance and/or nexus to his case. We have included discussions of some of these discovery requests throughout our analysis. In addition, we note that Plaintiff has failed to show the relevance of his requests for documents regarding the "board of directors packages," the "top technical consultant process," "scoping team meetings," California's Unfair Settlement Practice, telephone templates for initial interviews, and recommendations from the Psychiatric Disability Consultants (Requests 38-40, 41-43, 117, 126, 181). Therefore, we will not permit discovery pursuant to these requests.

### i. Discussions of the Goal of Termination and its Implementation

Plaintiff requests documents regarding Defendants'

alleged goal to terminate as many own-occupation claims as possible in order to improve their financial status. (Request 60.) Setting such goals in itself could be considered bad faith conduct, which could assist the jury in the instant case in determining whether the Defendants were acting in bad faith in the termination of Plaintiff's benefits. Plaintiff has also presented the Court with a number of requests regarding the implementation of strategies, policies, and procedures in order to meet those termination goals. Plaintiff has alleged that the termination of his claim was a result of these termination goals and policies. Therefore, any potential information regarding these goals and policies would clearly be relevant to the specific harm to Plaintiff.

Plaintiff has supported his allegation of the existence of documents describing these termination goals and how to implement them by providing the Court with documents written by Provident employees that allegedly refer to those goals and strategies or policies to implement them. For example, Plaintiff requests documents relating to Paul Revere's implementation of "stronger claim management techniques," citing an internal memorandum from Ralph Mohney, mentioned above in regards to the *Hangarter* case, to Tom Heys, on April 25, 1995, which states that the "application of stronger claim management techniques resulted in significant savings." [FN10] (Request 37.) Plaintiff also requests documents that refer to the establishment and implementation of termination goals, citing a Provident internal memorandum from Tom Heys to Harold Chandler on June 9, 1995 discussing the Monthly Risk Management Report and stating that "[w]e continue to improve the termination level and have a good chance of meeting our goal of $132 million of terminations for the quarter." [FN11] (Request 60-62.) Plaintiff specifically requests information regarding those cost-saving strategies mentioned in the 1995 memo, which include "Tuesday and Thursday" evening "legal review meetings." [FN12] (Requests 63-64.) To support Plaintiff's allegation that one of Defendants' cost-saving techniques was to shift from a policy of paying own-occupation disability claims to a policy of managing those claims with the goal of terminating benefits,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

224 F.R.D. 169                                                                    Page 15

224 F.R.D. 169
(Cite as: 224 F.R.D. 169)

Plaintiff requests documents related to "claims improvement initiatives," "risk management initiatives," "claims strategies," the "claims management" approach*182 to claims handling, and a claims-handling "plan." [FN13] (Request 27-28, 34-36, 52-56, 75, 94, 120, 151-152, 177.) Plaintiff contends that this shift in claims-handling policy directly affected Plaintiff's ability to receive disability benefits and is evidence of Defendants' reprehensibility. In order to show the direct link with Plaintiff's harm, Plaintiff requests information about the claims-handling policy and results in the Worchester office and how they compared to Defendants' other offices.[FN14] (Requests 65, 71, 93, 95, 118, 120-121.)

FN10. Defendants assert that this particular memo referred to the management of equitable policies and not own-occupation policies. We will limit Plaintiff's requests on those "stronger management techniques" to those used in the administration of own-occupation disability policies.

FN11. While Defendants dispute Plaintiff's characterization of those documents, we find the statements in the documents to be sufficient to establish that other relevant evidence potentially exists.

FN12. Plaintiff contends that part of Defendants' new claims management strategy was to terminate more claims, and that Defendants knew that such a strategy would result in increased litigation costs. Plaintiff seeks documentation of Defendants' knowledge that it would have increased litigation costs as evidence of Defendants' knowledge that its actions were unreasonable. (Request 103.) The connection between an increased litigation budget and knowledge of wrongdoing is too tenuous to permit this discovery.

FN13. These terms have been referred to in the 1995 budget, internal 1995 memoranda, and internal 1997 memoranda.

FN14. While we find that evidence of the alleged claim termination strategies in general and those strategies applied to either Plaintiff's type of claim or the Worchester office are relevant and connected to Plaintiff's case, we reject Plaintiff's argument that documents related to the expected levels of performance for the "ortho unit," information about " cardiac units," the "major project on claims of floor traders," or the identification of "test" cases have a sufficient nexus to Plaintiff's harm to permit discovery. (Requests 74, 78-79, 171, 174). While information regarding the "ortho units," cardiac units, floor traders, or test cases might potentially provide evidence of the fact that the Defendants set claim termination goals or established unreasonable claims handling behavior, that information is too remote to be useful in Plaintiff's case. Plaintiff's case does not involve an orthopedic problem, cardiac problem, a floor trader, or involvement in a test case.

Plaintiff alleges that there were a number of aspects to Defendants' claims handling policy that constituted bad faith, including how Defendants determined that some claims were "illegitimate," Defendants' focus on terminating claims of a certain duration, Defendants' use of roundtable discussions to brainstorm how to save costs on a claim, and Defendants' implementation of employee incentives to terminate claims.[FN15] Plaintiff contends that each of these policies is evidence of Defendants' bad faith practices when handling disability claims like Plaintiff's and that discovery regarding these policies potentially will yield relevant evidence as to whether they were applied to the denial of Plaintiff's benefits. Since Defendants contend that Plaintiff's claim for benefits was illegitimate, Plaintiff requests information as to how Defendants' define "illegitimate" claims. [FN16] (Request 133.) Plaintiff alleges that Defendants adopted a "more proactive stance in defense against" those illegitimate claims, citing a 1996 PL & A document, and Plaintiff seeks information about that " proactive stance." (Request 134.) Plaintiff also

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

contends that Defendants implemented a system of terminating claims on the basis of their duration and has requested any documents related to such a policy.[FN17] (Request 46.) If such a system exists, it would be relevant to the termination of Plaintiff's benefits, which occurred after he received benefits for seventeen months. Defendants contend that Plaintiff's benefits were terminated after his doctor approved his return to work and not due to this alleged duration-termination strategy. However, the issue of whether Plaintiff's doctor approved his return to work is in dispute. If such a management strategy exists, it would certainly be relevant to determining whether the Plaintiff's claim was targeted due to its duration.

FN15. Plaintiff also alleges that Defendants' incentive structure with Genex is evidence of Defendants' attempt to implement their bad-faith policy. This structure is discussed below in the section about Genex's relationship with Defendants.

FN16. Similarly, Plaintiff seeks the criteria Defendants used to define the term "high profile opportunities" in order to determine whether Plaintiff was such a "high profile opportunity" based on the high value of his claim (approximately $1 million at time of termination) and to determine whether that was the reason for Defendants referral of Plaintiff to Genex. (Requests 85-86.) We will permit the discovery of information regarding Plaintiff's referral to Genex, including the definition of "high profile opportunities".

FN17. Plaintiff has identified a Provident internal memorandum from Tom Heys to Harold Chandler on May 24, 1996 that refers "enhancing our performance measurement capabilities beyond the rather simplified rations which we now use. Performance indicators in the future will focus more on termination activity at specific claim durations."

In addition, Plaintiff alleges that Paul Revere imported Provident's practice of having "roundtable" discussions, in which claims handlers met to develop rationales and plans for how to terminate claims based on the **183** dollar value of the reserves of those claims. Plaintiff has requested documents regarding the existence of roundtables and whether they were used to discuss Plaintiff's claim. (Requests 26, 45, 89, 141, 142, 153-159.) Defendants respond that they did not use a roundtable to discuss Plaintiff's claim and that the rest of the roundtable discussions should be kept confidential to protect information regarding other insureds. If information regarding a roundtable discussion about Plaintiff's claim exists, those documents, as well as general information regarding roundtable discussions, would certainly be relevant to Plaintiff's claim. However, the parties dispute whether such roundtable discussions occurred, what claim handler Paul Yranski said regarding any possible discussion, and whether if such a discussion occurred, it would have been recorded in Plaintiff's claim file. Because the parties' dispute appears to be somewhat semantic and because if such documents exist they would be relevant and would establish the relevance of broad information regarding the use of roundtable discussions, we will require Defendants to produce any documents regarding any "roundtable" discussions involving Plaintiff and any discussions among two or more employees about the termination of Plaintiff's claim. If any such document exists, then Plaintiff will be entitled to the rest of the discovery regarding the use of roundtable discussions in claims handling.

In order to protect the privacy of the information of other insureds, we will require Defendants to redact identifying information from those documents. If Defendants certify that they have no documents, notes or information concerning conversations about the termination of Plaintiff's claim, then Plaintiff will not be permitted to discover general information regarding roundtable discussions.[FN18]

FN18. Plaintiff alleges some bad faith practices by Defendants that were not applied to Plaintiff. Because these practices were not applied to Plaintiff, we will not permit discovery. Such evidence

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

224 F.R.D. 169                                                                                            Page 17

224 F.R.D. 169
**(Cite as: 224 F.R.D. 169)**

of a general bad faith practice of the Defendants that did not have any relation to the Defendants' actions in the instant case is prohibited by *State Farm*. Among those requests without a sufficient nexus are Plaintiff's requests regarding Defendants' practice of hiring biased independent medical examiners. Defendants did not hire an independent medical examiner to evaluate Plaintiff's claim (Requests 81, 97, 127, 178-179). In addition, Plaintiff requests information regarding Defendants use of "SWAT" teams to handle files in the Special Handling Unit and other information regarding the Special Handling Unit, even though Plaintiff's claim was never handled by a SWAT team or in the Special Handling Unit. (Requests 82-84, 90-92, 113-114, 146.) Plaintiff also requests Defendants' reports that track claims based on indemnity amount, called "PING" reports. (Request 101.) We will limit the discovery of the PING reports to those reports that monitored Plaintiff's claim, if any such reports exist. Finally, Plaintiff has requested information regarding Defendants' "profiling methodology, early intervention nurses, duration and treatment protocols, and field referral to Genex managers," without explaining the specific nexus between those records and Plaintiff's harm. (Request 76.) While we will permit discovery of those methods that were applied to Plaintiff in his instant claim, we will not permit the discovery of the records generally for the sole purpose of establishing evidence of Defendants' mental state. In two other requests that are potentially relevant if they apply to Plaintiff, Plaintiff seeks documents regarding the identification of high litigation risk states and the creation of a separate claims management unit that focused exclusively on claims from high legal exposure states. (Request 130, 147.) If Pennsylvania is considered a high legal exposure state, this separate claims management unit would be relevant to the instant case and the information will be discoverable. If not, this request is too remote and lacks a necessary nexus to Plaintiff's claim.

Plaintiff has also requested information about Defendants' employees, including general information regarding the training, standards and incentive structure for employees and specific information regarding the performance and training of the employees and units that handled Plaintiff's claim. Plaintiff alleges that this information will be relevant to show that Defendants had a plan to terminate expensive claims and implemented that plan, in part, through their structuring of incentives for their employees. Plaintiff contends that these documents will show that Defendants knew about the improper termination actions of their employees and promoted such actions through their discipline, award and training procedures. Generally, we find that the relationship between Defendants and the employees and units that handled Plaintiff's claim is relevant to show the responsibility of the Defendants for the actions of their employees in the termination of **\*184** Plaintiff's claim. Because that documentation is specific to the employees and units involved in Plaintiff's claim, there is a nexus between these requests and Plaintiff's harm.

Addressing the specific terms of each of Plaintiff's requests and Defendants' concerns Plaintiff seeks the personnel files and performance reviews of the employees who handled Plaintiff's claim and their supervisors, including a description of their jobs, training records, personnel evaluations, goal setting documents, and disciplining or rewarding documents, as well as information regarding participation in incentive plans, and their scope of authority in relationship to each other and the plaintiff.[FN19]   (Requests 5-6, 205.) Plaintiff requests much of this information starting from 1992. Plaintiff argues that these documents are relevant for the reasons stated above regarding Defendants' knowledge and ratification of the misconduct of their employees as well as Defendants' improper incentives for employees. Also, Plaintiff argues that former employees have in the past provided relevant information about their former employer's policies and practices. To

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

support his claim, Plaintiff has offered an affidavit from a plaintiff's attorney attesting to the fact that such personnel records were relevant and lead to the discovery of additional relevant evidence in similar cases.

> FN19. Plaintiff has also requested material regarding field report evaluations. (Request 182.) If the requested evaluation material was applicable to the field agents handling Plaintiff's claim, then we consider the information relevant and discoverable.

Defendants argue that the personnel files and other related materials are highly confidential and unduly burdensome because there are twenty-five requests per defendant. However, Defendants have not alleged with specificity why it is necessary to keep these records confidential or what embarrassing or private information might be obtained from the requested documents.

Federal courts have recognized a "heightened standard of relevance" for discovery of information contained in personnel files. *See Kaufman,* 1997 WL 703175 at *1. Courts in this district have refused to permit the discovery of these personnel files when such discovery information about the compensation of claims adjusters or their home addresses was obtainable through other, non-confidential means. *Id.; See also Cantor v. Equitable Life Ass. Soc'y of the United States,* Civ. A. No. 97-5711, 1998 WL 306208, *3 (E.D.Pa. June 9, 1998). In the instant case, Defendants have not identified a less confidential source from which Plaintiff could obtain this material. For the reasons stated above, we find these records to be relevant and have a sufficient nexus to the instant case, and therefore, we will affirm Judge Rapoport's decision to deny Defendants' request for a protective order for these records. However, we will change the relevant dates in the discovery request to June 1996, when Plaintiff first applied for benefits.[FN20]

> FN20. We have addressed any potential concerns about confidentiality with our general order requiring that Plaintiff not

exchange or disclose these records to anyone not associated with the case.

Plaintiff has also requested documents regarding the evaluations of any of the individuals or units involved in investigating Plaintiff's claim as well as any documents that explain the criteria and process used in those evaluations.[FN21] (Requests 138, 193-194.) ***185** Plaintiff alleges that these documents will show the relationship between the Defendants and the employees who handled Plaintiff's claim. In addition, documents regarding Defendants' criteria for evaluation and the development and implementation of a quality assurance program designed to evaluate the performance of claim representatives would identify information about the corporate philosophy, standards, and procedures.

> FN21. Plaintiff specifically requests the criteria used for monitoring the activities, quality and cost for internal staff and outside vendors and other performance standards. (Request 125, 129.) To the extent that records show the standards or criteria for monitoring either the employees or units related to Plaintiff's claim or other employees or units handling similar own-occupation disability claims, there exists a sufficient nexus to support discovery. Such documentation is relevant to show the pressures and incentives for the employees and units handling Plaintiff's claim or handling claims of the same type as Plaintiff's claim. Plaintiff also seeks documents related to the Defendants' decision to focus their attention on one of the general claim units which experienced unusually low results and to hire a consultant to review 824 low resolution potential cases. (Request 102, 149.) To the extent that these requests seek information about either the unit that handled Plaintiffs' claim or a unit that handled other own-occupation disability claims, we will permit the discovery. To the extent that Plaintiff's claim or other similar own-occupation claims are among

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

224 F.R.D. 169                                                            Page 19

224 F.R.D. 169
**(Cite as: 224 F.R.D. 169)**

the 824 low resolution cases referenced in the above request, we will permit the discovery. Similarly, Plaintiff seeks all of the templates for the management of claims that Defendants have created. (Request 143). These templates are relevant if they are applicable to Plaintiff, to rebut Defendants' argument that they decided Plaintiff's claim on an individual basis. Since these templates appear to be categorized by type of claims, we find that the only relevant template to Plaintiff's claim is a template about the management of own-occupation disability policies like Plaintiff's and therefore only permit the discovery of that template, if it exists.

Defendants object to this request, arguing that this information is training material and is irrelevant, proprietary, privileged, and confidential. For the reasons explained above, we find that the evaluation materials are relevant to Plaintiff's claim and are discoverable. We find Judge Rapoport's denial of the protective order as to this information to be reasonable and not contrary to law or an abuse of discretion.[FN22]

> FN22. We have addressed any potential concerns about maintaining the privacy of the employees with our general order requiring that Plaintiff not exchange or disclose these records to anyone not associated with the case.

In addition, Plaintiff seeks information about the awards and financial bonus programs for which the claims personnel could qualify, as well as information about specific awards that Plaintiff learned about in other litigation. (Requests 161-162, 195-196, 201-204.) Plaintiff alleges that the incentives offered to employees will provide evidence of the motivation of those employees. Defendants allege that this information is irrelevant, proprietary, privileged, and confidential, without providing a specific explanation.[FN23]

> FN23. Defendant also alleges that because

none of the claims handlers involved in Plaintiff's claim received the "Columbo" award, information regarding the award has no nexus to Plaintiff's claim. (Requests 161-162.) In order to ensure that there is a nexus between the requested information and Plaintiff's claim, we will only permit discovery of the "Columbo" award material if it was possible for one of the claims personnel who handled Plaintiff's claim to qualify for the award. If so, the award would be relevant in that it would have been a potential incentive for the employee handling Plaintiff's claim. If those employees could not have qualified for the "Columbo" award, information about the award would be too remote to be discoverable in the instant case.

We consider these documents relevant to show Defendants' state of mind as well as their relationship with the employees who handled Plaintiff's claims. We find Judge Rapoport's denial of the protective order as to this information to be reasonable and not contrary to law or an abuse of discretion.

Plaintiff requests that Defendants provide Plaintiff with all of the training materials used to train those employees who handled Plaintiff's claim. (Request 7.) Plaintiff argues that training materials are relevant to show Defendants' relationship with these employees as well as Defendants' policies, procedures, corporate philosophy, and corporate knowledge of these claims-handlers' actions.

Defendants state that the training materials are not relevant to Plaintiff's claim and are confidential and proprietary business information. In their supplemental brief (Doc. No. 22), Defendants argue that Plaintiff cannot establish that Defendants' manuals, policies or procedures are relevant to Plaintiff's termination without deposing the individual claims handlers and having evidence from those claims handlers that they made their decisions based on those manuals, policies and procedures. We disagree. Plaintiff has established the relevance of this training information and general information about Defendants' policies and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

224 F.R.D. 169                                                                                           Page 20

224 F.R.D. 169
**(Cite as: 224 F.R.D. 169)**

procedures by providing evidence of Defendants' bad faith practices in similar claims. These requests focus on the nexus between Defendant's national policies and their effect on the training of those claims handlers who examined Plaintiff's claim. We consider these documents to be relevant, and they should be produced for Plaintiff. *See Cantor,* 1998 WL 306208 at *2 (ordering insurance company to produce all educational materials used in training of those who were involved in handling plaintiff's claim). Furthermore,**186** we note that Defendants merely make broad allegations that their training materials contain proprietary information. This does not meet the *Pansy* requirement to show specific good cause for a protective order. Recognizing, however, that other courts have found similar materials to require some level of confidentiality, we will require that Plaintiff not exchange or disclose these documents with anyone not associated with this case.

Having sought information regarding those documents used to train the employees handling Plaintiff's claim, Plaintiff additionally requests a number of other training materials, contending that they show corporate knowledge, corporate standards, and/or are evidence of the procedures in use by those employees handling Plaintiff's claim. (Request 98-99-100, 104, 107-108, 124, 128, 136, 137, 144, 145, 148, 160, 163, 165-168, 172, 180, 183.) Defendants allege that these training documents have no nexus to Plaintiff's claim because they were not used to train the employees who handled Plaintiff's claim and many of them were created and used before Plaintiff sought disability benefits.

We find that those documents that include training sessions on the subject matters of handling own-occupation disability policies, handling an insured with alleged drug problems, handling depositions and trial preparation, handling investigations of claims similar to Plaintiff's, and creating and maintaining claim records or field reports are likely to produce information that is relevant to Plaintiff's claim. These training documents on relevant subjects are evidence of Defendants' standards and expectations regarding

their employees' conduct on these matters and are discoverable. Plaintiff has not identified a nexus between those documents that do not relate to the enumerated subject matters and Plaintiff's claim, and, therefore, we will not permit discovery of those training materials. In addition, in order to limit the broad sweep of these discovery requests and to ensure that these documents are relevant to the standards of the Defendants at the time that they denied Plaintiff's claim, we will limit the discovery to those policies that were in effect after the date that Plaintiff first applied for employment benefits, in June of 1996.

In addition, Plaintiff seeks information regarding staffing and retention problems that allegedly occurred in the Worchester office. (Requests 77, 106, 115.) Plaintiff contends that these problems show that the employees handling Plaintiff's claim may have had unreasonably heavy caseloads that led to poor performance in their handling of Plaintiff's claim, as well as evidence that Defendants knew of this possibility. Plaintiff also alleges that Defendants' attempts to improve their retention problems might further show the relationship between Defendants and their employees, and the pressures and incentives given to those employees. While Defendants contend that those documents will not show any of the above relevant information, we will affirm Judge Rapoport's decision to permit this discovery as these documents are potentially relevant and connected to Plaintiff's claim.

### ii. Studies Conducted of Claims Management Processes

Plaintiff alleges that Defendants engaged in a number of studies to analyze their claims management strategies and help them improve corporate profits. Among these studies are the 1994 study of Provident Life & Accident Insurance Company's individual disability claim handling operations by the law firm of LeBouef, Lamb, Greene & MacCrae. Plaintiff alleges that the LeBouef study recommended that Defendants involve counsel in claim denial decisions in order to protect mistakes by creating attorney-client

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

224 F.R.D. 169    Page 21

224 F.R.D. 169
(Cite as: 224 F.R.D. 169)

privilege over internal memos. The **LeBoeuf Report** also allegedly explains that every case has an optimal point for the termination of the claim. Plaintiff argues that Defendants used attorneys to handle Plaintiff's claim, and in fact, Defendants contend that the actions of that attorney, Maureen Griffen, are protected by attorney-client confidentiality. Plaintiff alleges that the recommendations show a bad faith corporate state of mind and that the use of an attorney in the handling of his claim is evidence of Defendants' unreasonableness in handling his claim. Plaintiff requests the LeBouef Report itself as well as *187 any documents referring to its adoption and implementation by Defendants. (Requests 29-30, 131-132, 169-170, 197-198.) Defendants allege that these documents are irrelevant, have no bearing on Plaintiff's instant claim, and are proprietary, privileged and confidential. We find that these documents are relevant to Defendants' state of mind and that Defendants have failed to meet their burden to show that they are protected by any privilege.

Plaintiff also requests a copy of and information regarding the use of the Tillinghast Study, which allegedly studied the frequency and severity of claims in an attempt to develop a forecasting tool. (Requests 31, 50-51, 173.) Plaintiff alleges that the study evaluated the financial gain of certain policies and is relevant to show that Defendants denied Plaintiff's claim in order to increase profits, which is further evidence of Defendants' reprehensibility. To prevent the discovery from being overly broad and from including information that is not relevant to Plaintiff's specific harm, we will limit discovery to those parts of the study that discuss individual own-occupation disability claims like Plaintiff's.

Plaintiff seeks information regarding a validation project and operational audit conducted by Price Waterhouse of Provident Life & Accident Insurance Company around 1995. (Requests 47-49.) Citing an internal memorandum from Tom Heys to Harold Chandler on November 14, 1995, Plaintiff notes that Price Waterhouse outlined the "best practices" for handling claims. Plaintiff contends that this information regarding Defendants' interpretation of " best practices" for the handling of individual

disability claims would show either the reasonableness or reprehensibility of Defendants' policies. This information concerning what the Defendants generally considered to be the "best practices" for the handling of individual disability claims is relevant to Defendants' general state of mind and potentially important in relation to Defendants denial of Plaintiff's claim.[FN24]

> FN24. Plaintiff also requests any other description of the "best practices" approach to claims handling that was implemented in April of 1997, or that was implemented in the Worchester disability insurance units. (Request 87-88.) For the reasons stated above, Plaintiff has established the relevance of such information and its nexus to his claim.

Plaintiff also requests those documents related to a claims study conducted by employee Tom Heys of the companies' disability insurance that focused on the "difference that reasonable occupation makes in our claim management efforts as opposed to an own-occupation." (Request 96.) Defendants' analysis of the effect of issuing own-occupation policies instead of reasonable occupation policies is relevant to Plaintiff's claim that Defendants targeted own-occupation policies like his in order to increase their profits because those policies were unduly expensive.[FN25] We find Judge Rapoport's denial of the protective order as to the documents regarding these studies to be reasonable and not contrary to law or an abuse of discretion.[FN26]

> FN25. However, Plaintiff has not provided the Court with sufficient information regarding the alleged McKinsey study to establish a nexus between that study and Plaintiff's harm. Plaintiff requests any documents concerning a meeting between Defendants and McKinsey, which it alleges consulted with Defendants regarding "claims processing." (Request 73.) This information is insufficient for the Court to determine whether the meeting will provide evidence relevant to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

224 F.R.D. 169

224 F.R.D. 169
**(Cite as: 224 F.R.D. 169)**

the denial of Plaintiff's claim.

FN26. We have addressed any potential concerns about the proprietary or confidential nature of these studies with our general order requiring that Plaintiff not exchange or disclose these records to anyone not associated with the case.

### iii. Results of Strategies

Plaintiff seeks Defendants' internal documents that record the progress that Defendants were making on implementing the goals and strategies mentioned above. These documents include monthly reports on risk management and individual disability claims, unit supervisor's monthly reports, and documents related to the expense of the new claims initiatives. Plaintiff has provided some of these documents obtained through other litigation. We consider these documents relevant to show Defendants' alleged bad faith methods, and they may be useful in **188** determining whether such methods were used against Plaintiff.[FN27]

FN27. Plaintiff has also requested discovery of "project team reports." (Request 44.) To be discoverable, these team reports would have to have some nexus to the denial of Plaintiff's benefits. Because Plaintiff's request for project team reports does not identify specifically what relevant topics the reports cover or what teams made such reports, the request is overly broad and demands documents that are not related to Plaintiff's claim. Therefore, we will limit the discovery of these monthly reports to those teams that potentially could have discussed Plaintiff's claim, for example those teams that discussed own-occupation claims or Worchester claims. Similarly, Plaintiff has not provided the Court with sufficient information to show that his request for documents related to the early phases of claim improvement initiatives are related to Plaintiff's claim. (Requests 175-176.) Therefore, we will not require Defendants

to produce these documents.

Specifically, Plaintiff requests Defendants' Monthly Reports on individual disability claims, which allegedly will show activity in the claims department, including information about claim terminations, personnel training, and the creation and use of round tables to review claims. (Request 185.) Plaintiff also seeks the Monthly Risk Management Reports and Individual Disability Reports from all of the Defendants, in order to show their corporate policies and philosophies, and specifically their treatment of terminating claims and their knowledge of the poor profitability of own occupation policies like Plaintiff's.[FN28] (Request 188-192.)

FN28. Plaintiff has established that these reports are also potentially relevant to show the relationship among the Defendants. For example, if claims handling documents for one company are no longer created after the merger, one can infer that the other company has taken over the responsibility of claim management.

Defendants argue that this information is irrelevant, unlikely to lead to the discovery of relevant evidence, and seeks information that is proprietary, privileged and confidential. Defendants do not provide a specific explanation as to why the monthly reports must be kept confidential. Based on our examination of Plaintiff's submissions, we conclude that these documents are relevant, connected to Plaintiff's harm, and subject to discovery. We find Judge Rapoport's denial of the protective order as to this information to be reasonable and not contrary to law or an abuse of discretion.

Plaintiff also seeks monthly reports from the supervisors of the unit handling Plaintiff's claim to the head of claims at the time, Ralph Mohoney, and Mohoney's responses to those reports. (Requests 24-25.) Plaintiff alleges that these reports identify the pressure on employees to terminate claims, the emphasis on the termination of claims and reduction of reserves, and the fact that termination was

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

224 F.R.D. 169

224 F.R.D. 169
**(Cite as: 224 F.R.D. 169)**

reported in a favorable manner. Defendants contend that this request is overly broad because it seeks information regarding other insureds and not Plaintiff.

Since these documents are written by the claim unit handling Plaintiff's claim, the information regarding the attitude of supervisors of that unit towards claim termination and the reduction of reserves is relevant to Plaintiff's specific harm. In order to prevent the request from being overly broad, we will limit the discovery of those monthly reports and responses to those documents that refer to claim termination or the reduction of reserves. In addition, to protect the confidentiality of the other insureds, we will require that Defendants redact any identifying information for other insureds from these documents.

Plaintiff also seeks documents that record the expense, manpower, and staffing changes that were required by the implementation of the claims initiatives. (Requests 32-33.) Plaintiff requests this information based on an attachment to a document that they already have from May of 1995. These documents potentially show that the expenditures for claims initiatives were justified based on the additional number of claims that the companies could terminate. These are also potentially relevant to show the implementation of Defendants' policies. Therefore they are discoverable.

### c. Intent to disregard their own standards

[9] Plaintiff has requested the manuals on procedures, ethics, training, and claims handling to show that Defendants knew the *189 appropriate standards for their actions and that they intentionally did not follow them.[FN29] (Requests 22-23, 139-140, 206-208.) Plaintiff requests these documents from 1990 to the present. Defendants argue that these manuals are irrelevant, privileged, confidential and proprietary. Defendants also contend that some of these documents were not used by the Worchester employees who handled Plaintiff's claim, and, therefore, that they do not have a nexus to Plaintiff's claim.

FN29. Plaintiff also seeks documents related to the development of the Quality and Training Assurance Unit, alleging that such information will further explain how Defendants define quality and train employees regarding that standard. (Request 135.) This information is relevant to show the reasonableness or the unreasonableness of Defendants' actions in handling Plaintiff's claim in light of their standards.

We find that at least some of these manuals are relevant to Defendants' state of mind. Because Plaintiff seeks to use this information to show that Defendants generally knew what behavior was reasonable and did not act unreasonably in the instant case, the nexus does not require the use of the manuals by those employees involved in denying Plaintiff's claim. Rather, the nexus is based on the fact that Defendants created such manuals and knew of them. Defendants have not identified any way for us to determine if there are parts of these manuals that we should protect. Accordingly, Judge Rapoport's decision to disclose all of the manuals to be reasonable and not contrary to law. However, we will limit the discovery of the manuals to those manuals being used during and after the time that Plaintiff first applied for benefits, June 1996.

Plaintiff also seeks documents concerning Defendants' policies on record retention and file documentation. (Request 13, 184.) Plaintiff contends that Defendants' failure to follow their own document preservation and claim file documentation policies may indicate that Defendants acted unreasonably and in bad faith. As we explained above, because this request seeks to show that Defendants created such policies and did not follow them, it is not necessary to limit this discovery to those policies that were taught to the claims handlers of Plaintiff's claim. Regardless of how such employees were trained, Plaintiff would potentially be able to demonstrate Defendants' bad faith by showing that the claims handlers who maintained Plaintiff's file did not follow these policies. Defendants allege that the document request is overly broad because it requests

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

224 F.R.D. 169
**(Cite as: 224 F.R.D. 169)**

documents beginning in 1992. Defendants also indicate that Paul Revere did not have a document retention policy until it implemented Provident's policy after the merger on March 27, 1997. We conclude that Defendants' document retention policies and file documentation policies are relevant to Plaintiff's claim; however, in order to prevent Plaintiff's request from being overly broad, we will limit the discovery to those policies in effect beginning when Plaintiff applied for disability benefits in June 1996.[FN30]

> FN30. We have addressed any potential concerns about the proprietary or confidential nature of these studies with our general order requiring that Plaintiff not exchange or disclose these records to anyone not associated with the case.

**(2) Determining Who is at Fault: The Relationship Among the Parties**

[10] Plaintiff seeks information about the relationship among the Defendants and the relationship of the Defendants with Genex in order to determine which party or parties are ultimately at fault for the harm to Plaintiff. Defendants contend that none of the Defendants other than Paul Revere should be subject to discovery because only Paul Revere was involved in issuing and terminating Plaintiff's claim. For the reasons hereinafter discussed, we conclude that the relationship among the Defendants and between the Defendants and Genex are relevant and have a sufficient nexus with Plaintiff's claim to be discoverable. We therefore affirm Judge Rapoport's decision.

**a. Provident, PL & A, and UnumProvident as Proper Recipients of Discovery and their Post-Merger Relationships**

Defendants' initial argument is that Defendants Provident, PL & A, and UnumProvident*190 should not be subjected to discovery because they are not proper parties to the action.[FN31] We reject this argument in light of the earlier order denying the motion to dismiss Provident, PL & A, and

UnumProvident. (Order dated May 10, 2000, Doc. No. 18.) While we recognize that only Paul Revere made the initial contract with Plaintiff, Plaintiff's complaint alleges that Provident, PL & A, and UnumProvident were jointly involved in either the decision to terminate his benefits and/or the decision to continue to withhold his benefits. Since Plaintiff has alleged that the four Defendants violated his contract jointly as part of a common scheme or plan, the discovery of business practices should apply to all Defendants.

> FN31. A set of all of the discovery materials discussed in this opinion were served on all four Defendants, and Defendants jointly filed all of the motions, briefs, and objections discussed in this opinion.

**b. Defendants' Relationship with Each Other**

Plaintiff requests information about Defendants' merger, including newsletters and internal documents related to the merger. (Requests 66, 72, 150, 164.) Plaintiff contends that these documents are relevant to show the importing and exporting of policies and claims handling procedures and will support his allegation that all of the Defendants were responsible for the bad faith practices implemented against Plaintiff. Defendants contend that these requests seek general information about the merger of the companies that is neither related to Plaintiff's claim nor related to the company's policies regarding own-occupation policies.

Discovery of the relationships between the Defendants is relevant to questions of corporate control, alter ego, joint venture, and whether the parties acted in concert in regards to the termination of Plaintiff's benefits. Therefore, we will affirm Judge Rapoport's decision to permit this discovery.

**c. Genex's Relationship with Defendants**

Plaintiff has submitted a number of requests pertaining to Defendants' relationship with Genex, the company hired by Defendants to investigate

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

224 F.R.D. 169

224 F.R.D. 169
**(Cite as: 224 F.R.D. 169)**

Plaintiff's disability claim. (Requests 14-21, 67-70, 80, 109-112, 116, 119, 122-123, 186-187.) Plaintiff contends that these relationship documents will show that Defendants were responsible for the actions of the Genex employees and units, in that they knew or should have known that Genex conducted biased investigations and that Defendants' incentive structure, training, standards, and goals encouraged such improper action by Genex.

Specifically, Plaintiff requests documents that identify Defendants' standards for Genex and its opinions of Genex's work. Plaintiff seeks the agreements between Defendants and Genex and the documents exchanged between the companies about Genex's investigation, management, and evaluation of individual disability claims. (Requests 14-19.) Plaintiff also requests documents regarding Defendants' expectations generally from vendors and the feedback Defendants gave about its increased referrals. (Requests 70, 116.) Defendant contends that these requests are overly broad and do not relate to Plaintiff's specific claim. We find that these documents are relevant. However, we recognize that the request for general information regarding Defendants' standards for outside vendors will include information about its standards for vendors other than Genex. In order to avoid an overly broad request, we will require Defendants to produce only those documents that state general expectations for all vendors and specific expectations regarding Genex in the time period after Plaintiff filed his initial request for benefits, June of 1996.

Plaintiff alleges that further evidence of the relationship of Defendants with Genex, and Defendants' expectations for Genex employees is found in documents concerning the training of Genex employees. As we explained above, the training of Defendants' employees is relevant to Plaintiff's claim either when those employees were specifically involved in Plaintiff's claim or when the training was on a specific subject matter relevant to Plaintiff's claim, such as the handling*191 of own-occupation disability benefit. We will permit discovery of Genex's training to the same extent. Training information relevant to the criteria for

referring files to Genex, the tracking of the files referred to Genex, the relationship of Genex with Defendants, Genex's interest in saving money for its clients, and Genex's policies regarding how to investigate claims may be discovered. (68, 109-112, 119, 122.) Plaintiff also seeks documents showing that Defendant knew about complaints or concerns regarding Genex's training of its employees and the qualifications of Genex employees. (Requests 67, 80.) While these complaints themselves are not relevant to Plaintiff's claim, Defendants' knowledge of such concerns and its reaction to them is relevant to the relationship between Defendants and Genex and whether Defendants were responsibly monitoring those Genex employees.

As part of Plaintiff's claim that Defendants' purpose in using Genex was to save money because Genex's biased investigations led to a large quantity of benefits' terminations, Plaintiff seeks reports by Defendants and Genex regarding the claims savings accomplished by using Genex. (Requests 20-21, 69, 123.) We find these documents relevant to Plaintiff's allegation regarding Defendants' bad faith policies and practices, and therefore, affirm Judge Rapoport's decision to permit this discovery.

Plaintiff also requests information regarding the specific employees at Genex who handled Plaintiff's claims in order to show that they had a practice of conducting biased investigations and to show which Defendant or Defendants were responsible for those employees actions. (Requests 186-187.) Plaintiff requests information about all of the investigations done for Defendants by those investigators and units at Genex that handled his claim. Plaintiff alleges that these documents will be important to show that the employees handling Plaintiff's claim were conducting biased investigations that almost always resulted in the termination of claims and that the Defendants received reports of these actions and, therefore, knew or should have known of them.

Plaintiff also requests payroll information for those individuals who handled Plaintiff's claim from 1996 until the present. Plaintiff wants these payroll records to show *who* was paying the individuals involved in Plaintiff's claim. Defendants allege that this information is proprietary, privileged, and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

224 F.R.D. 169                                          Page 26

224 F.R.D. 169
**(Cite as: 224 F.R.D. 169)**

confidential, specifically asserting that those individuals have a legitimate expectation of privacy in their pay records. Defendants also argue that compiling this information will take thousands of hours and involve thousands of documents, which would be unduly burdensome, especially if they are forced to redact confidential information from the payroll records.

We conclude that the Genex investigations and payroll documents are discoverable. While we recognize that the investigations involved different insureds, the history of the actions of the employees who handled Plaintiff's claim is potentially relevant to show whether those employees were conducting their business in a reasonable and responsible manner. In addition, discovery of these investigations is relevant to show whether Defendants knew or should have known of the allegedly biased actions of these employees. The discovery of the payroll records will reveal which of the Defendants was directly responsible for the actions of the Genex employees. We find Judge Rapoport's denial of the protective order as to this information to be reasonable and not contrary to law or an abuse of discretion. In order to protect the privacy of these documents, we direct that Defendants redact any confidential pay information on the payroll records.

**(3) Preparing for Additional Arguments**

**a. Cross Examining Claim Handlers**

[11] Plaintiff has requested the depositions or affidavits of the employees who handled Plaintiff's claim or their supervisors in other cases involving allegations of bad faith, unfair claim practices, consumer fraud, or breach of the covenant of good faith and fair dealing. (Requests 10-11.) Defendants object that previous bad-faith actions are not relevant to present bad-faith actions, citing several Eastern District of Pennsylvania decisions *192 denying the discovery of previous bad-faith cases because they "will necessarily involve totally different facts and circumstances from those present here." *Kaufman*, 1997 WL 703175 at *2. None of

the cases cited by Defendants discuss similar discovery requests for previous sworn statements made by employees who handled a plaintiff's claim. While we recognize that the circumstances of the other bad-faith cases will differ from the facts of the instant case, we find it reasonable to conclude that the previous statements of the employees may well be relevant or may lead to relevant evidence in this case. Since these statements were made by the claims handlers involved in denying Plaintiff's claim, there is a sufficient nexus between the statements and the alleged harm to Plaintiff. Therefore, we affirm Judge Rapoport's order to disclose these sworn statements as not contrary to law or an abuse of discretion. If any of these statements contains information that is not a matter of public record and/or reveals confidential information about other insured litigants, the names of those litigants should be redacted in order to ensure their privacy.

**b. Rebutting Defendants' "Return to Work" Arguments**

Plaintiff has requested any documents that support Defendants' contention that some percentage of the individuals insured under the same type of policy as Plaintiff were capable of returning to work after their benefits were terminated.[FN32] (Request 220.) We discuss this issue later when addressing Defendants' Fourth Motion for a Protective Order, which requests similar information in interrogatories. As we explain, if Defendants choose to make the "return-to-work" argument, the requested information is relevant to analyze Defendants' claim and rebut it. Therefore, we will require Defendants to compile the statistical information requested by Plaintiffs in their Third Set of Interrogatories. We will not require Defendants to produce all of these claims files in the original.

FN32. Plaintiff has also requested any documents describing Defendants' process for developing termination data, which would assist Plaintiff in interpreting that data and any statistics regarding the "

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

224 F.R.D. 169

224 F.R.D. 169
(Cite as: 224 F.R.D. 169)

return-to-work" policy that Defendants create. (Request 105.) If Defendants are going to make a "return-to-work" argument at trial, Defendants' process for developing termination data will be an important aspect of Plaintiff's ability to rebut that argument. Therefore, we will affirm Judge Rapoport's decision to permit discovery of those documents.

## C. Defendants' Third Motion for a Protective Order

[12] Defendants have objected to Judge Rapoport's January 3, 2001 order denying their Third Motion for a Protective Order, which addressed Plaintiff's Notices of Deposition and accompanying subpoena duces tecum of a corporate designee of Genex and each of the Defendants, the Notice of Deposition accompanying the subpoena duces tecum for in-house counsel, Maureen Griffen, and the subpoena duces tecum of Goldstein, Alvino, Wyman, Moore, Yranski, Speroni, Goyette, Silverberg and Martinez.

### i. Deposition of Corporate Designee of Genex

Plaintiff seeks to take a 30(b)(6) deposition of Genex regarding six issues: (1) investigation, evaluation and processing of Plaintiff's claim; (2) the business relationship between Genex and the defendant companies; (3) "savings" and "savings estimation" as a result of terminating Plaintiff's claim in particular; (4) the reporting of savings and savings estimations to defendant companies by Genex; (5) the training of Genex personnel in the investigation or evaluation of disability claims and insurance practices; and (6) the training of Genex personnel with respect to disability contract reading and interpretation.

Defendants object to the deposition on issues 2-6, claiming that they are not relevant to Plaintiff's claim and that the information should be protected because it is proprietary, confidential, and privileged. The business relationship between Genex and Defendants is relevant to establish whether Defendants knew of or recklessly

disregarded the alleged improper investigation by Genex's employees. Information regarding the possible savings to Defendants that could be created by terminating Plaintiff's claim and whether *193 those savings estimates were communicated to Defendants is also relevant. Such information may establish a motive for bad-faith actions and a policy of communicating such information could reasonably imply a bad-faith policy or practice. [FN33]

> FN33. Plaintiff has submitted material from his claim file that refers to a "savings and savings estimation." (Pl. Opp. to Defs. Third Mot., Ex. 1.)

As we have explained above, we consider information regarding the training of the employees who handled Plaintiff's claim to be relevant and will permit discovery of that information. Because Plaintiff's current request is limited to training on the subject matters at hand, we are unsure whether Plaintiff's request is functionally any different from his previous request for information about the training of the personnel who handled his claims. Should there be such a distinction, we will limit the deposition testimony to include only those training programs to which the employees who handled Plaintiff's claim were subject. We also direct that any claims or training manuals produced in the deposition not be exchanged or disclosed by Plaintiff to anyone not associated with this case. Based upon the foregoing, we find that Judge Rapoport's decision to require the Genex deposition and subpoena duces tecum was reasonable and we affirm it as modified.

### ii. Deposition of Corporate Designee of Defendants

Plaintiff seeks to take a deposition of the corporate designees of Defendants in order to obtain the corporations' explanation of their claims-handling process. Plaintiff explains that he needs an official explanation of the Defendants' claims handling process, and that the individual claims handlers are incapable of giving such an explanation.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

224 F.R.D. 169                                                                                            Page 28

224 F.R.D. 169
**(Cite as: 224 F.R.D. 169)**

Defendant objects to this information as cumulative and unnecessary. In addition, Defendant objects to the savings estimation and training information.

We reiterate our earlier determinations on the savings estimations and training information. We also find that Plaintiff is entitled to depose the corporate designees and obtain an official explanation of the claims-handling policies.

### iii. Deposition of Counsel Maureen Griffen

Plaintiffs seek a deposition with UnumProvident attorney Maureen Griffen, alleging that Ms. Griffen was involved in handling Plaintiff's claim before the institution of the suit. Defendants object to Ms. Griffen's deposition, alleging that Ms. Griffen worked as an attorney in this case in anticipation of litigation and that any information she has is protected as attorney-client privilege or work product.

[13][14] Under Pennsylvania state law, the party asserting privilege has the initial burden of proving that the privilege is properly invoked. [FN34] *Schmidt, Long & Assoc., Inc. v. Aetna U.S. Healthcare, Inc.,* Civ. A. No. 00-3683, 2001 WL 605199, *2 (E.D.Pa. May 31, 2001). To do this, the party resisting discovery must demonstrate:

> FN34. Pursuant to the Federal Rule of Evidence 501, we apply state law to determine the applicability of any evidentiary privileges in diversity actions alleging state law claims.

(1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made is a member of the bar of a court, or his or her subordinate, and is acting as a lawyer in connection with the communication; (3) the communication relates to a fact of which the attorney was informed by the client without the presence of strangers for the purpose of securing primarily either an opinion of law, legal services, or assistance in some legal proceeding, and not for the purpose of committing a crime or tort; and (4) the

privilege has been claimed and not waived by the client. *Id.* at *3 (citing *Rhone-Poulenc Rorer, Inc. v. Home Indem. Co.,* 32 F.3d 851, 862 (3d Cir.1994)). In addition, the party claiming a work product privilege has the burden of showing that the materials at issue were prepared in anticipation of litigation. *Id.* at *4. Commonly, the party asserting the privilege demonstrates a need for the privilege by submitting the papers in question or an affidavit by the attorney or a privilege log. *See* *194 *United States v. Constr. Prod. Research, Inc.,* 73 F.3d 464, 473 (2d Cir.1996).

In the instant case, we find that Ms. Griffen has information relevant to the handling of Plaintiff's claim and that Defendants have not submitted any information to support their bald and conclusory assertions of privilege. Therefore, we conclude that her deposition and the subpoena duces tecum are not subject to a protective order, and we affirm Judge Rapoport's order. [FN35]

> FN35. We note that this analysis regarding the attorney-client privilege is applicable to all of Defendants' allegations of such confidentiality throughout these motions. (Requests (29, 30, 31, 63, 131, 132, 160, 169, 170, 197, and 198.)) Defendants have had more than ample opportunity in the numerous motions filed before this Court to supply to the Court with detailed explanations of why these discovery requests will interfere with the attorney-client privilege. Defendants have failed to do so. This burden rests on the Defendants. The Defendants are the ones that know the exact contents of these requested documents and what attorney-client privilege information they contain.

### iv. Subpoena Duces Tecum of Relevant Employees

Plaintiff seeks to have a number of employees who handled Plaintiff's claims bring documents that they have in their possession to their depositions.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

224 F.R.D. 169

224 F.R.D. 169
**(Cite as: 224 F.R.D. 169)**

Defendants argue that this request is overbroad and not limited in time or scope. To the extent that these claims handlers have possessed these documents, they are relevant. It is reasonable to believe that if the employee had these documents they were read or considered by the employee, and, therefore, could have influenced the actions of the employee. Therefore, we affirm Judge Rapoport's decision to deny Defendants' protective order in this regard.

### D. Defendants' Fourth Motion for a Protective Order

[15] Defendants' Fourth Motion for a Protective Order objects to Plaintiff's Third Set of Interrogatories, which consist of four questions submitted to each of the individual Defendants, requesting statistical information relating to the authorization and/or institution of rehabilitation plans under their policies. (Requests 20-24, Def. Fourth Mot. for Protective Order, Doc. 42, Ex. "A" .) Defendants argue that because Plaintiff's claims do not involve a rehabilitation plan, information about the rehabilitation of other parties is irrelevant and not likely to lead to the discovery of relevant evidence. Furthermore, Defendants argue that the three Defendants other than Paul Revere had nothing to do with Plaintiff's insurance contract and should not be forced to produce this information about their own policies. Defendants also argue that compiling the statistical information will require a laborious manual search through thousands of claims files, which is an undue burden, and that the confidential information in the files prevents them from permitting Plaintiff to compile the information himself.

Plaintiff alleges that he has requested this rehabilitation information in anticipation of Defendants' possible trial strategy of claiming that when they terminate benefits, many of their claimants return to work. Plaintiff has provided this Court with evidence that Defendants have made a similar "return to work" statistical argument in previous cases to rebut claims of bad-faith termination of claims.[FN36] (Pl. Memo. of Law., Doc. No. 48, Exs. "4", Provident's Offer of Proof

Re: The Testimony of Ray Warren at 1.) If Defendants make such an argument, Plaintiff would need the presently requested data to rebut the accuracy and reliability of Defendants' statistical argument. Since the files are confidential, Defendants will have to compile the information themselves. Plaintiff has offered to withdraw his requests for this statistical information if Defendants would agree not to make this argument at trial. (Pl. Reply to Defs' Objs., Doc. No. 60, ¶ 8.) However, Defendants have refused to make such an agreement. (*Id.*) Under the circumstances,*195 we agree with Judge Rapoport's decision that this discovery is relevant to Plaintiff's case and will not cause Defendants an undue burden. Since Defendants have failed to show that Judge Rapoport's Order was contrary to law or an abuse of discretion, we will affirm that order.

> FN36. Specifically, Provident has previously offered statistical testimony to show that Provident paid at least 95 percent of all of its claims submitted during the period in question. That evidence was offered to rebut Plaintiff's claim that Provident had undertaken a pattern and practice of wrongfully denying disability insurance claims. (Pl. Memo. of Law., Doc. No. 48, Ex. "4", Provident's Offer of Proof Re: The Testimony of Ray Warren at 1.)

### E. Defendants' Fifth Motion for a Protective Order

Defendants' Fifth Motion for a Protective Order objects to Plaintiff's Fourth Set of Interrogatories, Third Set of Requests for Admissions and Fourth Set of Requests for Production of Documents. Because this motion for a protective order was submitted after Magistrate Judge Rapoport made his rulings, these discovery requests are being addressed for the first time; however, most of the issues are not new.

### a. Fourth Set of Requests for Production of Documents

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

224 F.R.D. 169                                                         Page 30

224 F.R.D. 169
**(Cite as: 224 F.R.D. 169)**

[16] In this Fourth Set of Requests for Production of Documents, Plaintiff seeks documents that it contends are relevant to the relationship of Defendants to each other, the alleged bad faith policy of Defendants to terminate claims, the alleged success of that policy, and the pressure on employees to terminate claims. Defendants contend that only Paul Revere should be subject to discovery and that the requested documents are irrelevant, lack a nexus to Plaintiff's claim, are onerous, and some are confidential. As we have explained above, we find that generally information regarding these subjects is relevant, has a nexus to Plaintiff's specific harm, and all of the Defendants are subject to this discovery. However, we will address these requests individually in order to determine whether they will provide the information sought and whether they are overly broad for those requested purposes. [FN37]

FN37. While the title of Defendants' motion implies that they seek a protective order for all of the documents requested in Plaintiff's Fourth Set of Requests for Documents, Defendants motion and memorandum of law does not specifically address all of the requested documents. Because Defendants have the burden in obtaining a protective order, we will permit discovery without discussion for those requests that were not addressed by Defendants. (Requests 223-229, 231.)

In request 230, Plaintiff seeks Board of Director's Meeting Minutes from January 1997 to the present. Plaintiff contends that these documents will provide information about the relationships between the parties. For example, Plaintiff has evidence that Paul Revere only had one Board of Director's Meetings separate from the other Defendants in the above time period, and that information potentially supports an alter ego theory of liability. This information is potentially relevant to liability between the Defendants. Therefore, we will deny Defendants Motion for a Protective Order.

[17] Plaintiff has requested a number of documents regarding Defendants' setting of termination goals

and their tracking of their own progress meeting those goals. (Requests 232-242.) Plaintiff seeks the Monthly Trend Reports for the last five years, which Plaintiff contends track the progress in closing claims and meeting net resolution ratio goals, as well as the net termination goals for the past five years. (Request 232, 241.) Plaintiff also seeks financial and reserve documents for the past five years, which Plaintiff contends show the setting of financial goals for the closing of claims and release of reserves for all of the Defendants and specifically for the unit that handled Plaintiff's claim. (Requests 233-236.) Plaintiff requests the monthly projections for claim resolutions from the units handling Plaintiff's claim as well as any management memos relating to the setting of goals for closing claims. (Request 237.) Plaintiff also seeks documents that track or discuss the liability acceptance rate for own-occupation policies like Plaintiff's and for the unit handling Plaintiff's claim. (Requests 239-242.) These documents allegedly measure the performance of the different products and units. We find that all of these requests are relevant to Plaintiff's allegation that Defendants had a bad faith policy of terminating claims in order to save money. These documents also have a sufficient nexus with Plaintiff's specific harm because they are related either to the claims units handling Plaintiff's claim, **\*196** own-occupation policies like the Plaintiff's, or the specific subject of the bad faith policy of terminating claims, which Plaintiff alleges was the reason his claim was terminated.

[18] Plaintiff also seeks information about Defendants involvement in other bad-faith cases, which Plaintiff contends will show similar issues of misconduct, and will help establish corporate policies as well as show Defendants' recidivism and reprehensibility. (Requests 243-249.) As we explained above, previous bad-faith actions are generally not relevant to present bad-faith actions because they "will necessarily involve totally different facts and circumstances from those present here." *Kaufman,* 1997 WL 703175 at \*2. While the specific facts of every case are different due to the specific circumstances of the Plaintiff, we find that other bad-faith cases in Pennsylvania, during the time that Plaintiff was requesting benefits, that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

224 F.R.D. 169                                                      Page 31

224 F.R.D. 169
(Cite as: 224 F.R.D. 169)

involve termination of benefits for own-occupation, non-cancelable, guaranteed renewable policies by the same unit as was involved in Plaintiff's case, would be potentially relevant to Plaintiff's case and should be subject to discovery. [FN38] Therefore, we will permit discovery of settlements of such cases in which Defendants entered into a non-confidential settlement with value in excess of the present value of contract benefits. In addition, we will permit discovery of any documents related to changes in education or procedures that resulted from such a settlement. For those cases that alleged similar bad-faith actions in their complaints but resulted in confidential settlements, we will permit Plaintiff to discover a list of those civil actions.[FN39] We will grant Defendants' request for a protective order as to all of the other documents requested pertaining to other bad-faith actions. That other litigation is remote from Plaintiff's case and is not likely to produce evidence relevant to Plaintiff's case.[FN40] (Requests 246-249).

FN38. This definition is somewhat more limited than the one presented by Plaintiff in Request 242.

FN39. Plaintiff also requests documents related to Defendants' procedures for the entry or enforcement of confidential settlement agreements, alleging that these policies will show Defendants policy to hide their misconduct. Even if Defendants have stringent policies to enforce their confidential settlement agreements or have a policy of always obtaining confidential agreements, this information would not be direct evidence of Defendants' bad faith or attempts to hide their misconduct. Because of the limited potential relevance of these documents, we will grant Defendants motion for a protective order regarding these documents. (Request 245.)

FN40. In these requests, Plaintiff sought records of other similar bad-faith cases that were filed throughout the nation or were filed before Plaintiff's requests for benefits

in June of 1996.

### b. Plaintiff's Third Set of Requests for Admission

[19] Plaintiff has submitted fifty-three requests to each of the defendants requesting that Defendants admit the authenticity of documents that Plaintiff has obtained through other litigation, and admit that those documents were authorized, are products of regularly conducted activity, and constitute statements made within the scope of employment. Defendants object to these requests as being overly broad, seeking general practice information that is remote in time to the matters at issue in Plaintiff's claim. While we might have been inclined to limit the scope of these admissions to a specific time period, we find that Defendants' general statements about their concerns regarding these admissions do not meet the burden required to establish a need for a protective order. Even though Defendants objected to a specific category of the documents, they failed to indicate which of the fifty-three requests for admission contained those categories of documents. To determine the merits of Defendants' allegations, this Court would be forced to examine each of the fifty-three requests and determine when those documents were created. That is not our role. The Third Circuit has made clear that the burden for a protective order is on the moving party and that the moving party must demonstrate good cause beyond bald assertions of harm for each specific request that it wants protection from.[FN41] Authenticating*197 these documents does not appear to this Court to create an undue burden on the Defendants. We will deny Defendants Motion for a Protective Order to prevent their response to these requests for admission.[FN42]

FN41. We note that *Pansy* does not require the moving party to address every discovery request specifically, especially when there are so many discovery requests. However the moving party must attempt to address the requests with some specificity, for example, by grouping the requests by subject matter, as Defendants did above when discussing personnel

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

records.

FN42. Because Plaintiff has not shown the "nexus" between each individual document and the specific harm alleged in this case, we limit this "authentication" request to only those "types" of documents which we have previously found sufficiently related to the present case. *See State Farm,* 123 S.Ct. at 1522.

### c. Plaintiff's Fourth Set of Interrogatories

[20] Plaintiff submits two interrogatories, the first asking whether Plaintiff's policy was reinsured individually or as a block of business and the second asking whether Defendants believe that unreasonable delay or denial of disability insurance benefits is lawful in any of the fifty states, and if it is, to identify which one. (Interrogatories 24-25.) Plaintiff alleges that if such reinsurance exists for Plaintiff's policy, communications between Paul Revere and its reinsurer could contain admissions against interest regarding Paul Revere's opinion of Plaintiff's claim for disability benefits because insurers have a duty to inform reinsurers about outstanding claims. Defendant objects that these interrogatories are beyond the scope of permissible discovery and will not lead to admissible evidence. We disagree. If Plaintiff's insurance policy was reinsured and Defendants have had non-confidential communications regarding their state of mind concerning Plaintiff's request for disability benefits, that information is relevant to Plaintiff's claim. Therefore, we will deny Defendants Motion for a Protective order regarding Interrogatory No. 24. [FN43]

FN43. The parties have not specifically addressed in their pleadings why interrogatory No. 25 would either be relevant to the instant case or why the production of the information would be onerous for Defendants. Since the interrogatory calls for Defendants' interpretation of the law in fifty states and Plaintiff can only recover in the instant case for the harm done to Plaintiff in

Pennsylvania, we find that Plaintiff's request is too remote for discovery in the instant case. Therefore, we will grant Defendants' Motion for a Protective Order as it applies to Interrogatory No. 25.

An appropriate order follows.

### *ORDER*

AND NOW, this 13th day of August, 2004, upon consideration of Defendants' Objections to Magistrate Judge Arnold C. Rapoport's Orders dated January 3, 2001, and March 6, 2001, and Defendants' Fifth Motion For Protective Order, it is ORDERED as follows:
1. Defendants' Objections are OVERRULED to the extent provided in the attached Memorandum.
2. The Orders of Judge Rapoport dated January 3, 2001 and March 6, 2001 are AFFIRMED as modified by the attached Memorandum.
3. Defendants' Fifth Motion For Protective Order is GRANTED in part and DENIED in part, as provided in the attached Memorandum.

IT IS SO ORDERED.

E.D.Pa.,2004.
Saldi v. Paul Revere Life Ins. Co.
224 F.R.D. 169

Briefs and Other Related Documents (Back to top)

• 2006 WL 738153 (Trial Pleading) Answer on Behalf of All Defendants to Plaintiff's Second Amended Complaint (Civil Action) and Demand for Jury Trial (Feb. 10, 2006) Original Image of this Document (PDF)
• 2006 WL 431989 (Trial Pleading) Second Amended Complaint (Civil Action) (Jan. 18, 2006) Original Image of this Document (PDF)
• 2005 WL 2151908 (Trial Motion, Memorandum and Affidavit) Motion (Jul. 15, 2005) Original Image of this Document (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT

## "4"

EXHIBIT "4"



# FIBROMYALGIA
# POSITION STATEMENTS AND
# GUIDELINES

# Table of Contents

I    Introduction to our Proposed Guidelines on Fibromyalgia    page 3

II    Our Current Position Statements on Fibromyalgia    page 4

III    A 2002 Understanding of Fibromyalgia    page 5

IV    Some Notable Quotes on Fibromyalgia    page 14

V    References/Bibliography    page 17

VI    A Fibromyalgia Process Proposal    page 20

VII    Tools which may be helpful in addressing functional capabilities and claimed limitations in reported cases of Fibromyalgia    page 23

VIII    Contributors    page 30

Appendix - Templates    page 31

# FIBROMYALGIA
## POSITION STATEMENTS AND GUIDELINES
(7-29-2002)

## I.   INTRODUCTION

- The following is intended only to be a guideline. Each claim is unique and needs to be addressed on it's own individual merits.

- Please note that although these guidelines have been written for fibromyalgia, considerable overlap exists between fibromyalgia and other defined syndromes of medically unexplained symptoms (such as chronic fatigue syndrome).

- Unum Provident's Customer Care Philosophy:

  - To provide a thorough, fair, and objective evaluation of all claims
  - To pay all valid claims with high degree of customer service
  - To assist our claimants in their return to work efforts
  - To defend the company against invalid claims

- The intent of these guidelines are:

  - To provide a basic outline on what is currently known in respect to the defined syndrome of fibromyalgia.
  - To provide a list of references to support the opinions and statements expressed in the above outline.
  - To provide a Fibromyalgia Process Proposal in an effort to better leverage the return to work features in some of our contracts; and to better utilize the expertise of our physicians, psychologist, nurses, and rehabilitation professionals.
  - To provide an outline of some of the tools which may be helpful in addressing functional capabilities and claimed limitations, and give an understanding of how they might be utilized in some reported cases of fibromyalgia.

- Our ambition in our Fibromyalgia Process Proposal is to improve and enhance our effectiveness as enablers of wellness rather than of illness. It is certainly understandable to have compassion for a patient's reported suffering, but harm is done when that compassion allows one to become less functional.

- Our position statements and guidelines on fibromyalgia have been reviewed by three nationally recognized medical experts in rheumatology. It is expected that these guidelines will be updated and revised as advances in medicine require.

## II.    OUR CURRENT POSITION STATEMENTS ON FIBROMYALGIA

- Fibromyalgia is a defined syndrome; one that represents a patient population experiencing a constellation of medically unexplained symptoms.

- Current evidence does not allow one to conclude that fibromyalgia is a physical disease- its etiology remains unknown and to date no pathophysiological process has been established.

- Psychological factors may exist in a significant portion of individuals labeled with fibromyalgia.

- Treatment plans, which include cognitive behavioral therapy and a graded low impact aerobic, conditioning program, have been shown to improve symptoms in some fibromyalgia patients.

- The vast majority of individuals labeled with fibromyalgia have no physical impairment; they are on a physical basis able to return to work (especially with appropriate care). Generally, continued activity (including work) is of value even in the face of symptoms.

## III.  A CURRENT UNDERSTANDING OF FIBROMYALGIA

Introduction – History

1.  Unexplained chronic widespread body pain has been a source of confusion and bewilderment since the advent of medicine. Over the years, this problem has been given various names. The two best known and remembered are neurasthenia in the nineteenth century and fibrositis in the twentieth century. Today we call it fibromyalgia.

Beginning with the mid nineteen eighties, there has been a concerted effort to find new answers to this age-old problem. The formulation of the 1990 American College of Rheumatology (ACR) Classification Criteria gave further impetus to this effort,  yielding numerous valuable clinical research studies, which have greatly advanced our understanding of this major problem.

Before presenting a summary of the more important new data from these studies, it is necessary to present and explain an unforeseen negative result coming from a misunderstanding of the purpose of the 1990 ACR Classification Criteria for Fibromyalgia.

The classification criteria were established and intended primarily for the clinical and epidemiologic research of patients with the symptom of widespread musculoskeletal pain. The purpose of the criteria was to provide research experts a uniform patient selection guide for the study of patients with widespread body pain.

Unfortunately, the use of the classification criteria i.e., the proper uniform selection of study patients, was misunderstood by some physicians in the day-to-day clinical practice, as a criterion for the diagnosis of individual patients presenting in their office with chronic widespread pain.  Meeting the classification criteria is not equivalent to making a diagnosis in an individual patient.[1]

This initial misinterpretation soon expanded and escalated for many, both in clinical practice and medicolegal contexts, to the greater misunderstanding prevalent today. Many now view persons who satisfy the classification criterion as having a rheumatic disease, some even view them as having a chronic incurable disabling disease.  Not all diagnoses are diseases.[2]

---

[1]

[2]

Two mindsets have developed. One acknowledges, as per their original intent, the classification criteria as a valuable tool for the selection of patients for research, the other inappropriately views persons satisfying the criteria as having a disease, that is, for some, a chronic progressive incurable disabling disease.

For our community of claims reviewers to provide a thorough, fair, and objective evaluation of fibromyalgia claims, it is mandatory for us to understand the genesis and evolution of the misinterpretation of the classification criteria.

Since the publication of the 1990 fibromyalgia classification criteria, it is claimed that more research papers have been written on this problem than any other medical condition. Although most of the research data directly address the problems of this unexplained widespread pain syndrome, its cause or causes, pathophysiology, pathology and treatment, many papers deal with the misunderstandings surrounding the classification criteria, the label fibromyalgia, the definition of syndrome, the value of tender points, and the question of physical disability.

### Summary of the current state of the art regarding fibromyalgia

- *Current thoughts concerning the 1990 ACR Classification Criteria for Fibromyalgia:*
    1. Classification criteria are necessary for the proper conduct of clinical trials and epidemiologic studies. They are useful for teaching purposes. They are, however, explicitly proscribed for diagnosis.[3] Satisfying the criteria does not necessarily mean that an idividual has fibromyalgia.
    2. The use of classification criteria for labeling certain conditions that do not meet the definition of disease (fibromyalgia) has been severely criticized. Such diagnostic labels, in themselves, may induce illness behavior.[4]
    3. The process of illness description needs to be dynamic with addition or changes to classification criteria as more is learned about these illnesses. Classification criteria are not illness, only descriptors that change as new knowledge is acquired.[5]
- *Current thoughts concerning "syndrome"*
    1. There are two kinds of syndromes. The first kind represents a grouping of symptoms resting on pathology and an underlying disease.
    2. The second kind of syndrome represents a grouping of unexplained symptoms with no known pathology and underlying disease.

---

[3]

[4]

[5]

3. Fibromyalgia is a grouping of unexplained symptoms without demonstrable pathology or underlying disease; such groupings of unexplained symptoms are now termed by some authors "functional somatic syndromes".[6]

4. Functional somatic syndromes are not restricted to and limited to the medical specialties which gave them birth, rather, they overlap. A patient often presents with several such syndromes, or parts of syndromes.[7]

5. Such syndromes often present with concomitant underlying psychological distress.

6. The fibromyalgia syndrome, when viewed as one of the many functional somatic syndromes, is seen as presenting with more than widespread body pain and tender points accompanied by fatigue, disordered sleep, poor memory and decreased concentration. It is now appreciated that the syndrome may present with any combination of symptoms from the following three symptom categories.

    (i) Other unexplained somatic symptoms:

       1. Tenderness, fatigue, sleep disorder, memory impairment, cognitive loss, short attention span, paresthesias, dizziness, anxiety, depression, dry mouth, feeling of swelling in the hands and feet

    (ii) Other symptoms from overlapping functional somatic syndromes

       1. Irritable bowel syndrome, irritable bladder syndrome, tension headaches, migraine headaches, TMJ syndrome, myofascial pain syndrome, allergies, sick building syndrome, dysmenorrhea

    (iii) Psychological symptoms

       Anxiety, depression, personality disorders, illness behavior, somatization.[8]

- *Current thoughts concerning the diagnostic label "fibromyalgia"*

1. The label does not explain or define fibromyalgia. It is merely another name for chronic widespread musculoskeletal pain associated with other functional symptoms.

2. Fibromyalgia is not the name of a disease.

3. Some fibromyalgia experts argue that the labeling of fibromyalgia may be harmful.[9]

---

[6]
[7]
[8]
[9]

- *Current findings and reflections concerning "tender points"*
  1. Recent studies show that there are no convincing reproducible structural or biophysiological abnormalities demonstrable at the sight of tender points.

  2. Studies reveal that tender points are a common finding. Although found in small numbers, they are present in healthy individuals. They are a common finding in many functional somatic syndromes, and found in large numbers in patients with psychological distress.

  3. Documented studies report a high correlation between high tender point scores and the level of distress, anxiety, depression, somatization and illness behavior.[10]

  4. Many physicians in clinical practice are thought to examine patients with tender points inaccurately, applying pressure in the wrong areas, applying too much pressure or too little pressure.[11]

  5. The reliability of tender points in the medicolegal setting of disability is unclear.[12]

  6. Recent data show that the emphasis on tender points does not adequately define the pain that people with fibromyalgia feel.

  7. People with fibromyalgia are more sensitive to musculoskeletal pain throughout their entire body, perhaps reflective of a lower pain threshold.[13]

- *Current findings on "subjective symptoms"*
  1. Recent data indicate that most but not all fibromyalgia research experts believe that fibromyalgia patients present solely with subjective symptoms.
  2. There are no generally accepted objective fibromyalgia illness markers.[14]

- *Current findings on "treatment"*
  1. "Although there is little evidence that most therapies usually employed in FM have any substantial long-term benefit, myriad treatment programs have sprung up. There is little scientific rationale

---

10

11

12

13

14

and research support for most of these interventions, and it seems clear that many FM treatments initiatives promote medicalization and prolonged illness"[15]

2. Narcotics are generally not recommended to treat pain in fibromyalgia patients.

3. It is necessary for patients with chronic pain to understand their condition. This requires willingness on the part of treating physicians to be generous with their time spent with the patient, to explain the newest of insights in the condition so as to obtain maximum cooperation in the proposed treatment program.

4. A recent editorial proposed that "it may well be better not to treat patients with our well known but hardly effective armamentarium of drugs". "In many patients with FM the problem is not so much FM, but psychosocial issues, inappropriate pain behavior and sometimes somatization".[16]

5. Aerobic exercise is effective in preventing physical deconditioning brought about by inappropriate rest and inactivity.

6. Cognitive Behavioral therapy when indicated appears to show promise.

- *Current findings on "disability"*

  1. It is estimated that between 10 - 12% of the general population experience chronic widespread body pain. Most do not see a physician for this symptom and proceed with the business of daily life.[17]

  2. The majority of fibromyalgia experts are presently in agreement that fibromyaliga patients are not physically impaired.

  3. Severe psychological distress in patients with fibromyalgia not only plays a significant role but also may lead to psychological impairment.

  4. "Physicians should discourage inactivity and disability in fibromyalgia patients because, if these are prolonged there is an adverse effect on the prognosis".[18]

  5. "We must halt the trend to label patients with FM as disabled, and we must interfere with the social trend toward encouragement of the disability concept".[19]

- *Current findings on the "etiology" of unexplained chronic body pain*

  1. No definitive cause for this unexplained somatic pain symptom, as well as for other unexplained somatic symptoms/syndromes has been found, but investigators now postulate a common pathophysiologic pathway or pathways.[20]

[15]
[16]
[17]
[18]

2. They now view these unexplained symptoms/syndromes as the result of a "process" of interrelated and interconnected influences.

3. These interrelated, and interconnected influences come from the environment, mind, brain and organ systems. Each interacts and influences the others. Authors refer to this etiology of illness as the Biopsychosocial Model of Illness.[21]

4. The old model of cause and affect, the BioMedical Model, which still applies to many diseases, has been abandoned for this group of unexplained, subjective, functional symptoms/syndromes.

5. Patients with either a genetic prediction or cultural determinants, (stressors) or both, for emotional vulnerability and fragility are the more likely candidates for the expression of their psychological distress as physical symptoms.[22]

6. The physical expression of psychological distress, most often brought on by a variety of stressors is referred to by the psychological community as "somatization," and thought by the medical community (neurophysiologists) to be the result of altered CNS function, the exact pathophysiology of which remains unresolved at this time.[23]

## SOME STATE OF THE ART REFLECTIONS GLEANED FROM RECENT FIBROMYALGIA RESEARCH:

1. Chronic widespread musculoskeletal pain (fibromyalgia) is seen as a continuum existing in the general population. The pain is mild in most individuals and does not require involvement with the medical community.[24]

2. The end of this continuum is composed of individuals with moderate to severe pain often accompanied by tenderness, fatigue, poor sleep and symptoms of concomitant psychological distress.[25]

3. Tenderness in discrete regions of the body (tender points) do not adequately define the pain of fibromyalgia. These individuals are more sensitive to musculoskeletal pain throughout their entire body, a reflection of their lowered pain threshold.[26]

20
21
22
23
24

4. Upon involvement with the medical community, the label of fibromyalgia is most often attached to these individuals to describe their widespread body pain. This label does not define a physical disease condition.

5. Fibromyalgia is best interpreted as a syndrome of functional symptoms. Each medical specialty has at least one of these medically unexplained or functional syndromes, not adequately explained by physical disease processes.

6. Current research studies in neurophysiology addressing stress induced changes in CNS chemical secretions, and studies in psychology addressing heightened somatization show encouraging signs in approaching an explanation of functional somatic syndromes.

7. "Education about the nature of this disorder is of paramount importance. Some patients who present with symptoms of FM want only to be told that this is a non progressive condition that is not causing damage or inflammation in the body".[27] The remainder need to have this explained to them.

8. Appropriate management of fibromyalgia patients consists of attention to all potential aspects of this biopsychosocial illness.

   i. Identification and amelioration of psychological and environmental physical stressors.

   ii. Identification of the nature and severity of all aspects of psychological distress underlying this syndrome and their appropriate treatment with pharmaceutical agents and psychological attention whenever necessary.

   iii. Physical and occupational therapy and rehabilitation attention as necessary.[28]

Treatment with a primary care physician, an internist, or a rheumatologist attending to all the aspects of the illness suffices in most cases. In cases presenting with severe psychological symptoms, a psychological consultation for evaluation and treatment is in order.

9. Fibromyalgia, when interpreted, approached and treated in this fashion affords the patient the best chance for continuing an active and productive life.

## Conclusion:

Much has been accomplished in fibromyalgia research in the last ten years, and much remains to be done. Today, most would agree, we have many answers that we did not have yesterday. More answers will come tomorrow. It is the duty of

26
27

all of us who deal those with fibromyalgia claimants to stay current with the latest findings. All of us at UnumProvident, claims consultants, nurses, vocational rehab consultants, psychologists, and physicians, need to acquaint ourselves with every new finding so as, to better serve our fibromyalgia claimants. Only in this way are we able to assist them and their physicians in their return to wellness.

## REFERENCES

1. Hunder GG. Editorial: The Use and Misuse of Classification and Diagnostic Criteria for Complex Diseases. Ann Intern Med 1998;29:__-__.

2. Ibid

3. Gabriel SF. Classification Of Rheumatic Diseases. In: Klippel JH, Dieppe PA, eds. Rheumatology, 2nd ed. London: Mosby, 1998:1:3.1.4

4. Ibid

5. Hunder GG. The Use and Misuse

6. Barsky AJ, Borus JF. Functional Somatic Syndromes. Ann Intern Med 1999;30:910-21.

7. Aaron LA, Buchwald D. A Review of the Overlap Among Unexplained Clinical Conditions. Ann Intern Med 2000;134 Supplement part 2:__-__.

8. Clauw DJ. Musculoskeletal Pain and Evaluation. In: Ruddy S, ed. Kelley's Textbook of Rheumatology, 6th ed. Philadelphia: Saunders, 2001: __-__.

9. Hadler, NM, Fibromyalgia, Chronic Fatigue and other Iatrogenic Diagnostic Algorithms: Do labels escalate illness in vulnerable patients? Postgrad Med 1997;102:161

10. Clauw DJ. Elusive Syndromes: Treating the Biologic Basis of FM and Related Syndromes. Cleve Clin J Med 2000;68:__-__.

11. Clauw DJ. Questions and Challenges in the Diagnosis of Fibromyalgia Syndrome. Journal of Musculoskeletal Medicine 1999; Supplement

12. Ibid

13. Mikkelsson M, et al. Muscle and Bone Pressure Pain Threshold and Pain Tolerance in FM Patients. Arch Phys Med Rehabil 1992;73:__-__.

14. Goldenberg DL. Fibromyalgia Symptoms a Decade Later. Arch Intern Med 1999;159:__-__.

15. Wolfe F. Editorial: The Fibromyalgia Problem. J Rheumatol 1997;24:1247-49.

16. Ibid

16. Goldenberg DL. Fibromyalgia Symptoms a Decade Later

17. Ibid

18. Wolfe F. The Fibromyalgia Problem

19. Winfield JB. Pain in Fibromyalgia. Rheumatic Disease Clinic of North America 1999;25: __-__.

20. Engel GL. The Need for a New Model: A Challenge for Biomedicine. Science 1977;196:__-__.

21. Barsky AJ, Borus JF. Functional Somatic Syndromes. Ann Intern Med 1999;130:910-21.

22. Winfield JB. Editorial: Does Pain in FM Reflect Somatization? Arthritis and Rheum 2001;44:__-__.

23. Goldenberg DL. Soft Tissue, Fibromyalgia and Related Syndromes. In: Klippel JH, Dieppe PA, eds. Rheumatology, 2nd ed. London: Mosby, 1998:__-__.

24. Clauw, Daniel J. Elusive Syndromes

25. Granges G, Littlejohn G. Pressure Pain Threshold in FM Syndrome. Arch Phys Med Rehabil 1992;73:__-__.

26. Clauw, Daniel J. Musculoskeletal Pain and Evaluation

28. Sharpe M, et al. Innovations in Symptoms Management. Ann Intern Med 2001;134 Part 2 Supplement: __-__.

## IV.   SOME NOTABLE QUOTES ON FIBROMYALGIA

- Dr. George E. Ehrlich states in review of The Oxford Textbook of Rheumatology Vol. I & II, 2nd ed. "I am pleased that Brian Hazelman sees fit to end his discussion of fibromyalgia approvingly citing Simon Carette."

(Dr. Simon Carette states) " Physicians have taken an entity that existed for centuries, given it a new name and created a major health issue by elevating it in importance and suggesting it deserves disability coverage."

Dr. Ehrlich then goes on to state:
"This echoes statements in the Klippel-Dieppe (Rheumatology) Text  I recently reviewed.  Perhaps if enough texts address this contentious and subversive issue, the mischief caused by physicians who champion the painful symptoms as incurable and compensable disease and contrive causal relationships to trauma and childhood abuse can be mitigated."

Ehrlich, George E., Reviewer, <u>JAMA</u>, October 7, 1998, Vol.280, No.13: pp1198-1199

- Dr. Sherine E. Gabriel notes (in her chapter on Classification of Rheumatic Diseases in the 2nd edition of <u>Rheumatology</u> edited by John Klippel & Paul Dieppe) that Cohen and Quinter have challenged the usefulness of the diagnostic criteria for fibromyalgia and notes that they feel that the diagnostic criteria "convey no pathophysiological insight and that they have been validated via a circular argument in which the evidence on which the construct is based is taken as proof of its veracity."

  Cohen, M., Quinter, J., *Fibromyalgia Syndrome*, a Problem of Tautology. Lancet. 1993: 342: 906-909

- Dr. Milton L. Cohen states:
  "No distinctive tissue pathology, pathophysiology or psychopathology has been found."

  Cohen, Milton L. & Quinter, John L. Fibromyalgia, A Problem of Tautology.  *The Lancet*:1993:342: 906-908.

- Dr. Arthur J. Barsky states:
  "Somatic distress and medically unexplained symptoms have always been endemic to daily life, but the social and cultural characteristics of each era shape the expression, interpretation, and attribution of these symptoms...

  Patients who have these symptoms today differ from their predecessors by being less relieved by negative findings...and less responsive to explanation, reassurance, and palliative treatment."

  Barsky, Arthur J., & Borus, Jonathan F. Functional Somatic Syndromes. *Annals of Internal Medicine*. 1999:130 (11): 910-921

- Dr. Warren D. Blackburn states:
  "There is no evidence that fibromyalgia is (a) crippling or incapacitating disorder or is a prodrome for a more serious illness."

  Blackburn, Warren D. Fibromyalgia. *Southern Medical Association – Southern Medicine*. 1998: 85(2): 3-5.

- Dr. Frederick Wolfe comments:  On tender points... "A notorious unreliable an manipulatable exercise."

  On patients with fibromyalgia... "There is mounting evidence that many patients have major affective, somatization, and personality disorders."

  On fibromyalgia... "There is little evidence to support that FM (fibromyalgia) is a disease, and many of us who helped develop the FM construct still consider it a syndrome."

  On treatment..."It seems clear that many FM treatment initiatives promote medicalization and prolong illness."

  The Fibromyalgia Problem. Frederick, Wolfe. *The Journal of Rheumatology*. 1997: 24(7): 1247-1249

- Dr. Nortin Hadler comments:
  On tender points... "I have serious reservations about asserting that tender points can be used to define a discrete pathological entity.  Many patients with all sorts of chronic illness – and some healthy persons – find the pressure of the examining finger uncomfortable."

  On fibromyalgia... "The debate rages as to whether the illness is a consequence of an underlying organ dysfunction or a form of illness behavior magnified by the medical model for care.  I am of the latter opinion."

  Fibromyalgia, Chronic Fatigue, And Other Iatrogenic Diagnostic Algorithms. Hadler, Nortin M. *Postgraduate Medicine*. 1997: Vol. 102, No. 2, 161-176

- Dr. Hugh Smyth comments:
  "We agree with Wolfe that '...tenderness can be manipulated up or down.'  Also, I fear that he may be correct, in that detection of exaggeration '...requires so much effort it almost will never be done.'"

  "The same could be said for effective treatment. It is our money that is being used for wrongful claims and for the twin industries of invalid assessments and subsidized but ineffective therapies."

  Fibromyalgia: Can One Distinguish It From Malingering?  More Work Needed; More Tools Supplied. Smyth, Hugh. *The Journal of Rheumatology*. 2000: 27(11): 2536-2539

- Dr. Daniel Clauw comments:
  On fibromyalgia..."Patients should be educated on the non-destructive nature of this condition, as well as the fact that meaningful improvement rarely occurs without  active participation on their part."

On therapies for fibromyalgia... "Cognitive behavioral therapy (CBT) has generally been shown to be successful in treating patients with chronic pain syndromes such as fibromyalgia, since it helps identify and eliminate maladaptive behaviors and substitutes more effective mechanisms for managing symptoms and improving functions."

"An exercise program for fibromyalgia patients needs to be designed with the goals of physical tolerance and long term compliance..." "The occurrence of post- exertional worsening of symptoms is reduced by utilizing low-impact conditioning programs, initiated at a slow pace (sometimes beginning at only 5 minutes per day) that is gradually increased over time."

Fibromyalgia Syndrome: An Update On Current Understanding And Medical Management. Clauw, Daniel J. *Rheumatology Grand Rounds*. 2000: 3(4)1-9

## V.    BIBLIOGRAPHY/REFERENCES OF FIBROMYALGIA

The following bibliography/references are not intended to represent a comprehensive review of all of the current literation on fibromyalgia, but rather are intended to provide support for the opinions/comments expressed in our position statements and our 2002 Understanding of Fibromyalgia.

1.  Patients Who Amplify Bodily Sensations
    Barsky III, Arthur J. *Annals of Internal Medicine*. 1979;91:63-70.

2.  1990 Criteria For The Classification Of Fibromyalgia
    Wolfe, Frederick & Smythe, Hugh, et al. *The American College of Rheumatology*. 1990: 33(2): 160-172.

3.  The American College of Rheumatology 1990 Criteria for the Classification of Fibromyalgia, Wolfe, Frederick. *Arthritis and Rheumatism*. 1990:33:160-172.

4.  Fibromyalgia Syndrome, A Problem of Tautology
    Cohen, Milton L., et al. *The Lancet*. 1993;342:906-909.

5.  Fibromyalgia 20 Years Later:  What Have We Really Accomplished?
    Dr. Carrette. *The Journal of Rheumatology*. 1993; 590-593.

6.  Fibromyalgia Syndrome and Myofascial Pain Syndrome: Do They Exist?
    Bohr, Thomas W. *Neurologic Clinics*. 1995:13(2): 365-384.

7.  Is Fibromyalgia A Useful Diagnostic Label?
    Hadler, Nortin M. *Cleveland Clinic Journal of Medicine*. 1996:63 (2): 85-87.

8.  The Fibromyalgia Syndrome: A Consensus Report on Fibromyalgia and Disability.
    Wolfe, Fred  *The Journal of Rheumatology*. 1996; 23(3): 534-539.

9.  What Is The  Future Of Fibromyalgia?
    Goldenberg, Don L. *Rheumatic Disease Clinics of North America*. 1996; 22(2): 393-407.

10. Fibromyalgia And The Disability Dilemma.
    Bennett, Robert. *Arthritis & Rheumatism*. 1996:39(10): 1627-1632.

11. If You Have To Prove You Are Ill, You Can't Get Well.
    Hadler, Nortin  *SPINE*. 1996: 21(20): 2397-2400.

12. The Relation Between Tender Points And Fibromyalgia Symptom Variables: Evidence That  Fibromyalgia Is Not A Descrete Disorder In The Clinic
    Wolfe, Frederick. *Annals of Rheumatic Diseases*. 1997:56:268-271

13. The Fibromyalgia Problem
    Wolfe, Frederick. *Journal of Rheumatology*. 1997:24(7):1247-1249.


14. Fibromyalgia – Out of Control?  Comment.

Gordon, Duncan A. *The Journal of Rheumatology*. 1997: 24, 1247

15. 17. A 37-Year Old Man With Somatic Complaints.
    Barsky, Arthur J. *Clinical Crossroads*. 1997: 278(8): 673-679

16. Fibromyalgia, Chronic Fatigue, And Other Iatrogenic Diagnostic Algorithms.
    Hadler, Nortin M. *Postgraduate Medicine*. 1997: Vol. 102, No. 2, 161-176

17. Chronic Fatigue And Its Syndromes
    Wessely, S., Hotopf, M., & Sharpe, M., et al. *Oxford University Press*. 1998

18. Fibromyalgia by Brian Hazelman
    *The Oxford Textbook of Rheumatology*, Madison, P.J., et al., 2nd ed. 1998

19. Classification Of Rheumatic Diseases
    Gabriel, Sherine E. *Rheumatology, Volume I  Klippel, J. & Dieppe, P. 2nd education*. 1998: Section 1:
    3.1-4

20. Fibromyalgia
    Blackburn Jr., Warren D. *SMA Southern Medicine*. 1998:85 (2): 3-5

21. Work Disability And Soft Tissue Rheumatism
    Reilly, Paul The Journal of Rheumatology. 1998:25(8): 1454-1455

22. Is Fibromyalgia A Distinct Clinical Entity? The Disapproving Rheumatologist's Evidence. Cohen, Milton.
    *Baillier's Clinical Rheumatology*. 1999:Vol 13, No. 3, pp. 421-425.

23. Functional Somatic Syndromes
    Barsky, Arhtur J., et al. *American College of Physicians – American Society of Internal Medicine*. 1999:130
    (11): 910-921.

24. Pain In Fibromyalgia.
    Winfield, John B. *Rheumatic Disease Clinics of North America*. 1999: 25(1): 55-79

25. Functional Somatic Syndromes.
    Barsky, Arthur J. & Borus, Jonathan F. *Annals of Internal Medicine*. 1999: 130(11): 910-921.

26. Questions And Challenges In The Diagnosis Of Fibromyalgia Syndrome.
    Clauw, Daniel J. *The Journal of Musculoskeletal Medicine 1999; June Supplement, S7-S12*

27. How Can We Manage Fibromyalgia?
    Reilly, Paul A.. *Annals of Rheumatic Diseases*. 1999: 125-126.

28. Hurting All Over
    Groopman, Jerome The New Yorker. November 13, 2000: 78-92

29. Fibromyalgia Syndrome:  An Update On Current Understanding And Medical Management. Clauw, Daniel
    J. *Rheumatology Grand Rounds*. 2000:3 (4): 1-9

30. 29.Fibromyalgia:  Can One Distinguish It From Simulation?  An Observer-Blind Controlled Study.

Khostanteen, Irene, et al. *The Journal of Rheumatology.* 2000: 27(11) 2671-2676

31. Sayin' "Stand And Deliver, For You Are A Bold Deceiver": Faking Fibromyalgia
Wolfe, Federick. *Journal of Rheumatology.* 2000; 27(11):2534-2535

32. Fibromyalgia: Can One Distinguish It From Malingering? More Work Needed; More Tools Supplied.
Smyth, Hugh. *The Journal of Rheumatology.* 2000: 27(11): 2536-2539

33. Primary Care Rheumatology. Harris, Edward D. & Genovese, Mark C. *W.B. Saunders Company,*
Philadelphia, 2000

34. Primary Care Rheumatology
Howard, Edward D. & Genovese, Mark C. MD. *W.B. Saunders Company, Philadelphia, 2000.*

35. A General Population Study Of Fibromyalgia Tender Points (London Study)
White M., et al. *The Journal of Rheumatology.* 2000: 27

36. Editorial - Testing Tenderness: What's The Point?
Craft, Peter. *The Journal of Rheumatology.* 2000: 27

37. Fibromyalgia And Compensable Disability – Debate Over Medical, Socioeconomic, and Personal
Ramifications. Clauw, Daniel J., & Hadler, Nortin M. *Medical Crossfire.* 2000: Vol 2, No.2, 50-61

38. Fibromyalgia by Clauw, Daniel J.
*Textbook of Rheumatology,* Kelly, W., 6th ed. 2001. pp 417-423

39. Features Of Somatization Predict The Onset Of Chronic Widespread Pain.
Macbeath, John, Macfarlen, Gary J., & Benjamin, Sidney & Silman, Alan J., et al. *Arthritis & Rheumatism.*
*Vol 44, No.4, 2001, 4 Aril 2001, Manchester, U.K.*

40. Effort Testing in Patients with Fibromyalgia and Disability Incentives
By Roger O. Gervais, Anthony S. Russell, Paul Green, Lyle M. Allen III, Robert Ferrari, and Stephanie D.
Pieschl. *The Journal of Rheumatology, Vol. 28,* pp 1892-1899, 2001.

41. Disability Evaluation of Fibromyalgia
By Claire V. Wolfe, MD. *Physical Medicine and Rehabilitation Clinics of North America, Vol 12, Number
3, August 2001.* pp 709-719.

42. The Effects of Progressive Strength Training and Aerobic Exercise on Muscle Strength and Cardiovascular
Fitness in Woman with Fibromyalgia: A Pilot Study.
Rooks, DS., Silverman, CB., & Kantrowitz, FG. *Arthritis Rheum. 2002 Feb:* 47(1): 22-8

## VI.    A FIBROMYALGIA PROCESS PROPOSAL

If felt to be appropriate (as each claim is unique and is handled on its own merit) it may be helpful to initiate a partnering attempt with the insured and the insured's attending physician (and when appropriate with the insured's employer); in order to ensure that proper attention is being directed toward maximizing the insured's potential functional capabilities and to ensure that the treatment plan addresses appropriate return to work issues.

It is our belief that any such partnering attempts will be most successful if initiated as soon as possible (i.e. as soon as any period of disability is claimed or projected on the basis of fibromyalgia).   If after a period of time (determined appropriate for that specific case) the return to work partnering attempt fails within the determined appropriate period of time, one could then initiate a review to determine why the partnering attempt failed (See "Tools which may be helpful in addressing  functional capabilities and claimed limitations in some reported cases of fibromyalgia.").

Day 1 – Day 5

- Initial phone call to claimant from Customer Care Specialist (CCS)
  (See Initial Call Template in Appendix)
  * Purpose:  Information gathering, expectation setting
  – Please note each claim is unique and should be handled on its own

Day 6 – Day 10

- CCS discuss phone call findings with nurse, and nurse makes call to office
  (See Nurse to Physician's Office Call Template in Appendix)
  * Purpose:  Information gathering

- After the nurse call and using the information gathered to this point, the CCS will make a call to the employer.
  (See Employer Call Template in Appendix)
  * Purpose:  Convey informations regarding claim handling and gather information regarding return to work (RTW) possibilities.

- CCS to order medical records via fax from appropriate treating providers as identified by calls to claimant and primary physician office as advised by nurse using attached physician / psychologist template letters.
  * Purpose:  Information gathering for RTW where appropriate and validation.

Day 11 – Day 15

- CCS to call claimant to discuss activities to date (i.e., conversations thus far; records ordered and if necessary encourage claimant to assist with the gathering of records). During this call, CCS will get any updates from claimant and again set expectations regarding claim handling, RTW plan where appropriate.
  - Purpose: Expectation setting

Day 16 – Receipt of Medical Records

- Follow up as needed to obtain all records ordered

- Call claimant if necessary to intervene if records not forthcoming

After Receipt of Medical Records

- Clinical referral to nurse / physician / psychologist
  - Purpose: To evaluate support of impairment and identify RTW partnering potential

After Review of Medical Records

- Physician / psychologist to determine if a physician peer to peer call is appropriate
  - Purpose: To clarify appropriate restrictions and limitations (R&L's) with treating provider and / or appropriate RTW plan

- Multi-specialty roundtable review of information on claim to date
  - Purpose: To differentiate claims to TEAM process vs. evaluation / validation
  (See TEAM Process for additional information)

  At this point the claim may be identified as one in which we will partner with claimant, employer and / or physician to effect an appropriate RTW or one which will primarily be managed with additional evaluation / validation activities. Multi-specialty roundtable conferences may be conducted with physician / psychologist in attendance. In the multi-specialty conference, if it is determined that partnering (TEAM) process will not be effective, an evaluation / validation activity plan will be discussed using vocational, clinical and consultant input. Claims identified as primarily Psych and not supported from general medical condition will be transferred at this point to the appropriate impairment unit.

- CCS should have frequent phone contact with the claimant – at a minimum, once a month and preferably every 2 weeks
  - Purpose: Track claimant's progress

TEAM Process for Fibromyalgia Claims*
*(Please note each claim is unique and should be handled on its own merit)

Fibromyalgia claims with active RTW plans will be handled in the TEAM process. These claims will often have some of the following characteristics:

- A claimant who is motivated to return to work in the near future
- An attending physician who is supportive of a return to work plan
- A claimant who is receiving appropriate care (i.e., participating in exercise, cognitive behavioral therapy, etc.)

- An employer who is supportive of a return to work plan through a willingness to accommodate as required by the plan

Managing the claim in the TEAM process will provide:

- A formalized process to carefully monitor the appropriate care and the clinical progress of the claimant
- A forum for discussing the claimant's RTW progress with the claimant, physician and employer
- A successful return to work generally within 2-3 months from the implementation of the return to work plan barring unforeseen circumstances
- An effective use of vocational resources to work with the employer to remove most, if not all, RTW barriers
- Frequent communication with the claimant by the Team nurse and CCS to insure the return to work plan is successfully implemented and providing the desired outcomes (No more than 2 weeks without a call)

If RTW is unsuccessful within an appropriate timeframe, initiate steps to determine the underlying cause of the failed RTW plan. This might include an evaluation and validation of the claimed diagnosis and an assessment of the claimed degree of limitations.

**IV.** **TOOLS WHICH MAY BE HELPFUL IN ADDRESSING FUNCTIONAL CAPABILITIES AND CLAIMED LIMITATIONS IN SOME REPORTED CASES OF FIBROMYALGIA**

- In order to most appropriately address an insured's claimed degree of limitations and functional capabilities, an understanding of the specific activities which the insured feels that he / she is incapable of performing and an understanding of the reason why they insured feels incapable of performing any such activities is needed. It is also helpful to have understanding of the activities an insured continues to feel capable of performing. This information is also needed to most appropriately utilize any of the following tools.

- The following tools may be helpful in addressing claimed limitations and functional capabilities and in addressing the reasons for a failed return to work partnering attempt.
    - Clarifying actual daily activities
    - Appropriately focused Functional Capacity Evaluations (FCE's)
    - Neuropsychological testing evaluations
    - Independent medical evaluations (IME's)
      (From a medical / physical standpoint or from a psych / neuro-psych standpoint)
    - Panel IME's (multi-specialty) consisting of a combination of medical and or psych specialists.

- Please remember that each case is unique and needs to be addressed on it's own individual merits. In any individual case it may be appropriate to utilize one, none, or a combination of the following tools.

- **Clarifying Actual Daily Activities**

    Clarifying ones actual daily activities provides us with an understanding of what the claimant is "at least" or at a minimum able to perform (i.e. the "minimum" at which that claimant would be expected to perform on a formal FCE). A claimant may certainly be found capable of doing significantly more on an FCE, but it would be inconsistent for that claimant to perform at a lower level on a FCE. The above information may be helpful in determining whether one's claimed or reported limitations are consistent with reality.

- **Appropriately Focused Functional Capacity Evaluation (FCE's) with appropriate validity/credibility checks.**

**FUNCTIONAL CAPACITY EVALUATIONS OF PATIENTS WITH FIBROMYALGIA AND/OR OTHER MEDICALLY UNEXPLAINED SYMPTOMS (SUCH AS CHRONIC FATIGUE SYNDROME)**

The choice of whether or not to include a standardized functional capacity evaluation in the overall assessment of a claimant with a diagnosis of fibromyalgia is based on careful medical analysis of the data in the file. Because many patients with the classic symptoms included in the fibromyalgia construct ( pain and fatigue) will self-limit and not perform with full voluntary effort, the results may be significantly less than helpful and frequently invalid. Suboptimal efforts at physical activity, symptom magnification, and a cognitive belief system that they should not physically exert themselves if accompanied by pain frequently distorts the actual physical capacity findings.

Because there is a great deal of data about actual physical capacity that can be obtained from a detailed description and analysis of daily activities and the degree of self-limitation, an FCE may not contribute a great deal of additional data unless the claimant is motivated to return to work and is therefore likely to sincerely put forth the amount of effort required to assess actual physical capacity. A suboptimal exam with poor validity, reliability, and consistency does not support a conclusion of decreased capacity; rather it will describe an individual who may be capable of far more capacity than demonstrated.

Functional performance measures in claimants who have symptoms of fatigue and pain such as those diagnosed with fibromyalgia pose a special challenge, especially in the context of "impairment and Disability". Therefore, professionals performing a functional capacity evaluation (FCE) should have a strong clinical knowledge of musculoskeletal, neurological, and psycho-social evaluations, including ways of testing for validity, maximal effort, and symptom magnification a physical therapist or occupational therapist should perform the evaluation rather than their assistants. If a complex upper extremity evaluation is required, an occupational therapist with additional training as a certified hand therapist is preferred.

The patient should have an opportunity to repeat activities that were deemed invalid to assist in the final determination of validity.

A standard FCE for a fibromyalgia claimant, based on work with chronic pain patients in general, should include range of motion measures of each joint, measures of strength, lifting capacity, grip strength

Activities used to establish validity should be performed early in the testing procedure if the evaluator feels the patient may have difficulty with completing the full evaluation. Therefore, the evaluator needs to be flexible in the order of activities being requested. Casual observation of the patient's activities during the waiting room and between activities may assist in supporting validity.

<u>Most common validity and credibility testing should include</u>

- multiple position grip strength testing (looking for bell shaped curve)

- heart rate response to activities (noting change of heart rate with difficult activities or pain)

- appropriate correlation of pain behaviors with activities being performed

Other validity testing normally performed during various FCE protocols will assist in establishing validity, current level of function, and areas in need of rehabilitation.

A well-performed FCE will assist in establishing current functional status and current recommended restrictions and limitations.

FCE needs to include observed activities as well as a detailed musculoskeletal and neurological evaluation.

FCE providers should also include their own Validity and Reliability measures. Raw data should be included in the report and support conclusions in regard to stated Validity and Reliability.

- Gervais, RO  Effort Testing in Patients with Fibromyalgia and Disability Incentives   J Rheum 2001; 28: 1892-9
- Gatchel, RJ, ed  Psychological Factors in Pain: Critical Perspectives, Guilford Press, 1999

- ### Neuropsych Testing / Evaluations

The neuropsychological evaluation / testing assesses specific, cognitive skills. In summary, the neuropsychological evaluation / testing is most useful when there are specific complaints of cognitive dysfunction, when there are strong suggestions of cognitive dysfunction even without explicit claims, or when there is a need to determine whether or not there is a likely neurological condition underlying the claimant's complaints. Records review, formal testing for motivation and effort, and formal assessment of overall psychological functioning should routinely be included along with a formal assessment of neurocognitive capabilities. Recommendations for cognitive rehabilitation, if appropriate, would ideally be a part of the report.

In cases of fibromyalgia and other symptoms of medically unexplained symptoms two types of neuropsychological batteries are proposed:

1. A screening or sampling battery would be useful in cases where cognitive complaints are made either by an Insured or by treating provider but these are not supported by formal psychological/neuropsychological evaluation. In this case, we might want to obtain our own brief but formal neuropsychological evaluation. This battery should sample the relevant areas of cognitive functioning as well as comprehensively assessing effort/motivation and emotional/personality functioning. This battery would consist of the basic WMS-III along with an abbreviated WAIS-III (perhaps omitting one subtest from each of the two scales); a test of motor speed (either Finger Connor's CPT-II); and two measures of frontal/executive functioning (Trial Making and either the Category Test of Wisconsin Card Sorting Test). Additionally, two comprehensive tests of cognitive symptom validity (TOMM; WMT, CARB, Victoria, VIP) and either the MMPI-2 or PAI would be needed. The time needed for this battery should be substantially less than that required for the full neuropsychological evaluation. This battery is intended to serve as a means for determining objectivity of claimed impairment or for assisting in determining the direction of appropriate treatment. The screening battery should require about two thirds the time (administration, scoring and reporting) of a full battery.

2. The full neuropsychological evaluation battery may be used as a follow up to the screening battery or as an initial battery when an Insured's treatment provider has submitted a formal cognitive assessment that was felt to be inadequate for our evaluation of the claimed condition. The full neuropsychological battery does not always need to be done as a follow-up to the above screening battery. The full battery typically includes The Wechsler Adult Intelligence Scales (WAIS-III), The Wechsler Memory Scale (WMS-III), The Halstead-Reitan Battery, comprehensive evaluation of emotional/personality functioning (MMPI-2, MCMI-III or PAI), and two comprehensive tests of cognitive symptom validity (TOMM; WMT, CARB, Victoria, VIP). These tests and batteries have been selected because of their acceptance in the medico-legal arena, their inherent statistical properties and the fact that they yield overall indices as well as more specific test or subtest scores.

- **Independent Medical Evaluations (IME's) and Panel IME's**

In cases where limitations are claimed on the basis of fibromyalgia or other syndromes of medically unexplained symptoms (such as chronic fatigue syndrome), it is often helpful to discuss the file in a multi-specialty roundtable type conference with combined medical/physical and psych/neuropsych input.

The combined medical / psych multi specialty approach is helpful in determining whether any additional information may be needed from either a medical /physical standpoint or from a psych/neuro-psych standpoint. Furthermore, the above type of multi specialty discussion helps ensured the most appropriate utilization of any one or combination of above tools.

**How to better document subjective cognitive and psychological complaints related to defined conditions with medically unexplained symptoms (such as fibromyalgia or chronic fatigue syndrome)**

As the term suggests, a defined condition with medically unexplained symptoms is characterized by reported symptoms and the individual's perceived suffering. The claims are often accompanied by reports of psychiatric symptoms or diagnoses (e.g., depression, anxiety, adjustment disorder) and/or complaints of cognitive dysfunction (e.g., disrupted concentration, memory, or attention). Sometimes, either the claimant's attending physicians or the in-house medical reviewers will have suggested a possible somatoform disorder. Because of these issues, such conditions (e.g., Fibromyalgia and Chronic Fatigue Syndrome) have also been termed "Functional Somatic Syndromes".

The favored initial approach to a claimant reporting these problems is to solicit a partnership in which the claimant, his/her physician, and the company cooperate in a concerted return-to-work effort. An evaluation and validation of claimed impairments may be needed during this process or if this collaborative process is not possible. One potential means of validation is the Independent Medical Examination (IME). When psychological and/or cognitive concerns are a claimed basis for disability, or when they are strongly suspected based on the implications of obtained medical records, a Psychological, Psychiatric, and / or Neuropsychological IME may be warranted.

- The emphasis of a psychological IME is on psychological functioning and the impact of emotional issues on functional capacity. In the psychological IME the emphasis is on emotional concerns with a screening assessment of cognitive capacities, as compared to the neuropsychological IME in which the emphasis is on a complete evaluation of cognitive capacities with a screening evaluation of emotional functions. Like the more comprehensive neuropsychological evaluation, the psychological IME should include records review and formal assessment of motivation and effort. Recommendations for remediation of psychological distress, such as through specific suggestions for psychotherapy, would ideally be a part of the report. The psychological tests typically used in this type of evaluation might include the MMPI-2, MCMI-III, PAI, Patient Pain Profile, Millon Behavioral Medicine Diagnostic. Cognitive screening in this type of evaluation is usually accomplished via a comprehensive mental status examination during clinical interview. If a more in-depth cognitive evaluation is needed, refer to one of the Neuropsychological IME's below.

- A psychiatric IME also has many of the same features as the psychological IME, but the emphasis is on psychiatric diagnosis and an evaluation of appropriate medical care for a psychiatric condition. Here, a detailed formal Mental Status Evaluation would help screen for cognitive dysfunction, but the emphasis is on psychiatric interviewing and diagnosis. The psychiatrist involved would also be expected to review records and assess motivation and effort by comparing observed behavior to information contained in the records. The main advantage of a psychiatric IME is in obtaining evaluations of current medication effects on functioning, as well as recommendations regarding what would be appropriate care and/or follow up testing.

- The neuropsychological IME is most useful when there are specific complaints of cognitive dysfunction, when there are strong suggestions of cognitive dysfunction even without explicit claims, or when there is a need to determine whether or not there is a likely neurological condition underlying the claimant's complaints.

## CHOOSING THE TYPE OF IME

1. If cognitive complaints are a prominently claimed source of impairment, and particularly if there is any documentation in the file of previous cognitive testing or mental status examination that supports the claimed limitations, a neuropsychological IME is probably the most appropriate venue.

2. If psychological symptoms are a prominent complaint, but cognitive complaints are not claimed or indicated, then psychological testing may help clarify the issues involved. This is particularly relevant when the psychiatric symptoms are said to be impairing daily functioning, but there is no "hard" data to determine the extent of the impact. Cognitive screening should be included, but it need not be the main focus of the examination unless the screening demonstrates the need for further assessment.

3. Sometimes a combination of a psychological and psychiatric IME may be indicated. This is particularly true when there are questions regarding the combination of diagnosis, level of impairment, and credibility. Most often, the psychologist assesses the claimant first, with the report sent to the psychiatrist, who is the lead author of the report.

4. When credibility is a significant concern, it is sometimes helpful to suggest a specifically forensic evaluation, emphasizing issues of congruence between medical records, test results, and observed behavior.

5. If further input is felt to be needed on an IME basis from a medical / physical standpoint, then such input (in cases of fibromyalgia) might potentially be obtained by one of a number of appropriate medical specialists. Such an appropriate specialist might include a physiatrist, a rheumatologist, an internist, an occupational medical specialist, a neurologist, or other medical specialty (depending on the details of the case and the specific questions being asked of the IME).

6. A Functional Capacity Evaluation (FCE) could be obtained (see above) on a IME basis; and might, depending on the individual case, be obtained in conjunction with an evaluation by one of the above specialists (i.e. a physiatrist), or might be utilized in conjunction with another of the above tools.

7.  A medical / physical IME component might be combined with a psych or neuro-psych IME component in certain situations (depending on the details of the individual case and the specific questions asked of the IME). In such cases it is often helpful for us to discuss the file in a multi-specialty roundtable type conference (with combined medical / physical and psych / neuro-psych input). The above multi-specialty approach may help in selecting the most appropriate specialties for a panel type IME. Such an approach may also be helpful in insuring that our concerns are appropriately conveyed to the IME, and that the IME receives all of the information required to accurately address our questions regarding the insured's condition and functional capabilities.

## CONTRIBUTORS

Edward C. Alvino, MD
Robert N. Anfield, MD, JD
Nancy Ball, MD
Norman Bress, MD
Alan Cusher, PhD
Marianne Justin
Les Kertay, PhD
Paul Martin, MD
Burton McDaniel, MD
Thomas McLaren, PhD

# APPENDIX – FIBROMYALGIA PROCESS PROPOSAL

- <u>Customer Care Specialist Material</u>

  - Fibromyalgia Initial Call Template
  - Employer Call Template

- <u>Clinical Material</u>

  - Nurse to Physician's Office Call Template
  - Physician Peer to Peer Call Template

## CCS-FIBROMYALGIA INITIAL CALL

Hello Mr(s). _____. My name is _____ and I will be the Customer Care Specialist handling your claim for Long-Term Disability benefits. If it is o.k. with you, I would like to take a few minutes in order to obtain an understanding of your current medical condition and discuss how we can assist you with returning to work.

As your Customer Care Specialist, I am responsible for obtaining an understanding of your current ability to return to work. During this evaluation, I will be partnering with you along with our medical and vocational resources as well as your treatment providers and (if appropriate) your employer in order to pursue a plan that will allow you to have a smooth transition back into the work force. Additionally please be aware that while we are pursuing your return to work, we will also be evaluating your eligibility for benefits according to the provisions of the policy under which you are covered.

Following our discussion of your medical condition, I will explain to you the applicable policy provisions in your policy and allow you to ask any questions you may have regarding your policy.

### HISTORY

- To the best of your recollection, what were your first symptoms and when did they begin? (Consider getting records from that point; such records may be)
- What physicians have treated you for this condition and how were they diagnosed?
- How have your symptoms progressed since being diagnosed?
- What is your understanding of this condition?
- How did you come to the decision to stop working?
- How has the progression of your symptoms affected your ability to perform your occupation?
- If you were to return to work today, what parts of your job would you be able to do? What parts would be difficult for you? Can you think of any accommodations that your employer could make that would help you be able to work at your job?
- Did you ask for or did your employer make any accommodations for you while you were still at work? If so what were they and when were they made?
- Can you think of any accommodations, which could be made in order to allow you to continue working? Have you discussed these with your employer?
- Tell me about other medical conditions that you are receiving treatment for.
- Have these conditions ever required you to miss work for an extended period of time?
- Are you able to drive? (esp. if cognitive deficits are claimed)

### TREATMENT PLAN

- What is your physician's treatment plan? Have you and your physician discussed a return to work plan?
- What parts of your treatment plan seem to be helping the most?
- How do you measure improvement in your condition?
- How is your returning to work being incorporated into this plan?
- When do you anticipate this return to work occurring?

- What treatment providers have you seen and which are you currently seeing?
- Whom would you consider as your primary doctor? Would this be the doctor who would be responsible for your return to work plans?
- When was your most recent doctor's visit(s)? What visits do you have planned in the near future?
- Are you exercising regularly or doing physical therapy as part of your treatment plan?
- What medications including any herbal medicines or supplements are you currently taking? How long have you been taking these medications and have there been any recent changes? Who is prescribing these medications?
- Have you been referred to a psychologist, psychiatrist, counselor, or pastor for counseling or for testing?
- Have you received Cognitive Behavioral Therapy or discussed Cognitive Behavioral Therapy with your doctor?
- What testing has been completed, or is planned to be completed? What were the findings of these tests?

## EMPLOYMENT

- Can you please explain to me your exact duties of your occupation?
- Have there been any changes in your duties within the last two years?
- Did you enjoy your job? What part of your job did you enjoy the most and what part did you find the most challenging?

## SOCIAL

- How do you spend your day? Can you please describe how these activities have changed?
- What parts of your regular household duties are you still able to do and what parts have become more challenging?
- Do you have children? (ages) Are you the sole caregiver for your children?
- Does someone currently assist you with your household duties, What assistance do they provide?

- Have you applied for or are you receiving any other disability benefits?
- Is there any activity that energizes you or makes you feel better?
- Are you involved in any outside activities such as social groups or support groups? How often do these groups meet?
- Do you have anyone with whom you speak regularly about your condition?

# FIBROMYALGIA – EMPLOYER CALL

## Setting Expectations with the Employer

Gather Information
- Clarify the insured occupational duties as described by the insured in the initial telephone call
- Ask if there have been any recent job changes/responsibilities
- Ask if the insured is still employed
- Ask if the job description we have in our files accurately describes the duties of the insured
- Performance Issues
- Ask if there have been any visible changes in productivity and if so, when did they start?
- Ask if the insured has experienced any personal conflicts at work – i.e., issues with coworkers or supervisors

Discuss Return to Work Options
- Establish employer's willingness to accommodate
- Ask if employer desires to have the insured return to work
- Discuss and verify any suggested accommodations required for the insured to return to work
- Ask if insured has indicated to the employer that he wants to return to work and his plans for doing so

## NURSE TO PHYSICIAN'S OFFICE CALL

In order that we may obtain a more complete understanding of our insured condition, our Clinical resources will be contacting the treating physicians office for medical information regarding our Fibromyalgia claimants current diagnosis, treatment, medications, restrictions and limitations and prognosis. We anticipate that this call will help determine where the claimants are in their treatment plan (or lack of) and prognosis.

- How long has (patient's name) been seeing (physician's name)?
  - What is the frequency of treatment?
  - Last appt?
  - Next appt.?

- What are the current diagnoses/complaints listed in the records?

- What medication is the patient currently taking?

- What other physicians, health care professionals, exercise or physical therapists, etc. has the patient been referred to?

- Have you performed any formal mental status examinations?

  - Did you note any abnormalities?

- Are you aware of any evaluation or treatment by a psychiatrist, psychologist, or counselor?

  - Are you aware of any formal psychological or neuropsychological testing that has been done?
  - Are you aware of any referrals for evaluation or treatment along these lines?

- Does the claimant complain of depression, anxiety, panic attacks, insomnia, trouble eating, and memory problems, problems with concentration or any other cognitive functions?

- Please fax copies of recent lab work (diagnostic testing) i.e., MRI, CT scans, EMG, EEG, EKG, NCS, x-rays, etc.

- Does it appear that he/she is progressing, remaining stable, or regressing?

- Are there services (our vocational/case management staff) could offer to (insured's name) which would assist in restoring (insured's name) to his predisability functional capabilities?

Please add any additional information that you believe would be helpful.

## PHYSICIAN PEER TO PEER CALLS

### CLARIFICATION OF FUNCTIONALITY

Are you open to discussion on how we might work together to help return your patient to work?

In what way is the patient functionally impaired?

1. What is their activity level?
   - Can they work? Can they work in their occupation?
   - Shop?
   - Travel?
   - Drive?
   - Do household chores?
   - Care for children?
   - Care for self?

2. What impact, if any, has there been on patient's ADL's?

3. What objective measurements have been obtained to support impairment?

4. Has there been graded exercise testing either on a treadmill or a cycle-ergometer to determine maximum energy expenditure?

5. If there is range of motion impairment noted in the file, has the ROM impairment been measured (e.g., with a goniometer?) "Pain with no ROM limitation constitutes no impairment." (article in Journal Of Insurance Medicine 2001, volume 33:170-182)

### COGNITIVE ISSUES

Has the insured complained of problems with memory, concentration, or other cognitive functions? Have you observed problems in these areas?

1. How have they been documented?
2. Formal Mental Status Examinations? If so, what were the results?
3. Formal neuropsychological testing? If so, what were the results, or can you tell us who did the testing? If not, have you considered testing in any way?

Has the claimant complained of or exhibited signs of depression, anxiety, appetite changes, sleep disturbance, or any other psychiatric symptoms?

16

1. How have you addressed these?
2. Has there been a psychiatric referral?
3. A referral for psychotherapy or counseling?
4. To what extent do you think these issues impact the insured's symptoms?
5. Do you think there are functional issues that impact the symptoms, such as poor motivation, symptom magnification, secondary gain, job-site or home stress, or a tendency to express emotional issues through physical complaints?
6. If the patient wanted to return to work, would you support this?

## THERAPY

1. What therapy has been tried?
2. What has been the response?
3. How about non-pharmacological intervention?
4. Cognitive behavioral therapy?
5. Exercise based therapy?
6. Has occupational therapy been tried?
7. What was the impact?

## RETURN TO WORK

If the patient wanted to return to work, would you support this in his/her occupation?

1. Discuss the benefits of return to work on patient's overall health and well being.
2. Discuss UnumProvident's return to work philosophy and how we are willing to commit clinical and vocational resources to partner with the treating provider and employer to help patient/claimant return to work.
3. Discuss negative aspects of discontinuing work.

37