IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


CASE NUMBER:  2:05-CV-1217-MEF

Betty Bullard,

      Plaintiff,

      vs.

UnumProvident Corporation, et al.,

      Defendants.


S T I P U L A T I O N

      IT IS STIPULATED AND AGREED by and
between the parties through their respective
counsel, that the deposition of Betty
Bullard may be taken before Sara Mahler,
CSR, at the offices of Beasley, Allen, Crow,
Methvin, Portis & Miles, at 272 Commerce
Street, Montgomery, Alabama 36103, on the
8th day of March, 2006.


DEPOSITION OF BETTY BULLARD

46798


#1

Page 10

1          A.      No.

2          Q.      Can you state your full name

3     for the Record, please?

4          A.      Betty Jo Walding Bullard.

5          Q.      And how do you spell the Joe,

6     J-O?

7          A.      J-O.

8          Q.      All right.  Your date of birth

9     is ███████████?

10         A.      Yes.

11         Q.      And your Social Security ends

12     in 7612 -- Excuse me, 6712; right?

13         A.      6712.

14         Q.      Do you have a current Alabama

15     driver's license?

16         A.      I do.

17         Q.      Do you presently drive?

18         A.      Not very much.

19         Q.      Okay.  Do you know your

20     driver's license number?

21         A.      I do not.

22         Q.      Have you got it with you?

23         A.      I do.

Page 32

1   companies?

2        Q.    Yes, ma'am.  For right now,

3   other insurance companies.

4        A.    No.

5        Q.    Okay.  And I noted from the

6   information that your attorney provided that

7   you have made a claim for Social Security

8   benefits; correct?

9        A.    Yes.

10       Q.    And the document that you have

11  Bates -- that your attorney has Bates

12  stamped BULL 0861 is a copy of the signature

13  page on your Social Security application;

14  correct?

15       A.    Correct.

16       Q.    And the Social Security

17  Administration asked you to fill out a daily

18  activities questionnaire; is that correct?

19       A.    Yes.

20       Q.    I will show that to you here.

21  BULL 0868 through 879, is what I'm handing

22  you.  Can you confirm for me that that's a

23  copy of the questionnaire and your response

Page 33

1    to that questionnaire?

2         A.    Yes.

3         Q.    And you've had an opportunity

4    to review your responses to the questions in

5    this activity questionnaire, have you not?

6         A.    Yes.

7         Q.    And are your responses in this

8    questionnaire truthful and accurate?

9         A.    Yes.

10        Q.    Next I'm going to hand you an

11   opinion or a ruling of the Social Security

12   Administration.  It's been Bates labeled by

13   your attorney BULL 0881, through BULL 0886.

14   And I'll ask you if that is, in fact, a copy

15   of the Social Security Administration's

16   ruling on your claim for disability

17   benefits?

18        A.    Yes.

19        Q.    And is it true, Ms. Bullard,

20   that the Social Security Administration

21   denied your claim for Social Security

22   benefits?

23        A.    Yes.

Page 34

1      Q.    And is it true that the Social

2  Security Administration advised you in this

3  letter dated August 8, 2005, as follows:  We

4  have determined that your condition is not

5  severe enough to keep you from working?  We

6  considered the medical and other

7  information, your age, education, training

8  and work experience in determining how your

9  condition affects your ability to work.

10     A.    Your question was?

11     Q.    Is that what they advised you

12  in this letter?

13     A.    It is, yes.

14     Q.    And they invited you to appeal

15  this decision if you so chose; correct?

16     A.    Yes.

17     Q.    Have you chosen to appeal this

18  determination?

19     A.    Not yet.

20     Q.    Okay.  Do you have an attorney

21  assisting you with this --

22     A.    No.

23     Q.    -- Social Security claim?

Page 51

1    what the question was?

2         A.    Could you repeat it.

3         Q.    (By Mr. Fink) I just want to

4    confirm that that's the policy you referred

5    to in your complaint?

6         A.    Yes.

7         Q.    And what I really want to do

8    is make sure you're not going to say:  Oh,

9    no, no, no, this isn't what I'm talking

10   about at all.  I meant some other thing.

11                    (Defendant's Exhibit 4 was

12                     marked for identification

13                     purposes.)

14        Q.    Same thing with Exhibit 4.

15   This is a life insurance policy, and it

16   bears the number 552580, which I'll

17   represent to you are the same numbers

18   referenced in paragraph seventy-one of your

19   complaint.  Is that the life insurance

20   policy which you refer in your complaint?

21        A.    Yes.

22        Q.    Okay.  Who paid the premiums

23   on these policies?

Page 52

1        A.        I did.

2        Q.        You paid them out of your own

3   pocket?

4        A.        They came out of my salary.

5        Q.        Okay.  How did that work?  Was

6   there a payroll deduction?

7        A.        I'm not sure how they -- They

8   present it to us as part of our package.

9        Q.        Uh-huh.

10        A.        And, I mean, it is told that

11   it's part -- You know, we don't get our

12   salary, especially the secretaries, it's not

13   a high salary.  So this is something that is

14   offered to us.  Kind of it compensates

15   because it's something that we all want and

16   need.  And it's kind of a compensation

17   toward not having as much of a salary.

18        Q.        Okay.

19        A.        It's a package.

20        Q.        I'm going to jump ahead on my

21   exhibits here, in light of your answer, and

22   I'm going to show you Exhibit 6, which is an

23   Employment Statement that was submitted to

Page 53

1    Unum Life by your employer.  And there on

2    question number six it indicates that a

3    hundred percent of the premiums are paid by

4    the employer.

5         A.    Well, but to us --

6              MR. SINCLAIR:  Let him ask a

7    question and then answer his question.

8              THE WITNESS:  Okay.  I'm

9    sorry.

10         Q.    Do you see where I'm talking

11    about there on number six, on Exhibit 6?

12         A.    Yes.

13         Q.    Do you contend that that's

14    inaccurate?

15         A.    In the way it's represented to

16    me, it is part of my salary.  It comes --

17         Q.    Okay.  But you're not -- It's

18    not your testimony that you actually had to

19    pay either on a weekly or a monthly basis

20    that you had to write a check for the

21    premium for either the disability or life

22    insurance?

23         A.    No.

Page 54

1    Q.    Nor is it your understanding

2  that there was a specified amount through a

3  payroll deduction that was taken out of your

4  check to cover those premiums?

5    A.    No.

6    Q.    You just understood it to be a

7  benefit of your employment; correct?

8    A.    Correct.

9    Q.    Okay.

10    A.    But because of this, it means

11 my salary is not as much as if I was not

12 getting the benefits.  If I was not taking

13 this, then my salary would be more.  So I

14 consider it really is part of my salary.

15    Q.    Okay.  Did you ever receive

16 any documentation from the Annuity Board

17 that stated that?

18    A.    We always -- Every year we are

19 given, and it shows in one section where if

20 we -- you know, with the benefits as part of

21 our package, as part of our salary, what it

22 entails, what the bottom line is, and if we

23 were not getting those benefits what it

Page 59

1    given to you without your having to request

2    it?

3             A.       I requested it.

4             Q.       Okay.  Did you have questions

5    about your coverage?

6             A.       I wanted to be sure I

7    understood what I thought I understood.

8             Q.       Did you request copies of the

9    actual policies?

10            A.       I did.

11            Q.       From whom did you request

12   those?

13            A.       Ginny Hancock, the insurance

14   person.  I'm not sure of her title.

15            Q.       The insurance person at the

16   Annuity Board?

17            A.       No, at the Convention, the

18   State Convention.

19            Q.       You requested copies of the

20   actual policies?

21            A.       Yes.

22            Q.       Was that at or about the time

23   that you were given this handout?

Page 60

1          A.     Yes.

2          Q.     Okay.  And what was Ginny

3     Hancock's response?

4          A.     She did not have that to

5     provide to me, or she wasn't supposed to.  I

6     don't recall how it was worded, but she

7     could not get it for me.

8          Q.     Did you make any further

9     inquiry?

10         A.     No.

11         Q.     You never called Unum Life and

12    said:  Hey, I'd like a copy of this policy?

13         A.     No.

14         Q.     I noted that there are

15    actually two copies, I think they're the

16    same thing, but two copies of this

17    documentation that starts at BULL 1084,

18    another copy of BULL 0898, through 900.

19              Do those look to you to be the

20    same document?  They've got the same print

21    date off the Internet on the bottom.  05/08

22    of 2002.  Do you think that's about the time

23    you would have received this documentation?

Page 61

1        A.       I'm not sure.

2        Q.       Okay.  Was it Ginny Hancock

3   that provided you this three-page handout?

4        A.       Yes.

5        Q.       What did she -- What, if

6   anything, did she tell you about the

7   coverage when she gave you this?

8        A.       She kind of went over the same

9   things that I later read.

10       Q.       From the handout?

11       A.       Yes.

12       Q.       All right.  In paragraph

13  twenty-two of your complaint, you've still

14  got that.  Paragraph twenty-two of the

15  complaint, you state that:  On September 1,

16  2004, defendants notified plaintiff by

17  letter of their denial of her claim for

18  disability benefits and subsequently

19  notified her on September 9 that she was

20  denied a waiver of premium.

21                        (Defendant's Exhibits 4.1

22                        and 4.2 were marked for

23                        identification purposes.)

Page 67

1   going through my file and found that it had

2   not been sent.

3          Q.     Okay.

4          A.     So she gave it to me so that

5   we could send it.

6          Q.     Okay.  Going back to 4.5, the

7   letter to you from Unum Life stating that --

8   in the second paragraph:  In our

9   conversation of March 4 you advised us of a

10  physician, Dr. Paul, that you began treating

11  with in the summer of 2004.

12                In review of your claim file

13  it was noted that we did not have medical

14  records from Dr. Paul within your file.  You

15  don't deny the accuracy of those statements,

16  do you?

17         A.     Could you say that again,

18  because I'm really not sure.

19         Q.     You don't deny the accuracy of

20  the statements contained within this letter

21  that has been marked 4.5, do you?

22         A.     No.

23         Q.     I'm sorry?

Page 68

1       A.      That is accurate.

2               MR. SINCLAIR:  If there's any

3   part of that letter --

4       A.      It's accurate.  But I had been

5   told that they were going to be getting

6   any -- I tried -- I offered to get records

7   at one point, and was told that -- I know

8   that they would get them.  But, yes, I got

9   this letter.  This is accurate.

10      Q.      Isn't it true that if Dr. Paul

11  had sent in a form like you had asked, we

12  would have known about her sooner?

13              MR. SINCLAIR:  Object to the

14  form.  Go ahead and respond.

15      A.      Yes.

16      Q.      I'm not saying it was your

17  fault that we didn't get Dr. -- know about

18  Dr. Paul until March.  If she would have

19  sent in the form, we'd have known about her

20  earlier; correct?

21      A.      Correct.

22              MR. SINCLAIR:  Same objection

23  to that one too.

Page 78

1    treatment for drug or alcohol problems?

2         A.    No.

3         Q.    Let's talk a little bit about

4    your preparation for this deposition.  And

5    I'll tell you right up front, I don't want

6    to know what you discussed with your

7    attorney.  So other than discussions with

8    your attorney, did you do anything in

9    preparation for today's deposition?

10        A.    No.

11        Q.    Let's talk a little bit about

12   your educational background.  I assume you

13   went to high school in Opp, Alabama?

14        A.    Yes.

15        Q.    What year did you graduate

16   from high school?

17        A.    1973.

18        Q.    And did you take any courses,

19   any college courses, after graduation from

20   high school?

21        A.    Not right after.

22        Q.    Okay.

23        A.    I later took, like, two

Page 79

1    semesters.

2         Q.    Was that in Auburn?

3         A.    AUM.

4         Q.    What years did you take those

5    courses, roughly?

6         A.    '80 -- 1982 or 3.

7         Q.    Okay.  You did not get a

8    degree from AUM?

9         A.    No.

10        Q.    Did you obtain any sort of

11   certificate?

12        A.    No.

13        Q.    Did you declare a major there?

14        A.    No.

15        Q.    Are you a member of any

16   professional organizations?

17        A.    We have a Secretary's

18   Conference thing.  I don't know what the

19   correct word -- through the Convention that

20   I'm a member of.

21        Q.    Did your membership in that

22   Conference entitle you to any benefits for

23   disability?

Page 82

1    of absence with the Convention?

2        A.    It would be more, at this

3    point, of a charity.  I really -- They are

4    still paying me a partial sum of my salary

5    and paying the insurance, my health

6    insurance, more out of the respect of -- I

7    can't work.  I don't have a spouse.  I don't

8    have no other way of being -- of supporting

9    myself.  And so, really, at this point, it's

10   more out of charity, because, be in mind,

11   what they had to do.

12       Q.    Have they paid you

13   continuously since you stopped working there

14   in May of 2004?

15       A.    Yes.  Again, the last several

16   months have been more out of charity because

17   I did not get paid from the disability and I

18   couldn't -- I can't work a full-time job.  I

19   can't work even a part-time job.  I should

20   not be working what I am currently working,

21   but I have to.

22       Q.    How much do you presently

23   receive from the Convention on a monthly

Page 83

1    basis?

2        A.     Before taxes, roughly, a

3    thousand dollars.

4        Q.     And what does that equate to

5    after you pay your taxes?

6        A.     About eight.

7        Q.     You get a check for, roughly,

8    eight hundred dollars a month.

9        A.     Twice a month.   Four hundred

10   each check.

11       Q.     Four hundred each check for a

12   total of eight hundred a month?   So,

13   basically, each check is for five hundred

14   dollars, your taxes are taken out of that,

15   and it equates to four hundred dollars

16   biweekly, or, roughly, eight hundred dollars

17   a month?

18       A.     Correct.

19       Q.     In addition to that sum of

20   money, you also receive benefits from the

21   Convention; correct?

22       A.     Health insurance.

23       Q.     Okay.   Do they continue to pay

Page 84

1    premiums on your disability and life

2    insurance?

3          A.     It's my understanding that no.

4    I mean, since this -- they did not approve

5    the disability and it did not go through, I

6    do not have either of those insurances.

7          Q.     So it's your understanding

8    they discontinued that coverage?

9          A.     Correct.

10         Q.     So, the only benefit, as you

11   understand it, that you receive from them in

12   addition to the compensation is the health

13   insurance coverage through Blue Cross Blue

14   Shield?

15         A.     Correct.

16         Q.     Do you still have any coverage

17   through CUNA?

18         A.     No.

19         Q.     Okay.  For how long have you

20   received a thousand dollars a month from the

21   Convention?

22         A.     I don't recall.  I believe it

23   may be since May of '85.

Page 87

1          Q.     Do you recall how much sick

2     leave was donated to you by other employees

3     of the Convention?

4                     (Off-the-Record discussion

5                     was held.)

6          A.     No.

7          Q.     Ms. Bullard, one of the

8     documents that your attorney provided us,

9     Bates labeled BULL 0856, which is a letter

10    from the Alabama Baptist State Convention to

11    you dated May 24, 2005, in which the writer,

12    W. Robert DuBois states that:  When you met

13    with Dr. Lance recently, he indicated that

14    your salary and benefits would continue

15    through May 31, 2005.

16                     In light of your application

17    status for disability coverage, Dr. Lance

18    has approved the following extensions.  It

19    says:  Number one, there's a garnishment

20    applied each pay period to your SBOM

21    compensation.  SBOM is State Board of

22    Missions; correct?

23         A.        Correct.

Page 88

1          Q.      What garnishment is he

2     referring to there?  He says:  As of today,

3     there's a balance of eight hundred fifty-six

4     dollars on that garnishment.  Do you recall

5     that?

6          A.      I had the Chapter 13, and that

7     was what was owed.

8          Q.      You filed for Chapter 13

9     bankruptcy back in 2001?

10         A.      Yes.

11         Q.      And in order to get discharged

12    as you were, I believe in 2005 --

13         A.      Yes.

14         Q.      -- you had to pay off the

15    amounts that you owed thereunder; correct?

16         A.      Yes.

17         Q.      And their letter goes on to

18    state:  The SBOM will retire that obligation

19    immediately.  Did they pay that on your

20    behalf?

21         A.      Yes.

22         Q.      Is there -- Do you have an

23    obligation to refund that money to them?

Page 89

1          A.      No.

2          Q.      It further states into

3    paragraph number two that:  A stipend of one

4    thousand dollars will be paid to you until

5    December 31, 2005 or you are approved for

6    Social Security disability.  Obviously,

7    we're beyond December 31, 2005, and you're

8    still receiving that stipend; correct?

9          A.      Yes.

10         Q.      Have you received either

11   written or verbal information indicating to

12   you that that will end at some point certain

13   in the future?

14         A.      Not specific time, no.

15         Q.      Okay.  Have you received any

16   indication that they will continue to pay

17   that for an indefinite period?

18         A.      No.

19         Q.      It also states in paragraph

20   number three that your single coverage Blue

21   Cross medical insurance will remain in

22   effect until December 31, 2005 or until you

23   are approved for Social Security disability.

Page 90

1              And, again, you told us that

2     you were denied Social Security disability;

3     correct?

4              A.     Correct.

5              Q.     But you further told us that

6     the Convention is continuing to provide your

7     single coverage Blue Cross medical coverage

8     to date; correct?

9              A.     Correct.

10             Q.     I'll ask you the same question

11    about that as I did about the thousand

12    dollar stipend.  Do you have any information

13    indicating that that Blue Cross coverage

14    will continue to be paid by the Convention

15    for a -- or until a certain date in the

16    future?

17             A.     No.

18             Q.     You just haven't had any

19    discussions with them about that?

20             A.     No.

21             Q.     Okay.  I asked you if you've

22    ever filed suit.  You've now told me about

23    the bankruptcy.

Page 91

1          A.      Sorry.

2          Q.      Have there been any other

3    suits that you've filed?

4          A.      In forever or for a certain

5    period of time.

6          Q.      Well, forever.  You filed --

7    Did you file both divorce actions?

8          A.      Well, the first one, I did.

9    The second one was kind of a --

10         Q.      Mutual?

11         A.      -- mutual, yeah.

12         Q.      Okay.  And then you filed the

13   bankruptcy.  Have you ever filed any other

14   legal action?

15         A.      Yes.  I wasn't thinking

16   bankruptcy as a legal.  I know it is.  I'm

17   sorry.  I just didn't have that.  The -- My

18   first divorce, my attorney then recommended

19   that I --

20              MR. SINCLAIR:  Wait.  Don't

21   repeat what an attorney tells you to do.

22              THE WITNESS:  Correct.  Okay.

23              MR. SINCLAIR:  Answer his

Page 102

1    Q.    Okay.  Why did she leave?

2    A.    I'm not sure.

3    Q.    Did you take her place?

4    A.    No.  She had been gone for

5    years.

6                    (Defendant's Exhibit 4.7

7                    was marked for

8                    identification purposes.)

9    Q.    Okay.  Exhibit 4.7 is a

10   7/22/02, office note from Janise H.

11   Whitesell.  And it notes there on the first

12   page, it says:  She is a single mom who

13   notes that she has two jobs.  Did you

14   have --

15   A.    What date is this?

16   Q.    '02.  7/22/02.

17   A.    That is probably when I had

18   just started with Sylvan.

19   Q.    Sylvan.  Okay.  Since your

20   employment with the State Convention, have

21   you held any jobs, aside from your temporary

22   position that you've already described with

23   Sylvan Learning centers?

Page 105

1        Q.      Okay.  And I'm just --

2        A.      Briefly, before I started

3    Moore's, I just had never put that on the

4    resume because they -- you know, I think

5    they even paid me in cash.

6        Q.      I'm not taking you to task

7    here.  I'm seeing maybe if I can jog your

8    recollection where it had that reference to

9    your jobs.  This usher at the Shakespeare

10   Theater, what does that involve?

11       A.      I just -- Well, I was just an

12   usher for a brief time.

13       Q.      Okay.  How recently have you

14   done that?

15       A.      Gosh, it's been years.

16                   (Defendant's Exhibit 4.9

17                    was marked for

18                    identification purposes.)

19       Q.      Okay.  That's fair enough.

20   Exhibit 4.9 indicates that your annual

21   salary, at least as of January 7, 2003, was

22   eighteen thousand, one hundred and eight

23   dollars.  Is that accurate?

Page 108

1    date?  And you wrote in:  5/21/04; correct?

2        A.    Correct.

3        Q.    Okay.  And, yet, you signed

4    this on 3/25/04; right?

5            MR. SINCLAIR:  The question

6    is, you signed this on 3/25/04; right?

7        A.    Yes.

8        Q.    Okay.  Do you know the reason

9    for the differences in those two dates?

10       A.    No.

11       Q.    Okay.  You would not have sent

12   this in until after May 21, 2004; correct?

13       A.    I did not send it in.

14       Q.    Okay.  And the dates stamp

15   there on Exhibit 5 says:  Annuity Board SBC,

16   and it's dated May 25, 2004; right?  Do you

17   see that, Annuity Board SBC May 25, 2004?

18       A.    Okay.

19           MR. SINCLAIR:  I'm sorry.  Did

20   you just say a moment ago you did not send

21   this in?

22           THE WITNESS:  No, I did not.

23           MR. SINCLAIR:  Okay.

Page 131

1      Q.     Change your position?

2      A.     Correct.

3      Q.     Stand up if you needed to?

4      A.     Yes.

5      Q.     Okay.

6      A.     At times.  Sometimes we were

7 so busy I could not.

8                 (Defendant's Exhibit 7 was

9                   marked for identification

10                  purposes.)

11     Q.     Right.  Under number four

12 where it asks for your job duties, it says:

13 Copy attached.  What was attached, as we've

14 just gone through, is what I've now marked

15 as Exhibit 7, which is State Board of

16 Missions Job Description.  Have you seen

17 that before?

18     A.     Yes.

19     Q.     Does it accurately reflect the

20 duties of your job as a secretary?

21     A.     Yes.  To an extent.

22     Q.     Is there something you want to

23 add to it?

Page 132

1          A.      When we had conferences, we

2    would have out-of-town conferences, and

3    therefore, we went for these conferences,

4    there was lifting, heavy lifting, you know,

5    of boxes and a lot of standing.

6          Q.      How often did you have

7    conferences?

8          A.      Three to four times a year, of

9    this type conference.

10         Q.      What type conference are we

11   to?

12         A.      Where it would be out of the

13   building.

14         Q.      Where would they typically be

15   held?

16         A.      In Shocco Springs Conference

17   Center in Talladega, Alabama.

18         Q.      Is that where most of them

19   were held?

20         A.      Yes.  And our office also was

21   responsible or the legislative prayer

22   luncheon, which we would have that here, but

23   out of the  building.  Again, it was one of

Page 133

1   those type conferences.

2          Q.      Okay.  And you said that

3   involved heavy lifting of boxes and a lot of

4   standing?

5          A.      Yes.

6          Q.      Were you expected to lift the

7   heavy boxes?

8          A.      Yes.

9          Q.      Okay.  When did you last

10  assist with one of those conferences that

11  involved heavy lifting of boxes and a lot of

12  standing?

13         A.      I didn't make the one for, as

14  I recall, the legislative prayer luncheon in

15  2004, and I didn't go to it.  It was

16  probably 2002, was the last one that I --

17  Because I was not able to go to the ones in

18  2003 and 4.

19         Q.      Okay.  Did they send someone

20  else in your stead or did they just get

21  along without you?

22         A.      Got along without me.

23         Q.      Any other duties, aside from

Page 134

1  those listed here?

2      A.    No.

3      Q.    At the bottom, under work

4  environment, it says:  This position is full

5  time and requires forty hours of work

6  weekly.  A minimum of eighty percent of the

7  work day is spent seated at a desk.  Is that

8  accurate?

9      A.    It really is, because phones,

10  also.

11      Q.    Is there a more accurate

12  number than eighty?  It says:  A minimum of

13  eighty.  Was it ninety, ninety-five percent?

14      A.    Some of the times, yes, it

15  could be ninety or so, at least, because a

16  lot of it was not only typing, but phones.

17                  (Defendant's Exhibit 8 was

18                   marked for identification

19                   purposes.)

20      Q.    Okay.  Let me show you Exhibit

21  8.  This is a compilation of Attending

22  Physician's Statements that were submitted

23  with your claim.  Have you seen those

Page 135

1    before?

2                        (Off-the-Record discussion

3                         was held.)

4         A.      Yes.

5         Q.      Okay.   Were you aware that

6    Dr. Thornbury had submitted an Attending

7    Physician's Statement in relation to your

8    claim?

9         A.      Yes.

10        Q.      Okay.   That's the first page

11   on here.   Were you aware that he noted that

12   you were released to work in your occupation

13   and that he listed no specific restrictions

14   or limitations?

15        A.      Yes.

16        Q.      Were you aware -- Well, let me

17   ask you before I get to there.   This

18   references Blue Cross Blue Shield.   And that

19   was, of course, your carrier through the

20   Convention; correct?

21        A.      Yes.

22        Q.      Your medical carrier.   The

23   second page is from Dr. Reuben Richardson.

Page 136

1    He's your sleep disorder specialist; right?

2         A.    Correct.

3         Q.    Before I get too far,

4    Thornbury is an orthopedist; right?

5         A.    Correct.

6         Q.    Sleep disorder specialist,

7    Reuben C. Richardson.  Were you aware that

8    he had also filled out a form?

9         A.    Yes.

10        Q.    Were you aware that he listed

11   no restrictions or limitations?

12        A.    There's another form later

13   that's different.

14        Q.    That was submitted after your

15   claim was submitted?

16        A.    Right.

17        Q.    Okay.  He references CUNA

18   Mutual Group for credit union, indicating

19   that he had completed forms regarding your

20   request for benefits under that?

21        A.    Yes.

22        Q.    Coverage?

23        A.    Yes.  We gave forms from each

Page 137

1    company.

2           Q.      Okay.  You provided those to

3    Dr. Richardson as well; correct?

4           A.      Correct.

5           Q.      Okay.  The third page is

6    Dr. Albert Foy.  He's an orthodontist;

7    right?

8           A.      Correct.

9           Q.      His statement indicates that

10   you were treated by Dr. Farha, F-A-R-H-A.

11          A.      Correct.

12          Q.      For TMJD; correct?

13          A.      Yeah.

14          Q.      Dates unknown.  Who is

15   Dr. Farha?

16          A.      He is a TMJ specialist.  And I

17   made note that when they gave me the forms

18   and told me to get them to all of the

19   doctors, and they told me any doctors I had

20   seen in the last, I forget how many years.

21   And I probably went too far back with the

22   doctors because -- And I don't know that --

23   I was never sure if Dr. Farha sent anything,

Page 138

1    probably not.  It was too far back.

2          Q.      When did you last see

3    Dr. Farha?

4          A.      Probably 2001 or 2002.  I'm

5    not sure.

6          Q.      Are you aware that Dr. Farha

7    noted on this form, "none" under

8    restrictions and limitations?

9          A.      Yes.

10                      (Defendant's Exhibit 9 was

11                       marked for identification

12                       purposes.)

13          Q.      Okay.  Exhibit 9 is an

14    Attending Physician's Statement from Allen

15    Downs.

16              MR. SINCLAIR:  Tell me the

17    stickers aren't missing up to 25.

18              MR. FINK:  Well, no, but we're

19    going to breeze through those.  Seriously, I

20    only have, like, one question from most of

21    these forms.

22          Q.      How did you come to seek

23    treatment from Allen Downs?

Page 141

1    seeking disability benefits from either a

2    private disability insurer or from Social

3    Security?

4          A.      At this time?

5          Q.      Yes, ma'am.

6          A.      No.

7          Q.      Okay.  You've already

8    confirmed that, aside from your job at

9    Sylvan Learning Center, you have not worked

10   at all since May 31, 2004?

11         A.      Correct.

12         Q.      Since your job with the

13   Alabama State -- excuse me, the Annuity

14   Board of the Southern Baptist Convention,

15   have you applied for or pursued any other

16   jobs other than your Sylvan Learning Center

17   job?

18         A.      I think I answered that

19   before.

20         Q.      And your answer was no;

21   correct?

22         A.      Yes.

23         Q.      Have you been told by anyone

Page 147

1   how many feet or yards that would have been

2   from your office area?

3          A.     Oh, gosh.   I'm not good with

4   measurements like that.   I'm really not

5   sure.

6                 MR. SINCLAIR:  Are you at a

7   stopping point?

8                 MR. FINK:  Yes.  We can stop.

9                 (Recess taken.)

10         Q.     (By Mr. Fink) We're right back

11  after lunch.  And as your attorney just

12  pointed out, I'll probably ask you what

13  medication you just took.

14         A.     Adderall.

15         Q.     Adderall.  And what do you

16  take Adderall for, Ms. Bullard?

17         A.     Narcolepsy.

18         Q.     Okay.  Just before lunch we

19  were looking at Exhibit 7, which is a job

20  description of a secretary with the State

21  Board of Missions.  And it lists -- It says

22  seven, but, actually there are eight,

23  because seven is duplicated, or the numeral

Page 148

1    seven is duplicated, essential duties and

2    responsibilities.  Are these the material

3    and substantial duties of a secretary with

4    the State Board of Missions?

5              MR. SINCLAIR:  Objection to

6    the form.

7         A.    I believe I had answered it

8    before that with the exception of, you know,

9    the events that I have to do more standing

10   and heavy lifting.

11        Q.    When you're getting -- You

12   said when you're getting ready for

13   conferences three to four times a year.

14        A.    And work at conferences.  And

15   we actually go in and work at conferences.

16        Q.    But you said you haven't done

17   that in 2003 or 2004?

18        A.    I think that's correct.  If I

19   remember correctly.

20        Q.    All right.  What I'd like you

21   to do is, I'd like to talk about each one of

22   these eight items, each of these eight

23   duties, and ask you what you actually did in

Page 169

1    your house?

2          A.       Eight or nine miles.

3          Q.       How long did it take you to

4    get there in the morning?

5          A.       With traffic, thirty minutes.

6          Q.       Looking at those duties that

7    you've told me about on Exhibit 7, are you

8    able to perform any of those duties today?

9    Let's just go through them.  Number one:

10   Prepare office correspondence as directed by

11   the office director and associates?

12         A.       I would not be able to type.

13         Q.       Can you type at all?

14         A.       Not enough, not near enough,

15   no.  I mean, I could a type very small -- I

16   really don't know.  I haven't tried since

17   I've been gone.

18         Q.       But you maintain that you

19   couldn't?

20         A.       But I had got to that point

21   that I was not able to function enough to

22   stay awake, to stay out of the bathroom, you

23   know, the pain in my hands, my neck, all of

Page 170

1    it together.  I got to the point I could not

2    do it.

3          Q.     Do you have a computer at your

4    home?

5          A.     I have one, yes.

6          Q.     Do you use it?

7          A.     Not for typing.  My son and I

8    both use it for, like, e-mails sometimes, I

9    mean, just to check, but not a lot of typing

10   or anything like that.  But my son uses it

11   more than I do.

12         Q.     How much time a day do you

13   spend on it?

14         A.     Oh, gosh.  I probably don't

15   spend fifteen minutes.

16         Q.     Okay.  Do you have a modem or

17   do you have a faster connection than that?

18         A.     Yes.  It is does -- My son had

19   a modem put in, yeah.  I had a dial up, but

20   when he was there he had a modem.

21         Q.     Do you have, like, Comcast?

22   Do you have DSL?  Do you know what you have?

23         A.     I mean, it's through Knology.

Page 171

1    It's a DSL type of thing.

2            Q.      And you use it about fifteen

3    minutes a day, to check e-mails you said?

4            A.      Yeah.  My daughter might send

5    me something, you know, or, like, she sends

6    me pictures, you know.  She sent me two

7    pictures last night.

8            Q.      You don't spend time surfing

9    the Internet?

10           A.      Oh, no.

11           Q.      Back to the duties.  Prepare

12   for conferences related to the office that

13   include material preparation and promotion.

14   Are you able to do that, as you sit here

15   today?

16           A.      Excuse me.  Which number?

17           Q.      Number two.

18           A.      No, I would not be able to

19   type and put together the packets and things

20   that I did.

21           Q.      Why couldn't you do that?

22           A.      Because of standing and

23   lifting, and a lot of these packets we're

Page 172

1    talking might have a hundred pieces in it.

2    And you'd have to, you know, be able to pick

3    up and put it all in there and do this for a

4    while, and stand for a long period of time.

5         Q.    A hundred pieces of paper?

6         A.    Yes.

7         Q.    Number three:  Prepare weekly

8    requisitions in keeping with accounting

9    office guidelines and maintaining financial

10   records for the office.  Could you do that

11   today?

12        A.    Again, the typing would be

13   hard.

14        Q.    It would be hard, but could

15   you do it?

16        A.    I do not think I could do it,

17   no, I do not.

18        Q.    Anything else, aside from the

19   typing, that would keep you from performing

20   that duty?

21        A.    The copy on that one might be

22   bad.

23        Q.    Number four:  Serve as a point

Page 173

1    of contact for guests entering the office by

2    telephone or in person.  Could you do that?

3         A.    I would not be able to sit and

4    hold the phone like I did before.

5         Q.    Okay.  What would prevent you

6    from sitting and holding the phone?

7         A.    My back, my hips, the

8    arthritis in my back and hips and

9    degenerative joints in my back and hips.

10        Q.    Okay.  How do you spend most

11   of your day presently?  Do you spend it in a

12   seated position?  Do you stand?  Do you

13   alternate a good bit?

14        A.    I alternate a lot.

15        Q.    Okay.  If you had to say, I

16   mean, there are only so many positions you

17   can be in, you could be standing, sitting,

18   or, I guess, lying down.  Would you agree

19   with me on that?

20             MR. SINCLAIR:  Objection to

21   the form.

22        A.    Yes.

23        Q.    In a twenty-four hour period,

Page 174

1  how much time do you say you spend lying

2  down?

3        A.    It varies, again, because I'm

4  up and down, even during the night.  I might

5  -- I mean --

6        Q.    I understand that,

7  Ms. Bullard, I mean, that's a fairly simple

8  thing to say, you know:  I spend so many

9  hours lying down or I spend so many hours

10  sitting or standing.

11        And my question remains:  If

12  you had to give an answer, how many hours,

13  roughly, do you spend, in a twenty-four hour

14  day, in a lying down position?

15        MR. SINCLAIR:  She already

16  gave the answer to that.  She didn't know.

17        Q.    Do you lie down to sleep?

18        A.    Excuse me?

19        Q.    Do you lie down to sleep?

20        A.    When I try to sleep, yes.

21        Q.    How many hours a day do you

22  lie down and try to sleep?

23        A.    Again, that varies.

Page 175

1      Q.      Do you spend half your day

2   lying in bed?

3      A.      No.

4      Q.      Okay.  Do you spend a third of

5   your bed lying in bed?

6      A.      No, I would not say a third.

7      Q.      Less than a third?

8      A.      Probably.  I'm up and down,

9   I'm in the recliner, I'm in the bed, I'm

10  walking, I'm standing.

11     Q.      Do you think you spend more or

12  less than a third of your day standing,

13  which would include walking?

14     A.      Again, it would vary, but it

15  would be hard to say.

16     Q.      Okay.  I can appreciate that

17  it would be hard to say.  But if you had to

18  say more or less than eight hours a day in

19  an average day, how much time do you spend

20  standing, more or less than eight hours?

21     A.      Less.

22     Q.      Would you say more or less

23  than four hours?

Page 176

1       A.      Less.

2       Q.      Less than four hours standing.

3   Would you say more or less than two --

4       A.      Are you talking about -- You

5   said walking, also.  I'm trying --

6       Q.      Including standing, too, and I

7   include walking.

8       A.      I would still say it would be

9   less than four hours.

10      Q.      Okay.  Could you say that it

11  would be more or less than two hours?

12      A.      No.  It would be more than

13  that.  Again, it's going to vary.

14      Q.      I understand.  With regard to

15  sitting, would you say you spend more or

16  less than eight hours a day in a seated, as

17  opposed to a lying position?

18      A.      Less than eight hours.  It

19  varies.  I really cannot put -- on this.  I

20  mean --

21      Q.      You feel on a balance on an

22  average day you spend less than eight hours

23  sitting?

Page 177

1      A.      You know, when I hurt, if I'm

2   hurting when I'm sitting, I get up and walk

3   around.  It just varies.  I don't count the

4   time.  I do what I feel like I have to do at

5   the time.

6      Q.      Do you have wide fluctuations

7   in a given day or a week as to the amount of

8   pain that you're experiencing?

9      A.      A wide?

10      Q.      Yes, ma'am.

11              MR. SINCLAIR:  Go ahead.  You

12   already picked that up.  Objection to the

13   form.

14      A.      Can you specify what you mean

15   by wide?

16      Q.      Sure.  You said that if you're

17   in pain, it may affect it.  Are you in

18   constant pain?

19      A.      Yes.

20      Q.      Okay.  Does your pain vary

21   from day to day?

22      A.      Some.

23      Q.      Okay.  How much does it vary,

Page 178

1    from what to what?

2         A.    Some days it could -- It could

3    be a wide range sometimes.  Sometimes it can

4    be excruciating, sometimes I can manage to

5    get comfortable for just a few minutes at a

6    time, and some days I can't manage to get

7    comfortable at all.

8         Q.    Okay.  On those days when you

9    can get comfortable for a period of time, do

10   you spend less time lying down?

11        A.    I would say yes.

12        Q.    On those days where you have

13   excruciating pain, are you spending your

14   whole day in bed?

15        A.    No.

16        Q.    Okay.  You're still getting up

17   and performing activities?

18        A.    I'm trying to move around.  I

19   try everything.

20        Q.    Do your activities change a

21   lot from day to day?

22        A.    Again, that varies.  It's

23   going to vary.

Page 179

1          Q.      Do you remember the Social

2     Security report that you filled out about

3     your activities of living?  There you took

4     an average; right?

5          A.      I don't remember that, I mean,

6     exactly.  I mean, I answered their questions

7     the way they asked them.

8          Q.      You got pretty specific about

9     what you did in a given day.  Do you

10    remember that?  And what I'm asking you is

11    what you do in a given day?

12               How much of your time do you

13    spend lying, versus, sitting, versus

14    standing?  And I understand that it may vary

15    from day to day, and that there will be some

16    variations, but what I'm asking you for is,

17    on average, how much of your time you spend

18    in a given day lying down, how much of your

19    time you spend in a given day, in a seated

20    position, and how much of your time you

21    spend in a given day standing?

22               MR. SINCLAIR:  Don't guess,

23    but if you know, please answer.

Page 180

1    A.    I don't know.

2    Q.    My point is that no one would

3  know better than you.

4    A.    But, again, because it varies,

5  I can't put that kind of a specific.

6    Q.    Okay.  Let's talk about

7  yesterday, March the 7th of 2006.  What did

8  you do -- What time did you -- Well, let's

9  start at midnight or twelve o'clock in the

10  morning, were you in your bed at twelve

11  o'clock yesterday morning?

12    A.    Twelve o'clock a.m. in the

13  morning?

14    Q.    Yes, ma'am.  Let's use 12:01

15  to make it easier.  12:01 a.m. on March the

16  7th, were you in bed?

17    A.    You know I really don't look

18  at the clock.  I mean, I am up and down.

19    Q.    I understand.

20    A.    I don't know.

21    Q.    Did you arise at some point

22  yesterday morning from a sleep?

23    A.    Yes.  I arose several times

Page 181

1    from -- because I may sleep for an hour and

2    I wake up early and I get up.

3         Q.    What time did you get up

4    yesterday morning?

5         A.    The final time?

6         Q.    Yes, ma'am.

7         A.    Seven o'clock.  I mean, yeah.

8    I mean, you're talking about that's supposed

9    to be the time that I arose from a -- from

10   my night?

11        Q.    I'm awake and I'm not going to

12   the bathroom to return to bed.  I'm awake

13   now.  That was seven o'clock that you got

14   up?

15        A.    (Witness nods head in the

16   affirmative).  Yes.

17        Q.    Okay.  So let's call that --

18   Let's call that seven hours lying down.

19   Okay?  We're keeping a tally for the day.

20        A.    Seven hours lying down?

21        Q.    Yes, ma'am.

22        A.    Where did you come up with

23   that number?

Page 182

1        Q.      Let's just say from midnight

2    to seven o'clock in the morning.

3        A.      But I didn't stay in the bed

4    that whole amount of time.

5        Q.      Okay.  How much of that

6    seven-hour period -- I'm having to get at it

7    slowly, how much of that seven-hour period

8    between 12:01 a.m. and seven o'clock a.m.

9    did you stay in a lying-down position

10   yesterday morning?

11       A.      I did not time it.

12       Q.      Okay.  You have an idea way

13   better than I have of how much of that time

14   that you spent in a nonlying position.  I'm

15   not trying to be difficult, Ms. Bullard, I'm

16   just trying to get some feel.

17       A.      Again, I may sleep for an

18   hour.  I may sleep for two hours.  I wake up

19   hurting on an average -- I may not -- I get

20   up and I move around.  I go sit in the

21   recliner.  I may stay there for an hour.  I

22   may stay there for thirty minutes, and then

23   I go back and try it again.  And I may go to

Page 183

1   sleep or I may lay there for thirty minutes

2   or an hour and I may get back up.

3          Q.      Do you recall how many trips

4   you took from your bed to somewhere other

5   than the bathroom and back to bed yesterday

6   morning before you arose around seven

7   o'clock?

8          A.      No.  I honestly do not

9   remember.

10          Q.      You can't tell me whether it's

11   four, or whether you spent four hours in bed

12   or seven hours in bed?

13          A.      I don't spend my time counting

14   it.  I just do it.  Whenever I need to move

15   or get rearranged, I do it.  I don't pay

16   attention to it.

17          Q.      Let's try to move forward from

18   seven o'clock.  What do you do after you get

19   up?  You say you got up around seven

20   o'clock.  I appreciate that you may have

21   gotten up before seven o'clock and gone and

22   laid in the recliner and then gone back to

23   bed before you finally awoke or arose at

Page 184

1    seven o'clock.  What did you do after seven

2    o'clock?

3         A.       Take my medicine.  Usually I

4    have a heating pad with my recliner.  And I

5    try to get my back -- You know, I try to

6    start working the pain, the stiffness out.

7    And so after about an hour, I usually eat

8    something.

9         Q.    So, you spent an hour in the

10   recliner and then you get up and fix

11   yourself something to eat?

12        A.       Not necessarily for the whole

13   hour.  I sit in the recliner for a few

14   minutes and then I get up and walk around

15   for a few minutes.  I'm trying to get myself

16   awake and alert and get the stiffness out.

17        Q.       And then you get up and fix

18   yourself something to eat; right?

19        A.       Yes.

20        Q.       How long does that take you?

21   Do you make eggs and bacon or do you --

22        A.       No.  I usually eat -- I might

23   try something once or twice, but usually I

Page 185

1    have cereal or yogurt.

2         Q.    Do you eat that sitting at

3    your table?

4         A.    Sometimes.

5         Q.    Do you sit and read the paper,

6    or what else do you do?

7         A.    No.  I don't even get the

8    paper.

9         Q.    Okay.  So, how long do you

10   normally spend eating breakfast?

11        A.    Fifteen minutes.  Fifteen or

12   twenty minutes.

13        Q.    What do you typically do after

14   that?

15        A.    I usually go back -- maybe to

16   the recliner.  Whatever.  You know, if I'm

17   hurting, if I feel like I -- If I feel like

18   I would feel better sitting in the recliner,

19   I go to the recliner, if I don't, if I feel

20   like I should move around, I just try to

21   move around some in the house.

22        Q.    After you arise in the morning

23   from your bed, do you typically spend your

Page 186

1    day alternating between sitting in the

2    recliner and walking around?

3         A.    Or sometimes I do go back and

4    lay down, even.

5         Q.    Okay.  Do you do that on a

6    regular basis?  Do you take regular naps

7    during the day?

8         A.    I do have a tendency to take a

9    nap after lunch sometimes, because with the

10   narcolepsy, when you eat, if you -- you have

11   that feeling of -- that you need -- that

12   you're going to fall asleep or whatever.

13              And if I feel like that, if I

14   feel like that -- A lot of times I have

15   tried to -- If I'm going to be at home, not

16   take the Adderall or the prevential

17   medication because if you -- My doctor has

18   told me that if I can leave it off some, it

19   will be more effective.

20        Q.    When you need it?

21        A.    When you need it.  And so if

22   I'm not going to be -- You know, if I'm

23   going to be, then I might try to leave --

Page 187

1    take a nap.

2            Q.        If you're not in a position

3    where you -- If you're in a position where

4    you can take a nap, there's no need for you

5    to take medication to prevent you from

6    taking a nap, is that what you're saying?

7            A.        Correct.

8            Q.        When you do take your naps,

9    how long do you normally take a nap?

10           A.        I usually wake up within an

11   hour, thirty minutes to an hour.

12           Q.        Okay.

13           A.        Because I usually start

14   hurting.

15           Q.        And then, how do you spend the

16   rest of your afternoon?  Is it again

17   alternating between sitting in your recliner

18   or walking around?

19           A.        Yes.

20           Q.        Would you say it's, roughly,

21   equal, half the time in the recliner and

22   half the time walking around?

23           A.        Probably.

Page 188

1        Q.    And then at some point do you

2   eat again?  You say that -- You noted that

3   you eat normally two meals a day.

4        A.    No.  I don't eat -- because,

5   Again, the time varies.

6        Q.    Do you typically prepare your

7   own meal in the evening?

8        A.    Sometimes my son does.

9   Sometimes I'll fix something.  Sometimes

10  I'll have -- people have brought things by.

11  It varies.

12       Q.    Okay.  What time do you

13  typically retire in the evening to go back

14  to bed?

15       A.    A lot of the time I try to go

16  back to bed around ten o'clock, 9:30, ten.

17       Q.    9:30 or ten.  And then do you

18  typically try to rest or stay in bed?

19       A.    Yes.

20       Q.    Until seven in the morning?  I

21  mean, is that kind of your routine, to

22  attempt to do that?

23       A.    That's what I would attempt to

Page 189

1    do, but it never happens.  And sometimes I

2    might not sleep at all.  I may be up more

3    than I'm sleeping.  And until, like I say,

4    maybe five o'clock, I may ease off and I may

5    fall asleep and, therefore, I may not get up

6    until nine or ten o'clock.  Because I

7    finally got eased off enough that I did

8    sleep.  But that happens on occasion.

9              I don't always get up at seven

10    o'clock.  I don't have a set time when I'm

11    -- you know, if I don't have to.  When I'm

12    just -- I just -- If I can ease off enough

13    and fall asleep, I fall asleep.  If I wake

14    up and I hurt, I get up.

15         Q.    Back to trying to get some

16    idea of what you do in an average day, let's

17    look at the past month.  And let me ask you

18    how many times you typically -- Strike that.

19              In the last month, do you

20    leave -- have you left the house an average

21    of more than one time a day?

22         A.    Leave the house?

23         Q.    Yes.

Page 190

1    A.    There's a lot of times I don't

2  leave the house maybe one or two times a

3  week.  A lot of days I never leave the house

4  unless to walk out to the get the mail or,

5  you know, walk in the yard to just walk

6  around for a minute.  Get some air, but as

7  far as going somewhere.

8    Q.    Going somewhere sometimes.

9  You only go somewhere one or two times a

10  week?

11    A.    Correct.  Most of the time I

12  don't --

13    Q.    Most of the time you only go

14  somewhere one or two times a week?

15    A.    Yes.

16    Q.    And where do you go those one

17  or two times a week?

18    A.    To the grocery store, the post

19  office, occasionally I do have --

20    Q.    Doctor's office visits?

21    A.    Yeah.  I have the doctor's

22  office visits.

23    Q.    Is there anywhere that you

Case 2:05-cv-01217-MEF-VPM    Document 18    Filed 10/05/2006    Page 61 of 127

Page 191

1  regularly go, aside from the grocery store

2  or the post office or the doctor's visits?

3      A.    No.  On occasion, I might go

4  get something to eat with a friend for an

5  hour, just to eat, but that doesn't --

6  That's very rare.  I don't go to church

7  anymore because I can't sit through the

8  service.

9      Q.    When did you last regularly

10  attend church services?

11      A.    It's probably been three years

12  since I was regular.

13      Q.    Okay.  What church did you

14  attend?

15      A.    Pinedale Baptist Church.

16      Q.    Are you still a member there?

17      A.    Yes.

18      Q.    Okay.  Do you ever run out and

19  grab something to eat by yourself?

20      A.    No.

21      Q.    How often do you eat out with

22  a friend?

23      A.    Maybe once a month, at the

Case 2:05-cv-01217-MEF-VPM    Document 18    Filed 10/05/2006    Page 62 of 127

Page 192

1    most.  It's not very often.

2          Q.      Who do you go out and eat

3    with?

4          A.      It varies.  Someone that I

5    used to work with, someone from the church.

6          Q.      In the last year, that you can

7    recall, who have you gone out to eat with?

8          A.      Names?

9          Q.      Yes, ma'am.

10         A.      Well, let's see.  I've went

11    out with Joanne Farmer.

12         Q.      Okay.

13         A.      I went out with Annette

14    Sutton.  She's retired from the program.

15         Q.      Anyone else that you can

16    recall?

17         A.      Yes.  I'm sorry.  Is that what

18    you said, is that all I could recall?

19         Q.      That's all you can recall?

20         A.      Yes.

21         Q.      Okay.  We were talking about

22    your duties, and I was asking you whether or

23    not you could perform these today.  We had

Page 193

1    gotten up to number four.  So let me go

2    forward with number five:  Assist in

3    preparing materials for meetings that are

4    office related.  Could you still do that

5    today?

6          A.     No.

7          Q.     And why not?

8          A.     Because, again, there would be

9    a lot of standing and lifting, making the

10   packets.  And these are the things that they

11   take with them.  It would be a lot of

12   standing and lifting.

13         Q.     How much lifting did you have

14   to do?

15         A.     We did a good bit.

16         Q.     What exactly were you lifting?

17   You mentioned a hundred sheets of paper;

18   right?

19         A.     Right.  We would do packets

20   with those.  We would put them in the boxes.

21   They may have -- You know, sometimes they

22   may have a thirty-people conference.

23   Sometimes they may have seventy or a

Page 194

1   hundred, and we would have to prepare

2   materials for all of them, packets.  And we

3   would have to lift that and have boxes of

4   envelopes and things that we would have to

5   move.

6           Q.      That's, roughly, a hundred

7   sheets of paper right there?

8           A.      Uh-huh.

9           Q.      Is that, roughly, what you put

10  in a packet?

11          A.      We have at times.  Some of

12  them aren't that big, but a lot of them are.

13          Q.      Okay.  And that's about

14  three-quarters of an inch to an inch.

15          A.      And we've -- A lot of times we

16  have to take them and have them -- And we

17  bind them because they wouldn't fit in the

18  folders.

19          Q.      Okay.  And you're not

20  contending that you'd be incapable of

21  lifting a hundred sheets of paper at a time?

22          A.      No.  I'm saying that we would

23  have it spread out and you'd have to stand

Page 195

1    and collate and put it all together in a

2    certain -- and you'd have to do that, you

3    know, a hundred times or fifty times.

4         Q.    So, it's the walking to take a

5    sheet from this stack, a sheet from this

6    stack and a sheet from this stack that

7    caused you the problem?

8              MR. SINCLAIR:  Objection to

9    the form.

10        A.    The standing and the walking.

11   The reaching, the lifting.

12        Q.    As far as the lifting it, it

13   wasn't the weight of the lift that you

14   contend -- you say would have prevented you

15   from performing that task, it was the mere

16   act of reaching over to pick something up;

17   is that what you're referring to?

18             MR. SINCLAIR:  Objection to

19   the form.

20        A.    Well, the weight could be

21   because as you box -- you're fixing the

22   packages, you're putting them in a box and

23   you have to move the boxes to fix another

Page 196

1    box.

2         Q.      Okay.  Did you have people in

3    the office to assist with lifting, runners

4    and things of that nature?

5         A.      No.

6         Q.      Okay.  No assistance for that

7    purpose?

8         A.      There were two maintenance men

9    that if it were a piece of furniture or a

10   heavy piece, they would, but as far as

11   boxes, and things like that, no.

12        Q.      Okay.  Number six:  Maintain a

13   database.  Could you do that today?

14        A.      No.

15        Q.      And why not?

16        A.      Typing.  There's a lot of

17   typing.  And it's like that injury kind of

18   with that.

19        Q.      And you contend that your

20   arthritis in your back and neck problems

21   would prevent you from typing; correct?

22        A.      Correct.  My hands, neck,

23   back.

Page 197

1        Q.      Okay.  You've told us about

2   attending conferences, and you spoke

3   specifically about out-of-office

4   conferences.  How about in-office

5   conferences, could you attend those today?

6        A.      No.  Because it would be

7   sitting a lot.  We would have to -- After

8   everyone got in and they were having the

9   meeting, you would have to sit through the

10  meeting.  And we could run an hour to two

11  hours.  I wouldn't be able to sit that long.

12       Q.      Why specifically couldn't you

13  sit that long?

14       A.      Because of my back.  Actually,

15  my doctor has instructed me not to do it.

16       Q.      He's instructed you to stand

17  on a regular basis?

18       A.      I've been instructed by my

19  rheumatologist to not sit for more than

20  thirty minutes and not stand for more than

21  thirty minutes at a time.

22       Q.      Okay.  So, you get up and

23  alternate in that fashion?

Page 207

1    from that.  My jaws are so out of place and

2    so far gone that it closes my air, my

3    wind -- my air passage.

4                    (Defendant's Exhibit 13

5                     was marked for

6                     identification purposes.)

7         Q.     Exhibit 13 is an office note

8    from Dr. Richardson dated 5/24/95, in which

9    he notes:  She tells me that she's

10   thirty-nine years old, she's right-handed,

11   and she's had difficulties sleeping since

12   twelve years of age.  Is that accurate?

13        A.     Yes.

14        Q.     When were you first diagnosed

15   with sleep apnea?

16        A.     Dr. Richardson diagnosed me

17   with that, and I think it's -- I'm not

18   positive of the date.  It was '95, '96.

19        Q.     But you had had ongoing sleep

20   disturbance problems since childhood?

21        A.     Yes.

22        Q.     Had they gotten worse?

23        A.     Yes.

Page 210

1  lost the forty pounds he references earlier?

2          A.      Correct.

3          Q.      This note also references a

4  John Peden, P-E-D-E-N.  Who is Dr. Peden?

5          A.      He's -- Well, he was.  He's

6  retired.  But he was -- Oh, gosh, a surgeon

7  that I was sent to the first time about my

8  neck.  At that time he did not feel like it

9  was ready for surgery, but he would give me

10  injections in the neck.

11          Q.      When did you last see him?

12          A.      It's been -- I don't remember

13  the day.  It's been -- I don't know.  It's

14  been four or five years.  He was -- It was

15  before my surgery because I probably had the

16  surgery in '98.  So it probably was, like,

17  '96 or '97.

18          Q.      You had neck surgery in '98?

19          A.      Yes.

20          Q.      And who performed that?

21          A.      It's in the -- Dr. -- I'm

22  sorry.  I can't remember his name.

23          Q.      Dr. Ryan?  Patrick Ryan?

Page 211

1          A.      Yes, Dr. Ryan.

2          Q.      Have you seen him since the

3     surgery?

4          A.      I've been back once or twice

5     with my back.

6          Q.      Have you seen Dr. Patrick Ryan

7     in the last year?

8          A.      No, not in the last year.

9          Q.      How about in the last two

10    years?

11         A.      I think I did see him maybe at

12    the beginning of the year before.  It's been

13    a while, but I don't remember the exact

14    date.

15         Q.      Exhibit 14 also references a

16    Rachelle Janush, J-A-N-U-S-H.  Who is that?

17         A.      She was a -- I'm not sure what

18    Dr. -- I don't know what type of doctor she

19    would be.  Dr. Richardson sent me to her for

20    the fibromyalgia and the pain.  She did the

21    trigger-point injections?

22         Q.      When did you last see her?

23         A.      It's been a long time.  It's

Page 214

1    A.    Like I said, I was trying

2  doctors.  I had tried him, but then someone

3  recommended Dr. Whitesell.  And when I went

4  to her, I liked her better, so I stayed with

5  her.

6    Q.    The second page of that says:

7  You've had headaches, jaw pain, neck pain,

8  ear pain and face pain for twenty years;

9  right?

10    A.    At that time, yes, but this

11  has been a while.  It's longer now.

12    Q.    Longer now?

13    A.    Because this was in '98.

14    Q.    It says:  At that point the

15  pain was pretty much constant; right?

16    A.    Yes.

17    Q.    You filled out this form,

18  didn't you?

19    A.    Yes.

20    Q.    The second page?

21    A.    Yes.

22    Q.    Is everything on here

23  accurate, or was it accurate at the time you

Page 217

1    dated July 27, 2003.  It's Bates labeled

2    BULL 1005.  Would you read the part that I

3    have highlighted on there.

4         A.    Therefore, you have the

5    inflammation in your colon of the variety

6    that responds to the treatment you have been

7    given and you need to follow through with

8    that as outlined.

9         Q.    Is that the same advice that

10   Dr. Anderson gave you, that you have the

11   type of colitis that responds to medication?

12              MR. SINCLAIR:  Objection to

13   the form.

14        A.    He didn't put it that way.  He

15   told me to continue.  But he said that, you

16   know, to continue with the treatment.

17        Q.    Is the treatment effective?

18              MR. SINCLAIR:  Objection to

19   the form.

20        A.    It will help for a period of

21   time, but then I'll have flare-ups.  I

22   always have some abnormal problems, but I

23   will have major flare-ups.

Page 218

1          Q.      Another document I received

2    from your attorney, it's Bates labeled BULL

3    1221, and this is an X-ray report procedure

4    UGI with SB, the impression being negative

5    upper GI and negative small bowel follow

6    through.

7          A.      Correct.

8          Q.      Have you ever gotten a

9    positive X-ray related to your GU -- your

10   upper GI?

11         A.      No.  The upper is not what I

12   have problems with.

13         Q.      And how about the --

14         MR. SINCLAIR:  Small bowel

15   follow through.

16         Q.      The negative bowel follow

17   through?  Have you ever gotten positive on a

18   small bowel follow through?

19         A.      No.

20         Q.      Okay.  And what specifically

21   do you have a problem with?

22         MR. SINCLAIR:  Lower

23   intestines.

Page 219

1          A.      The lower intestines.

2          Q.      Okay.  What treatment have you

3    gotten from Dr. Jackson, aside from what's

4    reflected in these two documents I just

5    showed you?

6          A.      That's it.

7          Q.      Okay.  How about from

8    Dr. Anderson?

9          A.      And who is he?  I'm sorry.

10         Q.      Dr. Anderson.  Didn't you say

11   you went to Anderson next?

12         A.      He told me to continue with

13   those treatments.

14         Q.      The same ones that Dr. Jackson

15   had prescribed?

16         A.      Correct.

17         Q.      Dr. Anderson is Mark Anderson?

18         A.      Yes.  Excuse me.  Let me

19   correct myself.

20         Q.      Sure.

21         A.      He told me, to start with, to

22   continue with that.  And as I continued to

23   have problems, and I was going -- I was

Page 220

1    seeing Dr. Paul.  Dr. Paul wanted me to

2    start Remicade treatments.

3                    And for some reason,

4    Dr. Anderson wanted me to wait.  So we

5    waited a while.  And he finally told me to

6    go ahead and let Dr. Paul start Remicade

7    treatments.  And so I have been taking

8    Remicade for over a year now, Remicade

9    treatments.

10                   So that helped more than

11   anything.  It actually -- She was hoping it

12   was going to help both, but it helped the

13   colitis more than it helped the arthritis

14   but I still have flare-ups.  I just

15   flare-up.

16       Q.       Your rheumatologist prescribed

17   the Remicade for arthritis, and it had a

18   beneficial affect on the colitis?

19       A.       She had talked with

20   Dr. Anderson, noting that it could have a

21   positive, you know, response on both of

22   them.

23       Q.       Uh-huh.

Page 223

1    accurately depict your treatment history?

2              MR. SINCLAIR:  Hang on a

3    second.  As a matter of fact, let me take a

4    break for a second.  I won't ask her or

5    instruct her or anything with the question

6    pending.

7                   (Off-the-Record discussion

8                    was held.)

9              MR. SINCLAIR:  Can we go on

10   the Record.  There is a question pending

11   concerning mental health records marked as

12   Exhibit 4.8, which I understand we're going

13   to treat as confidential, and I appreciate

14   that.  In order to avoid -- Let me say it

15   another way.

16              We are going to stipulate on

17   the Record that she is not making a claim

18   for disability benefits under either policy

19   on the basis of any diagnosis of a mental

20   health condition such as depression or the

21   like.

22              MR. FINK:  Or inability to

23   concentrate?

Page 233

1    the form.

2         Q.     How does it affect you?

3         A.     It -- Because you are

4    constantly -- You constantly -- You know, I

5    stop breathing a bit.  If you look at my

6    sleep studies, I never go into the

7    correct -- have the correct amount of sleep.

8              The last sleep study I had, I

9    never went into the REM, which is your deep

10   sleep, I never even went into that.  So I'm

11   not getting the appropriate amount of sleep,

12   which can cause a lot of other physical

13   problems.  And I -- Like I said, it's

14   constantly waking you up, between that and

15   my pain, but it's, you know, I stop

16   breathing and I'm gasping.

17        Q.     How long have you suffered

18   from sleep apnea?

19        A.     I feel that I have had it for

20   years, but was not diagnosed until I found

21   Dr. Richardson.

22        Q.     Twenty years?

23        A.     I don't know that it had been

Page 234

1   that long, but it had been -- I really don't

2   know.  Maybe ten years.  Before I met

3   Dr. Richardson, which was in '96.

4         Q.      How about narcolepsy?  How

5   long have you suffered from narcolepsy?

6         A.      Again, looking back, I felt

7   like I've had it for several years, too, but

8   did not know what it was because the

9   patterns and what I've been told and read

10  about.

11        Q.      Ten years, twenty years?

12        A.      Maybe ten, fifteen years.

13        Q.      Okay.  How does the narcolepsy

14  affect you?

15        A.      I have these certain sudden

16  urges.  A lot of people may not really even

17  notice a person with that, but it's like I

18  can be talking to someone and I don't hear

19  what they're saying for a few seconds

20  because my eyes might be open but I'm not

21  there.

22              To give you an example, I --

23  one of the things during my -- I don't know.

Page 253

1    through any treatment that you've been

2    provided?

3        A.    No.

4        Q.    Okay.  How about your

5    ulcerative colitis?  Do you contend that

6    that, standing alone, prevents you from

7    performing the duties of a secretary?

8        A.    I think that has improved with

9    Remicade.

10       Q.    Okay.  So, you wouldn't say

11   that your ulcerative colitis alone keeps you

12   from performing the duties of a secretary?

13       A.    Not alone.

14       Q.    And that basically caused you

15   to -- required for you to take frequent

16   bathroom breaks; correct?

17       A.    Correct.  Which you're also in

18   pain, a lot of pain.  It's hard to

19   concentrate when you're cramping and have a

20   lot of pain.  But you also have to stay

21   close to a bathroom and you're there a lot.

22       Q.    But you feel that's pretty

23   well managed right now with medication;

Page 254

1    correct?

2        A.    Correct.

3        Q.    Do you still have regular

4    flares, even on the medication?

5        A.    Yes.

6        Q.    How often do you have flares?

7        A.    Could I change it?

8        Q.    Yes.

9        A.    I felt like that this is

10   flares, but Dr. Barranco, the doctor I just

11   saw, seems to think that what I'm feeling

12   now, that the colitis is better, what I'm

13   feeling is just a spastic colon.  I did have

14   blood, a lot of blood, and that it was

15   harder to determine that that was the

16   diverticulitis at the time or the colitis.

17       Q.    Okay.  Do you contend that

18   your diverticulitis, standing alone,

19   prevents you from performing the duties of a

20   secretary?

21       A.    Not standing alone.

22       Q.    Okay.  Are your problems with

23   diverticulitis better on medication?

Page 256

1    doctor's office because -- and they had to

2    give me nitroglycerin and things because you

3    could have a heart attack, I mean, it had

4    gotten so high.

5         Q.    Okay.  Is that something you

6    are able to control with medication and

7    treatment?

8         A.    I had been, but just Monday,

9    it was high again.  Lately it has been

10   erratic.  It's been high with medication.

11        Q.    You mentioned surgery on the

12   neck for herniated disks.  You've had

13   surgery; correct?

14        A.    Yes, on the neck.

15        Q.    Do you contend that your neck

16   problems, standing alone, prevent you from

17   performing the duties of a secretary?

18        A.    Not alone.

19        Q.    Did you have improvement with

20   your neck problems following the surgery?

21        A.    To an extent, yes.

22        Q.    What problems do you presently

23   have with your neck?

Page 257

1        A.      I still have some stiffness

2   and soreness, which is hard to determine if

3   it's just, you know -- I'm -- Probably both,

4   TMJ and the disk.

5        Q.      Okay.  Do you presently plan

6   any surgeries for either your neck problems

7   or for your TMJ?

8        A.      The neck has actually -- The

9   surgery that they have done has been done.

10  But the TMJ, like I said, the insurance will

11  not pay for it.

12       Q.      If you could afford it, would

13  you do it?

14       A.      Yes.

15       Q.      How about your feet problems?

16  Do you your feet problems, standing alone,

17  prevent you from performing the duties of a

18  secretary?

19       A.      Not standing alone.

20       Q.      What problems do you presently

21  have with your feet that might preclude you

22  from performing secretarial duties?

23       A.      I can't stand very long.  You

Page 258

1    know, it -- I can't walk a lot.  I can't do

2    stairs.  I mean, like I said, alone it

3    wouldn't, but, you know --

4            Q.      Where you worked, you were on

5    the second floor?

6            A.      Yes.

7            Q.      Did you have an elevator?

8            A.      Yes.

9            Q.      Two bulging disks in back that

10   hurt.

11           A.      But, now, from the last test

12   they did, there's four.

13           Q.      Okay.  You've got four bulging

14   disks?

15           A.      Basically degenerative disk

16   disease.

17           Q.      Has any doctor recommended

18   surgery?

19           A.      Not yet.  They would prefer,

20   with arthritis, you know, to not do that if

21   we can --

22           Q.      What treatment are you getting

23   for that presently?

Case 2:05-cv-01217-MEF-VPM    Document 18    Filed 10/05/2006    Page 84 of 127

Page 259

1          A.      I have a back brace that I

2     alternate, I can use.  I --

3          Q.      Are you wearing one now?

4          A.      I am.

5          Q.      Okay.

6          A.      I have a Tens Machine.

7          Q.      Is that an electric impulse?

8          A.      Right.  I have one of those at

9     home that I use.

10          Q.      How often do you use that?

11          A.      Several times a day.  And I

12     alternate and use heat and sometimes ice, I

13     alternate.

14          Q.      Who prescribed the Tens Unit;

15     is that Dr. Paul?

16          A.      Yes.

17          Q.      Arthritis.  Do your problems

18     with arthritis, standing alone, prevent you

19     from performing the duties of a secretary?

20          A.      Yes.  I have real bad

21     arthritis in my hips and in my hands, and,

22     you know, a lot of my joints.  But my hips,

23     that's one of the reasons, between my back

Page 261

1    asking her that.

2         Q.       (By Mr. Fink) Do you contend

3    that the four bulging disks in your back

4    presently prevent you from performing the

5    duties of a secretary, standing alone?

6         A.       That, I don't know.

7         Q.       Do you contend that your

8    problems with bursitis, standing alone,

9    prevent you from performing the duties of a

10   secretary?

11        A.       Not standing alone.

12        Q.       What problems -- Well, what is

13   bursitis, first of all, in your own words?

14        A.       It's an inflammation of the

15   bursa.  It's like a tendon.  That's what I

16   understand it is.  They call it the bursa.

17        Q.       It's in your right shoulder?

18        A.       Well, you have them in -- But

19   that's where the main -- that I've had the

20   injections for was in my right.

21        Q.       Who's treating you for that?

22        A.       The pain management doctors

23   had treated me.  Dr. Kemp, I believe it was,

Page 262

1  or Dr. Peden.  It might have been Dr. Peden.

2  But, again, since the Remicade, she doesn't

3  want me having injections.

4          Q.      Have your problems with your

5  bursitis improved since the Remicade?

6          A.      Some.

7          Q.      Have your problems with your

8  bulging disks in your back improved since

9  the Remicade?

10         A.      No.  I can't tell any

11 difference in that.

12         Q.      Have the problems with your

13 feet improved since the Remicade?

14         A.      I can't tell a difference with

15 that.

16         Q.      Have your problems with your

17 arthritis improved?

18         A.      Some.  Not much.

19         Q.      TMJ.  Do you contend that your

20 problems with TMJ prevent you from

21 performing the duties of a secretary?

22         A.      Not alone.

23         Q.      Okay.  And TMJ -- TMJ is

Page 263

1    actually the joint; right?

2          A.     Yes.

3          Q.     And it's the disorder of the

4    TMJ that causes you trouble; correct?

5          A.     Correct.

6          Q.     When did you last seek

7    treatment for a disorder of your TMJ?

8          A.     Whenever it was I saw

9    Dr. Farha and Dr. -- the oral surgeon.

10         Q.     Foy?

11         A.     Yes.  Those doctors, because,

12   you know, they had determined -- Dr. Farha

13   said it was too far -- my joints were too

14   far gone for the mouth pieces to help.  He

15   couldn't help me anymore.  And then when the

16   insurance wouldn't pay for the surgery, I

17   didn't see him anymore.

18         Q.     Fibromyalgia.  Do you contend

19   that your problems with fibromyalgia prevent

20   you from performing your duties of a

21   secretary?

22         A.     Not alone.

23         Q.     Do you contend that all of

Page 274

1       Q.    TMJ.  Have your problems with

2  TMJ gotten worse since May of 2004?

3       A.    Yes.

4       Q.    And you're -- Are you

5  presently seeing anyone, other than your

6  family practice doctor, for that?

7       A.    No.  Because there's really

8  nothing to be done.

9       Q.    Fibromyalgia.  Who are you

10  presently seeing for that, Thornbury?

11       A.    No.  Dr. Richardson -- Really,

12  like I said, the medications, are the only

13  thing that we're doing with that right now

14  because the trigger-point injections weren't

15  helping.

16       Q.    What medication is

17  Dr. Richardson giving you for fibromyalgia?

18       A.    He has given me an

19  antidepressant and an anti-inflammatory that

20  I was already on.  You know, he said that

21  should help, too.

22       Q.    Okay.  You may have told me

23  this.  Forgive me.  Who first diagnosed you

Page 283

1    your sleep apnea problem has increased?

2            A.      Yes.

3                        (Defendant's Exhibit 22

4                        was marked for

5                        identification purposes.)

6            Q.      Exhibit 22 is a set of notes

7    from Dr. Thornbury.  There on it's first

8    page, the first one is a January, 2004 note

9    in which Dr. Thornbury indicates that he

10   thinks you should do a rheumatological

11   workup on the patient.

12                   On the next page there's a

13   note that's a carryover from the first page,

14   February of 2004, wherein he states:  We did

15   obtain some rheumatoid studies.  A

16   rheumatoid factor.  Her sed rates are all

17   negative.  Do you see that?

18           A.      Yes.

19           Q.      The next entry there on that

20   second page is a February 26, '04, wherein

21   Dr. Thornbury says:  Her rheumatological

22   studies are negative.  Do you see that?

23           A.      Yes.

Page 286

1    help my doctors, when I went to a new doctor

2    or -- They would -- Actually, you know, to

3    keep me from having to try to write, because

4    it hurts me to write.  I would just say:

5    See attached.  And this would go through my

6    own things.

7         Q.    This accurately reflects all

8    of the surgeries that you've had?

9         A.    Yes.

10        Q.    There have been none since?

11        A.    No.

12        Q.    And you don't plan any in the

13   future presently?

14        A.    Not at this point.  I probably

15   have to have one on the right foot before

16   long.

17        Q.    Presently, you are physically

18   capable of standing, walking, sitting, lying

19   down and lifting certain amounts; correct?

20              MR. SINCLAIR:  Objection to

21   the form.

22        A.    Certain amounts and certain

23   times.

Page 287

1      Q.      How much are you able to lift,

2   weight-wise?

3      A.      I'd say -- I mean, I really

4   don't know.  Maybe ten, fifteen pounds.  I

5   mean, I'm just -- Not much, maybe ten

6   pounds.

7      Q.      And you told us earlier that

8   your doctors had told you to alternate

9   sitting and standing; correct?

10      A.      Correct.

11      Q.      Go ahead and tell us what they

12   told you again.

13      A.      Dr. Paul had just told me, the

14   last time I was there, I'm having a lot of

15   inflammation.  And if I could not rest and,

16   you know, stay off my, you know, hip and --

17   or, you know, take a rest as I need it.

18   Then she said if I was going to have to do

19   something like go out to another doctor and

20   do something that I had to, that I was going

21   to have to start using a wheelchair.

22   Because we had to rest the joints when they

23   were so inflamed because we did not want to

Page 305

1    become involved -- You don't have present

2    plans to become involved in any business

3    ventures?

4            A.    No.

5            Q.    You don't have present plans

6    to seek employment anywhere?

7            A.    No.

8            Q.    Ms. Bullard, in your complaint

9    you allege in count one that:  The

10   defendant's breached their policies of

11   insurance that have been marked as Exhibits

12   3 and 4 of this deposition.  Have you

13   reviewed the policies that have been marked

14   as Exhibits 3 and 4 of this deposition?

15   Have you ever read them?

16           A.    No.  Not the whole policy.

17   Just descriptions.

18           Q.    Okay.  Just descriptions,

19   including the one that you testified earlier

20   you received from the Convention; correct?

21           A.    Yes.

22           Q.    Even since filing this claim

23   and getting copies of the policies, you've

Page 306

1    not read them?

2                MR. SINCLAIR:  Objection to

3    the form.

4         A.    No.

5         Q.    Do you understand that you had

6    to meet the definitions of disability in the

7    policies in order to be entitled to benefits

8    under the policies?

9                MR. SINCLAIR:  Same objection.

10        A.    Yes.

11        Q.    You understood that the

12   policies are contracts and that the parties

13   would be bound by the terms of the

14   contracts; correct?

15               MR. SINCLAIR:  Hold on a

16   second.  I will object to the form to the

17   extent you're capable of answering.  You may

18   answer the gentleman's question.

19        A.    And could you repeat it again.

20        Q.    Sure.  You understand that the

21   policies are contracts, and that the parties

22   will be bound by the terms of the contracts;

23   correct?

Page 307

1          A.      Yes.

2          Q.      And you understand that the

3    language of the contracts governs the

4    obligations of the parties; correct?

5                  MR. SINCLAIR:  Same objection.

6    Same instruction, to the extent you're

7    capable of responding to the gentleman's

8    question.

9          A.      To my knowledge of what's in

10   the -- some of the wording -- I mean, I

11   don't know.  I haven't read all of this, but

12   what I know of it, yes.

13         Q.      Has anything kept you from

14   reading these policies?

15         A.      I was told that they were not

16   available to me at the Convention.

17         Q.      That was by Ginny Hancock back

18   in 2002?

19         A.      Yes.

20         Q.      And you never inquired further

21   of anyone else; correct?

22         A.      No.  I took them at their

23   word.

Page 308

1          Q.      You took Ginny Hancock at her

2     word?

3          A.      Yes.  She's our insurance --

4     the person that's in charge of this for our

5     Convention.

6          Q.      And you already told us you

7     didn't call anyone at Unum Life and ask for

8     a copy of the policies?

9               MR. SINCLAIR:  I'm sorry.

10    What?

11         Q.      You never called anyone at

12    Unum Life and asked for a copy of the

13    policies?

14         A.      No.  Because, again, I was

15    told I didn't have access to that.

16         Q.      But, again, the only person

17    who told you you didn't have access was

18    someone at the Convention as opposed to

19    someone at Unum Life; correct?

20         A.      Correct.

21         Q.      I know that you're not an

22    attorney, but can you tell me, in your own

23    words, how my clients breached their

Page 319

1          A.      Yes.

2          Q.      And that was -- That person

3    who came and talked to you was an employee

4    of the Annuity Board; correct?

5                  MR. SINCLAIR:  Objection to

6    the form.

7          A.      That's what I remember, yes.

8    He was one of them.

9          Q.      You've never heard any

10   representations about either of these two

11   policies from any employee or representative

12   of Unum Life or UnumProvident have you?

13                 MR. SINCLAIR:  Objection to

14   the form.  To the extent you understand

15   those terms, please respond to the

16   gentleman's question.

17         A.      Not to my knowledge, no.

18         Q.      Instead, you've heard, based

19   on what you've told me, representations from

20   folks at the State Convention or the Annuity

21   Board; right?

22                 MR. SINCLAIR:  Same

23   instructions.  Same objection.  Respond to

Page 322

1    get all of it.  That's why I went as far

2    back as I did.

3         Q.     You don't deny that Unum Life

4    conducted a vocational analysis to determine

5    whether or not you were capable of

6    performing the material and substantial

7    duties of a secretary, do you?

8                   MR. SINCLAIR:  Objection to

9    the form.  Answer if you know.

10                  THE WITNESS:  Was that that

11   paper we --

12                  MR. SINCLAIR:  You can't ask

13   me questions.

14        A.     I don't know.  I don't know.

15        Q.     You neither admit or deny

16   that?

17                  MR. SINCLAIR:  Objection to

18   the form.  Stop.  Don't answer his

19   questions.  Let me talk a little bit before

20   you start talking.

21        Q.     Ms. Bullard you also allege

22   that my clients misrepresented information

23   regarding subject policies, and that you

Page 323

1    purchased the policies based on

2    misrepresentation of facts; correct?  For

3    instance, if you'll take a look at

4    paragraphs fifty-nine, sixty and sixty-one

5    of your complaint.

6                MR. SINCLAIR:  What was your

7    question?

8                MR. FINK:  Sure.

9         Q.      You claim that

10   misrepresentations or -- or that my clients

11   misrepresented the information regarding

12   subject policies and that you purchased the

13   policies based on misrepresentations of

14   fact; correct?

15               MR. SINCLAIR:  I think this is

16   the write-in objection.  Interpretations to

17   the extent you understand the terms he's

18   using, please respond to his question.

19        A.      I'm not sure about what -- I

20   mean, it seems like we've been over this

21   before.  And I'm not sure what you're asking

22   anymore.  I don't know.

23        Q.      Just so it's clear, you don't

Page 324

1    contend that any employee or representative

2    of Unum Life or UnumProvident ever told you,

3    Betty Bullard, anything about either the

4    disability or the life policy, do you?

5             MR. SINCLAIR:  Objection to

6    the form.  To the extent you know whether or

7    not the people you were talking to were

8    UnumProvident employees or agents, you can

9    respond.

10          A.    Again, this was done on my

11   behalf by our Annuity Board.  They had my

12   interest at heart.  And, you know, I'm going

13   by what I was provided with.

14          Q.    The reason I'm asking is, I

15   don't want to get to trial and you start

16   talking about:  Well, Brandon Estrada came

17   down and was telling me about, you know,

18   what benefits I get under this policy.

19             You don't contend that a

20   UnumProvident or Unum Life employee ever

21   came down and spoke to you about this

22   coverage?

23             MR. SINCLAIR:  Same objection

Page 325

1    as the last.

2         A.      I spoke with him on the phone.

3         Q.      After you filed your claim?

4         A.      Yes.

5         Q.      But before you filed your

6    claim, you never spoke with a Unum Life or

7    UnumProvident employee about your coverage

8    under either the disability or life

9    policies, did you?

10                MR. SINCLAIR:  Same objection.

11        A.      Again, not directly because

12   that was not the way that it was set up.

13   The Annuity Board did that for me.

14        Q.      In paragraph sixty of your

15   complaint it says -- And I realize you

16   didn't draft this complaint.  It says:  The

17   defendants continuously represented to the

18   plaintiff that the defendants have provided

19   the plaintiff with a life insurance policy

20   that would remain in effect by operation of

21   a life premium waiver in the event the

22   plaintiff would become disabled and would be

23   unable to perform the duties of her

Page 326

1    occupation while said policy was in force.

2    Did I read that correctly?

3              MR. SINCLAIR:  Yes.

4         A.    Yes.

5         Q.      In paragraph sixty-one, you

6    say:  Plaintiff reasonably relied upon

7    defendant's representations regarding their

8    commitment to honor the terms of the

9    policies, to adjust the terms in good

10   faith -- or adjust claims in good faith, and

11   to pay any benefit that might come to be due

12   to the plaintiff.  Did I read that

13   correctly?

14        A.    Yes.

15        Q.      And going up even further.  In

16   paragraph fifty-nine you say:  At all times

17   relevant hereto, defendants continuously

18   represented to the plaintiff that defendants

19   had provided plaintiff with a disability

20   policy that would pay monthly disability

21   benefits in the event the plaintiff were to

22   become disabled and was unable to perform

23   the duties of her occupation while said

Page 327

1    disability policy was in force.  Did I read

2    fifty-nine correctly?

3        A.    You read that correctly.  And

4    what, in my opinion, this refers to the

5    reason they're saying the defendant is

6    because it's the policy, and what the policy

7    stated.  And that the fact that I was paying

8    the premium, it was, you know, to me, that

9    was good faith that they would do whatever

10    they said they were going to do for me.  I

11    was paying my premium.

12        Q.    But to the extent that anyone

13    actually said these things to you orally,

14    that would have been either Ginny Hancock,

15    Bobby DuBois or someone from the Annuity

16    Board who came and spoke to y'all when you

17    got your last new manual?

18        A.    Those people have said --

19        Q.    Have those people said those

20    things there in fifty-nine, sixty and

21    sixty-one?

22        A.    Not exactly like it is there.

23        Q.    Okay.  Well, what all has

Page 328

1    Ginny Hancock said to you about your

2    coverage under these two policies?

3          A.      That I paid my premiums, you

4    know, that it could cover what I've

5    interpreted from what she gave me, the

6    handout that she gave.  And, you know, the

7    doctors said that they say -- My doctors

8    said that I'm disabled, that y'all would pay

9    the benefits because I have been paying my

10   premium.  We had done this in good faith.

11         Q.      Do you recall anything else

12   that Ginny Hancock has said to you about the

13   policies?

14         A.      I don't recall everything

15   that's been said.

16         Q.      Okay.  Other than what you

17   just told me, do you presently recall

18   anything specific that she told you?

19         A.      Not specific.

20         Q.      Do you recall anything

21   specific that Bobby DuBois told you about

22   your coverage under either of the policies?

23         A.      Again, just what I've been

Page 329

1    saying.

2        Q.    You don't recall anything

3    specific that Bobby DuBois told you?

4        A.    That what the policy -- How it

5    gave the description of the policy and what

6    I could -- you know, what they thought I

7    could expect when I filed a claim, from what

8    they had -- the information they had.  They

9    were basing it on what they had.

10        Q.    Okay.  What did he tell you

11    you could expect?

12        A.    Again, what I've been saying

13    the whole time, that, you know, if my doctor

14    said I was disabled, that they would pay the

15    benefits.

16        Q.    So, you contend both Ginny and

17    Bobby said that?

18        A.    Yes.

19        Q.    Do you contend that that

20    person from the Annuity Board who came and

21    spoke to y'all when you got your last new

22    manual said something like that, too?

23        A.    That's what I remember, yes.

Page 330

1          Q.      Anything more specific than

2     that?

3          A.      I don't remember.

4          Q.      When did Ginny Hancock make

5     these representations to you?

6          A.      When I started talking to her

7     about filing for disability.  And then in

8     the meetings we had with the -- Well,

9     actually, I don't guess Ginny was the one

10    that -- it was Bobby that talked in the

11    meeting.

12         Q.      Which meeting?

13         A.      About the manual.

14         Q.      Bobby DuBois is the Annuity

15    Board person who came and spoke to y'all?

16         A.      No.  He is the assistant

17    executive director at the Convention.  But

18    he and Ginny, together, work on the

19    insurance, among other things.

20         Q.      Is it your testimony that

21    Ginny Hancock never made these

22    representations to you until you were ready

23    to file a claim?

Page 331

1           MR. SINCLAIR:  Objection to

2    the form.  Go ahead.

3           A.    No, not actually.  When we --

4    When I signed my beneficiary forms, when I

5    signed that I had got my manual, we

6    discussed it at those times.  We had

7    discussed it prior to that.

8           Q.    What I would like to know is

9    when you first recall Ginny Hancock making

10   these representations to you?

11          A.    Again, like I said, when I

12   signed, she's the one that has the paperwork

13   when we had to sign for our -- who our

14   beneficiary would be.  And then when we

15   signed for the manuals, she was the one that

16   had the forms that we signed for that.

17          Q.    And she made those

18   representations at the time you signed for

19   your manuals and assigned your

20   beneficiaries?

21          A.    I remember us talking about

22   what we could expect out of these policies.

23          Q.    You can't tell me what year or

Page 332

1    years that would have been?

2         A.    No.

3         Q.    Was it back in -- Was it more

4    than five years ago when she first told you

5    these things?

6         A.    It wasn't that long.  But I

7    really -- I don't know the exact time.

8         Q.    Was it back at the time that

9    you first had coverage under either of these

10   policies, or was it after that?

11        A.    Well, I believe when I signed

12   the papers about the beneficiaries, it would

13   have been, you know --

14        Q.    At that time?

15        A.    That was one of the times,

16   yes.

17        Q.    Okay.  What about Bobby

18   DuBois?  When did he tell you anything about

19   these policies?

20        A.    Again, in the meeting about

21   the manuals.  When they went through

22   everything that was in the manual.

23        Q.    When was that meeting?

Page 333

1          A.      I don't know for sure.  I

2    can't remember the year or the date exactly.

3          Q.      Would it have been five years

4    ago?

5          A.      I don't think it's been that

6    long.  I don't know exactly.

7          Q.      Do you have any better idea of

8    how long ago it was?

9          A.      I really don't know exactly.

10          Q.      It would have been about the

11    time, though, that you signed for a manual?

12          MR. SINCLAIR:  Objection to

13    the form.  I don't think that's what she

14    said.

15          Q.      Well, and I'm trying to

16    understand.  You said with regard to Ginny

17    Hancock, you think she first made the

18    representation about the time you signed for

19    a manual and assigned beneficiaries under

20    the life policy.

21          And I was thinking I could

22    probably figure out when that was through

23    documentation.  In other words, I could

Page 334

1    figure out when you signed for a manual or

2    when you assigned your beneficiaries.

3            But with regard to Bobby

4    DuBois, did he make the representations at

5    or about the same time that Ginny Hancock

6    made them?

7            A.    Well, he would have been the

8    one that went over the manual with us.

9    Ginny is the one that gave us the form to

10   sign.

11           Q.    So, I could tell -- He went

12   over the manual with you and then you signed

13   for a form -- you signed for it via a form

14   that Ginny gave you.  So, he would have made

15   the representations at or about the same

16   time Ginny Hancock made them; right?

17           A.    Probably.

18           Q.    Okay.  How about -- How about

19   this individual from the Annuity Board who

20   spoke to you when you got the last new

21   manual?  When did you get the last new

22   manual?

23           A.    That's what I'm saying, I

Page 335

1    don't remember the date on that.  I really

2    don't know.

3         Q.     Is that the same manual that

4    you're talking about with regard to Ginny

5    Hancock and Bobby DuBois?

6         A.     Yes.

7         Q.     So, it was all -- These

8    representations were all made at or about

9    the same time?

10        A.     The first -- I mean -- When I

11   first started working there I also had -- it

12   wouldn't have been Ginny at the time.  I

13   think the lady has retired.  The director

14   that was there has retired, also.  But, you

15   know, they went over and had a different

16   manual at that time.

17        Q.     You don't remember whether it

18   was even Unum Life then?

19        A.     Correct.

20        Q.     You don't remember --

21        A.     But then -- I'm sorry.

22        Q.     You don't remember any

23   specific representations that were made to

Page 336

1    you back then in '93; right?

2        A.    It was basically the same

3    description.  I was told kind of the same

4    things.

5        Q.    But you don't contend that

6    these representations that you've just told

7    me about, and these ones referenced in

8    fifty-nine, sixty, and sixty-one, were made

9    back in '93; right?  You contend that those

10    have been made more recently; correct?

11              MR. SINCLAIR:  Stop.  Same

12    objection.  Interpreting my work product.

13    To the extent you know what I was talking

14    about in there, you feel free to answer.

15        A.    Again, that was probably

16    another company, but it was the same

17    overview as what I got for this company

18    because it was the same type thing.

19        Q.    But with respect to the

20    overview that you remember getting for this

21    company, this company being Unum Life, and

22    specifically the representations that you've

23    told me about by Ginny Hancock, Bobby DuBois

Page 337

1    and someone from the Annuity Board, you

2    contend that those conversations or

3    representations happened, I believe you said

4    probably less than five years ago; right?

5                    I'm just trying to figure out

6    when these representations were.  I wasn't

7    there.  And I just -- To the extent you

8    remember, if you can tell me when you recall

9    them being made.  If you're not sure, say:

10   I'm not sure, but I think it was this date,

11   if that's you're accurate testimony.

12                   MR. SINCLAIR:  I tell you

13   what, here's what I'm going to say.  I'm

14   going to have to tell you to stop guessing

15   and estimating.  Unless you have a definite

16   knowledge of when this happened, you're

17   going to stop guessing.  Because I think

18   you've gotten him a little confused about

19   when you signed the beneficiary forms

20   initially for this thing, and when the

21   subsequent handbook was handed out.

22                   If you don't know, say:  I

23   don't recall.  Okay?  Let him ask his

Page 338

1    questions and you answer him to the best of

2    your ability.  Don't guess anymore.  Okay?

3           A.     I don't know.

4           Q.     Okay.  Do you recall when you

5    signed up and identified beneficiaries with

6    respect to Exhibit 4, the Unum Life life

7    insurance policy?

8           A.     I don't remember.

9           Q.     Do you recall when you got

10   these handbooks that you're telling me

11   about, or these handouts relating to either

12   of these policies, whether it be Exhibit 3

13   or Exhibit 4?

14          A.     I don't recall the date.

15          Q.     You told me about

16   representations that you contend were made

17   by Ginny Hancock, Bobby DuBois and someone

18   from the Annuity Board.  And you said that

19   you thought that those were all made at or

20   about the same time; correct?

21          A.     Correct.

22          Q.     But you don't know when that

23   time was; correct?

Page 339

1          A.      Correct.

2          Q.      But you think it's been within

3    the last five years; correct?

4          A.      Correct.

5                  MR. SINCLAIR:  Are you

6    guessing?

7                  THE WITNESS:  I'm guessing.

8                  MR. SINCLAIR:  Don't guess.

9                  THE WITNESS:  Okay.

10                 MR. SINCLAIR:  Say:  I don't

11   recall.

12         A.      I don't know for sure.  I

13   don't recall.

14         Q.      Okay.  Do you believe it was

15   in the -- within the last two years?

16         A.      I don't recall.

17         Q.      Okay.  You just can't tell me

18   when these representations were made?

19         A.      No.

20         Q.      And you've told me, as best

21   you can recall, specifically what was said

22   to you?

23         A.      Yes.

Page 340

1      Q.      Where were you when these

2   representations were made to you?

3      A.      In a room at the Convention, a

4   board room.

5      Q.      Were other people around?

6      A.      Yes.  Everybody that works

7   there was there.

8      Q.      Okay.  You don't contend that

9   any of these individuals told you anything,

10  outside of the presence of other people?  It

11  wasn't a one-on-one situation where you were

12  told anything by Ginny Hancock, Bobby DuBois

13  or this individual from the Annuity Board

14  about these two policies?

15     A.      At that time?

16     Q.      At that time.

17     A.      No, no.  I mean, it was all a

18  group.

19     Q.      Okay.  At some earlier or

20  later time, was there a one-on-one situation

21  where any one of these three individuals

22  told you anything about your coverage under

23  either of these two policies?

Page 341

1           A.      Later I had talked with Ginny

2    and Bobby.  I talked to Bobby, also.

3           Q.      Both individually, or did you

4    speak to them together?

5           A.      I have done both.

6           Q.      Okay.  Since the time that you

7    spoke to all three of them at or about the

8    time you assigned your beneficiary and/or

9    signed for a handbook, you have spoken with

10   Ginny and Bobby both individually and

11   together about this coverage under these two

12   policies; is that correct?

13          A.      Yes.

14          Q.      And were there representations

15   at these individual meetings or when just

16   the three of you met together any different

17   than what you've already explained to me?

18          A.      No.

19          Q.      And do you recall anything

20   else specific that any of these three

21   individuals, Ginny Hancock, Bobby DuBois or

22   this Annuity Board individual told you about

23   your coverage under either of these two

Page 342

1    policies?

2              MR. SINCLAIR:  Other than what

3    she's already testified to?

4              MR. FINK:  Other than what

5    she's already testified to.

6         A.    Just what I've testified to.

7         Q.    On how many occasions did you

8    meet with Ginny Hancock alone about your

9    coverage under these two policies?

10        A.    I don't recall how many times.

11        Q.    More than once?

12        A.    Yes.

13        Q.    Was it in the process of your

14   filing your claim?

15        A.    Some of it was.

16        Q.    Was some of it before you

17   filed your claim?

18        A.    Yes.

19        Q.    Okay.  And was the only

20   conversation you had with Ginny Hancock

21   before you filed a claim, the conversation

22   you had at or about the time you assigned

23   your beneficiaries under the life policy?

Page 343

1          MR. SINCLAIR:  Objection.

2          A.    No.  I think I said before

3     that we talked.  I had asked questions.  I

4     talked to her and asked questions.

5          Q.    Okay.  You told me earlier

6     that you asked her for a copy of the

7     policies.  Was that at or about the time you

8     assigned beneficiaries under the life

9     policy?

10         A.    I don't recall.

11         Q.    Okay.  Were you ever given any

12    literature about these policies, aside from

13    the information that I showed you earlier

14    that your attorney has Bates labeled with

15    the prefix BULL?

16         MR. SINCLAIR:  And the

17    handbook she mentioned earlier, or

18    handbooks?

19         Q.    Handbooks.  Anything else?

20         A.    No.  Not that I recall.

21         Q.    These individual meetings that

22    you had with either Ginny or Bobby, where

23    did those take place?

Page 344

1      A.      In their office.

2      Q.      Okay.  Ginny has her own

3  office and Bobby has his own office?

4      A.      Correct.

5      Q.      And then you met with the two

6  of them together?

7      A.      I met with them and with Rick

8  Lance, the executive director, and discussed

9  what -- you know that I was going to be

10  filing -- after I made my decision to go

11  through with it.

12      Q.      Did Rick Lance make any

13  representations to you that you contend were

14  untrue?

15      A.      Excuse me?

16      Q.      Did Rick Lance make any

17  representations about your coverage under

18  either of these policies?  Let me ask you

19  that first.

20      A.      Well, he kind of -- It was

21  just kind of reinforced that -- what I had

22  already been told, you know, that we were --

23  that we would start the process.  I would

Page 345

1  fill out the forms and get the doctors'

2  reports -- I mean, they would get the

3  doctors' stuff.

4        And then if I was -- my

5  doctors said I was disabled, then they would

6  pay the benefits, basically, what I had

7  already been told.

8        Q.    Did Rick -- Did you meet with

9  Rick Lance more than one time about this?

10       A.    Yes.  I mean, after I filed

11 the process.

12       Q.    But they were all after you

13 had begun the claim process?

14       A.    Yes.

15       Q.    Did you -- When you met with

16 Ginny and Bobby together, was that after you

17 had decided to file the claim?

18       A.    Yes.

19       Q.    You never met with them

20 together, before you decided to file the

21 claim, about your coverage under the

22 policies?

23       A.    No.

Page 346

1        Q.    You had only met with them

2    individually prior to that?

3        A.    I don't recall.  I'm not sure.

4        Q.    But, at any rate, now that

5    we've gone through this and tried to figure

6    out exactly when you had these meetings, you

7    haven't -- it hasn't jogged any additional

8    representations that you claim were made

9    about the coverage under these policies?

10   You stick with what you told me earlier;

11   correct?

12       A.    You're talking about where

13   I've said that the manual -- when they

14   talked -- the group session about the manual

15   and things, that those were the only ones?

16       Q.    Those are the only

17   representations they've ever made to you;

18   correct?

19       A.    The ones that I've already

20   stated?

21       Q.    Correct.

22       A.    Yes.

23       Q.    Okay.  Have you covered all

Page 347

1    misrepresentations that you contend were

2    made to you about these policies?

3                   MR. SINCLAIR:  Objection, to

4    the extent it calls for her to interpret

5    legal definitions or words.  Please respond

6    to the best of your ability.

7         A.      That's why I got my attorney

8    to help with all of this.

9         Q.      Sure.  To the extent that you

10   claim anyone told you anything about these

11   policies that you contend is false, have you

12   now told me about those statements?

13        A.      I'm sorry.  Could you say that

14   again.

15        Q.      To the extent that anyone has

16   ever told you anything about these policies

17   that you contend is false, have you now told

18   me about those statements?

19                  MR. SINCLAIR:  Do you want her

20   just to predate the claim?

21                  MR. FINK:  Yeah.  I'm talking

22   about preclaim at this point.

23                  MR. SINCLAIR:  Okay.

Page 351

1    instructions.

2         A.    I don't recall.  I don't know.

3         Q.    Do you contend that at the

4    time you first received coverage under

5    either of these two policies, that Unum Life

6    intended not to pay some claim that you

7    might make in the future under those

8    policies?

9              MR. SINCLAIR:  You've

10   officially lost her.  Are you exhausted?

11             THE WITNESS:  I am.  And I'm

12   hurting.

13             MR. SINCLAIR:  Do you

14   understand his questions as he's posing

15   them?

16             THE WITNESS:  Not anymore, no.

17        Q.    Do you have any evidence,

18   Ms. Bullard, that at the time you first

19   obtained coverage under these two policies

20   that Unum Life or UnumProvident didn't

21   intend to perform in accordance with the

22   terms of the policies?

23        A.    Okay.  You're saying --

Page 352

1            MR. SINCLAIR:  Do you

2    personally have any evidence?  He's not

3    asking me.

4            THE WITNESS:  Right.

5            MR. SINCLAIR:  He's asking

6    you.

7            THE WITNESS:  That they would

8    not do what the policy said they would do?

9            MR. SINCLAIR:  Right.  Do you

10   have secret documents or stashes of Unum

11   memos at your house?

12           THE WITNESS:  No.

13           MR. FINK:  Any evidence?

14           THE WITNESS:  No.

15           MR. SINCLAIR:  No.  Okay.

16       Q.    (By Mr. Fink) Do you have any

17   evidence that either of my clients intended,

18   at the time you took out this coverage or

19   were provided this coverage, not to pay you

20   benefits under the disability policy or to

21   waive your life insurance premiums if you

22   became disabled?

23           MR. SINCLAIR:  I do, but he's

Page 353

1    asking you.  Do you have any evidence, and

2    not -- You're not to give him stuff that I

3    told you, but do you have any evidence that

4    they --

5         Q.    You don't need -- You can't --

6    I'm not asking you to tell me what he told

7    you, but I'm asking you if you have any

8    evidence.  And I don't care how you got it,

9    I want to know if you have evidence?

10        A.    That they --

11        Q.    That they intended not to pay

12   you if you became disabled under the terms

13   of the policy.

14        A.    No.  I wouldn't have been

15   paying the premiums if I thought they

16   weren't going to pay me.

17        Q.    Do you have any evidence that

18   my clients intended to deceive you at the

19   time that you received coverage or were

20   provided coverage under the terms of either

21   of these policies?

22        A.    No.  Again, I wouldn't have

23   been paying the premiums if I thought they

Page 354

1    were going to deceive me.

2              MR. SINCLAIR:  That was an

3    excellent answer.

4         Q.    Your complaint also alleges

5    suppression.  Do you know what that means?

6    That's a legal term, I understand.

7         A.    No.

8         Q.    You don't know what that

9    means?  Okay. Do you contend that either of

10   my clients withheld information from you in

11   an attempt to deceive you at the time you

12   received coverage under either of these

13   policies?

14             MR. SINCLAIR:  Do you

15   understand what he's asking you?

16             THE WITNESS:  No.

17             MR. SINCLAIR:  Is this

18   something you rely on me to answer for you?

19             THE WITNESS:  Please.

20        Q.    Well, I still need to ask you

21   the question.

22        A.    Well, this is why I got my

23   attorney.

Page 355

1          Q.     Sure.   And I'm trying --

2     Honestly, I'm trying to make it simple for

3     you.   And I'm trying to not to make it

4     overly legal.

5                 Do you, Ms. Bullard, have any

6     evidence that either Unum Life or

7     UnumProvident withheld information from you

8     in an attempt to deceive you at the point

9     you received coverage under either of these

10    policies?   Do you have any?

11                MR. SINCLAIR:   Do you

12    personally, not me as your attorney, who you

13    rely on, but you personally, do you have it

14    at the house?

15                THE WITNESS:   No.

16         Q.     You don't have any evidence --

17                MR. SINCLAIR:   This is the

18    part of the depositions I always hate.   And

19    you know you'll do it.

20         Q.      -- that my clients intended,

21    at the time you received this coverage, not

22    to pay a legitimate claim for benefits if

23    ever you filed one?