# ATTACHMENT

# "A"
# Part 1
# Summary Pages 1-10

ATTACHMENT "A"

# Summary of documents pertaining to UnumProvident's Claims Handling Procedures

A.  *Information from Dr. McSharry*

UnumProvident's in-house medical reviewers are paid bonuses based, in part, on company profitability.

Following are excerpts from the 1007 page deposition of Dr. Patrick Fergal McSharry, taken in the first week of September, 2002. Dr. McSharry's testimony shows that the medical advisors who provide the medical decision on which UnumProvident decision rely operate under a conflict of interest in that they were bonus based on company earnings at a level of 25% of his base salary. McSharry Deposition at p. 87-88 (bates pg. 1). Exhibit P-3 to that deposition (bates pg. 22-24) further explains that, as an Associate Medical Director, Dr. McSharry is "eligible to participate in the Management Incentive Compensation Plan (MICP) at a target level of 25% of your base salary earnings. The MICP is based on the achievement of certain corporate earnings thresholds and the formula includes weights for both corporate and individual goals." The letter also states that he would be eligible for stock option grants consistent with the company program and based upon management's recommendation and the Compensation Committee's approval. See also testimony, p. 91 (bates pg. 2).

ii. The Performance evaluation of UnumProvident's in-house medical staff is based, in part, on whether their opinion can be used to support the claim's departments desire to save money.

When asked about how his performance was evaluated, Dr. McSharry testified "that there's two main parts to your performance. One was [how] many files you did and

kept Dr. Vatt happy, and number two, how you kept all the claims people happy. . p. 120 (bates pg. 3).

Dr. McSharry testified that the cases were assigned to different teams or offices based on the type of impairment (p. 103)(bates pg. 4) and the impairment heads would impact the company results, in that "They were responsible for the numbers. They were responsible for the company making the profit, the profitability. They were – you know, there's two ways that an insurance company makes money. One is from investments that they make on the claimant's policies, and the second area is the claims management. That's the two areas, and these impairment heads were very responsible for getting results from claims management." p. 143 (bates pg. 5).

Dr. McSharry testified that UnumProvident kept track of the amount of money in reserves various claims handlers could "free-up" by denying cases. Specifically, he obtained a spreadsheet that was sent to him that showed the claim's handler's name and the claim number and the amount of reserve that would be released by closing the claim. p.153 (bates pg. 6) and 155-7 (bates pg. 7) (See also exhibit P-6) (bates pg. 25). He explained that the ones closing the most in claims were considered the "great performers. p. 160 (bates pg. 8).

Dr. McSharry testified that he was pressured to agree with claims handlers to deny cases. Specifically, he said, "Tom [Lamar] let it [be] known to me and other consultants did too . . .that everybody was upset with having docs who would not just accept what the claims people wanted them to do,    and that he "looked on me [as if] was not part of the team if I continued to make it difficult for him to close the file.    p. 163 (bates pg. 9). Tom Lamar later told him in a meeting, "you've got to help us here,

Fergal, you know, you're part of this team and everybody is complaining about you and thinking you're not." Specifically, Tom Lamar asked him to restate an opinion, by asking "But can' you say it a little different?" p. 165 (bates pg. 9). Dr. McSharry also testified that he got pressure from his fellow physicians as well; he was told by Dr. Vatt and the other doctors, "you don't tie the hands of the claim. .handler. .We got various things from Dr. Vatt about how we should form our sentences. ." p. 181 (bates pg. 10). Dr. Vatt also told the doctors not to use their clinical experiences to go outside the charts to evaluate claims. p. 181 (bates pg. 10).

  iii. UnumProvident's medical experts are encouraged to "sign off" on recommendations to deny benefits.

  As to how the claims were handled, Dr. McSharry testified that the files would go from a claim handler to a nurse, who would make a decision and he was pressured to go along with the nurse. The way it worked was this: the claim consultant would pose questions, usually three, concerning the restrictions and limitations, whether they would support an impairment that would prevent the person from doing his own job or any other job. p. 184-5 (bates pg. 11). The nurses would answer the questions, then the file would come to Dr. McSharry. p. 184-5 (bates pg. 11). If it came to the doctor without going to a nurse first, it would be frowned upon. p. 185 (bates pg. 11). The file would come to the doctor with the nurse having already answered the questions. "Then I would just be asked to –you know, sometimes we were asked do we just agree with the nurse, and some doctors would just do what was called a sign-off and say I agree with the nurse based on her findings, but I refused to do that." p. 186 (bates pg. 12). "Q what was a sign off? A.

3

A sign off was that the nurse did the work on it and we would sign off on their work." p. 186 (bates pg. 2).

iv    UnumProvident's medical advisors are told that the proper "career path" is to go along with company policy and to help create documentation to support the denial of claims

When asked if he ever complained to his supervisors how it was the file came to him with the conclusion to deny, he was told that people complained about his ability to communicate, and that "you're falling off the career ladder, you've fallen off the career path   p. 188 (bates pg. 12). Dr. Anfeld told him he was falling off the career path due to many complaints "that I was not cooperating with the – you know, right through our incentives its all about partnering with our business partners on an equal basis, and you know, them being happy with us. p. 189 (bates pg. 12). He explained that the business partners were the "internal customers" who were essentially the nurses and claims people. p. 189-190 (bates pg. 12-13). Business partners also included customer care representatives and consultants, (p. 190)(bates pg. 13) as well as directors and impairment heads. p. 191 (bates pg. 13). "Both Dr. Vatt and Dr. Anfield both told me how important it was to please their business partners. p. 192 (bates pg. 13). He testified that the "vast majority" of times he got in trouble was when he disagreed with a nurse's conclusion, and that was never when the nurse's conclusion was to pay. p. 192 (bates pg. 13). In fact, he testified "we never saw the ones where the nurses approved" but only when it was their report to deny. p. 193 (bates pg. 13)

By 2000 the company had instituted a new procedure called a walk-in and "the purpose in UnumProvident parlance was to give the opportunity to the claims

4

representatives to understand a part of the medical reports they didn' understand. But he became distressed because they would not bring all the medical records, would ask him only about a small part of the records, and ask leading questions. "Then I would get it back on appeal where their claims representative had used my walk-in to deny the case and that's when I would get upset." p. 201-2 (bates pg. 14-15). He answered affirmatively that he would be asked a particular question about some aspect of the treatment "and rather than send it to you for a full and fair review, you would see it back on appeal after the claim rep had denied the file." p. 203 (bates pg. 5).

At one time, Dr. McSharry spoke with a Dr. Anfield who wanted Dr. McSharry to get back on a career path. He relayed the discussion as follows:

> Q. And did he give you some suggestions as to how you could get back on path, on track?
> A. Yes, he said that I really – well, what he said is you don't – you've been in the business world for a while, but you don't seem to understand the – how important it is to serve our business partners, how important it is to support them. After all, I can't remember whether it was Dr. Vatt or Dr. Anfield said we are a means to an end."

p. 241-2 (bates pg. 19-20). When asked about what did they mean by means to an end, Dr. McSharry explained,

> that's why we're here. You know, everybody knows that every doctor who's worked has mentioned that we're totally nonvaluable to the company unless we're able to support the denial of claims, and that is the end game. . . My problem, my feeling is that we are doing things that are just not fair to the claimant number one, but also, really my understanding of the law and ERISA in particular, because that's what I came from in Blue Cross [a previous job] was that they are sidestepping some of the requirements of this, and that -- and the whole emphasis on denial and there really isn't a chance to really asses the claim fully.

p. 242-3 (bates pg. 20). As to the work culture, he testified, it was implied that if the doctors didn't leave room for the claims people to deny, "that we don't keep the claims

5

people happy, and the way to keep the claims people happy we all knew was because they were so incentivized [sic] by this as in money. p. 244 (bates pg. 20) (pointing to exhibit P-6, the list of reserves that would be freed up by various claims handlers by closing (denying) certain cases. p. 245 (bates pg. 20) (Exhibit P-6 at bates pg. 25). He explained, we, the doctors, were "a means to an end, yeah, a means to an end to keep the claims people happy and if we didn't do that, then there would be no need for doctors in this unit. .we were a means to an end." p. 245 (bates pg. 20). He went on, "Dr. Vatt said it to me directly one time, too. He said we have no role here unless we keep the business partners totally happy. You know, they could decide that they have too many doctors at any time." p. 245 (bates pg. 20). "Did Dr. Vatt explain to you what he needed you to do in order to keep your business partner happy?. .Did keeping the claims people happy mean to you helping them deny claims?...Yes, there is just no doubt about that." p. 245-6 (bates pg. 20-21) (Defense objections omitted).

He testified that Dr. Vatt and some of the claims handlers tried to get him to change his opinions and to put words in his mouth. p. 246-7 (bates pg. 21). And he said of Dr. Vatt, "he retaliated against me if I didn't do what he said." p. 248 (bates pg. 21

UnumProvident's in-house physicians are discouraged from seeking additional medical evidence to help them evaluate a case.

Dr. McSharry testified that he was discouraged from asking for additional records or for pointing out that additional records should have been ordered.

> Q. Were your business partners pleased if you reviewed the file and made suggestions that the file was incomplete?
> MR. SHEA: Object to form
> THE WITNESS: No, that's when Dr. Vatt – that's when I got into the most trouble is when I would say something like that. . ." [He gave an example of wanting a neurologists records where all they had were the

6

general practitioner or family practitioner's records in a multiple sclerosis case, and Dr. Vatt would say,] "I suppose that's fine, but really, you're not supposed to be going looking for all these possible things that might be there, we have to look at the objective, what's objective in the file and that's it. And I mean, whatever objective proof, if there is no objective proof, there is no objective proof."

p209-210 (bates pg. 16-17).

vi   UnumProvident's claims handling practices include goals for denying and terminating benefits

Concerning the issue of the number of cases that needed to be closed and the pressure on claims handlers, Dr. McSharry, at p. 226-7 (bates pg. 18), explained he attended team meetings, and was told by David Soloman about the monthly numbers, which were the goals for closing cases. At the mini-round table meetings it would be said "here's another one that will, should be able to help us reach our goal. But then [the claims handlers] would say, but of course you're not supposed to know that Dr. McSharry." p.228 (bates pg. 18).

When asked what he was not supposed to know, Dr. McSharry explained, "You're not supposed to know about that we're under this pressure and you're not supposed to feel this pressure. However, you're here now and you see the pressure we're under."

B.   *Information from Dr. William Feist.*

i. Dr. William Feist, a former Chief Medical Officer, worked for Provident for fourteen years, and testified about the changes that occurred toward the end of his employments.

Dr. William Feist was Vice President and Chief Medical Officer for Provident Life Insurance in Chattanooga from July 1, 1982 to February 29, 1996. (Deposition of Dr.

7

William Feist, in the case of <u>United Policyholders et. al. v. Provident Life and Accident Insurance Company et.al</u>, Alameda County Superior Court, case number 815688-2, taken Aug 23, 2001.p. 13. (bates pg. 27).

Dr. William Feist is board certified in insurance medicine, which he describes as a certification that deals with consultation to the insurance industry. p. 09-11 (bates pg. 27-29). This includes training in the standards of the insurance industry with regards to claims payment and fair practice standards. p. 12 (bates pg. 30).

Dr. Feist testified that Provident's claims handling changed in the mid 90's, in that Provident began to deny more claims. When asked if his training made him familiar with "whether or not ambiguities in a policy have to be interpreted in favor of a policyholder against the insurance company?" he responded, "Well, I think traditionally at Provident it was interpreted in favor of the claimant. If there was a dispute – I think that after Mr. Chandler and Mr. Mohney came on board in the mid-90's, I think that changed to give the benefit of the doubt, if you will, to the insurance company. p12-13 (bates pg. 30-31).

When "Mr. Chandler came in the fall of 1993 and sometime in '94 Ralph Mohney came to be vice president of Claims. And after that was in place, then the change in the claims handling procedures changed rather dramatically. Before Mr. Mohney took over, the claims handling operation of claims was basically held – or actually evaluated in the field, at lest the initial evaluation, and any problem cases came into the home office. And then under Mohney, all claim operations was brought into the office. But I think the other thing was, of course, that Provident became a company that tried to do what was

fair for the claimant [into] the one that tried to enhance the bottom line any way they could. p.33 (bates pg. 35).

11.     New procedures, such as "round tables" were put into place to be used as tools to find ways to terminate ongoing claims:

Dr. Feist was asked if he recalled what's meant by the term roundtables, to which he answered, "roundtables were discussions that were group discussions that were started in the spring of '95. And these were set up to look at some high risk or high dollar claims in terms of seeing of those claims could be rescinded, or terminated, I guess is the better word." p. 25 (bates pg. 32). The original official name of the round table was the "special review process." p. 28 (bates pg. 33). They were often held on Tuesdays and Thursdays around 4:30 or 5:00 and lasted two to three hours. p. 28-29 (bates pgs. 33-34). Each discussion of a case was preceded by announcing the claim reserve in a particular case; usually the tell the occupation, how much insurance the person had and the amount of the reserve. p. 72 (bates pg. 57). He explained, "to my recollection, during the nine months that I was involved with the roundtable discussion meetings, virtually all the claims that I recall were individuals who had been judged disabled but then were reexamined at the roundtable process to see if there was some way to reverse that initial decision." p. 40-41 (bates pg. 39-40).

He explained, "I think the rationale of the roundtable discussion was basically to look at a block of claims that were high reserve, meaning they had set aside a good amount of money to cover their claims. They were looking to see if the claims were, what I have termed gray areas, psychological claims, chronic fatigue, some of the real

9

vague difficult medical impairments to evaluate, basically going back and relooking at these claims to see if there is some way that it could be terminated." p. 40 (bates pg. 39).

Dr. Feist is asked about a May 22, 1995 memo from Ralph Mohney to Harold Chandler that states that a "one percent decrease in benefit costs due to more effective claims management translates to six million dollars in annual savings. We believe that aggregate improvement in the five-ten percent (thirty million to sixty million dollars annually) range are possible-once the initiatives have been fully implemented. This range of potential savings is consistent with the recently completed Tillinghast study." p. 35-36 (bates pg. 36-37).

While Dr. Feist had not seen this memo before, he stated that "I think this memo supports the rationale of the roundtable to basically go back and relook at problem claims." p. 38 (bates pg. 38).

Later in the deposition, he was asked about a memo that discussed trying to get lots of information on claimants, such as info from ex-wives and court records. Dr. Feist had never seen the memo, "but I think the tone of the discussion at the roundtables were often in that vein. To me, anything was fair game to try to terminate the claim – surveillance or financial records, ex-wives, mistresses, whatever, anything was fair game. p. 62-63 (bates pg. 52-53). Over the next several pages he explains that the purpose of gathering the information was not to embarrass the claimant, that was immaterial; rather it was just that "anything is fair game to try to get information to terminate the claim. p. 65 (bates pg. 54).

He testified that claims adjustors, "certainly were looked at favorably by the administration if the Claims Department if these claims adjustors did bring files to the