# ATTACHMENT

# "A"
# Part 2
# Summary Pages 11-20

ATTACHMENT "A"

roundtable discussion." p. 68 (bates pg. 56). Especially claims with high-dollar reserves and gray areas. p. 67-68 (bates pg. 55-56).

Later, he again explained, "I think the whole goal of roundtable discussions was to terminate claims. to me that is unethical for a company to decide to do this activity. I think it was a definite corporate strategy to do this. They just didn't fall into this serendipitously, they just decided to do that." p. 88 (bates pg. 62). And then he explained again, "they developed a corporate strategy to try to terminate some of those claims, as many as possible, and the roundtable was a major modality to do that." p. 90 (bates pg. 63). He testified that of the cases he recalled having been reviewed at roundtables, were people who had already been evaluated as disabled, sometimes years earlier, and "there['s] no documentation of any cases I ever heard of in that time frame that the individual's medical impairment had changed from the initial disability income determination. So if somebody is evaluated and determined to be disabled and there's no medial change in his condition, there's no reason to look at it unless you want to go back and get rid of some high dollar claims." p. 91 (bates pg. 64). He explained that for people who have already been found disabled, that an unethical insurance company "will say, well, we made a mistake back several years ago, the claims people didn't evaluate it properly, we have to go back and see if we can change their decision. I think that was the driving force of the whole roundtable process. p. 92 (bates pg. 65).

He explained again that it is reasonable to investigate claims at the beginning, but one the person is certified disabled, and continues to be certified, "the roundtable, I think, overstepped the bounds of when they went back and looked at these persons with sort of a philosophy that the initial process was in error, so therefore we have to go back and try

to find that error and correct that error, even though it might have happened months or years before the roundtable process. p. 124 (bates pg. 76).

He explained that Provident was not trying to correct errors; "they were trying to do something else, They were trying to find a way to terminate the claim, or resolve the claim, as Mr. Mohney prefers, in any manner – whatever it took to try to terminate the claim for their goal, if you will, of the dollar reserve." p. 125 (bates pg. 77).

"That's what the roundtable was, to drum up something to terminate the claim. p. 134 (bates pg. 78). If its getting paid, "there is no reason to go back unless the company has the intent and the corporate philosophy to terminate those claims any way they could." p. 137 (bates pg. 79). "There's no reason for a roundtable unless the company wants to write down the reserves. That is the total intent of the roundtable as far as I'm concerned." p. 141 (bates pg. 80). If the claim "was determined to be valid initially and there is no change in the person's condition, what else can there be but to try to terminate the claim." p. 160 (bates pg. 81).

    iii.    Provident had a policy of destroying documents, removing evidence from files, or avoiding putting information in writing.

Dr. Feist stated that he believed the insurance company had a right to investigate claims, but had to document them honestly and completely. p. 42 (bates pg. 41). He explained, "It seems to me if an insurance company is fair and honest, they are going to document everything in the file and come to a fair and honest conclusion. If there is some data that doesn't support their conclusion that they purge, I think that is dishonest." p. 44 (bates pg. 42).

12

During his deposition, Dr. Feist read portions of Exhibit 44-F an "Outline for Information Management presented by the Law Department of Provident Life and Accident Insurance Company." (bates pg. 164-166). In this document it instructs employees to avoid sending written memos and to shred all sensitive papers. p. 45-46 (bates pg. 43-44). After reading a portion of the document, Dr. Feist says his understanding of the document was that "I think that document basically instructs the claims adjudicators to destroy or shred information that would be detrimental to the Provident Company and only to keep things that would be beneficial or helpful to the Provident company. p. 47 (bates pg. 45).

"I think before Chandler and Mohney came to Provident, claims were handled in fair and aboveboard way. don't think there was anything about shredding documents and not putting in information. I think the standards that were there at Provident would be what I would considered the industry standard for an ethical company. But the standards that came in after Mr. Chandler came to Provident, think, did not meet those standards." p. 50 (bates pg. 46).

He testified that Jeff McCall took notes at roundtables, and those notes were destroyed. Jeff McCall's function at roundtables was "to take notes to follow up to make sure that the modalities that were suggested in a given case were followed through on by the various persons, whoever was involved in that case. Those records have all been destroyed, nobody can find them. p. 55-56 (bates pg. 47-48). He later clarified that "Mr. McCall was Ralph Mohney's administrative assistant, and basically Mr. McCall did – had duties and responsibilities of whatever Mr. Mohney asked him to do. I recall distinctly Mr. McCall taking notes on cases. .His role was to follow up with the claims

13

adjustor so that – you know, if a certain case was to have surveillance or they were going to go back and check the financial records, or whatever, his role was to follow up. And m sure those records have been destroyed. They may be in the individual files, as you say, but going through the thousands of files to find them would be, as you say, an impossible task." p. 59 (bates pg. 49). Later, he explained further, "typically we would discuss six or eight cases during a given roundtable discussion, and my recollection was he, Mr. McCall, took notes on every case that we discussed." p. 60 (bates pg. 50). He explained more, 'Mr. McCall's responsibility was to follow up with the claims adjustors to see that if surveillance was suggested, that was scheduled; if an IME was suggested, that was scheduled; if they were going to back and look at the individual's financial records, the appropriate financial people would do that. That was his role. Now I'm sure once the case was finished, finished the process, if you will, McCall's notes were destroyed. I'm sure they were. p. 61 (bates pg. 51

He was asked to comment on a memo (dated February 21, 1996, document 9) (bates pg. 49) that instructs that field reports should not include recommendations and conclusions. p. 77 (bates pg. 58). Dr. Feist explained that the date on the memo was from about ten days before he left the company, and that "my impression of this is that some of the information that you as a field investigator obtain in your course of activities that is detrimental to Provident Life and Accident Company, we don  want it in the file. p.79 (bates pg. 59). Later, Dr. Feist testified that "this in essence is unethical. To me a claims adjustor goes out and gets his or her information, writes it up completely as he or she can, puts it in the file  this to me is basically putting in the file what the insurance company

14

wishes to have there and not having anything that the insurance company doesn't want to have that might be beneficial to the claimant's situation. p.80-81 (bates pg. 60-61

The in-house physicians at Provident went from making decision on claimant's records to being used to support the decisions of the claim department.

Dr. Feist testified that when Mr. Mohney took over the claims department, he made the edict, if you will, that the Claims Department would make the decision whether a claimant was disabled or not. The Medical Department – the medical director reviewing the file was not to make that adjudication. recall specifically a case, probably in November of '95 [for a man who had several myocardial infarctions] This man could literally not walk across the length of this room without getting severe chest pain. I wrote on the file that this man is permanently and totally disabled just as clear as I could write it. was called on the carpet by Mr. Mohney saying, 'Dr. Feist, you are not to write on any file, this file or any file, that this person is disabled. That is for the Claims Department to make the decision. pg. 99-100 (bates pg. 66-67).

He went on to explain that this was a "profound philosophical change" because from 1982 to 1995-96 "the physicians were asked to write is this person disabled or not." p. 99-100 (bates pg. 66-67). Then again, he testified, "that the Medical Department was there to and the physicians were there to provide medical input on a case, but the final decision was to be made by the Claims Department." p. 101 (bates pg. 68)

v   Provident adopted a policy that the opinion of a claimant's own physician should be disregarded, on the assumption they are in league with the claimant to wrongfully obtain benefits.

15

Dr. Feist testified that at roundtables, "the implication was that the attending physician who submitted the initial disability report certifying disability was somehow in collusion with the claimant, and therefore you are getting an IME to prove that the attending doctor is giving us misleading information." p. 105-106 (bates pg. 69-70). He goes on to explain that normally the treating physician knows about the claim and that, while there are cases of collusion, it happens infrequently that it is just not a factor on an average basis. p. 107 (bates pg. 71).

    vi.    Provident used independent medical exams to support their decision to deny benefits, rather than to conduct a fair examination of the claimant.

Dr. Feist testifies that "an independent medical examination is not independent if the physician that examines the claimant doesn't have all the information, the records, the history, any studies that are made, any chance that they talk with the claimant et cetera. If you don't have all those parameters in force, its worthless, particularly if you are going to take the information and pick and choose what you want to use. That borders on fraudulent." p. 111-112 (bates pgs. 72-73).

However, rather than fairly evaluating the claimant, Dr. Feist testified that "Provident was using the IME to get the information that they wished to get, and any information that was not useful, they would disregard." p. 114 (bates pg. 74). He stated that it was implicit in the roundtable discussions that, "be sure to get the right physician to do the IME because we want to get the answer we want, we don't want to get the answer that's detrimental to our cause." p. 115 (bates pg. 75).

16

C.     *Statement of former Claims Handler, Donna Wright.*

A former claims handler at UnumProvident provided a sworn statement on August 21, 2003. (bates pg. 82 et. seq  She testified that she was first an employee of Provident and then of UnumProvident after the merger, and handled Paul Revere claims while employed by UnumProvident. p. 6-7 (bates pg. 84).

Much of the training provided to UnumProvident employees is on-the-job, with little formal training and little documented guidance on claims procedures.

Ms. Wright testified that her training program only consisted of four hours a day for five days. p. 8-9 (bates pg. 84-85). Most of her training was on the job. p. 9 (bates pg. 85). She first worked in the "special handling unit" ("SHU") which was for claims that it had already been decided would be paid for the duration. p. 7-8 (bates pg. 84), 22-23 (bates pg. 88). Later she explained that of the 3000 claims she was assigned that would be paid to the expected duration, about one third were paid on the mental limitations. p. 92-3 (bates pg. 105-106).

To determine which claims should have been paid and which should not have been paid, "I go from my instincts." p. 10 (bates pg. 85). The way she found out the criteria for terminating a claim was that she was told by management; however, she did not learn in a training session, but after the fact when she "messed up

> Q. ... [i]f you had a question about one of those files that you were trying to decide whether or not is should keep getting paid or not, what kind of training did you have as far as what to look at medically for these people?
>
> A: I didn't have any training. . .the only training I had was the training on the computer, four hours a day, five days a week, that was it. p. 24 (bates pg. 88).
>
> She explained that beginning in 2001 that they started a six or eight week training program, "but other than that when they come out on the floor it's like total blank to them." p. 25 (bates pg. 89).

7

She testified that there was a training manual on the computer, "but we weren't allowed to print it off." p. 26 (bates pg. 89). But, there was other stuff they were not allowed to print off, such as state laws. p. 26 (bates pg. 89) (Later she described these as guidelines applying to each state. p. 31) (bates pg. 90). When she first started working there, there was no manual on how to pay [decide] claims. p. 27 (bates pg. 89). But they were allowed to go by the manual, even though it was not finished. p. 28-29 (bates pg. 89-90). She explained that on the computer were guidelines that explained state law, but that she did not know if they were the actual state law or interpretations; "[w]e just took for granted what they put in the system." p. 31 (bates pg. 90). Under the states, some would say "governed by ERISA.

"Q. What did it mean if it was governed by ERISA?

A. Don't ask me.

Q. Why not?

A. Because even though I put it in all them letters that I sent out, I wasn't really sitting dawn and saying this is what ERISA means." p. 31-32 (bates pg. 90). She explained that she got no training on ERISA other than that they had to put it in every letter. She did not learn what claims were covered by ERISA and what were not. p. 59 (bates pg. 97).

ii     UnumProvident claims handlers do not have a copy of the actual policy available when working on a claim.

Ms. Wright worked in the special handling unit, handling 3000 claims and did not have an actual copy of the policy each person was getting paid under, but rather a generic policy. p. 1-12 (bates pg. 85). "Q: If an employer out there had purchased one of those

18

policies but had a special provision for certain people, how would you know that? A: Usually we found out by mistake. p. 18 (bates pg. 87). For example, she applied a social security offset to a claim that did not have one, because she did not know that employer had a different plan. p. 18-19 (bates pg. 87). "We [were]n't told in the beginning that they don't have an offset, we had to find out the hard way. p. 20 (bates pg. 87). She explained much later that if a policy had a rider, she wouldn't know that without calling somebody to ask. p. 54 (bates pg. 90). There was a sheet in the file that had check boxes to tell you if the person had this benefit or that kind of benefit.

  iii. UnumProvident claim handlers were instructed not to print documents off so that they would not end up in the file, and to destroy documents that had been created.

As explained above, Ms. Wright testified that there was a training manual on the computer, "but we weren't allowed to print it off." p. 26 (bates pg. 89). But, there was other stuff they were not allowed to print off, such as state laws. p. 26 (bates pg. 89). She explained at p. 33 (bates pg. 91

"Q. How did you know you weren't supposed to print this stuff [the information and guidelines] off?

  A. It says so in the system

  Q. What do you mean?

  A Down at the bottom it's highlighted 'do not print this

  Q. Why can't you print stuff?

  A. They don't want it ending up in the file."

She clarified that, even though there was information on the computer that told her information she needed to know as a claims handler and on how to handle a claim, she was not supposed to print it out because management did not want it to end up in the

claim file. p. 33-34 (bates pg. 91-92). She explained, "Q. Do you remember anybody specifically telling you that? A. Tony Price told me that. Let me think of the other one. Every supervisor I ever had." p. 34 (bates pg. 92). Later she remember the other one was Kim Beckett.

> Q. Did they ever say why they did not want them to end up in the claim file?
>
> A. They don't want the information in claim files because then they have more questions to answer if they have to go legally, you know. If they get sued, then if that information is in there in their claim file, then that give the opposition more questions to ask really, this information. So they don't want none of that in the files.
>
> Q. How do you know that was their reason.
>
> A. Because we were told that stuff in staff meetings.
>
> Q. Okay. Do you remember anybody who specifically said that?
>
> A. Well, Kim Beckett told it to us to begin with not to be putting any emails.
>
> Q. What your were just talking about, the reason why was because they didn't want those documents coming out later on if legal proceeding ensued, who told you that?
>
> A. Kim Beckett
>
> Q. Okay. Did you have any time that information was distributed by paper? Did anybody ever hand out a memo or mail to everybody, any kind of instructions or was it all done by computer?
>
> A. All done by computer.

p. 34-35 (bates pg. 91   She also explained that the reality at UnumProvident was that there was a conflicting informal policy, in that at time they were required to print out documents, for example, to show to a supervisor, but they could get in trouble for leaving