# ATTACHMENT

# "A"
# Part 3
# Summary Pages 21-30

ATTACHMENT "A"

such documents in the file, even though such documents were relied on in making the decision on the claim, so she shredded them:

> Q. Did any of [the documents] ever get printed out by anybody?
>
> A Yes
>
> Q. Tell me how you know that.
>
> A. I've seen them on the printer.
>
> Q Okay. Did you ever print any of them out?
>
> A. I have printed a couple out to show to upper management why was going to terminate the claim or deny the claim.
>
> Q. So stuff from the training manual that told you how to handle the claim you printed that out?
>
> A. Mostly state laws, the state laws then after I get through with it then I put it in the shredder. After I made my point and showed them why I was denying the claim, then I would put it in the shredder.
>
> Q. Okay. Why would you not put it back in the file if it was something you relied on to make a decision in the file?
>
> A. They don't want any of that and they audit you and you get an [audit hit] if they catch one in the claim file.
>
> Q. You mean somebody comes and checks the files to see what is going on? Is that what you mean by audit?
>
> A They pull five or ten claims a month.
>
> Q Who would do this?
>
> A. They had a person that's all they done was audit our claims.

p. 38-39 (bates pg. 92). She went on to explain that if something was printed up and put in a claim file, the person who was caught with it in a file would be written up, and that it was brought up at staff meetings. She explained

21

>   A.   They were very upset about them printing it off to begin with, They said that if we had to go before and make a sworn statement or anything then, you know, here you have this legal law, you know, which basically a couple of statement in that little whatever state it was wouldn't be but two or three little statements in there that pertained to your claim file and they had found them in files after the fact that someone had sued them. . .It's been brought up in court and they found these and that was one of the big things because the had a lawsuit going and they come up with emails and state laws and stuff like that where the person had put it in the file and then when it came out in court it must not have been a good thing because all of us got a staff meeting as was told not to be printing any emails, don't print any state laws, don't print anything from the claims manual that was on the system. Don't print any of it and put it in the claim file.
>
>   Q.   Do you remember who it was at the staff meeting that told you that?
>
>   A.   Kim Beckett.

p. 40-41 (bates pg. 92-93).

Ms. Wright explained that she was also told not to print out emails, even though at times she was told that certain other people were experts in certain areas and she could email questions to them and they "would email you back an answer of what or how to handle a claim. A. Right. Q. And you were told not to print that out? A. Right." p. 43 (bates pg. 93)

She explained that she did, in fact, save such emails as back-up on the reasoning why she did what she did. She did not print them out so they would not end up in the file, but that she saved the emails in a personal file in her computer "probably 100 or more

She knew a fellow employee, Belinda King, who was written up for printing off the claims manual; she was discovered when someone went through her desk when she was out one day. p. 45 (bates pg. 94). Ms. Wright was told by other employees, whose

names she doesn't know or remember, that after meetings telling them not to put stuff in files that she and the other claims handlers went back and pulled the documents out of files. p. 46-47 (bates pg. 94).

    iv.    As a claims handler, Ms. Wright was taught to pay claims under the "MDA guides" but those guidelines are not to be included in the record.

When evaluating a file, Ms Wright explained that she could have it reviewed by a nurse, but not a doctor.

> Q. What kind of stuff could you go talk to the nurse about?
>
> A. Durations on claims on certain diagnoses that we couldn't find.
>
> Q. Tell me what you mean by that?
>
> A. Well, we had the MDA guideline book which is medical where all the doctors, all these doctors across the United States are supposed to come up with these durations for certain illness, you know. Like your gallbladder, your expected duration for you to be out for gallbladder is two weeks. . . . We look up the duration but there would be some that would be a little more complex than what the book is telling us so we would take it to the nurse and the nurse would look up the duration or say I think that's really appropriate, you should go ahead and pay it… Every diagnosis has a duration according to the MDA guidelines. That's what they base their decisions on when they're paying claims is the duration in the book.

p. 65-66 (bates pg. 99).

She testified later that after Provident merged with Unum, things changed. Specifically, she was told by Kim Beckett not to pay claims longer than the MDA guidelines because "we needed to save money. p. 87-88 (bates pg. 104). (She was told this at a staff meeting. p. 89) (bates pg. 105).

She explained that they did not have the MDA guidelines in the computer, and they only had one book per unit. She knew this was the way to pay claims because she

23

was told by "upper management," namely, Kim Beckett. And she testified that upper management told them not to put that information in the file. p. 66-68 (bates pg. 99).

When she needed a page out of the MDA guidelines to explain a decision to a supervisor, they would make a copy of the page and take it to the coordinator and then the copy would be shredded. p. 68-69 (bates pg. 99-100).

      v.    Claims handler at UnumProvident were aware of the reserves on each claim at all times because they were available on the computer.

Ms. Wright testified that the amount of the reserves for each claim was on the computer system and "they were always there." p. 85 (bates pg. 104).

D.    *Statements from other UnumProvident employee.*

      ii.    Public statements made by UnumProvident employees on 60 minutes support the testimony of Dr. McSharry.

On CBS' 60 Minutes broadcast on November 17, 2002 several other employees spoke publicly. (bates pg. 115-120). Diane McGinnis, a three-year employee of UnumProvident worked as a claims handler; she explained that UnumProvident claims handlers were given goals to close a certain amount of claims each month. She explained, "at the end of the month, the projections would come down from the directors or above, who would give a number as to the amount of money we would have to come up with at the end of the month in closures." She explained that the policy was not based on a projection of a certain number of cases that should be closed based on the evidence of disability, rather "I don't think it was about whether they deserved to be closed. They had to be closed. They needed to make these projections." She agreed that "the dollar

24

figures had nothing to do with the validity of the claims." She described that in order to reach the goals, "[t]he claims reps would go looking for claims they could shut down, and the consultants would be right behind them, helping them go through files to look for those numbers that they needed." Ms. McGinnis agreed that "many times" claims handlers shut down claims they knew were legitimate in order to meet monthly targets.

In addition to Ms. McGinnis, three other former employees made public statements on 60 Minutes. Angela Brackett, a claims handler, stated, "about the middle of each month, they'd let us know if we were on track to meet our dollar amount for the month, and if we wouldn't, they would really start pushing us to either find more or to get the one that we thought we could get closed."

Gina Hartley worked five years as a claims handler. She explained, "[i]t was well-known to each individual, each one of us and to every department. It was standard. I mean, day-in/day-out there were targets, there were goals." Her statement was that if UnumProvident denied that there were money targets, than the company is lying.

Ms. Hartley further explained that if they were behind on their goals of closing cases, they would,

> have what was called a - - a blitz. . .where everybody would come in on a Saturday and we'd go through our claim files. . .we'd go through our - - our claims, our co-workers' claims, other department's claims, trying to find something that just might - - you know, whether - - even if it was a technicality, something that we could close that claim on, and the pressure on the claims representatives were so intense that we felt we had to go in to close that claim.

Mr. Bradley asked Ms. Hartley, "[y]ou knew of people who were really disabled, and their claims were terminated because in terminating those claims, UnumProvident would save money?"

25

Ms. Hartley replied, "Oh, yes."

Mr. Bradley asked, "no doubt about it?"

Ms. Hartley responded, "no doubt about it."

She also agreed that "supervisors [knew] that [we] were terminating legitimate claims."

Michelle Payne, a former administrative assistant with UnumProvident also spoke publicly. In response to UnumProvident's denial that claims handlers had no financial incentive to terminate claims, Ms. Payne said that wasn't true. She said, "[t]he ones that knew how to do what was asked of them, they're the ones that got the bonuses." She further explained that "what was asked of them" was to "close the claims." Mr. Bradley noted that she said that without hesitation, and she responded, "I saw it on a daily basis."

Ms. Payne described how this would happen:

> There were staff meetings that we sat in, and the manager would say, "well, so-and-so just closed two million dollar - - a two million dollar claim today." Everybody would give them a hand, and then in about two or three weeks, lo and behold, that person would end up being presented with a bonus, check, money.

E.   *UnumProvident business documents*

    i.   UnumProvident (and its predecessor Provident) have a history of have terminating claims as a goal to save money.

A memo from T.B. Heys, dated September 29, 1994 (labeled as exhibit 1 in the documents) (bates pg. 121-124) outlined Provident's difficulties with disability operations and underwriting at that time. In that memo, he describes that "the claims organization has been plagued by a work process called the quarterly scrub. In this situation, much of the work in the third month of each quarter is devoted to reviewing

open claims with the attempt to settle, close, or modify the reserves by quarter end. A new head of the claims area has been appointed and has several initiatives underway including the elimination of the quarterly scrub process.[1]"

  ii  UnumProvident (and its predecessor Provident) adopted policies and procedures to save money by denying or terminating claims, changing the philosophy from the payment of claims to the "management" of claims.

Provident new claims procedures included the goal of "closing claims" which meant terminating the payments under open claims. When a claim was closed, the amount of reserves assigned to that claim could be removed from reserves to profit, thus creating "savings" in the claims department. For example, a Memo from Barbara Collins to Steve Harman, March 30, 1995, regarding "Psychiatric claims – summary for first quarter 1995 closures" (exhibit 89) (bates pg. 170) shows the total reserves, less costs and "savings" by month for claims that were closed in the psychiatric unit at Provident. The second page shows all the closures for the month of March, by the reserves, costs, savings and status.

A memo from Ralph Mohney to Harold Chandler, dated May 22, 1995, re: revised 1995 budget – individual disability claims (labeled exhibit 3 in the attached documents) (bates pg. 125), mentions initiatives "are designed to move Provident from a claim payment to a claim management approach." Harold Chandler explains in this

---

[1] The "scrub" process (a process of intensely reviewing claims at the end of the quarter to improve the quarterly numbers) did not go away. For example, a July 14, 1995 memo describes "institutionalizing the scrub." (bates pg. 175-176). Also, in a Memo from Ralph Mohney to Tom Heys, dated February 15, 1996 (exhibit 44), "Individual Disability Claims – Monthly Report" for January 1996" (bates pg. 146-147) states, "[t]erminations were strong for a non-scrub month. . .The number of terminations was the second highest level ever for a non-scrub month." See also exhibits 96 and 114.

memo that a "1% decrease in benefit costs due to more effective claim management translates to approximately $6 million in annual savings. We believe that aggregate improvements in the 5% - 10% ($30 million - $60 million annually) ranges are possible – once the initiatives have been fully implemented." The memo formally asked for additional manpower and expenses approval to "fully implement our claim improvement initiatives."

The new claims procedures were soon implemented throughout the organization. For example, in a memo from Steve Harman to Ralph Mohney, July 14, 1995, entitled "Institutionalizing the Scrub" (exhibit 114) (bates pg. 175-176) The Northern Unit met and agreed to institute some new procedures on a permanent basis immediately, including a " 'Top 10 List' Each adjustor will maintain a list of ten claimants where intensive efforts will lead to successful resolution of the claim. As one name drops off, another name will be added." Another procedure is for "claims over 2 years old, "Each adjustor will do an in-depth review of 2 files per week in this category of claims. As issues surface, the adjustor will work with the consultant to find resolutions." The memo also states that two files per quarter will be referred to roundtables, (which are discussed in more detail below

Another memo from Steve Harmon to Northern Region Adjustors, entitled "Scrub Activities, further shows how these procedures were implemented. That memo, dated, October 5, 1995 (exhibit 96) (bates pg. 172) (which referenced the July 14, 1995 "institutionalizing the scrub" memo") explains, "[a]s I pointed out in my monthly letter to Ralph [Mohney], much of our success in the 3rd quarter was attributable to our

28

Permanent Scrub Activities. Please review the attached memorandum [exhibit 114] and make sure that you are performing the activities outlined, especially #1, #2, #4, and #5.

By the fourth quarter of 1995, Provident's new procedures and philosophy began to show results. In a memo from Ralph Mohney to Tom Heys, dated January 17, 1996, titled "Individual Disability Claims – Monthly Report" for December 1995 (labeled as exhibit 43) (bates pg. 141-145), Mr. Mohney reported, "[t]erminations increased 22% ($27.5 million) to the highest quarterly level ever. Both a higher number of terminations (up 5%) and a higher average size (up 16%) contributed to the increase." Later, the report continues,

> Overall, we are both pleased an encouraged with the results of the claim management activities during the quarter. The $114.8 million of net terminations (terminations minus re-opens) represents a record level and is 28% ahead of the previous four quarter average. Moreover, the fourth quarter represents the 3rd consecutive quarter of $100 million or more of net terminations. In addition to enhanced claim management results, the seasonally lower new claims combined to produce the very strong overall financial results.

That same memo explains, under Key Activities, that

> [t]he attached Exhibit III summarizes major accomplishments related to our 'top 10 claim initiatives' over the course of the year. The vast majority of the planned action items were implemented and the aggregate accomplishments are truly impressive. The entire management team – including our representatives from Law and Human Resources deserve considerable credit. The claim Improvement Initiatives included (including selective subparts, most subparts not listed):
> 1. Strengthen Investigative Capabilities
> 2. Effectively Manage MNDA Claims (is this Mental and Nervous Disability A)
> 3. Audit Financial Aspects of Residual Claims
> 4. Sharpen Legal Defense
>    -Instituted and staffed role of "claim counsel" to focus exclusively and more intensely on "front-end" work
>    -Implemented vast majority of LeBoeuf recommendations
> 5. Develop New Claim System
> 6. Introduce Formal Training

          -Developed quality assurance program designed to evaluate claim representative performance, identify training needs and identify specific claim resolution opportunities.
          -Commenced development of procedures manual
    7.    Implement Process Improvement
          -Instituted Round Table Review sessions for interdisciplinary review of problem claims. Over the course of 70 sessions, 358 claims with reserves totaling $228 million were reviewed and appropriate actions agreed upon.
          -Established procedures for identification and proper handling of ERISA claims.
    8.    Increase Staffing
    9.    Introduce Rehabilitation Capabilities
    10.   Strengthen Medical Resources.

The Monthly Risk Management Report Memo from Tom Heys to Harold Chandler, dated March 18, 1996 (labeled as exhibit 16) (bates pg. 136-140) gives an example of how the company measured the performance of the claims department in terms of how much money was saved by terminating claims. Mr. Chandler states, "February terminations were $43 million, slightly below January. We did not do as well on residual claims, and deaths were lower. I have attached the most recent claim reserve report. Ralph [Mohney] expects March terminations to be $50-55 million." (bates pg. 138).

By early 1996, Provident had its new claims "management" process in place, and began to assess the effectiveness of its new procedures. For example, in a memo from Ralph Mohney to Tom Heys, dated April 17, 1996, "Individual Disability Claims – Monthly Report" for March 1996 (labeled as exhibit 46) (bates pg. 151-152) the company had begun to measure performance by using a "net termination ratio" (terminations minus re-opens divided by new claims) which reached 94%, up from 47% in early 1995. The memo states, "[t]his result demonstrates that the investments in claim effectiveness over

30