# ATTACHMENT

# "A"
# Part 4
# Summary Pages 31-40

ATTACHMENT "A"

the last eighteen months are beginning to pay substantial dividends." Later in the same memo, Mr. Mohney explains,

> The first quarter provides strong momentum for what we believe will be a defining year of claim effectiveness at Provident. While some gaps exist, the infrastructure for effective claim management is largely in place. However, significant efforts need to be directed towards pushing these improvements deep into our culture, more closely monitoring activities and results, and achieving consistently higher levels of performance.

The Monthly Risk Management Report Memo from Tom Heys to Harold Chandler, dated May 24, 1996 (labeled as exhibit 15) (bates pg. 133-135) shows even more focus on terminating claims systematically. "Performance indicators in the future will focus more on termination activity at specific claim durations." (bates pg. 135).

By May 1996 the focus on "managing" claims lead the company to re-evaluate claims that had already been decided would be paid indefinitely. In a memo from Ralph Mohney to Tom Heys, May 22, 1996, "Individual Disability Claims – Monthly Report" for April 1996 (exhibit 47) (bates pg. 154-156). Mr. Mohney reports, "claim results were unfavorable in April, with higher new claims and lower terminations." (bates pg. 154) He discussed that claims that had been put in the special handling unit (for claims that were to be paid indefinitely) would be reevaluated by moving "a large block of claims from special handling status to claim management status." (bates pg. 155). Later, exhibit III to that memo describes review of 824 cases that were "temporarily placed in special handling (auto pay) status until staffing increased. These claims will be evaluated for return to claim management unit or placement in permanent special handling." (bates pg. 156)

31

In the Monthly Risk Management Report Memo from Tom Heys to Harold Chandler, September 17, 1996 (labeled as exhibit 13) (bates pg. 130-132). Mr. Heys reported, in regards to LTD claims: (bates pg. 130-131)

> The product management group has determined that our claim terminations have been running at a lower level over the past two years than in earlier periods. This could result from a number of factors, including a different claimant profile, i.e., physicians and lawyers, where the claims are tougher to close; however, we will intensify the efforts to review termination potential. We have instituted special review sessions to review in a cross-functional manner all LTD claims worth over $200,000 of reserve. Not only will the relevant LTD claim personnel be participants, but they will be assisted by an individual claim consultant at every meeting.

In the Monthly Risk Management Report Memo from Tom Heys to Harold Chandler, November 19, 1996 (labeled as exhibit 12) (bates pg. 126-129), Mr. Heys reported, "[i]n individual disability, October [1996] was an ok month. The number of terminations was good but the average size was lower than usual. . . In LTD, our average termination size in October was higher than normal and produced a good result. (bates pg. 128).

    iii.    Among the changes Provident adopted in order to "manage" claims, and thus save money by terminating them, were procedures called "roundtables.

In a memo from Ralph Mohney to Tom Heys, July 17, 1996, "Individual Disability Claims – Monthly Report" for June 1996 (exhibit 49) (bates pg. 157), he explained that roundtables have been expanded to a daily basis in all five specialized claim management units. In exhibit VI to that memo, ("key activities") (bates pg.160) the memo explained that roundtables had been held each Tuesday and Thursday evening for the last 15 months. It also explained, "in addition to problematic on-going claims, all

32

rescissions and new high indemnity claims will be reviewed in the roundtable forum. Over the last 15 months, 585 claims representing $323 million in reserve have been reviewed with appropriate actions agreed upon and implemented."

In a Monthly Risk Management Report Memo from Tom Heys to Harold Chandler, September 17, 1996 (labeled exhibit 13) (bates pg. 130-132), Mr. Heys reported: (bates pg. 130)

> I had the opportunity yesterday to sit in on one of the daily roundtables that are now occurring. As Ralph has reported to you, each unit has one day a week in which they have taken our special review meeting formats and developed that to the unit level. Large new claims, denial and problem situations are discussed in a cross-functional format.. . .This new approach is consistent with the institutionalization of the claim management approach and one which I think will continue to give us good pay-back.

The November 1996 report (Memo from Ralph Mohney to Tom Heys, November 22, 1996, "Individual Disability Claims – Monthly Report" for October 1996, (exhibit 53) (bates pg. 162-163) the explanation of "key activities," exhibit IV to the memo, reports that 24 LTD cases (i.e. group ERISA claims) (bates pg. 212) have also now been referred to roundtables.

Provident has a policy to use ERISA law to its advantage.

A "Provident Internal Memorandum" dated October 2, 1995 (bates pg. 77) explains that a Provident task force sought to

> promote the identification of policies covered by ERISA and to initiate active measures to get new and existing policies covered by ERISA. . .[because] the advantages of ERISA coverage in litigious situations are enormous; state law is preempted by federal law, there are no jury trials, there are no compensatory or punitive damages, relief is usually limited to the amount of benefit in question, and claims administrators may receive a deferential standard of review. The economic impact on Provident from having policies covered by ERISA could be significant. As an example,

33

> Glen Felton identified 12 claim situations where we settled for $7.8 million in the aggregate. If these 12 cases had been covered by ERISA, our liability would have been between zero and $0.5 million.

The same memorandum further explains that, "while our objective is to pay all valid claims and deny invalid claims, there are gray areas, and ERISA may influence our course of action." While it is certainly a laudable goal to deny only invalid claims, this policy statement goes further, in promoting a policy of pushing for ERISA treatment of claims in the "gray area" to help reduce the liability involved in denying those claims. The Plaintiff submits that, while it may be a good business practice to seek ways to defend the denial of claims in the "gray area," this policy also shows that the Defendant is motivated by the desire to save money, rather than to consider a claim fully and fairly under the fiduciary duties required of an insurance company under either ERISA or state law

v. UnumProvident, through its predecessor Provident, knew its new claims procedures were likely to lead to litigation and took steps to cover its tracks, including implementing policies to avoid putting information in writing or in the file, or painting it in a light favorable to the company.

As Provident began to change its policies toward denying more claims under the guise of "claims management" Provident adopted policies designed to avoid scrutiny of its claims handling procedures. For example, a Provident Internal Memorandum dated October 5, 1994, from Jeff McCall to Bob Best and Tome Heys, titled "Summary of October 3 DR Meeting" (exhibit 79) (bates pg. 168-169) contains "observations, key questions and a few conclusions gathered from the meeting on Monday" including the following statements:

34

> 1. There was a general consensus that we should be careful in the words we use and the documentation developed during the project...
>
> 6. [It was] suggested that we initiate a litigation tracking system that analyzes outcomes based upon several different parameters such as impairments, contract provisions, geography, claimant profile, and size of indemnity, etc. I think this information would be valuable.

Provident's practice of not putting important information in writing is reflected in the instructions given to Provident field investigators. In a memo dated February 21, 1996 (exhibit 44 C) (bates pg. 149), the policy reads, "effective immediately, 1 recommendations and/or conclusions should not be included in the written report. Recommendations and/or conclusions are to be communicated either verbally to the home office or submitted in a separate memo."

Plaintiff's exhibit 44 O from the same case is a note entitled "file documentation" which states, "We should make sure that our claim file is document[ed] in such a way that it proves whatever we are saying." (bates pg. 150). Later, that memo explains, "we should makes sure that we do not have anything in our claim file that could be used against the company if the file winds up in court."

The same philosophy of destroying documents and preparing for litigation is reflected in a memo dated June 12, 1996 from Jeff McCall to Ralph Mohney entitled "Round Table Review Meetings." (exhibit 112) (bates pg. 173). Among the items discussed (item 5) was a suggestion to add the word "legal" to the name "round table" "for privilege purposes," i.e "Legal Round Table Review." The memo also explained, "[i]t is important to remember that the file review sheets should be destroyed after each meeting and the actions recommended at the meeting, if approved, be transcribed in the Action Plan Log." (bates pg. 74, item 6).

At some point, Provident trained its claims handlers in "information management;" Provident employees were trained to limit what they put into writing, to destroy notes, and to conduct discussions in person so that the file is not fully documented. (exhibit 64) (bates pg. 164-166).

Claims handlers were instructed to "weigh your words carefully" and to "imagine how your words sound to an 'outsider' in the event your communication is brought up in court." (bates pg. 164). Personnel are instructed that "for matters that are especially sensitive or confidential, consider conducting most of your communications in person, not on paper." (bates pg. 164).

Provident Personnel were also trained to "shred all sensitive papers that will not be needed for business purposes." (bates pg. 165)  They were trained to, "retain only those documents needed for operations, legal compliance and official archives" but they were also told, "when finished with a project, destroy the temporary drafts, reminder notes, worksheets, personal memos, duplicate copies and the like." (bates pg. 166, items B & C)  Claims handlers are also instructed to "destroy chronological files or series of old, unnecessary documents wholesale instead of selectively purging 'unfavorable' documents and creating suspicious 'gaps in the record.'" (bates pg. 166, item F)

F   *Media reports*

In addition to the coverage of the Defendant by 60 Minutes, the Defendant's practices were also questioned by another major network on Dateline NBC, in an episode that aired in October 2002. (bates pg. 178-185)

36

Newspaper coverage of UnumProvident's practices contains similar reports. For example, The Nashville Tennessean, on November 17, 2002, reported "UnumProvident accused of being 'denial factory'." (bates pg. 186). The LA Times reported on November 15, 2002 that: "Insurer's Tactics Rebuked; A judge has ordered UnumProvident to 'obey the law' and make disability payments." (bates pg. 187-189). The Chattanooga Times Free Press reported on October 3, 2002 that: "Insurer faces legal challenge; Suits focus on denied disability claims; UnumProvident disputes allegations." (bates pg. 90-191). On October 19, 2002, the Chattanooga Times Free Press reported that: "Georgia regulator probes Unum; Investigators say number of complaints has tripled, arousing concerns." (bates pg. 192-193). And, On November 15, 2002, the Chattanooga Times Free Press reported that: "Verdict upheld against UnumProvident." (bates pg. 194-195).

On January 16, 2003, the Wall Street Journal reported "UnumProvident Memo Highlights Intent to Use Law to Save Money." In that article, the Journal reported on the UnumProvident memo that outlined the significant savings available if claims are treated as ERISA claims. (bates pg. 196). This article appears to be referring to the memo at bates pg. 177.

*G. Recent court decisions.*

In the case of <u>Hangarter v. The Paul Revere Life Insurance Company</u>, 236 F.Supp.2d 1069 (N.D. Cal 2002), the Court issued an order, approving a jury award in a non-ERISA case, and enjoining the Defendant to obey the law. Specifically, the Court ordered that the Defendants were enjoined "from future violations, including but not limited to, targeting categories of claims or claimants, employing biased medical

37

examiners, destroying medical reports, and withholding from claimants information about their benefits." Id at 1110.

The Court explained in the body of the decision that the Jury heard ample evidence to find that the Defendants acted in Bad Faith; specifically:

> Frank Caliri, Plaintiff's expert, testified that Paul Revere had a time line for terminating claims and that by the end of 18 months of benefits, a targeted claim would be due for termination (Tr. 287:11-289:11). The kinds of resolutions on the claims time line included: "return to work, pay enclosed, denial, termination, rescission, settlement, litigation, ongoing claim approval or other referrals." Five out of eight specific goals were negative for claimants. (Tr. 289:16-290:2)
>
> The jury heard testimony that Defendants' claims handling personnel evaluated Plaintiff with the intent to deny her claim, that they deliberately employed a biased examiner in Dr. Swartz, and that they terminated her benefits despite the fact that she was totally disabled from performing her own occupation, her attempts to make a living by other means had failed, and she was entitled to benefits under the terms of her policy. (Tr. 213:12-214:19)
>
> *Conclusion re bad faith---* The jury heard ample evidence from multiple sources that Defendants set out to target claims such as Plaintiff's with termination the goal, and that Defendants evaluated her claim with the purpose of terminating her benefits.

Hangarter, 236 F.Supp 2d at 1083. As to whether the Defendant Insurer was biased, the Court considered five factors:

1. The insurer may have misrepresented the nature of the investigatory proceedings;

2. The insurer's employees lied in depositions or to the insured;

3. The insurer dishonestly selected its experts;

4. The insurer's experts were unreasonable; or

5. The insurer failed to conduct a thorough investigation;

Id. As to the application of the factors, the Court explained:

> Plaintiff's expert, Frank Caliri, testified that Defendants did all of the above, as follows:

    1. Paul Revere misrepresented the benefits available to Plaintiff, by not informing her about recovery benefits, residual benefits or rehabilitation benefits and telling her in their denial letter that her policy was subject to ERISA, when it wasn't. (Tr. 82:23-83:6, 84:25-85:1, 138:3-140:9, 140:21-141:19, 194:3-196:9, 198:7-199:22, *see* Order Denying Partial Summary Judgment, issued January 3, 2001)

    2. Paul Revere exhibited bias against Plaintiff in its challenging the claimant's disability and in not providing Plaintiff's in job description in the IME letter. The examiner made his evaluation without having the claimant's description of her work. (Tr. 85:8-89:1, 128:2-132:17, 133:12-22)

    3. Paul Revere compelled the insured to litigate to obtain continued benefits.

    4. Paul Revere did not settle in good faith when its liability was clear.

    5. Paul Revere failed to pay as it was obligated to under the policy. (Tr. 74:2-75:17, 79:14-80:11)

    Defendants had a bias against claims like Dr. Hangarter's. They planned to save money by terminating claims like hers. They sent her to be examined by Dr. Swartz, who was biased--- 13 of 13 claimants whose records Plaintiff obtained were found by Dr. Swartz not to be totally disabled. (Tr. 135:12-16;136:8-24) Dr. Swartz himself was further influenced by Defendants' employee Dr. Bianchi, who in the referral letter expressed to Dr. Swartz his opinion regarding the results of the medical diagnostic tests and advised him that Plaintiff would probably improve with conservative treatment. (Tr.90:15-91:18, 294:12-295:13, Ex. 28). Dr. Bianchi had never met Plaintiff at the time he expressed this opinion. (Tr. 474:4-12)

Id at 1083-1084 (internal footnotes omitted).

This case shows that UnumProvident has acted in bad faith contrary to the law in another recent case, one in which the court felt compelled to order the Defendant to conform its conduct to the law

*H.*    *Investigation by the State Insurance Commissioners.*

    Investigation of State of Tennessee Department of Commerce and Insurance.

The Plaintiff here is not the only one interested in the Defendant's conduct. Recently, the Tennessee Commissioner of Insurance has issued an Inquisitorial Order in the matter of Provident Life and Accident Insurance Company, Provident Life and

39

Casualty Insurance Company, and UnumProvident Corporation (and other parties affiliated with them) (bates pg. 197-199). This order shows that the Commissioner has found that good cause exists to make inquiry into the activities of the Defendants. While this investigation is still in its preliminary stages, the fact that the Commissioner has found that there is good cause to conduct an investigation can be used as persuasive authority by the Court to support a finding that the Plaintiff's request to conduct basic discovery on the issue bias and conflict of interest is reasonable.

11.     The State of Georgia has fined the Defendant insurance company and placed it on probation.

Attached is an order from the Office of the Commissioner of Insurance of the State of Georgia, in which the state of Georgia fined the UnumProvident companies collectively $1,000,000 ($250,000 a piece) and placed them on probation. (bates pg. 200-204). Among the terms of the probation, the UnumProvident insurance companies are required, *inter alia*, not to overrule the "medical opinions relating to the disability status of a claim that is provided by a more highly trained and/or qualified professional without concurrence of an equally trained and or qualified professional."

I.     *Evidence from other experts*

Clinton E. Miller, an insurance expert, has stated that UnumProvident's claims handling procedures are in bath faith, and they use litigation as a tool in claims management.

Clinton E. Miller, an insurance expert, who wrote the book, "How Insurance Companies Settle Claims" as well as 30 article on insurance, provided

40

an affidavit in the case of <u>Ketzner v. John Hancock and Provident Life</u>, 99-4852 (D. N.J. 2002), in which he stated that UnumProvident acts in bad faith by failing to follow the appropriate claims manual guidelines, "as well as utilization of claims handling guidelines which are in part themselves **bad faith claims handling** practices. (bates pg. 205-208). UnumProvident engages in litigating as a claims handling tool, refusing to pay obviously valid claims. They "stonewall" claimants by "losing" documents then requesting they be re-sent and by changing claims handlers every few months so they can "seek further delay while he or she 'gets up to speed.'"