# ATTACHMENT

## "A"
## Part 5
## Documents Bates Stamped
## 1-62

ATTACHMENT "A"

Randall Chapman, et al. vs. Unumprovident Corporation, et al.
Patrick Fergal McSharry, Vol. I

CV00-08297
9/4/2002

Page 86

1 November of 2000, do you have a recollection of who was
2 in charge of the claim department then?
3    A. Ralph Mohney.
4    Q. Who was the CEO?
5    A. Harold Chandler.
6    Q. Who was the medical director for the company?
7    A. Dr. Bob Anfield.
8    Q. By the way, Dr. Anfield in 2000, when you
9 came back, was located where physically?
10    A. Same place as he was when I left, which is in
11 the fifth floor in his office.
12    Q. Right here in Chattanooga, Tennessee?
13    A. Oh, yeah, yeah.
14    Q. And in terms of the regional medical
15 director, Dr. Vatt, where was he physically located,
16 state?
17    A. Yes, he had been moved, and he was -- I
18 remember where he -- yes, yes, he had been in one of
19 the offices up on the fifth floor which had big glass
20 panes where a lot of the doctors were on the fifth
21 floor, he was in there as well.
22    Q. And when you got hired here again the second
23 time, what was you hired in as?
24    A. Associate medical director.
25    Q. Did you have any officer status?

Page 87

1    A. Yes, if I remember rightly, you were at vice
2 president level automatically and then after six months
3 probation, if you showed your ability to function
4 as an associate medical director, you would be promoted
5 to a medical director.
6    Q. All right. So associate medical director,
7 corporate officer, and then if you survive the
8 six-month period, you might get a change in title?
9    MR. SHEA: Object to the form .
10    BY MR. DARRAS:
11    Q. Am I accurate?
12    A. I believe that's what happened.
13    Q. And let's talk about your compensation. When
14 you were hired back, were you offered a salary?
15    A. I was.
16    Q. And do you have a recollection of what you
17 earned?
18    A. It was 128,500.
19    Q. All right. 128,500 --
20    A. 500 dollars
21    Q. -- per year?
22    A. Yes, annual, yeah.
23    Q. And in addition to the $128,500, were you
24 offered any bonus opportunities?
25    A. Yes, I was offered a prorated bonus

Page 88

1 opportunity.
2    Q. Prorated meaning you were being hired in
3 November and a couple of months left?
4    A. I believe the decision about the bonus was
5 made sometime like February or something like that, so
6 yeah, it was going to be for the months up to when the
7 bonus was distributed.
8    Q. The bonus was going to be how much of your
9 salary if you can recall?
10    A. I believe it's 25 percent at that time. It's
11 only decided, the amount of the bonus is only decided
12 towards the end of whatever it is, fiscal year or, you
13 know, it's decided at the same time every year whether
14 to give a bonus or not, and whether to -- what it
15 should be.
16    Q. All right. In addition to the $128,500, the
17 opportunity for the prorated bonus of 25 percent, what
18 else if anything was included in your package?
19    A. A relocation agreement and all the terms of
20 the insurances that were a part of the benefit.
21    Q. Let's talk about the relocation first. In
22 terms of relocation expenses, what if anything did the
23 company offer to pay?
24    A. It offered to pay my relocation expenses. I
25 didn't know exactly what the limit would be at that

Page 89

1 time, and, you know, so I went through with Dr. Vatt
2 the things that I would like to bring back that we'd
3 bought over time and he wanted to bring them back. And
4 he said, well, it's not an international reassignment
5 or anything like that, so it would have to go by the
6 usual package that he generally did with physicians
7 relocating within the United States, or the North
8 American continent, because UnumProvident also has
9 companies or offices in Canada. And I said, fine. And
10 he said, what roughly was it when you moved back? And
11 I said, well, I did it all on my own, and I, you know,
12 loaded stuff on my own, nearly killed myself when I
13 tried to do it, so it's going to be more expensive than
14 that, because I don't intend to do that again. And he
15 said, okay, but roughly blah, blah. And so then I gave
16 him a rough estimate, and he said yeah, we can do that
17    Q. Let's talk about what it turned out to be
18 How much?
19    A. I believe 25 or 26
20    Q. Thousand?
21    A. I think so.
22    Q. All right
23    A. 25 to 26 thousand dollars, yeah, sorry
24    Q. In addition to the 25 percent bonus, the
25 $128,500, the $26,000 rough relocation expenses, share

Randall Chapman, et al. vs. Unumprovident Corporation, et al.
Patrick Fergal McSharry, Vol. I

CV00-08297
9/4/2002

Page 90

1  with us whether or not the company offered rental car,
2  corporate apartment?
3     A.  Yeah.
4        MR. SHEA:  Object to the form.
5     BY MR. DARRAS:
6     Q.  Were there other expenses that the company
7  offered?
8     A.  Yes.
9     Q.  Tell us about those.
10    A.  I told them that it would take a while before
11 the car could get over and could they help me a little
12 bit with rental of a car.  And I believe I got two
13 weeks or I can't be specific, but I got enough time I
14 believe to get my own cars over.  And also I got a
15 sign-on bonus, and I was offered three months in the
16 corporate apartments right beside UnumProvident
17 buildings.
18    Q.  What do you mean by corporate apartments?
19    A.  I believe they are owned and run by -- yeah,
20 run by -- managed by UnumProvident.
21    Q.  So tell us, you were as you understood it
22 able to live there free for three months?
23       MR. SHEA:  Object to the form.
24       THE WITNESS:  Yes.
25       BY MR. DARRAS:

Page 91

1     Q.  You mentioned a sign-on bonus, what was your
2  signing bonus?
3     A.  $5,000, U.S. dollars.
4     Q.  In addition to all of the items that you've
5  outlined for us, were there any benefits offered by the
6  company?
7     A.  Yes, the disability benefit at 60 percent of
8  your income, I believe, and you didn't have to
9  contribute to that, I don't think.  Life insurance.
10 Medical insurance, of course.  Dental insurance, vision
11 plan.
12    Q.  Share with us whether there was any long-term
13 incentive program offered or not.
14    A.  Yes, there's a stock options program offered.
15    Q.  Explain in a little more detail what that
16 was.
17    A.  Well, officers I believe get offered a stock
18 option plan, which is that -- you know, it's hard to
19 explain, stock options, but you buy at a reduced rate
20 from the market rate UnumProvident's stock, and you are
21 allowed to sell it at a certain time -- after a
22 certain time, and you gain the benefit, you gain the
23 benefit of difference in price.
24    Q.  Did you have an understanding as to how many
25 shares of these stock options the company was prepared

Page 92

1  to offer?
2     A.  I did.
3     Q.  How much?
4     A.  I can't remember that.
5     Q.  Less than five thousand shares?
6     A.  At the time I looked at it, you know, I can't
7  remember.  I would have to look at the stock option
8  offer.
9     Q.  Sure, I think we've got your offer letter
10 that we can show you.  Does three thousand options
11 sound correct?
12       MR. SHEA:  Object to the form.
13       THE WITNESS:  It does, but, see, the way
14 I work it out is I was, you know, shares, they don't
15 have a numerical value, they just have a market value
16 at the time.  So the way I worked it out was, you know,
17 what was being offered, multiplied it by the price on
18 that day, so what I was being offered, so that's how I
19 worked out as to what they were worth.  And then, you
20 know, I would look at and see what they would be, you
21 know, if -- you know, that's how much I worked out to
22 be how much what they were worth.  So I didn't fixate
23 on the number of shares at all.
24       BY MR. DARRAS:
25    Q.  Doctor, I would like to show you a UNUM

Page 93

1  letter dated August  28, 2000.  We'll mark it as
2  Exhibit 3.  Put that in front of you and your counsel.
3     Do you recognize the document?
4     A.  Uh-huh, I do.
5     Q.  What is it?
6     A.  It is my offer letter, offer of employment
7  letter.
8     Q.  All right.  In the second paragraph of the
9  first paragraph, the document suggests that you're
10 going to be extended an offer as associate medical
11 director.  There's a compensation offer of $128,500 and
12 for 2000 there in the third paragraph, you're eligible
13 to participate in the management incentive compensation
14 plan at a target level of 25 percent of your base
15 salary earnings, do you see that?
16    A.  I do.
17    Q.  The next sentence suggests that the MICP is
18 based on achievement of certain corporate earnings
19 thresholds and the formula includes weight for both
20 corporate and individual goals.  Did you see that?
21    A.  I do.
22    Q.  All right.  Did you have an understanding of
23 what that meant?
24    A.  I did.
25    Q.  If --

24 (Pages 90 to 93)

Randall Chapman, et al. vs. Unumprovident Corporation, et al.
Patrick Fergal McSharry, Vol. I

CV00-03297
9/4/2002

Page 118

1  back to that. In terms of the types of claims that you
2  were working on when you came back in the fall of 2000,
3  do you have a recollection of the type of claims that
4  you worked on then?
5     A.  Yeah.
6     Q.  And what were those?
7     A.  They were very similar to the claims that I
8  was working on before I left.
9     Q.  And remind us, a combination of what?
10    A.  They were from different companies, different
11 centers, I believe, and different -- they were
12 similar, actually it was the exact same. Nancy Beecher
13 also selected which ones I would look at.
14    Q.  You mentioned the productivity levels. What
15 did you mean by that?
16    A.  Well, again, I was familiar with this from
17 -- to run any utilization review or claims management
18 department, it's, you know, it is about how many files
19 can be done and there's inventory and there's all this
20 process engineering factors. So this was part of it
21 that Dr. Vatt would have to produce to Dr. Anfield
22 and to his -- to the claims professionals how many
23 files he was capable of getting done. And he always
24 emphasized inventory, that was always his word.
25    Q.  And did you come to understand at any given

Page 119

1  time that you were required or not required to do a
2  certain number of files?
3     MR. SHEA: Object to the form.
4     THE WITNESS: Yes. Dr. Vatt gave me
5  various charts as to how I was not reaching the -- or
6  if I was reaching the standard of what the other
7  physicians were doing in gen med and across the
8  company, and you know, it was -- and then he would
9  actually give guideline as to how many he expected me
10 to do, and I would try to achieve. And Dr. Anfield
11 also actually got into this discussion with me once
12 about, you know, you must reach this many, it's very
13 important in the company because inventory is a
14 problem, we're falling way behind on getting reviews
15 done. And so then they had to ship off a lot of my
16 files to Worcester because we weren't reaching our
17 productivity levels.
18    MR. SHEA: Move to strike as
19 unresponsive.
20    MR. BURNETTE: Before we go on, can we
21 at least agree that his Irish accent is -- pronounces
22 the word that we all refer to as inventory as infantry.
23 and so can we at least agree that when he's --
24    THE WITNESS: Queen's English.
25    MR. BURNETTE: That word to our American

Page 120

1  ears is inventory.
2     BY MR. DARRAS:
3     Q.  Share with us, Dr. McSharry, whether or not
4  you were to review a certain quota of claimant files
5  per day.
6     MR. SHEA: Object to the form.
7     THE WITNESS: Yes, it was made very
8  plain that I would have to reach -- that this is part
9  of my performance, that --
10    BY MR. DARRAS:
11    Q.  Go ahead.
12    A.  It was part of my performance, it was laid
13 out in all of the documents that there's two main parts
14 to your performance. One was the many files you did
15 and kept Dr. Vatt happy, and number two, how you kept
16 all the claims people happy by -- and if you kept
17 them happy, your 360 review would be fine.
18    MR. SHEA: Motion to strike as
19 unresponsive.
20    BY MR. DARRAS:
21    Q.  We're going to get to the 360 review and how
22 you attempted to keep the claim people happy. I want
23 to re-focus us on this claim quota, these numbers of
24 files per day. Was there a certain number?
25    MR. SHEA: Object to the form.

Page 121

1     THE WITNESS: Yeah, I was told to do
2  -- that I had reached three by the time of this
3  discussion, I should try to reach four -- no, two and
4  a half was actually what I had reached, and other
5  physicians were doing more. I think only one physician
6  was doing less -- no, two or three physicians were
7  doing less, but they were not considered in the same
8  areas as us because they were mostly -- at that time
9  they were mostly doing individual .
10    BY MR. DARRAS:
11    Q.  I don't want to talk about Saturdays right
12 now, but Monday through Friday you would work from when
13 to when?
14    A.  I worked -- well, we had, I believe, Dr.
15 Vatt said we come in here at 8:00, but you can actually
16 come in whatever time you like as long as you do your
17 hours. And Nancy Beecher came in at 8:30, so I
18 generally came in around quarter to 9:00 or 9:00
19    Q.  And what time would you leave generally?
20    A.  I would leave, it's after 6:00.
21    Q.  And did you have a certain lunchtime hour ?
22    A.  No, we didn't. But generally, Nancy Beecher
23 would go around and gather physicians and so it was
24 time for lunch, and we'd all go down to the table or
25 where it was -- usually we went early because the

31 (Pages 118 to 121)

000003

Randall Chapman, et al. vs. Unumprovident Corporation, et al.
Patrick Fergal McSharry, Vol. I

CV00-0825?
9/4/2002

**Page 102**

1  question.
2      BY MR. DARRAS:
3    Q.  Sure.  When you joined the company as a
4  doctor, did you need to bring with the staff of people?
5    A.  No.
6    Q.  In terms of collections for your time for
7  your billing, did you have to do that while you were
8  here?
9      MR. SHEA:  Object to the form.
10      THE WITNESS:  No .
11      BY MR. DARRAS:
12    Q.  In terms of your employment when you
13  returned, who was your supervisor?
14    A.  Dr. Vatt.
15    Q.  And your understanding of who Dr. Vatt
16  reported to?
17    A.  Dr. Anfield.
18    Q.  And Dr. Anfield reported to?
19    A.  Don Boutin.
20    Q.  And you worked in what unit when you
21  returned?
22    A.  I worked in the general medical unit of the
23  medical department.
24    Q.  And briefly, what did the general medical
25  unit look at in terms of type of claims?

**Page 103**

1    A.  All general medical claims that had been
2  assigned to the general medical unit in Chattanooga.
3    Q.  And your impairment unit, this gen med unit,
4  general medical unit, were there other units,
5  impairment units in the company here in Chattanooga?
6    A.  Yes.
7    Q.  Tell us about those.
8    A.  There's orthopedic, psychiatry, cardiology,
9  and then at that time I don't think there was a cancer
10  unit.
11    Q.  So four different impairment units, am I
12  accurate?
13      MR. SHEA:  Object to the form.
14      THE WITNESS:  Yes.
15      BY MR. DARRAS:
16    Q.  In terms of these four particular impairment
17  units, did you have an understanding who the impairment
18  unit directors reported to here at the Chattanooga site
19  ?
20      MR. SHEA:  Object to the form.
21      THE WITNESS:  Yes.
22      BY MR. DARRAS:
23    Q.  Who was that?
24    A.  They all reported to Ken Denton.
25    Q.  Did you have an understanding of who Ken

**Page 104**

1  Denton reported to?
2    A.  Yes.
3    Q.  Who was that?
4    A.  Ralph Mohney.
5    Q.  Does UnumProvident have other sites where
6  claims were being handled other than Chattanooga in
7  2000?
8    A.  Yes.
9    Q.  Where were those?
10    A.  Well, at that time I believe there was a lot
11  of different sites, and --
12    Q.  Besides Chattanooga?
13    A.  Oh, yeah, yeah.  Like there -- I believe
14  they're still reviewing files in Chicago.  They are
15  definitely still reviewing files in Portland and
16  Worcester and Glendale.  I think there was a Tarrytown,
17  New York that people were reviewing files.  I'm not
18  sure exactly if customer care, as it was then called,
19  had centers in all of these places, but --
20    Q.  Let's talk about four of those sites.
21    A.  All right.
22    Q.  The Worcester site, Worcester, Massachusetts?
23    A.  Yes.
24    Q.  The Glendale site, Glendale, California?
25    A.  Yes.

**Page 105**

1    Q.  The Chattanooga site here in Tennessee?
2    A.  That's correct.
3    Q.  And Portland in Portland, Maine?
4    A.  Yeah.
5    Q.  In terms of files that you were seeing when
6  you returned, were the files that you saw strictly
7  limited to Chattanooga?
8      MR. SHEA:  Object to the form.
9      THE WITNESS:  No
10      BY MR. DARRAS:
11    Q.  Share with us whether or not you saw files
12  from these other site locations.
13    A.  You know, I didn't know about what happened
14  after I left, but as far as I know, we were reviewing
15  files from Worcester and some from Portland.  You know,
16  the only way you would know what, where it was from is
17  if you saw the company that it originated from, like
18  Paul Revere, and I eventually learned that Paul Revere
19  were based in Worcester.  Now, I'm not sure about that
20  but as far as I assumed, they were based in Worcester.
21  So that's the only way you would know where the claim
22  came from.
23    Q.  Is it -- share with us whether you saw
24  policies from other companies besides, say, Provident
25      MR. SHEA:  Object to the form

Reported By: Steve S. Huseby, RPR
Huseby, Inc., an Affiliate of Spherion (800) 342-5490

000004

Randall Chapman, et al. vs. Unumprovident Corporation, et al.
Patrick Fergal McSharry, Vol. I

CV00-08297
9/4/2002

Page 142

1  didn't really contribute as much to the company as they
2  did. So, therefore, you know, that's kind of the theme
3  running through was that they felt that they had the
4  more responsible positions and, therefore, should be
5  remunerated preferentially to us .
6       BY MR. DARRAS:
7    Q.  And how did you learn that information?
8    A.  Oh, Dr. Anfield said it, you know, after we
9  -- he sensed -- he was kind of apologetic. He said,
10  we know we brought you here, you've done well, we got
11  you to the vice president level, and we must say that
12  you're working here, you've got -- you've got a five
13  day a week, 40-hour job, we've achieved that, we've
14  achieved you to be paid similar to your -- similar,
15  not as much as your counterparts in practice, and, you
16  know, but that's as much as we can get for you guys.
17  And he was very apologetic, but we -- to me, it didn't
18  really  -- I wasn't motivated by that, so I didn't
19  really --
20    Q.  When you said that the impairment heads would
21  impact the company results, what did you mean?
22       MR. SHEA: Object to the form.
23       THE WITNESS: Could you say that
24  question again. I'm sorry.
25       BY MR. DARRAS:

Page 143

1    Q.  When you said the impairment heads would
2  impact the company results --
3    A.  Yes.
4    Q.  -- and, therefore, might get more of a bonus
5  --
6    A.  Right, yes.
7    Q.  -- you meant what?
8       MR. SHEA: Same objection.
9       THE WITNESS: That they were responsible
10  for the numbers. They were responsible for the company
11  making the profit, for profitability. They were --
12  you know, there's two ways that an insurance company
13  makes money. One is from the investments that they
14  make on the claimants' policies, and the second area is
15  on claims management. That's the two areas, and these
16  impairment heads were very responsible for getting
17  results from claims management .
18       BY MR. DARRAS:
19    Q.  Did you ever learn from Dr. Anfield that he
20  was referring to the investment money the company was
21  making as opposed to the impairment heads managing the
22  claims to provide better results?
23       MR. SHEA: Object to the form.
24       THE WITNESS: Did you say Dr. Vatt or
25  Dr. Anfield?

Page 144

1       MR. SHEA: Dr. Anfield.
2       MR. SHEA: Same objection.
3       THE WITNESS: Say the question again.
4       MR. SHEA: Sure.
5       BY MR. SHEA:
6    Q.  You talked about two forms an insurance
7  company makes profits, when they invest their money and
8  when the claims are managed to create a profit?
9    A.  Yes. .
10    Q.  Did you ever hear Dr. Anfield speak about
11  the money that the company made from investment?
12       MR. SHEA: Objection to form.
13       THE WITNESS: No.
14       BY MR. DARRAS:
15    Q.  The profit that you mentioned, you heard from
16  Dr. Anfield?
17       MR. SHEA: Objection to form.
18       THE WITNESS: Yes. The word profit, no,
19  there are some documents that, you know, talk about
20  profitability and the roles of the claim people, but
21  no, I didn't hear it directly. Dr. Anfield was just
22  obvious saying that's our value to the company is, I
23  mean --
24       BY MR. DARRAS:
25    Q.  Okay. Let's talk about the types of claims

Page 145

1  that you handled when you came back in 2000.  You told
2  us about the gen med. In terms of the type of claims,
3  can you explain to us what you were doing there?
4    A.  When I came back first?
5    Q.  Yes.
6    A.  The same sort of claims as when I had left in
7  1999, when I left previously.
8    Q.  So what types were those?
9    A.  They were a mixture of all companies, both
10  ID, individual disability, and group policies
11    Q.  The background of the other doctors in the
12  gen med unit as you understood it was what?
13       MR. SHEA: Object to the form.
14       THE WITNESS: Similar to my own. Some
15  had experience in claims management, whether that be
16  with disability or with managed care. One or two came
17  in direct. Most -- majority had some experience in
18  insurance companies already
19       BY MR. DARRAS
20    Q.  And who in the impairment unit that you
21  worked with dealt directly with the customer or the
22  claimant?
23    A.  In my impairment unit?
24    Q.  Yes.
25    A.  The unit -- well, I'm part of the medical

37 (Pages 142 to 145)

000005

Randall Chapman, et al. vs. Unumprovident Corporation, et al.
Patrick Fergal McSharry, Vol. I

CV00-08297
9/4/2002

**Page 150**

1  A. Uh-huh, yeah.
2  Q. Where did you see a white board with numbers?
3  MR. SHEA: Objection to form.
4  THE WITNESS: Tom, in the office of Tom
5  -- I can't pronounce his name now, Lamar, Tom Lamar.
6  BY MR. DARRAS:
7  Q. The numbers that you saw on the white board
8  in Tom Lamar, the consultant's office or cubby,
9  measured what?
10  MR. SHEA: Objection to form.
11  THE WITNESS: I had seen the numbers
12  before when I had gone to a team meeting with David
13  Solomon where he would go through and tell the folks
14  that we were a million off but we could make up the
15  million over the next week or so. And, you know, I
16  didn't -- I mean, I would only pass in and out of Tom
17  Lamar's office because he wanted me to look at a
18  surveillance or he wanted to talk to me about a case or
19  something. And so I just passed by it, and I would be
20  mostly paying attention to him, so I didn't
21  actually -- I looked at the numbers, I -- they looked
22  as if they were the same kind of numbers as David
23  Solomon, but they weren't -- I didn't look closely and
24  say that's, that exact number, because that would be
25  rude. I don't nosey around people's cubicles sort of

**Page 152**

1  THE WITNESS: Yes, it was the number of
2  resolutions as it was called, that you had to meet a
3  certain -- not so much amount of resolution but total
4  resolutions or you wouldn't meet the goals that had
5  been set by, in his case, it was Rob Hecker.
6  BY MR. DARRAS:
7  Q. The white board which had numbers on it, what
8  was your understanding if any as to what the numbers on
9  the board meant?
10  MR. SHEA: Objection to form.
11  THE WITNESS: That it was the individual
12  --
13  MR. SHEA: Asked and answered.
14  THE WITNESS: Individual claimant, an
15  individual claim representative or claim handler, that,
16  you know, that that was there -- well, I don't say if
17  it was part of their performance, I don't know, except
18  that that is what -- they had to present what they
19  hoped to achieve every month, and that was kind of a
20  reminder of what they had to achieve, I believe.
21  MR. SHEA: Motion to strike.
22  BY MR. DARRAS:
23  Q. David Solomon was one of the consultants for
24  the impairment unit?
25  A. Yes.

**Page 151**

1  trying to find out --
2  MR. SHEA: Motion to strike .
3  BY MR. DARRAS:
4  Q. The one million dollar number that you
5  mentioned was off, what did that relate to?
6  MR. SHEA: Objection to form.
7  THE WITNESS: Well, the reserves were
8  -- you know, I don't totally understand the insurance
9  industry because I'm not totally -- I'm not an
10  insurance executive, really, and -- but they appeared
11  to me to be the amount of the reserve that the premium
12  that they wanted to pay back for that month.
13  MR. SHEA: Motion to strike .
14  BY MR. DARRAS:
15  Q. Let's go back -- let's go and let's define
16  the word reserve. What's your understanding of what
17  that means, what is a reserve?
18  A. Reserve is the amount of money an insurance
19  company or a bank indeed has to have to allow them to
20  pay their claims.
21  Q. So the million dollars that you referred to
22  earlier, was that a million dollars' worth of claim
23  closures that Mr. Solomon suggested that the unit was
24  off for the month?
25  MR. SHEA: Objection, to form, leading.

**Page 153**

1  Q. Tom Lamar was also a consultant for --
2  A. No, I'm sorry, David Solomon was a --
3  Q. Director?
4  A. Director. Tom Lamar reported to David
5  Solomon.
6  Q. And did you actually see a white board with
7  claim handler's names on it with insureds' names as
8  well?
9  MR. SHEA: Objection to form.
10  THE WITNESS: Well, what I saw, which I
11  just happened to see, was -- actually I believe it
12  was sent to me, was a spreadsheet of what each claimant
13  was going to produce that month or had produced. I'm
14  not sure which. Let me see if I --
15  MR. SHEA: Motion to strike
16  BY MR. DARRAS:
17  Q. You saw some spreadsheet that listed the
18  claim handler's name and to the side of that was the
19  insured's claim number and the reserve that was going
20  to be released?
21  MR. SHEA: Objection
22  BY MR. DARRAS:
23  Q. Did I hear you right?
24  MR. SHEA: Objection as to form
25  THE WITNESS: Yes, and the total of what

39 (Pages 150 to 153)

Reported By: Steve S. Huseby, RPR
Huseby, Inc., an Affiliate of Spherion (800) 342-5490

000006

Randall Chapman, et al. vs. Unumprovident Corporation, et al.
Patrick Fergal McSharry, Vol. I

CV00-0S297
9/4/2002

Page 154

1  that reserve that would be met for that month. That's
2  what it looked like to me anyway.
3           MR. SHEA: Objection, motion to strike .
4           BY MR. DARRAS:
5       Q. Let me have you take a look at what we've
6  marked as Exhibit 6.
7           MR. BURNETTE: That's the document that
8  I had supplied to them that I redacted the names of the
9  individual claimants from so that you all wouldn't have
10  the names of the claimants on the document. I have the
11  original here that actually has the names of the
12  claimants, but you all had wanted to preserve the
13  identity of the insureds. So if -- I mean, you know,
14  I have the original that has the name of the insureds
15  as well and I have provided to you all but not to
16  plaintiff's counsel, whereas I provided to
17  UnumProvident's attorneys but not to the plaintiffs'
18  counsels.
19           MR. SHEA: My only concern is to have a
20  copy of this document while the examination proceeds.
21           MR. DARRAS: I would love to give you
22  one, counsel. I have two copies, so what we need to do
23  is  -- yeah, we can get an additional copy there.
24  Have you looked at the document now? Actually --
25           MR. SHEA: Why don't we just get it

Page 155

1  copied?
2           BY MR. DARRAS:
3       Q. Dr. McSharry, I'm going to hand you the only
4  copy of the document that I have. Earlier when you
5  were talking about the target for the month, does this
6  document have anything to do with that testimony?
7           MR. SHEA: Object to the form.
8           THE WITNESS: Yes, this would be what
9  David Solomon would talk at the team meeting about
10  target, this is that final figure, S3,098,748 is
11  the -- I believe. I mean, I'm not -- I wasn't part
12  of the claims numbers team, but from my interpretation,
13  this is what I saw.
14           MR. SHEA: Motion to strike
15           BY MR. DARRAS:
16       Q. Let's go ahead and identify the document
17  What is the document?
18           MR. SHEA: Object to the form.
19           THE WITNESS: The document is -- I have
20  written some things on it, because when I just came
21  across it initially and I photocopied it. I never took
22  anything away from UnumProvident without -- you know,
23  it was a copy whenever I copied something, whenever I
24  took something away.
25           BY MR. DARRAS

Page 156

1       Q. All right.
2       A. And yes, my interpretation was these were the
3  claim numbers, the numbers, the numbers, everybody
4  talked about the numbers for December. And I explained
5  it to myself, I wrote dollar amounts equal reserves.
6           MR. SHEA: Motion to strike.
7           BY MR. DARRAS:
8       Q. And the dollar amount equalling reserves at
9  the top, what was your understanding of what that
10  meant. was that the savings to the company when the
11  claims were going to be closed or something different?
12           MR. SHEA: Object to the form.
13           THE WITNESS: No, it was  -- savings is
14  not a good word to use. It's cost containment amount.
15  It's the amount that you can -- amount of claims you
16  can deny and, therefore, not have to pay the reserve on
17  that claim.
18           MR. SHEA: Motion to strike .
19           BY MR. DARRAS:
20       Q. Let's do it differently.  Under that first
21  column, there are some names, and on the document there
22  are six names. Boles -- seven names. Boothby, Carter,
23  Estes, Foster, and I can't read the other one.
24       A. Kettenring.
25       Q. Who were those people?

Page 157

1       A. They were the claims representatives that I
2  worked closely with.
3       Q. And at the top of the document, there's a
4  line for claim number, and what was your understanding
5  of what would go there?
6           MR. SHEA: Object to the form .
7           BY MR. DARRAS:
8       Q. If anything?
9       A. Well, there were all the claim numbers of the
10  individual claimants.
11       Q. All right.  And in terms of the name. what
12  was your understanding if any as to what went under the
13  name?
14           MR. SHEA: Object to the form.
15           THE WITNESS: It was the number
16           BY MR. DARRAS:
17       Q. The claim number related to the insured?
18           MR. SHEA: Object to the form.
19           THE WITNESS: Yes, I think it was the
20  universal number that they would continue to be
21  assigned by UnumProvident to handle their claim  That
22  was their claim number
23           BY MR. DARRAS
24       Q. And there's two amount numbers  There's an
25  amount, for instance, at the top of 162,702. and then

40 (Pages 154 to 157)

Randall Chapman, et al. vs. Unumprovident Corporation, et al.
Patrick Fergal McSharry, Vol. I

CV00-08297
9/4/2002

Page 158

1 to the right there's a number 95,739. Did you have an
2 understanding as to what the first column of numbers
3 was for?
4     MR. SHEA: Object to the form.
5     THE WITNESS: No, not the first column.
6     BY MR. DARRAS:
7     Q. Let me ask it differently. Was the first
8 column of numbers, if you know, the total pay-out and
9 the second column of numbers the reserve?
10     MR. SHEA: Object to the form .
11     BY MR. DARRAS:
12     Q. If you know.
13     A. My only understanding was that this total
14 here of 3 million, if you add all of these together,
15 this is the amount company saved, to use your word, by
16 denying the claim. That's all I understood.
17     MR. SHEA: Motion to strike.
18     BY MR. DARRAS:
19     Q. I'm reading upside down, so I'm at a bit of
20 disadvantage -- thank you very much. The numbers to
21 the right of the names of the claim people within the
22 gen med unit, was it your understanding that these
23 numbers, these six digit numbers were the claim
24 numbers?
25     MR. SHEA: Object to the form.

Page 159

1     THE WITNESS: No, the claim number is
2 there (indicating).
3     BY MR. DARRAS:
4     Q. Okay. And if we added up the numbers to the
5 right, and it's 3,098, 748, at the top of the document,
6 someone has written in hand, these are the ones
7 considered for closure. Who wrote that?
8     MR. SHEA: Object to the form.
9     THE WITNESS: Me. I wrote that.
10     BY MR. DARRAS:
11     Q. And what did you mean by that?
12     MR. SHEA: Object to the form.
13     THE WITNESS: These are the ones that
14 were prepared by the claims representatives to present
15 to their claims consultant that were deniable or
16 closeable, whatever term you want, deniable is more
17 managed care term, and resolution or a closing is the
18 UnumProvident term, and that these are the ones --
19 this is what their claim representative could produce
20 for the consultant.
21     BY MR. DARRAS:
22     Q. For the month of December?
23     MR. SHEA: Object to the form.
24     THE WITNESS: For the month of December
25 As you see, this Boothby was a very -- was pretty

Page 160

1 prolific as was Mr. Foster.
2     MR. SHEA: Motion to strike.
3     BY MR. DARRAS:
4     Q. When you say pretty prolific, you meant what
5 in terms of the numbers of listings there?
6     MR. SHEA: Objection to form.
7     THE WITNESS: When you add them
8 together, you know, if you compare it with Mr. Estes
9 who didn't get any, he's no -- hasn't produced
10 anything that month, it appears, I don't know if he had
11 or not, but here, there's large, large amounts in Mr.
12 Foster's which are 150 grand, 213 grand, 171, 117. So
13 the higher the amount in that individual claimant's, or
14 sorry, claim representative's column, you know, that's
15 -- you know, and these people were the ones that were
16 portrayed as the great performers. I mean, they are
17 the senior -- well, Ms. Boothby was getting there,
18 but Mr. Foster was one of the most senior and actually
19 Ms. Boles, the senior of the claim representatives.
20     MR. SHEA: Motion to strike .
21     BY MR. DARRAS:
22     Q. When you said that these people were the ones
23 that were portrayed as the great performers, performers
24 how?
25     MR. SHEA: Objection to form.

Page 161

1     THE WITNESS: Well, they were allowed to
2 talk more at round tables, you know. They were senior
3 and they belonged often longer with the company, and it
4 just appeared that they -- everybody was trying to
5 compete with them. Everybody was trying to say, you
6 know, can I use first names of people? That Chris is
7 -- you know, Grace is doing well and Kimberly is doing
8 well. I'm not -- Lisa in particular used to be
9 concerned, you know, that she wasn't looking good at
10 all, but she didn't care. She said it was -- she just
11 wanted -- well, she did say she just wanted to do the
12 right thing and she felt very bad for some of these
13 claimants and stuff, so she wasn't going to get into
14 this game of competing with each other. She just
15 didn't -- her friends were not there, she didn't want
16 to be friends with -- this was the way she talked. I
17 don't want to be friends with these people and I have
18 my life outside, and, you know, that's -- she didn't
19 want to be competing with these folks.
20     MR. SHEA: Motion to strike
21     BY MR. DARRAS:
22     Q. You mentioned that this person didn't feel it
23 was fair and didn't want to compete. What did you mean
24 by competition?
25     MR. SHEA: Object to the form

Randall Chapman, et al. vs. Unumprovident Corporation, et al.
Patrick Fergal McSharry, Vol. I

CV00-08297
9/4/2002

Page 162

```
 1        THE WITNESS: Well, she said that --
 2   she just didn't agree with the philosophy, and that she
 3   wasn't going to go and do  -- out of her way to
 4   impress Tom Lamar and that she just wanted to do her
 5   job and not -- and get by. So she didn't really feel
 6   like trying to impress -- she wanted to have some kind
 7   of normal relationship with the claimant and she didn't
 8   want to be doing anything to the claimant that she --
 9   behind their back after she talked to them and was nice
10   to them, she didn't want to be then suddenly on the
11   other side, you know, saying we're doing our best for
12   your claim and then knowing that she was incentivized
13   to, to close a claim. She wanted to be honest with the
14   claimant and say  -- so she wouldn't close them just
15   because it would be beneficial for her. She wanted to
16   have a more broad and open-minded approach to her.
17        MR. SHEA: Motion to strike.
18        BY MR. DARRAS:
19        Q.  Based on what she and others said within the
20   claim unit, what did you see in terms of pleasing the
21   consultant?
22        A.  For the claims?
23        MR. SHEA: Object to the form.
24        BY MR. DARRAS:
25        Q.  Yes.  How would you please Tom Lamar?
```

Page 163

```
 1        MR. SHEA: Object to the form.
 2        THE WITNESS: Well, Tom let it known to
 3   me and other consultants did too that, you know, that,
 4   you know, everybody was upset with having to deal with
 5   the docs who would not just accept what the claims
 6   people wanted them to do, and he understood that, you
 7   know, I was an independent-minded physician, but  --
 8   you know, that was my understanding of his -- the kind
 9   of way he looked on his claims representatives was the
10   same way as he looked on me was that I was not part of
11   the team if I continued to make it difficult for him to
12   close the file, because he really had the ultimate
13   decision actually.
14        MR. SHEA: Motion to strike.
15        BY MR. DARRAS:
16        Q.  Let's go back, because you were talking about
17   Lisa and how she didn't agree with the philosophy and
18   that people were upset.
19        A.  Uh-huh.
20        Q.  I wanted to know, based on what you saw from
21   the claim handlers, how would they please Tom Lamar or
22   how would Tom Lamar get upset with a claims handler
23   based on only what you saw?
24        MR. SHEA: Object to the form.
25        THE WITNESS: Some of the more
```

Page 164

```
 1   aggressive ones would come to me and say, look, I'm
 2   only been recently at this company and you don't seem
 3   to get it.  And I was saying this has nothing to do
 4   with me, your job is your job.  And you report to Tom
 5   Lamar and he would say, well, you know, I really feel
 6   this person should be closed, and I would say I don't
 7   mind what you feel, I have my medical opinion.  And
 8   they said, well, look, I don't see this here and I
 9   don't see that there.  And I would say, well, you're
10   not really trained to see that there, that's why you
11   come to me, surely.  And they would say, yes, but how
12   can you disagree with me and the consultant and the
13   director and the nurse, how can you disagree with all
14   of us?  And I said, because I'm a doctor.  And I
15   thought that's what I was supposed to do is can I look
16   and say, well, there's aspects you haven't seen here
17   and et cetera, et cetera.
18        And they would  -- one guy, his name is
19   not down here, just walked out and he came back with
20   his consultant to talk to me.  And then I believe he
21   came back then with the director to talk with me.  And
22   they talked and I tried to explain again, you know,
23   that I couldn't really  -- you know, Tom Lamar, said,
24   you got to help us here, Fergal, you know, you're part
25   of this team and everybody is complaining about you and
```

Page 165

```
 1   thinking you're not.  And I said, I understand my role,
 2   and I said, I understand, you know, that this company
 3   has to make money, but there's just no way I can change
 4   my ultimate opinion.  But can't you say it a little
 5   different?  And I said, yeah, I can.  And so the next
 6   time I would try to say it a little bit more the way
 7   they wanted, but I never seemed to do it exactly the
 8   way they wanted.
 9        MR. SHEA: Motion to strike .
10        MR. DARRAS: I need a short wash room
11   break.
12        THE VIDEOGRAPHER: We're off the record
13   at 2:10.
14        (Brief recess.)
15        THE VIDEOGRAPHER: We're on the record
16   at 2:20 .
17        BY MR. DARRAS:
18        Q.  There was some confusion, Doctor, in terms of
19   the document that's in front of you, Exhibit 6 as far
20   as for myself.  Can you date the document for me?
21        A.  December pot  -- sorry, it says D-E-C pot
22        Q.  So did you learn from anyone what D-E-C pot
23   meant?
24        MR. SHEA: Object to the form
25        THE WITNESS: D-E-C nearly always means
```

42 (Pages 162 to 165)

Reported By: Steve S. Huseby, RPR
Huseby, Inc., an Affiliate of Spherion (800) 342-5490

000009

Randall Chapman, et al. vs. Unumprovident Corporation, et al.
Patrick Fergal McSharry, Vol. I

CV00-08297
9/4/2002

Page 178

1  focus the question more. He would say, well, I think
2  we're not sure what we're talking about here, maybe Dr.
3  McSharry could tell us what myasthenia gravis is. And
4  so then I would talk, go through. I didn't know
5  exactly how much the person wanted to know about or the
6  group wanted to know about myasthenia gravis, so I
7  would start at the beginning. And then either a show
8  of raise of eyebrows and said the Reader's Digest,
9  version, please, Fergal, we have to move on. And I
10  said, well, I don't know what specific questions you
11  have, and that was the end of that.
12     BY MR. DARRAS:
13     Q.  Did you have an impression when you attended
14  these round table meetings that you were free to
15  explain the medical condition to those in attendance?
16     MR. SHEA: Object to the form.
17     THE WITNESS: I tried, and if there was
18  an inaccuracy in how the nurse had interpreted, say,
19  fibromyalgia versus myasthenia gravis, because they are
20  actually very different diseases, I would try to do
21  that. But then the nurse would get upset because it
22  looked like I was showing them up with  -- and so they
23  -- so I learned not to try, try not to criticize
24  people, and I tried to direct question  -- I do it more
25  in a question format where, what would you think about

Page 179

1  this, and direct that to the attorney or direct that to
2  the voc rehab person, and instead of saying  -- giving
3  my opinion, which, you know, Dr. Vatt told me I came
4  across very badly when I gave my opinion and that
5  people had complained to him about me.
6     BY MR. DARRAS:
7     Q.  Did anybody ever complain to you, Dr.
8  McSharry, when you supported denials?
9     MR. SHEA: Object to the form.
10     THE WITNESS: No .
11     BY MR. DARRAS:
12     Q.  The first complaints that you learned from
13  Dr. Vatt or your supervisors arose when?
14     A.  Well, really they arose very soon after he
15  -- Nancy Beecher handed me over to him sort of as my
16  sort of supervisor in the clinical content.
17     Q.  And generally what were the  -- what was the
18  criticism that you learned your peers were unhappy
19  with?
20     MR. SHEA: Object to the form
21     THE WITNESS: Well, my peers, I see as
22  my fellow physicians, so --
23     BY MR. DARRAS:
24     Q.  Let's go differently.  Did you learn from Dr.
25  Vatt anything that the customer care people had an

Page 180

1  issue with you about?
2     A.  Yes.  It was always being too wishy-washy, I
3  wouldn't go one way or the other, I was not helping,
4  there's  -- they just didn't like the terms I was
5  using. I was too definite sometimes and too
6  wishy-washy other times. Of course, I was only --
7  only definite about the restrictions and limitations
8  supported, also jumping out of my own area as Uneva
9  said directly to me, you know, you've pulled these
10  restrictions and limitations out of space, she said.
11     And I got  -- you know, I said that's
12  not fair for you to say, number one, you don't know
13  what the restrictions or limitations are, you're a
14  director, okay, you worked in CIGNA for all those
15  years, so you know maybe a little bit about medical
16  stuff, but you can't say what the restrictions or
17  limitations. And she said, well, you can't either
18  because you pulled them right off  -- there weren't
19  any restrictions in the APS, which is the attending
20  physician statement, they are not there and you're just
21  pulling them out.  And I said, no, look here, and I
22  pulled out the file or I went back to her later on I
23  believe with the file and I said, here's where the
24  doctor says the person is dragging their leg. To me,
25  and they have multiple sclerosis I think they had.

Page 181

1  multiple sclerosis, and they have it in that leg, and
2  they are dragging that leg, so to my  -- to me, that
3  is, person is restricted in movement of that leg. And
4  I said, I didn't pull anything out of thin air, thin
5  air is the expression I used, space is what she used.
6     Q.  And the too wishy-washy comment that you
7  learned from the claim handlers, the too wishy-washy
8  related to what, you were wishy-washy about the
9  restrictions and limitations, you were wishy-washy
10  about what aspect of your report writing?
11     MR. SHEA: Object to the form .
12     BY MR. DARRAS:
13     Q.  As you understood it?
14     A.  You see, I had already had meetings with Dr.
15  Vatt where he had said you don't  -- and other doctors
16  who said you don't tie the hands of the claim, the
17  claim handler.  You are not supposed to point out  --
18  and we got various things from Dr. Vatt about how we
19  should form our sentences and how we should be  -- not
20  assume there's something there or not claim there's
21  something there when it wasn't definitely in the chart.
22  And even though we had experience, this is one of the
23  real problems I had with him was where we had, you
24  know, experienced that, we knew that somebody with
25  severe muscular sclerosis would have this

46 (Pages 178 to 181)

Randall Chapman, et al. vs. Unumprovident Corporation, et al.
Patrick Fergal McSharry, Vol. I

CV00-08297
9/4/2002

Page 182

1  particular — even though it didn't show up on all
2  investigations, but we knew that this was consistent,
3  the doctor was consistent and the claimant was
4  consistent in their complaints and all the other things
5  led you to believe that the person had severe multiple
6  sclerosis, he would say, well, that test is not there,
7  so you can't say for certain that they have for certain
8  multiple sclerosis. And I said, okay, fine. However,
9  you know, whatever they have is bad, and --
10     Q. Did you ever -- were you ever criticized by
11  the claim handlers when you supported denial?
12        MR. SHEA: Object to the form.
13        THE WITNESS: No.
14        BY MR. DARRAS:
15     Q. Were you ever criticized by the claim
16  handlers when you used terms that supported denial?
17        MR. SHEA: Object to the form.
18        THE WITNESS: No.
19        BY MR. DARRAS:
20     Q. Were you ever criticized by the claim
21  handlers when you went the way they suggested, meaning
22  close it down?
23        MR. SHEA: Object to the form.
24        THE WITNESS: I was repeatedly told I do
25  not make that decision. It was up to the claims

Page 183

1  representative and their consultant to make that
2  decision, and I was only to give an opinion and, you
3  know, that even one of the vice presidents said to me,
4  you know, it's not the practice of medicine, this is
5  -- we pay you for something different here. You are
6  not -- this is insurance medicine, and Dr. Anfield
7  also says this, you don't jump out as if you're
8  practicing, you just stick to exactly what's there. We
9  do not insure risk or the possibility of this happening
10  or the possibility of that happening. We must look
11  exactly at what's in the records. And I said, well,
12  sometimes the records are not sufficient and there is
13  still more stuff out there. And she said, yes, and --
14  but unless it is -- and this was the same message from
15  -- that we got through documentation as from directly
16  verbally from claims folks was, you know, they had
17  already interpreted the medical record and who were we
18  to disagree with the interpretation that the nurses and
19  the conclusion indeed that the nurses had reached.
20        BY MR. DARRAS:
21     Q. When you spoke about that earlier --
22        MR. SHEA: Motion to strike.
23        BY MR. DARRAS:
24     Q. -- about the nurses preparing the file for
25  you, remember that?

Page 184

1     A. Uh-huh.
2     Q. Yes?
3     A. Yes, yes, sorry.
4     Q. The uh-huhs and huh-uhs are difficult for our
5  court reporter to interpret there.
6     A. Sorry.
7     Q. The nurses as I understand your testimony
8  would prepare the file, and you talked about the
9  symptoms and the review of the chart. Would there be
10  conclusions or recommendations by the nurses at the
11  bottom?
12        MR. SHEA: Object to the form.
13        THE WITNESS: Yes, they --
14        BY MR. DARRAS:
15     Q. Tell us about those conclusions.
16        MR. SHEA: Object to the form.
17        THE WITNESS: Well, they would directly
18  answer the question posed by the claim consultant --
19  sorry, the claim representative.
20        BY MR. DARRAS:
21     Q. And the typical claim representative question
22  would be what, if there was one?
23        MR. SHEA: Object to the form.
24        THE WITNESS: Usually not just one,
25  there would be three. And it depended upon the case.

Page 185

1  Sometimes when we started getting the preexisting ones,
2  it might be just one question there. But if it was
3  about the whole decision, it would be are those
4  restrictions limitations supported, do you think that
5  the restrictions and limitations lead to an impairment
6  that would prevent this claimant returning to an
7  occupation, to his own occupation or any occupation,
8  depending on whether his own oc or any oc.
9        BY MR. DARRAS:
10     Q. So how many of these clinical review forms
11  did you see prepared by nurses over the second time
12  that you were employed with UnumProvident?
13     A. Well, they were supposed to always have one,
14  or I would say sometimes that didn't occur. I would get
15  the claim directly from the claim representative and be
16  asked questions, but that was frowned upon and
17  eventually the nurses would get every one.
18     Q. So the way it went was the claim
19  representative, without medical formal training, would
20  prepare medical questions for you?
21        MR. SHEA: Object to the form.
22        THE WITNESS: Well, essentially there
23  were to me restrictions and limitations, in the big
24  world of medicine, with occupational medicine, yeah,
25  there are medical questions

47 (Pages 182 to 185)

Randall Chapman, et al. vs. Unumprovident Corporation, et al.
Patrick Fergal McSharry, Vol. I
C V00-08297
9/4/2002

---

Page 186

BY MR. DARRAS:
Q. And the nurses that worked within the claim unit themselves --
A. Uh-huh.
Q. -- would already have arrived at a conclusion for you to read at a time the file is sent to you, did I hear that right?
MR. SHEA: Object to the form.
THE WITNESS: Yes, they would answer the questions, and then I would just be asked to -- you know, sometimes we were asked do we just agree with the nurse, and some doctors would just do what was called a sign-off and say I agree with the nurse based on her findings, but I refused to do that.
BY MR. DARRAS:
Q. Well, what was a sign-off?
A. A sign-off was -- see, it was made out to be the same thing, we should be doing the same things as the claim consultant, because the claims consultant did this sheet where the claim representative presented this, you know, the case to them, and they would recommend denial or progress, I suppose, and he would then agree or not agree. And that was laid out to me as the same process, that the nurse did the work on it and we would sign off on their work.

---

Page 187

Q. The customer care representative or the claim consultant would meet with the nurse to recommend denial, the nurse would review the file, put the conclusion that denial was recommended, and ultimately it came to you in that format?
MR. SHEA: Object to the form.
THE WITNESS: Yeah, I mean, I got ones where the nurse would say, Brian is recommending denial, I tend to agree with him. I objected to that. So that's when I kind of started getting in trouble is I wanted to have a more cooperative approach where I was involved at an earlier stage so it just didn't come to me at the very end when everybody had decided what to do and I was the odd man out just disagreeing with the whole team.
MR. SHEA: Object.
BY MR. DARRAS:
Q. If the company was interested, Doctor, in your independent medical opinion, did you ever ask your supervisor how it was that the file came to you with the conclusion to deny?
MR. SHEA: Object to the form.
THE WITNESS: Well, that's why I went to Dr. Vatt and Dr. Anfield to say that I wanted to do things where I wasn't at the -- in this position. And

---

Page 188

they said back to me, yes, we have had problems with you. And I said, well, no, this is so I can try to improve the communications. And they said, yes, they have complained about your ability to communicate and to things. So -- and I said, well, it's not just here, it's not just me, I said, it's all, all the doctors have the same problem where there's the pressure and they feel uncomfortable with people running in at the last minute to their office and saying here's like 15 that have to be done by the end of the month. And, you know, he said no, no, as far as we are aware, this is just in your unit, you have a problem with the people in your unit, you're not cooperating. He even said, you're falling off the career ladder, you've fallen off the career path, he said, not ladder, and --
BY MR. DARRAS:
Q. Who told you that you fell off the --
MR. SHEA: Object, motion to strike.
BY MR. DARRAS:
Q. Who told you at UnumProvident that you had fallen after the career path?
A. Dr. Bob Anfield.
Q. And in what context did Dr. Anfield tell you that you had fallen off the career path?

---

Page 189

A. Because he was getting so many complaints about me.
MR. SHEA: Motion to strike.
BY MR. DARRAS:
Q. Complains that related to you not doing what?
MR. SHEA: Object to the form.
THE WITNESS: Complaints that I was not cooperating with the -- you know, right through our incentives it's all about partnering with our business partners on an equal basis, and, you know, them being happy with us. Our 360 performance was very much influenced by the nurse, the nurses, I mean, there was a small percentage --
BY MR. DARRAS:
Q. You've introduced a new term there for us, the business partner term.
A. Yeah.
Q. Who are you referring to was your business partner?
MR. SHEA: Objection to form.
THE WITNESS: Well, let's call it business, your internal customers.
BY MR. DARRAS:
Q. Who were your internal customers?

---

48 (Pages 186 to 189)

000012

Randall Chapman, et al. vs. Unumprovident Corporation, et al.
Patrick Fergal McSharry, Vol. I

Page 190

1    A. They were essentially the nurses and the
2  claims people, professionals in general.
3    Q. Were the customer care --
4    A. Yes.
5    Q. -- representatives --
6       MR. SHEA: Objection to the form.
7       MR. DARRAS: Maybe you could let me
8  finish.
9       MR. SHEA: The problem is the witness is
10 beginning his answer before you finish your question
11 and I get shut out from my objection. If the witness
12 could pause and give me a chance, I'm happy to
13 accommodate you, but I'm not going to let my objection
14 get overridden by the witness's premature answer.
15      BY MR. DARRAS:
16    Q. Dr. McSharry, were the customer care
17 representatives as you saw it internal customers of
18 yours?
19      MR. SHEA: Objection to form.
20      THE WITNESS: Yes.
21      BY MR. DARRAS:
22    Q. And a business partner, did that include the
23 consultant?
24      MR. SHEA: Objection to form.
25      THE WITNESS: Yes.

Page 192

1  Anfield both told me how important it was to please
2  their business partners.
3    Q. So let's look backwards now. The nurse has
4  arrived at a conclusion. The file arrives at you. You
5  thought you were to give your independent review --
6    A. Uh-huh.
7    Q. -- and you disagree?
8       MR. SHEA: Objection.
9       BY MR. DARRAS:
10    Q. Did that ever occur?
11      MR. SHEA: Objection to form.
12      BY MR. DARRAS:
13    Q. Where you disagreed with the nurse's
14 conclusion?
15    A. That's what -- all the times that I was in
16 trouble was because I disagreed with the nurse's
17 conclusion. I can't say all, you can never say all
18 about anything, but the vast majority.
19    Q. And when you disagreed with the nurse's
20 conclusion, was the nurse's conclusion that the insured
21 had impairment that warranted payment?
22      MR. SHEA: Objection to form.
23      THE WITNESS: No.
24      BY MR. DARRAS:
25    Q. What was it generally that the nurse

Page 191

1       BY MR. DARRAS:
2    Q. Was the director a business partner or not?
3       MR. SHEA: Objection to form.
4       THE WITNESS: Yes.
5       BY MR. DARRAS:
6    Q. Was the impairment head a business partner or
7  not?
8       MR. SHEA: Objection to form.
9       THE WITNESS: Yes.
10      BY MR. DARRAS:
11    Q. And Ken Denton, the site coordinator here in
12 Chattanooga, a business partner?
13      MR. SHEA: Objection to form.
14      THE WITNESS: Essentially of course
15 he's a business, but he wasn't -- he was higher than
16 my level, so he wasn't in my 360 --
17    Q. How did you learn that Dr. Anfield suggested
18 that these folks were business partners?
19      MR. SHEA: Objection to form.
20      THE WITNESS: Say that again, sorry
21      BY MR. DARRAS:
22    Q. You mentioned that Dr. Anfield told you
23 about business partners. When did that happen?
24      MR. SHEA: Same objection.
25      THE WITNESS: Both Dr. Vatt and Dr.

Page 193

1  concluded?
2    A. We never saw the ones where the nurses
3  approved. We never -- they were deciding consultation
4  with the clinical, sorry, with the nonclinical
5  personnel, the claims representatives. They would
6  decide what was approvable. Only things we saw was
7  what was deniable, that's all. When they in their
8  report said deny, that's the only thing that we would
9  see.
10    Q. So the pressure to complete the quota of 2.53
11 or 4 claim files a day, do you remember that?
12      MR. SHEA: Objection to form.
13      THE WITNESS: Yes.
14      BY MR. DARRAS:
15    Q. In order to do a full and fair review on the
16 files that you saw, how was it possible to accomplish
17 that in a given work day?
18      MR. SHEA: Objection to form.
19      THE WITNESS: Well, it would be very
20 easy if you just agreed with the nurse, you could do
21 you can do 15, 20 if you just signed off.
22      BY MR. DARRAS:
23    Q. What was the largest number that you learned
24 doctors at the company doing?
25      MR. SHEA: Objection to form

26 (Pages 190 to 193)

000013

Randall Chapman, et al. vs. Unumprovident Corporation, et al.
Patrick Fergal McSharry, Vol. I

CV00-08297
9/4/2002

Page 198

1  Q. Well, Lamar suggesting to you that you had to
2  help us, Dr. McSharry?
3  MR. SHEA: Objection to form.
4  THE WITNESS: Yeah.
5  BY MR. DARRAS:
6  Q. Help them do what?
7  A. Well, I mean, all the consultants, I mean,
8  their expertise, the reason they are recruited for
9  their companies is they had a very good record in the
10  other company of being able to close -- that was my
11  understanding that they were -- you know, they had
12  done this before.
13  MR. SHEA: Motion to strike.
14  BY MR. DARRAS:
15  Q. Is your testimony that in order to become a
16  claim consultant, you had to have a history or a track
17  record of closing claims as a claim handler?
18  MR. SHEA: Objection to form.
19  BY MR. DARRAS:
20  Q. If you know?
21  A. Most came directly from the claim handler,
22  yes. I mean, it was the next step up after a claim
23  handler.
24  Q. Have you heard the expression of softy in the
25  claim department?

Page 200

1  to help somebody who's very distressed like that. I
2  mean, I think really you shouldn't -- you should stop
3  at that level when they are that distressed because you
4  are not helping them.
5  BY MR. DARRAS:
6  Q. At any -- go ahead.
7  MR. SHEA: Again, you're cutting the
8  witness off.
9  THE WITNESS: And he would just -- you
10  know, so that was the training mechanism. The other
11  support would say, you'll be able to do this, you'll be
12  able to do this. It's -- you will eventually be able
13  to be -- have no feeling as regards if somebody
14  cries. And what the person would say was, I feel like
15  paying her, I feel like paying her, you know, because
16  I'm sad. And I would say, well, I mean, it really
17  should depend on what medical, how really depressed
18  they are, not that they cry to you on the phone. And
19  that particular claim representative said -- just
20  looked at me and went, I made the decision. And I
21  said, well, that's just my feeling. I said, you know,
22  it really -- you should wait until it gets here and
23  we can assess how, about this person as I accept, if
24  the person said they are suicidal, you should take that
25  very seriously and expedited this appeal, absolutely.

Page 199

1  A. Yeah, a patient advocate.
2  Q. Softy you equate to patient advocate?
3  MR. SHEA: Objection to form.
4  THE WITNESS: As regard the claim, as
5  you know, a claim person can't be considered a claim
6  advocate because they're not -- that's kind of really
7  a medical or a, you know -- in practice, we're
8  supposed to be patient advocates, but --
9  Q. Did you ever see in a round table --
10  MR. SHEA: You cut the witness off
11  MR. DARRAS: I'm sorry.
12  THE WITNESS: But yes, people were
13  called, you know, they were -- if they weren't able to
14  handle the stress, and one or two kind of ventilated
15  publicly about how they felt that this person might
16  commit suicide or something and they didn't want this
17  on their head, and people were saying, come on, you're
18  just using that as manipulation and you got to get used
19  to it, eventually when you're here longer, you'll get
20  used to that and you'll know that these folks are
21  really -- and you know, and you'd say, well, they are
22  crying on the phone to me and everything and I just --
23  I don't know how to handle a crying woman. And they
24  would say, you know, you're not really trained at that
25  level unfortunately to hire somebody who's very -- or

Page 201

1  expedite this appeal or this claim. But I don't think
2  you should be left stuck to kind of handing over the
3  decision to this. Well, you know, we should have more
4  input from us before you go ahead and make a decision.
5  And he just said, no, he just -- you know, he was
6  going to make his decision.
7  BY MR. DARRAS
8  Q. Were there things about the way UnumProvident
9  handled claims after you came back in 2000 that
10  bothered or offended you?
11  MR. SHEA: Object to the form.
12  THE WITNESS: Yeah, it was very
13  different.
14  BY MR. DARRAS
15  Q. Can you list your concerns about the way
16  claims were handled?
17  A. Well, there was this new thing called a
18  walk-in, where the claim representative would come in
19  generally unannounced, but then they developed a system
20  whereby you had walk-in days or walk-in half days where
21  the claim, so as not to obstruct you looking at the
22  full file when you got the full file. And the purpose
23  in UnumProvident parlance was to give the opportunity
24  to the claims representatives to understand a part of
25  the medical records they didn't understand

Reported By: Steve S. Huseby, RPR
Huseby, Inc., an Affiliate of Spherion (800) 342-5490

000014

Randall Chapman, et al. vs. Unumprovident Corporation, et al.
Patrick Fergal McSharry, Vol. I

CV00-08297
9/4/2002

Page 202

1   But I was distressed because they would
2   come in -- initially I wasn't distressed. I thought
3   this was a good way of explaining something, and they
4   would come in with one particular area, say,
5   preexisting or something and say, now, Doctor, here's
6   the four pages that I think are important to this
7   question and here's my question, is alcohol the cause
8   of this person's cirrhosis? And I would say oh, okay,
9   what have you got there? And they would say, four
10  pages here. And I would look through and I'd say,
11  well, I don't know, I said, that, you know, the doc --
12  and this is where I get into a problem being
13  wishy-washy, I would say I don't know, it says here all
14  right that the person thinks he might have drank too
15  much, but it also says that the person is hepatitis C.
16  And then he would say, well, in your opinion would the
17  hepatitis C be more important or the alcohol? And I
18  said, I really can't say that, I really can't say.
19      And he said, well, wouldn't you admit,
20  wouldn't you say that the most -- what is the contract
21  language, symptoms, that the person has had symptoms of
22  a condition as in alcoholism that would lead to this
23  condition? And I would say, oh, yes, I mean, there was
24  -- there was -- there is a relationship, certainly,
25  between the condition and the alcohol. They'd say,

Page 203

1   thank you, could you write that down. So I would write
2   that down and they would go, and I thought that was
3   fine. And then I would get it back on appeal where
4   their claims representative had used my walk-in to deny
5   the case, and that's when I would get upset.
6       Q.  Without the benefit of a review of the entire
7   medical, you would be asked a particular question about
8   some aspect of the treatment?
9       A.  Yes.
10      Q.  And rather than send it to you for a full
11  review, you would see it back on appeal after the claim
12  rep had denied the file?
13      MR. SHEA: Object to the form
14      THE WITNESS: Yes
15      BY MR. DARRAS.
16      Q.  Have you ever heard the term presell or
17  precondition?
18      A.  Not those exact words, no.
19      Q.  Looking back on the walk-in experience, would
20  you characterize what the claim people were trying to
21  do or the nurse as precondition or presell you on one
22  aspect to deny?
23      MR. SHEA  Objection to form.
24      THE WITNESS: No, I would say it was
25  more than that  It was just, here's what we want, you

Page 204

1   give it to me, that's it. There was no preselling,
2   there was no selling on it. It was like here it is,
3   we've shown this, you just --
4       BY MR. DARRAS:
5       Q.  These walk-ins, when you would later see it
6   come back to you on appeal, was the walk-in meeting
7   where you had with the nurse or the claim handler
8   always documented in the claim file?
9       MR. SHEA: Object to the form.
10      THE WITNESS: The actual formal walk-in
11  would be, yes.
12      BY MR. DARRAS:
13      Q.  And the conversation that ensued?
14      MR. SHEA: Object to the form.
15      THE WITNESS: No, the only thing that
16  was documented was the question -- in fact, a lot of
17  the times, the -- it would be a blank sheet of paper
18  that they would bring along and then they would fill in
19  the question as we discuss it, and then I would give
20  the answer that I said I would give to that question .
21      BY MR. DARRAS:
22      Q.  And did you advise your supervisors that you
23  didn't feel this walk-in was appropriate?
24      MR. SHEA: Object to the form.
25      THE WITNESS: I did. I advised that to

Page 205

1   me, it wasn't adequate.
2       BY MR. DARRAS:
3       Q.  And did your supervisors make any change to
4   the walk-in procedure before you left?
5       A.  Changes as in formalized it, but --
6       Q.  Let me rephrase it.
7       A.  Yeah.
8       Q.  Did your supervisors make any changes in the
9   walk-in procedures that assisted the insureds?
10      MR. SHEA. Object to the form.
11      THE WITNESS: My supervisors didn't, no
12      THE VIDEOGRAPHER:  We're off the record
13  at 3:07.
14      (Brief recess.)
15      THE VIDEOGRAPHER.  We're on the record
16  at 3:25.
17      BY MR. DARRAS
18      Q.  Dr McSharry, you told us earlier that Dr
19  Vatt had said to you, quote, don't tie the hands of the
20  claim handler. What did that mean?
21      MR. SHEA  Object to the form
22      THE WITNESS  Actually, they are not the
23  words he used  That was used by another doctor who
24  -- a Dr. Steve Fagan who said that. I kind of
25  explained the dilemma I was in, and he worked for a

52 (Pages 202 to 205)

000015

Randall Chapman, et al. vs. Unumprovident Corporation, et al.
Patrick Fergal McSharry, Vol. I

CV00-08297
9/4/2002

Page 206

1  long time with UnumProvident and he said  — my
2  situation was that situation where I was tying the
3  hands of the claims professional all the time. And
4  what it meant was that you — the decision was
5  already made and if you said anything definitely the
6  opposite, you were definitely tying their hands. If
7  you did it in a very equivocal kind of way, you weren't
8  tying their hands. And it also pertained to ordering
9  extra tests and everything, because that stopped the
10  decision being made. It put a hiccup, because the
11  decision could not be made if you had asked for further
12  tests to be done or further — suggested further
13  records to be received, you would stop the flow of the
14  process. And so you were therefore tying the claims
15  handler's hands, they couldn't deny just then, they had
16  to wait until — to get the records. And what upset
17  me a lot of times is they sometimes just ignored them
18  anyway.
19      MR. SHEA: Motion to strike.
20      BY MR. DARRAS:
21      Q.  When you suggested that the decision was
22  already made, made by who?
23      MR. SHEA: Object to the form.
24      THE WITNESS: The decision makers were
25  — and, you know, UnumProvident made no secret about

Page 207

1  this, the decision makers are the claims handlers.
2      BY MR. DARRAS:
3      Q.  And when you told us that you created a
4  hiccup in the process when you ordered tests, what did
5  that mean?
6      MR. SHEA: Object to the form.
7      THE WITNESS: That meant — sorry, just
8  got distracted there.  What was the question again?
9      BY MR. DARRAS:
10      Q.  When you told us that ordering tests was a
11  hiccup, what were you referring to?
12      MR. SHEA: Same objection
13      THE WITNESS: Well, it's — you know,
14  very often, folks were under a limit. There isn't a
15  limit under ERISA of how long the claim is supposed to
16  take, and they had generally not sought these records.
17  So as I said before, this was coming to us at the last
18  minute, when the claim was about to be closed, and we
19  would say, look for more records. Well, then it
20  couldn't be closed that month, we had to go and get
21  those extra records. So they might have to apply for
22  an extension or the time or they might just have to
23  reopen it pending the new records coming, or not reopen
24  but decide not to close, I suppose
25      BY MR. DARRAS

Page 208

1      Q.  Were your business partners pleased with you
2  when you ordered tests?
3      MR. SHEA: Objection to form.
4      THE WITNESS: No. They — well, at one
5  time, David Solomon called me in and said, I don't
6  think you totally understand that when you write
7  something is necessary, we have to do it.  And I said,
8  well, I didn't understand that, I said, I thought that
9  it was just a suggestion.  And he said, no, no, we have
10  to do it, so the best thing to do is before you —
11  before you say that, just go talk to the claims person
12  first and discuss with them why you might want an FCE.
13      BY MR. DARRAS:
14      Q.  How would ordering tests slow down the
15  decision if at all?
16      MR. SHEA: Object to the form.
17      THE WITNESS: Well, of course it would
18  have to be organized. There was two people that could
19  do the FCE. UnumProvident preferred to organize their
20  own when they thought it was worthwhile, and so it
21  would slow down.  That's to answer your question
22  directly, that's what it would slow down, it just took
23  a while to organize.
24      BY MR. DARRAS:
25      Q.  Were your business partners pleased if you

Page 209

1  reviewed a file and made a suggestion that the file was
2  incomplete?
3      MR. SHEA: Object to the form.
4      THE WITNESS: No, that's when Dr. Vatt
5  — that's when I got into the most trouble is when I
6  would say something like that, and the communications
7  from Dr. Vatt to me and verbally and written were
8  always, do not go beyond the record and be suggesting
9  things that there is really no — nothing in the
10  record to suggest these were necessary  And I would
11  say back to him, well, the records — the doctor did
12  say that he saw this other doctor, and I actually think
13  it is important because it's multiple sclerosis and
14  it's a neurology appointment versus the general
15  practitioner or family practitioner was seeing the
16  patient a lot and they might know, and it was
17  mentioned  And he said, but, you know, was it
18  definitely mentioned in the record?  And I would say
19  yeah  And he would say, well, you know  yes — well
20  he said, I suppose that's fine but really, you're not
21  supposed to be going looking for these, you're not
22  supposed to be going looking for all these possible
23  things that might be there, we have to look at the
24  objective, what's objective in the file and what's it
25  And I mean, whatever objective proof, there is in

Reported By: Steve S. Huseby, RPR
Huseby, Inc., an Affiliate of Spherion (800) 342-5490

000016

Randall Chapman, et al. vs. Unumprovident Corporation, et al.
Patrick Fergal McSharry, Vol. I

CV00-0S297
9/4/2002

Page 210

1  objective proof, there is no objective proof.
2      BY MR. DARRAS:
3      Q. From the training that you got from your
4  superiors, were you or were you not trained to notify
5  someone at the company when the file had incomplete
6  medical?
7      MR. SHEA: Object to the form.
8      THE WITNESS: Could you ask that again,
9  sorry, lost concentration.
10     BY MR. DARRAS:
11     Q. Sure. Did you have any training or if I
12  understood your testimony, was the training received
13  from Dr. Vatt what, if you came across a circumstance
14  where the file was incomplete, how were you trained in
15  that circumstance?
16     A. Just say the file was incomplete.
17     Q. In terms of ordering or suggesting an FCE or
18  an IME, were you encouraged or discouraged or not at
19  all to make recommendations like those?
20     MR. SHEA: Object to the form.
21     THE WITNESS: I was discouraged to order
22  expensive tests. The claims folks came to me on many
23  occasions saying that there was a clamp down on video
24  surveillance. But that wasn't with me, because we very
25  rarely would say a video surveillance would be useful

Page 211

1  because a lot of times it wasn't at all useful. But
2  FCE's, they were concerned but particularly abut neuro
3  psych evaluations.
4      BY MR. DARRAS:
5      Q. In the last year that you were with the
6  company, did you see the number of IME's going up,
7  going down or staying the same?
8      MR. SHEA: Object to the form.
9      THE WITNESS: I did notice when I
10  was -- the first few months, there were IME's, and we
11  -- but there were very few as time went on. And as
12  time went on, I was doing more and more group files.
13     BY MR. DARRAS:
14     Q. In terms of the impairment units, the way
15  they set up and functioned --
16     A. Yes.
17     Q. -- did you have a problem with the way the
18  groups were set up and functioned?
19     MR. SHEA: Object to the form.
20     THE WITNESS: I didn't have a medical
21  problem, that it didn't really reflect the wholistic
22  way that disability affected somebody.
23     BY MR. DARRAS:
24     Q. For instance?
25     A. For instance, you -- most patients, even in

Page 212

1  family practice where I am and the same with the folks
2  whose files came in, they had multiple diagnoses, and
3  there was no way in this impairment model to address
4  those multiple diagnoses together. The UnumProvident
5  model was to pick them out, look at the doctor's APS
6  statement, and for a triage person, nobody ever met
7  these triage people, but I think some of the nurses
8  were involved, and they would pick and say, this is the
9  main diagnosis, that's that, and then it would
10  automatically be a general medical claim. And what we
11  would find is that it would come to us general medical
12  and we would say the major problem from my generalist
13  approach is not this physical general medical problem,
14  but, say, a psychiatric problem or indeed an
15  orthopedic, more often psychiatric problems, because,
16  really, gen med, and this is the same in practice as
17  well, gen med is the big bucket, and our family
18  practice, big bucket, which, and the others are
19  specialties, so --
20     Q. Were you criticized by your superiors for
21  looking at the whole person of the insured?
22     MR. SHEA: Object to the form.
23     THE WITNESS: Well, when I objected or
24  felt that the model was difficult to work with, you
25  know, that it didn't really -- wasn't really fair to

Page 213

1  the claimant, I was told that this is very much Ralph
2  Mohney's baby, you do not mess with the impairment
3  based model.
4      BY MR. DARRAS:
5      Q. Explain to us what you meant by it was really
6  unfair to the claimant.
7      MR. SHEA: Object to the form.
8      THE WITNESS: Well, essentially, if you
9  could just -- I just go through a page and probably is
10  an easier way, but you add up, if that person has three
11  or four different problems, they may have physical
12  restrictions and limitations from: say, an orthopedic
13  condition. They may have what I call cognitive and
14  psychological restrictions and limitations from either
15  a functional disorder or a psychiatric disorder. And
16  really, you have to look at all of those restrictions
17  and limitations to really comment on whether the
18  person's impaired or not. But we were told only to
19  look at the physical restrictions and limitations from
20  the general medical condition. And so I really look at
21  that part, and then the orthopedist would only look at
22  one part. And then the -- or the nurse would actually
23  look at the other part. More usually it was a nurse,
24  it went to a nurse, sometimes didn't get a physician
25  review. And so come back to me, and I would be saying,

54 (Pages 210 to 213)

000017

Randall Chapman, et al. vs. Unumprovident Corporation, et al.
Patrick Fergal McSharry, Vol. I

CV00-08297
9/4/2002

Page 226

1  THE WITNESS: In this particular
2  instance, no way.
3  BY MR. DARRAS:
4  Q. I would like to move now to closing claims.
5  We briefly touched on it before with Exhibit Number 6,
6  the --
7  MR. SHEA: Are you done with 6, Frank?
8  MR. DARRAS: Not yet.
9  BY MR. DARRAS:
10  Q. The December potentials. Could you put
11  Exhibit 6 in front of you again, Doctor?
12  A. Sure.
13  Q. The monthly meetings that you talked about
14  before where numbers were talked about, can you explain
15  to us what meetings that you attended where you heard
16  numbers talked about?
17  MR. SHEA: Objection to form.
18  THE WITNESS: This was the team meeting,
19  and -- now have enough time to object because I'm
20  concerned about that.
21  MR. DARRAS: Don't worry about it, we'll
22  do fine.
23  BY MR. DARRAS:
24  Q. The question again was, where did you hear
25  the monthly numbers, and you told us team meetings so

Page 227

1  far, who did you hear it from?
2  A. David Solomon.
3  Q. And what did you hear?
4  A. I heard --
5  MR. SHEA: Objection to form.
6  THE WITNESS: -- guys, we are not
7  reaching our targets. It was at a -- either a
8  biweekly, sorry, not a biweekly, but every two weeks or
9  monthly team meeting. I think it was every two weeks,
10  where all the team came. Initially they weren't
11  supposed to be for physicians, and indeed many round
12  tables were not supposed to be for physicians, but
13  myself and Nancy Beecher and another physician had
14  tried to help the situation. And so we would go to
15  their team claims professionals meetings.
16  BY MR. DARRAS:
17  Q. So team meetings and mini round tables you
18  mentioned. Did you attend monthly team meetings?
19  A. At least monthly. I think it was more often
20  Q. And the target numbers that you mentioned
21  did they have anything to do with paying claims?
22  MR. SHEA: Object to the form.
23  BY MR. DARRAS:
24  Q. The target numbers?
25  A. No, the only ones that were introduced were

Page 228

1  ones where the claim specialist -- the team meetings
2  were not about claims. They were not about individual
3  claims.
4  Q. The mini round table reviews were to evaluate
5  what?
6  A. Yes, the mini round tables were about
7  individual claims.
8  Q. Did you hear at mini round table anything
9  about targeting numbers or closures?
10  MR. SHEA: Object to the form.
11  THE WITNESS: Yes.
12  BY MR. DARRAS:
13  Q. And what exactly did you hear about targets
14  at the mini round table?
15  A. Well, very often it would revert back and
16  here's another one that will, should be able to help us
17  reach our goal. But then they would say, but of course
18  you're not supposed to know that, Dr. McSharry.
19  Q. And did anybody say, of course,
20  Dr. McSharry, you're not supposed to know about what?
21  MR. SHEA: Object to the form.
22  THE WITNESS: Well --
23  Q. Targets?
24  A. You're not supposed to know about that we're
25  under this pressure and you're not supposed to feel

Page 229

1  this pressure. However, you're here now and you see
2  the pressure we're under.
3  Q. You mentioned that you worked Monday through
4  Friday, right?
5  A. Uh-huh.
6  Q. Did you ever work Saturdays?
7  A. Yes, we were asked to come in quite a few
8  times.
9  Q. Was there a typical time during the month or
10  the year that you were asked to come in and work on
11  Saturdays?
12  A. Yes, usually the -- towards the end of the
13  month.
14  Q. And did you have some understanding as to why
15  a Saturday was necessary at the end of the month?
16  MR. SHEA: Object to the form.
17  THE WITNESS: It was -- well, the
18  claims professionals were allowed to either come in
19  during that week late or on a Saturday.
20  BY MR. DARRAS:
21  Q. At the end of a month?
22  A. At the end of a month, and the understanding
23  was -- everybody knew about the end of the month
24  pressure.
25  Q. Tell us about the end of the month pressure

58 (Pages 226 to 229)

000018

Randall Chapman, et al. vs. Unumprovident Corporation, et al.
Patrick Fergal McSharry, Vol. I

CV00-08297
9/4/2002

Page 238

1  where I really feel she should be denied and you don't.
2  And I said, I don't, you know, I don't have the
3  decision, you have the decision, however I can't help
4  you deny it, I feel we need to do this and that. But
5  he said, you're making my life so difficult. And I
6  said, well, I'm sorry.
7      So then he went and got the consultant,
8  Tom Lamar, to come back. And I think you need to show,
9  too, and they all talked about it and said there must
10  be some way we could come up maybe. And I said, well,
11  there's no point in you guys coming to talk to me, why
12  don't you have the nurse come and talk to me who's
13  looked at this review, who's done this and given --
14  you're talking about their opinion here, I would like
15  to know where they got this opinion from, it's not
16  really clear in their note.
17      So then they would -- they felt that I
18  should start meeting the nurse. So that's when we
19  started to -- the nurse to come down before she had
20  done the full review and presented me with a fait
21  accompli I would be able to talk to and fro. And I
22  thought that resolved the problem, but unfortunately I
23  went away for two days and came back and the nurse had
24  gone to somebody else. They had --
25      Q.  What time frame are we talking about?

Page 239

1      A.  As in the time between the different --
2      Q.  Where you went away and the nurse had gone to
3  somebody else?
4      A.  Two days.
5      Q.  Have you ever heard the expression doctor
6  shopping?
7      A.  Yes.
8      Q.  What is it?
9      MR. SHEA: Object to the form.
10      THE WITNESS: Well, it's come from the
11  real world of medicine where patients just don't get
12  the opinion that they like and so they hop around from
13  one doctor to the next until the person says, you know,
14  they are convinced that they have very severe disease
15  and they will go to the -- eventually the twentieth
16  specialist and they say, yes, you do indeed have that
17  And then they stop doctor shopping, they stick with
18  that person, but they go to 20 doctors beforehand.
19      Q.  In terms of your file review, did you ever
20  learn that claim handlers went to others rather than
21  direct files to you?
22      A.  Yes.
23      Q.  And how did you learn that?
24      A.  It could come back on appeal and I would see
25  that it was supposed -- we agreed that files from a

Page 240

1  certain, the group pace area, would come to me unless I
2  was away.  And two instances that I remember, I had
3  already given an opinion and the first one, Dr.
4  Beecher, overruled my opinion.  And the second occasion
5  I had given an opinion at the mini round table, and the
6  claims representative and the nurse didn't like what I
7  was saying and went to their nursing supervisor and
8  said, you know, what can we do?  So she recommended
9  they go and give it to Dr. Beecher, even though that
10  was against our protocol.  We were  -- no matter what
11  the claim was and what I had said about the claim, it
12  was still supposed to come to me.
13      Q.  In terms of your peer pressure regarding
14  claim closure --
15      A.  Yes.
16      Q.  -- did you ever hear from your peers that
17  you weren't supporting them as business partners?
18      MR. SHEA: Object to the form.
19      THE WITNESS: No.
20      BY MR. DARRAS:
21      Q.  In terms of Dr. Vatt and --
22      A.  Oh, Dr. Vatt, he's not my peer.
23      Q.  Okay.  Dr. Vatt, did Dr. Vatt ever express
24  to you you weren't supporting your business partners?
25      MR. SHEA: Object to the form.

Page 241

1      THE WITNESS: Yes, yes.
2      BY MR. DARRAS:
3      Q.  In what context?
4      MR. SHEA: Object to the form
5      THE WITNESS: In the form of a written
6  warning.
7      BY MR. DARRAS:
8      Q.  We'll get to that in a bit  Did Dr. Anfield
9  speak to you about your report writing?
10      A.  He did.
11      Q.  And what if anything did he say to you about
12  the way you were writing your reports?
13      A.  Well, that was the conversation about how I
14  seem to be antagonizing everything that I touched and
15  that he was willing to work with me on a way  and there
16  was also that he felt personality problem between me
17  and Dr. Vatt, which I didn't agree with.
18      Q.  Okay. Dr. Anfield is the one who said he
19  wanted you to get your career back on path?
20      A.  Yeah.
21      Q.  And did he give you some suggestions as to
22  how you could get back on path  on track?
23      A.  Yes, he said that I really  well, what he
24  said is you don't -- you've been in the business
25  world for awhile, but you don't  seem to understand the

Reported By: Steve S. Huseby, RPR
Huseby, Inc., an Affiliate of Spherion (800) 342-5490

61 (Page 238 to 241)

Randall Chapman, et al. vs. Unumprovident Corporation, et al.
Patrick Fergal McSharry, Vol. I

CV00-08297
9/4/2002

Page 242

```
 1   -- how important it is to serve our business partners,
 2   how important it is to support them. After all, I
 3   can't remember whether it was Dr. Vatt or Dr. Anfield
 4   said, we are a means to an end.
 5        MR. SHEA: Motion to strike .
 6        BY MR. DARRAS:
 7   Q.  And did Dr. Vatt or Dr. Anfield explain to
 8   you what they meant by you are just a means to an end?
 9        MR. SHEA: Object to the form.
10        THE WITNESS: Yes, we had a conversation
11   and I said, look, you're right. I mean, I've done the
12   ambient program, I've worked at Blue Cross, I know that
13   we're not here unless the claims management -- we
14   won't be here when -- if this company ever decides
15   not to manage claims. I mean, that's why we're here.
16   You know, everybody knows and every doctor who's worked
17   has mentioned and knows that we're totally nonvaluable
18   to the company unless we're able to support the denial
19   of claims, and that is the end game, that is -- and I
20   said to him, I know the end game. I said, this company
21   has to make money. But I said, my problem, my feeling
22   is that we are doing things that are just not fair to
23   the claimant, number one, but also, really my
24   understanding of the law and ERISA in particular,
25   because that's what I came from in Blue Cross was that
```

Page 244

```
 1   be pointing all these things out, but we will work with
 2   you on a project, this is the same meeting, we will
 3   work with you on a project to get, so that you can have
 4   a better relationship with the claims people. And I
 5   said, okay, I suppose that's something.
 6        MR. SHEA: Motion to strike.
 7        BY MR. DARRAS:
 8   Q.  When you said that you were nonvaluable to
 9   the company unless you supported the denial of claims,
10   that came from whose mouth?
11        MR. SHEA: Object to the form.
12        THE WITNESS: That came from my mouth,
13   but it --
14        BY MR. DARRAS:
15   Q.  Were there words or sum and substance --
16        MR. SHEA: Objection.
17        THE WITNESS: Yes, there were words --
18        BY MR. DARRAS:
19   Q.  Excuse me. Were there words either in form
20   or substance said by Dr. Vatt along those same lines?
21        MR. SHEA: Object to the form.
22        THE WITNESS: The way it was implied was
23   that we don't keep the claims people happy, and the way
24   to keep the claims people happy we all knew was because
25   they were so incentivized by this as in money --
```

Page 243

```
 1   they are sidestepping some of the requirements of this,
 2   and that -- and the whole emphasis on denial and there
 3   really isn't a chance to really assess the claim fully.
 4        And he said, well, look, don't you
 5   understand, that's fine, but there's even more pressure
 6   on us to just look at what the nurses says and even go
 7   to the extent of agreeing with the nurse. And I said,
 8   well, I said, I hope we're not moving to that. I said,
 9   because that in the disability world is not workable.
10   I said, in my estimation it may be somewhat workable
11   when there's just this much information available, but
12   when there's this much information available
13   (indicating), then usually we would have to see that
14   much information. He said, no, the move is on to do
15   more reviews, more like utilization review department
16   I said, this is not, this is different, this is
17   disability. And he said -- he kind of I think maybe
18   got offended, because he's been in disability longer
19   than me and is more senior  So he said, no, I don't
20   think you understand, Fergal, that this is a problem
21   with you and the way you do it  And I said, well, I
22   think myself it's the whole way the company does it
23        And he said, you know, we have to stay
24   in our unit, and we have to have uniform systems across
25   our unit and that's -- it doesn't do you any good to
```

Page 245

```
 1        MR. BURNETTE: He's pushing to Exhibit
 2   6.
 3        THE WITNESS: Yes, sorry.
 4        MR. BURNETTE: Isn't that 6? You all
 5   have taken the original.
 6        MR. DARRAS: Yes, it's 6.
 7        THE WITNESS: Yeah, I'm pointing to
 8   this. That was the way to keep them happy. And we
 9   were not necessarily evil, but the word was, a means to
10   an end, yeah, a means to an end to keep the claims
11   people happy and if we didn't do that, then there would
12   be no need for doctors in this unit.  And Dr. Vatt
13   said that through actually Dr. Metheny, that, you
14   that's who I heard it from. Dr. Metheny, that, you
15   know, that was the situation, that it was -- we were a
16   means to an end. And actually Dr. Vatt said it to me
17   directly one time, too. He said we have no role here
18   unless we keep the business partners totally happy
19   You know, they could decide that they have too many
20   doctors at any time
21        MR. SHEA: Motion to strike
22        BY MR. DARRAS:
23   Q.  Did Dr. Vatt explain to you what he needed
24   you to do in order to keep your business partner happy
25        MR. SHEA: Object to the form
```

Reported By: Steve S. Huseby, RPR
Huseby, Inc., an Affiliate of Spherion (800) 342-5490

000020

Randall Chapman, et al. vs. Unumprovident Corporation, et al.
Patrick Fergal McSharry, Vol. I

CV00-08297
9/4/2002

Page 246

```
1          THE WITNESS: Well, yeah, every day I
2    would go for meetings early in the morning or late at
3    night, well, what was to me early in the morning, but
4    it wasn't too late at night, and how I was to present
5    my files. And he was I think a little upset that he
6    didn't get the opportunity for me initially to look at
7    these files.
8          BY MR. DARRAS:
9          Q.  Did keeping the claims people happy mean to
10   you helping them deny claims?
11         MR. SHEA: Object to the form.
12         THE WITNESS: Yes, there is just no
13   doubt about that.
14         BY MR. DARRAS:
15         Q.  And how did you arrive at that opinion?
16         MR. SHEA: Object to the form.
17         THE WITNESS: Because the only people I
18   could in any way relate to were the people who didn't
19   mind what opinion I came up with, who came to me and
20   said, listen, I don't mind what way you go with this.
21   One or two people did come, it won't upset me. But all
22   the others said, hey, but Dr. McSharry, don't you
23   believe this and don't you believe that, and would
24   practically be putting words in my mouth. And then Dr.
25   Vatt, my supervisor, was also taking the same line,
```

Page 248

```
1          MR. SHEA: Object to the form.
2          THE WITNESS: Yes. I mean, he
3    realized against me if I didn't do what he said.
4          BY MR. DARRAS:
5          Q.  I want to go back and talk now about these
6    mini round table -- I want to go back and talk about
7    the mini round tables and find out whether the target
8    monthly numbers were shared at the mini round tables
9    that you attended?
10         MR. SHEA: Object to the form.
11         THE WITNESS: I don't recall those
12   actual numbers being at the mini round table.
13         BY MR. DARRAS:
14         Q.  The numbers that you're talking about there,
15   those monthly target numbers, were numbers discussed at
16   mini round tables?
17         MR. SHEA: Objection.
18         BY MR. DARRAS:
19         Q.  By numbers, I mean reserves on claims?
20         MR. SHEA: Object to the form.
21         THE WITNESS: In a generalized way, not
22   as far as action numbers, at the mini round tables.
23         BY MR. DARRAS:
24         Q.  And based upon what you observed at the mini
25   round tables, what were the claim handlers supposed to
```

Page 247

```
1    putting words in my mouth. And I said it to him, I
2    said -- you know, he said, I'm not asking you to
3    change your opinion, what I'm asking you to do is put
4    it in a different context and a different -- that is
5    inflammatory, and, you know, things we have pointed out
6    where you're wishy-washy and all this. And I said, if
7    I did that, it changes my opinion. And I said, there
8    are other physicians who feel like that, too. And then
9    he got excited and said, you're trying to enjoin others
10   and I am aware that you're trying to enjoin others in
11   this attempt to discredit the process. And I said, I
12   am not. I have just talked to my colleagues about the
13   pressure I'm under and some of them have empathized and
14   some have not.
15         MR. SHEA: Motion to strike.
16         BY MR. DARRAS:
17         Q.  In effect when Dr. Vatt said to you I'm not
18   asking you to change your opinion, did you believe him?
19         MR. SHEA: Object to the form
20         THE WITNESS: No, I knew exactly where
21   he was coming from.
22         BY MR. DARRAS:
23         Q.  And based on what he told you about not
24   wanting to change your opinion, were his actions
25   different than the words he used?
```

Page 249

```
1    do if anything at a mini round table?
2          MR. SHEA: Object to the form.
3          THE WITNESS: The mini round table was
4    to see if the nurse or physician agreed with the
5    direction they were taking.
6          BY MR. DARRAS:
7          Q.  These numbers on Exhibit 6, those were
8    numbers, if I recall correctly, that were discussed at
9    the team meetings?
10         MR. SHEA: Object to the form
11         THE WITNESS: Yes, correct.
12         BY MR. DARRAS:
13         Q.  Thanks. Well, let me ask it differently.
14   Where did you hear the target numbers discussed on
15   Exhibit 6?
16         A.  At the team meeting
17         Q.  Thank you. Would you participate at the mini
18   round tables?
19         A.  Yes
20         Q.  And what would you be asked to do if
21   anything?
22         A.  They were more informal, and I looked at them
23   as a way of bonding with the team and some helping
24   them understand my particular role. And so they would
25   present their cases, very similar to the large or big
```



UNUM.

*Protecting everything you work for*

August 28, 2000



EXHIBIT
P-3

Patrick Fergal McSherry, MD
11 Stillorgan Park
Blackrock County
Dublin, Ireland

Dear Fergal:

I am confirming the employment offer extended to you for Associate Medical Director, which is an exempt position with UnumProvident Corporation ("UNUM") in Chattanooga, TN. This offer will remain open for one month from the above date of this offer letter, at which point in time it will be withdrawn.

You will be paid at a rate of $5,354.17 semi-monthly ($128,500 annually). This salary describes your rate of compensation, but does not imply any length of employment. The following summarizes the offer:

- For 2000, you will be eligible to participate in the Management Incentive Compensation Plan (MICP) at a target level of 25% of your base salary earnings. The MICP is based on the achievement of certain corporate earnings thresholds and the formula includes weights for both corporate and individual goals. Your participation in the MICP for 2000 will be prorated according to the actual portion of the year you are employed by UnumProvident

- You will participate in the long-term incentive plan (LTI). You will be eligible for stock option grants consistent with the company program and based upon management's recommendation and the Compensation Committee's approval.

- A one-time bonus of $5,000.00 (gross amount before taxes and FICA) will be paid upon employment with UnumProvident. The terms and conditions of your bonus are governed by the UnumProvident Signing Bonus Repayment Agreement.

- Anticipated start date November 1, 2000.

Relocation assistance will be provided which will include the Primacy Relocation Program for:

- Up to $20,000 reimbursement for expenses associated with the physical move of your household goods, including packing; transporting; limited storage, if necessary; househunting; final move trip; and all other incidental expenses associated with your move.

- Administrative closing costs associated with the purchase of a home at your new location, including up to 1% discount point.

- Up to 90 days stay in UnumProvident corporate apartments

000022

UNUMPROVIDENT CORPORATION
1 Fountain Square, Chattanooga, Tennessee 37402
423-755-1011

Doc #:50332

000 210

Page 2
Fergal McSharry, MD

The terms and conditions of your relocation package are governed by the UnumProvident Relocation Payback Agreement which is attached for your execution. UnumProvident has partnered with Primacy Relocation to administer your relocation benefits in a quality and cost efficient manner. You will be working with Debbie Robinson at Primacy Relocation, who will be your consultant helping you through the entire process. After we provide information to Primacy, Debbie will be calling you and sending more detailed material to you. She will be available to interpret this information and address any issues you have may regarding these details, including relocation expense report administration. In order to get you authorized with Primacy, please call Sharon Van Der Cammen in Human Resources toll free at 1-877-524-7768 to get the process initiation process started.

This letter does not constitute an employment contract. UnumProvident's employment relationship is on an at-will basis, as stated on our application form and in our Employment Policies. New employees will be in an initial evaluation period during the first six months of employment. However, completion of the initial evaluation period does not change the at-will relationship or in any way restrict the Company's right to end or change the terms or conditions of the employment relationship.

Our offer is contingent upon a satisfactory background check, and may be withdrawn at anytime if a background check is unsatisfactory.

Enclosed is the pre-employment paperwork for you to review/complete and bring with you on your first day. If you do not have any questions regarding the paperwork, please include it with your signed offer letter and repayment agreement in the self addressed envelope to ensure that your sign on bonus will be available on your first day of employment. Please pay close attention to the Employment Eligibility Form. (I-9) UnumProvident is required by federal legislation to hire only those individuals who are authorized to work in the United States. Consequently, this offer is contingent upon your meeting the provisions of the Immigration Reform and Control Act of 1986. Enclosed please find an I-9 Employment Eligibility Verification form which all new employees must complete. Be sure to bring the necessary identification with you as indicated on the form. YOU WILL BE ABLE TO START WORK ONLY WHEN THIS DOCUMENTATION IS COMPLETED.

On your first day at UnumProvident you may park in our Visitor's Lot which is located on the corner of 5th and Walnut Streets. Employee parking and ID badges are administered by Facilities Management on 1-South. Please stop by Facilities Management your first day and they will assist you with these services. If your first day of employment is not an orientation day, please have the Security desk contact your manager at the number below.

New employee orientation is conducted from 8:00-12:00 noon. Your orientation is scheduled for November 1, 2000 Please report to the Human Resources Department on 7N at 8:00 a.m. on this date. Normal dress attire is business casual. We will discuss more details in orientation.

As a new employee of UnumProvident Corporation, you are eligible for our benefit plans your date of hire. A benefit enrollment package will be mailed to your home shortly after your date of hire. We encourage you to read the material in this package and call the Benefit Service Center to enroll on the day you receive this information. The Benefit Service Center phone number is 1-877-868-6236.

Doc #:50232

Page 3
Fergal McSharry, MD

If you do not call the Benefit Service Center to enroll in specific coverage for yourself, you will not have health insurance and many other benefits going forward. Without enrollment, the only benefits you receive as a standard default are:

- $50,000 in company-paid life insurance for full-time employees (a lesser amount if you are part-time)

- Disability income protection covering 60 percent of your salary up to $50,000.

Please note that after your initial enrollment via the Benefit Service Center, you can only make changes to your benefits during annual enrollment each fall or if you have a family status change (such as marriage or birth of a child).

Fergal, we believe you can make a significant contribution to UnumProvident. We are excited you have verbally accepted our offer and also excited about the opportunity of you joining the UnumProvident team.

Enclosed is our standard Relocation and Hiring Repayment Agreement. Please sign one copy of this letter and the agreement and return them to me in the enclosed, self-addressed envelope. If you have any questions regarding employment with UnumProvident, please feel free to contact me at 423-755-8034.

Sincerely,

Richard D. Vatt, DO, MPH
Vice President, Regional Medical Director
Customer Care

Enclosure

cc:     Bob Anfield
        Ralph Mohney
        Sue Masterson
        Don Boutin
        Bob Daigle
        Lori Carter
        Sharon VanDerCammen

Acceptance.

_Patrick Fergal McSharry_ ____09/03/2000____
Patrick Fergal McSharry        Date

Confirmed Start Date:

____November 2000____
                Date

Doc #:50232

000024    000 212

*# Columns = reserves*

| Dec Pot | Claim Number | Name | Amount |
|---|---|---|---|
| Boles | | | $ 26,467 |
| | | | $ 56,770 |
| Boothby | 162702 | | $ 95,729 |
| | 158512 | | $ 80,618 |
| | 161454 | | $ 107,870 |
| | 167681 | | $ 44,736 |
| | 167890 | | $ 59,014 |
| | 164132 | | $ 108,443 |
| | 147834 | | $ 62,973 |
| | 143738 | | $ 64,335 |
| | 158021 | | $ 56,120 |
| Carter, L | 142257 | | $ 53,011 |
| | 163540 | | $ 52,417 |
| | 167617 | | $ 31,974 |
| | 136412 | | $ 179,950 |
| Estes | | | |
| Foster | 21174 | | $ 150,908 |
| | 158928 | | $ 213,948 |
| | 122011 | | $ 46,318 |
| | 164454 | | $ 7,181 |
| | 164677 | | $ 16,806 |
| | 163273 | | $ 37,650 |
| | 156576 | | $ 30,756 |
| | 168469 | | $ 10,322 |
| | 165648 | | $ 41,852 |
| | 160687 | | $ 36,363 |
| | 34431 | | $ 87,974 |
| | 130388 | | $ 73,420 |
| | 126515 | | $ 171,687 |
| | 113471 | | $ 117,304 |
| | 112977 | | $ 70,458 |
| | 165551 | | $ 37,921 |
| Kettenring | 147231 | | $ 8,608 |
| | 164885 | | $ 50,787 |
| | 162820 | | $ 16,331 |
| | 144879 | | $ 8,852 |
| | 146666 | | $ 8,212 |
| | 139668 | | $ 36,825 |
| | 161163 | | $ 39,806 |
| | 134787 | | $ 26,689 |

*[Handwritten right margin:]* These are the ones considered for Closure

If doctor does not recommend Closure

Target may be reached

Target set by Impairment Head

EXHIBIT
P-6

000025

*[Handwritten bottom:]* Ralph Mohney Executive Vice President to All Claims Personnel Dec '00. There is nothing

001



| | | |
|---|---|---|
| 91088 | $ | 95,364 |
| 103067 | $ | 13,233 |
| 166833 | $ | 40,554 |
| 168241 | $ | 91,896 |
| 159322 | $ | 102,498 |
| 87004 | $ | 144,886 |
| 168385 | $ | 66,405 |
| 146250 | $ | 69,907 |
| 162956 | $ | 46,600 |
| | $ | 3,098,748 |

Wilkey

000026

0009
1    being first duly sworn, was examined
2    and testified as follows:
3
4    EXAMINATION BY MR. BOURHIS:
5        Q.    Would you please state your
6    name for the record?
7        A.    My name is William E. Feist,
8    M.D.
9        Q.    Where do you currently live,
10   sir?
11       A.    Birmingham, Alabama.
12       Q.    What's your profession?
13       A.    Physician, Medical Director
14   of an insurance company currently.
15       Q.    Do you have a board-
16   certified specialty in medicine?
17       A.    I'm board-certified in
18   insurance medicine.
19       Q.    How long have you been
20   board-certified in insurance medicine?
21       A.    Since '85.
22       Q.    How would you describe board
23   certification in insurance medicine?

0010
1   What distinguishes that specialty from
2   other specialties?
3       A.   Well, primarily insurance
4   medicine deals with medical
5   consultation, for lack of a better
6   word, to the insurance industry, the
7   relationship to underwriting or claims
8   adjudication, et cetera.
9           The board certification
10  requires some life office management
11  association courses in insurance in
12  general, and statistics in particular,
13  and four years of practice in insurance
14  medicine plus a written and oral board
15  examination for certification.
16      Q.   I don't want to belabor this
17  too much, but I would like to find --
18  have you explain to the Court and the
19  jury a little bit more about what is
20  entailed with becoming board-certified
21  in insurance medicine.
22          You mentioned some courses
23  and study in the insurance field.

0011
1         A.    Yes, uh-huh.
2         Q.    What does that involve?
3         A.    Well, about four courses in
4    insurance, a couple of courses of just
5    basic insurance, structure, policy,
6    what the various agencies of insurance
7    do, a course in statistics, a course in
8    insurance law.  Basically just courses
9    to understand what insurance is about
10   in North America.
11        Q.    So I take it then that you
12   have to be familiar with insurance
13   policy language for policies such as
14   disability policies?
15        A.    Yes, sir.
16        Q.    Do you have to be able to
17   understand, for example, the
18   differences between OWNOCC disability
19   policies or other types of disability
20   insurance policies?
21        A.    That is part of the training
22   to interpret policy language, yes.
23        Q.    Are you also -- do you also

0012
1   have to be familiar with the standards
2   of the industry with regard to claim
3   payments, fair practice standards and
4   that sort of thing?
5            MR. NALTY:    Objection.
6   Leading.
7            THE WITNESS:  Yes, the LOMA
8   course on insurance law deals with that
9   in general, and, of course, just the
10  day-to-day practice of claims
11  adjudication would be involved with
12  that.
13        Q.    (BY MR. BOURHIS)  As part of
14  your training to become board-
15  certified, was part of your experience
16  -- are you familiar with whether or not
17  ambiguities in a policy have to be
18  interpreted in favor of the
19  policyholder against the insurance
20  company?
21        A.    Well, I think traditionally
22  at Provident it was interpreted in
23  favor of the claimant.  If there was a

000030

```
0013
 1    dispute -- I think after Mr. Chandler
 2    and Mr. Mohney came on board in the
 3    mid-'90's, I think that changed to give
 4    the benefit of the doubt, if you will,
 5    to the insurance company.
 6         Q.    What is your current
 7    position?
 8         A.    Medical Director of
 9    Protective Life Insurance Company in
10    Birmingham.
11         Q.    When did you join them?
12         A.    March 4th of 1996.
13         Q.    Where were you previously
14    employed before that?
15         A.    I was employed at Provident
16    Life Insurance in Chattanooga July 1,
17    1982 to February 29, 1996.
18         Q.    And what was your position at
19    Provident Life at the time that you
20    left the company?
21         A.    I was Vice President and
22    Chief Medical Officer for Provident.
23         Q.    And as Vice President and
```

000031

0025
1   fell, that actuarial structure
2   basically suffered some cracks, so to
3   speak.
4        Q.    Exhibit 61 is a four-page
5   document.
6             Who's Mr. Ralph Mohney?
7        A.    Mr. Mohney is an executive of
8   Provident who came to the disability
9   income claims vice presidency sometime
10  in '94. I can't give you the specific
11  date of that.
12       Q.    Do you know -- do you recall
13  what's meant by the term roundtables?
14       A.    Roundtables were discussions
15  that were group discussions that were
16  started in the spring of '95. And
17  these were set up to look at some high
18  risk or high dollar claims in terms of
19  seeing if those claims could be
20  rescinded, or terminated, I guess is a
21  better word.
22       Q.    I'm going to hand you a copy
23  of a document that I believe you

0023
1    review process meetings each week.
2              At the time, I take it, they
3    had not -- well, at least this document
4    doesn't indicate that they had decided
5    to call them roundtable meetings at
6    this point.  I don't know whether they
7    had or not.  Do you know?
8         A.   Well, I think the official
9    name was the one used there, the
10   special review process, but the
11   colloquial name, if you will, was
12   roundtable because of the nature of the
13   conference room, the table, and the
14   participants in the process.  But it is
15   one and the same in terms of what was
16   happening.
17        Q.   I think you mentioned that
18   these roundtable meetings or the
19   meetings that came to be known as
20   roundtable meetings were held at night
21   on Tuesday and Thursday evenings.
22        A.   That's correct.  Typically
23   they would start at 4:30 or 5:00 in the

000033

0029
1   evening and run two or three hours
2   depending on the number of cases
3   discussed and the complexity of the
4   cases discussed.
5        Q.   Was that a new or an old
6   procedure for the roundtable meetings
7   that you are describing?
8        A.   To my recollection and
9   understanding, that was a new process
10  that was being instituted at that time
11  to try to deal with this large block
12  of, quote/unquote, "problem" disability
13  income claims.
14       Q.   Now, did you attend vice
15  president meetings from time-to-time,
16  meetings of the vice presidents of the
17  company?
18       A.   I did.
19       Q.   When those meetings were
20  scheduled, did you attend them on a
21  regular basis or sporadically?
22       A.   I did.  They were held
23  typically quarterly, and the attendance

000034

0033
1    foundation.
2              THE WITNESS:  Well, I think
3    Mr. Chandler came in the fall of 1993,
4    and sometime in '94 Ralph Mohney came
5    to be Vice President of Claims.  And
6    after that was in place, then the
7    change in the claims handling
8    procedures changed rather dramatically.
9              Before Mr. Mohney took over,
10   the claims handling operation of claims
11   was basically held -- or actually
12   evaluated in the field, at least the
13   initial evaluation, and any problem
14   cases came into the home office.
15             And then under Mohney, all
16   claim operations was brought into the
17   office.
18             But I think the other thing
19   was, of course, that Provident became a
20   company that tried to do what was fair
21   for the claimant, the one that tried to
22   enhance the bottom line in any way they
23   could.

000035

0035
1              THE WITNESS:  That's correct.
2        Q.   (BY MR. BOURHIS)  This
3    exhibit, Exhibit 10, is a memo that was
4    produced by Provident, and it's a memo
5    to Harold Chandler from Ralph Mohney
6    dated May 22, '95 with handwritten
7    notes with the initial H.C., which
8    would indicate that they are the notes,
9    I believe, of Mr. Chandler at the top.
10             This document refers to the
11   fact that a one percent decrease in
12   benefit costs due to more effective
13   claims management translates to
14   approximately six million dollars in
15   annual savings.  "We believe that
16   aggregate improvement in the five to
17   ten percent (thirty million to sixty
18   million dollars annually) range are
19   possible" -- there is a parenthesis
20   after -- let me read that to you again
21   for the record.
22             "One percent decrease in
23   benefit costs due to more effective

```
0036
 1   claims management translates to
 2   approximately six million dollars in
 3   annual savings, period.  We believe
 4   that aggregate improvement in the five,
 5   dash, ten percent, parenthesis, thirty
 6   million to sixty million dollars
 7   annually, close parenthesis, range are
 8   possible, dash, once the initiatives
 9   have been fully implemented.  This
10   range of potential savings is
11   consistent with the recently completed
12   Tillinghast study."
13           Do you remember in any of the
14   meetings that you attended any
15   discussion by anyone of the savings
16   that the company could achieve as a
17   result of increasing the claim
18   terminations?
19           MR. NALTY:  Objection.
20   Misstates the exhibit.  It was a
21   narrative question and it was not read
22   in its entirety and was misstated, and
23   it also lacks foundation.
```

000037

0038
1    result of increased terminations that
2    the company was achieving.
3            MR. NALTY:  Objection as
4    leading and it's vague.
5            THE WITNESS:  Are you
6    speaking of when I was at Provident?
7        Q.   (BY MR. BOURHIS)   At any
8    time.
9        A.   I did not see them at
10   Provident, but they are in the packet
11   of information that your office
12   provided.
13       Q.   Let me ask you whether there
14   is anything in this document, namely
15   Exhibit 10, that is inconsistent with
16   what your observations were as to how
17   the roundtable meetings were conducted?
18           MR. NALTY:  Objection.  It's
19   vague, lacks foundation, overly broad.
20           THE WITNESS:  I think this
21   memo supports the rationale of the
22   roundtable to basically go back and
23   relook at problem claims.

0040
1  maintain the continuity of the
2  disability, but I think the rationale
3  of the roundtable discussion was
4  basically to look at a block of claims
5  that were high reserve, meaning they
6  had set aside a good amount of money to
7  cover their claims.
8          They were looking to see the
9  claims that were, what I have termed
10  gray areas, psychological claims,
11  chronic fatigue, some of these real
12  vague difficult medical impairments to
13  evaluate, basically going back and
14  relooking at these claims to see if
15  there is some way that it could be
16  terminated.
17          To my recollection, during
18  the nine months that I was involved
19  with the roundtable discussion
20  meetings, virtually all the claims that
21  I recall were individuals who had been
22  judged disabled but then were
23  reexamined at the roundtable process to

0041
1    see if there was some way to reverse
2    that initial decision.
3         And I think that is where the
4    -- where it was wrong as a corporate
5    strategy.  Granted a company has a
6    right to do all the investigations they
7    need to do to make their judgment, but
8    once that has been made, that really is
9    no time to go back and look at it in my
10   experience and training and thinking
11   about it.
12        Q.   Let me ask you about some of
13   the components of these reviews in
14   roundtable.
15        As a board-certified
16   specialist in insurance medicine, I
17   think you have already testified about
18   this, but let me ask you more
19   specifically, are you familiar with the
20   standards and ethics of the insurance
21   industry concerning the evaluation of
22   disability?
23        MR. NALTY:  Objection.

000040

0042
1    Vague, overly broad.
2        THE WITNESS:  Yes, I am.
3        Q.   (BY MR. BOURHIS)  Are
4    claimant files that pertain to a
5    medical evaluation of a claimant
6    required to be thoroughly and properly
7    documented?
8        MR. NALTY:  Objection.
9    Vague, overly broad.
10       THE WITNESS:  Certainly.  I
11   think the insurance company has the
12   right to -- as I said earlier, to
13   investigate appropriately and to
14   document all the data that they
15   accumulate.  That should be in the
16   claimant's file for review at any time.
17       Q.   (BY MR. BOURHIS)  Do they
18   have to be documented honestly?
19       A.   They should be.
20       Q.   And completely?
21       A.   Yes, sir.
22       Q.   Are recommendations and
23   conclusions concerning the file

000041

0044
1    a way that it proves whatever we are
2    saying?
3              MR. NALTY:  Objection.
4    Leading, lacks foundation.
5              THE WITNESS:  I'm not exactly
6    sure what you are asking.  It seems to
7    me if an insurance company is fair and
8    honest, they are going to document
9    everything in the file and come to a
10   fair and honest conclusion.
11             If there is some data that
12   doesn't support their conclusion that
13   they purge, I think that is dishonest.
14        Q.   (BY MR. BOURHIS)  I'm going
15   to show you a document and ask -- this
16   one is not marked.  We will just call
17   this 44-F, which is the exhibit number
18   for this file when it was introduced in
19   evidence in Federal Court in San
20   Francisco in another case.  It's called
21   an Outline for Information Management
22   presented by the Law Department of
23   Provident Life and Accident Insurance

000042

```
0045
 1     Company.  It's a three-page document.
 2
 3          (Whereupon, Exhibit 44-F was
 4          marked for identification and
 5          same is attached hereto.)
 6
 7          Q.    I'll hand you this document.
 8     You can read whatever you would like.
 9     You should review the entire document.
10          I'm going to direct your
11     attention to the highlighted portions
12     of Sections 8, 9, 9-A  and 9-B.  But
13     before you address those sections, why
14     don't you take a look at the entire
15     document.
16          A.    Okay.
17          Q.    Would you please read into
18     the record the highlighted sections
19     beginning --
20          A.    Paragraph 8?
21          Q.    Yes, sir.
22          A.    Well, it's Roman numeral II,
23     Section 8.  "Avoid sending written
```

```
0046
 1   memos about sensitive subjects when a
 2   phone call or face-to-face discussion
 3   will suffice."
 4            Paragraph 9, "Shred all
 5   sensitive papers that will not be
 6   needed for business purposes.
 7   Generally, when copies of certain legal
 8   type documents are sent to you for
 9   informational purposes only, these
10   documents should be shredded after you
11   have read them.  These may include:
12   documents prepared for lawsuits,
13   reports of investigations, or legal
14   audits," that's subparagraph A_, and
15   paragraph B, "memos, responses or
16   reports from the Law Department
17   involving actual facts about company
18   business or legal situations;" C, "any
19   copies of legal document drafts,
20   especially when the drafts contain
21   handwritten notes or comments in the
22   margins," parenthesis, "these documents
23   should be kept by the Law Department."
```

0047
1          Q.   Can you tell me whether or
2     not the idea of avoiding sending
3     written memorandums about "sensitive
4     subjects," quote/unquote, when a phone
5     call or face-to-face discussion will
6     suffice satisfies your understanding of
7     the standards of the industry with
8     respect to the need to document files
9     accurately?
10          MR. NALTY:  Objection.  Lacks
11     foundation, calls for speculation.
12     This witness is not qualified to talk
13     about industry standards in this
14     regard.
15          THE WITNESS:  Well, I think
16     that document basically instructs the
17     claims adjudicators to destroy or shred
18     information that would be detrimental
19     to the Provident company and only to
20     keep the things that would be
21     beneficial or helpful to the Provident
22     company.
23          Q.   (BY MR. BOURHIS)  How would

000045

0050
1    that point?
2          MR. NALTY: Objection.
3    Leading and lacks foundation.
4          THE WITNESS: Well, I would
5    say in answering the question, perhaps
6    in an indirect way, I think before
7    Chandler and Mohney came to Provident,
8    claims were handled in a fair and
9    aboveboard way. I don't think there
10   was anything about shredding documents
11   and not putting in information. I
12   think the standards that were there at
13   Provident would be what I would
14   consider the industry standard for an
15   ethical company.
16          But the standards that came
17   in after Mr. Chandler came to
18   Provident, I think, did not meet those
19   standards.
20          MR. NALTY: Objection. Move
21   to strike the answer as non-responsive.
22          Q.   (BY MR. BOURHIS)  As
23   mentioned, Plaintiff's Exhibit 44-F is

000046

0055
1
2           MR. NALTY:  Also leading.
3           THE WITNESS:  Well, I think
4 that is basically what Ralph Mohney and
5 Chandler -- Mr. Chandler -- I don't
6 think Ralph Mohney did anything without
7 -- anything major without Mr.
8 Chandler's approval.  I think basically
9 that document describes the claims
10 process from '94/'95 onward.
11    Q.    (BY MR. BOURHIS)  In terms of
12 what you observed in the roundtables as
13 well as in other activities in the
14 company?
15    A.    Yes.  Well, I think an
16 example of that is Mr. Jeff McCall took
17 notes, and those notes were destroyed.
18 Mr. McCall's function in the roundtable
19 process was to -- as a case was
20 presented, to take notes to follow up
21 to make sure that the modalities that
22 were suggested in a given case were
23 followed through on by the various

000047

0056
```
 1   persons, whoever was involved in that
 2   case.  Those records have all been
 3   destroyed, nobody can find them.
 4         So I think that that in
 5   itself proves the intent of that memo
 6   that you are discussing.
 7   Q.    That is very interesting.
 8   This is the first time I have heard
 9   this, because we have asked Provident
10   on numerous occasions whether there was
11   an agenda for these meetings, whether
12   they kept notes of the roundtable
13   meetings anywhere, and they have denied
14   that there were notes that were kept.
15         MR. NALTY:  Object.  That
16   misstates the record.
17         THE WITNESS:  My recollection
18   of Mr. McCall's role, Mr. McCall was --
19         MR. NALTY:  I'm sorry.
20   Objection.  The question lacks
21   foundation and calls for speculation
22   and it misstates the record.  It's also
23   leading.
```

000048

0059
1    McCall taking notes on cases.
2         Q.    (BY MR. BOURHIS)   You saw him
3    do that?
4         A.    Yes, I did.   His role, as I
5    understood it, Mr. McCall's role, was
6    to follow up with the claims adjuster
7    so that -- you know, if a certain case
8    was to have surveillance or they were
9    going to go back and check the
10   financial records, or whatever, his
11   role was to follow up.
12              And I'm sure those records
13   have been destroyed.   They may be in
14   the individual files, as you say, but
15   going through the thousands of files to
16   find them would be, as you say, an
17   impossible task.
18        Q.    When you say that they have
19   been destroyed, what's the basis for
20   your belief that those notes have been
21   destroyed?   Just that they don't exist
22   any more?
23        A.    Basically they don't exist.

000049

0060

1      Q.   Did you ever hear any
2   specific conversation at the vice
3   president meetings or any of the
4   roundtable meetings or in any other
5   context concerning Mr. McCall's notes
6   or any aspect of them?
7      A.   No, I don't recall any
8   discussion of that.
9      Q.   When you say that you saw him
10  taking notes, do you mean on a regular
11  basis or infrequently or once or twice
12  or what?
13          MR. NALTY:  Objection.
14  Vague.
15          THE WITNESS:  I would say on
16  a regular basis.  I mean, typically we
17  would maybe discuss six or eight cases
18  during a given roundtable discussion,
19  and my recollection was he, Mr. McCall,
20  took notes on every case that was
21  discussed.
22      Q.   (BY MR. BOURHIS)  I have
23  never been able to figure out how

000050

```
0061
  1    people could have meetings like this
  2    without keeping records of them and how
  3    there could be follow-up without
  4    records.
  5         A.    Mr. McCall's responsibility
  6    was to follow up with the claims
  7    adjuster to see that if surveillance
  8    was suggested, that was scheduled; if
  9    an IME was suggested, that was
 10    scheduled; if they were going to go
 11    back and look at the individual's
 12    financially records, the appropriate
 13    financial people would do that.  That
 14    was his role.
 15         Now, I'm sure once the case
 16    was finished, finished the process, if
 17    you will, McCall's notes were
 18    destroyed.  I'm sure they were.
 19         Q.    I'm handing you Exhibit 57.
 20
 21    (Whereupon, Exhibit 57 was marked
 22    for identification and same is
 23    attached hereto.)
```

000051

0052
1
2          Q.    This is also a handwritten
3     document.  Do you recognize the
4     handwriting on that document?
5          A.    No, I don't.
6          Q.    Did you ever hear anyone
7     discussing trying to get dirt basically
8     on policyholders in connection with
9     claim investigations.  Quote, "We
10    should sit back and decide exactly what
11    it is we want and get it, court
12    records, ex-wives, hospital records,
13    that sort of thing."  Did you ever hear
14    any discussion concerning that?
15              MR. NALTY:  Objection.
16    Leading.
17              THE WITNESS:  I have not seen
18    that memo, but I think the tone of
19    discussion at the roundtables were
20    often in that vein.  To me, anything
21    was fair game to try to terminate the
22    claim -- surveillance or financial
23    records, ex-wives, mistresses,

0063
1   whatever, anything was fair game.
2        Q.   (BY MR. BOURHIS)  So you seem
3   to be saying that one of the things the
4   company would do is try to find things
5   that would be embarrassing to people
6   and use that to get them to not pursue
7   their claims?  Is that a
8   mischaracterization of what you
9   observed?
10        MR. NALTY:   Objection.
11   Leading and calls for speculation,
12   lacks foundation.
13        THE WITNESS:  I think they
14   would try to get information to
15   terminate the claim.  Whether it
16   embarrassed the individual, I think,
17   was immaterial.
18        Q.   (BY MR. BOURHIS)  What I was
19   thinking in saying that is I suppose if
20   you go up to somebody and you have got
21   video surveillance showing them in an
22   embarrassing situation, for example, or
23   you have gotten information from, you

000053

0065
1   Vague, lacks foundation. It's leading,
2   assumes facts not in evidence.
3        THE WITNESS: There might
4   have been several roles. But I think
5   they would not -- anything is fair game
6   to try to get information to terminate
7   the claim.
8        I don't recall a particular
9   instance where they would embarrass the
10  person, but in thinking about it, I can
11  see where that could happen. If
12  somebody -- a difficult situation that
13  they didn't want to be brought to
14  light, they would just say, well, it's
15  easier to quit fighting the
16  determination and go on with life.
17       MR. BOURHIS: I hand you a
18  document marked Exhibit 18.
19
20       (Whereupon, Exhibit 18
21       was marked for identification and
22       same is attached hereto.)
23

000054

0067
1    successful resolution of the claim.  As
2    one names drops off, another name will
3    being added."
4            Did you ever observe that
5    process or anything similar to that
6    process taking place?
7            MR. NALTY:  Objection.  Lacks
8    foundation, assuming facts not in
9    evidence.
10           THE WITNESS:  I was not
11   involved in the process.  I didn't know
12   anything about it at the time I was
13   there.
14       Q.    (BY MR. BOURHIS)  Do you know
15   how the lists were developed that were
16   discussed at the roundtable meetings?
17           MR. NALTY:  Objection.  Lacks
18   foundation, calls for speculation.
19           THE WITNESS:  My impression
20   was, and it's purely my impression,
21   that each of these claim adjusters was
22   encouraged to look through their
23   portfolio at claimants to find cases

000055

0068
1    that could be brought to the roundtable
2    that would fit the criteria of high
3    dollar claims and maybe had a gray
4    area.
5        They were encouraged to do
6    so, and I don't know whether they got
7    any monetary reward, but they certainly
8    were looked at favorably by the
9    administration of the Claims Department
10   if these claims adjusters did bring
11   files to the roundtable discussion.
12       MR. BOURHIS:  I'm going to
13   hand you Exhibit 25 and Exhibit 16.
14
15       (Whereupon, Exhibits 25 and 16
16       were marked for identification and
17       same are attached hereto.)
18
19       Q.   Why don't you take a -- I'm
20   sorry, and also Exhibit 17.
21
22       (Whereupon, Exhibit 17 was marked
23       for identification and same is

000056

0072
1    there was more money that could be
2    saved by terminating the benefit --
3        A.    Okay.
4        Q.    -- in 1983 to 1989, the
5    targeting of policies sold in that
6    period, the targeting of California and
7    Florida policyholders, and the
8    targeting of certain occupations for
9    termination attempts?
10           MR. NALTY:  Objection.  Lacks
11   foundation.  It's leading, assumes
12   facts not in evidence.
13           THE WITNESS:  Well, the thing
14   that I recall about the roundtable
15   discussions specifically was each case
16   -- each case discussion was preceded by
17   a recording or announcing of the claim
18   reserve in a particular case, and it
19   usually would be -- also they would
20   tell the occupation, how much insurance
21   they had, what the financial reserve
22   was.
23           I think, at least initially,

000057

0077
1   who are these individuals, Bob Moss,
2   Tom Timpanaro, John Morris; do you
3   know?  Do you recognize those names?
4        A.   I recognize Timpanaro.  I
5   think they were claims adjusters if I'm
6   not mistaken.  They might have been
7   field investigators.  They were
8   involved in claim evaluations one way
9   or another.
10       Q.   Okay.  This Document 9 states
11  "As a result of a meeting with the
12  legal and senior claims staff, we have
13  found it necessary to change the
14  content of the field reports as it
15  pertains to recommendations and
16  suggestions.  Therefore, effective
17  immediately recommendation and/or
18  conclusions should not be included in
19  the written report.  Recommendations
20  and/or conclusions are to be
21  communicated either verbally to the
22  home office or submitted in a separate
23  memo."

0079
1   talk to him or her, and everything that
2   they -- all the information they
3   gathered during that process was
4   documented in the file.  It was
5   available.
6           This basically says to me --
7   my impression of this is that some of
8   the information that you as a field
9   investigator obtain in your course of
10  activities that is detrimental to
11  Provident Life and Accident Insurance
12  Company, we don't want it in the file.
13      Q.    (BY MR. BOURHIS)  Given your
14  training with regard to standards --
15  let's just focus, for example, on the
16  medical aspects of information that is
17  gathered by the field offices.
18      A.    Uh-huh.
19      Q.    Is it consistent with your
20  understanding of the standards that are
21  required of the insurance industry that
22  medical information not be documented
23  in the file, that they not write it

0080
1   down, they not include it in the file,
2   that they do it verbally instead?  Is
3   that fair to a claimant?
4           MR. NALTY:  Objection.
5   Leading, assume facts not in evidence,
6   lacks foundation, calls for opinion
7   testimony by a lay witness that he's
8   not qualified to give.
9       Q.   (BY MR. BOURHIS)  Let me
10  rephrase the question.
11          Can you tell me whether it's
12  consistent or inconsistent with your
13  knowledge of the requirements imposed
14  on insurance companies for field claims
15  adjusters to not include written
16  recommendations or conclusions in the
17  written report, and instead to
18  communicate that either verbally so
19  that it is not in writing at all to the
20  home office or to submit it in a
21  separate memo?
22          MR. NALTY:  Same objections.
23          THE WITNESS:  Well, to me

0081
1    this in essence is unethical.
2         To me a claims adjuster goes
3    out and gets his or her information,
4    writes it up completely as he or she
5    can, puts it in the file -- this to me
6    is basically putting in the file what
7    the insurance company wishes to have
8    there and not having anything that the
9    insurance company doesn't want to have
10   that might be beneficial to the
11   claimant's situation.
12       Q.    (BY MR. BOURHIS)   Okay.   I'm
13   handing you Exhibit 14.   Would you
14   please take a look at that?
15
16       (Whereupon, Exhibit 14
17       was marked for identification and
18       same is attached hereto.)
19
20       A.    It is a rather extensive
21   memo.  I have got it.
22       Q.    Have you ever seen any
23   documents referred to as monthly risk

000061

0088
1           MR. NALTY:  Objection.  Calls
2    for speculation, assumes facts not in
3    evidence.  It's opinion testimony of a
4    lay witness who is not qualified to
5    give the opinion testimony, and it's
6    leading.
7           THE WITNESS:  Well, I think
8    the whole goal of roundtable
9    discussions was to do just that, to
10   terminate claims, and obviously the
11   numbers, I was not privy to the
12   numbers, but to me that is unethical
13   for a company to decide to do this
14   activity.  I think it was a definite
15   corporate strategy to do this.  They
16   just didn't fall into this
17   serendipitously, they just decided to
18   do that.
19           As any corporate strategy,
20   one usually tries to set goals and
21   objectives and targets, if you will,
22   and that was probably just their
23   target, if you will, that's what we

000062