# ATTACHMENT

## "A"
## Part 6
## Documents Bates Stamped
## 63-113

ATTACHMENT "A"

0090
1   earlier and they developed a corporate
2   strategy to try to terminate some of
3   those claims, as many as possible, and
4   the roundtable was a major modality to
5   do that.
6       Q.    (BY MR. BOURHIS)  Was it your
7   experience at these roundtables that
8   they were trying to do this in an
9   ethical manner, or were they trying to
10  do this by hook or by crook regardless
11  of whether they were doing the right
12  thing or the fair thing or not?
13      MR. NALTY:  Objection.
14  Leading, vague.  It assumes facts not
15  in evidence, it lacks foundation.
16      THE WITNESS:  As I said on
17  more than one occasion, these cases
18  that I recall coming to the roundtable
19  were persons who had been evaluated
20  earlier, sometimes years earlier, and
21  had been determined to be disabled.
22      There no documentation of any
23  cases I ever heard of in that time

000063

0091
1   frame that the individual's medical
2   impairment had changed from the initial
3   disability income determination. So if
4   somebody is evaluated and determined to
5   be disabled and there's no medical
6   change in his condition, there's no
7   reason to look at it unless you want to
8   go back and get rid of some high dollar
9   claims.
10      Q.   (BY MR. BOURHIS)  Beyond the
11  question of simply reviewing claims in
12  which a decision had previously been
13  made, did you observe at these meetings
14  anything one way or the other with
15  respect to whether the company was
16  using -- improperly using embarrassing
17  information, biased medical opinions
18  and other improper methods to
19  accomplish their goals?
20          MR. NALTY:   Objection.
21  Leading, lacks foundation, assume facts
22  not in evidence.
23          THE WITNESS:  Well, I think

000064

```
0092
 1    the modalities were valid, but the way
 2    they used them was invalid in terms
 3    of -- again, I have said this before in
 4    this deposition, but it seems to me
 5    that a fair and ethical insurance
 6    company will, when the initial claim
 7    comes in, use every modality that they
 8    have at their disposal to determine
 9    whether a person is disabled or not.
10             Once that determination has
11    been made, there's no reason to go back
12    and look at it if the company is
13    ethical.
14             If they are unethical, they
15    will say, well, we made a mistake back
16    several years ago, the claims people
17    didn't evaluate it properly, we have
18    got to go back and see if we can change
19    their decision.
20             I think that was the driving
21    force of the whole roundtable process.
22             MR. NALTY:  Move to strike
23    the Doctor's answer to the extent he is
```

000065

0099
1   adjudication.
2           I recall specifically a
3   case -- probably in November of '95 --
4   I had been in the claims business, or,
5   you know, reintroduced to the claims
6   operation in April about six months
7   prior, in which I wrote in the file of
8   a very unfortunate man -- he was like
9   in his mid-forties and had several
10  myocardial infarctions.  He had had all
11  the medical procedures that were
12  available to him, yet he had severe
13  incapacitating angina.  This man could
14  literally not walk across the length of
15  this room without getting severe chest
16  pain.
17          I wrote on the file that this
18  man is permanently and totally disabled
19  just as clear as I could write it.  I
20  was called on the carpet by Mr. Mohney
21  saying, "Dr. Feist, you are not to
22  write on any file, this file or any
23  file, that this person is disabled.

000066

0100
1   That is for the Claims Department to
2   make the decision."
3           That sounds like a simple
4   procedural thing, but it is really a
5   profound philosophical change from what
6   I had seen before Mr. Mohney took over
7   that position. Because I -- from '82
8   to '95/'96, the Medical Department --
9   the physicians were asked to write is
10  this person disabled or not.
11          Well, with that change, Mr.
12  Mohney and his associates could make
13  the call. Even if a person was
14  disabled, if for some reason they
15  didn't want to permit disability, they
16  could make the final call.
17          I think that is a small
18  example, but that is a good example of
19  the philosophy change that came in when
20  Mr. Mohney -- again, Mr. Mohney could
21  not have introduced any of these
22  changes without the full approval and
23  backing of Mr. Chandler.

000067

0101
```
 1        Q.   Was that an isolated incident
 2   that you were describing of the
 3   situation with the gentleman that had
 4   had a heart attack, or was that
 5   consistent with your observations
 6   in other cases as well as, that that
 7   is what Mohney wanted to do?
 8             MR. NALTY:  Objection.
 9   Vague, lacks foundation.
10             THE WITNESS:  That was what
11   Mr. Mohney exposued, that the Medical
12   Department was there to -- and the
13   physicians were there to provide
14   medical input on a case, but the final
15   decision was to be made by the Claims
16   Department.
17        Q.   (BY MR. BOURHIS)  That's
18   interesting, because it leads to the
19   next thing I wanted to ask you about,
20   which is independent medical
21   examinations.
22             I'm going to hand you a
23   document that was labelled Exhibit 2.
```

000068

0105
```
 1   documentation that needs to be made in
 2   addition to what the attending
 3   physician can do, then the IME is
 4   appropriate.
 5           MR. NALTY:  Move to strike
 6   the entire answer as non-responsive.
 7       Q.   (BY MR. BOURHIS)  When you
 8   attended these roundtable meetings, you
 9   heard discussion -- strike that.
10           Did you hear discussions
11   about suggesting independent medical
12   examinations and discussions about how
13   those medical examinations might be
14   conducted?
15           MR. NALTY:  Objection.
16   Leading.
17           THE WITNESS:  Typically in
18   the roundtable discussions one of the
19   participants might say, well, let's get
20   an IME and see if the attending doctor
21   is giving us misleading information.
22   Many times the implication was that the
23   attending physician who submitted the
```

0106
1  initial disability report certifying
2  disability was somehow in collusion
3  with the claimant, and therefore you
4  are getting an IME to prove that the
5  attending doctor is giving us
6  misleading information.
7        Q.    (BY MR. BOURHIS)   It's
8  possible that in some cases maybe there
9  might be some relationship or something
10  between the doctor and the claimant.  I
11  mean, it's possible that there might be
12  misleading information given --
13  provided by a treating physician; isn't
14  that so?
15        A.    Well, I think that is
16  possible, but I think by and large,
17  and, of course, there is no profession
18  that has got everybody who is on the up
19  and up.  But I think most physicians
20  know their patient.  They know if they
21  are disabled.
22             Typically in a primary care
23  setting the physician has this patient

000070

0107
1    for a number of months or years, and if
2    they come in and they have got a truly
3    -- the patient comes in with a truly
4    disabling injury or illness, the
5    physician can sense the change.  I
6    think that -- I'm sure there are well
7    documented cases where there has been
8    collusion, but I think it happens so
9    infrequently that it is just not a
10   factor on an average basis.
11        Q.    Let me ask you to
12   distinguish between two different
13   situations.  One is where there is an
14   independent medical examination that is
15   requested or required by an insurance
16   company for the purpose of getting an
17   independent third-party opinion, an
18   honest opinion where the doctor is
19   given the ability to look at whatever
20   he or she wants to look at, to obtain
21   whatever records, to have any
22   conversation necessary with the
23   treating doctor to find the truth about

000071

0111
```
 1    foundation.
 2            THE WITNESS:  Well, my
 3    concept of an independent medical
 4    examiner and the way it was used before
 5    Mr. Chandler was it truly was an
 6    independent examination.  The agency
 7    that I'm most familiar with was the one
 8    in Michigan in the Wayne -- I can't
 9    think of the name of it.
10            This agency in Michigan had a
11    reputation for having specialists
12    throughout most of the major cities in
13    the country, and these were
14    board-certified specialists in these
15    areas, and you knew you would get a
16    good report from this agency out of
17    Michigan.
18            An independent medical
19    examination is not independent if the
20    physician that examines the claimant
21    doesn't have all the information, the
22    records, the history, any studies that
23    are made, any chance that they talk
```

000072

0112
```
 1   with the claimant, et cetera.  If you
 2   don't have all those parameters in
 3   force, it's worthless, particularly if
 4   you are going to take the information
 5   and pick and choose what you want to
 6   use.  That borders on fraudulent.
 7            MR. NALTY:  Objection.  Move
 8   to strike the last portion of the
 9   Doctor's testimony.
10        Q.   (BY MR. BOURHIS)  From your
11   experience, can you tell me whether or
12   not when Mr. Mohney and Mr. Chandler
13   took over, and from that point forward
14   as long as you were with the company,
15   did you -- do you have any opinion as
16   to whether or not they wanted to
17   encourage doctors to provide honest
18   opinions about medical situations or
19   did they try to prevent doctors from
20   providing unsolicited information or
21   information that would be damaging to
22   the company's interest?
23            MR. NALTY:  Objection.
```

000073

0114
1   examinations to include concerns about
2   identifying unexpected impairments
3   communicated in these roundtable
4   meetings, that there was some fear that
5   a truly independent medical examination
6   might actually prove that the person
7   was disabled?
8           MR. NALTY:  Objection.
9   Leading and assumes facts not in
10  evidence, lacks foundation.
11          THE WITNESS:  I think, again,
12  Provident was using the IME to get the
13  information that they wished to get,
14  and any information that was not
15  useful, they would disregard.
16      Q.    (BY MR. BOURHIS)  This
17  document, Exhibit 2, also states as a
18  drawback to an IME that an IME
19  doctor -- a situation where an IME
20  doctor would provide unsolicited
21  damaging information.
22          Did you ever experience at
23  the roundtable people --  anyone saying

000074

0115
1   things to the effect that, well, we
2   better watch out who we use for an
3   independent medical examination because
4   you never know, somebody might actually
5   provide information favorable to the
6   policyholder which would be damaging to
7   the interest of the insurance company,
8   or words to that effects?
9           MR. NALTY:  Objection.
10  Leading, lacks foundation, assumes
11  facts not in evidence.
12          THE WITNESS:  Well, I think
13  that that was implicit in the
14  roundtable discussions.  You know, if
15  we are going to get an IME, be sure to
16  get the right physician to do the IME
17  because we want to get the answer we
18  want, we don't want to get the answer
19  that's detrimental to our cause.
20      Q.   (BY MR. BOURHIS)  I think
21  you indicated that -- maybe you didn't.
22          Approximately how many cases
23  were reviewed in each one of these

0124
1    and is continuing to be certified as
2    being disabled and there's no apparent
3    change in their medical impairment for
4    which they were disabled, there's no
5    reason to go back and look at it.
6         That is what the roundtable,
7    I think, overstepped the bounds of when
8    they went back and looked at these
9    persons with sort of the philosophy
10   that the initial process was in error,
11   so therefore we have to go back and try
12   to find that error and correct that
13   error, even though it might have
14   happened months or years before the
15   roundtable process.
16        Q.   (BY MR. BOURHIS)  But was
17   what Provident was doing simply going
18   back to correct errors, or were they
19   doing something else?
20        A.   My impression is they were
21   doing something else.  They were trying
22   to find a way to terminate the claim,
23   or resolve the claim, as Mr. Mohney

000076

0125
```
 1  prefers, in any manner -- whatever it
 2  took to try to terminate the claim for
 3  their goal, if you will, of the dollar
 4  reserve.
 5           MR. BOURHIS:  That's all I
 6  have.
 7           MR. NALTY:  We are going to
 8  be here for a while.  Do you want to
 9  take a break?
10           THE WITNESS:  Yes.
11
12      (Whereupon, a brief recess was
13      taken.)
14
15  EXAMINATION BY MR. NALTY:
16      Q.   Good morning, Doctor.
17           I represent Provident and I
18  have several questions I want to ask
19  you.
20      A.   All right.
21      Q.   How many times do you think
22  you have testified in depositions
23  involving cases between Provident and
```

000077

0134
1    roundtable to try to drum up reasons to
2    terminate the claim.  And that's what
3    the roundtable was, to drum up
4    something to terminate the claim.
5        Q.    (BY MR. NALTY)  If someone
6    came to the roundtable and said I
7    suspect fraud, I need to discuss this
8    with an attorney or an accountant or an
9    underwriter, would you believe that
10   would be proper?
11       A.    To me, if that were the case,
12   they should go with the claim file to
13   the appropriate person, lawyer,
14   physician, or tax accountant, whatever,
15   and discuss it in private.  There is no
16   reason to bring it to the roundtable.
17       Q.    Wasn't one of the purposes of
18   the roundtable to bring all these
19   resources together to facilitate access
20   to them rather than having to go from
21   office-to-office and person-to-person
22   to bring them together?
23               MR. BOURHIS:  Objection.

000078

0137
1   claims any way they could.
2       Q.   (BY MR. NALTY)  Do you
3   believe that the roundtable in its
4   concept, in the concept of the
5   roundtable, do you think that is a good
6   concept?
7           MR. BOURHIS:  Objection.
8   Vague and ambiguous.
9           THE WITNESS:  I think it is
10  unneeded.  The concept of maybe having
11  various modalities to come to a
12  roundtable to evaluate a claim is great
13  in the initial process.  But after the
14  claim has been adjudicated, there is no
15  need for it.
16      Q.   (BY MR. NALTY)  Can you think
17  of any situation, Doctor, that after
18  six months a carrier can come back and
19  reexamine a claim?
20          MR. BOURHIS:  Objection.  The
21  Doctor has already said that for
22  fraudulent claims --
23          MR. NALTY:  Mr. Bourhis, make

000079

0141
1   adjudicated and paid and there's no
2   change in impairment, there's no reason
3   for a roundtable unless the company
4   wants to write down the reserves.  That
5   is the total intent of the roundtable
6   as far as I'm concerned.
7        Q.   So there would be no reason
8   at all to come back and look at claims
9   to see if the insured went from total
10  to residual disability after this
11  six-month period?
12       A.   Well, there is a mechanism in
13  place.
14       Q.   What is the mechanism?
15       A.   The periodic review of the
16  person's disability.  I have alluded to
17  that.
18            If a person is being paid for
19  a disability, they don't just give them
20  a blank check for the rest of their
21  life.  The person has to maintain the
22  same level of disability.
23            If it goes from total to

000080

0160
1    to go back and relook at a claim that
2    was determined to be valid initially
3    and there is no change in the person's
4    condition, what else can there be but
5    to try to terminate the claim?
6          MR. BOURHIS:  What Counsel is
7    getting at, do you recall any
8    statements that were made by people at
9    these meetings along the lines of
10   anything that would shed some light on
11   what the intentions were, the claims
12   adjuster, Mr. Mohney, or anyone?
13         MR. NALTY:  Move to strike
14   the narrative.
15      Q.   (BY MR. NALTY)  Did anyone
16   ever state at a roundtable, Doctor,
17   that we have to try to terminate this
18   claim?
19      A.   Well, I don't want to be
20   blount about it, but on several
21   occasions the claims adjuster would say
22   this turkey has really kind of screwed
23   the company, we have got to try to

000081

Sworn Statement of Donna Wright

August 21, 2003

Janet B. Thacker, Certified Court Reporter
Hall & Associates
1010 Market Street, Suite 402
Chattanooga, Tennessee 37402
(423) 267-4328    FAX: (423)266-0178

Word Index included with this CondenseIt!

000082

Sworn Statement of Donna Wright                CondenseIt!™                Taken on 8

Page 1

1                SWORN STATEMENT
2                      OF
3                DONNA WRIGHT
4
5        The sworn statement of Donna Wright,
6   taken on the 21st of August, 2003, at the offices
7   of Eric L. Buchanan, McCallie Avenue, before
8   Janet B. Thacker, Notary Public and Court
9   Reporter, in the presence of:
10
11       Eric L. Buchanan, Esquire
         434 McCallie Avenue
12       Chattanooga, Tennessee 37402
13
14
15
16
17
18
19
20
21
22
23       JANET B. THACKER, CERTIFIED COURT REPORTER
24                HALL AND ASSOCIATES
         1010 MARKET STREET, SUITE 402
25        CHATTANOOGA, TENNESSEE  37402

Page 2

1                DONNA WRIGHT
2   called as a witness, having been first duly
3   sworn, was examined and testified as follows:
4        DIRECT EXAMINATION
5   BY MR. BUCHANAN:
6   Q        State your name, please.
7   A        Donna Wright.
8   Q        Okay.  Ms. Wright, where did you
9   last work?
10  A        UnumProvident.
11  Q        Okay.  And could you go ahead and
12  state the date when you first started working
13  there?
14  A        June of '98.
15  Q        Okay.  Was that when you started
16  full-time?
17  A        Uh-huh, yes.
18  Q        Did you start part-time before
19  that?
20  A        Yes.
21  Q        In January of '98?
22  A        Yes.
23  Q        When did you stop working there?
24  A        10/2001.
25  Q        Okay.  And your first job there

Page 1

1   part-time from January of '98 to June of '98 was
2   what?
3   A        Mail sorter.
4   Q        Okay.  And then what job did you
5   start doing in June of '98?
6   A        Customer care rep.
7   Q        Okay.  And, Ms. Wright, I'm going
8   to ask you some more questions specifically about
9   how you did that job and what happened at
10  UnumProvident and I would like to know if it's
11  okay if I share this information with other
12  people.
13  A        Yes.
14  Q        Okay.  The job title you had again
15  was -- say it again.
16  A        Customer care representative.
17  Q        Okay.  And what did that job
18  encompass as far as your job duties while you
19  were working there?
20  A        I had to answer the telephones.  I
21  paid claims.  I did audits.  I did reports and
22  handled appeals.
23  Q        Okay.  When you're talking about
24  answering the phone, is that from the people who
25  were the claimants and the insured people whose

Pa

1   files you had?
2   A        The customers.
3   Q        Were you answering the phone for
4   other customers, too, or just for your own cases?
5   A        I answered questions for all Paul
6   Revere business.
7   Q        If someone was not out on
8   disability yet and they were calling to ask a
9   question about whether or not they would be
10  covered, that might be someone you would answer
11  their phone call?
12  A        Yes.
13  Q        Did you have specific files that
14  were assigned to you?
15  A        No.  Well, at one time I did when
16  I paid long-term disability, but when I paid
17  short-term I didn't have those files, you know.
18  They come in on a daily basis.  They were short
19  duration claims and you just look at them and
20  review them and you have to make a quick decision
21  on if they're appropriate to pay or they're
22  denied.
23  Q        Okay.  Let's try to be specific
24  with some stuff here.  You said you did Paul
25  Revere claims.

Hall & Associates - Janet B. Thacker, CCR                    000083    Page 1 - Page

Sworn Statement of Donna Wright          CondenseIt!™                    Taken on

**Page 5**

| | | |
|---|---|---|
| 1 A | Correct. |
| 2 Q | Who was your employer? |
| 3 A | When I paid LTD claims Provident |
| 4 | was. |
| 5 Q | Just Provident or UnumProvident? |
| 6 A | Just Provident. |
| 7 Q | So you handled Provident LTD |
| 8 | claims? |
| 9 A | Yes. |
| 10 Q | Were they group policies or |
| 11 | individual policies? |
| 12 A | Group policies on Paul Revere |
| 13 | business. |
| 14 Q | And the Provident were individual |
| 15 | policies? |
| 16 A | Yes. They had the individual |
| 17 | policies, too. |
| 18 Q | My question is which ones did you |
| 19 | handle. |
| 20 A | I handled the group. |
| 21 Q | For the Paul Revere? |
| 22 A | Yes. |
| 23 Q | What about the Provident? |
| 24 A | There is only two people that |
| 25 | could pay Provident claims. |

1 hired to work for who?
2 A      Provident.
3 Q      Who did your check come from?
4 A      Provident at the time.
5 Q      When they were bought out by
6 UnumProvident did they come from Provident?
7 A      No. UnumProvident then when they
8 merged.
9 Q      Okay. And so even though you were
10 handling mostly Paul Revere claims and sometim
11 Provident claims you were an employee of
12 UnumProvident?
13 A      Correct.
14 Q      When you first started in June of
15 '98 as a customer care representative which
16 types of claims were you looking at?
17 A      I was looking at SHU claims which
18 is special handling unit.
19 Q      That was the first job you had?
20 A      Right.
21 Q      What is a special handling unit
22 claim?
23 A      Claims they decided that is going
24 to go to duration.
25 Q      Can you explain what that means?

**Page 6**

1 Q      You said you handled Provident
2 claims.
3 A      I handled Paul Revere claims.
4 Q      Okay. What did you say about you
5 handled Provident claims?
6 A      Provident claims is only handled,
7 you know, they're considered a customer. There
8 is only a few people that can handle those
9 claims. As far as paying Provident claims, I
10 didn't pay the employees' claims. I paid claims
11 for Provident, but the way they split the
12 business up, I paid Paul Revere and their
13 employees.
14          Provident -- confidentiality on
15 Provident there is only two people that can pay
16 Provident employee claims and I wasn't chosen as
17 one. I was chosen for the Paul Revere business
18 of paying their employees' claims.
19 Q      Okay. So my question was a minute
20 ago who was the company that you actually worked
21 for? Who did your check come from when you
22 worked over there? Did you get a check from Paul
23 Revere or Provident or UnumProvident?
24 A      UnumProvident.
25 Q      So when you were hired you were

1 A      That means that the company had
2 already decided that these claims were going to
3 stay. They were going to be paid to their max
4 benefit.
5 Q      You mean up to age 65?
6 A      Yes. And on those claims you paid
7 psych claims or SHU claims you paid everything.
8 I had 300 files.
9 Q      Okay. This was your first job?
10 A      Three thousand files.
11 Q      Three thousand or three hundred
12 files?
13 A      Three thousand files to keep up
14 with.
15 Q      Okay. There's a couple of
16 different things I want to cover so let's do this
17 one at a time.
18          When you first started working on
19 these claims and they gave you this full-time
20 job, what training program did they put you
21 through?
22 A      Four hours, five days of computer
23 training.
24 Q      Four hours a week, I mean, four
25 hours a day for five days of computer training?

Page 9

1  A        Uh-huh.
2  Q        Okay.  What did that computer
3  training consist of?
4  A        Learning the Paul Revere system.
5  Q        Okay.  And give me an example of
6  what type of stuff was on there you had to learn.
7  A        It was basic crash course of, you
8  know, this is where you find this information
9  like the max benefits in the system, you know.
10 They explained what menus would show you what
11 information so when you answered the telephone
12 you would know where to go to find the
13 information.  Most of it was just trial and error
14 on our part, you know.
15 Q        What do you mean by that?  You
16 mean you learned after the training was over you
17 learned how to do it?
18 A        I got to learn how to do it when I
19 was on the job.
20 Q        Okay.  Did they give you any
21 specific training on how to determine whether a
22 case should be properly paid or not?
23 A        No.
24 Q        How did you learn which cases
25 should have been paid and which cases should not

Page 10

1  have been paid?
2  A        Well, I go from my instincts on
3  the claims.  I had a lot of psych claims that
4  shouldn't have been on psych.  They should have
5  been on physical.  I had brought it to
6  management's attention that, you know, we were
7  not paying these people's benefits to the maximum
8  that they really are entitled to.
9  Q        How did you know to bring that to
10 management's attention?
11 A        Because I don't feel like it's
12 fair.  I don't know about their policy and what
13 they wanted to do, but I personally didn't think
14 it was fair so I questioned it.
15 Q        Okay.  And so my question is
16 you're saying you didn't know about their policy.
17 How did you know which cases were appropriate to
18 be paid and which cases were not?
19 A        By reviewing the files.
20 Q        Okay.  When you had this job, your
21 first job under the special handling unit, did
22 you have the authority to deny somebody's
23 benefits?
24 A        I had the authority to terminate
25 somebody's benefits, yes.

Page

1  Q        What criteria were you given to
2  decide whether or not somebody's benefits should
3  be terminated?
4  A        If they're no longer seeing a
5  physician.
6  Q        Okay.
7  A        If they do not return a
8  physician's statement once a year.
9  Q        Okay.
10 A        If they send in a doctor's
11 statement and they hadn't really seen that doctor
12 since five years, then we will ask for an updated
13 doctor's statement or they end up reaching their
14 max benefits and terminate the claim.
15 Q        What do you mean by max benefits?
16 A        Like on psych claims it's two
17 years and the other ones are until they're age 65
18 and then I terminate them.
19 Q        Okay.  For the different -- now,
20 you said you had 3,000 claims under your
21 responsibility?
22 A        Yes.
23 Q        Did you treat all these claims the
24 same or differently?
25 A        I treated them all -- if they're a

Page

1  psych claim, I went through them a lot more
2  thoroughly.
3  Q        Did you have a copy of whatever
4  policy the person was getting paid under for each
5  claim?
6  A        No.
7  Q        Did you know what the policy
8  definition of disabled was from file to file?  If
9  it had been somebody from a policy from one
10 company and someone from a different policy and
11 the two had a different definition of disabled,
12 did you know that?
13 A        There was only two policies on the
14 Paul Revere business and we had a generic what
15 they call a generic policy for the G6 and G8.
16 Q        Was that the two policies that you
17 were handling was G6 and G8?
18 A        Yeah.  That was all they offered
19 in Paul Revere.
20 Q        Okay.  Did you know which policy
21 was which when you were dealing with somebody's
22 claim?
23 A        There is a place in the system
24 where you could tell if they had G6 or G8.
25 Q        Do you know if there is any change

Sworn Statement of Donna Wright    CondenseIt!™    Taken on 8

**Page 13**

1 in the definition or how you were to handle the
2 claims different in those two?
3 A       One was just a better policy as
4 far as the percentage wise.
5 Q       Of how much they're paying?
6 A       Yes.
7 Q       Okay. Did you have authority to
8 terminate somebody's benefits for any other
9 reasons other than the reasons you already talked
10 about?
11 A       Well, they might have died.
12 Q       Okay. What about if they had a
13 letter from a doctor saying they were disabled
14 and they were still seeing that doctor, were
15 there ever times that those cases were
16 terminated?
17 A       Not that I seen, not that I did.
18 Q       Okay. Now, how did you know what
19 the grounds were for terminating a claim? Those
20 things you just listed a few minutes ago, how did
21 you know those were the things it was okay to
22 terminate a claim for?
23 A       I was told by management.
24 Q       Okay. How much -- how were you
25 told by management? Was it a training session?

1 A       Correct.
2 Q       Which one?
3 A       It was one that I maxed a man out
4 and he shouldn't have.
5 Q       Explain what you mean by maxed him
6 out.
7 A       Maxed out means they reached their
8 max benefit.
9 Q       Like age 65?
10 A       Right. This man's came up and the
11 system will highlight, you know, that they have
12 only got a month left on their claim and you're
13 supposed to send the letter out.
14 Q       Okay.
15 A       That triggers you. I did and
16 everything and sent the letter out. Well, the
17 man wasn't but 50 something.
18 Q       So what was the mistake? The
19 computer had the wrong birthday?
20 A       They set it up incorrectly.
21 Q       Who is they?
22 A       Intake.
23 Q       The --
24 A       The people who set up the claim to
25 begin with.

**Page 14**

1 How did it work?
2 A       You usually messed up.
3 Q       So you were working on files
4 before you actually were told what the criteria
5 was for terminating a claim?
6 A       Yes.
7 Q       How long did you work on files
8 before somebody told you what the criteria was
9 for terminating a claim?
10 A       Well, I don't think I've never had
11 a training class saying when to terminate a
12 claim.
13 Q       But you said management came and
14 told you?
15 A       Yeah.
16 Q       How long were you working on files
17 before somebody from management came and said
18 that was not a valid reason or was a valid
19 reason?
20 A       Probably within a month.
21 Q       Okay. Was it for a case that you
22 should have terminated and they were mad that you
23 did not or was it a case that you terminated and
24 they were mad that you should not have terminated
25 it?

1 Q       Had put in the wrong birthday into
2 the computer?
3 A       (Thereupon witness nods head up
4 and down.)
5 Q       You need to say yes or no.
6 A       Yes.
7 Q       Okay. Did you have a copy of the
8 paper file in his case to double check?
9 A       Yes. I had to go back and double
10 check.
11 Q       Were you taught to look at the
12 paper file before you sent out termination
13 letters?
14 A       No.
15 Q       Okay.
16 A       System letters you can't pay the
17 claim unless you send a certain letter. If the
18 system highlights a claim saying that, you know,
19 they have a month before the last -- before their
20 max benefits, the system will make you send the
21 letter out or it won't let you pay the claim.
22 Q       What kind of letters are we
23 talking about? What would they say?
24 A       You have reached your -- as of
25 June 8, 2000, you have reached your maximum

Hall & Associates - Janet B. Thacker, CCR

Sworn Statement of Donna Wright                CondenseIt!™                            Taken on 8,

Page 17

1 benefit date basically, you know, just a single
2 basic letter.
3          It's not real in depth as far as
4 that goes. It's just basically, you know, you've
5 reached age 65. And the man called in and was
6 very upset saying he's not 65. All I can do is
7 look at the system and the system had him at 65
8 and, you know. I didn't have anything else to do
9 but to say, well, you know, I'm going to have to
10 investigate this a little further because, you
11 know, I just take what they set up. And, see,
12 somebody should have caught it before it ever got
13 to me on the other side of the business.
14 Q     Okay. Now, let's be specific
15 about what you're talking about about what
16 information you had. You said there were two
17 different policies that you handled the claims
18 that were being paid under those policies.
19 A     Yes.
20 Q     Okay. Did you have a copy of both
21 policies in writing at your desk?
22 A     Generic policies.
23 Q     Okay. What do you mean by that?
24 A     It's a guideline, you know. There
25 might be a little more information depending on

1 Q     It did get fixed?
2 A     Yes.
3 Q     Were there ever any people that
4 didn't get all their money?
5 A     Not to my knowledge.
6 Q     Okay. But there were some people
7 that weren't getting all their benefits for a
8 time period? They were getting Social Security
9 offset and it wasn't until later that they got
10 the rest of their money?
11 A     Right.
12 Q     How long was the time period from
13 the time they got the offset started to the time
14 you guys figured that out?
15 A     Several months.
16 Q     Three or four months or more than
17 that?
18 A     Three or four months.
19 Q     How did you guys finally figure
20 out the mistake?
21 A     We got a phone call.
22 Q     From?
23 A     Shaw Industries.
24 Q     Okay. So that's an example of how
25 one policy was different from the other ones.

Page 18

1 the company, but it's a general draft of the
2 copies of those.
3 Q     Okay. So if an employer out there
4 had purchased one of those policies but had a
5 special provision for certain people, how would
6 you know that?
7 A     Usually we found out by mistake.
8 Q     Tell me what you mean by that.
9 A     Like Shaw Industries, maybe I
10 shouldn't say that.
11 Q     That's okay. Go ahead.
12 A     They don't have an offset on their
13 policies.
14 Q     Okay.
15 A     We started offsetting all their
16 claims for Social Security.
17 Q     Okay.
18 A     We didn't know that they didn't
19 have a rider on that that says Social Security is
20 not a reduction in benefits. So we kind of fixed
21 a couple of them up to offset the Social
22 Security.
23 Q     Did that ever go back and get
24 fixed so those people got all their money?
25 A     Yes.

1 A     Well, Shaw was an exception. It
2 didn't follow either G6 or G8.
3 Q     But you guys handled Shaw
4 policies?
5 A     Yes. We wasn't told in the
6 beginning that they don't have an offset. We had
7 to learn that the hard way.
8 Q     Were you told in the beginning if
9 there were any other differences between those
10 two policies?
11 A     No.
12 Q     So if somebody else, we already
13 talked about Shaw as an example of somebody who
14 had a different policy, if a different company
15 out there took a G6 or G8 and said I want to have
16 this other provision for my employees instead of
17 it being 24 months it would be 36 months for
18 mental or something like that, would you know
19 about that?
20 A     It should be set up in the system
21 that way.
22 Q     Where would you find that
23 information?
24 A     We just take it for granted that
25 they set it up right.

Hall & Associates - Janet B. Thacker, CCR

000087

Page 21

1 Q     They set it up according to the
2 generic policies you have?
3 A     They set it up as far as the
4 policies they had.
5 Q     If a company bought a slightly
6 different policy, how would you know that
7 information when you're working on the person's
8 claim?
9 A     Well, it goes back to like the
10 time before I get it an LTD specialist has
11 already handled it. He should have found all
12 this stuff out for me before I ever received the
13 claim.
14 Q     Okay.
15     Then after he has made all of his
16 reviews.
17 Q     What is his -- what kind of stuff
18 does he review?
19 A     He takes the first initial claim.
20 He takes it in first.
21 Q     Does he decide to pay it or not?
22 A     Yes.
23 Q     Okay.
24 A     He's the one that makes the
25 decision if it's going to be a SHU claim or

1 something that they made the decision it's likely
2 they're going to stay disabled up to age 65, it
3 goes to SHU.
4 A     Correct.
5 Q     If it's something that they might
6 improve from and be able to return to work, whe
7 does the case go?
8 A     It goes back to a specialist that
9 handled it to begin.
10 Q     The original LTD specialist?
11 A     Correct.
12 Q     Okay.
13 A     Or if we got a new claim from
14 them, I got to where I would review mine because
15 there was so many of them that we were getting
16 that there was too many unanswered questions.
17 Q     Give me some examples.
18 A     Like I had psych claims that
19 should have been on physical disability instead
20 of mental disability and I would send those back
21 to them and tell them they needed to look at it
22 because the person had cancer. The reason they
23 went to see a psychiatrist is because they
24 couldn't deal with they were going to die.
25     I would return those claims back

Page 22

1 they're going to try to get this man back to work
2 or not.
3 Q     Okay. So I'm going to come back
4 to the SHU claims in a little bit to make sure I
5 understand the difference in the types of claims,
6 what you were talking about.
7     So the LTD specialist is somebody
8 who is -- is that another type of customer care
9 representative?
10 A     Uh-huh.
11 Q     Yes?
12 A     Yes.
13 Q     Okay. And they decide whether or
14 not to pay the case?
15 A     Yes.
16 Q     Okay. Do they ever make a
17 determination of whether or not there are certain
18 cases that are not going to go the full duration
19 of the policy? In other words, if somebody is 40
20 and the policy pays to 65, do all those cases get
21 paid up to age 65?
22 A     If they have a diagnosis that they
23 don't think they're going to return to work, then
24 they send it to SHU. That's when I would get it.
25 Q     I got you. So if they have

1 because they had set them up wrong and I went to
2 management and complained that we shouldn't hav
3 these claims and they shouldn't be maxing out
4 these people just because they're depressed and
5 they have cancer.
6 Q     Did you always have success
7 getting management to change their mind when you
8 found those cases?
9 A     I'm a very persuasive person when
10 it comes to my job. Most of the time they said
11 you're right.
12 Q     Did they ever say you're wrong?
13 A     No. They always sent back -- they
14 got to where they took my word for it.
15 Q     Okay. Now, if you had a question
16 about one of those files that you were trying to
17 decide whether or not it should keep getting paid
18 or not, what kind of training did you have as far
19 as what to look at medically for these people?
20 A     I didn't have any training.
21 Q     Okay.
22 A     The only training I had was the
23 training on the computer, four hours a day, five
24 days a week. That was it.
25 Q     Okay.

Sworn Statement of Donna Wright          CondenseIt!™                                    Taken on 8

**Page 25**

1  A        As far as a training class goes,
2  that was nonexistent when I went to work there.
3  Q        When you left working there did
4  they have training classes?
5  A        Yes.
6  Q        Tell me what you know about
7  those.
8  A        I don't know too much about those.
9  I know they stay in there six or eight weeks, you
10 know, but other than that when they come out on
11 the floor it's like total blank to them, you
12 know. They don't really know any more than we
13 did when we first started except, you know, they
14 would let them sit with someone while they paid
15 claims so if they had a question they could come
16 ask a question.
17 Q        Do you know when they started that
18 training program like that?
19 A        It's just been in the last couple
20 of years that they had a training program.
21 Q        You stopped working in 10 of '01.
22 So about how long before you stopped working; do
23 you remember?
24 A        Probably the first of the year.
25 Q        Of '01?

1  Q        Let's start at the basics here.
2  What other information did you have available or
3  the computer? You said there was a training
4  manual on how to use the computer that was
5  available on the computer.
6  A        A training manual on how to pay
7  claims.
8  Q        And that was on the computer?
9  A        They were working on it.
10 Q        So until — let me make sure I
11 understand what you're saying. When you first
12 started working there you did not have a training
13 manual that told you how to decide claims?
14 A        Correct.
15 Q        Okay. When you're saying to pay
16 claims, you mean decide to pay it or not to pay
17 it, right?
18 A        Yeah.
19 Q        Okay. So when you first started
20 you didn't have a manual telling you what to look
21 at and decide how to pay a claim or not pay a
22 claim?
23 A        No.
24 Q        After you started working there
25 they started putting something on the computer

**Page 26**

1  A        Yeah.
2  Q        Okay.
3  A        And they were working on a
4  training manual in '01 on the system where we
5  could go in on the system and look at what they
6  called a training manual, but weren't allowed
7  to print it off.
8  Q        Why is that?
9  A        Because management said not to.
10 Q        Okay. Now, this was a training
11 manual that wasn't ready yet?
12 A        This was a training manual on the
13 system.
14 Q        Was it ready?
15 A        Parts of it was, but not all of
16 it.
17 Q        So could that be the reason why
18 they said not to print it off?
19 A        Well, there was other things we
20 couldn't print off either like state laws, if we
21 had a claim and was looking to see if we had the
22 authority to if it was third person or whatever.
23 Q        Okay. Try to help me and be more
24 specific to tell me what you're talking about.
25 A        It's hard to explain on that.

1  that was a manual?
2  A        Yes.
3  Q        And that manual they told you was
4  not finished.
5  A        Right.
6  Q        And they also told you you
7  couldn't print it off.
8  A        Right.
9  Q        Did they tell you it was okay to
10 look at it and go by it even though it wasn't
11 finished?
12 A        We could look at it and go by it,
13 but couldn't print it off.
14 Q        How did you know it was okay to
15 look at it and go by it?
16 A        Well, they called a meeting and
17 told us they were going to come up with a claims
18 manual.
19 Q        Who is they?
20 A        Supervisors.
21 Q        Okay.
22 A        They called a meeting and said
23 that part of the training manual was on email,
24 you know, where we could go in through Lotus
25 notes and look through it and we could look at

Hall & Associates – Janet B. Thacker, CCR

**Page 29**

1 the training manual --
2 Q     Okay.
3 A     -- if we had any questions before
4 we took it to a supervisor.
5 Q     So it was okay to rely on the
6 training manual even though it wasn't completed?
7 A     Right. We also had the state laws
8 on there.
9 Q     Okay. Did you have a copy of the
10 ERISA law on there?
11 A     Yeah. We all had a copy of ERISA
12 because we had to put it on our letters when a
13 claim terminated.
14 Q     Was it a copy of the whole law or
15 just a copy of stuff telling you what to put in
16 the letters?
17 A     It was just something they give us
18 to put in the letters.
19 Q     You didn't have a copy of the
20 whole ERISA law?
21 A     No. I don't think so.
22 Q     Okay. Now, let's go back to what
23 you were talking about a few minutes ago. There
24 was the training manual, some information about
25 state laws?

1 claim, we have to look up in the state laws if we
2 can pay that claim after the 180 days or can we
3 just deny the claim.
4 Q     Okay. So this wasn't a copy of
5 the actual state law. This was a copy of
6 guidelines by state.
7 A     Right.
8 Q     Telling you what they had, how
9 they interpreted the state law.
10 A     Right.
11 Q     Did you have an actual copy of the
12 state law to look at and read of what the actual
13 state law said?
14 A     I don't know. We just took it for
15 granted what they put on the system.
16 Q     That's what I'm trying to figure
17 out. So then the other stuff that was on there,
18 you said there was some information about ERISA.
19 A     Yeah.
20 Q     What kind of stuff was on there
21 about ERISA?
22 A     Under the states it would say
23 governed by ERISA. That would be all that we
24 would get information on.
25 Q     What did that mean if it was

**Page 30**

1 A     (Thereupon witness nods head up
2 and down.)
3 Q     Yes or no? Information about
4 state laws?
5 A     You cannot print them.
6 Q     I'm talking about what was on the
7 computer. You said there was a copy of the
8 training manual that wasn't ready yet.
9 A     It wasn't finished.
10 Q     That was on the computer?
11 A     Uh-huh.
12 Q     There was something about state
13 laws. What was it about state laws that was on
14 the computer?
15 A     Well, some of them, you know.
16 Q     Some. What documents on the
17 computer?
18 A     Some claims in certain states, if
19 they do not file a claim within a certain amount
20 of time, then we don't pay it according to state
21 laws. We don't to pay that claim. If they had
22 like for instance 180 days to get that claim in
23 from their disability, if they do not file in
24 that guideline from their injury, you know, their
25 injury is six months prior to them filing a

1 governed by ERISA?
2 A     Don't ask me.
3 Q     Why not?
4 A     Because even though I put it in
5 all them letters that I sent out, I really wasn't
6 sitting down and saying this is what ERISA means.
7 You know, bottom line I know you had the right to
8 appeal it, you know, under the ERISA law.
9 Q     So a claimant who was denied had a
10 right to appeal because ERISA says so?
11 A     Uh-huh.
12 Q     What else did ERISA tell you you
13 had to do on a claim?
14 A     That's it for me under the SHU
15 claims.
16 Q     Now, let's go back to what we were
17 talking about. You had this information
18 available on the computer and these guidelines,
19 right?
20 A     Right.
21 Q     How do you know you weren't
22 supposed to print this stuff off?
23 A     It says it on the system.
24 Q     What do you mean?
25 A     Down at the bottom it's

Sworn Statement of Donna Wright            CondenseIt!™            Taken on

Page 33

1 highlighted do not print this.
2 Q      Why can't you print stuff?
3 A      They don't want it ending up in a
4 file.
5 Q      There is information on the
6 computer, if I understand what you're saying
7 right, that tells you, gives you guidelines on
8 how to handle a claim.
9 A      (Thereupon witness nods head up
10 and down.)
11 Q      You need to say yes or no. You're
12 nodding your head.
13 A      Yes.
14 Q      There is information on the
15 computer that tells you information you need to
16 know as a claims handler on how to handle a
17 claim?
18 A      Correct.
19 Q      They tell you not to print out
20 that information on the computer. It says that?
21 A      Correct.
22 Q      And then how do you know the
23 reason why is because they don't want it to end
24 up in the claim files?
25 A      Right.

1 you know. If they get sued, then if that
2 information is in there in their claim file, then
3 that gives the opposition more questions to ask
4 really, this information. So they don't want
5 none of that in the files.
6 Q      How do you know that was their
7 reason?
8 A      Because we were told that in staff
9 meetings.
10 Q      Okay. Do you remember anybody who
11 specifically said that?
12 A      Well, Kim Beckett told it to us to
13 begin with not to be putting any emails.
14 Q      What you were just talking about,
15 the reason why was because they didn't want those
16 documents coming out later on if a legal
17 proceeding ensued, who told you that?
18 A      Kim Beckett.
19 Q      Okay. Did you have any time that
20 information was distributed by paper? Did
21 anybody ever hand out a memo or mail to
22 everybody, any kind of instructions or was it all
23 done by computer?
24 A      All done by computer.
25 Q      Okay. As far as having any of the

Page 34

1 Q      How do you know that's the reason?
2 A      They told us.
3 Q      Who is they?
4 A      Upper management.
5 Q      Do you remember anybody
6 specifically telling you that?
7 A      Tony Price told me that. Let me
8 think of the other one. Every supervisor I ever
9 had.
10 Q      But you remember for sure that
11 Tony Price told you they didn't want that to end
12 up in the claim files?
13 A      Yes.
14 Q      Okay. If --
15 A      Kim Beckett.
16 Q      Okay. Do you remember their job
17 titles?
18 A      They're supervisors.
19 Q      Okay. Were they your supervisors?
20 A      Yes.
21 Q      Okay. Did they ever say why they
22 did not want them to end up in the claims file?
23 A      They don't want that information
24 in claim files because then they have more
25 questions to answer if they have to go legally,

1 other instructions on how to handle claims, what
2 other documents were on the computer other than
3 what we already talked about that gave you any
4 guidelines to go by when you were working on
5 somebody else's files?
6 A      That was it.
7 Q      What was on the computer?
8 A      That was all.
9 Q      You said the training manual that
10 wasn't finished.
11 A      Uh-huh.
12 Q      Yes?
13 A      Yes.
14 Q      There was some guidelines about
15 certain states having to have their appeals in or
16 applications in by a certain time.
17 A      Yes.
18 Q      There was some information about
19 ERISA appeal rights.
20 A      Yes.
21 Q      Was there anything on there that
22 told you about any advice about what medical
23 conditions?
24 A      All that went through from my
25 understanding when it went from being a

Hall & Associates - Janet B. Thacker, CCR

000091

Page 33 - Page

Sworn Statement of Donna Wright          CondenseIt!™                          Taken on

**Page 37**

1 short-term claim to a long-term claim and the
2 specialist that got it on the long-term claim he
3 was supposed to do your background work, getting
4 your medical records, all that. Then he would
5 make a decision to, you know, if he thought that
6 the claim was going, that they were sick enough
7 and going to pay them through the duration to
8 their maximum benefit date, he would send the
9 claim to me.
10        Sometimes I would get claims that
11 had one payment made on them and there was hardly
12 any information in the claim file as far as,
13 well, they had AIDS and, you know, they're going
14 to die so they would send it on. I would end up
15 having to order the medical records and stuff
16 like that. Just because you have a diagnosis you
17 still need medical records to back up the
18 diagnosis.
19        So I started raising cain about
20 them not doing the work because I wasn't getting
21 their money and if I'm going to do their work I
22 want their pay added to. So I quit taking them.
23 I took them back to my supervisor and said, hey,
24 look, they haven't paid but one payment on this
25 claim, I'm not taking it.

**Page 38**

1 Q        Okay. Now, I want to go back to
2 the documents that you guys had on the computer.
3 Did any of them ever get printed out by anybody?
4 A        Yes.
5 Q        Tell me how you know that.
6 A        I've seen them on the printer.
7 Q        Okay. Did you ever print any of
8 them out?
9 A        I have printed a couple out to
10 show to upper management why I was going to
11 terminate the claim or deny the claim.
12 Q        So stuff from the training manual
13 that told you how to handle the claim you printed
14 that out?
15 A        Mostly state laws, the state laws
16 and then after I get through with it then I put
17 it in the shredder. After I made my point and
18 showed them why I was denying the claim, then I
19 would put it in the shredder.
20 Q        Okay. Why would you not put it
21 back in the file if it was something you relied
22 on to make a decision in the file?
23 A        They don't want any of that and
24 they audit you and you get an auditor or if they
25 catch one in the claim file.

1 Q        You mean somebody comes and checks
2 the files to see what is going on? Is that what
3 you mean by audit?
4 A        They pull five or ten claims a
5 month.
6 Q        Who would do these audits?
7 A        They had a person that's all they
8 done was audit our claims.
9 Q        Okay. Then tell me how that would
10 work.
11 A        They would come to your desk and
12 pick ten claims that you have paid and they would
13 go through and audit them making sure you checked
14 the right address and all the information in the
15 system was correct and you had paid the correct
16 amount and, you know, just everything about the
17 claim.
18 Q        How do you know that it was
19 something that the audit people would catch if
20 you printed something off the computer system and
21 left it in the file?
22 A        Well, there is no telling. You
23 can't do that because you never knew which files
24 she was going to pull.
25 Q        My question is how do you know if

**Page 39**

1 she pulled one that had something in it if you
2 printed it out and stuck it in the file?
3 A        They got wrote up for it.
4 Q        Who did? Did you ever get written
5 up for it?
6 A        No.
7 Q        Is that because you never printed
8 one off or never got caught with one in the file?
9 A        I never got caught with one in the
10 file.
11 Q        Was there some in some files that
12 you printed off?
13 A        Not in my files.
14 Q        How do you know other people got
15 in trouble for it?
16 A        It was brought up in staff
17 meetings.
18 Q        Tell me how that was told to you
19 guys.
20 A        They were very upset about them
21 printing it off to begin with. They said that if
22 we had to go before and make a sworn statement or
23 anything then, you know, here you have this legal
24 law, you know, which basically a couple of
25 statements in that little whatever suit it was

Hall & Associates - Janet B. Thacker, CCR

000092

Page 41

1 wouldn't be but two or three little statements in
2 there that pertained to your claim file and they
3 had found them in files after the fact that
4 someone had sued them.
5 Q        Okay.
6 A        It's been brought up in court and
7 they found these and that was one of the big
8 things because they had a lawsuit going and they
9 come up with emails and state laws and stuff like
10 that where the person had put it in the file and
11 then when it came out in court it must not have
12 been a good thing because all of us got a staff
13 meeting and was told not to be printing any
14 emails, don't print any state laws, don't print
15 anything from the claims manual that was on the
16 system. Don't print any of it and put it in the
17 claim file.
18 Q        Do you remember who it was at the
19 staff meeting that told you that?
20 A        Kim Beckett.
21 Q        You also mentioned emails. We
22 talked about these other documents and guidelines
23 and stuff that were in there. What might the
24 emails be about that you might want to print off
25 but they're telling you not to?

Page 42

1 A        New York is a pain, New York
2 state, because they have a state benefit and
3 under New York state law we pay all those and on
4 New York is where they have most of the problems,
5 people not offsetting because they're not
6 offsetting the New York state benefit. It's real
7 confusing, especially if you're new and never
8 paid a New York claim.
9 Q        Okay. So how would you get that
10 information?
11 A        It's in the system, New York is.
12 New York has its own little book, if you want to
13 call it a book, because there is so many quirky
14 little things in the state of New York that you
15 have to abide by.
16 Q        Let's go back. What I was asking
17 is you were told not to print out emails.
18 A        Yes.
19 Q        Emails, I'm assuming, are
20 different than these guidelines you're talking
21 about for New York and ERISA and for different
22 states.
23 A        On New York I would ask a girl
24 that was supposed to specialize in New York
25 claims and I would ask her questions.

Page

1 Q        By email or in person?
2 A        By email on, you know, I've got
3 this claim so and so, this is what I'm seeing.
4 Q        Okay.
5 A        And she would say -- give me an
6 answer back, but I wasn't supposed to put that in
7 the claim file.
8 Q        So you would email her a
9 question. She would email you back an answer of
10 what or how to handle a claim.
11 A        Right.
12 Q        And you were told not to print
13 that out?
14 A        Right.
15 Q        That's what they were talking
16 about, don't print out the emails?
17 A        That's the kind of emails that you
18 save so if it comes back on you. So you say I
19 didn't put it in the claim file but I have the
20 email right here is the reason I did what I did.
21 Q        Did you save it on the computer or
22 print it out?
23 A        I saved it on the computer. I
24 made sure it didn't get deleted. I put it in a
25 personal file on the computer. That way, you

Page

1 know, I had backup on the reasoning why I did
2 what I did because here's the email. It's not
3 in the file because we were told not to put the
4 emails in the file, but this is where I got my
5 information.
6 Q        Do you remember about how many
7 emails you had saved in the personal file?
8 A        A bunch.
9 Q        Five? Ten? Twenty?
10 A        Probably 100 or more.
11 Q        Of emails about cases?
12 A        Uh-huh.
13 Q        Were each one that same kind of
14 example where you asked someone a question and
15 they told you what to do and you saved it?
16 A        Uh-huh.
17 Q        Say yes or no.
18 A        Yes, sir.
19 Q        Okay. Do you know of any other
20 people doing the same job you did doing the same
21 thing?
22 A        I know other people printed off
23 the laws and the parts of the claim manual to
24 support what they were trying to get across to
25 upper management. But as far as them putting it

Sworn Statement of Donna Wright          CondenseIt!™                          Taken on 8

**Page 45**

1 in the claim file, I don't know if they did or
2 not. I know personally myself I did not put
3 those in the claim file. I know there has been
4 people that put them in the claim files and has
5 gotten wrote up for it.
6 Q        So they actually got wrote up for
7 putting stuff in the claim file. Can you give me
8 an example of a time you know that for sure or
9 did you just hear that happen?
10 A        It was a rumor through the
11 grapevine and I went to the source and said did
12 you get wrote up and she said yeah.
13 Q        Do you remember her name?
14 A        Belinda King. She still works
15 there. She won't tell you nothing.
16 Q        What did she tell you at the time?
17 A        That she had those printed off,
18 those claim manuals and the state laws, and she
19 had them on her desk and management come through
20 and looked at her desk because if you're out of
21 work one day, they go through your desk to see
22 what you have printed off. They found them
23 printed off on her desk. She was told did you
24 not see the memo at the end of the email that
25 says do not print this page.

**Page 46**

1        So we had a staff meeting and that
2 was brought up at the staff meeting that these
3 things were getting put in the file claim files
4 and they didn't want them in there.
5 Q        Okay. Do you know if any of those
6 documents were ever taken back out of the claim
7 file once they were put in the claim file?
8 A        I'm sure a lot of people went
9 through their claims and pulled them out if they
10 thought they had some.
11 Q        Do you know that for sure or you
12 just assume they did?
13 A        I know that for sure.
14 Q        How do you know that for sure?
15 A        Because when you go to smoke in
16 the circle, I smoke, that's where you learn all
17 the information down there smoking.
18 Q        Okay.
19 A        It was said by several people
20 that, well, I had to go back through my files.
21 Q        Do you remember the names of any
22 of those people?
23 A        And pull all that stuff out.
24        Belinda is the only one I
25 remember. The other girls I don't remember, you

1 know. I just remember their faces. I don't
2 remember their names. They weren't in my unit.
3 They said they went back and pulled all theirs
4 out.
5 Q        Okay.
6 A        That they could find. I'm sure
7 there is still some floating around in there
8 because, you know, we try to cover ourself, you
9 know, when we make a decision. At least I do.
10 Some people don't.
11 Q        What do you mean by trying to
12 cover yourself?
13 A        Well, just like if I deny a claim,
14 I want to know the reason why I denied that
15 claim. We always -- denials always had to go
16 through what they called a coordinator. If you
17 deny a claim, you had to get her approval before
18 you could deny this claim.
19 Q        Okay.
20 A        So, you know, to get her backup
21 information, you know, you say, well, do you want
22 to look on the system for where I got the
23 information or do you want me to print it off.
24 She would say print it off.
25        When she says print it off, a lot

**Page**

1 of people put it in the claim file. It was a
2 misinterpretation. There was a big stink over
3 it. I never was one to put it in there.
4 Q        Who was that?
5 A        Kim Porter.
6 Q        Kim Porter. And Kim Porter was
7 the coordinator that would actually --
8 A        Sign off on them. She would sign
9 off on denials.
10 Q        If you were recommending a denial,
11 you had to take it to her?
12 A        Everybody did.
13 Q        In the SHU unit?
14 A        No. This was when I was paying
15 short-term disability claims.
16 Q        You started out working in the SHU
17 claims?
18 A        Right.
19 Q        You worked there how long?
20 A        Two and a half years.
21 Q        So that would have been the rest
22 of '98, '99 and 2000 and where did you move after
23 that?
24 A        STD.
25 Q        Short-term disability?

Hall & Associates - Janet B. Thacker, CCR                    000094          Page 45 - Page 48

Sworn Statement of Donna Wright          CondenseIt!™                    Taken on 8

Page 49

1 A      Uh-huh.
2 Q      Were those Paul Revere also?
3 A      Uh-huh.
4 Q      Okay. So were you still working
5 for UnumProvident at the time?
6 A      That's when it changed over to
7 UnumProvident. When it merged they shipped the
8 SHU files up to Portland and moved us to
9 short-term.
10 Q     Okay.
11 A     See, my claim is not being paid in
12 Chattanooga. It's being paid in Portland. The
13 short-term claims is what I'm telling you about
14 the printoffs of everything. That's how they're
15 handling the short-term claims.
16       On long-term claims it's supposed
17 to be the same way because they're looking at the
18 same information we are.
19 Q     Here's what I'm trying to make
20 sure I understand. All the information you told
21 me about how when to print stuff up, not to print
22 stuff out is when it was still Provident and you
23 were working in the SHU unit; is that right?
24 A     No. It was when I was working in
25 short duration, STD.

Page 50

1 Q      So when you moved over to
2 short-term disability is when they told you all
3 the things about don't print the stuff?
4 A      (Thereupon witness nods head up
5 and down.)
6 Q      All the stuff was in 2001 that we
7 were talking about?
8 A      Uh-huh.
9 Q      That was after Unum and Provident
10 combined?
11 A     Uh-huh.
12 Q     And you became an employee at that
13 time of UnumProvident?
14 A     Right.
15 Q     You were handling in the
16 short-term disability department which company
17 claim files?
18 A     Paul Revere.
19 Q     All Paul Revere?
20 A     Uh-huh.
21 Q     Okay.
22 A     I was a Paul Revere specialist as
23 far as the system went. If anybody had any
24 problems with the Paul Revere system, they would
25 call me and I would go fix it for them.

1 Q      Paul Revere specialist as far as
2 the computer program?
3 A      The business, Paul Revere
4 business.
5 Q      Did you have training in the Paul
6 Revere policies?
7 A      Just what I have learned by
8 myself.
9 Q      How did you become the Paul Revere
10 specialist?
11 A     On the system it's not a friendly
12 system and people would make mistakes and I wou
13 have to go fix the system where it would balance
14 out.
15 Q     My question is how did you know
16 how to fix that stuff? How did you learn to be
17 the person who knew the answers to those kinds of
18 questions?
19 A     I learned by trial and error. If
20 I really come to a real hard problem, I would
21 call Donna Urick (phonetic) in Worcester,
22 Massachusetts and ask her if I was doing it
23 correctly.
24 Q     At what point did they say you
25 were the Paul Revere specialist?

Page

1 A      It was probably in 2001 they
2 wanted me to go up to LTD and train everybody to
3 pay RSP benefit.
4 Q      What is RSP?
5 A      Retirement savings plan, something
6 like that. It's where they get a little more
7 extra money on them, you know. Certain companies
8 have this for their employees and they didn't
9 know how to set them up. So I would go up there
10 and show them how to set it up. They were
11 sending them down to me, you know. I told the
12 supervisor at the time that they're not setting
13 these up.
14 Q     Okay. So my question is –
15 A     I asked Donna Urick if I had any
16 problems on that.
17 Q     When did you start working on the
18 Paul Revere files?
19 A     '98.
20 Q     Okay.
21 A     And I quit working on Paul Revere
22 files.
23 Q     You were still working on Paul
24 Revere files in October of '01 when you stopped
25 working?

Hall & Associates – Janet B. Thacker, CCR

Page 53

1 A     Right. I just went from long-term
2 to short-term.
3 Q     The part of you becoming the Paul
4 Revere specialist is that because you worked on
5 Paul Revere files for so long?
6 A     Because I was the first one.
7 There wasn't but two that learned Paul Revere
8 business.
9 Q     Okay. You never had any training
10 that was specifically Paul Revere training, did
11 you?
12 A     Just four hours, five days.
13 Q     That was at the very beginning you
14 said?
15 A     Yeah.
16 Q     Okay. And that you said was on
17 the computer system?
18 A     Right.
19 Q     What training did you get on the
20 interpretation of Paul Revere policy provisions?
21 A     I didn't get any.
22 Q     Okay.
23 A     I mean, if I had a question on
24 policies, I would have to call Worcester and ask
25 them to send me a copy of the claim policy.

1     If you had questions, you know,
2 or someone called and asked you questions to get
3 the adequate information that you need you're
4 not -- I'm not going to rely on that generic
5 policy, you know. If they have a specific policy
6 question, then I'm going to call Worcester and
7 get a copy of that contract before I say
8 anything. I'll tell them I'll call them back.
9 Q     Okay.
10 A     But a lot of them they couldn't
11 find and we started making our own files up here
12 in Chattanooga, you know, like everybody that
13 ordered a contract we started making copies of
14 them and making our own little library of
15 contracts, me and this other guy did.
16 Q     These were the contracts between
17 the group -- like these are group policies?
18 A     Group policies.
19 Q     Where some company had a policy
20 that applied to everybody that worked for that
21 company?
22 A     Right.
23 Q     And if they worked for that
24 company and under that group policy, you guys had
25 to make your own library of those policies to

Page 54

1 Sometimes they could find it. Sometimes they
2 couldn't.
3 Q     I thought you said you had a
4 generic copy.
5 A     We do, but it's generic. You
6 don't know if it has a rider on it or not.
7 Q     You wouldn't know if it had a
8 rider without calling somebody?
9 A     Right.
10 Q     Even when you're working on
11 somebody's file?
12 A     Right. See, Provident didn't have
13 business like that. Every claim file on
14 Provident they had a policy in their file.
15 Q     Okay.
16 A     That they worked on, you know.
17 They had it right in front of them.
18     Paul Revere didn't set theirs up
19 like that as far as putting a copy of the
20 contract in the file. They didn't do that.
21     They just had this little sheet
22 over here, you know, they had check marks that
23 they had this kind of benefit or that kind of
24 benefit and that was it. That's all you had to
25 go by.

1 keep track if Mr. Smith worked for a big company
2 X and somebody else came along that worked for
3 company X did you look at the copy you had made
4 of that?
5 A     I would make a copy of it and put
6 it in the claim file.
7 Q     My question is you said you made a
8 library of these different policies.
9 A     Yeah.
10 Q     What did you use the library for?
11 A     When you get another one.
12 Q     From the same company?
13 A     From the same company. We wrote
14 the name of it on a folder, put the claim policy
15 in the folder and made us a library and if you
16 ever had a question, we could go to this library
17 and somebody might have already ordered it and
18 made a copy of it and it would be in that library
19 that you would have the actual contract in front
20 of you. If it wasn't there, then you had to call
21 Worcester and see if they could find a copy, the
22 original copy of the contract.
23 Q     The copies you guys had from other
24 people's files and used them in somebody else's
25 file, did you double check to make sure they

Sworn Statement of Donna Wright    CondenseIt!™    Taken on 8/

**Page 57**

1 hadn't changed the provision of the policy
2 between those two people's claims?
3 A    There wasn't any change on any of
4 them except Shaw.
5 Q    How did you know that?
6 A    Huh?
7 Q    How did you know if there was a
8 change or not? How could you tell?
9 A    Because X got more money than
10 employees on Shaw.
11 Q    You said you made this library of
12 these policies?
13 A    Uh-huh.
14 Q    How did you know if somebody was
15 under one policy and somebody else came along
16 under the same policy but they became disabled
17 later that the policy hadn't changed between the
18 two people?
19 A    We get updates on email.
20 Q    You get updates on email?
21 A    Yes. Basically Paul Revere
22 business there wasn't any changing of the policy
23 because by the time they bought Paul Revere out,
24 you know, the policies never did change.
25 Q    Okay. Now, you said you worked on

1 Q    Okay. But that went back and got
2 fixed?
3 A    Yeah.
4 Q    Tell me what specific training you
5 had about what ERISA means.
6 A    I didn't have any training. I'm
7 telling you. There was no training.
8 Q    What did you learn about ERISA?
9 A    That you had to put it in every
10 letter.
11 Q    Okay. Do you know what type of
12 cases are covered by ERISA and what type are not
13 covered by ERISA?
14 A    No, I do not.
15 Q    Do you know anything about what
16 ERISA means other than the person's right or
17 other than they have the right to appeal? Other
18 than that, do you know anything about what their
19 rights are and how that is different from other
20 people's claims?
21 A    No, not until you told me.
22 Q    You also discussed something about
23 when they first look at claims they decide that
24 some are going to basically get paid for the full
25 time period they're eligible under the policy.

**Page 58**

1 the Shaw policies.
2 A    Yeah, Shaw Industries. They had
3 two different policies, one for execs and one for
4 employees. The ones for the employees didn't
5 offset Social Security where the ones on the
6 execs did.
7 Q    Okay. And then you said those
8 changed?
9 A    No. They didn't change. That was
10 the only difference in the two different
11 policies. I questioned it because I seen the man
12 was working at Shaw. When I went to pay it, I
13 thought why is he getting so much more because it
14 was like a $500 benefit that they received if
15 they were an employee with no offset and I
16 thought, now, you know, this is set up and he's
17 making $1,500, I don't get it.
18 Q    You're talking he gets the Social
19 Security plus the full policy amount?
20 A    Yeah. I questioned it and I got a
21 copy of the policy, both policies, and said,
22 well, he's an executive. They have got two
23 different policies for executives. But until,
24 you know, we made the error, see, I offset Social
25 Security on that man.

1 A    Correct.
2 Q    Okay. What about the other
3 claims? What do they do with those?
4 A    If it's a diagnosis that needs
5 medical records, then they go to another unit.
6 They triage everything according to the
7 diagnosis. If it's cancer, then it goes to an
8 LTD specialist and they handle the claim for the
9 duration unless it's skin cancer or something
10 like that then they don't. They will send it to
11 an STD specialist and he will handle it unless
12 they go over to the long-term.
13 Q    Okay.
14 A    They're trying to make it as
15 seamless a process where the same claim adjuster
16 is going to be handling the STD and LTD and no
17 break in between.
18 Q    Okay.
19 A    As far as I know, that wasn't
20 going too well when I left, but that was their
21 goal.
22 Q    Okay. Did you ever hear the term
23 expected duration?
24 A    No.
25 Q    Okay. Do you know if they ever

Hall & Associates - Janet B. Thacker, CCR

Sworn Statement of Donna Wright          CondenseIt!™          Taken on 8,

Page 61

1 thought that some cases or claims would only be
2 paid for a certain number of years?
3 A      Yeah.
4 Q      Tell me what you know about that.
5 A      Psych claims are only paid for two
6 years.
7 Q      Not under the policy as far as the
8 number of years, but I'm asking if you heard
9 anything about as far as like certain types of
10 conditions that would be physical and otherwise
11 if you could stay disabled until age 65, but they
12 treat them so they might not get paid as long.
13 Have you heard anything about that?
14 A      No.
15 Q      Okay. Now, the areas you worked
16 in in the SHU claims those were all basically
17 claims that they expected the people to be paid.
18 A      To max benefit.
19 Q      Okay. And then you went from
20 there to the short-term disability for Paul
21 Revere.
22 A      Right.
23 Q      Okay. What was your job title
24 when you went to short-term disability for Paul
25 Revere?

1 set it up and it's been paid for a month or a
2 week, then that's considered a paid claim. It's
3 handled.
4 Q      Okay.
5 A      We were supposed to pay, I think,
6 12 claims a day every day.
7 Q      To pay them or process them?
8 A      Process them, make a decision if
9 you're going to pay it or not pay it or deny.
10 Q      You keep saying pay the claim like
11 all you do is pay claims. Did you ever turn
12 people down?
13 A      Mostly New York.
14 Q      The reason I'm saying that is to
15 make sure because the way you're saying it you're
16 saying you paid claims but actually when you say
17 that --
18 A      Handled it.
19 Q      You handled the claim?
20 A      Yeah.
21 Q      How did you know you were supposed
22 to handle 12 claims a day?
23 A      Management said we had to pay 12
24 claims per day.
25 Q      Do you remember somebody specific

Page 62

1 A      Same.
2 Q      Customer care representative?
3 A      Yes.
4 Q      What is the next level above?
5 A      Customer care specialist.
6 Q      How long do you have to work there
7 before you become a customer care specialist?
8 A      It depends on how much you're
9 liked.
10 Q      Tell me what it is that got people
11 promoted.
12 A      You know, going out of your way to
13 help people and being able to produce those
14 claims and get them out.
15 Q      What do you mean by produce the
16 claims?
17 A      By your production.
18 Q      By the number of decisions you
19 make?
20 A      How many claims you pay that day.
21 Q      You mean pay as in pay the
22 benefits to or make a decision to pay or not to
23 pay?
24 A      How many you take care of and set
25 up. It don't matter. If you pay that claim and

1 telling you that?
2 A      Becky.
3 Q      Okay. And what happened if you
4 had complicated cases that you couldn't get to 12
5 a day?
6 A      Then you better make it up another
7 day.
8 Q      Okay. Did you ever take cases to
9 be reviewed by a doctor?
10 A      Nurse.
11 Q      By a nurse?
12 A      (Thereupon witness nods head up
13 and down.)
14 Q      Why only a nurse and not a doctor?
15 A      We didn't have access to doctors.
16 Q      Why not?
17 A      Our unit didn't. Because if it
18 was going to have to be looked at by a doctor,
19 we're supposed to refer that claim to the next
20 unit.
21 Q      What was the next unit?
22 A      It depended on the diagnosis. It
23 if it was a maternity claim, we sent it to the
24 maternity ward, what we called it. If it was
25 like heart attack or something else, it went to a

Hall & Associates - Janet B. Thacker, CCR

Sworn Statement of Donna Wright                CondenseIt!™                                    Taken on 8

**Page 65**

1 different unit.
2 Q        Okay.
3 A        It would depend on the diagnosis
4 what unit it went to.
5 Q        Okay.
6 A        All we had access to was a nurse.
7 Q        Okay.  What kind of stuff could
8 you go talk to the nurse about?
9 A        Durations on claims on certain
10 diagnosis that we couldn't find.
11 Q        Tell me what you mean by that.
12 A        Well, we had an MDA guideline book
13 which is medical where all the doctors, all these
14 doctors across the United States are supposed to
15 come up with these durations for certain illness,
16 you know.  Like your gallbladder, your expected
17 duration for you to be out for gallbladder is two
18 weeks.
19 Q        That's what I asked you about a
20 few minutes ago when I asked you expected
21 duration.
22 A        That's MDA guidelines to me.
23 Yeah, I used those.
24 Q        Okay.
25 A        We look up the diagnosis in the

1 A        We didn't have access to it on the
2 computer.  We had to go to another little pew and
3 it was sitting in there because we only had one
4 book for everybody in the unit.  Nobody had one
5 on their desk.  You had to get up and go to
6 another pew to look it up which takes a lot of
7 time but, you know, I would take all the claims
8 and look up on a duration and on a short piece of
9 paper put a sticky on it saying how long the
10 duration is and pay it up to that duration.  Once
11 they reach that duration, then I would -- if
12 they're out longer I would refer that claim to
13 the next unit.
14 Q        How did you know that was the way
15 you were supposed to determine how long a case
16 would get paid?
17 A        We were told.
18 Q        Who told you?
19 A        Upper management.
20 Q        Do you remember anybody
21 specifically?
22 A        Kim Beckett.
23 Q        Okay.  So specifically how did she
24 tell you?  How did she explain that to you; do
25 you remember?

**Page 66**

1 book and it would show us a duration but there
2 would be some that would be a little bit more
3 complex than what the book is telling us so we
4 would take it to the nurse and the nurse would
5 look up duration or say I think that's really
6 appropriate, you should go ahead and pay it.
7 Q        Okay.  What to do you mean by the
8 duration?  Tell me some more about this.
9 A        Every diagnosis has a duration
10 according to the MDA guidelines.  That's what
11 they base their decisions on when they're paying
12 claims is what the duration is in the book.
13 Q        Do you remember any more details
14 about what the MDA guideline book was?  Was it a
15 hard bound book?
16 A        Yeah.  It was a book about like
17 that (indicating).
18 Q        About ten inches apart, a really
19 big book?
20 A        Real thick.  It's got just about
21 everything you can think of.
22 Q        For the different diagnosis?
23 A        Uh-huh.  That's what we base our
24 decisions on was the MDA guideline book.
25 Q        Okay.

1 A        Everybody has to go look at the
2 MDA guidelines for the duration on claims.
3 Q        Okay.  Are you supposed to record
4 that in the file?
5 A        No.
6 Q        How do you know you're not
7 supposed to record it in the file?
8 A        We don't put anything like that in
9 the file.
10 Q        How do you know that?
11 A        Upper management told us not to.
12 Q        Okay.  So Ms. Beckett told you to
13 go look in that MDA guidelines for the expected
14 duration and if somebody went past the expected
15 duration, you would refer it to a different unit?
16 A        Right.  We would print those off,
17 put it on the printer and print it out of the
18 book.
19 Q        Make a copy of the page?
20 A        Yeah, take it to our coordinator.
21 Q        Who was that?
22 A        Kim Porter.  You got her name down
23 there.
24 Q        Yeah.
25 A        To back up our decision on the

**Page 69**

1 reason we're making the decision is based on
2 this, you know.
3     Q    And then what would happen to
4 those pages that you would copy?
5     A    They would be shredded.
6     Q    What other kind of stuff ended up
7 in the shredder?
8     A    Like if you were sitting there on
9 the telephone like I kept a legal pad beside my
10 phone, whoever called I would say, Mary, this is
11 what they was asking duh, dah, dah.
12     Q    So your notes from the phone calls
13 from clients or from customers?
14     A    Well, like that sheet I would keep
15 at my desk. Instead of filling out a whole
16 telephone sheet, I would go back and fill the
17 telephone sheet out. I did it after I got
18 through with this. I would take this piece of
19 paper and this is shredded.
20     Q    The piece you had notes on?
21     A    It would have Social Security
22 numbers on it and stuff like that. We put it in
23 the shredder. Anything that had a Social
24 Security number went to the shredder.
25     Q    What else went in the shredder?

**Page 70**

1     A    That was all I put in the
2 shredder. I didn't shred most of the stuff. I
3 trashed a lot of stuff as far as just plain old
4 garbage. As far as the shredder the only thing I
5 shredded was the guidelines and the laws and
6 those few claim manual things which, you know, it
7 was still in the process when I left.
8     Q    Okay. Now, you mentioned
9 something earlier about the fact that they went
10 through your desk if you weren't there. How do
11 you know that happened?
12     A    I seen it.
13     Q    Tell me more about that. What did
14 you see?
15     A    If somebody was out, they would go
16 over there and look through their desk to see if
17 they had any old work over there or if they were
18 hiding work and if you come back and they found
19 all this stuff in your desk, you were in trouble.
20     Q    Okay. Did you ever have any
21 meetings where anybody from the legal department
22 met with you guys?
23     A    I met with the legal on several
24 files.
25     Q    Okay. Are we talking about group

1 meetings or where you had a meeting individual
2 with legal?
3     A    I had an individual meeting with
4 legal.
5     Q    What kind of stuff would you have
6 to go meet with them about?
7     A    Back when I was paying SHU claims
8 I had a customer that got a Social Security award
9 which made his claim overpaid and he got real
10 upset because we were deducting his benefits to
11 pay the overpayment back and he got real upset.
12 He said he was going to have to live on the
13 streets and everything and so he got this lawyer
14 and this lawyer from what we could tell the
15 lawyer was taking his money. I don't know how h
16 had it set up, but he kept sending us this thing
17 and from what me and my supervisor could gather
18 out of it, you know, because he kept saying he
19 wasn't getting any money. Well, I said, you
20 know, you had X amount of dollars sent to you,
21 what happened to it.
22     He kept saying that he was -- he
23 didn't understand. I said, well, I think you
24 need to go talk to your attorney. I said I think
25 you have a problem with your attorney.

**Page**

1     Q    Did anybody ever suggest to you
2 that it was a problem talking to him since he had
3 an attorney?
4     A    No.
5     Q    Did you ever have any training on
6 whether it was appropriate to talk to people if
7 they said they had an attorney?
8     A    Yeah.
9     Q    Tell me about that.
10     A    If you get a written documentation
11 stating that a person has retained an attorney,
12 you no longer can talk to the claimant.
13     Q    So why were you doing it in that
14 case?
15     A    I didn't have anything from the
16 lawyer. I didn't have a written notification
17 from the lawyer. I just had his word he was
18 going to get a lawyer.
19     Once he got a lawyer, then it got
20 so bad that my supervisor had to take over it.
21     Q    So how did you find out that that
22 was the way you were supposed to handle a case if
23 they had a lawyer was not to talk to them
24 anymore?
25     A    We were told in a staff meeting.

Page 73

1 Q        You didn't have a special training
2 session on it. It was told at a staff meeting?
3 A        Right.
4 Q        Was there any other special
5 instructions given to you if there was a lawyer
6 involved at staff meetings?
7 A        Any time you got a lawyer you have
8 to show it to your supervisor or VP.
9 Q        Okay.
10 A        You have to take the file in there
11 and they review it and look at it just like that
12 letter that you wanted me to get for you. I
13 didn't know. I couldn't find it the other day.
14 I called and asked her to send me another copy of
15 it. I knew by then, you know, she don't know
16 I've got an attorney. She said I'll be more than
17 glad and then I found it.
18 Q        Okay.
19 A        Once they know that I've got an
20 attorney, they're not going to talk to me
21 anymore.
22 Q        Okay. What other instructions did
23 they tell you at the staff meetings about what to
24 do if there is an attorney involved? Anything
25 else?

Page 74

1 A        That's it.
2 Q        Now, when you went and had the
3 file reviewed because an attorney was involved,
4 what kind of stuff did you guys do at that point
5 when they looked at the file?
6 A        Usually the file was taken away
7 from us and the supervisor handled it or a
8 coordinator.
9 Q        Okay.
10 A        You didn't have too many of them
11 in the STD department, but you did in the SHU
12 department.
13 Q        Okay. Is that when somebody was
14 getting terminated in the SHU department?
15 A        Yeah.
16 Q        When you were in the SHU
17 department did you have access to talk to
18 doctors?
19 A        Huh-uh.
20 Q        No?
21 A        No.
22 Q        When somebody's claim was one that
23 should be terminated for medical reasons, how did
24 you figure that out?
25 A        Most of them went through the

1 duration of age 65.
2 Q        Okay. Because they had already
3 been put in the SHU unit?
4 A        Right.
5 Q        You said some people got lawyers
6 because they got terminated.
7 A        That was on psych claims. On
8 psych claims it's a two-year duration and they
9 would terminate them after two years and they
10 would have a physical disability that made them
11 go to a psychiatrist and those would get a lawyer
12 and those were the ones that was appealed.
13 Q        Okay. Did you have access to take
14 it to a doctor who could assess whether or not
15 they had physical disabilities?
16 A        I took it to my supervisor and my
17 supervisor if she needed a doctor, she would go
18 talk to one and come back and give me an answer
19 to pay it or we're going to stand by our
20 decision.
21 Q        Okay. Did you have access to a
22 nurse before you talked to your supervisor?
23 A        Not in the SHU unit.
24 Q        Okay. Were you ever told anything
25 as far as a policy of when to determine if

1 something was a mental case or a physical case?
2 In other words, how to know which one of these
3 people should be stopped for mental, how was that
4 determined?
5 A        Well, from what I seen when I was
6 working the SHU unit there was a lot of them that
7 I brought to management and told them, you know.
8 Q        Who had decided it should be paid
9 only on the mental is what I'm asking.
10 A        Under mental, the specialist.
11 Q        Who had it first?
12 A        Uh-huh.
13 Q        And they would send it to you to
14 finish paying the two years?
15 A        Uh-huh.
16 Q        Say yes or no.
17 A        Yes.
18 Q        Okay.
19 A        But there was a lot of the psych
20 claims I got to where when they would send me a
21 psych claim I went through it from front to
22 bottom because there was too many coming through
23 that there was -- they were really physically
24 sick. It needed more handling than what they
25 handled. We would send it back.

Sworn Statement of Donna Wright                    CondenseIt!™                                    Taken on 8

**Page 77**

1 Q        What kind of training did you get
2 as far as how to tell if there was enough mental
3 involvement where they could do that under mental
4 versus physical?
5 A        None.
6 Q        No training?
7 A        No.
8 Q        How did you figure out it was
9 okay?
10 A        It don't take a whole lot of
11 common sense to look down and see if they have
12 rheumatoid arthritis and they're going to a
13 neurologist and everything or they have cancer
14 or, you know, AIDS or something like that. They
15 were basically looking at it the shortest way
16 they could get out of paying a claim, whether
17 it's seeing a psychiatrist and depressed we're
18 going to pay it under mental and there was a lot
19 of them paid that way.
20 Q        Okay.
21 A        There was a lot of them that my
22 supervisor overrode and told me to pay it for
23 physical.
24 Q        What would happen to those people
25 if you had not taken them to your supervisor?

**Page 78**

1 A        They would have went back and paid
2 to the two-year duration and maxed them out.
3 Q        Were there other people in your
4 unit doing the same thing, taking files to the
5 supervisor?
6 A        Yeah, just on the Paul Revere
7 business, not on any of the Provident business.
8 Q        Okay.
9 A        I don't know if everybody, you
10 know, works the way I do reviewing the files when
11 they get them.
12 Q        Do you know whether or not people
13 like either Kim Porter or Kim Beckett or
14 employees of UnumProvident or Paul Revere or
15 what, do you have any way of knowing that when
16 you're working for them?
17 A        Where they work from?
18 Q        Yeah. For example, Ms. Porter,
19 does she only do Paul Revere cases?
20 A        No. She does everything.
21 Q        She supervises people working on
22 Paul Revere, Unum and Provident cases?
23 A        Yes. So does Kim Beckett.
24 Q        And Kim Beckett was supervising
25 all those people, too?

1 A        Uh-huh.
2 Q        If you just looked at somebody
3 over there that was a supervisor or one of the
4 other people that was at the same level as you,
5 could you tell whether or not they were just
6 handling either Paul Revere or Unum or Providen
7 or Standard?
8 A        Yes.
9 Q        How could you tell if they were
10 just handling that one area of business?
11 A        You can tell by their folders.
12 Q        By their folders?
13 A        Uh-huh. Each business has a
14 different color folder, binder thing, that it
15 comes in.
16 Q        Okay.
17 A        When you first get it.
18 Q        Do they look the same except for
19 different color?
20 A        Yeah.
21 Q        Okay. Were there people that
22 worked on more than one company's files?
23 A        Yes.
24 Q        They were doing the same job but
25 doing it for either Unum or Provident?

1 A        Right.
2 Q        How would -- what is the best way
3 to ask this? If you just went to a staff meeting
4 where the supervisor was telling you what to do,
5 some of the stuff you've already talked about,
6 what to print off the computer and what not to,
7 would they just tell the people in Paul Revere
8 files to come in or everybody?
9 A        Everybody.
10 Q        Did management treat people any
11 different depending on what company's files they
12 were working on?
13 A        Not that I noticed.
14 Q        Okay. What were you told as far
15 as the fact that Provident, Unum Life, Paul
16 Revere are separate insurance companies? How
17 were you told to address that separate from
18 UnumProvident?
19 A        We really -- they never really
20 discussed that, you know. The people that was on
21 the Paul Revere business would still get checks
22 that says Paul Revere.
23 Q        The people who worked for Paul
24 Revere originally?
25 A        People that has claims on Paul

Sworn Statement of Donna Wright                CondenseIt!™                                    Taken on 8,

Page 81

```
 1   Revere.
 2   Q        The insured people, disabled,
 3   their checks still say Paul Revere?
 4   A        Right.
 5   Q        The employees working on the
 6   files --
 7   A        They're UnumProvident employees
 8   now.
 9   Q        And another thing I want to ask
10   you about is when you had a file, for example
11   when you were working in the SHU unit, did you
12   know how much the benefits each person was
13   getting paid were?
14   A        Yeah.
15   Q        How did you know that?
16   A        The system would tell us.
17   Q        What information would the system
18   tell you about what they would be getting paid?
19   A        The system would be set up to pay.
20   Q        Would that be done by the LTD
21   specialist who decided it had to be paid before
22   they moved it to the SHU unit?
23   A        Yes.
24   Q        What information would it say
25   about the financial part of the case?  What kind
```

Page 82

```
 1   of information could you find out from the
 2   system?
 3   A        You could get the duration of the
 4   claim.
 5   Q        Is that the duration based on up
 6   to the policy limits of the duration or the
 7   duration based on the MDA book?
 8   A        Both.
 9   Q        There is two separate places?
10   A        Well, no.  I mean, they're going
11   to decide, make their decision from the MDA
12   guidelines.
13   Q        Of the duration of the claim.
14   A        Duration of the claim.  It didn't
15   come to SHU unless it's going to the duration.
16   Q        Unless the MDA matches up with
17   the --
18   A        Right.
19   Q        If it matches up with the duration
20   of the actual policy?
21   A        Right.
22   Q        So somebody who has something that
23   the MDA guidelines say they should be better
24   before age 65, what duration is on the computer?
25   A        Well, they're still going to have
```

Page

```
 1   the maximum benefit, but you could terminate the
 2   claim any time you want to.
 3   Q        What information is on the
 4   computer?  Does it show the MDA duration on the
 5   computer?
 6   A        No.  You have to look at the book.
 7   Q        The duration on the computer is
 8   the one for the policy?
 9   A        It's one from the MDA guidelines.
10   Q        It is from the MDA guidelines?
11   A        Yeah, out of the book.
12   Q        You're confusing me.
13   A        The MDA guidelines they look at.
14   Q        The claim handler?
15   A        Yes.
16   Q        Do they put that information on
17   the computer?
18   A        No.
19   Q        Okay.
20   A        They just have it.  They have it
21   in front of them.  They're managing this claim.
22   A lot of people don't go through the duration.
23   Some people that's workaholics go back to work
24   way before the duration.  I never seen a claim in
25   the SHU unit that was not expected to go through
```

Page

```
 1   the max benefit date until they're age 65.
 2   Q        Based on the MDA duration?
 3   A        Right.  But you can't see the MDA
 4   duration on the system.  It's not on there unless
 5   they put it on there in the last year.
 6   Q        If that's not on the system and
 7   somebody has a file that has a shorter MDA
 8   duration, how do they know when it's time to
 9   review the file?
10   A        It never hit SHU.
11   Q        I got you.  The other information
12   that would be on there would be what as far as
13   financial information?  Would it show the monthly
14   benefit?
15   A        Monthly benefit.
16   Q        Would it show the amount before
17   and after Social Security?
18   A        Yes, even retirement.  That's an
19   offset.
20   Q        Okay.
21   A        It would show that.  It would show
22   the reserves on the claim.  It would show the
23   maximum benefit date when the claim actually
24   started, the diagnosis.  That's basically it,
25   life waiver.
```

Hall & Associates - Janet B. Thacker, CCR                    000103          Page 81 - Page 84

Page 85

```
 1 Q        What is the life waiver?
 2 A        Your insurance.  If you have life
 3 insurance with Provident then your premiums are
 4 waived.
 5 Q        While you're getting your
 6 disability?
 7 A        Yes.
 8 Q        Did you ever see one where if you
 9 looked it up on the screen that it did not have
10 the reserves on there or were they always on
11 there?
12 A        They were always on there.
13 Q        From your personal knowledge did
14 you ever see or hear about from a reliable source
15 any information about whether or not people were
16 being encouraged to terminate benefits for people
17 or to not pay benefits?
18 A        No, not to my knowledge.  I mean,
19 I've heard them arguing about worker's comp stuff
20 but, no.
21 Q        Have you heard any stories or
22 talked to anybody about any times when any of the
23 LTD specialists or anybody else like that were
24 supposed to try to stop paying claims to save
25 money?  Has that ever come up?
```

```
 1 would terminate benefits.  If they was not seeing
 2 that psychiatrist on a regular basis, they would
 3 terminate benefits when actually the claim should
 4 have been paid under physical because what was
 5 wrong with them mentally is what was wrong wit
 6 them physically making them have mental proble
 7 Q        Okay.
 8 A        Do you understand what I said?
 9 Q        I do understand what you're
10 saying.  How do you know why they did that?
11 A        Because that would save them
12 money.
13 Q        Did you ever hear anybody say
14 that's why they were doing it?
15 A        No.
16 Q        Did you -- what makes you think
17 that then?
18 A        Because it was a big thing that
19 they needed to save money, you know, to get the
20 stock back up and everything else.
21 Q        Tell me about that.  Tell me what
22 you heard along those lines.
23 A        The good bottom line is when they
24 merged with Unum things changed.
25 Q        Okay.  Where did you hear this
```

Page 86

```
 1 A        Any way they could save money,
 2 they're going to save money.
 3 Q        How do you know that?
 4 A        Well, for instance, I'll use
 5 myself as an example.
 6 Q        Okay.
 7 A        They don't want to pay me to age
 8 70.  That's what the duration is now is age 70.
 9 And I went out on irritable bowel syndrome, GERD,
10 hiatal hernia, diverticulitis, which is all
11 physical.
12 Q        I need you to talk about when you
13 were working there.
14 A        This is when I was working there.
15 Q        Okay.  When you were working there
16 and the way you saw them handle claims, tell me
17 about what they were told and what people were
18 told as far as how they were supposed to do that
19 stuff.
20 A        If it was -- if they went and seen
21 a psychiatrist and depression on there, you got
22 paid under psych.  I don't care what else was
23 wrong with you, you're automatically on a psych
24 claim.  Then they would send out follow ups and
25 if they quit seeing the psychiatrist, then they
```

```
 1 idea from that they needed to save money to bring
 2 the stock back up?  Who told you that?
 3 A        Kim Beckett.
 4 Q        Was this at a staff meeting or
 5 one-on-one?
 6 A        One-on-one.
 7 Q        Tell me specifically what she
 8 said, if you can remember it.
 9 A        Well, she just said, you know, we
10 need to watch supplies and stuff like that, don't
11 be using -- they put a key, a lock and key on the
12 supply cabinet, you know, where you can't use
13 it.  They got little shredder boxes that you had
14 to empty every day.  If they come by and found
15 you didn't empty your thing, you were in trouble
16 for that because of Social Security numbers.
17 Q        You're talking about papers that
18 were supposed to go to the shredder?
19 A        Yes.
20 Q        What else did Kim say?
21 A        They said we don't want to pay any
22 claims longer than the duration, you know.
23 Q        Longer than what duration?
24 A        MDA guidelines duration.  We
25 needed to save money.
```

Sworn Statement of Donna Wright                CondenseIt! ™                                      Taken on 8

**Page 89**

1 Q    Who did she tell that to?
2 A    All of us.
3 Q    Was that at a staff meeting?
4 A    Uh-huh.
5 Q    Be specific with me on that.
6 A    Yes.
7 Q    Do you remember about when that
8 was?
9 A    It's been a long time ago.
10 Q   Was this still when you were in
11 the SHU unit?
12 A   No. It's been since I've been in
13 STD.
14 Q   Okay. And she said -- tell me as
15 best you can exactly what she said.
16 A   I can't tell you exactly what she
17 said, but bottom line is we need to process our
18 claims in three days.
19 Q   Tell me what she said about the
20 MDA duration again.
21 A   You look up the MDA guidelines.
22 You're supposed to on every case look up the MDA
23 guidelines for that duration.
24 Q   Okay.
25 A   And only pay it through that

1 A    No.
2 Q    It was okay to do that?
3 A    Yes.
4 Q    Okay. Now, you worked first in
5 the SHU claims and then in the short-term
6 disability claims. You never worked with the
7 long-term disability claims that were not already
8 in SHU, if I understand what you're telling me,
9 right?
10 A   Right.
11 Q   Okay. So if somebody's case was
12 at the beginning of the long-term disability when
13 they were trying to decide what the duration was
14 or what they were going to be paid under SHU or
15 whatever, you didn't actually work in that area.
16 A   Right.
17 Q   Okay. From working in the SHU
18 area, what did you see in the files that let you
19 know how they determined that it was going to be
20 a case that was going to be moved to SHU versus
21 not being moved to SHU?
22 A   Well, when we first got the files
23 I didn't know. I just had to take their word for
24 it. You can't look through 3,000 claims and
25 review every one of them, but if they called and

**Page 90**

1 duration. If it goes past that duration, you
2 send that claim somewhere else for somebody else
3 to handle it. That way it covers her and me
4 because they need meds after that duration.
5 Q    Okay.
6 A    We weren't allowed to order meds.
7 Q    So where did it go after that?
8 A    They went to another unit.
9 Q    Do you know where?
10 A   Yeah, up the hill.
11 Q   What is the name of the unit?
12 A   It don't have a name.
13 Q   What does it do?
14 A   It's just like my unit didn't have
15 a name. We were just short-term disability. It
16 goes to short-term disability unit, but they're
17 specialists. They're not representatives.
18 They're specialists.
19 Q   Okay.
20 A   I'm a representative. So I don't
21 have to order meds.
22 Q   Did you or anybody else feel any
23 pressure to not send files on to that other unit
24 if they were going to be paid past the MDA
25 duration?

1 had a question on it, then, you know, you would
2 get kind of interested in that claim and you
3 would look through it, you know, to see exactly
4 what is wrong with the person. Usually that's
5 where they should have been was SHU. They should
6 have been paid through the duration because most
7 of them died before they even got the duration.
8          The only problem I ever seen in
9 SHU was the psych claims. They were sending
10 psych claims down there left and right that they
11 said was psych claims that weren't psych claims.
12 They were medical. I couldn't live with myself
13 and pay them claims under psych without, you
14 know. So I took it to upper mangement and I
15 said, look, this lady has Crohn's disease, she is
16 not mentally. She wouldn't have mentally if she
17 didn't have Crohn's.
18          That was the biggest problem I
19 seen on anything that was sent to SHU was you
20 better look over your psych claims. If they were
21 schizophrenic and everything else and nothing
22 physically wrong, that's two different stories.
23 Q   You said you had about 3,000 files
24 in the SHU claims that you were responsible for.
25 A   Yeah.

Hall & Associates - Janet B. Thacker, CCR

Sworn Statement of Donna Wright          CondenseIt! ™                              Taken on 8.

Page 93

1 Q      Do you remember about what
2 percentage of them were psych claims?
3 A      About a third.
4 Q      Okay.  I think that's a good
5 stopping point unless there is something else you
6 want to tell me about what you did over there.
7 A      No.
8       MR. BUCHANAN:  Thank you.
9       (End of proceedings.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 94

1       REPORTER'S CERTIFICATE
2
3 STATE OF TENNESSEE   )
4 COUNTY OF HAMILTON   )
5
6       I, Janet B. Thacker, the officer
 before whom the foregoing sworn statement was
 taken, do hereby certify that the witness whose
7 testimony appears in the foregoing sworn
 statement was duly sworn by me;
8
       That the testimony of said witness
9 was taken by me in machine shorthand and
 thereafter reduced to typewriting; that the said
10 sworn statement is a true record of testimony
 given by said witness;
11
       That I am neither counsel for,
12 related to, nor employed by any of the parties to
 the action in which this sworn statement was
13 taken, and further that I am not a relative or
 employee of any attorney or counsel employed by
14 the parties hereto, nor financially or otherwise
 interested in the outcome of the action;
15
       That the said sworn statement has
16 in no manner been changed or altered since same
 was given by said witness, but that the same has
17 remained in my possession up to the time of
 delivery.
18
       In witness whereof, I have
19 hereunto set my hand this 4th day of September,
 2001.
20
21
22       JANET B. THACKER, Notary Public
23       in and for the State of
        Tennessee at Large.
24       My commission expires
        January 10, 2004
25

Hall & Associates - Janet B. Thacker, CCR                    000106          Page 93 - Page 94

Sworn Statement of Donna Wright          CondenseIt!™

$1,500 -
Taken on 8,

**-S-**

| | |
|---|---|
| $1,500 [1] | 58:17 |
| $500 [1] | 58:14 |

**-'-**

| | | |
|---|---|---|
| '01 [4] | 25:21 | 25:25 |
| 26:4 | 52:24 | |
| '98 [2] | 2:14 | 2:21 |
| 3:1 | 3:1 | 3:5 |
| 7:15 | 48:22 | 52:19 |
| '99 [1] | 48:22 | |

**-1-**

| | | |
|---|---|---|
| 10 [2] | 25:21 | 94:24 |
| 10/2001 [1] | | 2:24 |
| 100 [1] | 44:10 | |
| 1010 [1] 1:24 | | |
| 12 [4] | 63:6 | 63:22 |
| 63:23 | 64:4 | |
| 180 [2] | 30:22 | 31:2 |

**-2-**

| | | |
|---|---|---|
| 2000 [2] | 16:25 | 48:22 |
| 2001 [2] 50:6 | | 52:1 |
| 2003 [2] 1:6 | | 94:19 |
| 2004 [1] 94:24 | | |
| 21st [1] 1:6 | | |
| 24 [1] | 20:17 | |

**-3-**

| | | |
|---|---|---|
| 3,000 [3] | | 11:20 |
| 91:24 | 92:23 | |
| 300 [1] | 8:8 | |
| 36 [1] | 20:17 | |
| 37402 [2] | | 1:12 |
| 1:25 | | |

**-4-**

| | | |
|---|---|---|
| 40 [1] | 22:19 | |
| 402 [1] | 1:24 | |
| 404 [1] | 1:11 | |
| 4th [1] | 94:19 | |

**-5-**

| | |
|---|---|
| 50 [1] | 15:17 |

**-6-**

| | | |
|---|---|---|
| 65 [11] | 8:5 | 11:17 |
| 15:9 | 17:5 | 17:6 |
| 17:7 | 22:20 | 22:21 |
| 23:2 | 61:11 | 75:1 |
| 82:24 | 84:1 | |

**-7-**

| | | |
|---|---|---|
| 70 [2] | 86:8 | 86:3 |

**-8-**

| | |
|---|---|
| 8 [1] | 16:25 |

**-A-**

| | | |
|---|---|---|
| abide [1] | | 42:15 |
| able [2] | 23.6 | 62:13 |
| above [1] | | 62:4 |
| access [6] | | 64:15 |
| 65:6 | 67:1 | 74:17 |
| 73:13 | 75:21 | |
| according [4] | | 21:1 |
| 30:20 | 60:6 | 66:10 |
| action [2] | | 94:12 |
| 94:14 | | |
| actual [5] | | 31:5 |
| 31:11 | 31:12 | 56:19 |
| 82:20 | | |
| added [1] | | 37:22 |
| address [2] | | 39:14 |
| 80:17 | | |
| adequate [1] | | 55:3 |
| adjuster [1] | | 60:15 |
| advice [1] | | 36:22 |
| again [3] | | 3:14 |
| 3:15 | 89:20 | |
| age [12] | 8:5 | 11:17 |
| 15:9 | 17:5 | 22:21 |
| 23:2 | 61:11 | 75:1 |
| 82:24 | 84:1 | 86:7 |
| 86:8 | | |
| ago [5] | 6:20 | 13:20 |
| 29:23 | 65:20 | 89:9 |
| ahead [2] | | 2:11 |
| 18:11 | 66:6 | |
| AIDS [1] | | 37:13 |
| 77:14 | | |
| allowed [2] | | 26:6 |
| 90:6 | | |
| along [3] | | 56:2 |
| 57:15 | 87:22 | |
| altered [1] | | 94:12 |
| always [6] | | 24:6 |
| 24:13 | 47:15 | 47:15 |
| 85:10 | 85:12 | |
| amount [5] | | 30:19 |
| 39:16 | 58:19 | 71:20 |
| 84:16 | | |
| answer [6] | | 3:20 |
| 4:10 | 34:25 | 43:6 |
| 43:9 | 75:18 | |
| answered [2] | | 4:5 |
| 9:11 | | |
| answering [2] | | 3:24 |
| 4:3 | | |
| answers [1] | | 51:17 |
| apart [1] 66:18 | | |
| appeal [4] | | 32:8 |
| 32:10 | 36:19 | 59:17 |
| appealed [1] | | 75:12 |
| appeals [1] | | 3:22 |
| 36:15 | | |

| | | |
|---|---|---|
| applications [1] | | |
| 36:16 | | |
| applied [1] | | 55:20 |
| appropriate [4] | 4:21 | |
| 10:17 | 66:5 | 72:6 |
| approval [1] | | 47:17 |
| area [3] | 79:10 | 91:15 |
| 91:18 | | |
| areas [1] 61:15 | | |
| arguing [1] | | 85:19 |
| arthritis [1] | | 77:12 |
| assess [1] | | 75:14 |
| assigned [1] | | 4:14 |
| ASSOCIATES [1] | | |
| 1:24 | | |
| assume [1] | | 46:12 |
| assuming [1] | | 42:19 |
| attack [1] | | 64:25 |
| attention [1] | | 10:6 |
| 10:10 | | |
| attorney [10] | | 71:24 |
| 71:25 | 72:3 | 72:7 |
| 72:11 | 73:16 | 73:20 |
| 73:24 | 74:3 | 94:13 |
| audit [5] 38:24 | | 39:3 |
| 39:8 | 39:13 | 39:19 |
| auditor [1] | | 38:24 |
| audits [2] | | 3:21 |
| 39:6 | | |
| August [1] | | 1:6 |
| authority [1] | | 10:22 |
| 10:24 | 13:7 | 26:22 |
| automatically [1] | | |
| 86:23 | | |
| available [1] | | 27:2 |
| 27:5 | 32:18 | |
| Avenue [2] | | 1:7 |
| 1:11 | | |
| award [1] | | 71:8 |
| away [1] 74:6 | | |

**-B-**

| | | |
|---|---|---|
| B [4] | 1:8 | 1:23 |
| 94:5 | 94:22 | |
| background [1] 17:3 | | |
| backup [1] | | 44:1 |
| 47:20 | | |
| bad [1] | 72:20 | |
| balance [1] | | 51:13 |
| base [2] 66:11 | | 66:13 |
| based [1] | | 69:1 |
| 82:5 | 82:7 | 84:2 |
| basic [2] 9:7 | | 17:2 |
| basics [1] | | 27:1 |
| basis [2] 4:18 | | 87:2 |
| became [2] | | 50:12 |
| 57:16 | | |
| Beckett [10] | | 34:15 |
| 35:12 | 35:18 | 41:20 |
| 67:22 | 68:12 | 78:13 |
| 78:23 | 78:24 | 88:3 |

| | | |
|---|---|---|
| Becky [1] | | 64:2 |
| become [2] | | 51:9 |
| 62:7 | | |
| becoming [1] | | 53:3 |
| begin [1] | | 15:25 |
| 23:9 | 35:13 | 40:21 |
| beginning [4] | | 20:6 |
| 20:8 | 55:13 | 91:12 |
| Belinda [3] | | 45:14 |
| 46:24 | | |
| benefit [16] | | 8:4 |
| 15:8 | 17:1 | 37:8 |
| 42:2 | 42:6 | 52:3 |
| 54:23 | 54:24 | 58:14 |
| 61:18 | 83:1 | 84:1 |
| 84:14 | 84:15 | 84:23 |
| benefits [18] | | 9:9 |
| 10:7 | 10:23 | 10:25 |
| 11:2 | 11:14 | 11:15 |
| 13:8 | 16:20 | 18:20 |
| 19:7 | 62:22 | 71:10 |
| 81:12 | 85:16 | 85:17 |
| 87:1 | 87:3 | |
| beside [1] | | 69:9 |
| best [2] 80:2 | | 89:15 |
| better [4] | | 13:3 |
| 64:6 | 82:23 | 92:20 |
| between [1] | | 20:9 |
| 55:16 | 57:2 | 57:17 |
| 60:17 | | |
| big [2] | 41:7 | 48:2 |
| 56:1 | 66:19 | 87:18 |
| biggest [1] | | 40:8 |
| binder [1] | | 79:14 |
| birthday [2] | | 15:19 |
| 16:1 | | |
| bit [2] | 22:4 | 66:2 |
| blank [1] | | 25:11 |
| book [16] | | 42:12 |
| 42:13 | 65:12 | 66:1 |
| 66:3 | 66:12 | 66:14 |
| 66:15 | 66:16 | 66:19 |
| 66:24 | 67:4 | 83:11 |
| 82:7 | 83:6 | |
| bottom [3] | | 32:7 |
| 32:25 | 76:22 | 87:23 |
| 89:17 | | |
| bought [3] | | 7:5 |
| 21:5 | 57:23 | |
| bound [1] | | 66:15 |
| bowel [1] | | 86:9 |
| boxes [1] | | 88:13 |
| break [1] | | 60:17 |
| bring [2] | | 10:9 |
| 88:1 | | |
| brought [5] | | 10:5 |
| 40:16 | 41:6 | 46:2 |
| 76:7 | | |
| Buchanan [4] | | 1:7 |
| 1:11 | 2:5 | 93:8 |
| bunch [1] | | 44:8 |
| business [16] | | 4:6 |
| 5:13 | 6:12 | 6:17 |
| 12:14 | 17:13 | 51:3 |

**-C-**

| | |
|---|---|
| cabinet [1] | 88 |
| cain [1] 37:19 | |
| calls [1] 69:12 | |
| cancer [5] | 23 |
| 24:5 | 60:7 | 60. |
| 77:13 | |
| cannot [1] | 30: |
| care [9] 1:6 | 3:1 |
| 7:15 | 22:8 | 62: |
| 62:5 | 62:7 | 62: |
| 86:22 | |
| case [15] 9:22 | 14: |
| 14:23 | 16:8 | 22:1 |
| 23:7 | 67:15 | 72:1 |
| 72:22 | 76:1 | 76:1 |
| 81:25 | 89:22 | 91:1 |
| 91:20 | |
| cases [1] | 4:4 |
| 9:24 | 9:25 | 10:1 |
| 10:18 | 13:15 | 22:1 |
| 23:20 | 24:8 | 44:1 |
| 59:12 | 61:1 | 64:4 |
| 64:8 | 73:19 | 78:2 |
| catch [2] | 38:25 |
| 39:19 | |
| caught [3] | 17:12 |
| 40:8 | 40:9 | |
| certain [12] | 16:17 |
| 18:5 | 22:17 | 30:18 |
| 30:19 | 36:15 | 36:16 |
| 32:7 | 61:2 | 61:9 |
| 63:9 | 65:15 | |
| CERTIFICATE [1] | |
| 94:1 | |
| CERTIFIED [1] | |
| 1:23 | |
| certify [1] | 94:6 |
| change [6] | 12:25 |
| 24:7 | 57:3 | 57:8 |
| 57:24 | 58:9 | |
| changed [4] | 49:6 |
| 57:1 | 57:17 | 58:8 |
| 87:24 | 94:16 | |
| changing [1] | 57:22 |
| Chattanooga [3] | |
| 1:12 | 1:25 | 49:12 |
| 55:12 | |
| check [7] | 6:21 |
| 6:22 | 7:3 | 16:8 |
| 16:10 | 54:22 | 56:25 |
| checked [1] | 39:13 |
| checks [2] | 39:1 |
| 80:21 | 81:3 | |
| chosen [2] | 6:16 |
| 6:17 | |
| circle [1] | 46:16 |
| claim [104] | 7:22 |
| 14:14 | 12:1 | 12:5 |
| 13:22 | 13:19 | 13:22 |
| 14:5 | 14:9 | 14:12 |

| 15:12 | 15:24 | 16:17 |
| 16:18 | 16:21 | 21:8 |
| 21:13 | 21:19 | 21:25 |
| 23:13 | 26:21 | 27:21 |
| 27:22 | 29:13 | 30:19 |
| 30:21 | 30:22 | 31:1 |
| 31:2 | 31:3 | 32:13 |
| 33:8 | 33:17 | 33:24 |
| 34:12 | 34:24 | 35:2 |
| 37:1 | 37:1 | 37:2 |
| 37:6 | 37:9 | 37:12 |
| 37:25 | 38:11 | 38:11 |
| 38:13 | 38:18 | 38:25 |
| 39:17 | 41:2 | 41:17 |
| 42:8 | 45:3 | 43:7 |
| 43:10 | 43:19 | 44:23 |
| 45:1 | 45:3 | 45:4 |
| 45:7 | 45:18 | 46:3 |
| 46:6 | 46:7 | 47:13 |
| 47:15 | 47:17 | 47:18 |
| 48:1 | 50:11 | 50:17 |
| 53:25 | 54:13 | 56:6 |
| 56:14 | 60:8 | 60:15 |
| 62:25 | 63:2 | 63:10 |
| 63:19 | 64:19 | 64:23 |
| 67:12 | 70:6 | 71:9 |
| 74:22 | 76:21 | 77:16 |
| 82:4 | 82:13 | 82:14 |
| 83:2 | 83:14 | 83:21 |
| 83:24 | 84:22 | 84:23 |
| 86:24 | 87:3 | 90:2 |
| 92:2 | | |
| **claimant** [2] | | 32:9 |
| 72:12 | | |
| **claimants** [1] | | 3:25 |
| **claims** [102] | | 2:7 |
| 4:19 | 4:25 | 5:3 |
| 5:8 | 5:25 | 6:2 |
| 6:3 | 6:5 | 6:6 |
| 6:9 | 6:9 | 6:10 |
| 6:10 | 6:16 | 6:18 |
| 7:10 | 7:11 | 7:16 |
| 7:17 | 7:23 | 8:2 |
| 8:6 | 8:7 | 8:7 |
| 8:19 | 10:3 | 10:3 |
| 11:16 | 11:20 | 11:23 |
| 13:2 | 17:17 | 18:16 |
| 22:4 | 22:5 | 23:18 |
| 23:25 | 24:3 | 25:15 |
| 27:7 | 27:13 | 27:16 |
| 28:17 | 30:18 | 32:15 |
| 33:16 | 34:22 | 36:1 |
| 37:10 | 39:4 | 39:8 |
| 39:12 | 41:15 | 42:25 |
| 46:9 | 48:15 | 48:17 |
| 49:13 | 49:15 | 49:16 |
| 57:2 | 59:20 | 59:23 |
| 60:3 | 61:1 | 61:5 |
| 61:16 | 61:17 | 62:14 |
| 62:16 | 62:20 | 63:10 |
| 63:11 | 63:16 | 63:22 |
| 63:24 | 65:9 | 66:12 |
| 67:7 | 68:2 | 71:7 |
| 75:7 | 75:8 | 76:20 |
| 80:25 | 85:24 | 86:16 |
| 88:22 | 89:18 | 91:5 |
| 91:6 | 91:7 | 91:24 |
| 92:9 | 92:10 | 92:11 |
| 92:11 | 92:13 | 92:20 |
| 92:24 | 93:2 | |
| **class** [2] 14:11 | | 25:1 |

| **classes** [1] | | 25:4 |
| **clients** [1] | | 69:13 |
| **color** [1] 79:14 | | 79:19 |
| **combined** [1] | | 50:10 |
| **coming** [2] | | 35:16 |
| 76:22 | | |
| **commission** [1] | 94:24 | |
| **common** [1] | | 77:11 |
| **comp** [1] | | 85:19 |
| **companies** [2] | | 52:7 |
| 80:16 | | |
| **company** [14] | | 6:20 |
| 8:1 | 12:10 | 18:1 |
| 20:14 | 21:5 | 50:16 |
| 55:19 | 55:21 | 55:24 |
| 56:1 | 56:3 | 56:12 |
| 56:13 | | |
| **company's** [1] | 79:22 | |
| 80:11 | | |
| **complained** [1] 24:2 | | |
| **completed** [1] | 29:6 | |
| **complex** [1] | 66:3 | |
| **complicated** [1] | | |
| 64:4 | | |
| **computer** [37] | 8:22 | |
| 8:25 | 9:2 | 15:19 |
| 16:2 | 24:23 | 27:3 |
| 27:4 | 27:5 | 27:8 |
| 27:25 | 30:7 | 30:10 |
| 30:14 | 30:17 | 32:18 |
| 33:6 | 33:15 | 33:20 |
| 35:23 | 35:24 | 36:3 |
| 36:7 | 38:2 | 39:20 |
| 43:21 | 43:23 | 43:25 |
| 51:2 | 53:17 | 67:12 |
| 80:6 | 82:24 | 83:4 |
| 83:5 | 83:7 | 83:17 |
| **conditions** [2] | 36:23 | |
| 61:10 | | |
| **confidentiality** [1] | | |
| 6:14 | | |
| **confusing** [2] | 42:7 | |
| 83:12 | | |
| **considered** [2] | 6:7 | |
| 63:2 | | |
| **consist** [1] | 9:3 | |
| **contract** [5] | 54:20 | |
| 55:7 | 55:13 | 56:19 |
| 56:22 | | |
| **contracts** [2] | 55:15 | |
| 55:16 | | |
| **coordinator** [4] 47:16 | | |
| 48:7 | 68:20 | 74:8 |
| **copies** [3] | | 18:2 |
| 55:13 | 56:23 | |
| **copy** [25] | | 12:3 |
| 16:7 | 17:20 | 29:9 |
| 29:11 | 29:14 | 29:15 |
| 29:19 | 30:7 | 31:4 |
| 31:5 | 31:11 | 53:25 |
| 54:4 | 54:19 | 55:7 |
| 56:3 | 56:5 | 56:18 |
| 56:21 | 56:22 | 58:21 |
| 68:19 | 69:4 | 73:14 |
| **correct** [1] | | 5:1 |

| 7:13 | 15:1 | 23:4 |
| 23:11 | 27:14 | 33:13 |
| 33:21 | 39:15 | 39:15 |
| 60:1 | | |
| **correctly** [1] | | 51:23 |
| **counsel** [2] | | 94:11 |
| 94:13 | | |
| **COUNTY** [1] | 94:4 | |
| **couple** [5] | | 8:15 |
| 18:21 | 25:19 | 38:9 |
| 40:24 | | |
| **course** [1] | | 9:7 |
| **court** [4] 1:8 | | 1:23 |
| 41:6 | 41:11 | |
| **cover** [1] | | 8:16 |
| 47:8 | 47:12 | |
| **covered** [1] | | 4:10 |
| 59:12 | 59:13 | |
| **covers** [1] | | 90:3 |
| **crash** [1] | | 9:7 |
| **criteria** [1] | | 11:1 |
| 14:4 | 14:8 | |
| **Crohn's** [2] | | 92:15 |
| 92:17 | | |
| **customer** [9] | | 3:6 |
| 3:16 | 6:7 | 7:15 |
| 22:8 | 62:2 | 62:5 |
| 62:7 | 71:8 | |
| **customers** [1] | 4:2 | |
| 4:4 | 69:13 | |

**-D-**

| **dah** [3] | 69:11 | 69:11 |
| 69:11 | | |
| **daily** [1] 4:18 | | |
| **date** [5] | 2:12 | 17:1 |
| 37:8 | 84:1 | 84:23 |
| **days** [7] | 8:22 | 8:25 |
| 24:24 | 30:22 | 31:2 |
| 53:12 | 89:18 | |
| **deal** [1] | 23:24 | |
| **dealing** [1] | | 12:21 |
| **decide** [2] | | 11:2 |
| 21:21 | 22:13 | 24:17 |
| 27:13 | 27:16 | 27:21 |
| 59:23 | 82:11 | 91:13 |
| **decided** [4] | | 7:23 |
| 8:2 | 76:8 | 81:21 |
| **decision** [12] | | 4:20 |
| 21:25 | 23:11 | 37:5 |
| 38:22 | 47:9 | 62:22 |
| 63:8 | 68:25 | 69:1 |
| 75:20 | 83:11 | |
| **decisions** [2] | | 62:18 |
| 66:11 | 66:24 | |
| **deducting** [1] | 71:10 | |
| **definition** [1] | | 12:8 |
| 12:11 | 13:1 | |
| **deleted** [1] | | 43:21 |
| **delivery** [1] | | 94:17 |
| **denial** [1] | | 48:10 |
| **denials** [2] | | 47:15 |
| 48:9 | | |

| **denied** [3] | | 4:22 |
| 32:9 | 47:14 | |
| **deny** [7] | 10:22 | 31:3 |
| 38:11 | 47:13 | 47:17 |
| 47:18 | 63:9 | |
| **denying** [1] | | 38:13 |
| **department** [16] | 50:16 | 50:16 |
| 70:21 | 74:11 | 74:12 |
| 74:14 | 74:17 | |
| **depend** [1] | | 65:3 |
| **depended** [1] | 64:22 | |
| **depending** [2] | 17:25 | |
| 80:11 | | |
| **depressed** [2] | | 24:4 |
| 77:17 | | |
| **depression** [1] | 86:21 | |
| **depth** [1] | | 17:3 |
| **desk** [1] | | 17:21 |
| 39:11 | 45:19 | 45:20 |
| 45:21 | 45:23 | 67:5 |
| 69:15 | 70:10 | 70:16 |
| 70:19 | | |
| **details** [1] | | 66:13 |
| **determination** [1] | | |
| 22:17 | | |
| **determine** [3] | | 9:21 |
| 67:15 | 75:25 | |
| **determined** [2] | 76:4 | |
| 91:19 | | |
| **diagnosis** [1] | 22:22 | |
| 37:16 | 37:18 | 60:4 |
| 60:7 | 64:22 | 65:3 |
| 65:10 | 65:25 | 66:9 |
| 66:22 | 84:24 | |
| **die** [2] | 23:24 | 37:14 |
| **died** [2] | 13:11 | 92:7 |
| **difference** [2] | | 22:5 |
| 58:10 | | |
| **differences** [1] | 20:9 | |
| **different** [24] | | 8:16 |
| 11:19 | 12:10 | 12:11 |
| 13:2 | 17:17 | 19:25 |
| 20:14 | 20:14 | 21:6 |
| 42:20 | 42:21 | 56:8 |
| 58:3 | 58:10 | 58:23 |
| 59:19 | 65:1 | 66:22 |
| 68:15 | 79:14 | 79:19 |
| 80:11 | 92:2 | |
| **differently** [1] | 11:24 | |
| **DIRECT** [1] | 2:4 | |
| **disabilities** [1] | 75:15 | |
| **disability** [18] | 4:8 | |
| 4:16 | 21:19 | 23:20 |
| 30:23 | 43:15 | 48:25 |
| 50:2 | 56:14 | 61:20 |
| 61:24 | 75:10 | 85:6 |
| 90:15 | 90:16 | 91:6 |
| 91:7 | 91:12 | |
| **disabled** [7] | | 12:8 |
| 12:11 | 13:13 | 23:2 |
| 57:16 | 61:11 | 81:2 |
| **discussed** [2] | 59:22 | |
| 80:20 | | |
| **disease** [1] | 92:15 | |
| **distributed** [1] | 35:20 | |

| claimant - ‹ | | |
| **diverticulitis** [1] | | |
| 86:10 | | |
| **doctor** [8] | | 1:7 |
| 13:13 | 13:14 | 63 |
| 64:14 | 64:18 | 75 |
| 75:17 | | |
| **doctor's** [2] | | 11 |
| 11:13 | | |
| **doctors** [4] | | 6:1 |
| 63:13 | 65:14 | 74: |
| **documentation** [1] | | |
| 72:10 | | |
| **documents** [6] | | 30: |
| 35:16 | 36:2 | 38: |
| 41:22 | 46:6 | |
| **dollars** [1] | | 71: |
| **done** [4] 35:23 | | 35: |
| 39:8 | 81:20 | |
| **Donna** [4] | | 1:3 |
| 1:5 | 2:1 | 2:7 |
| 51:21 | 52:15 | |
| **double** [2] | | 16:3 |
| 16:9 | 56:25 | |
| **down** [13] | | 16:4 |
| 30:2 | 32:6 | 32:2 |
| 33:10 | 46:17 | 50:5 |
| 52:11 | 63:12 | 64:1 |
| 68:22 | 77:11 | 92:1 |
| **draft** [1] 18:1 | | |
| **duly** [2] 2:2 | | 94:7 |
| **duration** [52] | | 4:19 |
| 7:24 | 22:18 | 37:7 |
| 49:25 | 60:9 | 60:23 |
| 63:17 | 65:21 | 66:5 |
| 66:5 | 66:8 | 66:9 |
| 66:12 | 67:8 | 67:10 |
| 67:10 | 67:11 | 68:22 |
| 68:14 | 68:15 | 75:1 |
| 75:8 | 78:2 | 82:1 |
| 82:5 | 82:6 | 83:7 |
| 82:13 | 82:14 | 82:15 |
| 82:19 | 82:24 | 83:4 |
| 83:7 | 83:22 | 83:24 |
| 84:2 | 84:4 | 84:8 |
| 86:8 | 88:22 | 88:23 |
| 88:24 | 89:20 | 89:23 |
| 90:1 | 90:1 | 90:4 |
| 90:25 | 91:13 | 92:6 |
| 92:7 | | |
| **durations** [2] | | 65:9 |
| 65:15 | | |
| **duties** [1] | | 3:18 |

**-E-**

| **eight** [1] 25:9 | | |
| **either** [5] | | 20:2 |
| 26:20 | 78:13 | 79:6 |
| 79:25 | | |
| **eligible** [1] | | 59:25 |
| **email** [10] | | 29:23 |
| 43:1 | 43:2 | 43:8 |
| 43:9 | 43:20 | 44:2 |
| 45:24 | 57:19 | 57:20 |
| **emails** [12] | | 35:13 |
| 41:9 | 41:14 | 41:21 |
| 41:24 | 42:17 | 42:19 |

| | | |
|---|---|---|
| 43:16 | 43:17 | 44:4 |
| 44:7 | 44:11 | |
| **employed** [2] | 94:12 | |
| 94:13 | | |
| **employee** [5] | 6:16 | |
| 7:11 | 50:12 | 58:15 |
| 94:13 | | |
| **employees** [9] | 6:13 | |
| 20:16 | 52:8 | 57:10 |
| 58:4 | 58:4 | 78:14 |
| 81:5 | 81.7 | |
| **employees'** [2] | 6:10 | |
| 6:18 | | |
| **employer** [2] | 5:2 | |
| 18:3 | | |
| **empty** [1] | 88:14 | |
| 88:15 | | |
| **encompass** [1] | 3:18 | |
| **encouraged** [1] | 85:16 | |
| **end** [7] | 11:13 | 33:9 |
| 34:11 | 34:22 | 37:14 |
| 45:24 | 93:9 | |
| **ended** | | 69:6 |
| **ending** [1] | | 33:3 |
| **ensued** [1] | | 35:17 |
| **entitled** [1] | | 10:8 |
| **Eric** [2] | 1:7 | 1:11 |
| **ERISA** [16] | | 29:10 |
| 29:11 | 29:20 | 31:18 |
| 31:21 | 31:23 | 32:1 |
| 32:6 | 32:8 | 32:10 |
| 32:12 | 36:19 | 42:21 |
| 59:5 | 59:8 | 59:12 |
| 59:13 | 59:16 | |
| **error** [3] | 9:13 | 51:19 |
| 58:24 | | |
| **especially** [1] | | 42:7 |
| **Esquire** [1] | | 1:11 |
| **everybody** [10] | 35:22 | |
| 48:12 | 52:2 | 55:12 |
| 55:20 | 67:4 | 68:1 |
| 78:9 | 80:8 | 80:9 |
| **exactly** [3] | | 89:15 |
| 89:16 | 92:3 | |
| **EXAMINATION** [1] | | |
| 2:4 | | |
| **examined** [1] | | 2:3 |
| **example** [8] | 9:5 | |
| 19:24 | 20:13 | 44:14 |
| 45:8 | 78:18 | 81:10 |
| 86:5 | | |
| **examples** [1] | | 23:17 |
| **except** [2] | | 25:13 |
| 57:4 | 79:18 | |
| **exception** [1] | | 20:1 |
| **execs** [2] | 58:3 | |
| 58:6 | | |
| **executive** [1] | | 58:22 |
| **executives** [1] | | 58:23 |
| **expected** [7] | | 60:23 |
| 61:17 | 63:16 | 65:20 |
| 68:13 | 68:14 | 83:15 |
| **expires** [1] | | 94:24 |
| **explain** [4] | | 7:25 |

| | | |
|---|---|---|
| 15:5 | 26:25 | 67:24 |
| **explained** [1] | | 9:10 |
| **extra** [1] | 52:7 | |

**-F-**

| | | |
|---|---|---|
| **faces** [1] | 47:1 | |
| **fact** [3] | 41:3 | 70:9 |
| 80:15 | | |
| **far** [2] | 10:12 | 10:14 |
| **far** [23] | 3:18 | 6:9 |
| 13:4 | 17:3 | 21:1 |
| 24:18 | 25:1 | 35:25 |
| 37:12 | 44:25 | 50:23 |
| 51:1 | 54:19 | 60:19 |
| 61:7 | 61:9 | 70:3 |
| 70:4 | 75:23 | 77:2 |
| 80:14 | 84:12 | 86:18 |
| **few** [5] | 6:8 | 13:20 |
| 29:23 | 65:20 | 70:6 |
| **figure** [4] | | 19:19 |
| 31:16 | 74:24 | 77:8 |
| **figured** [1] | | 19:14 |
| **file** [49] | 12:8 | 12:8 |
| 16:8 | 16:12 | 30:19 |
| 30:23 | 33:4 | 34:22 |
| 35:2 | 37:12 | 38:21 |
| 38:22 | 38:25 | 39:21 |
| 40:2 | 40:8 | 40:10 |
| 41:2 | 41:10 | 41:17 |
| 43:7 | 43:19 | 43:25 |
| 44:3 | 44:4 | 44:7 |
| 45:1 | 45:3 | 45:7 |
| 46:3 | 46:7 | 46:7 |
| 48:1 | 54:11 | 54:13 |
| 54:14 | 54:20 | 56:6 |
| 56:25 | 68:4 | 68:7 |
| 68:9 | 73:10 | 74:3 |
| 74:5 | 74:6 | 81:10 |
| 84:7 | 84:9 | |
| **files** [44] | 4:1 | 4:13 |
| 4:17 | 8:8 | 8:10 |
| 8:12 | 8:13 | 10:19 |
| 14:3 | 14:7 | 14:16 |
| 24:16 | 33:24 | 34:12 |
| 34:24 | 35:5 | 35:17 |
| 39:2 | 39:23 | 40:14 |
| 40:13 | 41:3 | 45:4 |
| 46:3 | 46:20 | 49:8 |
| 50:17 | 52:18 | 52:22 |
| 52:24 | 53:5 | 55:11 |
| 56:24 | 70:24 | 78:4 |
| 78:10 | 79:22 | 80:8 |
| 80:11 | 81:6 | 90:23 |
| 91:18 | 91:22 | 92:23 |
| **filing** [1] | | 30:25 |
| **fill** [1] | 69:16 | |
| **filling** [1] | | 69:15 |
| **finally** [1] | | 19:19 |
| **financial** [2] | | 81:25 |
| 84:13 | | |
| **financially** [1] | | 94:14 |
| **finish** [1] | | 76:14 |
| **finished** [4] | | 28:4 |
| 28:11 | 30:9 | 36:10 |
| **first** [20] | 2:2 | 2:12 |
| 2:25 | 7:14 | 7:19 |

| | | |
|---|---|---|
| 8:9 | 8:18 | 10:21 |
| 21:19 | 21:20 | 25:13 |
| 25:24 | 27:11 | 27:19 |
| 53:6 | 59:23 | 76:11 |
| 79:17 | 91:4 | 91:22 |
| **five** [7] | 8:22 | 8:25 |
| 11:22 | 24:25 | 39:4 |
| 44:9 | 53:12 | |
| **fix** [3] | 50:25 | 51:13 |
| 51:16 | | |
| **fixed** [4] | 18:20 | 18:24 |
| 19:1 | 59:2 | |
| **floating** [1] | | 47:7 |
| **floor** [1] | 25:11 | |
| **folder** [3] | | 56:14 |
| 56:15 | 79:14 | |
| **folders** [2] | | 79:11 |
| 79:12 | | |
| **follow** [2] | | 20:2 |
| 86:24 | | |
| **follows** [1] | | 2:3 |
| **foregoing** [2] | | 94:6 |
| 94:7 | | |
| **found** [9] | | 18:7 |
| 21:11 | 24:8 | 41:3 |
| 41:7 | 45:22 | 70:18 |
| 73:17 | 88:14 | |
| **four** [9] | 8:22 | 8:24 |
| 8:24 | 19:16 | 19:18 |
| 24:23 | 53:12 | |
| **friendly** [1] | | 51:11 |
| **front** [4] | 54:17 | 56:19 |
| 76:21 | 83:21 | |
| **full** [3] | 22:18 | 58:19 |
| 59:24 | | |
| **full-time** [2] | | 2:16 |
| 8:19 | | |

**-G-**

| | | |
|---|---|---|
| **G6** [3] | 12:15 | 12:17 |
| 12:24 | 20:2 | 20:15 |
| **G8** [5] | 12:15 | 12:17 |
| 12:24 | 20:2 | 20:15 |
| **gallbladder** [2] | 63:16 | |
| 65:17 | | |
| **garbage** [1] | | 70:4 |
| **gather** [1] | | 71:17 |
| **general** [1] | | 18:1 |
| **generic** [7] | | 12:14 |
| 12:15 | 17:22 | 21:2 |
| 54:4 | 54:5 | 55:4 |
| **GERD** [1] | | 86:9 |
| **girl** [1] | 42:23 | |
| **girls** [1] | 46:25 | |
| **given** [4] | | 11:1 |
| 73:5 | 94:10 | 94:16 |
| **glad** [1] | 73:17 | |
| **goal** [1] | 60:21 | |
| **goes** [8] | 17:4 | 21:9 |
| 22:3 | 23:8 | 25:1 |
| 60:7 | 90:1 | 90:16 |
| **good** [3] | 41:12 | 87:23 |
| 93:4 | | |

| | | |
|---|---|---|
| **governed** [2] | | 31:23 |
| 32:1 | | |
| **granted** [2] | | 20:24 |
| 31:15 | | |
| **grapevine** [1] | | 45:11 |
| **grounds** [1] | | 13:19 |
| **group** [8] | | 5:10 |
| 5:12 | 5:20 | 55:17 |
| 55:17 | 55:13 | 55:24 |
| 70:25 | | |
| **guideline** [5] | | 17:24 |
| 30:24 | 65:12 | 66:14 |
| 66:24 | | |
| **guidelines** [20] | | 31:6 |
| 32:18 | 33:7 | 36:4 |
| 36:14 | 41:22 | 42:20 |
| 65:22 | 66:10 | 68:2 |
| 68:13 | 70:5 | 82:12 |
| 82:23 | 83:9 | 83:10 |
| 83:13 | 88:24 | 89:21 |
| 89:23 | | |
| **guy** [1] | 55:15 | |
| **guys** [9] | 19:14 | 19:19 |
| 20:3 | 38:2 | 40:19 |
| 55:24 | 56:23 | 70:22 |
| 74:4 | | |

**-H-**

| | | |
|---|---|---|
| **half** [1] | 48:20 | |
| **HALL** [1] | | 1:24 |
| **HAMILTON** [1] | | |
| 94:4 | | |
| **hand** [2] | 35:21 | 94:19 |
| **handle** [4] | | 5:19 |
| 6:8 | 13:1 | 33:8 |
| 33:16 | 36:1 | 38:13 |
| 43:10 | 60:8 | 60:11 |
| 63:22 | 72:22 | 86:16 |
| 90:3 | | |
| **handled** [16] | | 3:22 |
| 5:7 | 5:20 | 6:1 |
| 6:3 | 6:5 | 6:6 |
| 17:17 | 20:3 | 21:11 |
| 23:9 | 63:3 | 63:18 |
| 63:19 | 74:7 | 76:25 |
| **handler** [1] | | 33:16 |
| 83:14 | | |
| **handling** [11] | | 7:10 |
| 7:18 | 7:21 | 10:21 |
| 12:17 | 49:15 | 50:15 |
| 60:16 | 76:24 | 79:6 |
| 79:10 | | |
| **hard** [4] | 20:7 | 26:15 |
| 51:20 | 66:15 | |
| **hardly** [1] | | 37:11 |
| **head** [6] | 16:3 | 30:1 |
| 33:9 | 33:12 | 50:4 |
| 64:12 | | |
| **hear** [5] | 45:9 | 60:22 |
| 85:14 | 87:13 | 87:25 |
| **heard** [2] | | 61:8 |
| 61:13 | 85:19 | 85:21 |
| 87:22 | | |
| **heart** [1] | 64:25 | |
| **help** [2] | 26:23 | 62:13 |

| | | |
|---|---|---|
| **hereby** [1] | | 94: |
| **hereto** [1] | | 94 |
| **hereunto** [1] | | 86 |
| **hernia** [1] | | 86 |
| **hey** [1] | 37:23 | |
| **hiatal** [1] | | 86 |
| **hiding** [1] | | 70: |
| **highlight** [1] | | 15: |
| **highlighted** [1] | 33: | |
| **highlights** [1] | 16: | |
| **hill** [1] | 90:10 | |
| **hired** [2] | 6:25 | 7:1 |
| **hit** [1] | 84:10 | |
| **hours** [5] | | 8:23 |
| 8:24 | 8:25 | 24:2 |
| 55:12 | | |
| **Huh** [1] | 57:6 | |
| **Huh-uh** [1] | | 74:1 |
| **hundred** [1] | | 8:11 |

**-I-**

| | | |
|---|---|---|
| **idea** [1] | 88:1 | |
| **illness** [1] | | 65:15 |
| **improve** [1] | | 23:6 |
| **inches** [1] | | 66:18 |
| **incorrectly** [1] | | 15:20 |
| **indicating** [1] | | 66:17 |
| **individual** [4] | | 5:11 |
| 5:14 | 5:16 | 71:3 |
| **individually** [1] | | |
| 71:1 | | |
| **Industries** [3] | | 18:9 |
| 19:23 | 58:2 | |
| **information** [41] | | 9:11 |
| 3:11 | 9:3 | |
| 9:13 | 17:16 | 17:25 |
| 20:23 | 21:7 | 27:2 |
| 31:24 | 32:17 | 33:5 |
| 33:14 | 33:15 | 33:20 |
| 34:23 | 35:2 | 35:4 |
| 35:20 | 36:18 | 37:12 |
| 39:14 | 42:10 | 44:5 |
| 46:17 | 47:21 | 47:23 |
| 49:18 | 49:20 | 55:3 |
| 81:17 | 81:24 | 82:1 |
| 83:3 | 83:16 | 84:11 |
| 84:13 | 85:15 | |
| **initial** [1] | | 21:19 |
| **injury** [2] | | 30:24 |
| 30:25 | | |
| **instance** [2] | | 30:22 |
| 86:4 | | |
| **instead** [3] | | 20:15 |
| 21:9 | 69:15 | |
| **instincts** [1] | | 10:2 |
| **instructions** [4] | 35:22 | |
| 38:1 | 73:5 | 73:22 |
| **insurance** [3] | | 80:16 |
| 8:2 | 85:3 | |
| **insured** [2] | | 3:25 |

Sworn Statement of Donna Wright          CondenseIt!™

Intake [1]          15:22
interested [2]      93:2
  94:14
interpretation [1]
  55:20
interpreted [1]     31:9
investigate [1]     17:10
involved [3]        73:6
  73:24  74:3
involvement [1]
  77:3
irritable [1]       86:9

            -J-

Janet [4] 1:8       1:23
  94:5  94:22
January [2]         2:21
  3:1  94:24
job [17]  2:25      3:4
  3:9               3:17
  3:18  7:19        8:9
  8:20  9:19        10:20
  10:21  24:10      34:16
  44:20  61:23      79:24
June [5] 2:14       3:1
  3:5   7:14        16:25

            -K-

keep [5] 8:13       24:17
  56:1  63:10       69:14
kept [4] 69:9       71:16
  71:18  71:22
key [2] 88:11       88:11
Kim [15] 34:15      35:12
  35:18  41:20      48:5
  48:6  48:8        67:22
  68:22  78:13      78:13
  78:23  78:24      88:3
  83:20
kind [17]           16:22
  18:20  21:17      24:18
  31:20  35:22      43:17
  44:13  54:23      54:23
  65:7  69:6        71:5
  74:4  77:1        81:25
  92:2
kinds [1]           51:17
King [1] 45:14
knew [3]            39:23
  51:17  73:15
knowing [1]         78:15
knowledge [1]       19:5
  85:13  85:18

            -L-

L [2]      1:7      1:11
lady [1] 92:15
Large [1]           94:23
last [4]  2:9       16:19
  25:19  84:5
law [10]  29:10     29:14
  29:20  31:5       31:9
  31:12  31:13      31:21

laws [15]           26:20
  29:7  29:25       30:4
  30:13  30:13      30:21
  31:1  38:15       38:15
  41:9  41:14       44:23
  45:18  70:5
lawsuit [1]         41:8
lawyer [1]          71:13
  71:14  71:15      72:10
  72:17  72:18      72:19
  72:23  73:5       73:7
  75:11
lawyers [1]         75:5
learn [7] 9:6       9:18
  9:24  20:7        46:16
  51:16  59:8
learned [1]         9:16
  9:17  51:7        51:19
  53:7
Learning [1]        9:4
least [1] 47:9
left [4]  15:12     25:3
  39:21  60:20      70:7
  92:10
legal [7] 35:16     40:23
  69:9  70:21       70:23
  71:2  71:4
legally [1]         34:25
letter [8] 13:13    15:13
  15:16  16:17      16:21
  17:2  59:10       73:12
letters [7]         16:13
  16:16  16:22      29:12
  29:16  29:18      32:5
level [2] 62:4      79:4
library [8]         55:14
  55:25  56:8       56:10
  56:15  56:16      56:18
  57:11
life [4]  30:15     84:25
  85:1  85:2
liked [1] 62:9
likely [1]          23:1
limits [1]          82:6
line [2]  32:7      87:23
  89:17
lines [1] 87:22
listed [1]          13:20
live [2]  71:12     92:12
lock [1] 88:11
long-term [4]       4:16
  37:1  37:2        49:16
  33:1  60:12       91:7
  91:12
longer [1]          11:4
  67:12  72:12      88:22
  88:23
look [36] 4:19      16:11
  17:7  23:21       24:19
  26:5  27:20       28:10
  28:12  28:15      28:25
  28:25  31:1       31:12
  37:24  47:22      56:3
  59:23  65:25      66:5

67:6  67:8         68:1
63:13  70:15       75:11
77:11  79:18       83:6
83:15  89:21       89:22
91:24  92:3        92:15
92:20
looked [3]         45:20
  64:18  74:5      79:2
85:9
looking [5]        71:6
  7:17  26:21      49:17
77:15
Lotus [1]          28:24
LTD [10]           5:3
  5:7   21:10      22:7
  23:10  52:2      60:8
  60:15  81:20     85:23

            -M-

machine [1]        94:9
mad [2]  14:22     14:24
mail [1]  3:3      35:21
makes [2]          21:24
  87:16
man [6]  15:3      15:17
  17:5  22:1       58:11
  58:25
man's [1]          15:10
management [1]
  13:21  13:25     14:13
  14:17  24:2      24:7
  26:9  34:4       38:10
  44:25  45:19     63:23
  67:19  68:11     76:7
  80:10  92:14
management's [1]
  10:6  10:10
managing [1]       83:21
manner [1]         94:16
manual [1]         26:4
  26:6  26:11      26:12
  27:4  27:6       27:13
  27:20  28:1      28:3
  28:13  28:23     29:1
  29:6  29:24      30:8
  36:9  38:12      41:15
  44:23  70:6
manuals [1]        45:13
MARKET [1]         1:24
marks [1]          54:22
Mary [1]           69:10
Massachusetts [1]
  51:22
matches [1]        82:16
  82:19
maternity [2]      64:23
  64:24
matter [1]         62:25
max [8]  8:3       9:9
  11:14  11:15     15:8
  16:20  61:18     84:1
maxed [1]          15:3
  15:5  15:7       78:2
maximum [5]        10:7

16:25  37:8        83:1
84:25
maxing [1]         24:3
McCallie [2]       1:7
  1:11
MDA [2]            65:12
  65:22  66:10     66:14
  66:24  68:2      68:13
  82:7  82:11      82:16
  82:23  83:4      83:9
  83:10  83:15     84:2
  84:3  84:7       88:24
  89:20  89:21     89:22
  90:24
mean [31]          8:5
  8:24  9:15       9:16
  11:15  15:5      17:23
  18:8  31:14      31:25
  32:24  39:1      39:3
  47:11  53:23     62:15
  62:21  65:11     66:7
  82:10  82:18
means [6]          7:25
  8:1  15:7        32:6
  59:5  59:16
medical [1]        36:22
  37:4  37:15      37:17
  60:5  65:13      74:23
  92:12
medically [1]      24:19
meds [3] 90:4      90:6
  90:21
meet [1] 71:6
meeting [13]       28:16
  28:22  41:13     41:19
  46:1  46:2       71:1
  71:3  72:25      73:2
  80:3  88:4       89:3
meetings [6]       35:9
  40:17  70:21     71:1
  73:6  73:23
memo [2]           35:21
  45:24
mental [1]         20:18
  23:20  76:1      76:3
  76:9  76:10      77:2
  77:3  77:18      87:6
mentally [1]       87:5
  92:16  92:16
mentioned [2]      41:21
  70:8
menus [1]          9:10
merged [1]         7:8
  49:7  87:24
messed [1]         14:2
met [2]  70:22     70:23
might [8]          4:10
  13:11  17:25     23:5
  41:23  41:24     56:17
  61:12
mind [1] 24:7
mine [1] 23:14
minute [1]         6:19
minutes [3]        13:20
  29:23  65:20

misinterpretatio
  48:2
mistake [1]        24:3
  18:7  19:20      1:
mistakes [1]       51
money [15]         18
  19:4  19:10      37
  52:7  57:9       71
  71:19  85:25     86
  86:2  87:12      87
  88:1  88:25      87
month [1]          14:
  15:12  16:19     19:
  63:1
monthly [2]        84:
  84:15
months [1]         19:
  19:16  19:18     20:
  20:17  30:25
most [6] 9:13      24:1
  42:4  70:2       74:2
  92:6
mostly [1]         7:10
  38:15  63:13
move [1]           48:2
moved [4]          49:8
  50:1  81:22      91:20
  91:21
Ms [4]   2:8       3:7
  68:12  78:18
must [1] 41:11

            -N-

name [7]           2:6
  45:13  56:14     68:22
  90:11  90:12     90:21
names [2]          46:21
  47:2
need [16]          16:5
  33:11  33:15     37:17
  55:3  71:24      86:12
  88:10  89:17     90:4
needed [6]         23:21
  75:17  76:24     87:19
  88:1  88:25
needs [1]          60:4
neither [1]        94:11
neurologist [1]    77:13
never [1]          14:10
  39:23  40:7      40:8
  40:9  42:7       48:3
  53:9  57:24      80:19
  83:24  84:10     91:6
new [15] 23:13     42:1
  42:1  42:3       42:4
  42:6  42:7       42:8
  42:11  42:12     42:14
  42:12  42:23     42:24
  6:13
next [4] 62:4      64:19
  64:21  67:13
Nobody [1]         67:4
nods [5] 16:3      30:1
  3:9   50:4       64:12
none [2] 35:5      77:5

Hall & Associates - Janet B. Thacker, CCR

Sworn Statement of Donna Wright          CondenseIt!™

nonexisten
Taken on 8.

nonexistent [1] 25:2

nor [2] 94:12   94:14
Notary [1]              1:8
94:22
notes [3]              28:25
69:12   69:20
nothing [1]            45:15
92:21
noticed [1]            80:13
notification [1] 72:16
now [16] 11:19   13:18
17:14   24:15   26:10
29:22   32:16   38:1
57:25   58:16   61:15
70:8   74:2   81:8
86:8   91:4
number [4]             61:2
61:8   62:18   69:24
numbers [2]            69:22
88:16
nurse [6]              61:10
64:11   64:14   65:6
65:8   66:4   66:4
75:22

-O-

October [1]            52:24
off [22]   26:7   26:13
26:20   28:7   28:13
32:22   39:20   40:8
40:12   40:21   41:24
44:22   45:17   45:22
45:23   47:23   47:24
47:25   48:8   48:9
68:16   80:6
offered [1]            12:18
officer [1]            94:5
offices [1]             1:6
offset [1]             18:12
18:21   19:9   19:13
20:6   58:5   58:15
58:24   84:19
offsetting [1]         18:15
42:5   42:6
old [2]   70:3   70:17
once [5]   11:8   46:7
67:10   72:19   73:19
one [41]   4:15   6:17
8:17   11:9   13:3
15:2   15:3   18:4
19:25   21:24   24:16
34:8   37:11   37:24
38:25   40:1   40:8
40:8   40:9   41:7
44:13   45:21   46:24
48:3   53:6   56:11
57:15   58:3   58:3
67:3   67:4   74:22
75:18   76:2   79:3
79:10   79:22   83:8
83:9   85:8   91:25
one-on-one [2] 88:5
88:6
ones [6]   5:18   11:17
19:25   58:4   58:5

75:12

opposition [1]         35:3
order [3] 37:15   90:6
90:21
ordered [2]            55:13
56:17
original [2]           23:10
56:22
originally [1]         80:24
otherwise [2]          61:10
94:14
ourself [1]            47:8
outcome [1]            94:14
overpaid [1]           71:9
overpayment [1]
71:1
overrode [1]           77:22
own [5]   4:4   42:12
55:11   55:14   55:25

-P-

pad [1]   69:9
page [2] 45:25   68:19
pages [1]              69:4
paid [44] 3:21   4:16
4:16   5:3   6:10
6:12   8:3   8:6
8:7   9:22   9:25
10:1   10:18   12:4
17:18   22:21   24:17
25:14   37:24   39:12
39:15   42:8   49:11
49:12   59:24   61:2
61:5   61:12   61:17
63:1   63:2   63:16
67:16   76:8   77:19
78:1   81:13   81:18
81:21   86:22   87:4
90:24   91:14   92:6
pain [1] 42:1
paper [1]              16:8
16:12   35:20   67:9
69:19
papers [1]             88:17
part [4]   9:14   28:23
53:3   81:25
part-time [2]   2:18
3:1
parties [2]            94:12
94:14
parts [2] 26:15   44:23
past [1]   68:14   90:1
90:24
Paul [47] 4:5   4:24
5:12   5:21   6:3
6:12   6:17   6:22
7:10   9:4   12:14
12:19   49:2   50:18
50:19   50:22   50:24
51:1   51:3   51:5
51:9   51:25   52:18
52:21   52:23   53:3
53:5   53:7   53:10
53:20   54:18   57:21
57:23   61:20   61:24

78:5   78:14   78:19
78:22   79:5   80:7
80:15   80:21   80:22
80:23   80:25   81:3
pay [47]   4:21   5:25
6:10   6:15   16:16
16:21   21:21   22:14
27:6   27:15   27:16
27:16   27:21   27:21
30:20   30:21   31:2
37:7   37:22   42:3
52:3   58:12   62:20
62:21   62:21   62:22
62:23   62:25   63:5
63:7   63:9   63:9
63:10   63:11   63:23
66:6   67:10   71:11
75:19   77:18   77:22
81:19   85:17   86:7
88:21   89:25   92:13
paying [10]            6:9
6:18   10:7   13:5
48:14   66:11   71:7
76:14   77:16   85:24
payment [2]           37:11
37:24
pays [1] 22:20
people [51]            3:12
3:24   3:25   5:24
6:8   6:15   15:24
18:5   18:24   19:3
19:6   24:4   24:19
39:19   40:14   42:5
44:20   44:22   45:4
46:8   46:19   46:22
47:10   48:1   51:12
57:18   61:17   62:10
62:13   63:12   72:6
75:5   76:3   77:4
78:3   78:12   78:21
78:25   79:4   79:21
80:7   80:10   80:20
80:23   80:25   81:2
83:22   83:23   85:15
85:16   86:17
people's [4]          10:7
56:24   57:2   59:20
per [1]   63:24
percentage [1] 93:2
percentage-wise [1]
13:4
period [2]            19:8
19:12   59:25
person [11]           12:4
23:22   24:9   26:22
39:7   41:10   43:1
51:17   72:11   81:12
92:4
person's [2]          21:7
59:16
personal [3]
44:7   85:13
personally [1]   10:13
45:2
persuasive [1] 24:9
pertained [1]   41:2
pew [1]   67:2   67:6

phone [6]              3:24
4:3   4:11   19:21
69:10   69:12
phonetic [1]          51:21
physical [10]         10:5
23:19   61:10   75:10
75:15   76:1   77:4
77:23   86:11   87:4
physically [3] 76:23
87:6   92:22
physician [1]   11:5
physician's [1] 11:8
pick [1] 39:12
piece [3] 67:8   69:18
69:20
place [1]             12:23
places [1]            82:9
plain [1] 70:3
plan [1] 52:5
plus [4] 58:19
point [4] 38:17   51:24
74:4   93:5
policies [10]         5:10
5:11   5:12   5:15
5:17   12:13   12:16
17:17   17:18   17:21
17:22   18:4   18:13
20:4   20:10   21:2
21:4   51:6   53:24
55:17   55:18   55:25
56:8   57:12   57:24
58:1   58:8   58:11
58:21   58:23
policy [35]
10:16   12:4   12:7
12:9   12:11   12:15
12:20   13:3   19:25
20:14   21:6   22:19
22:20   53:20   55:5
54:14   55:5   55:5
55:19   55:24   56:14
57:1   57:15   57:16
57:17   57:22   58:19
57:25   59:25   61:7
75:25   82:6   82:20
83:8
Porter [6]            48:5
48:6   48:6   68:22
78:13   78:18
Portland [2]   49:8
49:12
possession [1] 94:17
premiums [1]   85:3
presence [1]   1:9
pressure [1]   90:23
Price [2] 34:7   34:11
print [29]
26:18   26:20   28:7
28:11   30:5   32:22
33:1   33:2   33:19
38:7   41:14   41:14
41:16   41:24   42:17
43:12   43:16   43:22
45:25   47:23   47:24
45:29   49:21   49:21
50:3   68:16   68:17

printed [1]           3:
38:9   38:13          3:
40:2   40:7           4:
44:22   45:17         4!
45:23
printer [2]           38
68:17
printing [2]          40
41:13
printoffs [1]         49
problem [5]           51
71:25   72:2          92:
92:18
problems [4]          42:
50:24   52:16         87:
proceeding [1] 35:
proceedings [1]93:5
process [5]           60:1
63:7   63:8           70:7
89:17
produce [2]           62:1
62:15
production [1] 62:1
program [4]           8:20
25:18   25:20         51:2
promoted [2]          62:11
properly [1]          9:22
Provident [30] 5:3
5:5   5:6           5:7
5:14   5:23          5:25
6:1   6:5           6:6
6:9   6:11           6:14
6:15   6:16          6:23
7:2   7:4           7:6
7:11   49:22         50:9
54:12   54:14        78:7
78:22   79:6         79:25
80:15   85:3
provision [3]
20:16   57:1          18:5
provisions [1] 53:20
psych [20]            8:7
10:3   10:4          11:16
75:7   75:8          76:19
76:21   86:22        86:23
92:9   92:10         92:11
92:11   92:13        92:20
93:2
psychiatrist [6] 23:23
75:11   77:17        86:21
86:25   87:2
Public [1]
94:22
pull [3]   39:4      39:24
46:23
pulled [3]
46:9   47:3          40:1
purchased [1] 18:4
put [4]   8:20        16:1
26:12   29:15        29:18
30:15   32:4         38:16
31:18   38:20        41:10
41:14   43:6         43:19
44:24   44:3         43:6

Hall & Associates - Janet B. Thacker, CCR

Sworn Statement of Donna Wright          CondenseIt!™

putting - state
Taken on 8/2

| | | |
|---|---|---|

relied [1] 38:21
rely [2] 29:5 55:4
remained [1] 94:17
remember [20] 25:23
34:5 34:10 34:16
35:10 41:13 44:6
45:13 46:21 46:25
46:25 47:1 47:2
63:25 66:13 67:20
67:25 88:3 89:7
93:1
rep [1] 3:6
Reporter [2] 1:9
1:23
REPORTER'S [1]
94:1
reports [1] 3:21
representative [5]
3:16 7:15 22:9
62:2 90:20
representatives [1]
90:17
reserves [2] 84:22
85:10
responsibility [1]
11:21
responsible [4] 92:24
rest [2] 19:10 48:21
retained [1] 72:11
retirement [2] 52:5
84:18
return [1] 11:7
22:23 23:6 23:25
Revere [4] 4:6
4:23 5:12 5:21
6:3 6:12 6:17
6:23 7:10 9:4
12:14 12:19 49:2
50:18 50:19 50:22
50:24 51:1 51:3
51:6 51:9 51:25
52:18 52:21 52:24
53:4 53:5 53:7
53:10 53:20 54:18
57:21 57:23 61:21
61:25 78:6 78:14
78:19 78:22 79:6
80:7 80:16 80:21
80:22 80:24 81:1
81:3
review [6] 4:30
21:18 23:14 73:11
84:9 91:25
reviewed [1] 64:9
74:3
reviewing [2] 10:19
78:10
reviews [1] 21:16
rheumatoid [1] 77:12
rider [1] 18:19 54:6
5:18
right [45] 7:20
15:10 19:11 20:25
24:11 27:17 28:5
28:8 29:7 31:7
31:10 32:7 32:10

**Column 1 (top)**

45:4 46:3 46:7
48:1 48:3 56:5
56:14 59:9 67:9
68:3 68:17 69:22
70:1 75:3 83:16
84:5 88:11

putting [5] 27:25
35:13 44:23 45:7
54:19

—Q—

questioned [3] 10:14
58:11 58:20
questions [10] 3:8
4:5 23:16 29:3
34:25 35:3 42:25
51:18 55:1 55:2
quick [1] 4:20
quirky [1] 42:13
quit [5] 37:22 52:21
86:25

—R—

raising [1] 37:19
reach [1] 67:11
reached [4] 15:7
16:24 16:25 17:5
reaching [1] 11:13
read [2] 31:12
ready [3] 26:11
26:14 30:8
real [6] 17:3 42:6
51:20 66:20 71:9
71:11
really [1] 10:8
11:11 25:12 32:5
35:4 51:20 66:5
66:18 76:23 80:19
80:19
reason [12] 14:18
14:19 23:22 26:17
33:23 34:1 35:7
35:15 43:20 47:14
63:14 69:1
reasoning [1] 44:1
reasons [3] 13:9
13:9 74:23
received [2] 21:12
58:14
recommending [1]
48:10
record [3] 68:3
68:7 94:10
records [4] 37:4
37:15 37:17 60:5
reduced [1] 94:9
reduction [1] 18:20
refer [1] 64:19 67:12
68:15
regular [1] 87:2
related [1] 94:12
relative [1] 94:13
reliable [1] 85:14

32:19 32:20 32:23
33:22 39:14 43:11
43:14 43:20 48:13
49:23 50:14 53:1
53:13 54:9 54:12
54:17 55:22 59:16
59:17 61:22 68:16
75:3 75:4 80:1
81:4 82:18 82:21
84:5 91:9 91:10
91:16 92:10
rights [2] 36:19
59:19
RSP [2] 52:3 52:4
rumor [1] 45:10

—S—

save [3] 43:18 43:21
85:24 86:1 86:2
87:11 87:19 88:1
88:25
saved [3] 43:23
44:7 44:15
savings [1] 52:5
saw [1] 86:16
says [7] 18:19 32:10
32:23 33:20 45:25
47:25 80:22
schizophrenic [1]
92:21
screen [1] 85:9
seamless [1] 85:10
Security [12] 18:16
18:19 18:22 19:8
58:5 58:19 58:25
69:21 69:24 71:8
84:17 88:16
see [18] 17:11 23:23
26:21 39:2 45:21
45:24 49:11 54:12
56:21 58:24 70:14
70:16 77:11 84:3
85:8 85:14 91:18
92:3
seeing [6] 11:4
13:14 43:3 77:17
86:25 87:1
send [17] 11:10
15:13 16:17 16:20
22:24 23:20 37:8
37:14 53:25 60:10
73:14 76:13 76:20
76:25 86:24 90:2
90:23
sending [3] 52:11
71:16 92:9
sense [1] 77:11
sent [7] 15:16 16:12
24:13 32:5 64:23
71:20 92:19
separate [3] 80:16
80:17 82:9
September [1] 94:19
session [2] 13:25
73:2

set [17] 15:20 15:24
17:11 20:20 20:25
21:1 21:3 24:1
52:9 52:10 54:18
58:16 62:24 63:1
71:16 81:19 94:19
setting [1] 52:12
several [3] 19:15
46:19 70:23
share [1] 3:11
Shaw [10] 18:9
19:23 20:1 20:3
20:13 57:4 57:10
58:1 58:2 58:12
sheet [4] 54:21 69:14
69:16 69:23
shipped [1] 49:7
short [3] 4:18 49:25
67:8
short-term [15] 4:17
37:1 48:15 48:25
49:9 49:13 49:15
50:2 50:16 53:2
61:20 61:24 90:15
90:16 91:5
shorter [1] 84:7
shortest [1] 77:15
shorthand [1] 94:9
show [1] 9:10
38:10 52:10 66:1
73:8 83:4 84:13
84:16 84:21 84:21
84:22
showed [1] 38:18
shred [1] 70:2
shredded [1] 69:5
69:19 70:5
shredder [10] 38:17
38:19 69:7 69:23
69:24 69:25 70:2
70:4 83:13 88:18
SHU [35] 7:17
8:7 21:25 22:4
22:24 23:3 32:14
48:13 48:16 49:8
49:23 61:16 71:7
74:11 74:14 74:16
75:3 75:23 76:6
81:11 81:22 82:15
83:25 84:10 89:11
91:5 91:8 91:14
91:17 91:20 91:21
92:5 92:9 92:19
92:24
sick [2] 37:6 76:24
side [1] 17:13
sign [2] 48:3 48:3
single [1] 17:1
sit [1] 25:14
sitting [3] 32:6
67:3 69:8
six [3] 25:9 30:25
skin [1] 60:9
slightly [1] 21:5
Smith [1] 56:1

smoke [3] 46:
46:16
smoking [1] 46:1
Social [12] 18:1
18:19 18:21 19:5
53:5 58:13 58:2
69:21 69:23 71:8
84:17 88:16
someone [7] 4:7
4:10 12:10 29:1
41:4 44:14 55:2
sometimes [4] 7:10
37:10 54:1 54:1
somewhere [1] 90:2
sorter [1] 3:3
source [1] 45:11
85:14
special [4] 7:18
7:21 10:21 18:5
73:1 73:4
specialist [16] 21:10
22:7 23:8 23:10
37:2 50:22 51:1
51:10 51:25 53:4
60:8 60:11 62:5
62:7 76:10 81:21
specialists [3] 85:23
90:17 90:18
specialize [2] 22:24
specific [9] 4:13
4:23 9:21 17:14
26:24 55:5 59:4
63:25 89:5
specifically [7] 3:8
54:6 54:11 55:10
67:21 67:23 88:7
split [1] 6:11
staff [3] 35:8
40:16 41:19
46:1 46:2 72:25
73:2 73:6 73:23
80:3 88:4 89:3
stand [1] 75:19
Standard [1] 79:7
start [4] 2:18 3:5
37:1 52:17
started [17] 2:12
21:5 7:14 8:18
18:15 19:13 25:13
25:17 27:12 27:19
27:24 27:25 37:19
48:16 55:11 55:13
84:24
state [38] 2:6
2:12 26:20 29:7
29:25 30:4 30:12
30:13 30:20 31:1
31:5 31:6 31:7
31:12 31:13 38:15
31:15 40:25 41:9
41:14 42:2 42:2
42:3 42:6 42:14
42:18 94:3 94:23
statement [2] 1:1
1:5 11:8 11:11
11:13 40:22 94:6

Hall & Associates - Janet B. Thacker, CCR

000119          Index Page 6

Sworn Statement of Donna Wright          CondenseIt!™

| | | |
|---|---|---|
| 94:7 | 94:10 | 94:12 |
| 94:15 | | |
| statements [2] | 40:25 | |
| 41:1 | | |
| states [5] | | 30:18 |
| 31:22 | 36:15 | 42:22 |
| 65:14 | | |
| stating [1] | | 72:11 |
| stay [4] | 8:3 | 23:2 |
| 25:9 | 61:11 | |
| STD [6] | 48:34 | 49:25 |
| 60:11 | 60:16 | 74:11 |
| 89:13 | | |
| sticky [1] | | 67:9 |
| still [12] | 13:14 | 37:17 |
| 45:14 | 47:7 | 49:4 |
| 49:22 | 52:23 | 70:7 |
| 80:21 | 81:3 | 82:25 |
| 89:10 | | |
| stink [1] | 48:2 | |
| stock [2] | | 87:20 |
| 88:2 | | |
| stop [2] | 2:23 | 85:24 |
| stopped [4] | | 25:21 |
| 25:22 | 52:24 | 76:3 |
| stopping [1] | | 93:5 |
| stories [2] | | 83:21 |
| 92:22 | | |
| STREET [1] | | 1:24 |
| streets [1] | | 71:13 |
| stuck [1] | | 40:2 |
| stuff [32] | | 4:24 |
| 9:6 | 21:12 | 21:17 |
| 29:15 | 31:17 | 31:20 |
| 32:23 | 33:2 | 37:15 |
| 38:12 | 41:9 | 41:23 |
| 45:7 | 46:23 | 49:21 |
| 49:22 | 50:3 | 50:6 |
| 51:16 | 65:7 | 69:6 |
| 69:22 | 70:2 | 70:3 |
| 70:19 | 71:5 | 74:4 |
| 80:5 | 85:19 | 86:19 |
| 88:10 | | |
| success [1] | | 24:6 |
| sued [2] | 35:1 | 41:4 |
| suggest [1] | | 72:1 |
| SUITE [1] | | 1:24 |
| supervises [1] | 78:21 | |
| supervising [1] | 78:24 | |
| supervisor [6] | 29:4 | |
| 34:8 | 37:23 | 52:12 |
| 71:17 | 72:20 | 73:8 |
| 74:7 | 75:16 | 75:17 |
| 75:22 | 77:22 | 77:25 |
| 78:5 | 79:3 | 80:4 |
| supervisors [3] | 28:20 | |
| 34:18 | 34:19 | |
| supplies [1] | 88:10 | |
| supply [1] | | 88:12 |
| support [1] | | 44:24 |
| supposed [11] | | 15:13 |
| 32:22 | 37:3 | 42:24 |
| 43:6 | 49:16 | 63:5 |
| 63:21 | 64:19 | 65:14 |

**-T-**

| | | |
|---|---|---|
| takes [3] | 21:19 | 21:20 |
| 67:6 | | |
| taking [4] | | 37:22 |
| 37:25 | 71:15 | 78:4 |
| taught [1] | | 16:11 |
| telephone [3] | | 9:11 |
| 69:9 | 69:16 | 69:17 |
| telephones [1] | 3:20 | |
| telling [12] | | 27:20 |
| 29:15 | 31:8 | 34:6 |
| 39:22 | 41:25 | 49:13 |
| 59:7 | 64:1 | 66:3 |
| 80:4 | 91:18 | |
| tells [2] | 33:7 | 33:15 |
| ten [4] | 39:4 | 39:12 |
| 44:9 | 66:18 | |
| Tennessee [4] | | 1:12 |
| 1:25 | 94:3 | 94:23 |
| term [1] | 60:22 | |
| terminate [12] | | 10:24 |
| 11:14 | 11:18 | 13:8 |
| 13:22 | 14:11 | 30:11 |
| 73:9 | 83:1 | 85:16 |
| 87:1 | 87:3 | |
| terminated [5] | | 11:3 |
| 13:16 | 14:22 | 14:23 |
| 14:24 | 29:13 | 74:14 |
| 74:23 | 75:6 | |
| terminating [3] | 13:19 | |
| 14:5 | 14:9 | |
| termination [1] | 16:12 | |
| testified [1] | | 2:3 |
| testimony [3] | | 94:7 |
| 94:8 | 94:10 | |
| Thacker [4] | | 1:8 |
| 1:23 | 94:5 | 94:22 |
| Thank [1] | | 93:8 |
| theirs [2] | | 47:3 |
| 54:18 | | |
| thereafter [1] | 94:9 | |
| Thereupon [3] | | 16:3 |
| 30:1 | 33:9 | 50:4 |
| thick [1] | 56:20 | |
| third [2] | 26:22 | 93:5 |
| thoroughly [1] | 12:2 | |
| thought [6] | | 37:5 |
| 46:16 | 54:3 | 53:13 |
| 58:15 | 61:1 | |
| thousand [3] | | 8:10 |
| 8:11 | 8:13 | |
| three [3] | 8:10 | 8:11 |
| 8:11 | 8:13 | 19:16 |
| 19:13 | 41:1 | 89:18 |
| through [26] | | 8:21 |
| 12:1 | 28:24 | 28:25 |
| 36:24 | 37:7 | 38:16 |
| 39:13 | 45:10 | 45:19 |
| 45:21 | 46:9 | 46:20 |
| 47:16 | 69:18 | 70:10 |
| 70:16 | 74:25 | 76:21 |
| 76:22 | 83:22 | 83:25 |
| 89:25 | 91:24 | 92:3 |
| 92:6 | | |
| times [2] | | 13:15 |
| 85:22 | | |
| title [2] | 3:14 | 61:23 |
| titles [1] | 34:17 | |
| Tony [2] | 34:7 | 34:11 |
| too [8] | 4:4 | 5:17 |
| 23:16 | 25:8 | 60:20 |
| 74:10 | 76:22 | 78:25 |
| took [7] | 20:15 | 24:14 |
| 29:4 | 31:14 | 37:23 |
| 75:16 | 92:14 | |
| total [1] | 25:11 | |
| track [1] | 56:1 | |
| train [1] | 52:2 | |
| training [4] | | 8:20 |
| 8:23 | 8:25 | 9:3 |
| 9:16 | 9:21 | 13:25 |
| 14:11 | 24:18 | 24:20 |
| 24:22 | 24:23 | 25:1 |
| 25:4 | 25:18 | 25:20 |
| 26:4 | 26:6 | 26:10 |
| 26:12 | 27:3 | 27:6 |
| 27:12 | 28:23 | 29:1 |
| 29:6 | 29:24 | 30:8 |
| 36:9 | 38:12 | 51:5 |
| 53:9 | 53:10 | 53:19 |
| 59:4 | 59:6 | 59:7 |
| 72:5 | 73:1 | 77:1 |
| 77:6 | | |
| trashed [1] | | 70:3 |
| treat [3] | 11:23 | 61:12 |
| 80:10 | | |
| treated [1] | | 11:25 |
| triage [1] | | 60:6 |
| trial [1] | 9:13 | 51:19 |
| triggers [1] | 15:15 | |
| trouble [2] | | 40:15 |
| 70:19 | 88:15 | |
| true [1] | 47:3 | |
| try [5] | 4:23 | 22:1 |
| 26:23 | 47:8 | 85:24 |
| trying [7] | | 24:16 |
| 41:16 | 44:24 | 47:11 |
| 49:19 | 60:14 | 91:13 |
| turn [1] | 61:11 | |
| Twenty [1] | | 44:9 |
| two [23] | 5:24 | 6:15 |
| 11:16 | 12:11 | 12:13 |
| 12:16 | 13:2 | 17:16 |
| 20:10 | 41:1 | 43:20 |
| 53:7 | 57:2 | 57:13 |
| 58:3 | 58:10 | 58:22 |
| 61:5 | 65:17 | 75:9 |
| 76:14 | 82:9 | 92:20 |
| two-year [2] | | 73:8 |
| 78:2 | | |
| type [4] | 9:6 | 22:3 |
| 39:11 | 59:12 | |
| types [2] | | 7:16 |
| 22:5 | 61:9 | |
| typewriting [1] | 94:9 | |

**-U-**

| | | |
|---|---|---|
| unanswered [1] | 23:16 | |
| under [20] | | 10:21 |
| 11:20 | 12:4 | 17:18 |
| 31:22 | 32:8 | 32:14 |
| 42:5 | 55:24 | 57:15 |
| 57:16 | 59:25 | 61:7 |
| 76:10 | 77:3 | 77:13 |
| 86:22 | 87:4 | 91:14 |
| 92:13 | | |
| understand [8] | 22:5 | |
| 27:11 | 33:6 | 49:20 |
| 71:23 | 87:8 | 87:9 |
| 91:8 | | |
| unit [28] | 7:18 | 7:21 |
| 10:21 | 47:2 | 48:13 |
| 49:23 | 60:5 | 64:17 |
| 64:20 | 64:21 | 65:1 |
| 65:4 | 67:4 | 67:13 |
| 68:15 | 75:3 | 75:23 |
| 76:6 | 78:4 | 81:11 |
| 81:22 | 83:25 | 89:11 |
| 90:8 | 90:11 | 90:14 |
| 90:16 | 90:23 | |
| United [1] | | 65:14 |
| unless [1] | | 16:17 |
| Unum [6] | 60:9 | 60:11 | 82:15 |
| 82:16 | 84:4 | 93:5 |
| 78:22 | 79:6 | 50:9 |
| 80:15 | 87:24 | |
| UnumProvident [14] | | |
| 2:10 | 3:10 | 5:5 |
| 6:23 | 6:24 | 7:6 |
| 7:7 | 7:12 | 49:5 |
| 49:7 | 50:13 | 78:14 |
| 80:18 | 81:7 | |
| up [74] | 6:12 | 8:5 |
| 8:13 | 11:13 | 14:2 |
| 15:10 | 15:20 | 15:24 |
| 16:3 | 17:11 | 18:21 |
| 20:20 | 20:25 | 21:1 |
| 21:3 | 22:21 | 23:2 |
| 24:1 | 28:17 | 30:1 |
| 31:1 | 33:3 | 33:9 |
| 33:24 | 34:12 | 34:22 |
| 37:14 | 37:16 | 40:4 |
| 40:5 | 40:16 | 41:6 |
| 41:9 | 45:5 | 45:6 |

**statements - ...**

**Taken on 8/...**

| | | |
|---|---|---|
| 45:12 | 45:2 | 49... |
| 49:21 | 50:4 | 52:... |
| 52:9 | 52:9 | 52:... |
| 52:12 | 54:13 | 55... |
| 58:16 | 62:25 | 63... |
| 64:6 | 64:12 | 65... |
| 65:25 | 66:5 | 67... |
| 67:6 | 67:8 | 67... |
| 68:25 | 69:6 | 71... |
| 81:19 | 82:5 | 82:... |
| 82:19 | 85:9 | 85... |
| 87:20 | 88:2 | 89:... |
| 89:22 | 90:10 | 94:1 |
| updated [1] | | 11:... |
| updates [2] | | 57:1 |
| 57:20 | | |
| upper [6] | | 34:4 |
| 38:10 | 44:25 | 67:1... |
| 68:11 | 92:14 | |
| ups [1] | 88:24 | |
| upset [4] | | 17:6 |
| 40:20 | 71:10 | 71:11 |
| Urick [2] | | 51:21 |
| 52:15 | | |
| used [2] | 56:24 | 65:23 |
| using [1] | | 83:11 |
| usually [4] | | 14:2 |
| 18:7 | 74:6 | 92:4 |

**-V-**

| | | |
|---|---|---|
| valid [2] | 14:18 | 14:18 |
| versus [2] | | 77:4 |
| 91:20 | | |
| VP [1] | 73:8 | |

**-W-**

| | | |
|---|---|---|
| waived [1] | | 85:4 |
| waiver [2] | | 84:25 |
| 85:1 | | |
| ward [1] | 64:24 | |
| watch [1] | | 88:10 |
| week [3] | 8:24 | 24:24 |
| 63:2 | | |
| weeks [2] | | 25:9 |
| 65:18 | | |
| whereof [1] | | 94:18 |
| whole [4] | | 29:14 |
| 29:20 | 69:15 | 77:10 |
| within [4] | | 14:30 |
| 10:19 | | |
| without [4] | | 34:8 |
| 92:13 | | |
| witness [11] | | 2:2 |
| 16:3 | 30:1 | 33:9 |
| 50:4 | 64:24 | 94:6 |
| 94:8 | 94:10 | 94:16 |
| 94:18 | | |
| Worcester [4] | | 51:21 |
| 31:24 | 55:6 | 56:21 |
| word [2] | 24:14 | 72:17 |
| 91:23 | | |
| words [2] | | 22:19 |
| 76:2 | | |