# ATTACHMENT

## "A"
## Part 7
## Documents Bates Stamped
## 114-164

ATTACHMENT "A"

workaholics [1]
  83:23
worked [13]        6:20
  6:22    48:19    53:4
  54:16   55:20    55:23
  56:1    56:2     57:25
  61:15   79:22    80:23
  91:4    91:6
worker's [1]       85:19
works [2]          45:14
  78:10
Wright [6]         1:3
  1:5     2:1      2:7
  2:3     3:7
writing [1]        17:21
written [3]        40:4
  72:10   72:16
wrong [9]          15:19
  16:1    24:1     24:12
  86:23   87:5     87:5
  92:4    92:22
wrote [5]          40:3
  45:5    45:6     45:12
  56:13

-X-

X [4]     56:2     56:3
  57:9    71:20

-Y-

year [3]  11:8     25:24
  84:5
years [9]          11:12
  11:17   25:20    48:20
  61:2    61:6     61:8
  75:9    76:14
yet [3]   4:8      26:11
  30:8
York [13]          42:1
  42:1    42:3     42:4
  42:6    42:8     42:11
  42:12   42:14    42:21
  42:23   42:24    63:13
yourself [1]       47:12

60 Minute - Unum - transcript
c MMII, CBS Worldwide Inc.  ALL RIGHTS RESERVED.

Prepared by Burrelle's Information Services, which takes sole responsibility for accuracy of transcription. No license is granted to the user of this material other than for research. User may not reproduce any copy of the material except for user's personal or internal use and, in such case, only one copy may be reproduced, nor shall user use any material for commercial purposes or in any manner that may infringe upon CBS Inc.'s copyright or proprietary interests in the material.

*****

SHOW:  60 Minutes

DATE:  November 17, 2002


NOT THE BEST POLICY?

ED BRADLEY, co-host:

If you're one of the 50 million Americans who has money deducted from your paycheck to pay for disability insurance or if you purchased a disability policy on your own, you may think you're covered if you're injured or too sick to work.  But don't be too sure.  A number of people who worked at UnumProvident, the giant of the disability insurance business, whose clients include CBS, told us that the company's management puts tremendous pressure on claims handlers to deny new claims and shut down existing ones, and that many UnumProvident policyholders who are obviously disabled are left out in the cold.

(Footage of UnumProvident building; people walking down sidewalk; Dr.  John Tedesco)

BRADLEY: (Voiceover) UnumProvident is the largest disability insurance company by far, providing disability insurance to 17 million Americans.  One of them was Dr.  John Tedesco.  Today, Dr.  Tedesco does part-time diagnostic work, but he used to be a successful eye surgeon.  Then four years ago, he developed a tremor in his right hand.

Dr. JOHN TEDESCO: I knew that if I tried to operate on somebody, I might hurt them.  I might blind them.

BRADLEY: So you had to stop?

Dr.  TEDESCO: Yeah, I had to give it up.

(Footage of Dr. Tedesco)

BRADLEY: (Voiceover) For six years, Dr.  Tedesco had paid for an insurance policy which guaranteed him a decent income if he could no longer do surgery.  He filed a claim with UnumProvident, and the company paid his claim for four months.  Then a claims handler sent Dr.  Tedesco a letter.

Dr. TEDESCO: Basically, the letter said, 'We're cutting off your benefits. We don't think you're disabled, and you're not entitled to any benefits.'

BRADLEY: Did they talk to your doctors?

Dr. TEDESCO: Not that I'm aware of.

BRADLEY: Did--did they come to see you, to see how you were?

Page 1

60 Minute - Unum - transcript

Dr. TEDESCO: No. They sent surveillance to see what I was doing.

(Footage of surveillance video of Dr. Tedesco's son)

BRADLEY: (Voiceover) UnumProvident had a cameraman secretly follow Dr. Tedesco for six days and shoot this videotape. The company said it showed Dr. Tedesco playing football in his back yard, looking anything but disabled. However, there was just one problem.

Dr. TEDESCO: That was actually my son. I have a 23-year-old son who looks a lot like me.

BRADLEY: So they didn't talk to your doctors, but they did send someone to take a videotape of you?

Dr. TEDESCO: Right.

BRADLEY: And he took a videotape of the wrong person?

Dr. TEDESCO: Right.

(Footage of Dr. Tedesco)

BRADLEY: (Voiceover) Three years ago, Dr. Tedesco was diagnosed with Parkinson's disease. He found he couldn't keep his hands steady enough do to routine eye exams, let alone surgery. Three physicians said he was too disabled to operate.

So did they start paying you then?

Dr. TEDESCO: No.

BRADLEY: Their in-house physician said in a deposition that you--you could operate.

Dr. TEDESCO: Right.

BRADLEY: He was saying that you could be an eye surgeon?

Dr. TEDESCO: Right. Right. My attorney said, 'And he can do surgery?' And he said, 'Sure.'

BRADLEY: It almost sounds ridiculous: An insurance company refusing a disability from an eye surgeon who has a hand tremor and Parkinson's disease. How do you explain that?

Dr. TEDESCO: I can't explain it. There's not a person on this earth who would say that a person with Parkinson's disease can do eye surgery.

(Footage of people walking down sidewalk; Diane McGinnis; UnumProvident building)

BRADLEY: (Voiceover) But what happened to Dr. Tedesco came as no surprise to the UnumProvident employees we spoke to. Diane McGinnis started working at UnumProvident three years ago. When we interviewed her, she was working as a claims handler at the company's headquarters in Chattanooga. She says that the company told its workers they had to shut down enough claims to meet monthly targets in the millions of dollars.

MS. DIANE McGINNIS: At the end of each month, the projections would come down from the directors or above, who would give a number as to the amount of money we would have to come up with at the end of the month in closures.

Page 2

60 Minute - Unum - transcript

BRADLEY: So these were like targets you had to make?

Ms. McGINNIS: Right.

BRADLEY: And did the people who set the target know that there were a certain number of claims that deserved to be terminated before they set the target?

Ms. McGINNIS: I don't think it was about whether they deserved to be closed. They had to be closed. They needed to make these projections.

BRADLEY: So you--you wo--you would go into these meetings once a month with a--with a target, a dollar figure...

Ms. McGINNIS: Yes.

BRADLEY: ...which you had to save the company, and that dollar figure had nothing to do with the validity of the claims that were out there.

Ms. McGINNIS: Right. The claim reps would go looking for claims that they could shut down, and the consultants would be right behind them, helping them go through files to look for those numbers that they needed.

BRADLEY: And did the claims handlers ever shut down claims that they knew were legitimate, in order to meet a monthly target?

Ms. McGINNIS: Yes, many times, that's happened. Many times.

BRADLEY: You say that without any hesitation.

Ms. McGINNIS: Because I've seen it for three years.

BRADLEY: UnumProvident declined to talk to us on camera, but top executives repeatedly denied that the company sets any targets whatsoever for saving money by closing claims. The executives also told us the company processes 400,000 claims a year and occasionally makes a mistake which, they say UnumProvident is quick to remedy once the company is aware of it.

(Footage of McGinnis; UnumProvident building; Bradley with group of women)

BRADLEY: (Voiceover) As for Diane McGinnis, she resigned eight weeks ago. UnumProvident questions her integrity, citing several instances of dishonesty in her personal life. But more than a dozen current and former UnumProvident employees, including former vice presidents of the company, confirmed some or all of McGinnis' allegations. These three women also worked in the company's headquarters in Chattanooga. Angelique Brackett was a claims handler.

Ms. ANGELIQUE BRACKETT: About the middle of the month, they'd let us know if we were on track to meet our dollar amount for the month, and if we wouldn't, they would really start pushing us to either find more or to get the ones that we thought we could get closed closed.

BRADLEY: (Voiceover) Gina Hartley worked for five years as a claims handler. She resigned six weeks ago.

And--and if they would say to us that there were no targets, no money targets that we were aiming for each month, you would say?

Ms. GINA HARTLEY: It was well-known to each individual, each one of us and to every department. It was standard. I mean, day-in/day-out there were targets, there were goals.

BRADLEY: So--so you're saying the company is lying?

Page 3

000117

60 Minute – Unum – transcript

MS. HARTLEY: That's what I'm saying.

BRADLEY: A--and were these targets s--just suggestions or guidelines?

MS. HARTLEY: Oh, no, it was set. I mean, this is the amount that--we were given the exact dollar amount that we were targeting, and towards the end of the month, if we were far behind, then we'd have what was called a--a blitz in our--in the orthopedic area, where everybody would come in on Saturday and we'd go through our claim files. If they'd been gone through 20 times and reviewed 20 times by managers consultants, we would still go through our--our claims, our co-workers' claims, other department's claims, trying to find something that might just--you know, whether--even if it was a technicality, something that we could close that claim on, and the pressure on the claims representatives were so intense that we felt we had to go in to close that claim.

BRADLEY: You knew of people who were really disabled, and their claims were terminated because in terminating those claims, UnumProvident would save money?

MS. HARTLEY: Oh, yes.

BRADLEY: No...

MS. HARTLEY: Oh, yes.

BRADLEY: ...no doubt about it.

MS. HARTLEY: No doubt about it.

BRADLEY: And did your supervisors know that you were terminating legitimate claims?

MS. HARTLEY: They had to give the approval to--before we could--as a claims handler, we did not have the power or the authority to close that claim ourself. It had to be signed off by our consultant and by our manager.

(Footage of UnumProvident building; people walking down sidewalk; Bradley with group of women)

BRADLEY: (Voiceover) UnumProvident told us the claims handlers had no financial incentive to terminate the claims of disabled policyholders. Michelle Payne, a former administrative assistant, says that's not true.

MS. MICHELLE PAYNE: The ones that knew how to do what was asked of them, they're the ones that got the bonuses.

BRADLEY: And what was asked of them?

MS. PAYNE: Close the claims.

BRADLEY: You--you say that without any hesitation.

MS. PAYNE: I saw it on a daily basis.

MS. HARTLEY: There were staff meetings that we sat in, and the manager would say, 'Well, so-and-so just closed two million dollar--a 2 million claim today.' Everybody would give them a hand, and then in about two or three weeks, lo and behold, that person would end up being presented with a bonus, check, money.

(Footage of Bradley with group of women)

BRADLEY: (Voiceover) It wasn't just claims handlers who were under pressure to
Page 4

000118

60 Minute - Unum - transcript

close claims.

Dr. FERGAL MCSHARRY: I saw the same thing.

(Footage of Dr. McSharry)

BRADLEY: (Voiceover) Dr. Fergal McSharry worked for UnumProvident for nearly two years as an in-house physician, reviewing disability claims. Dr. McSharry says the company pressured him and other doctors to go along with the claims' handlers decisions to terminate claims.

Dr. MCSHARRY: The decision was nearly always made, and we were to not upset the apple cart and give this opinion which is contrary to everybody else's.

BRADLEY: Didn't the company give you the option to request more tests, more medical information about the claimant?

Dr. MCSHARRY: Yes, the option was there, but whenever I did it, I got into trouble.

BRADLEY: Why would that get you in trouble?

Dr. MCSHARRY: It would blow the target way back, and the team were very dependent on me as the physician to support their achieving the goal.

BRADLEY: Of meeting that target, the dollar figure?

Dr. MCSHARRY: Yeah. So I was getting a lot of upset people coming into my office saying, 'You're not helping us, Doc.'

(Footage of Dr. McSharry)

BRADLEY: (Voiceover) At first, Dr. McSharry says he did change his medical opinion once or twice to please his supervisor. Then he decided he could no longer do that. Six months ago, UnumProvident fired Dr. McSharry. He is now suing the company for wrongful termination.

BRADLEY: UnumProvident says that the issue with you was productivity. They say that you were slow to sign off on your claims.

Dr. MCSHARRY: I--I wouldn't sign off, yes. I wouldn't. I refused.

BRADLEY: Were other doctors in the claims department pressured to sign off on terminations?

Dr. MCSHARRY: We--we all were. And some doctors did, and some doctors didn't.

MS. HARTLEY: We knew what doctors to send it to, what not to. If we wanted that claim closed, we would send it to such-and-such doctor.

BRADLEY: Closing those existing claims or denying new ones has led to nearly 3,000 lawsuits against UnumProvident in the past five years. Gina Hartley says the company's lawyers warned claims handlers to be extra careful about denying claims in certain states.

MS. HARTLEY: We would get guidance, as far as what state you might be able to close this claim in, that may not give us trouble in the courts, what state would be, oh, OK, this is--this is a tougher state, they've got strong insurance commissioners, they've got strong courts, they've got courts that favor the insured; better not mess with this one too much.

BRADLEY: Tell me what you think the philosophy of this company is.

000119

60 Minute - Unum - transcript

MS. HARTLEY: Their philosophy was close it if you can close it, if there was any way possible to close it. That was the bottom line.

Mr. JOHN GARAMENDI: Every insurance department in this nation ought to be taking a hard look at this situation.

(Footage of Bradley and Garamendi)

BRADLEY: (voiceover) Last week, John Garamendi was re-elected to head the California Department of Insurance.

How can an insurance company decide in advance the percentage of claims that should be terminated?

Mr. GARAMENDI: How can they? Well, they can if they want to break the law, if they want to go against the normal practice, and if they want to get big lawsuits. It is not the thing to do.

BRADLEY: Provident's adjusters appear to be under pressure to increase terminations.

Mr. GARAMENDI: Exactly.

BRADLEY: On the face of it, what's wrong with that?

Mr. GARAMENDI: This kind of thing will lead to problems. It'll lead to fraud by the insurance company against the consumer, against the policyholder.

BRADLEY: Do you see a pattern here? What does it say about this company?

Mr. GARAMENDI: There's been successful lawsuits against this company, in which federal courts, by unanimous verdicts, have issued punitive damages for this kind of activity. That's another--not a warning sign. That's a clear siren out in the street, saying, 'What is going on here?'

(Footage of Dr. Tedesco; of UnumProvident building)

BRADLEY: (voiceover) Dr. John Tedesco, the eye surgeon with Parkinson's disease, sued the company, and a jury awarded him 36 million. To avoid a lengthy appeal, Dr. Tedesco settled with UnumProvident for an undisclosed sum.

If this company knows that they're going to be hit with these lawsuits and they're going to lose some of them, that there's going to be bad publicity, why would they do this?

Mr. GARAMENDI: It's an equation, an economic equation. 'How many will we lose? How much business will we lose vs. how much will we gain by denying these claims?' So they're doing that economic equation and they're saying, 'We'll run the risk of the lawsuits, we'll run the risk of the bad publicity, and probably the departments of insurance are asleep anyway, so let's go.'

BRADLEY: While the great majority of lawsuits against UnumProvident are settled out of court and the company says it wins most of those that do go to trial, this week, it lost a big one. A federal court in San Francisco upheld a 7 1/2 million judgment against UnumProvident, saying it showed bad faith in targeting a claim for closure, and that it employed biased medical examiners, and improperly destroyed medical and other reports. The court issued an injunction, ordering the company to stop those practices.

(Announcements)

Page 6

000120

*Confidential Information*

## Situation Analysis: Provident's Disability Operations

### Background

This narrative is intended to capture some of the recent history and current activities associated with Provident's individual disability line of business. This line of business has been an important part of the company's overall product offering for many years. It has been sold and administered through the Disability Operations area, and its predecessor the Accident Department.

The primary product offered in this marketplace is a non-cancellable disability income policy. It is sold to upper income markets and offers protection in the case of inability to perform one's occupation. Benefit periods range from two years to lifetime with the latter predominating. Associated coverages for business expense reimbursement during disability are also offered.

Provident has been a market leader in the individual disability income business ranking 1st or 2nd in the industry over the last 15 years. Customers are typically upper income individuals, particularly professionals, purchasing on both an individual as well as salary allotment basis (multiple insureds in a corporation). As such, many of the policyholders of this product are physicians, representing approximately 35% of sales. Lawyers and dentists represent other significant concentrations of insureds along with the executives, particularly of small businesses.

The product has been sold on a brokerage basis through an extensive network of branch offices where the sales personnel are Provident employees. Provident has over 50 sales offices throughout the United States as well as 7 sales offices in Canada. There are approximately 150 representatives in the sales force. The number of brokers who received a commission in the last year is in excess of 40,000. Typical insurance operations functions exist within the home office organization.

Attached to this document are charts showing patterns of sales, premium income and claim experience. The number of in-force policies exceeds 600,000.

### History - The 1980's

The early and mid-1980's were characterized by a highly competitive, growth oriented market environment. Product provisions and underwriting were liberalized and commissions increased as competitors in the market attempted to grow share. The product sold is non-cancellable which means it can neither be canceled nor its price raised, covering the own occupation of the individual and typically with an option to choose at time of issue lifetime benefits or some shorter period.

000121    PROV 02036    EXHIBIT

In hindsight, it is generally viewed that the policies sold during this period were poorly underwritten and underpriced. This was common among competitors, but Provident seems to have taken it a few steps further. Provident, in many cases, won the market share battle and, in fact, was very successful in certain high population growth states such as California and Florida. Provident was also slow to recognize the deteriorating experience on this block of business in terms of taking early action. As a result, it is felt that, as other companies were tightening their offerings, many of the poor risks went to Provident.

Provident began tightening underwriting by 1983, and making other modifications in ensuing years. A new product was introduced in 1989, which raised prices in some areas and was somewhat less liberal in its provisions.

Profits from this line of business peaked in 1990, and thereafter the operation suffered deteriorating financial results due to successive reserve strengthening actions. This pattern culminated in late 1993 in a $275 million charge to create a reserve for expected future losses on the business. This charge was determined based upon a gross premium valuation using a combination of morbidity and interest rate scenarios. A portion of the special reserve arose due to the decline in interest rates through the early 1990's, but most of it resulted from morbidity trends.

As financial results have deteriorated over the past three years, management has taken a successive number of actions to deal with the business. In 1991, two of the largest offices in the distribution network, Miami and Los Angeles, were closed; and new business was not accepted from brokers in those markets. Underwriting was tightened further, and product revisions were made in 1992 and 1993.

Key loss states (California and Florida) were identified based upon above average claim experience, and product offerings in those states were restricted. Rate differentials were introduced on a state basis reflecting experience. A 20% differential in premium rates exist between the best and poorest performing states.

In 1993, as a part of the gross premium valuation process, a multiple-cell financial projection model was developed. Differentiation among in force blocks was a key refinement of the model with particular emphasis on issue eras: pre-1983, 1983-1988, 1989-1992, and 1993. It was felt that the experience of these eras was fundamentally different due to underwriting and product provisions extant in each.

Other remedial actions included consolidating in late 1993 the claim payment functions, which had been decentralized in the field sales offices. Further, development of a new product line, focused on guaranteed renewable coverages and loss of earnings rather than own occupation concept, began last year.

A diagram of product and underwriting changes over the last 15 years is attached.

003320

## Current Activities

### 1. Sales

Production of disability products is down sharply compared to its high point several years ago. In many areas, production is off 40%. The competitive environment continues to change. Consistent players in the market have been Paul Revere, UNUM, and Northwestern Mutual. Many of the smaller competitors have chosen to exit the business and have either sold their block or have entered into either a joint marketing agreement or private label arrangements with the primary disability carriers.

To some degree, Provident has been a leader in product changes introducing sex distinct rates in 1993, and with its new loss of earnings product in 1994.

### 2. Product

A guaranteed renewable version of the own occ product as well as a loss of earnings product on both non-can and guaranteed renewable forms have been approved in over half of the states. These products are being introduced for sale currently. The non-can own occ product is still being sold and represents the primary portion of new business.

### 3. Underwriting

Underwriting practice continues to be tight in terms of the acceptance of risk. A major effort is underway to reengineer the new business process. It includes a dozen initiatives aimed at reducing turnaround time and improving broker service. Many of these changes will represent an opportunity for Provident to establish a competitive advantage in terms of service to brokers. The redesigned processes will be introduced in the first quarter of 1995.

### 4. Claims

As indicated earlier, the claim function was centralized in the home office in the 4th quarter of 1993. Much of this year has been spent in developing that organization. Somewhat of a crisis atmosphere has existed with the continuing high level of new claims.

Mental and nervous impairments now represent over 20% of all claims and continue to grow at a faster rate than other claims.

The claims organization has been plagued by a work process called the quarterly scrub. In this situation, much of the work in the 3rd month of each quarter is devoted to reviewing open claims with the attempt to settle, close, or modify the reserves by quarter end. A new head of the claims area has been appointed and has several initiatives underway including the elimination of the quarterly scrub process.

PROV 02 033

000129

The claim organization has found itself involved ever more frequently in litigation. Provident's legal posture on denial and settlements is viewed as having swung from aggressive to conservative over the last three years in part because of litigation trends including punitive damages.

5. Experience

Experience in the first two quarters of the year was consistent with financial projections developed as a part of the gross premium valuation last October. However, new claims accelerated in the 3rd quarter and termination rates have fallen off.

6. Financial

The disability operation continues to generate large statutory losses since no special reserve was recorded on the statutory side, jeopardizing the company's ratings and financial flexibility. Further, the existence of the special reserve on the block of business written prior to 1994 creates a huge drag on the company's reported ROE. Over $300 million of capital stands behind the special reserve block of business and essentially all earnings other than the return on capital and surplus have been zeroed out.

*T. B. Heys*
*9/29/94*

003923

PROV 02035

000124

*1) Case load → adjuster*
*2) early intervention → investigate*
*3) specialization → professional*

# Provident Internal Memorandum

*HC — Begin implementation*
*— Move w/ sense of urgency*
*w/o risk of being out of control*
*— 3rd party opinion for Boa*

**To:**     Harold Chandler

**From:**   Ralph Mohney

**Date:**   May 22, 1995

**Re:**     Revised 1995 Budget - Individual Disability Claims

To support our vision of becoming the "best in industry" individual disability claim operation, a number of claim improvement initiatives have been identified and are currently being implemented.

Broadly, these initiatives (summarized in Attachment 1) are designed to move Provident from a claim payment to a claim management approach. The keys to this transition are (1) more intensive claim investigation and (2) skill development to maximize effectiveness. While developed internally, these initiatives have been validated and are supported by the LeBoeuf review.

Due to the significant financial leverage associated with individual disability claims, the return on these claim improvement initiatives is expected to be substantial. A 1% decrease in benefit costs due to more effective claim management translates to approximately $6 million in annual savings. We believe that aggregate improvements in the 5% - 10% ($30 million - $60 million annually) range are possible - once the initiatives have been fully implemented. This range of potential savings is consistent with the recently completed Tillinghast study.

However, to achieve these results, significant investment will be required. Attachment 2 summarizes expense and manpower requirements associated with our recently revised 1995 budget. As shown in the attachment, 1995 expense is projected to grow 13% ($1.3 million) over the original 1995 budget and 57% ($3.8 million) over actual 1994 expense - on a comparable basis.

The substantial increase in expense is driven predominately by higher staffing levels. Compared to the original 1995 budget, staffing is up 41 positions. Attachment 3 provides a breakdown of the staffing changes.

This memorandum represents a request for formal approval of the manpower and expense additions necessary to fully implement our claim improvement initiatives. We believe that these additions are necessary and in the best interests of the company.

Achievement of our "best in industry" vision is inherently a long term proposition. However, it begins with continued support for our claim initiatives. We are convinced that these initiatives will far exceed the costs - even during 1995.

Please let me know what additional information is needed.

RWM:air

cc:  Tom Heys
     Al Morales

PROV 03101

**EXHIBIT**
3

000135

## Provident Internal Memorandum

**To:**        Harold Chandler

**From:**      Tom Heys

**Date:**      November 19, 1996

**Subject:**   Monthly Risk Management Report

1. <u>Transition</u>. There continues to be significant effort exerted by the Risk Management areas on our transition projects. I have attached an outline of some of the recent scoping team meetings to give you an indication of the breadth of activity. I am going to Worcester this week for more scoping presentations. Also attached is a draft of one of the project team reports—this particular one on workflow processes in the individual claim area. The work being done is good overall quality. We will be ready to be an integrated organization at closing.

2. <u>Budgets</u>. I was not pleased with the first run of the Risk Management budgets as the total expense amount is too high. Review is occurring now. We will identify separately in the form of a cost/benefit analysis all of the costs associated with improvements in performance associated with best practice activity. We will also identify separately the costs for conversion which should be non-recurring but will be significant in 1997. Our initial budgets also anticipated a much higher level of sales activity than was incorporated in the first draft of sales goals released last week. It would be desirable to have closure that these will be our sales goals as soon as possible. Unfortunately, the significant fall-off in production from the Paul Revere field force in the current version has some seriously negative implications on staffing in the Worcester underwriting unit. I will be prepared to discuss this with you next week.

3. <u>Individual Underwriting</u>. Submitted app count volumes seem to have plateaued this fall. The levels are higher than early in the year, but it does <u>not</u> appear that there has been continued upward momentum since summer. The same is true of life business.

   You asked me last week about whether we were going to extend the life products into the pods. It is Bob's intention to have a full product line pod for our Career and PPGA groups. It is difficult to have a pod approach for Brokerage, given the current volumes. At the time the volume is sufficient to justify more than a fraction of a person, we will integrate life underwriting with the disability pod with which the brokers are working.

000126

EXHIBIT

12

4. LTD Improvement Group. As I mentioned to you, Steve Carter, Cyd Davis, Gregg Tolliver, Ralph Mohney and I have met on a number of occasions to examine how we can improve our LTD results. As indicated in monthly meetings, we have begun the process of reviewing all large claims and have involved the DI consultants in that process. We are tracking the results of the additional actions which are recommended on those larger claims. To this point, we have not seen any successes, but, as you know, these investigative efforts take a while.

It was clear to our group that our LTD block is still underpriced due to systemic increases in incidence. The combination of pricing changes in '93 and '94 has also resulted in some groups being way below manual premium. While the underwriters have appropriate parameters for renewing individual cases, it is important that the non-credible block (<300 lives) as a whole be at target pricing. The sum of individual rate actions in past months had not achieved this. The block rate was more at break-even than target margins of 7%.

For January renewals, we reviewed the entire block and made adjustments from the original underwriter recommendations in enough cases that renewal rates in aggregate will be at target. The average renewal increase, weighted by premium, is 24%. Some cases have very sizable raises because they were so far below the manual rate. Where we have had worse experience (risk profile) such as contributory plans, the increases were higher. A breakdown of renewal rate actions by size of increase is shown below:

| Increase level | # of cases |
|----------------|------------|
| No increases   | 34         |
| <12%           | 32         |
| 13-25%         | 30         |
| >25%           | 34         |

Selling these increases will be tough but important to earning a profit on LTD business next year. The improvement group, along with Chuck Amis, will review the renewals as a block each month. Next week we will review February renewals.

5. Stop Loss. We continue to see pressure on the January renewals. Healthsource is apparently unable in many of their sales offices to sell a rate on renewal without shopping it, which puts us in a bidding process with the other vendors. The Healthsource actions in this regard are just not conducive to an effective long-term relationship with either Provident or any of their other vendors, and I will continue to pursue this with Jim Pesnell.

We are hearing that the experience for some stop-loss carriers is turning down. Most notable in this case are Jefferson Pilot and Hartford. On the other hand, our results in October were good, and we have a low claims start for November.

PROV 02150

000127

We are making efforts to expand beyond the Healthsource relationship. We have developed a relationship with a TPA in New York and expect to sell our first case there shortly. Linda Andreae was accompanied by Bob Davis in visiting Franey & Parr, one of our PPGAs in the Baltimore-Washington area last week. Franey & Parr has a large base of corporate clients and handle their group medical as a TPA. The trip went well. We received eight RFPs for stop-loss quotes on Linda's return. I will keep you apprised of progress. Our ultimate success, though, in expanding the stop-loss beyond Healthsource, likely requires a dedicated marketing resource seeking out appropriate TPA situations.

6. <u>Product Management.</u> A large number of new products continue to move through the filing and approval process. We had some significant successes last week securing approvals in Florida and North Carolina for the PAS group life product which was crucial to continuing discussions with NationsBank. Our one continuing problem area across product lines is with New York and New Jersey. We had a brief break in the usual stalled condition in New Jersey when our term life was approved, but we still do not have the Cornerstone approved in either of those states. New York is more or less incommunicado. Harriette is devoting extra attention to getting something moving in these two states. We are contacting Sue Kempler at LeBoeuf to see what suggestions she has for New York.

We are still in a stalemate with the M product. So many bells and whistles have been added that the price is non-competitive. We are continuing to work to resolve these differences, but major product design changes are required for competitiveness.

You will recall our initial analysis on changes in the Cornerstone pricing/commission levels to achieve a higher ROE. Before moving forward, we are waiting for Cliff Stalter to give us some indication of how ROE would be improved if we are able to achieve the expense savings anticipated in the new company. I will shortly give you a recommendation to withdraw the 338 GR own occ by the end of the year.

7. <u>Claims.</u> In Individual Disability, October was an okay month. The number of terminations was good but the average size was lower than usual. We are off to an extremely good start in November. Ralph and his staff have done an excellent job continuing to keep their eye on the ball while dealing with the demands of merger activity.

In LTD, our average termination size in October was higher than normal and produced a good result with the exception of some very poor experience on Nissan. In the Life and Special Account claim area, we are seeing the light at the end of the tunnel on conversion of the retained group department business. At this point, there are only 20 cases left. We are also staffing up to handle the additional railroad business which will become effective January 1.

Page 3

PROV 02191

000128

DI claim results were excellent in November, and it certainly appears we will have a strong fourth quarter. Our net resolution ratio year-to-date is 93%. This compares to 74% for the full year 1995, and 84% if the first quarter of 1995 is excluded. Clearly there has been a great pay-back for the investment we have made. A part of that investment has been in intensified surveillance and IME's—expenses which will be over budget by $1.5 million in 1996—but as we have done more of it, the higher activity level has been justified.

5.  Transition update. Both underwriting groups are involved in developing training plans for Day One so that business can flow smoothly from the sales offices. We are also in the process of finalizing vendors for medical evidence. We will achieve several hundred thousand dollars savings as a result of this effort.

    The claim transition project teams have completed their work by and large, and are now moving to implementation. Part of that implementation is to select the next level of managers—and we are going through a rather structured interview and assessment process to do that—since the organizational position requirements will be different in both locations from what they were before. Paul Revere will be adopting the top technical consultant process, while we will be supplementing our management levels in Chattanooga.

    Jeff McCall, Tim Arnold, Lee McClurg and Ken Blood, who are transferring between locations, will be on-site at their new assignments in January.

Page 4

PROV 02115

000120

04/29/99   09:32 FAX 423 755 1920          PROVIDENT MAN ...

*Provident Internal Memorandum*

To:        Harold Chandler

From:      Tom Heys

Date:      September 17, 1996

Subject:   Monthly Risk Management Letter

I want to report on a number of issues and activities occurring in the Risk Management area
in which I think you will be interested.

1.  <u>Individual Disability Claims</u>.  I had the opportunity yesterday to sit in on one of the daily
    roundtable reviews which are now occurring.  As Ralph has reported to you, each unit
    has one day a week in which they have taken our special review meeting formats and
    developed that to the unit level.  Large new claims, denials and problem situations are
    discussed in a cross-functional format.  In the meeting I attended yesterday morning, the
    claim adjusters were well prepared and the problem-solving process which occurred was
    very consistent with what we saw developing in our evening meetings last year.  This
    new approach is consistent with the institutionalization of the claim management
    approach and one which I think will continue to give us good pay-back.  For your
    information, the meetings are held every morning from 8:30 to 10:00.

    We have some initial results from the common claimant project where we have
    attempted to match claimants between Provident and Paul Revere.  The early screens
    showed nearly 600 persons with claims reported since January of 1994 at both Paul
    Revere and Provident.  For approximately half of these individuals, there was a
    discrepancy in status; for instance, a discrepancy would exist if one company had closed
    the claim while the other was still paying on it.  We believe that there are a number of
    "false positives" in the total, but clearly, once closing occurs, there is material
    opportunity in looking at the common claimants across companies.  A series of action
    plans has been developed to address not only the current claimants, but also to go back in
    time on older claims.

2.  <u>LTD Business</u>.  As you are aware, the experience on group disability business continues
    to stagnate and has even shown some signs of slippage from earlier this year.  We are
    examining a number of relevant questions.

    The product management group has determined that our claim terminations have been
    running at a lower level over the past two years than in earlier periods.  This could result

PROV 02152

000130          EXHIBIT

                     13

from a number of factors, including a different claimant profile, i.e., physicians and lawyers, where the claims are tougher to close; however, we will intensify the efforts to review termination potential. We have instituted special review sessions to review in a cross-functional manner all LTD claims with over $200,000 of reserve. Not only will the relevant LTD claim personnel be participants, but they will be assisted by an individual disability claims consultant at every meeting.

We are also reviewing new accounts which have shown an unusual incidence of new claims to understand the trends here and to review the underwriting process. Additionally, we are instituting a more comprehensive top-level review of renewal increases. Beginning with the January renewals which are now being developed, I and other management will look at all of the renewals as a block before they are released to the field. This process should help us identify more effectively the broad result which will be achieved from the renewal activity.

3. <u>Group Life and A&S Conversion</u>. Gregg Tolliver has applied extra resources, and we now have the conversion activity back on schedule. As I have indicated to you, the complexity of a number of former Group Department cases is very significant and that was what caused us to fall behind in July. We have also considerably reduced the backlog of other contract issuance requirements outside of the conversion activity.

4. <u>Individual Underwriting</u>. You normally receive Bob Nash's monthly report, so I won't reiterate all the information there. Under Dr. Taylor's direction, we have developed what represents a total overhaul of our approach to waivers and exclusions. This effort was initiated as a result of attempting to make our approach more acceptable to the marketplace as well as simpler to understand. The result is much more precise descriptions in our waivers for medical conditions.

5. <u>Monthly Reports</u>. You expressed some interest in Bob Nash's monthly report, as well as Ralph Mohney's earlier, which you see as part of the individual review meetings. In fact, all of my direct reports complete monthly management letters. I won't inundate you with all of that paper, but thought you would be interested in two which I have attached: Linda Andreae's for medical stop loss and Harriet Stokes' for compliance. Both of these managers do an outstanding job in managing their units. The reports show good news as well as problem areas which need to be addressed.

In that vein, through personal effort, as well as by retaining an outside lobbyist, Harriet achieved a recent success with the state of New Jersey--where we have basically been hung up on any kind of significant product approval for a number of months. Harriet visited the Insurance Department a month ago and established some new bridges there. We received approval for our level term products in New Jersey last week. This is a very welcome development.

EG0200

RGV G2153

000131

6.  _Product Development_.  The activity level continues in terms of new products, although a lower level of visibility.  We have completed the Checkguard Plus product and it is now in the filing process.  The products which are actively in Phase II are listed below with their status.

M Group - in final specifications stage

AMA Term - reviewed with the AMA, waiting for their sign-off

Managed Disability - a conceptual design has been prepared and will be shared with the product review committee shortly.

The other two Phase II activities, Voluntary life product to be sold on a direct basis, and the Index life product are both behind in terms of business case development because the product managers have been pulled off for other efforts.  As you may remember, the project managers on these projects are in the sales and marketing area.  This seems to be a flaw in our current development process which will be remedied with the new structure where full-time project managers are in the product management area.

7.  _Transition_.  Suffice it to say that there has been a tremendous amount of effort by members of the Risk Management organization in transition planning.  In particular, Bob Nash, Roland Rabon, Gregg Tolliver, Ralph Mohney and most of his direct reports, and Rick Magro have been heavily involved in a number of projects.  So far, we have been able to accomplish this without dropping the ball on our regular responsibilities and priorities.

Over the next three weeks, many of the best practice and structure project teams will report their recommendations to the scoping team.

As you know, Jeff McCall, Tim Arnold, and Lee McClurg have agreed to transfers.  I expect to finalize the situation with Ken Blood, whom we will ask to head the group disability claims in Chattanooga and report to Russ Deal within the next week.  Ken now heads group disability claims in Worcester.  He will replace Bill Gault.

*File*

## Provident Internal Memorandum

**To:**       Harold Chandler

**From:**     Tom Heys

**Date:**     May 24, 1996

**Subject:**  Monthly Risk Management Letter

1. <u>Product Management</u>. With the introduction of the Universal Life Accumulation product last week and the Foundation disability product on June 10, we will have completed the first wave of product introductions. Although there have been a few implementation glitches, the very substantial level of effort from the product, compliance, marketing and systems areas has clearly generated more new products in a shorter time frame than "ever before". A number of new Voluntary and Employee Benefit products will be introduced over the course of the summer.

   As you know, five products are now in the conceptual design phase with project managers assigned. I have met with each of the project managers to explain expectations of their role. As an example of how this process is working, I am enclosing an action plan put together by Byron Cox for the Managed Disability product.

   I attended the PPGA Product Focus meeting in Atlanta. This group expressed strong endorsement of the products we have introduced, although, as usual, they were interested in a few tweaks which we will analyze. In terms of new opportunities, some sales interest and commitment were conveyed if we extend our issue ages from 75 to 85, thus targeting the older age market. This was a product proposal which did not make it into Phase II but now seems appropriate to revisit when Bob Davis supplies additional volume information.

   The transition, as measured by submissions, from the 338 product series to Cornerstone has been slower than I expected. It turns out there are some attributes of the previous generation of products, including the 338 Guaranteed Renewable Own Occ, which make them more competitive in the marketplace. I intend to work with Rick Wolf to address these anomalies. For example, in repricing the Cornerstone, we eliminated discounts given to association-endorsed sales because of the poor performance of that business. However, I have discovered that the discounts are still available on the older products, thus creating an inconsistency in Cour product line.

EXHIBIT

15

PROV 02133

000133

We recently received survey information which tends to show that our current LTD rates are extremely competitive. An excerpt from this report is attached. Our competitiveness is a result of conscious decisions to offer discounts on new business in order to generate sales.

The experience on the Voluntary Benefit Provider Plus disability product has improved materially in the past few months. I attribute that improvement to restrictions in product availability made last year, an improved approach to claim management, and some wear-off in the anti-selection from initial enrollments of short elimination periods. The introduction of the Provider Plus replacement will go even further toward enhancing the financial viability of this product line.

2.  <u>Compliance</u>. Last week Harriette Stokes presented to the AMA our total review of compliance status of their products. As we had expected, the problems were widespread, but correctable. An action plan was reviewed with the AMA to rectify these compliance issues by July 15. This will take considerable effort but we will supplement our staff with outside resources. Harriette has done a great job in addressing these problems expeditiously and maintaining the confidence of the AMA in her ability to deliver on her commitments.

At the same meeting, Dick Busby received a second notice from Bill Zimmermann that Medicare Supplement business would be moved. There are issues to resolve here, since three-fourths of the existing business is written on a plan which can no longer be duplicated. We are evaluating the position we should take on this plan, whether we should seek to retain it as a closed block of business with the major issue being the aging of the insured population.

We have retained a consultant in New Jersey in an effort to improve the approval rate of our products. We have a logjam of product filings before the New Jersey Insurance Department which seem to be going nowhere. This contractual relationship is with a former insurance commissioner in New Jersey and is on a trial period for six months.

3.  <u>Underwriting</u>. Both underwriting units have introduced changes intended to make it easier to do business with Provident.

In the Individual area, you are familiar with our new organizational design which will be rolled out to the Southeastern area of the country next week. The backlogs have been eliminated for several weeks now. Further, our individual disability underwriters are relaxing requirements on lower risk cases in order to reduce the inventory in Underwriting below one month's volume.

Attached is an organizational chart showing changes in Gregg Tolliver's operation. This involved both a realignment in the way work is done between new business and renewal and within product areas (LTD and Life now being combined), and also in management. While this is not our target environment, it represents an effective interim step in reaching a more integrated, market-focused organization. I have received good feedback from our Employee Benefits field organization about this change.

4. Claims. LTD claims were down in April, but it now appears that we will catch up with higher levels in May.

We are suffering some real strains from the growth in STD business which we, frankly, did not anticipate in the budget. STD claims are more labor intensive, and I will shortly seek your review of a revised staffing model for it.

In April, DI claim results were mediocre, but in line for the first month of a quarter. Although new claims in May continue to be high, our results for the month should still be much better than April. The new "back" unit under the direction of Tim Arnold, with dedicated external physician support, was initiated in April. One of the improvement areas Ralph and I are focusing on currently is to enhance our performance measurement capabilities beyond the rather simplified ratios which we now use. Performance indicators in the future will focus more on termination activity at specific claim durations.

5. Open issues. Chuck Amis has made a proposal to Jeff Olingy that we hire a dedicated sales person to develop stop loss business outside of Healthsource. This is consistent with the Tillinghast report and analysis which we discussed two months ago. At that time, we identified the opportunity to write additional stop loss through other captive types of relationship, such as with the Blue Cross organizations. I recognize that there is uncertainty about the future of stop loss business, but we need to bring to closure the issue of adding a dedicated sales person. Linda and I believe this has a good chance of being a successful investment.

T447

USP500

PROV 02160

000135

*File*

## Provident Internal Memorandum

**To:**       Harold Chandler

**From:**    Tom Heys *[initials]*

**Date:**    March 18, 1996

**Subject:**  Monthly Risk Management Report

1. **Distribution Channel Support.** You have approved our proposal to give the PPGA direct access to the home office for new business. All that remains for implementation is to finalize the list of individuals who will be accorded this additional benefit and then to communicate it.

   Bob Nash has been integral to two initiatives to increase life production through the brokerage channel. We are trying to improve the placement rate in the APPS program, which is the automatic offer of a life policy to all standard approved DI applicants. Beginning April 15, we will automatically send a level term policy on all new DI issues. In the past, we just sent a certificate which required re-submission for the actual policy.

   Bob has also worked with Rick Wolf to put together a simplified issue term insurance program for medical residents to be offered in conjunction with our normal conversion program for disability insurance.

2. **Employee Benefits.** Last week Fred Brown, a senior principal with John Hewitt & Associates, spent a day with Steve Carter, Gregg Tolliver, Chuck Arnis, Cyd Davis and me, talking about managing the group disability line of business " in real time." We developed indicators to track and better understand key drivers of results on a current basis, and explored how those provided us with early warning signals. Nearly all of the data which we talked about is currently available and accessible, even though not necessarily being reported at this time. As a result, I think you will see improvement in the management information reports on our employee benefit business.

3. **Employee Benefit Marketing Initiatives.** Commission increases on STD and group life were introduced in February. Also, as you are aware, we have made downward rate adjustments in both group disability and group life manual premiums in order to increase sales activity. Feedback from the field indicates these new rates are

EXHIBIT

16

PROV 02167

000136

competitive. RFPs are up 12%, and quotes for multiple coverages are up 16%. This is a start but, clearly, not as much of an increase as envisioned.

4. <u>Individual Underwriting</u>. The backlog situation for app entry and ITA interviews has improved substantially in the past three weeks, as Bob Nash projected. The number of applications submitted and the number issued on a daily basis were improved in the first two weeks of March. George Shell has begun meeting with Bob Nash, Kathy Owen, Keith Hickerson, and Tom Thompson in reviewing corrective actions identified for the reengineering process as well as focusing on longer-term changes. I believe it would be desirable for that "operating committee" to meet with the senior management group soon to report on progress and also to assure alignment in expectations.

5. <u>Products</u>. The Cornerstone product has now been approved in 38 states, the term products in 32 states, the annuities in 19 states and the UL term in 16 states.

   After the review meeting with senior management, the voluntary benefits disability product was repriced to achieve a higher return on equity. The resulting rates are still competitive.

   We are in the process of finalizing the Canadian disability product and the group life portability rider. Both of these should be filed shortly.

   I have met twice with Rick Magro, Rick Morris, Mike Temple and Steve Carter to discuss improving the product development process. We will have recommendations for a more structured approach next week.

6. <u>Other Compliance Issues</u>. Harriette Stokes has contracted Andrews Consulting Services to research compliance requirements for all AMA products. Andrews Consulting specializes in this type of work for group insurance. The cost is not materially large and will speed the process of correcting the AMA compliance situation by a number of months.

7. <u>Claims</u>. On the personnel side, we are actively recruiting for a medical director and also a replacement for Bill Gault. A job description for the former position is attached. Some of the candidates we are seeing have corporate backgrounds in occupational medicine which could be leveraged on managed disability issues in the employee benefits market.

   The head of our Canadian claim unit has taken a significantly higher-level position with Paul Revere. We are in search for a quick replacement. Separately, Ralph recently recruited a claim consultant from Berkshire.

I continue to be concerned about the level of new claims. The number of claims is level with last year but the average size is up, probably 15% over and above factor changes. The increase in size has occurred across the board, not just in large indemnities. On a segmented basis, we have seen proportional increases in the North, on accidents as opposed to sickness, in muscle/joint impairments, and on the 337 policy (1990-92 issue years). Conversely, our poorly performing cells (California/Florida, physicians, MNDA and 1983-89 issue years) have been steady with last year.

February terminations were $43 million, slightly below January. We did not do as well on residual claims, and deaths were lower.

I have attached the most recent claim reserve report. Ralph expects March terminations to be $50-55 million.

As such, total terminations for the quarter will be less than in the fourth quarter by $7-12 million on a reported basis, but $15-20 million given the reserve factor change. Some drag on terminations should be expected, given the lower level of new claims in the fourth quarter. However, reopens are low so far, so net termination levels should be closer to last quarter and above the second and third quarters.

Attachment

TJ93

# MEDICAL DIRECTOR
# DISABILITY CLAIMS

## SUMMARY OF JOB

This position is responsible for establishing and maintaining best-in-industry practices for the medical evaluation and management of disability claims.

## SPECIFIC ACCOUNTABILITIES

1. Provide leadership in the development of comprehensive programs for the medical management of disability claims.

   * Determine and implement durational protocols.
   * Partner with claim unit heads in the establishment of diagnosis specific templates for investigation and management of disability claims.
   * Ensure establishment of appropriate training programs for claim representatives focusing on medical evaluation and management of claims.
   * Establish process and guidelines for referrals from claim representatives, consultations with attending physicians, etc.
   * Ensure feedback to medical resources supporting underwriting.

2. Ensure appropriate medical resources are brought to bear in the effective management of disability claims.

   * Determine medical resources required to achieve best in industry claim management capabilities.
   * Select, develop and motivate on staff physicians.
   * Identify, select and evaluate part-time or third party medical resources.

3. Establish effective process for acquiring independent medical examinations.

   * Evaluate and select IME physicians.
   * Implement process and guidelines for IME referrals.
   * Coordinate feedback to attending physicians and IME physicians.

4. Provide evaluations and recommendations on high exposure claims.

   * Review file and supporting documentation.
   * Initiate direct dialogue, where appropriate, with attending physicians.
   * Determine additional data/records needed to evaluate claim.
   * Opine on limitations and restrictions.

PROV 02170

000139

QUALIFICATIONS

Personal characteristics include broad business perspective, demonstrated leadership capabilities, pro-active attitude, strong communication skills, and a collaborative orientation. Educational and experience requirements include a medical degree with Board Certification in one or more of the approved medical disciplines of the broadest clinical perspectives. Five to ten years of successful clinical practice experience, a Tennessee medical license, and prior experience in insurance medicine.

PROV 0217

000140

04/23/99  13:24 FAX 423 755 1910        PROVIDENT LAW-LT                                      ⊠035

# Provident Internal Memorandum

**To:**  Tom Heys

**From:**  Ralph Mohney

**Date:**  January 17, 1996

**Re:**  Individual Disability Claims - Monthly Report

## CLAIM RESULTS.

As reflected in the attached Exhibit I, claim results were highly favorable in December as new claims remained seasonally low, re-opens were slightly below average and terminations reached the second highest level this year. The tabular change continued at a high level, partially offsetting these favorable developments.

It should be noted that the attached exhibits exclude the impact of changes in claim reserve factors implemented at year-end. The impact was excluded to facilitate comparisons with prior periods. While the factor change does create significant differences in several of the line items shown in this report, it is my understanding that the aggregate bottom line impact (including IBNR reserve) in December is minimal.

The attached Exhibit II summarizes quarterly results. For the fourth quarter of 1995:

- New claims declined as expected to a seasonally low level. Reserves on new claims were down 15% ($16.8 million) compared to the previous four quarter average. The number of new claims was down only slightly, but the average size declined 12% reflecting lower monthly indemnities.

- Re-opens increased 7% ($2.5 million) over the previous four quarter average due to an up-tick in October, but generally remained within our expectations.

- Terminations increased 22% ($27.5 million) to the highest quarterly level ever. Both a higher number of terminations (up 5%) and a higher average size (up 16%) contributed to the increase.

- The tabular change increased 24% ($13.4 million) from the previous four quarter average.

Overall, we are both pleased and encouraged with the results of the claim management activities during the quarter. The $114.8 million of net terminations (terminations minus re-opens) represents a record level and is 28% ahead of the previous four quarter average. Moreover, the fourth quarter represents the 3rd consecutive quarter of $100 million or more of net terminations. In addition to enhanced claim management results, the seasonally lower new claims combined to produce the very strong overall financial results.

CV00100

**EXHIBIT**
**43**

PROV 02432

000141

04/23/99  13:25 FAX 423 755 1310        PROVIDENT LAW-LT                              ☐ 027

## KEY ACTIVITIES

The attached Exhibit III summarizes major accomplishments related to our "top 10 claim initiatives" over the course of the year. The vast majority of the planned action items were implemented and the aggregate accomplishments are truly impressive. The entire management team - including our representatives from Law and Human Resources - deserve considerable credit.

## STAFFING SUMMARY

The attached Exhibit IV reflects the status of our scheduled additions to staff.

- In the investigator category, John Morris was hired as a regional director of field investigators and Jeff Mayhall accepted a field investigator position in Birmingham.

   John Morris: Retired from FBI in December 1995 following 25 years of distinguished service. Most recently served as Chief, Training and Administration for the FBI Academy with overall responsibility for the Academy as well as the Bureau's world-wide training program. Previously served as Supervising Special Agent of the Boston office and Assistant Special Agent in Charge in the Los Angeles office. BBA, University of Miami; MPA, Northeastern University.

   Jeff Mayhall: Six years insurance related field investigation experience with Equifax and most recently with International Claim Specialists; BS, University of Tennessee-Martin; licensed private investigator, active member Tennessee Private Investigators Society and Tennessee Life and Health Claim Association.

- One consultant level position was filled.

   John Kas: Twenty-four years group claim experience (focusing on life and disability claims) with Equitable, Crown, Mutual of Omaha and Fortis. Currently Director of Claims for First Fortis in Syracuse. BS, Indiana University; Executive Management Development Program, Harvard Business School.

## ISSUES AND CONCERNS

The seasonality in new claims which contributed to strong fourth quarter results will reverse in the first quarter of 1996. Sharply higher new claims are expected. Additionally, the lower new claims in the fourth quarter reduces the inventory for potential closures in the first quarter. While we do not expect the same fall-off in terminations as was experienced in the first quarter of 1995, flat or slightly reduced terminations are likely. The higher new claims and flat or reduced terminations will result in less favorable experience. This deterioration in results should be expected.

RWM:ajr

cc:  Harold Chandler
     Glenn Felton
     IDC Management Team

000142        PBSV 02423

04/23/99   13:26 FAX 423 755 1310          PROVIDENT LAW-LT                                    @006

## EXHIBIT III

## Accomplishments Relating to Top 10

## Claim Improvement Initiatives - 1995 Summary

1.    STRENGTHEN INVESTIGATIVE CAPABILITIES

* Eleven field investigators and two regional directors hired, nearly doubling existing field staff. Quality of new staff is outstanding.
* Instituted formalized training program for field staff and conducted 2 one-week sessions.
* Revised referral process, clarified roles and responsibilities, and modified settlement authority to increase effectiveness and ensure appropriate controls.
* Established performance standards and instituted activity reporting system to track results.
* Fourth quarter claim resolutions involving field staff totaled $15.3 million - nearly four times the $4.1 million reported in the first quarter.
* Special Investigative Unit established focusing on fraud.

2.    EFFECTIVELY MANAGE MNDA CLAIMS

* Formed structurally separate psychiatric claim management unit to focus exclusively on MNDA claims.
* Retained Psychiatric Disability Consultants, Inc. to establish methodology for managing MNDA claims, provide training and provide professional assistance on specific claims.
* Intensive "objectification" training conducted; process and methodology modified (including development of unique forms, letters, questionnaires).
* Reduced caseloads from approximately 200 (in 1994) to 60 (currently) so as to allow time for more intensive objectification of each claim.
* Began evaluation of outside professional resources (psychiatrists and psychologists) to provide part-time, on-site consultations.

3.    AUDIT FINANCIAL ASPECTS OF RESIDUAL CLAIMS

* Formed structurally separate residual claim management unit to focus exclusively on residual claims.
* Staffed unit with 2 additional CPA's (three in total).
* Provided in-depth financial/tax training to members of unit.
* Successfully commenced on-site audits where income shifting or non-disability related reductions in earnings were suspected.
* Established consistent claim practices and procedures for management of residual claims.
* Reduced caseloads from approximately 200 (in 1994) to roughly 70 currently to permit more thorough review of claim and income loss.

PROV 02426

04/23/99  13:29 FAX 423 755 1316          PROVIDENT LAW-LT

4.  SHARPEN LEGAL DEFENSE

- Instituted and staffed role of "claim counsel" to focus exclusively and more intensely on "front-end" work.
- Formed structurally separate claim management unit to focus exclusively on claims from high legal exposure states.
- Implemented vast majority of LeBoeuf recommendations.
- Provided specific training sessions on legal environment in California and Texas.
- Adopted a more pro-active stance in defense against illegitimate claims.

5.  DEVELOP NEW CLAIM SYSTEM

- Provided staff (3 claim professionals full-time) to support high level study of directional issues involving platform, architecture and high level requirements.
- Participated in selecting vendor to drive out detailed requirements and develop code.
- Developed detailed user requirements.
- Devoted 3 additional claim representatives to development effort.

6.  INTRODUCE FORMAL TRAINING

- Developed and staffed Training and Quality Assurance unit.
- Developed formalized training program for new entry level claim representatives; conducted program for 24 new hires in four separate classes.
- Conducted 15 sessions of on-going training for all IDC staff.
- Developed quality assurance program designed to evaluate claim representative performance, identify training needs and identify specific claim resolution opportunities.
- Commenced development of a procedures manual.

7.  IMPLEMENT PROCESS IMPROVEMENTS

- Designed and instituted case management program (including claim specific action plans) for all new claims.
- Created two special handling units (SHU's) staffed with clerical employees for handling of approximately 3,500 low resolution claims.  Result was a reduced case load so claim representatives could focus on high resolution claims.
- Formed and staffed central support unit to allow off-loading of clerical functions from claim reps.
- Implemented numerous enhancements (including check writing capabilities) to existing system to allow greater efficiency and control.
- Instituted Round Table Review sessions for interdisciplinary review of problem claims. Over the course of 70 sessions, 353 claims with reserves totaling $228 million were reviewed and appropriate actions agreed upon.
- Established procedure for identification and proper handling of ERISA claims.
- Developed and implemented templates for management of three specific types of claims.

04/23/99   13:27 FAX 423 755 1910        PROVIDENT LAW-LT                        @133

8.  **INCREASE STAFFING**

* 24 entry level claim representatives hired and trained.
* 2 additional CPA's hired and trained.
* 10 experienced claim representatives/claim consultants hired from companies such as UNUM, Mass Mutual, Lincoln National, Mutual of New York, Maccabees, Metropolitan, and Fortis.
* Four top flight managers (Arnold, Denton, Kinback and McCall) brought in to strengthen the talent content of the organization and to assist in the implementation of our claim initiatives.
* New six step career path developed and implemented as a means of attracting and retaining quality staff.
* Caseloads reduced from approximately 200 per claim representative in 1994 to : 60 for Psych, 70 for Residual, and less than 100 for other claims by year-end 1995.

9.  **INTRODUCE REHABILITATION CAPABILITIES**

* Conducted successful pilot test.
* Developed criteria for broader based referral program.
* Trained claim reps on referral criteria and capabilities of rehab unit.
* Authorized hiring of additional rehab specialists.
* Of 87 completed referrals during 1995, 29 were successfully closed for a net reserve reduction of $7.3 million.

10.  **STRENGTHEN MEDICAL RESOURCES**

* Developed plan for strengthening medical resources through addition of full and part-time physicians.
* Commenced recruitment process.
* Initiated pilot test with Healthsource to assess their ability to supplement our resources.

## ACCOMPLISHMENTS NOT RELATED TO TOP 10 INITIATIVES

* Strengthened quality and quantity of feedback to product management and underwriting disciplines.
* Achieved considerable progress in moving away from "scrub" mentality to ongoing claim management process.
* Enhanced management information and increased focus on measuring performance and progress.
* Instituted special activities (fun committee) and provided liberal use of recognition and rewards as a means of maintaining morale.
* Established vision, strategy and guiding principles and communicated throughout organization.
* Took initial steps in developing teamwork and more collaborative culture.

04/13/96  13:36 FAX 423 733 1313    PROVIDENT LAT-LT    @043

# Provident Internal Memorandum

**To:** Tom Heys

**From:** Ralph Mohney

**Date:** February 15, 1996

**Re:** Individual Disability Claims - Monthly Report

## Claim Results

As reflected in the attached Exhibit I, claim results were unfavorable in January, due principally to a higher level of new claims.

As mentioned in last month's report, new claim reserve factors were instituted at year-end 1995. In aggregate, these factors served to lower the total reserve increase for January by approximately $2.7 million. Generally, these factors result in higher reserves on early duration (up to six months) claims and lower reserves on later duration (over two years) claims.

Because of the factor changes, January line item results are not comparable with prior periods. Later this quarter we hope to restate 1995 results using the new factors so as to provide an appropriate comparison base for 1996 results. In the interim, our analysis of line item results will reference both before and after factor change results. The attached Exhibit II reflects January results _before_ the impact of factor changes.

- New claims increased as expected from the seasonally low levels of the fourth quarter. Claims were up 29% or $11.2 million (12% or $4.7 million before factor changes) from the previous 12 month average. Claim frequency was unexpectedly low while average claim size was up sharply (31% after factor changes; 14% before).

- Reopens were 12% or $1.5 million (9% or $1.0 million before factor changes) lower than the previous 12 month average. Particularly gratifying was the fact that the number of reopens was at the lowest monthly level on record.

- Terminations were strong for a non-scrub month. After factor changes, terminations were 4% or $2.0 million higher than the previous 12 month average (before factor changes, terminations were 1% or $.5 million lower than the previous 12 month average). The number of terminations was the second highest level ever for a non-scrub month.

- Even after factor changes, the tabular increase was level with the previous 12 month average. Before factor changes, the increase was 32% ($6.4 million) higher than the previous 12 month average.

As mentioned in last month's report, the seasonal downturn in first quarter results should be expected. However, despite the large aggregate reserve increase, January results contain a number of positive signs. Based on number of claims, January results are actually better than anticipated with new and reopen claims lower than expected and terminations higher than

EXHIBIT

44

PROV 02413

000146

01/23/96  13:01 FAX 423 751 1313          PROVIDENT LIFE-LT                                    Ø043

expected.  The total increase in the number of open claims for the month was only twelve -
compared to 250 in January 1995 and a monthly average of 60 in 1995.  Additionally, both
before and after factor changes, net terminations for the month were more than double the
year ago level.

Key Activities

The attached Exhibit III summarizes key activities for January.

Staffing Summary                    Paul Martin          N W M L
                                    Younger             Mass Mutual

The attached Exhibit IV reflects our 1996 plan for additions to staff (excluding clerical
positions).  No additions were made nor planned for January.  The difference between planned
and actual staffing for January in the attached exhibit reflects either advance hiring or unfilled
vacancies at year-end 1995.

While no additions were recorded during January, there was considerable activity involving
consultant level positions and claim representative positions which should result in February
additions.

Issues and Concerns

The aggregate reserve increase for the month is both frustrating and perplexing, since many of
the fundamentals were favorable.  Additional attention needs to be directed towards
understanding the dynamics involved in the tabular increase.

As much of the infrastructure for improved claim effectiveness is now in place, we need to turn
our attention more to execution, measurements and feedback.  Capabilities are presently
being developed to support these initiatives.

RWM:ajr

cc:    Harold Chandler
       Glenn Felton
       IDC Management Team

04/23/99   13:32 FAX 423 755 1310       PROVIDENT LAW-LT                              @143

# Exhibit III

# KEY ACTIVITIES

- Task force assigned to study question of further specialization of claim management units recommended formation of separate units focused on orthopedic and cardiovascular conditions. We plan to migrate one of the regional units to an orthopedic focus beginning April 1, and form a cardiovascular unit late this year.

- Fourth class of trainees graduated following formalized training program. Currently recruiting entry level claim representatives to begin fifth class in February.

- Decision made to continue payment of Canadian claims in Canada. With this decision, additional actions are being implemented to allow Canada access to specialized resources and capabilities available in the U. S. Home Office.

- Initiated executive search for Medical Director.

- Rehab: three of fourteen completed referrals were successful for a net reserve impact of $.9 million for the month.

- Net reserve reductions involving field investigators total $5.1 million in January versus $3.5 million average over the previous twelve months.

- The quality assurance audit program developed in 1995 was implemented in January. Average score for January equals 81% reflecting opportunities for improvement. Primary improvement areas include follow through on action plan steps, receipt of FICA letters and verifying job duties.

- Three additional claim representatives devoted full-time to systems development effort. User support now numbers 6 full-time claims professionals along with three part-time.

- Central Support unit phone results: 15,240 calls; 89% answered within 60 seconds; 4.5% abandoned.

- Completed two department wide training sessions: Payments with Reservation of Rights; new process for ordering Independent Medical Exams.

- Commenced quarterly meetings with Senior Underwriters to discuss exceptions reports.

- Round Table Review sessions continued with an additional 40 claims representing $18.8 million in reserve reviewed in January. Appropriate actions were agreed upon and are being implemented.

PROV 02442

000148

*Provident Memorandum*

To:        Field Personnel

From:      Bobby Moss
           Tom Timpanaro
           John Morris

Date:      February 21, 1996

Subject:   1. Written Report-Changes
           2. Field Investigation Evaluation

As a result of a meeting with the Legal & Senior Claim Staff, we have found it necessary to change the content of the Field Reports as it pertains to "Recommendations and Suggestions."

Therefore effective immediately:

1. Recommendations and/or conclusions should not be included in the written report. Recommendations and/or conclusions are to be communicated either verbally to the home office or submitted in a separate memo.

2. The use of the phrase "The file seems to be in order" in the written report is inappropriate and should be discontinued. We need only the facts of the investigation in the written report.

Attached you will find a field report evaluation. This report is to be attached to each report returned to the home office. With each field report, the referring home office Claim Representative will receive and evaluate your report. These evaluations will also be reviewed your respective Director of Field Claims. These evaluations will be part of your annual performance appraisal.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
Case No. C97 4646 SC
PLAINTIFF Exhibit No. 44 C
Date Entered: 4/21/99
RICHARD W. WIEKING, CLERK
                    T. Schultz
BY:_____
              Deputy Clerk

000149

AKO9446

FILE DOCUMENT ION

1. We should make sure that our claim file is document in such a way :

    A. That it proves whatever we are saying.

    B. That everything should be in writing.

    C. That everything is from the logical source for the infor-
    ation. ex. Medical records from: doctors & hospital
        income → from claimants tax return crcccc

2. We should make sure that we do not have anything in our claim files that could be used against the company if the file winds up in court; such as statements: CLAIMANT is crook

3. When we obtain medical information, we should request it from ALL SOURCES AVAILABLE TO US, + NOT FROM ONE SOURCE

    [AND IT SHOWS THAT PRO...
IS GETTING ALL THE INFORMATION IN ORDER TO MAKE A GOOD DEC...

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
Case No. C97 4646 SC
PLAINTIFF Exhibit No. 440
Date Entered: 4/21...
RICHARD W. WIEKING, CLERK
BY: T. A Matz

AKO944

000150

04/23/93   13:40 FAX 423 755 1310          PROVIDENT LAW-LT

# Provident Internal Memorandum

**FILE COPY**

*To:*      *Tom Hays*

*From:*    *Ralph Mohney*

*Date:*    *April 17, 1996*

*Re:*      *Individual Disability Claims - Monthly Report*

## Claim Results

As reflected in the attached Exhibit I, claim results were highly favorable in March. New claims moderated, reopens remained low and terminations reached a surprisingly high level.

Strong results in March largely offset the unfavorable results in January and February. Exhibit II compares first quarter 1996 results with the previous four quarters. First quarter results are shown both before reserve factor changes (to allow comparison with the previous four quarters) and after reserve factor changes.

On a <u>before</u> factor change basis:

- New claims of $126.6 million were $10.7 million (9.2%) above the previous four quarter average. Higher claim size (due principally to larger monthly indemnities) accounted for the increase, as the number of claims grew less than one percent. Exhibit V reflects a profile of new claims for 1996 vs. 1995.

- Re-opens totaled $23.0 million down $8.3 million (23.9%) from the previous four quarter average. As a percentage of terminations, first quarter re-opens were 19% compared to 23% in 1995. The improvement in re-open ratio reflects a higher quality of claim terminations.

- Terminations reached the second highest level ever at $147.2 million, up $15.1 million (11.4%) from the previous four quarter average. While terminations were down slightly from the fourth quarter of 1995, it was expected that the low level of new claims in the fourth quarter of 1995 would translate (after an approximately three month lag) to lower termination levels in the first quarter.

- Before factor changes, the tabular change moderated somewhat from the fourth quarter level but remained $4.4 million (7.4%) above the previous four month average. After factor changes, the tabular change decreased sharply.

Overall, we are highly pleased with first quarter results. Before factor changes, the net termination ratio (terminations minus re-opens divided by new claims) reached 94% compared to 47% in the first quarter of 1995 and 82% for the entire year of 1995. When applied to first quarter new claims, the twelve percentage point improvement in net termination ratio from the 1995 average, translates to $15.9 million of lower reserves for the quarter. This result demonstrates that the investments in claim effectiveness over the last eighteen months are beginning to pay substantial dividends.

1100

000151

PROV 02464

EXHIBIT

46

**Key Activities**

The attached Exhibit III summarizes key activities for March.

**Staffing Summary**

The attached Exhibit IV reflects staffing changes in March.

One additional field investigator was added in March to replace a retirement.

- Ed Rose: Seven years claim investigative experience; 3 years law enforcement experience; honors graduate Auburn University B.S. in criminal justice; previously regional SIU investigator for UNUM.

One of two new claim consultants reported last month – Jeff Yeager – elected to remain with Berkshire Life as a result of a significant counter offer (including a job for his spouse) from that company. While we are disappointed with his decision, we continue to vigorously pursue other candidates. Two candidates have been invited to return for second visits.

Recruitment for a new class of claim representative trainees continues with a focus on high potential new college graduates.

**Issues and Concerns**

The first quarter provides strong momentum for what we believe will be a defining year of claim effectiveness at Provident. While some gaps still exist, the infrastructure for effective claim management is largely in place. However, significant efforts need to be directed towards pushing these improvements deep into our culture, more closely monitoring activities and results, and achieving consistently higher levels of performance.

RWM:ajr

cc:    Harold Chandler
       Glenn Felton
       Cliff Stalter
       IOC Management Team

PROV 02465

000152

04/23/99  13:41 FAX 423 755 1910          PROVIDENT LAW-LT                                      ☑013

EXHIBIT III
KEY ACTIVITIES

- Roundtable review sessions continued with an additional 43 claims representing $20 million in reserves reviewed in March.  Appropriate actions were agreed upon and are being implemented.

- Training - a full day of "objectification" training was conducted by Tom Morse of Psychiatric Disability Consultants for all claim representatives other than those in the Psych Unit.  Originally conducted for claim reps in the Psych Unit, we found most of the principles and methods associated with "objectification" to be equally applicable to other more subjective disabilities.

- QA Scores - Average QA scores for March dropped to 73% bringing year-to-date results 81%.  The top five improvement areas included: timeliness of initial telephone interview, verification of occupational duties, timeliness of follow-up on outstanding information, waiver of premium and FICA procedures.

- Central Support Unit phone results improved in March as abandoned calls dropped to 2.7% and 92% of all calls were answered in less than one minute.  A total of 13,259 calls were received.

- Doug Freytag spent approximately three weeks in the Canadian Head Office in March reviewing claim files, providing training, moving the office and recruiting additional claim reps.  One vacancy was filled and one other remains.

- Net reserve reductions involving field investigators totaled $2.3 million in March bringing the year-to-date reductions to $9.8 million.  This compares to $4.1 million of reserve reductions in the first quarter of 1995.  This improvement is driven by higher activity levels in the field - 955 completed investigations in the first quarter of 1996 vs. 569 in the first quarter of 1995.

- Rehabilitation results:  Two of fourteen completed referrals were successful for a net reserve impact of $.2 million for the month.

- Six field investigators spent one week each in the Home Office during March reviewing files for investigative opportunities or other needs.

- An evaluation process was introduced in March focusing on the quality and timeliness of field evaluations.  Essentially, each investigative report is evaluated by the requesting claim representative on four different factors.  An overall score is determined from these ratings and is taken into account in both training and performance appraisal.  For March, the average score was 89%.

- All normal pregnancy claims exceeding certain parameters were audited to ensure the appropriateness of coding.

- Significant overtime was worked to compensate for days lost in February and March due to weather, heavier training commitments and other factors.

PROV 02463

000153

04/23/93  13:43 FAX 423 755 1310        PROVIDENT LAW-LT                    @023

## Provident Internal M.

**To:**       Tom Heys

**From:**     Ralph Mohney

**Date:**     May 22, 1996

**Re:**       Individual Disability Claims - Monthly Report

### Claim Results

As reflected in the attached Exhibit I, claim results were unfavorable in April, with higher new claims and lower terminations.

It should be noted that the 1995 results reflected in the attached exhibit have been restated based on reserve factors currently being used for 1996. This restatement allows an accurate comparison of current results to prior year results.

For the month of April:

- New claims of $51.7 million were $5.4 million (12%) above the previous twelve month average. The number of claims increased 5% while the average size increased 7%. The attached Exhibit II reflects a profile of new claims.

- Reopens totaled $9.5 million, down $1.2 million (11%) from the previous twelve month average.

- Terminations of $45.5 million were $4.6 million (9%) below the previous twelve month average. This reduction was driven by a 12% decline in the number of terminations. The average size of terminations increased 3%.

- The tabular change was $16.4 million, up $1.7 million (12%) from the previous twelve month average.

While results in April were not favorable, they were generally in line with previous non-scrub months. We expect continued improvement in May.

### Key Activities

The attached Exhibit III summarizes key activities for April.

### Staffing Summary

The attached Exhibit IV reflects staffing changes since our last report.

A field investigator was added in New Orleans:

000154

PROV 02475

**EXHIBIT**

47

- Chris Pazos: Three years workers comp claim experience; University of Southern Mississippi, BS Criminal Justice, National Deans list, Outstanding College Students of America.

Two claim consultants have accepted offers with Provident:

- Candice McGrath: 17 years disability and life claim experience; previously Disability Claims Manager with Northwestern Mutual Life; medical assistant certificate, degree in business administration from University of Wisconsin.

- Dan Christner: 23 years disability and life claim experience; previously Director of Individual Disability Income Claims, Lincoln National Life; FLMI, ACS.

Six highly talented individuals have been selected to participate in our latest training class which began this month. All are college grads - two with psych degrees and one with a masters degree in vocational rehabilitation; four were recognized for college or national academic honors; universities represented include University of South Carolina, University of Texas, University of Georgia, University of Tennessee and UTC. Three of these individuals came to us as a result of college recruiting efforts this spring.

Issues and Concerns

Insufficient medical resources continue to hamper improved claim effectiveness. As our search for a medical director continues, we are now proceeding with plans to contract (on a part-time basis) a number of local physicians in selected specialties. To date, we have contracted an orthopedic surgeon, an ophthalmologist, and a generalist. Additional professional support for the psych unit (beyond that provided by Psychiatric Disability Consultants) is also being sought.

As we move a large block of claims from special handling status to claim management status, it is imperative that the additional resources contemplated in our budgets be available.


RWM:ajr

cc:   Harold Chandler
      Glenn Felton
      Cliff Stalter
      IDC Management Team

000155

PROV 02479

04/23/99   13:44 FAX 423 755 1910          PROVIDENT LAW-LT                                        ⊠033

# EXHIBIT III
## KEY ACTIVITIES

- Our migration towards specialized claim management units continued in April with the formation of a "back" unit. All new claims involving back conditions are now being handled by this unit. Dr. Robert Coddington, a local board certified orthopaedic surgeon, has been contracted to work on a part-time basis in support of this unit. Initial training has taken place and specialized templates and protocols are being developed.

- In a related move, our psychiatric claim management unit has been split into two units due to the large size of the unit - 25 employees currently with plans to increase to 30 or more by year-end. Chris Kinback heads the Western division of the psych unit, which includes all high litigation risk states while Jeff McCall heads the Eastern division which includes states in the eastern US along with all residual psych claims.

- Our field investigators completed one of two week long training sessions in the Home Office scheduled for 1996. Topics included settlement negotiations; interview techniques, report writing, trial and deposition preparation, and a team building session with Home Office claim reps. Attendees rated the sessions 7.9 on a scale of 0 (poor) to 10 (exceptional).

- Roundtable review sessions continued with an additional 38 claims representing $14.6 million in reserves reviewed in April. Appropriate actions were agreed upon and are being implemented.

- QA scores for April increased to 83% bringing year-to-date results to 81%. Improvement areas were consistent with prior months reports. For the month, verification of occupational duties showed improved results.

- Central Support Unit results reached the strongest level ever in April as abandoned calls dropped to 2.4% and 93% of all calls were answered in less than 45 seconds. A total of 13,795 calls were received.

- Field investigators completed 275 referrals in April, down from an average of 325 in the first quarter due to the week long training. Quality and timeliness of investigations was evaluated at 89%.

- Rehabilitation results: 4 of 33 completed referrals were successful for a net reserve reduction of $4.1 million for the month. Year to date net reductions total $5.6 million.

- Commenced consultant level review of 824 low resolution potential cases which were temporarily placed in special handling (auto pay) status until staffing increased. These claims will be evaluated for return to a claim management unit or placement in permanent special handling. The review process is expected to be completed by the end of the year.

- Implemented a tracking system to measure over 30 activities performed by claim representatives and consultants in the Psych unit. This system is designed to place additional emphasis on activity based claim resolution and will facilitate stronger follow-up on quality and quantity of activities by claim representatives.

PROV C2482

04/23/99  13:33 FAX 423 755 1610          PROVIDENT LAW-LT                                    ☑001

# Provident Internal Memorandum

**To:**      Tom Heys

**From:**   Ralph Mohney

**Date:**    July 17, 1996

**Re:**       Individual Disability Claims - Monthly Report


<u>Claim Results</u>

As reflected in the attached Exhibit I, claim results were outstanding in June. New claims declined to the lowest level this year, reopens were at the lowest level in the last four years and claim terminations were at the highest level in the last year.

Strong results in both May and June contributed to a record quarter. The attached Exhibit II reflects quarterly results for the past five quarters. Exhibit III provides a graphical presentation of this data over the last six quarters.

- New claims of $147.0 million were $3.2 million (5.9%) above the previous four quarter average. Higher claim size (due principally to larger monthly indemnities) accounted for the increase as the number of new claims actually declined 3%. Excluding the seasonally low fourth quarter, new claims were up only $1.3 million (.9%). Exhibit IV reflects a profile of new claims for 1996 and 1995.

- Reopens declined to $23.0 million - the lowest level for which we have comparable data (last four years) and $8.0 million (26%) below the previous four quarter average. As a percentage of terminations, second quarter reopens were 14% compared to 26% in all of 1995. The continued improvement in the reopen ratio reflects a higher quality of claim terminations.

- Terminations reached a record level of $166.7 million, up $16.5 million (11%) from the previous fourth quarter average. The size of terminated claims was up 9% while the number of terminations increased 2%.

- At $36.6 million, the tabular change was $5.6 million (13%) below the previous four quarter average.

Obviously, we are pleased with second quarter results. These results represent a return on the investments which have been made over the last 18 months to improve our claim effectiveness. As such, we believe they are sustainable and that the momentum of the last six quarters will continue into the third quarter of 1996.

As reflected in the attached Exhibit V, on a year-to-date basis, net terminations are up $91.4 million (51%) while new claims are up only $6.7 million (2%) compared to the first half of 1995.

EXHIBIT

49

PROV 02506

000157

04/23/99  13:33 FAX 423 755 1910          PROVIDENT LAW-LT

## Key Activities

The attached Exhibit VI summarizes key activities for June.

## Staffing Summary

The attached Exhibit VII summarizes staffing levels. There have been no changes since our last report. However, interviewing has commenced for a new class of trainees who are expected to join us late this month. Additionally, Doug Fraytag, Vice President Field Claim Investigations, has announced his intention to retire following over 32 years of service to the company. Doug will be missed both personally and professionally. We wish him well as he joins his son in a new business endeavor. Doug's position will not be filled at this time, pending completion of the transition planning relating to structure and deployment of resource. In the interim, his direct reports will work in more of a team management role reporting to me.

## Issues and Concerns

A heavy vacation schedule along with commitment of substantial resources to transition planning activities will challenge our ability to achieve an increasing level of claim management activities during the third quarter. We are committed to maintaining this difficult balance and are prepared to adjust transition planning efforts to the extent necessary to maintain operational effectiveness.


RWM:ajr

cc:   Harold Chandler
      Glenn Felton
      Cliff Stalter
      IDC Management Team


PROV 02567

000158



PROV 025LQ

000159

04/23/99  13:56 FAX 423 755 1919          PROVIDENT GAM-LI

## EXHIBIT VI
## KEY ACTIVITIES

- Initial planning for the transition to an integrated claim operation (Provident and Paul Revere) commenced in June with the development of a scoping plan, the identification of key deliverables and the assignment of over 50 individuals to fourteen different work teams. The teams commenced their work during a two-day session in Chattanooga July 8 and 9 and are continuing their work during a session in Worcester the week of July 15.

- June concluded 15 months of roundtable review sessions each Tuesday and Thursday evenings. Based on the value of these sessions as well as the acquisition of additional medical and legal resources to support the reviews, the roundtables have been expanded to a daily basis occurring within each of the five specialized claim management units. In addition to problematic on-going claims, all rescissions and new high indemnity claims will be reviewed in the roundtable forum. Over the last 15 months, 585 claims representing $323 million in reserve have been reviewed with appropriate actions agreed upon and implemented.

- Activities in the Residual unit were particularly heavy during the second quarter as year-end audits were conducted based on 1995 Federal Income Tax returns. These audits produced true-ups to previously reported monthly income contributing to a net tabular decrease for residual reserves of $.8 million in the second quarter versus a net tabular increase of $8.7 million in the first quarter.

- A major milestone of the systems development effort was reached during June with the sign-off of the business specifications. A team of claim users, claims management, Internal Audit, and Systems conducted an intensive review of the details of the proposed system and the corresponding rules in the month preceding the sign-off. Technical design is now proceeding with the initial coding of the system. It is anticipated that version one of the Leader system will be incorporated into the common (Provident and Paul Revere) systems which will support the integrated individual disability claims operation in the future.

- Rehabilitation results: 5 of 21 completed referrals were successful for a net reserve reduction of $.8 million for the month. Year-to-date net reductions total $7.6 million.

- Field investigators completed a record 443 referrals in June up from an average of 345 in the first five months. Quality and timeliness of investigations was evaluated at 86%. Individual investigator scores ranged from 80% to 94%.

- QA scores for June were 83% bringing year-to-date results to 80%. Due to other priorities, the sample of claims audited in June was small.

- Central Support unit results remain strong as abandoned calls were 2.2% and 95% of all calls were answered in less than 45 seconds. A total of 13,299 calls were received. 27% of these calls (3,617) were handled without being transferred. During June a decision was made to expand Central Support unit services to Voluntary Benefit claims. Higher service levels along with greater efficiencies resulting from economies of scale are expected.

PROV 02513

000160

04/23/99  14:00 FAX 423 755 1910        PROVIDENT LAW-LT                                    ⓐ023

# EXHIBIT IV
## KEY ACTIVITIES

- Transition planning with Paul Revere continued at an intensive level with heavy involvement of managers from both companies. Various work teams are making good progress and a number of these teams are nearing final recommendations. It is already apparent that the new claim process will reflect a blend of Provident practice, Revere practice and a number of practices not currently followed by either company.

- As referred in last month's letter, our round table reviews were expanded and institutionalized in July. Under the new format, a total of 106 claims with reserves totaling $33.4 million were reviewed in July. Under the previous format, an average of 39 claims with reserves totaling $21.5 million were reviewed on a monthly basis. In addition to involving greater volumes of claims, the new round table reviews are focusing more on early duration claims.

- A tracking mechanism is being established to better monitor the level of investigative and claim management activities. For July, the following major investigative actions were undertaken:

  | Independent Medical Exams | 96 |
  |---|---|
  | Surveillances | 84 |
  | Field Referrals | 349 |
  | Medical Records ordered | 1,764 |

  For August, we will supplement these categories with information on claimant interviews, attending physicians calls, rehab referrals, etc.

- Field Investigators set another new record with a completion of 479 referrals in July, up 36% from the first six month average. The average number of completed referrals per individual field investigator has risen steadily from 13 per month in January to 19 per month in July. The quality and timeliness of the investigations was evaluated at 87% in July, while individual scores ranged from 80% to 92%.

- Rehabilitation results: Six of 24 completed referrals were successful for a net reserve reduction of $1.3 million, bringing the year-to-date reduction to $8.8 million.

- QA scores for July are 80% and the year-to-date average is also 80%. Refresher training on two topics identified in previous audits was conducted in each of the claim units.

- The central support unit received 14,574 calls in July with 96% of these being answered within 45 seconds. Only 2.5% (371) were abandoned and 28% (4,140) were assisted without being transferred.

PROV 02527

000161

01/23/00  14:13 FAX 423 755 1916        PROVIDENT LAW-LT

# Provident Internal Memorandum

**To:**       Tom Heys

**From:**   Ralph Mohney

**Date:**    November 22, 1996

**Re:**       Individual Disability Claims - Monthly Report

### Claim Results

As reflected in the attached Exhibit I, claim results were unfavorable in October, following the historical pattern for the first month of a quarter. The $24.2 million aggregate reserve increase was up $7.8 million (48%) from the previous twelve month average. However, it was also the lowest reserve increase for the first month of a quarter over the last two years.

- New claims of $48.4 million were up $1.7 million (4%) from the previous twelve month average. Growth in the average size of claim accounted for the entire increase as the number of new claims remained flat. Exhibit II reflects a profile of new claims for 1995 and 1996. Accident claims fell from previous levels as did claims from the Southern region.

- Reopens climbed to $12.3 million, up $2.5 million (25%) over the previous twelve month average and the highest level this year. The average size of reopened claims continue to increase as the number of reopens declined 11%. Formal monthly reports on all reopens in excess of $250,000 have been instituted. While not all of these reports have yet been received for October, it appears that the spike-up results from several very large but legitimate reopens.

- Resolutions of $47.8 million were $5.6 million (11%) less than the previous twelve month average, due to a smaller average size. The number of resolutions was in line with the average of the last twelve months.

- At $13.3 million, the normal monthly reserve change was $2.0 million (13%) below the previous twelve month average. The normal aging component decreased $.9 million while coding corrections (benefit period, date of disability, etc.) resulted in an $.8 million decrease.

The attached Exhibit III compares results on a year-to-date basis. Net resolutions are at $115 million through October, while new claims have declined $13 million. The overall reserve change through October is $122 million less than that same period in 1995.

### Outlook for November

At mid-month, November appears highly favorable. An expected seasonal downturn in new claims along with higher resolutions and a moderate "normal" change are positioning November for a single digit aggregate reserve change.

PROV 02553

000162                    EXHIBIT
                          53

04/23/99  14:14 FAX 423 755 1910          PROVIDENT LAW-IT

## Key Activities

The attached Exhibit IV summarizes key activities for October.

## Staffing Summary

The attached Exhibit V summarizes staffing levels.

Steve Harmon, the unit head for the general claim unit resigned to pursue a career change. We support Steve's decision and wish him well. A replacement for this position is currently being sought. In the interim, the general unit will report to Ken Denton who now has overall responsibility for the General and Residual units.

## Issues and Concerns

The backlog in incomplete field referrals referenced in last month's letter continues to grow. New field referrals (reflecting higher claim investigation activities) are growing at a faster rate than the increased productivity of our field investigators. Presently, our inventory of incomplete referrals is three months versus a normal inventory of one month. While steps are being taken to re-prioritize and step-up completions over the short-term, additional field staffing is urgently needed.


RWM:ajr


cc:   Harold Chandler
      Glenn Felton
      Cliff Stalter
      IDC Management Team

PROV 02569

000163

Outline for "INFORMATION MANAGEMENT"

(Presented by the Law Department of Provident Life & Accident Insurance Co.)

Protecting your Company's confidential information and following Company guidelines for document retention is an important part of your job. The Company's success in managing legal and business information depends in part on how you and others handle or manage this information. Doing your part means following three simple rules:

(1) Think before you speak or write;

(2) Keep private documents and conversations private; and

(3) Follow your Department's document retention and destruction rules.

These rules and some of the other important points illustrated by the video are summarized in this outline.

I. <u>Think Before you Speak or Write.</u>

A. Answer three questions before speaking or writing about sensitive or confidential Company information.

1. Is the information private?

2. Does the person I'm speaking or writing to <u>need</u> to know it?

3. <u>By disclosing it, am I putting the Company at risk legally or financially?</u>

B. <u>Make it a habit to weigh your words carefully before you write or speak and trim out the incautious language when you revise.</u>

1. Do not confuse facts and your opinions. Facts are what people usually want to hear. Uninvited opinions and "off the cuff" remarks should be kept out of print.

2. Be clear and precise, and do not make sweeping generalizations or exaggerate for effect.

3. <u>Imagine how your words would sound to an "outsider" in the event your communication is later brought up in court.</u>

4. <u>For matters that are especially sensitive or confidential, consider conducting most of your communication in person, not on paper. If you do write something that's sensitive, be cautious. Say only what's necessary, and copy only those who need to know.</u>

C. If you are dealing with a legal issue, get some legal advice before you write, -- that's what the Company attorneys are here for. <u>Do not conduct your own legal investigations.</u>

1. If a task-force is organized to include one of the Company atto

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
Case No. C 97 446 SC
PLAINTIFF Exhibit No. 44 F
Date Entered: 4/3/01
RICHARD W. WIEKING, CLERK
By:
Deputy Clerk

EXHIBIT
64

000164