# ATTACHMENT

## "A"
## Part 8
## Documents Bates Stamped
## 165-212

ATTACHMENT "A"

2. Any memo announcing a legal investigation should come from the Law Department or a high level manager following consultation with the Law Department. The memo should be sent only to those employees who need to be involved and should remind them of the need to keep it and all matters concerning the investigation confidential.

3. Any status memos, non-attorney notes, or other documents generated during a legal investigation should be retained by or as instructed by the Law Department. Copies should not be retained unless you are otherwise informed.

D. In a nutshell, when you're writing for the Company or about the Company, keep it straight, keep it right -- and, most importantly, keep it ethical - keep it legal!

II. Keep Private Documents and Conversations Private.

A. If your communications about Company legal matters have been discussed only with attorneys and other Company personnel with a need to know, then you have the right to keep these communications private (and to avoid having to testify about them in court).

B. You and the Company may lose this right if the communications are disclosed to persons inside or outside the Company who do not have a legal need to know.

C. Company information should be protected just as any other type of Company property.

1. Do not give out confidential document identification numbers or computer passwords.

2. Do not leave computer workstations logged on and unattended.

3. Take steps to avoid eavesdropping situations with speakerphones, open doors, conversations in hallways and other public places.

4. Do not leave sensitive documents on desks or in plain view.

5. See that any visitors to your Department are properly escorted.

6. When a sensitive legal document is sent to you, do not copy it, post it on a bulletin board, forward it to others, or otherwise discuss it's contents without first getting clearance from the Law Department. After getting clearance, make sure the documents are marked "Privileged and Confidential" if appropriate.

7. Use the "Mark-Message-Private" and Special Delivery features of PhoneMail for confidential messages.

8. Avoid sending written memos about sensitive subjects when a phone call or face-to-face discussion will suffice.

9. Shred all sensitive papers that will not be needed for business purposes. Generally, when copies of certain legal type documents are sent to you for informational purposes only, these documents should be shredded after you have read them. These may include:

- 2 -

000165

GSCONF 392 1

a) documents prepared for lawsuits, and reports of investigations or legal audits;

b) memos, responses or reports from the Law Department involving actual facts about Company business or legal situations;

c) Any copies of legal document drafts, especially when the drafts contain handwritten notes or comments in the margins (these documents should be kept by the Law Department).

## III. Follow Your Department's Document Retention and Destruction Rules.

A. Learn the document retention and destruction requirements for your own area. If you do not know, ask your manager. You should also review the attached memo from the Records Management Department titled "RECORDS AND INFORMATION MANAGEMENT – a Policy Statement" for additional information about records retention matters.

B. Retain only those documents needed for operations, legal compliance and official archives.

C. When finished with a project, destroy temporary drafts, reminder notes, worksheets, personal memos, duplicate copies and the like.

D. Set up a plan for managing your own records. At least once each year, you should identify important records to be retained and properly destroy the rest.

E. When documents are due to be destroyed, usually after retaining them for seven years for legal purposes, go ahead and destroy them! Do not be a "pack rat" who saves them "just in case."

F. Destroy chronological files or series of old, unnecessary documents wholesale instead of selectively purging "unfavorable" documents and creating suspicious "gaps in the record."

G. Do not forget computer records! They should be saved or destroyed according to the same principles as paper records.

H. Do not print SYSM messages unless they contain information needed in the file.

I. And last, but not least, if you get a legal directive to suspend your regular document destruction program, take it seriously! Such directives are usually a sign that legal action is on the horizon. It is important to follow instructions in these situations. In fact, if you are in doubt about any of the legal aspects of document retention, check first with the Law Department.

Conclusion: This video and outline have covered many situations and rules. No one can be expected to memorize all of these points, so we hope that this handout will serve as a useful reference and reminder. More importantly, we hope both the video and outline will help you recognize situations where you can better protect the Company's confidential information. If you have questions concerning a particular situation, please contact the Law Department.

RCA\1210a01

**000166**

GSCONF3922

04/23/03  14:13  FAX 423 755 1910        PROVIDENT LAW-LT

## EXHIBIT IV
## KEY ACTIVITIES

- Transition planning efforts related to the merger continue to occupy much of the time of management. Four teams completed their recommendations relating to field investigations, vendor relations, quality assurance and training, and claim settlements. The two remaining teams (DI claim process and structure) will present their recommendations to the scoping team during the week of November 15. This will conclude individual DI activity for this particular stage of the transition planning process.

- In October, 128 claims totaling $31.4 million were reviewed in roundtable discussions. Appropriate actions were agreed upon and initiated. Individual disability claim representatives have also participated in the review of over 24 LTD cases during the month and will be following up on agreed actions.

- The following claim investigations and management activities were reported for October:

|                          |       |
|--------------------------|-------|
| Independent Medical Exams | 130   |
| Medical Referrals         | 375   |
| Surveillances             | 70    |
| Referrals to Rehab        | 44    |
| Field Referrals           | 479   |
| Medical Records Ordered   | 1,222 |

- Rehabilitation results: Five of 24 completed referrals (21%) were successfully handled for a net reserve reduction of $.5 million, bringing the year-to-date total of reserves reduced through Rehab reviews and activities to $10.1 million.

- The Quality Assurance area audited 47 files in October and the results maintained the overall 85% accuracy rate. Additionally, the auditors trained all claim reps on processing claims with the Disability Annuity Supplement, and presented a session to the Field Reps on Objectification Training. The new hires are being released to their permanent unit assignments on November 15.

- Field Investigators completed 353 referrals, a 5% decline from the previous 9 month average. This decline was influenced by a week long training session conducted in the Home Office.

- All field investigative personnel and selected Home Office staff from both Paul Revere and Provident met during the week of October 7 - 11 for a joint training session. Some of the focal points were: Interviewing Techniques, Managing Surveillance, Recommended "Best Practices", Moot Court Exercise, Legal Update, and case presentations. Evaluations of all the sessions provide that the overall meeting was a great success. With 1 being low, and 10 high, scores for the twelve sessions evaluated rated from 5.3 to 9.3, with three sessions rating 9.2 to 9.3, five sessions 8.0 to 8.7 and four sessions from 5.3 to 7.4.

- Phone calls continued to increase as the Central Support Unit answered 19,329 calls in October, up 22% from the previous 9 months average of 15,100. Of that number, 94% were answered within 45 seconds and 2.6% were abandoned, exceeding our goals in each category.

- A data clean-up initiative has been undertaken to correct social security numbers, blank data fields and other data which could impact the calculation of reserves.

PROV 02573

000167

PROVIDENT INTERNAL MEMORANDUM.

TO:     Bob Berr
        Tom Heys

DATE: October 5, 1994

FROM:   Jeff McCall

SUBJECT:  Summary of October 3 DR Meeting

STRICTLY PERSONAL
AND CONFIDENTIAL

I have listed below my observations, key questions and a few conclusions gathered from the meeting on Monday.

1.  There was a general consensus that we should be careful in the words we use and the documentation developed during this project.

2.  Wayne Smith questioned whether what we will be doing is really "reengineering", since he perceived that our involvement will be removed from the day-to-day processes. I believe we concluded that although our efforts will not be concentrating specifically on the day-to-day processes, they would not be excluded from our scope and that we will need to coordinate closely with Ralph Mohney.

3.  There was some question from Doug as to whether or not we had a valid platform for predicting the future performance of our business. The conclusion was that while not perfect, our model will be a valuable tool in Tillinghast's work.

4.  Sue wanted to know what % of our claims denials are litigated.

5.  Sue wanted to know how many adjusters we had.   5 to

6.  Sue suggested that we initiate a litigation tracking system that analyzes outcomes based upon several different parameters such as impairment, contract provision, geography, claimant profile, and size of indemnity, etc. I think this information would be valuable. We need to follow up with Mike Gannon.

7.  Our 15 zone claims managers are basically investigators and need to be used more effectively. Tom is addressing this by having them report to Doug Freytag in the home office. There was some suggestion that we could be vulnerable to inappropriate settlements on their part. There was a general feeling that our senior claims adjusters are competent, that our newer adjusters (there are quite a few) are not very strong and that our work loads are generally not in sync).

6253

EXHIBIT
79

000168   0684

8.  Sue inquired as to the possibility of selling the good parts of the "old" block or even spinning off the old block. The spinoff doesn't seem feasible to me, but obviously retaining part of the business is an alternative. We will need to generate some capital in order to do this. Richard is providing some information to Johnson & Higgins who would presumably be the broker if we decided to do anything in this vein. At some point, it may be valuable to talk directly with a structurer about our objectives and leverage their creativity.

9.  Wayne suggested a broader way of thinking of the overall project using a 15 cell matrix defined within risk tolerance, capital and market vision parameters determined by management. The vertical components of the matrix were the ABC business, current business, and new business. The horizontal components of the matrix are environmental/market, product design, claims, distribution, and financial. I like our four initiative way of thinking about it better.

10.  Doug said that one of their first efforts would be to develop a concise risk profile. They would also be instantly interested in the adequacy of our statutory reserves and therefore they would be involved in the gross premium valuation. We need to clarify the extent of their involvement with Tom Wayne and Richard.

11.  Bill Malin said from a systems perspective, the major areas of emphasis would be insuring the control cycle was effective and that (i.e., that claims experience was appropriately fed into the front end decisions, e.g., underwriting and pricing) and analysis (perhaps design at some point) of the requirements necessary for a cost effective private labeling system.

000169  0685

## Provident Internal Memorandum

To:       Steve Harmon

From:     Barbara Collins

Date:     March 30, 1995

Re:       Psychiatric Claims - Summary of First Quarter 1995 Closures

Attached is the closure list for March 1995 and the following is a quarterly summary:

| Month | Reserves | Cost | Savings |
|-------|----------|------|---------|
| January | $  701,874.00 | $    6,000.00 | $  695,874.00 |
| February | 2,391,823.00 | 371,541.00 | 1,712,382.00 |
| March | 4,375,718.00 | 1,075,470.00 | 4,600,248.00 |
| Total for 1st Quarter | $ 1,468,815.00 | $ 1,481,211.00 | $ 7,006,504.00 |

These figures represent 33 claims which have been closed since January. Since the unit's consolidation we have closed a total of 38 claims. We are currently servicing approximately 250 open claims. In addition, the majority of closures represent older mental/nervous claims.

Let me know if you need additional information concerning the unit's claim activity.

Attachment

CONFIDENTIAL

1679

EXHIBIT
89

PSYCHIATRIC CLAIMS UNIT
CLOSURE REPORT
MONTH OF MARCH

| Name | Claim # | Date closed | Reserve | Cost | Savings | Status | Adj |
|------|---------|-------------|---------|------|---------|--------|-----|
| Harry Hodge | 845427 | 3/02/95 | $ 20,301.00 | $ 6,000.00 | $ 14,301.00 | Advance paid | MS |
| James Banda | 844671 | 3/06/95 | 14,428.00 | 14,428.00 | 14,428.00 | Denial | MS |
| Fred Minkleisner | 845324 | 3/21/95 | 140,502.00 | -0- | 140,502.00 | Denial | MS |
| Laura Brown | 845624 | 3/21/91 | 850,723.00 | -0- | 850,723.00 | Denial | MS |
| Wanda Egg | 833116 | 3/01/95 | 75,198.00 | -0- | 75,198.00 | Closed/RTW | B3 |
| David F. Brown | 853325 | 3/07/95 | 494,343.00 | 330,000.00 | 344,343.00 | Settlement/PS | B3 |
| Donald R. Anderson | 843667 | 3/10/95 | 154,427.00 | -0- | 154,427.00 | No longer TD | B3 |
| Donald R. Anderson | 843643 | 3/10/95 | 15,536.00 | -0- | 15,536.00 | No longer TD | B3 |
| Robert R. Kurz | 838731 | 3/17/95 | 450,450.00 | 31,330.00 | 419,320.00 | Advance paid | B3 |
| Leonard C. Curry | 858721 | 3/17/95 | 195,412.00 | 113,000.00 | 81,412.00 | Settlement/PS | B3 |
| Robert L. Sturgis | 849821 | 3/21/95 | 135,366.00 | 150,000.00 | 81,566.00 | Settlement/PS | B3 |
| Michele Errenda | 834451 | 3/21/95 | 832,493.00 | 415,000.00 | 417,493.00 | Settlement/PS | B3 |
| Peter Auricchio | 853031 | 3/23/95 | 127,357.00 | | 127,357.00 | Rescission | B3 |
| Julie Justin | 838129 | 3/06/95 | 87,394.00 | 1,000.00 | 86,394.00 | Closed/RTW | LH |
| John Mauser | 843844 | 3/02/95 | 5,647.00 | 4,200.00 | 1,447.00 | Full & final | LH |
| John Mauser | 843666 | 3/02/95 | 2,021.00 | 1,500.00 | 521.00 | Full & final | LH |
| Philip Cavender | 844921 | 3/01/95 | 393,398.00 | -0- | 393,398.00 | Denial | LH |
| Raymond Hicks | 832433 | 3/15/95 | 65,890.00 | -0- | 65,890.00 | No longer TD | LH |
| David Rubin | 844371 | 3/24/95 | 149,163.00 | -0- | 149,163.00 | Denial | LH |
| V. Ford Donnelly | 840164 | 3/21/95 | 329,722.00 | -0- | 329,722.00 | Rescission | LH |
| Thomas R. Cornello | 835101 | 3/02/95 | 39,336.00 | 6,140.00 | 33,196.00 | Advance paid | TP |
| Steve Lemmons | 859045 | 3/21/95 | 490,287.00 | -0- | 490,287.00 | No longer TD | TP |
| Michael Chistaro | 866031 | 3/24/95 | 45,343.00 | -0- | 45,343.00 | Denial | TP |
| Michael Chistaro | 866032 | 3/24/95 | 53,343.00 | -0- | 53,343.00 | Denial | TP |
| Michael Chistaro | 856031 | 3/24/95 | 18,339.00 | -0- | 18,339.00 | Denial | TP |

Total     $5,475,718.00 $1,071,470.00 $4,600,248.00

1330

**Memo**

TO:        Northern Region Adjusters

FROM:      Steve Harmon

DATE:      October 5, 1995

SUBJECT:   Scrub Activities

As I pointed out in my monthly letter to Ralph, much of our success in the 3rd quarter was attributable to our Permanent Scrub Activities. Please review the attached memorandum and make sure that you are performing the activities outlined, especially #1, #2, #4, and #5. The work that we do in the initial weeks of the quarter is critical if we are to have a good year. Thanks!

cc: Steve Korshoff
    Paul Douglass

SEH/td

EXHIBIT

96

GSCONF 40.1

000172

*REVISED*

# *Memo*

To:    Ralph Mohney
From:  Jeff McCall
Date:  June 12, 1995
Re:    Round Table Review Meetings

Leaba Cash and I met last week to discuss the further institutionalization of the Round Table Review Meetings. The key components of our recommendation are itemized below:

1.  We believe the meetings should take place daily at 8:30 a.m. according to the following schedule:

              Monday ------------ West & Voluntary Benefits
              Tuesday ------------ Orthopaedic
              Wednesday --------- North
              Thursday ----------- Psych
              Friday -------------- Residual & SHU

The new schedule would begin on July 1. It is anticipated that the meetings would adjourn between 11:00 a.m. and noon each day.

2.  The new RTR meetings would supplant the Wednesday and Friday legal meetings.

3.  It will be important to ensure Legal, Medical, Underwriting and management representation at each meeting. We should also provide an open invitation to representatives from the Product Development Area and from Marketing. Since not all cases or questions will concern Underwriting, it will be appropriate to consider all underwriting issues at the onset of each meeting.

Every claim representative will be required to attend and present cases at these meetings; the frequency would depend upon the unit size.

4.  The criteria for determining cases to be brought to the meetings is slightly different from the criteria previously used. Since there will no longer be the semi-weekly Legal Meetings, specifically questions would be brought to these meetings. This would also be the forum for spot medical questions. It is recommended that there be at least four in-depth case presentations at each meeting. Psych, North, West, and Ortho would each present four cases; Residual would present three cases; and Voluntary Benefits and SHU would each present one case.

Cases for in-depth presentation should have higher indemnity, complex or disputed issues, and/or be less than a year old. All rescissions should be brought to these meetings. In addition, all new claims with a monthly indemnity of $10,000 or more should be presented, subsequent to the initial phone call, in order to suggest action plan steps.

5.  What should we call these meetings? There is some advantage to including the word "legal" in the name for privilege purposes. Legal Round Table Review Meetings is suggested.

000173

BELL/CPG-10704

P R L 003193

EXHIBIT

Round Table Review Meetings
June 12, 1996
Page 2

6. It is important to remember that the review sheets should be destroyed after each meeting, and the actions recommended at the meeting, if approved, be transcribed to the Action Plan Log. Claim Representatives should be encouraged to be thorough, concise, and accurate in their presentations. All cases should be reviewed by a consultant prior to presentation, and claim representatives should come to the meeting with a recommendation on the cases they present.

7. It is important to remember that the purpose of these meetings is to promote a "triage" concept to claims management, to provide a learning opportunity for claims personnel, to ensure consistent claim handling, and to develop positions on difficult claim issues. It is felt that this approach is more efficient that an "ad hoc" meeting approach.

8. The next steps are to secure the necessary medical resources and determine the Underwriting attendees. Dr. Codington would attend the Tuesday meeting, we would find a part-time psychiatrist or psychologist for the Thursday meeting, and Dr. O'Connell would attend the rest.

We need to arrange through Bob Nash a schedule of Underwriters to attend the meetings. We have the necessary legal resources; we just need to formalize the schedule.

Please let me know if you wish to proceed.

Juliet

cc: IDCMT
    Leaba Cash

SELL/CFG-10705

# Memo

To:       Ralph Mohney
From:     Steve Harman
Date:     July 14, 1995
Re:       "Institutionalizing the Scrub"

The Northern Unit met on Thursday, July 13, 1995 to brainstorm ideas that will insure we are effectively managing our claims. Based on our meeting, we have agreed to institute the following procedures on a permanent basis immediately:

1. "Top 10 List" — Each adjuster will maintain a list of ten claimants where intensive effort will lead to successful resolution of the claim. As one name drops off, another name will be added.

2. Vocational Rehabilitation Resources — Each adjuster will identify 3 files per quarter to refer to Rehab. Issues concerning the file can range anywhere from assistance with occupational analysis to full rehabilitation of the claimant into another occupation. If three good opportunities are not present though, this standard can be relaxed somewhat. We're looking for quality here, not quantity.

3. Identification of Files for the Special Handling Unit — Instituting this step in our procedures will free up more time and resources to devote to claims in the investigative stage. Consultants will be signing off on any file prior to shipment to review for settlement possibilities.

4. List of All Claims in Investigative Stage — Each adjuster will maintaining a list of all claims on their CIQS system where the first payment has not been paid. Periodic review of the list will insure that we are moving the investigation along. This will not only lead to quicker claim resolution, but also provides the claimant better service.

5. Field Referrals — A minimum of 10 files will be referred to the field per month. This number can be less or more based on the volume of new claims. Again, we want quality field referrals, not quantity. With the number of new claims in our Unit though, reaching the minimum should be no problem.

6. Claims Over 2 Years Old — Each adjuster will do an in-depth review of 2 files per week in this category of claims. As issues surface, the adjuster will work with the consultant to find resolutions.

GSCONF 37.507

000175

EXHIBIT
114
P R L 003200

7. Claims Reaching the 6-Month Mark -- Using the attached audit worksheet, each adjuster will review their claims six months from the date of disability. Why let Quality Assurance have all the fun?

8. Roundtable Discussions -- Based on the auditing efforts of #3 and #7, each adjuster will identify two files per quarter for this forum. The adjuster will then work with the consultant to develop the issues and actions for the case.

9. Lists -- Periodically, we will request lists from Systems to review certain categories of claims. These can be coding error lists, over 60-day lists, impairment code lists, etc.

While the above actions will increase workloads somewhat initially, everybody in attendance at our meeting agreed that their efforts will be more than compensated by spreading the work over the entire period rather than the third month of the quarter. Of course, if additional effort at quarter end is needed, we are more than equal to the task.

abs/SH

cc:     Steve Karshoff
        Paul Douglass
        Andrea Barrett
        Roger Coulter
        Anne Davis
        Joy Gaston
        Judy Hahn
        Cindy Garland
        Pam Killough
        Kim Simmons
        Clayton Smith
        Charlene Stamey
        Anne Talley
        Dolly Vinci

GSCONF 27.303

PRIVILEGED

# Provident Internal Memorandum

To:      IOC Management Group
         Glenn Felton

From:    Jeff McCall

Date:    October 2, 1995

Re:      ERISA

A task force has recently been established to promote the identification of policies covered by ERISA and to initiate active measures to get new and existing policies covered by ERISA. The advantages of ERISA coverage in litigous situations are enormous: state law is preempted by federal law, there are no jury trials, there are no compensatory or punitive damages, relief is usually limited to the amount of benefit in question, and claims administrators may receive a deferential standard of review. The economic impact on Provident from having policies covered by ERISA could be significant. As an example, Glenn Felton identified 12 claim situations where we settled for $7.8 million in the aggregate. If these 12 cases had been covered by ERISA, our liability would have been between zero and $0.5 million.

In order to take advantage of ERISA protection, we need to be diligent and thorough in determining whether a policy is covered. Accordingly, I have attached a rough draft of questions that should be asked in our claim investigation process. I recommend that it be used for all claims. The key for determining the applicability of ERISA is whether or not the employer "sponsors" or "endorses" the plan. If the employer pays the premium, the policy would usually, but not always, be considered to be governed by ERISA. Salary allotment or payroll deduction arrangements, by themselves, do not necessarily mean that a policy is subject to ERISA. While our objective is to pay all valid claims and deny invalid claims, there are gray areas, and ERISA applicability may influence our course of action.

Another requirement needed in order to take advantage of the protection offered by ERISA, is to establish a formal appeal process for ERISA situations. When we deny a claim, we must include language in our letter that informs the claimant of the right to appeal our decision within 60 days. I have attached a copy of sample language. The appeal must be in writing and should be reviewed by a panel specifically established to review ERISA appeals. I recommend that the panel be composed of Chris Kinback, Bob Parks, Becky Absher, Tom Timperand and me.

We will be modifying the salary allotment agreements used at the point of sale to include endorsement language.

I am interested in any comments or feedback you may have on this issue.

JM:ajr

GSCONF 2893

000177

c 2002 National Broadcasting Company, Inc.  ALL RIGHTS RESERVED.

Prepared by Burrelle's Information Services, which takes sole responsibility for accuracy of transcription.  No license is granted to the user of this material other than for research.  User may not reproduce any copy of the material except for user's personal or internal use and, in such case, only one copy may be reproduced, nor shall user use any material for commercial purposes or in any manner than may infringe upon National Broadcasting Company's copyright or proprietary interests in the material.

** * **

SHOW:  Dateline

DATE:  October 13, 2002


BENEFIT OF THE DOUBT

Announcer: From our studios in New York, here is Stone Phillips.

STONE PHILLIPS: Good evening.  Insurance.  We buy it for peace of mind, to cover our homes, our health, our lives.  And millions of Americans have disability insurance to help replace lost income in case of a serious illness or injury.  If you can't work, those benefits may be crucial for you and your family.

But what if suddenly, unexpectedly your benefits were cut off?  That's what happened to the people in our first story.  Tonight, some startling charges against the biggest disability insurance provider in the country.  Here's John Larson with a DATELINE investigation.

JOHN LARSON reporting: (Voiceover) It began on this stretch of Interstate 40 in Albuquerque, New Mexico, in February of 1998.  A car salesman swerves to avoid some rocks, and the world suddenly turns upside down.

(Car driving on highway; interstate sign; car headlights spinning)

Mr. JOHN MONTANO: The nurses and all the physicians they were saying, 'Do you have any feeling?  Can you move your legs?' And--and I kept telling them, 'I can't feel anything from the chest down.'

LARSON: (Voiceover) The accident had severed John Montano's spinal cord.  Although he was spared some limited use of his arms, he's considered a quadriplegic, paralyzed for life.  And what lay ahead could hardly have looked worse.  Unable to work or support his family, Montano faced losing everything.  But like millions of Americans, he had prepared for just such a disaster.  He had paid $59 a month for disability insurance, which promised if he was ever too sick or too injured to keep working, it would help replace his lost income.  The checks began arriving as promised, but after two years, he got a shocking letter.  His disability benefits were being cut off.

(Crashed car; John Montano looking at photo album; Montano moving from wheelchair onto bed; girl helping Montano into bed; letters; excerpt from letter)

Mr. MONTANO: I was scared and I was frightened.  I go, 'Well, there--there's got to be a mistake.'

LARSON: But there was no mistake.  Montano's insurance company had decided that

despite his paralysis he no longer deserved benefits. So what was going on?

Sources tell DATELINE that what happened to John Montano may have been part of something much larger. Tonight, a DATELINE Investigation into whether the largest disability carrier in the United States, UnumProvident, launched a company-wide effort to cut costs aggressively, and in the process, unfairly denied benefits, selling out people it promised to protect.

Mr. MONTANO: They just basically cut me off and that was it.

LARSON: (Voiceover) In Montano's case, Provident claimed to have good reason. It said it had surveillance tape that Montano had improved immensely and he should go back to work selling cars.

(Montano talking to reporter; UnumProvident letters; excerpts from letters)

LARSON: Was there any way that John was faking his quadriplegia?

Dr. JONATHAN BURG: Absolutely not. There's no way.

LARSON: (Voiceover) Dr. Jonathan Burg is Montano's doctor.

(Jonathan Burg talking to reporter; Burg examining x-rays)

Dr. BURG: This is the area of his--basically the area of his paralysis.

LARSON: (Voiceover) He says the records are clear, Montano is a quadriplegic.

(Burg explaining x-rays)

LARSON: Did you tell the company, 'Look, I'll take any test you want me to take?'

Mr. MONTANO: Yes.

LARSON: And so did they do that? Did they evaluate you?

Mr. MONTANO: No, they--I didn't hear back from them.

LARSON: (Voiceover) The disability and life insurance industry says it faces $1 1/2 billion in fraudulent claims every year. So you can understand why it might investigate Montano's claim. But when UnumProvident finally shared its surveillance tape, Dr. Burg says it showed nothing new. Just John Montano driving his specially-equipped van, demonstrating what everyone already knew. Montano had a limited use of his upper arms. In a letter to UnumProvident, Dr. Burg stated, "by all standards this man is completely and totally disabled."

Meanwhile, his benefits cut off, Montano spiraled towards bankruptcy. His wife had divorced him after the accident. Now, faced with losing his home and his children, he says he became suicidal.

(Insurance company logos; Montano in wheelchair; video of Montano driving van; letters; excerpt from letters; Montano typing on computer with pencil; photo of Montano and family; Montano and girl)

LARSON: It sounds like it was pretty close.

Mr. MONTANO: Yeah. Yeah.

LARSON: (Voiceover) So how could something like this happen? These people say they know.

(Montano talking to reporter; people talking to reporter with their faces obscured)

Unidentified Man #1: They have to literally fight to get their benefits.

LARSON: (Voiceover) These three former UnumProvident employees tell a disturbing story of a company obsessed with finding excuses to cut off benefits.

(People in shadows talking to reporter; UnumProvident building)

LARSON: Did you feel pressure to deny claims?

Unidentified Man #2: Absolutely.

LARSON: They asked DATELINE to conceal their identities because they're afraid of reprisals.

Man #2: Find ways to close the claim. Just look so very carefully to find anything that will disqualify them from claim.

Man #1: They even gave incentives.

LARSON: Incentives how?

Man #1: Incentives for closing claims. If we projected that we're going to close 30, if we get to 30 we'll have a pizza party or we'll have an ice cream party.

LARSON: (Voiceover) Would the company pressure employees to terminate claims? Financial reports show that in 1993 the company was losing millions. Then came new management and a complete reversal. It began making millions. How did they do it? UnumProvident says by restructuring and making smart business decisions. But internal documents suggest the company had a new game plan to help it deny as many claims as it could.

(UnumProvident building; financial reports; graphic of net income; UnumProvident building; UnumProvident documents marked "confidential")

Offscreen Voice: (From video) Would you raise your right hand, please.

LARSON: (Voiceover) This man, Dr. William Feist, was one of Provident's two staff physicians when new management took over in 1993. He left the company two years later. Here in a deposition, he describes under oath how the company changed.

(William Feist in videotaped deposition; UnumProvident building)

Dr. WILLIAM FEIST: (From video) There was no concern for the individual. It was just bottom line. 'If we can terminate this file, we're going to do it.'

LARSON: (Voiceover) Dr. Feist says the company first began targeting the policyholders who were costing the company the most money at meetings called "round tables."

(Feist videotaped deposition; UnumProvident building)

Dr. FEIST: (From video) The object of the round table was to cut off the high-dollar claims.

LARSON: (Voiceover) UnumProvident urged DATELINE not to believe Dr. Feist, saying his knowledge of the company is "outdated," and that he has twice signed affidavits which included false information. Dr. Feist says they were simple mistakes. And remember, Dr. Feist is not the only one speaking out.

(UnumProvident letters; excerpts from letters; Feist videotape deposition; people in shadows talking to reporter)

Unidentified Man #3: It became a witch hunt.

LARSON: (Voiceover) These people say they encountered similar round tables years later.

(People in shadows talking to reporter)

Man #3: It was all looking for loopholes to close the claim.

LARSON: 'And if you can't do it, we'll have a team of experts here to figure out how you can.'

Man #1: It was mandatory. Even if you didn't have a claim, you'd better find one.

LARSON: (Voiceover) They say most vulnerable were policyholders with so-called "subjective illnesses," illnesses that don't show up on x-rays or MRI's, like mental illness, chronic pain, migraines or even Parkinsons.

(MRI scans; x-rays; MRI scans)

Man #1: 'So they're fatigued. Prove it.' 'So they've got achy joints. Prove it. Why can't they work?'

LARSON: And if they can't prove it?

Man #1: They're out of there.

LARSON: Denied.

Man #1: Denied.

LARSON: And they are not the only ones saying this. In all, 10 UnumProvident employees agreed to speak with DATELINE, but only if we promised not to reveal their names. We can tell you this about them: their jobs range from claim representatives all the way up to vice presidents. Some left the company on their own, some were fired, and some still work at UnumProvident. But all have described the same atmosphere, one of intense pressure coming from management, down to employees. Pressure to cut off benefits to policyholders.

(Voiceover) DATELINE also searched thousands of pages of internal corporate documents and court records and found evidence that appears to back up what they say. This is a series of internal monthly reports that show company savings seem to be growing--the result of cutting claims. "Terminated claims have reached a record level."

And, we found evidence that suggests the company set goals for cutting claims, deciding ahead of time how many claims should be denied. Like this 1995 top-level memo. It spells out a company-wide goal to terminate $132 million in claims. Here, an internal e-mail from last year alerting a group of adjusters they have one week to close 18 more claims to meet our projections. These people say if they didn't meet their projections, they'd have what they called "fire drills," intensive efforts to find claims to close.

(Stacks of papers; memos; excerpts from memos; UnumProvident building; memos; excerpts from memos; e-mail; excerpts from e-mail; people in shadows talking to reporter; files)

LARSON: The image is of a fire drill, a bell goes off, everybody rallies to a cause. What was the cause?

Man #3: The cause was looking for opportunities to close a file.

LARSON: Deny claims.

Man #3: Deny claims.

LARSON: (Voiceover) UnumProvident would not agree to an on-camera interview, but vehemently denies that it sets goals to terminate claims. In a letter to DATELINE, it says it does "estimate claim results to project a business plan into the future," which may have been "mischaracterized or misinterpreted by others." Also, it says that it will pay $3.6 billion in benefits this year. And that of all the people who filed claims with UnumProvident last year, only 2 percent were found to be not disabled. And, it says it has a consistent record in paying claims.

UnumProvident is more than just claims people and managers. It's also doctors, over 100 of them, doctors sworn to do no harm. Wouldn't a UnumProvident doctor stop the company from cutting off disabled people? Not according to this policy holder.

(UnumProvident building; UnumProvident letter; excerpts from letter; UnumProvident buildings; Rosemary Wright)

If I could have every wish in the world, I'd--I'd wish that I could teach again and see my kids get older. Two wishes.

LARSON: (Voiceover) Once a healthy, vibrant school teacher from Illinois, Rosemary Wright began suffering from a progressive, fatal form of emphysema. Even the smallest activity can leave her gasping for breath.

Her doctors say the kind of emphysema Wright has is genetic, it's not from smoking. The same disease had already killed her younger brother, and now it's killing her. When Wright became too sick to teach, UnumProvident began paying her disability benefits. But two years later, just as in John Montano's case, the company cut her off.

(Photos of Rosemary Wright; Wright making bed, pausing to catch breath; photo of man; Wright; Wright taking medicine from inhaler)

Ms. WRIGHT: I opened that letter, and I couldn't believe it. I thought, 'Why? I mean, this must be a mistake.'

LARSON: (Voiceover) UnumProvident based its decision on the opinion of a UnumProvident staff doctor who not only never examined Wright in person, but disregarded the opinions of Wright's two doctors, both lung specialists who had examined her and found her totally and completely disabled.

So how could a UnumProvident doctor help cut her off? Dr. Fergal McSharry, who doesn't know Rosemary Wright, worked for UnumProvident for a year and a half. He says it is more about the system than the doctor.

(UnumProvident building; UnumProvident letter; excerpt from letter; letter from Arizona Pulmonary Specialists, Ltd.; excerpt from letter; UnumProvident

building; Fergal McSharry)

LARSON: Doctor, were they interested in your honest, objective medical opinion?

Dr. FERGAL MCSHARRY: No.

LARSON: (Voiceover) McSharry says doctors at UnumProvident were pressured to write narrow medical reports to help the company deny benefits.

(UnumProvident building)

Dr. MCSHARRY: We were a means to an end.

LARSON: And the end was?

Dr. MCSHARRY: The end was denial.

LARSON: (Voiceover) And if too many of their opinions favored the claimants, McSharry says doctors would be reprimanded, in his case, by his boss.

(UnumProvident building)

Dr. MCSHARRY: I was told that I'd fallen off the career path.

LARSON: What did you feel you had to do to get back on their career path?

Dr. MCSHARRY: You know, I was just going to have to do more of what the claims people wanted me to do, which was...

LARSON: And what was that?

Dr. MCSHARRY: That was to make it easy for them to deny the claim.

LARSON: (Voiceover) Dr. McSharry says, like other doctors who work at UnumProvident, he succumbed to the pressure.

(McSharry talking to reporter)

LARSON: Did you ever change a medical opinion because you were being pressured?

Dr. MCSHARRY: Yes.  I did.

LARSON: These were cases where, in your best medical opinion, you thought these people were either sick or impaired or disabled.  You reversed your own best judgment?

Dr. MCSHARRY: Mm-hm.  Mm-hm.  I did that.  I didn't want to lose my job.  I didn't want to upset everybody around me, and I tried to play within the rules.

LARSON: (Voiceover) McSharry says he did it only a couple of times and vowed never to do it again.  Even so, if what he's saying is true, they got his medical soul.

(McSharry talking to reporter)

Dr. MCSHARRY: Yeah.  I'm only human.  I--I had--you know, I--I gave in once or twice.  I just hope I didn't hurt somebody too--too badly--

LARSON: (Voiceover) UnumProvident says it doesn't pressure doctors to terminate claims.  So what happened to Dr. McSharry?  He was fired from UnumProvident for what the company calls "poor performance."  It also says Dr. McSharry was forced

to resign from other jobs for similar reasons. But McSharry says that losing those other jobs had nothing to do with his performance, and the real reason he was fired from UnumProvident was that he began standing up to the company, refusing to play along. In fact, five of DATELINE's sources back up Dr. McSharry's story. Specifically, that doctors were pressured to help cut off benefits. Dr. McSharry is now suing UnumProvident.

(McSharry talking to reporter; UnumProvident building; UnumProvident letters; excerpts from letters; McSharry; UnumProvident building)

Dr. McSHARRY: I don't have a problem with people setting targets as long as those targets are reasonable and don't hurt people.

LARSON: Were these targets reasonable?

Dr. McSHARRY: No, not at all.

LARSON: Did they hurt people?

Dr. McSHARRY: They hurt people every day.

Ms. WRIGHT: They didn't just take the money away from me. But they took a sense of dignity away from me.

LARSON: (Voiceover) After UnumProvident ended her disability payments, Rosemary Wright says she was forced to begin spending money she had saved for a lung transplant just to cover living expenses. Wright sued the UnumProvident, which suddenly reversed itself, reimbursed her back benefits and began paying her again. But Wright has not dropped her lawsuit, and says the stress took its toll.

(Wright)

Ms. WRIGHT: I wasn't sleeping. You know, I was a wreck. And yes, last year was the sickest year I've ever had. I believe that they robbed me of a--of a whole--almost a year of my life.

LARSON: (Voiceover) As for John Montano, the quadriplegic, he also filed suit against UnumProvident and the company settled with him for an undisclosed amount of money.

(Montano getting into van)

LARSON: In the end what was this company's promise worth?

Mr. MONTANO: To me, nothing. Their word, the way they operate, they're totally unethical.

LARSON: (Voiceover) UnumProvident says it regrets how it handled the cases of Wright and Montano, but says they're exceptions. It also says it handles 400,000 new claims a year and it does on occasion, make a mistake. Yet, in the eyes of at least one insurance commissioner, it may be more than an occasional mistake.

(UnumProvident letters; excerpts from letters; John Oxendine)

Mr. JOHN OXENDINE: There are some substantial problem areas...

LARSON: (Voiceover) Georgia Insurance Commissioner John Oxendine told DATELINE he began investigating UnumProvident's disability practices more than a year ago. He says his investigation should be complete by the end of the year.

(Oxendine; UnumProvident building)

Mr. OXENDINE: Unless something radical changes, there probably will be some disciplinary action based on what we have already found.

LARSON: (Voiceover) UnumProvident says the problems in Georgia represent a small percentage of their overall claims, and it will do what is necessary to correct those issues.  In the end, both Montano and Wright say no one should be treated the way they were created--cut off, abandoned by a company that had promised if the worst ever happened, it would be there for them.

(UnumProvident building; Wright; Montano and girl)

Mr. MONTANO: It's like stealing.  They should have--be held accountable for that.

Announcer: Coming up, they look like computers offered at fantastic prices, but DATELINE's hidden cameras uncovered some bogus bargains, and the man who could be behind the schemes.

LEA THOMPSON reporting: You're just a customer.

Announcer: We'll show you who he is.

Plus, a weekend of terror, of wondering if the sniper would strike again.

Unidentified Woman: We've all mentioned that we've looked across the street, and we don't think we're in firing range.

Announcer: Anxious hours as police try to catch a killer.  We'll have the latest.

(Announcements)

Announcer: DATELINE NBC, proud winner of two Emmy awards, including best report in a news magazine.  DATELINE will be right back.

(Announcements)

*Sunday - 11/17/02 "GC TN dc*

HEALTH CARE

# UnumProvident accused of being 'denial factory'

**By DAVID GLOVIN**
*Bloomberg News*

NEW YORK — UnumProvident Corp. the nation's largest disability insurer, has been accused in a lawsuit of systematically denying claims for long-term disability insurance by thousands of people too sick or too injured to work.

The Chattanooga-based company violated its duty under federal insurance laws by paying bonuses to its workers based on the number of claims they denied, the suit said. The plaintiffs accuse the company of operating "long-term disability denial factories," where in-house physicians rubber-stamp medical decisions made by non-doctors.

Hundreds of people filed cases against the insurer since UnumProvident was formed in a 1999 merger.

Relying in part on documents from Patrick McSharry, a former UnumProvident medical director who filed his own complaint against the company, the class-action suit makes claims on behalf of thousands of people.

"It's been difficult to say there's a global practice" of denying claims, plaintiff's attorney Evan Schwartz said. "But they have a companywide practice since the merger, and we have the documents to show it."

Disability insurers have started focusing their claims handling strategies to root out fraud. During economic downturns UnumProvident and other disability insurers have to watch for customers who may try to stretch their benefits or file fraudulent claims, insurance industry analysts said.

The suit follows a report last month on General Electric Co.'s NBC about improper denials of coverage by UnumProvident. McSharry was among several ex-employees who were interviewed in the *Dateline* broadcast.

A UnumProvident spokesman, Thomas White, said the company hadn't seen the suit and couldn't immediately comment. Shares fell 36 cents, to close at $20.67, in trading on the New York Stock Exchange.

In a statement issued about two weeks before the *Dateline* broadcast, the company said it paid more than $3.6 billion in disability-related claims last year.

"The company is proud of its record in paying claims and of the more than 3,000 people who work in the company's claims area," the statement said.

The suit, which was filed in federal court in New York, seeks an order forcing UnumProvident to review claims it denied and to change its practices. It doesn't seek damages.

The case was filed on behalf of people whose policies were underwritten by UnumProvident units or whose disability plans are administered by the company. ∎

000186

Los Angeles Times: Insurer's Tactics Rebuked



**latimes.com.**

http://www.latimes.com/la-fi-unum15nov15,0.1787311.story

# Insurer's Tactics Rebuked

## A judge has ordered UnumProvident to 'obey the law' and make disability payments.

By Lisa Girion
Times Staff Writer

November 15 2002

The nation's largest disability insurance firm is facing a flurry of lawsuits in California and across the country from policyholders who contend that UnumProvident Corp. cheated them out of their disability payments in an aggressive campaign to boost profit.

The company's tactics allegedly included spying on customers, shredding medical records and using biased doctors to justify its cancellations.

The Chattanooga, Tenn.-based company received a harshly worded rebuke this week from a San Francisco federal judge. who ordered it to "obey the law" and stop targeting certain categories of claims for cancellation, employing biased medical examiners, destroying medical reports and withholding from policyholders information about their benefits.

U.S. District Judge Robert Larson issued the unusual injunction late Wednesday in a ruling upholding a $7.67-million jury verdict for a single mother of two who lost her home and went on welfare after the company cut off her disability benefits.

Citing corporate documents and testimony of current and former employees and an industry expert, Larson concluded that former chiropractor Joan Harngarter's case was part of a broader effort to target expensive claims filed by doctors. lawyers and other self-employed professionals. particularly in California and Florida.

"They planned to save money by terminating claims like hers." Larson said in the order. The company developed a "comprehensive system for targeting and terminating expensive claims."

The litigation has put a spotlight on the culture of an insurer that once handed out a "Hungry Vulture" award to its best employees. A UnumProvident executive said the award was discontinued when it became clear that people outside the company were misconstruing what was meant as a lighthearted effort to boost morale.

In a similar case against the company, a Tampa jury awarded $36.7 million last year to an eye surgeon who claimed that Parkinson's disease left him unable to operate. A class-action suit recently was filed in New York. several lawyers said they were preparing to file additional lawsuits. and the Georgia insurance commissioner's office has been investigating the company's practices in that state for two

00018.7

years.

Lawsuits have pilloried the company for requiring its claims adjusters to maintain and give special attention to "Top 10" lists of certain claims that were costing the company the most and for conducting round-table internal discussions allegedly to come up with ways to deny claims and cut off benefits.

A top UnumProvident executive said Thursday that the company was proud of its claims management practices and believed that plaintiffs' lawyers were mischaracterizing its conduct in a smear campaign designed to bolster their suits. The giant insurer, formed in the 1990s through the merger of Provident Cos. and Unum Corp. and the acquisition of Paul Revere Life Insurance Co., dominates the individual and group disability market.

"We're the biggest target out there." said J. Christopher Collins, a senior vice president. "We have a third of the marketplace, and we've just become their favorite whipping post."

The disputed policies offer what is known as noncancelable, own-occupation disability coverage. Such policies typically are purchased by self-employed professionals to make up for lost income if a disability were to prevent them from working in their specific field. If a policyholder were able to work in another job, he or she still would be entitled to benefits.

One insurance analyst said there were concerns within the industry in the mid-1990s that own-occupation policies were being exploited in some cases by professionals who were not actually disabled but were looking to retire with an income. And Collins of UnumProvident said some industry experts believe fraud affects 5% to 15% of claims.

But plaintiffs' lawyers said UnumProvident brought the suits on itself by cutting off claims and benefits at the expense of policyholders they contend are legitimately disabled. The lawyers said that people who have been terminated by UnumProvident have included individuals with Parkinson's disease, AIDS, spinal injuries, organic brain damage and cancer.

"These are the most vulnerable people imaginable." said Ray Bourhis, a San Francisco lawyer with several cases against the company, including the one before Judge Larson.

"They're disabled. They don't have the energy to take on an $8-billion insurance company, and the company knows it. You sell them this policy on the basis that you will be there if anything should ever happen.... You take their money, their premiums, for 10 or 15 years. And then lightning strikes, and you refuse to pay the claims."

Incoming California Insurance Commissioner John Garamendi, who takes office in January, said he had talked to lawyers involved in some of the California suits and planned to launch an investigation.

"It appears to me to be a conspiracy to defraud individuals," Garamendi said Thursday.

UnumProvident is the subject of an audit in California, said a spokesman for the current insurance commissioner, Harry Low. The spokesman characterized the review as routine.

The company has not publicly disclosed how many of the so-called bad-faith suits it faces on own-occupation policies, but Collins estimated that fewer than 200 have been filed.

Collins said the company planned to appeal Judge Larson's ruling and that his injunction was based on bad evidence.

000188

Los Angeles Times: Insurer's Tactics Rebuked

"The judge has essentially enjoined us to not do things we're not doing," Collins said. "We don't employ biased medical examiners. We don't destroy medical records. And we don't withhold from claimants information about their benefits."

In his 62-page ruling, Larson found support for his order in company documents, including a law department instruction that claims adjusters "shred all sensitive papers that will not be needed for business purposes."

Collins said the document was distributed in the early 1990s and only to employees of the former Provident Life & Accident Insurance Co. He said it had been provided by an outside vendor. Collins said it had been superseded by a newer policy on document retention but that there was nothing wrong with the old instruction.

Collins said the company stood by its termination of Harngarter's benefits. He said the judge based his decision on the testimony of former employers and others with an ax to grind against the company and on company memos that were old or mischaracterized at trial.

Harngarter, a former Berkeley chiropractor, said she was forced to walk away from her $100,000-a-year profession because of disabling joint pain.

"I keep wondering how long I can hold out," Harngarter said.

If you want other stories on this topic, search the Archives at latimes.com/archives. For information about reprinting this article, go to www.lats.com/rights.

Copyright 2002 Los Angeles Times

000189

**University of the South** |  | **Giants get upper hand**
School sued in name dispute. Southeast Tennessee | | Braves fall in playoff opener, 8-5. Sports, D1

# Chattanooga Times Free Press

Chattanooga Now www.timesfreepress.com

Thursday, October 3, 2002 • Vol. 133, No. 293 • • •   To Give The News Impartially, Without Fear or Favor   48 PAGES 6 SECTIO

---

**tencing**
**ges**
**ough**
**UIs**

*...shold for*
*...riving in state*
*...on a blood-*
*...tent of 0.10*
*...08 percent*

**...KE O'NEAL**
Staff Writer

...in Tennessee's
...aimed at reduc-
...offenders and
...he amount of fed-
...als said.
...accomplishment
...keep drunk drivers
... and make Ten-
...s safer," said Todd
...Don Sundquist's
...istrative officer.
...ces will lower the
...ld for drunken dri-
...nnessee from a
...ol content of 0.10
...08 percent, match-
...most other states,
...se fees by $100 to
...ment and assess-
...r indigent offend-
...new provisions of
...e effect on July 1.

...said lowering the
...d threshold means
... longer will have
... percent of each
...al highway user
...mey into safety.

# Insurer faces legal challenge

### Suits focus on denied disability claims; UnumProvident disputes allegations

By Mike Pare
Staff Writer

UnumProvident Corp. faces a number of lawsuits nationally alleging it has unfairly denied disability claims, and one suit by a former company medical director contends the business did so illegally.

Dr. Patrick McSharry, who was fired from his post at the Chattanooga-based disability insurer earlier this year, said it was UnumProvident's "primary practice and policy to deny disability claims."

However, the company denies Dr. McSharry's allegations of wrongdoing or that it encourages employees to turn down claims.

"We're going to defend the company and our name. We have very thorough and fair claims practices," said company spokeswoman Pamela Smith.

UnumProvident, the nation's No. 1 disability insurer, is estimated to have between 25 percent to 30 percent market share in the industry. That's thought to be about 2.5 times its nearest competitor.

Arnie Levinson, a San Francisco attorney handing several of the lawsuits against the company, said many of allegations involve UnumProvident setting up a system designed to make it easier to deny claims for financial reasons.

"A lot of attorneys are alleging the claims process was unfair," he said.



**Disability claims :**
UnumProvident Corp. is facing a number of lawsuits nationally contending that it wrongly denied disability business.

- **Number of insured:** 25 million
- **Disability-related benefits paid in 2001:** $3.6 billion
- **New claims filed in 2001:** more than 400,000
- **Number claims denied in 2001:** less than 2 percent
- **Workers in the claims area:** 3,000

Source: UnumProvident

The company would not say how many suits are pending against it regarding the denial of claims. Mr. Levinson said there could be as many as 2,500 to 3,000 suits nationally. The lawsuits have gained the attention of national media outlets.

Harold Chandler, chairman of UnumProvident, said, "In handling approximately 400,000 new disability claims each year, we also acknowledge that we make occasional mistakes. But when mistakes are brought to our attention, we work to resolve them fairly."

Harry F. Burnette, a Chattanooga attorney representing Dr. McSharry, said some of the lawsuits claim UnumProvident went through "a sham process."

See LAWSUITS, Page H

**Congr**
**closes**
**on Iraq**
**resolu**

■ *Measure giv*
*president broad*
*to use military*
*against Baghda*
*to pass easily ne*

By Tom F
The Associated

WASHINGTON
...ats and Republica
...gress began clo
Wednesday behir
...tion giving Pres
...broad authority to
...force against Iraq.

Bush hailed th
...ment and suggeste
...Baghdad could
..."unavoidable" if Sa
...sein does not disa
...Full complianc
U.N. Security
...demands "is the
...only choice and [N
...the time
...remaining for
...that choice it cal
...limited." Bush
...said, standing
...with top con-
...gressional lead-
...ers in the Rose
Garden
Bush struck do
...a deal on the of l
...resolution with
House leaders
...in the morning,
and momentum qu
...behind it throughou
...Leaders of both h

---

# Iraq says British dossier full of lies

FOR ASSOCIATED PRESS

BAGHDAD, Iraq — Iraq says war and U.N. inspections have ensured it is no longer capable of producing nuclear, chemical or biological weapons, and Baghdad released a detailed report Wednesday rebutting a British dossier on its arms programs.

Washington says toppling Saddam Hussein may be the only way to ensure Iraq is not rearming. British Prime Minister Tony Blair, who has been a strong backer of the United States on Iraq, issued a 50-page dossier last week detailing what British intelligence said was Iraq's growing arsenal of chemical and biological weapons and Saddam's plans to use them. Blair also said Iraq was trying to develop nuclear weapons.

The dossier, Iraq's Foreign Ministry said in its 29-page, English-language rebuttal, was "full of lies, fabrications and fallacies."

"Iraq's capabilities to produce biological, chemical agents were destroyed during the 1991 aggression," the Foreign Ministry said, referring to the Gulf War that forced Iraq to reverse its 1990 invasion of Kuwait.

Iraq said its chemical program never advanced beyond a "crude" level and that U.N. inspectors after the Gulf War destroyed stocks of chemical weapons, munitions and production equipment.

Iraq said it cooperated with inspectors and described their destruction during seven years of work of such items as entire buildings in nuclear sites, missiles, 400 rockets filled with Sarin, and even "the furniture, desks, cooling systems, refrigerators, science books and journals" of a biological weapons laboratory.

Just as Blair's dossier sought to offer little new evidence, Iraq's rebuttal reiterated its long-standing position that by 1998 it had complied with U.N. resolutions barring it from stockpiling weapons of mass destruction and the missiles to deliver them.

# U.S. plan calls for new inspection powers

FOR ASSOCIATED PRESS

UNITED NATIONS — A roughly worded U.S. proposal on Iraq would give U.N. inspectors broad new powers to hunt for weapons of mass destruction and provide them with military backing to carry out the search.

According to the 8-page draft resolution obtained Wednesday by The Associated Press, the Security Council would give Iraq 30 days to compile an "accurate, full and complete" inventory of its weapons of mass destruction, and currently accurate, full and complete declaration of all aspects of its program to develop chemical, biological and nuclear weapons, ballistic missiles and unmanned aerial vehicles.

If any "false statements or omissions" are made in the declaration, member states would be authorized to "use all necessary means to restore international peace and security in the area," diplomatic language permitting military force.

The U.S. proposal has not been submitted formally to the Security Council or even shown to the majority of its 15 members. The draft document faces deep opposition from Russia, China and France — three veto-holding council members who say the use of force before inspectors are ready to authorize the use of force before inspectors have time to test Iraq's willingness to comply.

Working a two-track approach on Iraq at the United Nations and at home Wednesday, President Bush said the use of force against Iraq "may become unavoidable" if President Saddam Hussein refuses to disarm. He issued his threat after House leaders agreed to give Bush authority to oust Saddam. A top Senate Democrat suggested the plan might win Senate support as well.

If the American draft resolution at the United Nations is passed in its current form, it would give U.N. inspectors sweeping powers and authorize a foreign military presence in Iraq to enforce the resolution.

France has been floating a counterproposal which she says to change the inspection regime but does not authorize force against Iraq. Indeed, a draft of the French proposal offers Iraq a chance to cooperate but says that "any serious failure by Iraq to comply with its obligations" would lead to an immediate Security Council meeting to "consider any measure to ensure full compliance."

# Iraq

*Continued from Page A1*

important thing that we do. This should not be about politics. We have to do what is right for the security of our nation and the safety of all Americans."

At the United Nations, the administration was pursuing a Security Council resolution that would give Iraq 30 days to compile an "accurate, full and complete" inventory of all aspects of its weapons programs — and provide U.N. inspectors military backing to carry out their search.

The 8-page draft proposal, obtained by The Associated Press, has not been submitted formally. It faces deep opposition from Russia, China and France, each of which holds veto power.

Bush planned to address Monday in Ohio to bolster his case for regime change in advance of the congressional votes, senior White House officials said. The speech, which is his first formal push on this issue, is U.S. allies as both seek support for the U.S. resolution before the United Nations.

As part of the deal with the House, Bush bent to Democratic wishes and pledged to certify to Congress — before any military action takes place, if feasible, or within 48 hours of a U.S. attack — that diplomatic and other peaceful means alone are inadequate to protect Americans from Saddam's weapons of mass destruction.

The resolution also would require Bush to report to Congress every 60 days — instead of the 90 days suggested by the



THE ASSOCIATED PRESS
President Bush and leading Democratic and Republican lawmakers announce they have agreed on a resolution that would give Bush the powers to deal with Iraq. Bush is joined by, from left, Sen. John McCain, R-Ariz.; Sen. John Warner, R-Va.; Speaker of the House of Representatives Dennis Hastert, R-Ill.; House Minority Leader Dick Gephardt, D-Mo.; and Sen. Joe Lieberman, D-Conn.

White House — on matters relevant to the confrontation with Iraq, and it would reaffirm the policy embedded in U.S. law that Saddam should be removed.

Still, the resolution would give Bush wide latitude to act, with or without waiting for the United Nations.

The House International Relations Committee worked into the night on the measure, although no votes were expected until Thursday. An identical version was introduced in the Senate by a bipartisan group that included Warner and Sens. John McCain, R-Ariz., and Joseph Lieberman, D-Conn.

Three women, shouting "no war with Iraq," briefly disrupted the House committee's session. Chairman Henry Hyde, R-Ill., ordered them removed from the room.

Rep. Tom Lantos of California, the panel's senior Democrat, said defying a confrontation with Iraq would only "increase the danger" and make the people "inflame the United States' humiliated future history."

Rep. Gary Ackerman, D-N.Y., said: "I continue to have grave concerns about the administration's impulse before we plunge into Iraq will do to our efforts to establish a stable global order."

Many Democrats and moderate Republicans remained unhappy with the wording, preferring to have stricter limits on the president's authority. But there was also a growing sense of resignation among critics that the president would get his way.

"In this case, everybody's pretty practical at the end of the day," said Senate Foreign Relations Committee Chairman Joseph Biden, D-Del. He said Senate Democrats remained divided, but that he doubted the momentum building behind the resolution could be slowed.

Biden dropped plans to try to have his committee consider an alternative he drafted with Sen. Richard Lugar, R-Ind., that would have put more emphasis on U.N. role and made disarmament the only reason for confronting Iraq.

Biden said he and Lugar still hoped to offer it as an amendment during Senate debate, but conceded it was unlikely to prevail.

Biden expressed surprise that Gephardt had agreed so readily to a deal with the White House and said his former colleague was not pleased with the approach. "We have a disagreement, Mr. Gephardt and I," Biden told reporters. "We've got to digest this."

Biden suggested that various offices in charge of the wording of the resolution probably could craft Gephardt's show of support. Asked if that meant negotiations with the White House were over, Biden said: "Yes."

Many Democrats feared being used in getting the matter behind them — so before they could register public attention on economic issues before the midterm elections two weeks away.

Staff writer Mike O'Neil contributed to this story.
E-mail Mike Tere at
mpere@timesfreepress.com

# Lawsuits

*Continued from Page A1*

of reviewing Cast.

Dr. McSharry's lawsuit contends the company's medical advisers were raised to ignore the language and conclusions supporting their demands.

"If the medical advisers reports were unsatisfactory that end, the doctors were asked to delete and resend phrases as not in compliance with the law.

The suit states medical advisers were supposed to review numbers of files a day but face meaningful analysis.

During Dr. McSharry's 11 months of employment, she said he tried to work out the medical dilemma by working a full time.

But after letting his supervisors know he would no longer be part of unethical and illegal practices, the suit states, he was terminated.

The company said a group attorneys frequently involved claim litigation against UnumProvident and its parent group determined employees are stirring up the disability claims over.

"We don't encourage people to deny claims," said Mr. Smith.

She said its compliant and pro-former national averages. Mr. Smith said less than four out of 1 percent of all new disability claims end up in litigation.

However, Mr. Levinton said the alleged company practice of making it easier to deny claims leaves employees at greater risk.

During that time, then-President Cox made the move to Security, a significant database insurance underwriter. It later merged with The Paul Revere Co. and Unum Care.

Dr. McSharry's suit was originally filed in Hamilton County Circuit Court, but was later moved to federal court. The attorneys have appealed, and an ongoing demand to have it reviewed.

A federal magistrate has ordered that the contents of the files relate and its adequacy. Dr. McSharry be denied. Dr. McSharry plans to make her case that the company intentionally curtailed and determine which occurred in September.

The complaint addresses an explanation order signed by the Chancellor and restricts contents of files from being disclosed in litigation.

UnumProvident's stock dated Wednesday at $10.21, down 9.45 percent.

000191



# Business

**C**

Nasdaq
1,287.36

ooga Times Free Press

Saturday, October 19, 2002 ...



Staff Photo by Stephen Jones
Owner Ken Hunt stands in the showroom of Hunt Nissan on Chapman Road Thursday. Hunt changed the name of the dealership from United Nissan in September.

## Chain sells United Nissan to Hunt

### UnitedAuto found its sole car dealership couldn't create right synergy

By MIKE PARE
Staff Writer

Nissan has about a half-dozen new models coming out in the next 12 months, and Ken Hunt sees an opportunity to sell a lot of cars and trucks belonging to the revived brand.

"This place has a lot of potential," said Mr. Hunt, owner of what is now Hunt Nissan off Highway 153 in Chattanooga.

Mr. Hunt purchased the former United Nissan dealership from UnitedAuto Group, one of the nation's biggest auto retailers with 127 sites in the United States and 71 more internationally, primarily in the United Kingdom.

Mr. Hunt is no stranger to UnitedAuto or the Chattanooga dealership. His last job was as UAG's Southeast regional president.

He said the 7.5-acre dealership, since it is UAG's only one in Chattanooga, couldn't take advantage of business and advertising synergy. UAG usually own several dealerships in a metro area.

"Once I found out it didn't fit ... something I really wanted to do was own my own dealership," said Mr. Hunt, who declined to reveal the purchase price.

The dealership, also former-

ly Standefer Nissan, was held by publicly traded UAG for about six years.

"The store has a history of doing a lot of volume. It's a good property," said Mr. Hunt.

David Doster, owner of Lawrence-Doster Motor Co. and president of the Chattanooga Automotive Trades Association, said the big advantage of in-

See NISSAN, Page C5

## Barnes heralds 14,000-job Chrysler plant

By RUSS BYNUM
The Associated Press

SAVANNAH, Ga. — Standing onstage beside a fire-engine red cargo van, and wearing a tie to match, Gov. Roy Barnes welcomed DaimlerChrysler and an anticipated 14,000 jobs to Geor-

of the van the German automaker supplied for the event in lieu of a company representative.

Barnes officially announced the $750 million plant for coastal Georgia at a downtown Savannah theater, delivering the good news barely more than three weeks before he stands for re-

700 to work on or near the site at the intersections of Interstates 95 and 16.

The economic ripple effect is expected to be huge, with 10,000 additional jobs created by additional suppliers along with new hotels, restaurants, retailers and others hoping to

of the state Department of Industry, Trade and Tourism. "We have done the studies."

Georgia Tech economists estimate the economic ripple effect could be up to $557 million in yearly income.

The jobs come at a price,

### Left sidebar column

... according to analysis by Thomson

... ateway's showing ... car's results. In the ... ud a year ago, the ... San Diego-based ... reported a far wider ... million or $1.61 per

## k ends its c voucher

NGTON —
... ending the "satis-... rantee" program ... two years ago ... aneuver to ... issengers.
... ssenger railroad ... kind of holding ... ment requests to ... 100 passengers ... and that most of ... ates we were issu-... from factors out-... rk's control —
... delays on the ... roads, or weather ... days," said Amtrak ... Dan Stessel. ... Amtrak will con-... view customer ... on a case-by-case ... of Nov 1, will no ... matically issue a ... any dissatisfied ... who asks for one.

## earnings off ... ructuring

... — Avon ... world's ... set seller of beauty ... Friday said its ... its earnings fell 21 ... to a previously ... restructuring.

... York-based ... earnings before ... in line with Wall ... cast as strength ... and the United ... some weakness ... merica.

## plans stock ... reverse

... ON, N.J. — Lucent ... es said Friday it ... shareholder ... a reverse stock ... set its stock price. ... averaged below $1 ... 10 trading days. ... mpany's board ... ock approval for ... under which a

### Right sidebar column

## Georgia regulato probes Unum

■ Investigators say number of complaints tripled, arousing concer

By MIKE PARE
Staff Writer

Georgia's insurance c
missioner says a jump in c
plaints against UnumProvi
Corp. prompted his offic
investigate the company
the review has turned up is
regulation still are produc

"There are some signific
areas of concern," said Ju
Oxendine, the state's insura
commissioner.

Other states have see
number of complaints and i
levied fines against Unu
Provident, officials said rece
But UnumProvident of
cials said complaints agai
the company nationwide
below industry average, a
as the nation's largest disab
ity insurer, the number of c
plaints reflect UnumPro
dent's bigger presence in t
industry.

"The Illinois Department
Insurance earlier this ye
levied a $40,000 fine agains
UnumProvident subsidia
over what a departme
spokeswoman called poor
dural issues regarding the h
dling of a claim.

"A $40,000 fine is probab
our average high fine," said t
nois insurance departme
spokeswoman Nan Nases. St
said a total of $220,000 in fine
have been levied against insu
ance companies this year b
the department.

In Arizona, a UnumProvi
dent affiliate has seen com
plaints rise from 8 in 1998 to 1
so far this year, said Erin Klu
of the Arizona Department
Insurance. UnumProviden
was fined a total of $15,50
after two market conduct
reviews in 2000, she said

"They use a lot of busines
over $60 million in premium
she said, telling it likely has
lot of policyholders in the sta

See REGULATOR, Page C5

000196

Chattanooga Times Free Press

* * * Saturday, October 19, 20—

## Georgia

● Continued from Page C1

That comes to $67,000 per job — about the mid-range of what neighboring Southern states paid to lure automakers in the past 20 years. During those years Georgia sat on the sidelines content with the economic boom in metro Atlanta while rural areas saw their manufacturing jobs dry up.

Now communities outside Chatham County are looking to jumpstart their economies with one of Chrysler's suppliers.

"We need something badly," said state Rep. Greg Morris, D-Vidalia. "Like many rural communities, we've been losing industries in apparel, losing Piggly Wiggly's headquarters. We're going to be aggressive pursuers."

The surest bets for spillover jobs will likely be counties closest to the plant, growing bedroom communities such as Effingham County, where 65 percent of residents commute to outside jobs.

"I think it'll be big for the entire area," said Herb Jones, di-



The site for the new DaimlerChrysler $750 million van plant sits in the upper left area, northeast of the intersections of Interstates 95 and 16 in Pooler, Ga.
THE ASSOCIATED PRESS

rector of the Chamber of Commerce in Effingham County, which sits just northeast of the plant site. "But our location is

going to make us the county of choice."

Georgia's incentive plan includes $54 million in tax cred-

its, which the company will receive over seven years, that the Legislature must approve next year.

## Regulators

● Continued from Page C1

Tom White, a UnumProvident vice president, said market conduct examinations by insurance regulators go on all the time.

"It's their job," he said. Mr. White said one review in Maine, where UnumProvident has large operations, recently found no issues.

Chattanooga-based UnumProvident has come under fire recently for the way it handles some of its claims. The company faces a number of lawsuits. A former company medical director has sued the firm, alleging it engaged in unethical and illegal practices.

UnumProvident has denied

the charges. The company, which insures 23 million people, said its complaint ratio is measured by the National Association of Insurance Commissioners below the national medium for its primary insurance entities. It also said it paid more than $1.6 billion in disability-related benefits last year.

Concerning the Georgia review, Mr. White said Unum-Provident is cooperating, the findings will still open for discussion and the state's regulatory office is sending representatives to Chattanooga to look over operations.

"We're confident we'll be able to work with the department for a resolution hopefully by the year's end," he said.

In Georgia, complaints against UnumProvident nearly tripled last year over 2000, according to the insurance commissioner's office. It said it received 85 complaints in 2001, compared to 31 in 2000 and 50 in 1999.

So far this year, the Georgia regulatory agency has received 29 complaints against the insurer.

Mr. Oxendine said any large insurance company is going to get complaints, but he and his staff felt the number in 2001 was more than usual. Earlier this year, Georgia regulators started their review, but they had trouble getting documents from the company, he said.

Mr. Oxendine said the company cited attorney-client privilege. The agency fined Unum-Provident $5,000 and threatened to levy the amount daily and put it on probation, said Mr. Oxendine.

"They recanted and turned over the documents," he said. "That got us suspicious further. I ordered the examination

## Social

● Continued from Page C1

problem is made worse by Congress' failure to pass legislation this year that would have added drug coverage to Medicare.

"For millions of people without drug coverage, the 1.4 percent cost-of-living increase is not going to even come close to the soaring cost of prescription drugs they are facing," said David Certner, director of federal affairs for AARP, formerly known as the American Association of Retired Persons.

The 2.7 percent increase in monthly Medicare premiums is mandated by Congress so that premiums will cover 25 percent of the cost of the health care program for the elderly. Those premiums were set at $54 a month when Medicare began in 1967.

Social Security's 1.4 percent cost-of-living increase, which also will go to 7 million recipients of Supplemental Security Income, the government's cash assistance program for the poor, is the smallest since a 1.3 percent rise in 1999. This year's benefit increase is 2.6 percent, and in 2001 it was 3.5 percent, the biggest rise in nine years.

broadened."

Mr. Oxendine said the examination is still open and he wouldn't talk about the details except to say that it deals with claims handling. He, too, hopes to have it wrapped up before Christmas.

Mr. White said if there are issues, UnumProvident will correct them.

"We do have a significant amount of business in the state of Georgia," he said. "It's a big, big state for us."

Ms. Nace in Illinois said she did not know what triggered the review there. She also has checked with regulators in her office and they aren't aware of any particular problem with the company.

UnumProvident, with 1,000 employees in Chattanooga, said it paid about 90 percent of the 400,000 new disability claims filed in 2001.

E-mail Mike Pare at mpare@timesfreepress.com

## Nissan

● Continued from Page C1

owner-operator is being on the daily.

He said the owner "is present but not come on a daily basis."

Also, said Mr. Dostie, an owner-operator has the ability of adjusting operations and marketing to changing market conditions.

Nissan, Japan's No. 2 automaker, has seen demand for vehicles in the United States stronger so far than that from relatively optimistic forecast. Nissan officials expect demand to continue for the rest of 2002, though it was hurt by the California longshoremen strike earlier this month.

Curt VanZanwith, Nissan North America's director of

public relations, said the company recently debuted at the 350Z. It will introduce crossover sport utility vehicle, the Murano, at the Detroit Auto Show in January, he said.

Also, a bigger Maxima, made in Smyrna, Tenn., will be introduced, as well as a full-size SUV to compete with the Ford Expedition. In addition, a Nissan full-size truck and new Quest minivan will be unveiled, said Mr. VanZanwith.

Mr. Hunt, with an office at the showroom floor, has plans to increase sales at the franchise.

"We need to pump up the volume in new and used," he said.

In addition, he'd like to see an increase in sales in the service and parts area.

"It's a good property," said Mr. Hunt.

E-mail Mike Pare at mpare@timesfreepress.com

The country's first retirees in a decade last year as this year's stop-and-go recession have combined to keep an inflation, which means smaller cost-of-living adjustment for government beneficiaries.

Social Security Commissioner Jo Anne Barnhart said the containment of inflation was elderly and disabled, "since living on fixed incomes from rising prices."

Friday's announcement came in the closing week of out-of-congress in which a hard-fought campaign for control of Congress. Both parties have tried to use Social Security's financial plight their advantage.

Two years ago, President Bush campaigned for the White House on a program that would have privatized Social Security partially by allowing younger workers to divert part of their Social Security taxes into personal investment accounts. With the plunging stock market, however, Democrats have accused Bush and Republican supporters of the approach of putting retirees' pensions at risk. The GOP counters that Democrats have failed to propose a plan to bolster the government's biggest benefit program.

## Commodities

### Georgia Poultry          Metals

Marriages



Dow
8,542.13

Nasdaq
1,411.52

# Business

*Chattanooga Times Free Press*

Friday, November 15, 2002

## Business Roundup

**South Broad buildings razed**

Two abandoned buildings on South Broad Street are being demolished to make way for future development.

The Bell's Smoke Shop and Burger King buildings are in the 3300 block on 3.8 acres owned by TE Properties.

"We would like to either sell it, develop it ourselves or work with someone to develop it," said David Kent of TE Properties.

The property also includes the former M&F building, which won't be razed by TE Properties.

"We're not going to pay to have it torn down. Somebody might could use the shell," TE Properties has listed the 3.8 acres for sale at $500,000 to $600,000 per acre.

Bell's Smoke Shop relocated to 2700 S. Broad St.

**Chipmaker AMD will cut 2,000 jobs**

SAN JOSE, Calif. — Advanced Micro Devices Inc., battered by weak demand for computer chips and tough competition, said Thursday it will cut 2,000 jobs.

The cuts have been expected since the company announced earlier this year that it would substantially reduce costs and trim its staff to return to profitability.

The maker of Duron and Athlon microprocessors has been struggling because of the weak economy, product delays and stiff competition from its larger rival, Intel Corp.

**Sprint PCS lays off**

## Verdict upheld against UnumProvident

BY MIKE PARE
Staff Writer



A California judge has upheld a $7.67 million verdict against UnumProvident Corp. in which a chiropractor alleged the company had wrongly denied her benefits when she could no longer work.

The ruling comes as UnumProvident prepares to come under more scrutiny Sunday night when the CBS news magazine "60 Minutes" airs a report critical of the claims-handling process by the Chattanooga-based disability insurer.

In the California case, Berkeley, Calif., chiropractor Joan Hangarter claimed in 1997 the no longer could practice after a traffic accident. Her policy had begun paying her, but the company shortly cut off payments and said she wasn't disabled.

Tom White, UnumProvident's vice president for investor relations, said the company will appeal the ruling, which was made by Magistrate Judge James Larson in the Northern District of California. Judge Larson had overseen the case that was decided by a jury in February.

"We'll definitely appeal. The next step is to the appeals court," said Mr. White.

While UnumProvident has come under fire recently for the way it pays claims, the company has said it paid more than $16 billion in disability-related benefits last year. Of 400,000 new disability claims filed in 2001, the company said it paid 90 percent of them.

The "60 Minutes" report is

slated to provide an interview with former employees who are upset with claims practices.

Gus Harley, a Chattanooga and former claims handler for UnumProvident who was viewed by "60 Minutes" as a monthly monetary target set. The goals would be met by closing down claims, he said.

"They'd put on fancy

*See UNUM, Page C*

## Kandy Kastle's sweet renovation

### The Deli Man and Cake Lady will open in April on McCallie Avenue

BY EMILY McDONALD
Staff Writer

If things work out the way entrepreneur, cake baker and caterer Ruth Reynolds plans, Chattanooga soon will have a Rainbow Row reminiscent of the colorful dockside area in Charleston, S.C.

The Deli Man and the Cake Lady is a partnership between Ms. Reynolds and Greg Garrett of Rome, Ga., will be the first tenant in the Kandy Kastle building on McCallie Avenue recently purchased by Jonathan and Heather Bell. The new eatery will occupy 1,300 square feet of the 8,000-square-foot former day-care center. Mr. Garrett owns Duffy's Deli in Rome, which he will continue to operate.

The highly visible white-brick, red-trimmed building represents the second commercial venture for the Bells, who have been involved in renovating



Staff Photo by Chad McClure
Jonathan Bell stands in front of the former Kandy Kastle buildings on McCallie Avenue. He and

## Mallch wins bid on NAR Park

BY BOB GARY JR.
Staff Writer

One dollar made the difference Thursday in owner of the Alton Park industrial park bids by North American Royalties.

Chattanooga developer Mallchok's company Paul I Inc., was NAR Park in U.S. Bankruptcy Court. Rival developer Jimmy Hudson had $3.41 million for the property but Mr. Mallchok topped bid by a single dollar.

"I'm glad it's over, and I look forward to closing on the property," said Mr. Mallchok, who added



000194

Friday, November 15, 2002 • • •

## Mortgage rates drop to new low

Tennessean/Tom
WASHINGTON — Rates on 30-year mortgages dropped to a new low this week, providing fuel even to people looking to refinance or buy a home...

The average interest rate on 30-year fixed rate mortgages dropped to the lowest on record this week, mortgage company Freddie Mac reported Thursday in its nationwide survey.

## Renovation: To building

• Continued from Page C1

At a glance

## Unum

• Continued from Page C1

## Accounting trouble has cost U.S., says SEC commissioner

By Marcy Gordon
The Associated Press

WASHINGTON — The string of accounting scandals has cost investors hundreds of billions of dollars...

## Gilley: Heads accounting foundation

• Continued from Page C1

## Delta soon to announce low-fare uni...

Los Angeles Times
ATLANTA — Delta Air Lines will soon announce a new low-fare unit designed to compete with discount airlines such as Southwest, AirTran and JetBlue...

Personal glance

Home Equity Lines of Credit

FIRST TENNESSEE
MEMBER FDIC        Call 1-800-382-5465

000195

was in accordance with generally ac-
cepted accounting principles.

Already, the Mahonia transactions
have been picked over in court, in a case
brought by J.P. Morgan against several
insurance companies. J.P. Morgan had
purchased surety bonds from the insur-
ance firms to reduce the bank's risk; the

the settlement with the insurance compa-
nies. The rest may be used to pay for
other litigation and regulatory issues, in-
cluding the Enron investor class-action
suit in Houston. Citigroup has said it will
take a big charge against fourth-quarter
earnings to cover any financial impact of
that case.

# UnumProvident Memo Highlights
# Intent to Use Law to Save Money

### By Christopher Oster

As state regulators scrutinize the
claims practices of disability-income in-
surer UnumProvident Corp., a document
obtained by policyholders' attorneys
shows the insurer's intent to use a law
meant to protect workers' retirement sav-
ings to help it save money on claims.

The memo, written in 1995, says Provi-
dent Corp., which merged with Unum
Corp. in 1999, had formed a "task force"
to identify policies covered by the Em-
ployee Retirement Income Security Act
of 1974. "The advantages of ERISA cover-
age in litigious situations are enormous,"
reads the memo, written by Jeff McCall,
at the time an assistant vice president in
the claims department at Provident.
"There are no jury trials. There are no
compensatory or punitive damages."

UnumProvident said the memo was
merely an attempt by the company to
better comply with Erisa, which gov-
erns many of its claims practices. But
the memo, a copy of which was re-
viewed by The Wall Street Journal,
adds fuel to critics' complaints Unum-
Provident in some instances has been
overzealous in denying claims.

The insurer says it pays all legitimate
claims and that critics, including some
former employees who recently have
given sworn statements to plaintiffs' law-
yers, have distorted its approach, which
is geared toward getting employees back
to work. The Chattanooga, Tenn., compa-
ny's claims-handling procedures are be-
ing scrutinized by state insurance regula-
tors in Georgia and California.

Erisa long has been a frustration for
plaintiffs' lawyers. Under the law, a poli-
cyholder who sues an insurer alleging a
claim was mishandled can't collect any
court award other than restoration of pol-
icy benefits and in some cases attorneys'
fees. Erisa doesn't allow awards for puni-
tive damages.

Insurance policies endorsed by any em-
ployer—even if the employee pays the pre-
mium—are protected by Erisa. The act's
main provisions require better disclosure
by benefit plans of how the plans are oper-
ated and administered and establish safe-
guards to protect employee benefits.

The 1995 Provident memo says, "While
our objective is to pay all valid claims and
deny invalid claims, there are some gray

areas, and ERISA applicability may influ-
ence our course of action." The memo says
a Provident manager had identified 12
claims settled for $7.8 million, that, if gov-
erned by Erisa, "our liability would have
been between zero and $0.5 million."

Plaintiffs' lawyers said the memo re-
veals how UnumProvident—and other in-
surers—increasingly have used Erisa's
loopholes to their advantage, allegedly
by forcing policyholders to go to court to
collect their benefits. Joseph Belth, pro-
fessor emeritus for insurance at Indiana
University in Bloomington, who has re-
viewed the memo, said, in general and in
the UnumProvident instance, Erisa "was
supposed to be protection for employees,
but it's being used to protect insurance
companies and employers."

But Glen Felton, vice president of em-
ployment law at UnumProvident, said
some consumer ire should be directed
toward plaintiffs' attorneys, who turn
away Erisa cases and "look for cases that
are non-Erisa, trying to get these exorbi-
tant awards."

Plaintiffs' lawyers say Erisa leaves
them little leeway, because it pre-empts
state insurance laws and allows insurers
to insert policy language that makes it
easier to deny claims. "People shouldn't
have to hire a lawyer to get a legitimate
claim paid," said Ray Bourhis, a lawyer
at Bourhis & Wolfson in San Francisco
who last year won a $7.7 million award
against UnumProvident in a non-Erisa
case. In upholding the jury award in No-
vember, a federal judge in California
said the company had "a comprehensive
system for targeting and terminating ex-
pensive claims." UnumProvident has ap-
pealed the decision.

In February, a federal judge in Mary-
land concluded UnumProvident's behav-
ior, in denying the Erisa-covered disabil-
ity-income claim of a Baltimore legal sec-
retary, had "bordered on outright fraud"
and that the company implemented "an
unprincipled and unreasonable review
process." Despite that view, the company
only had to restore the benefits of the
secretary, Valerie Watson.

UnumProvident later agreed to pay
Ms. Watson's attorneys' fees, according
to her attorney, James P. Koch of Balti-
more. A spokesman for UnumProvident
said the company wasn't immediately
prepared to comment on the case.

BEFORE THE COMMISSIONER OF COMMERCE AND INSURANCE
FOR THE STATE OF TENNESSEE

IN THE MATTER OF:                                                    )
                                                                     ) No.: 02-76
PROVIDENT LIFE AND ACCIDENT INSURANCE COMPANY,                       )
PROVIDENT LIFE AND CASUALTY INSURANCE COMPANY, and                   )
UNUMPROVIDENT CORPORATION                                            )
                                                                     )

## INQUISITORIAL ORDER

WHEREAS, Tenn. Code Ann. § 56-1-204 empowers the Commissioner of Commerce and Insurance (hereinafter referred to as the "Commissioner") or her deputies to inquire into any violation of the Tennessee Insurance Law, Title 56, Tennessee Code Annotated, and to compel the production of books, records, or papers relative to such inquiry; and,

WHEREAS, Tenn. Code Ann. § 56-1-409(b) provides that, for the purpose of ascertaining the financial condition or legality of conduct, the Commissioner may, for good cause, make an investigation and examination of any accounts, records, files, documents and transactions pertaining to the business of insurance. This authority extends to, among others, any insurance agency, agent, general agent, surplus lines agent, insurance representative, or any person holding himself out to be any of the foregoing; and,

WHEREAS, Tenn. Code Ann. § 56-8-107 provides that the Commissioner shall have the power to examine and investigate into the affairs of every person engaged in the business of insurance in this state in order to determine whether such person has been or is engaged in any unfair method of competition or in any unfair or deceptive act or practice prohibited by Tenn. Code Ann. § 56-8-103; and,

00019

WHEREAS, good cause exists for the Commissioner, through her deputies, to make inquiry and investigate the activities of Provident Life and Accident Insurance Company, Provident Life and Casualty Insurance Company, and UnumProvident Corporation. The foregoing are alleged to have violated Tenn. Code Ann. § 56-8-103. The alleged violation primarily relates to the use of certain unfair claim settlement practices, as are enumerated in Tenn. Code Ann. § 56-8-104.

NOW, THEREFORE, IN VIEW OF THE FOREGOING, it is hereby deemed necessary for the proper administration of the above referenced provisions, and ORDERED that G. Everett Sinor, as Assistant Commissioner for the Insurance Division and deputy of the Commissioner, conduct an inquiry and investigate the activities of the above referenced parties, and other such persons or entities affiliated with them. Such inquiry shall extend, but not be limited, to the examination and duplication of any accounts, records, files, documents, and transactions pertaining to the business of insurance by the above named company, as well as the questioning under oath of any parties that may have information related to the alleged violations.

ENTERED this ___20^TH___ day of ___November___, 2002.

_Anne B. Pope_

Anne B. Pope, Commissioner
Department of Commerce and Insurance
State of Tennessee

000198

APPROVED FOR ENTRY:

John F. Morris (BPR# 019144)
Kevin M. Rhoten (BPR# 020973)
Staff Attorneys
Department of Commerce and Insurance
312 Eighth Avenue, North
Twenty Fifth Floor, Tennessee Tower
Nashville, Tennessee 37243-0569
(615) 741-2199

000199

OFFICE OF COMMISSIONER OF INSURANCE

STATE OF GEORGIA

IN THE MATTER OF:                          :

UNUM LIFE INSURANCE COMPANY    :          CASE NUMBER 2002C-028
OF AMERICA, THE PAUL REVERE    :
LIFE INSURANCE COMPANY,         :
PROVIDENT LIFE AND ACCIDENT     :
INSURANCE COMPANY, and          :
PROVIDENT LIFE AND CASUALTY     :
COMPANY

## ORDER

WHEREAS, the Commissioner of Insurance (hereinafter the "Commissioner") commenced an examination of the records and activities of Unum Life Insurance Company of America, The Paul Revere Life Insurance Company, Provident Life and Accident Insurance Company, and Provident Life and Casualty Insurance Company (hereinafter the "Respondents"); and

WHEREAS, pursuant to Georgia law, the Commissioner may use information discovered or developed during the course of an examination in furtherance of any legal or regulatory action which the Commissioner may, in his sole discretion, deem appropriate; and

WHEREAS, during the initial period of examination, the Commissioner has determined that certain issues associated with the handling of claims, complaint resolution, and record maintenance warrant further examination; and

WHEREAS, notwithstanding the further examination of Respondents as set forth herein, the Commissioner has determined that certain actions are necessary at this time for the protection of Georgia consumers.

NOW THEREFORE, upon consideration thereof, the Commissioner hereby places Respondents on regulatory probation for a period of 2 years. The terms are as follows:

1.      Each of the Respondents shall immediately pay a monetary penalty in the amount of $250,000.

2.      The market conduct examination of the Respondents, initiated by Certificate 2000-MC15 and initially covering the period of January 1, 1999 through November 30, 2000 (the "initial exam period"), shall be extended and continue through the period of regulatory probation. The scope of the examination will include further investigation of certain

000200

issues identified during the initial exam period and the monitoring of current claims handling practices as described below.

3.  As part of the continuing market conduct examination of the Respondents, a quarterly review of Georgia claims by a qualified examiner with knowledge and experience in the area of disability insurance to be selected by the Commissioner shall be performed for each quarter for 2 years from the date of this Order. Claims to be reviewed will be claims and/or complaints (whether previous, pending, or future) submitted by Georgia residents, and the claims and/or complaints selected shall include but not be limited to consumer complaints received by the Commissioner and Respondents and random samples of denied claims.

4.  Respondents agree to be sensitive to claims in which a narrow interpretation of policy provisions or legal principles may lead to an unfair result. Respondents will consider, and, on a case-by-case basis, will make exceptions to such narrow interpretations, particularly in claim cases involving more subjective determinations, in order to accomplish a fair result. Any such exception will be consistent with the medical findings in the case, normal and customary application of the relevant policy provisions and applicable legal principles.

5.  Claims personnel will not overrule medical opinions relating to the disability status of a claim that is provided by a more highly trained and/or qualified professional without concurrence of an equally trained and/or qualified professional.

6.  Respondents shall provide improved communications to claimants regarding denial and the availability of the appeals process. Such communications shall accurately and clearly explain the disability definition and basis for denial and refer to specific language in the policy that is relevant to the decision.

7.  Respondents shall maintain copies of applicable policy forms or provisions in the claim files. Additionally, Respondents shall adhere to Respondents' policy of maintaining copies of medical records in the claim files.

8.  Respondents shall improve tracking and availability of claims files and complaint files.

9.  Respondents shall meet all applicable time standards for appropriately responding to claims filings and correspondence.

10. Respondents shall respect the privacy of claimants and will, in the process of collecting, using and determining disclosure of claim information to any third parties, act in accordance with applicable laws, regulations, policy provisions and claim policies of the Respondents.

11. Respondents shall bear all costs associated with the extended examination.

000201

FURTHER, by consenting to this Order, Respondents agree to comply with all of the above-referenced terms of this Order and to comply with all applicable Georgia law and regulations. Respondents admit no violation of Georgia law or regulation and do not admit that the inclusion of any matter in this Order implies failure of prior compliance.

FURTHER, all terms and conditions contained herein are hereby ORDERED,

this _____19th_____ day of _____March_____, 2003.


JOHN W. OXENDINE
COMMISSIONER OF INSURANCE
STATE OF GEORGIA


[Signatures Continued on Next Page]

000202

03/19/03  09:07 FAX 661386212073466230    PROVIDENT                                                ☑ 005

Consented to by:                                    Consented to by:

_J. Harold Chandler_                                _J. Harold Chandler_

Name  J. HAROLD CHANDLER                            Name  J. HAROLD CHANDLER
Title  Chairman, President & CEO                    Title  Chairman, President & CEO
Company  Unum Life Insurance Company               Company  The Paul Revere Life Insurance
              of America                                        Company

[SEAL]                                              [SEAL]


Consented to by:                                    Consented to by:

_J. Harold Chandler_                                _J. Harold Chandler_

Name  J. HAROLD CHANDLER                            Name  J. HAROLD CHANDLER
Title  Chairman, President & CEO                    Title  Chairman, President & CEO
Company  Provident Life and Accident               Company  Provident Life and Casualty
              Insurance Company                                  Insurance Company

[SEAL]                                              [SEAL]


4

000203

OFFICE OF COMMISSIONER OF INSURANCE

STATE OF GEORGIA

IN THE MATTER OF:                    :

UNUM LIFE INSURANCE COMPANY          :        CASE NUMBER 2002C-028
OF AMERICA, THE PAUL REVERE          :
LIFE INSURANCE COMPANY,              :
PROVIDENT LIFE AND ACCIDENT          :
INSURANCE COMPANY, and               :
PROVIDENT LIFE AND CASUALTY          :
COMPANY

## CERTIFICATE OF SERVICE

I do hereby certify that I have this date served a copy of the within and foregoing

Order in the above-styled case by placing in the United States Mail one copy, certified,

postage prepaid, with return receipt requested, properly addressed as follows:

Jeffrey Thomas, Esq.
Mitchell, Williams, Selig, Gates & Woodyard, PLLC
425 West Capitol Ave., Suite 1800
Little Rock, AR 72201

This _19th_ day of _March_, 2003.

_____
Steve L. Carlton
Enforcement Attorney

000204

ANDERSON KILL & OLICK, P.C.
A New York Professional Corporation
Robert F. Pawlowski, Esq. (RFP-4577)
One Gateway Center, Suite 901
Newark, NJ 07102
973-642-5858
Attorneys for Plaintiff
    Helen Ketzner, M.D.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

HELEN KETZNER, M.D.,

                    Plaintiff,

vs.

JOHN HANCOCK MUTUAL LIFE
INSURANCE COMPANY,
PROVIDENT LIFE INSURANCE
COMPANY,

                    Defendants.

Civil Action No. 99-4852 (JWB)

THE AFFIDAVIT OF
CLINTON E. MILLER,
INSURANCE EXPERT

STATE OF CALIFORNIA          }
                             } ss.
COUNTY OF SANTA CLARA        }

        I, CLINTON E. MILLER, AN INSURANCE EXPERT, of full age, being duly sworn
and upon my oath, depose and say:

        1.      I am a Bad Faith Expert and an expert on insurance, the business of insurance,
and the practices of insurance companies.

        2.      I have a bachelor of science degree in Insurance Risk Management, (1969) as well
as a J.D. (1974)

        3.      I worked as an insurance adjuster from 1963 to 1987, obtaining a California
Independent adjuster's license in 1980, as well as a Private Investigations License in 1981.

NJDOCS-33414.1

000205

4.    In addition to about thirty (30) articles on insurance, I have written a book titled, "How Insurance Companies Settle Claims." (13th Ed.)

5.    I have taught law seminars regarding insurance practices and customs, and standards.

6.    I have been qualified and testified as an expert witness in California, Texas, North Dakota, New York, Massachusetts, Connecticut, North and South Carolina, New Jersey, Georgia, Tennessee, Kentucky, West Virginia, Ohio, Illinois, Indiana, Iowa, Kansas, Oklahoma, New Mexico, Oregon, Washington, Nevada, Wyoming, Montana, Colorado, Florida, Virgin Islands, (St. Thomas) Hawaii, Arkansas, Minnesota, South Dakota, Mississippi, Idaho, Missouri, Nebraska, Alaska, Virginia, Washington, Washington DC, Maine, Utah, Pennsylvania, New Mexico, Mexico, Louisiana and Canada (British Columbia). A copy of my curriculum vitae is attached hereto.

7.    I have acted approximately 400 times as a designated expert in insurance coverage litigation to testify regarding bad faith allegations against, and including UnumProvident and/or its affiliates

8.    In that capacity, I have had access to the claims manuals of UnumProvident and/or its affiliates.

9.    I have presented prior expert opinions regarding UnumProvident's and/or its affiliates' claims handling practices that have resulted in findings of bad faith claims handling practices against those entities.

10.    This bad faith conduct includes a failure to follow appropriate claims manual guidelines, as well as utilization of claims handling guidelines which are in part themselves bad faith claims handling practices.

NJDOCS-33414.1

000206

11.   In my experience in the insurance industry I have observed that certain insurance companies, including UnumProvident, engage in what can only be referred to as litigation as a claim handling tool.  In engaging in litigation as a claim handling tool, insurance companies like UnumProvident refuse to pay obviously valid claims as they come in.  Instead, the insurance company engages in a long series of requests for information which delay payment of the claim. A typical ploy, used by UnumProvident in this case I am told, is to "lose" documentation and, weeks or months later, request that new documentation be sent. ("stonewalling").  Another typical ploy is to change claim handlers every several months so that the new claim handler can seek further delay while he or she "gets up to speed." ("stonewalling").

12.   Finally, the insurance company may, as UnumProvident has done here and in many other cases around the country, force the policyholder to retain counsel and institute needless litigation to enforce his or her benefit rights under the insurance policy.

13.   The insurance company will then hire relatively low-cost counsel which will defend the case.  The insurance company can count on a typical case lingering in the court system for at least two years.  I understand that this case is three years old and has not yet been assigned a trial date.  During the pendency of the litigation, the insurance company has gained the use of the policyholder's money.  The insurance company typically counts on the profit it earns on the wrongfully withheld claim proceeds to pay for its litigation costs.  In the meantime, after litigating for some time, most policyholders, and the lawyers representing those policyholders, grow tired of the battle and agree to settle their claims for less than full dollar value.  Thus, in most instances, the insurance company ends up profiting by its own wrongful conduct which it is encouraged to repeat over and over again with resulting increased profits.

NJDOCS-33414.1

14.    In the meantime, the policyholder which has received less than full value for its claim for two or more years after the claim was submitted, is deprived of the use of its money for the period after the claim and before settlement of the litigation. Thus, the 80 or 90 cents on the dollar that the policyholder is paid in settlement is actually worth significantly less because of the policyholder's loss of the time value of money. Insurance company representatives have actually argued the fact of this calculus; policyholders should take $.37 ½ on the dollar to settle claims quickly since that is all their claim will be worth - - factoring in the loss attributable to the time value of money - - when the case is ultimately resolved down the road. For example, please see "Equitas Claims," Scott Moser, Claims Director, Equitas Limited.

15.    This conduct by insurance companies is a conscious disregard and utter bad faith disregard of policyholder's rights and in clear violation of the insurance statutes and regulations in most states, including New Jersey. I believe that UnumProvident regularly engages in this conduct and has done so in this case.

_____

Clinton E. Miller, J.D., DABFE, FACFE, DABDA

State of California, County of Santa Clara
Sworn to and subscribed before me
This 25th day of May, 2002.


_____
Notary Public



OFFICIAL SEAL
SHAUNA ATKINSON
NOTARY PUBLIC - CALIFORNIA
COMMISSION # 1250657
SANTA CLARA COUNTY
My Commission Exp. April 14, 2004

000208

EDUU1001

# Hungry Vultures...



"Patience, my foot...
I'm gonna kill something"

Richard Leiderman, Kevin Shaughnessy and Larry Sims are the winners of Provident's first Hungry Vulture awards, given to those employees who are "operating with a sense of urgency, influencing our future, not just waiting for it to happen or relying solely on someone else's opinion or information." So what did each of these gentlemen do to qualify? Leiderman, a chief financial analyst in individual operations, was recognized for seeing the need to expand the scope of the company's financial modeling capability and challenging others to look ahead. Shaughnessy, a disability claims representative, won his designation for voluntarily shouldering a heavy complex case load and for having a keen eye in identifying problem claims. Sims, manager of materials management in Corporate Properties and Services, was chosen for his leadership in "just in time" inventory management in Provident's warehouse and supply operations. Congratulations, and keep up that appetite for success!

## Industry BRIEF

Paul Revere Insurance Group has introduced a new short-term disability product which can be sold with any new or existing Paul Revere long-term disability plan or on a stand alone basis. The product includes a partial disability benefit; several payment options, including employee contribution plans and language consistent with the company's LTD product which will allow insureds a smooth transition from STD to LTD benefits.
from National Underwriter, August 7, 1995.

The anticipated merger between Metropolitan Life and New England Mutual Life has been agreed to by the Boards of Directors of both companies, and should be complete by the end of the year. With the merger, the assets of Met Life, the nation's second-largest insurance company, will grow to $146.9 billion, still leaving it second in size behind Prudential Insurance Company of America, which has $167.5 billion in assets.
from The New York Times, August 17, 1995.

Jefferson-Pilot Corporation has acquired Alexander Hamilton Life for $575 million in cash. The transaction represents approximately 300,000 policies and increases Jefferson-Pilot's invested assets by approximately $850 million. Total assets for Jefferson-Pilot after the acquisition will be $14 billion, up from $7 billion.

According to analysts, the acquisition signals a change in strategic direction for Jefferson-Pilot, which cited an expanded geographic reach outside of the South as one of the benefits of the agreement. Earlier this year, Jefferson-Pilot acquired a block of business of more than 300,000 policyholders from insurer Kentucky Central Life.
from Resource, August 1995, and National Underwriter, August 21, 1995.

BRD - 472

000209



# Customer Care Center
# Claims Manual

As of May 10, 2002

Confidential and Proprietary Information

Authorized Use Only

DO NOT PRINT, COPY, OR DISTRIBUTE

000210



000211

04/23/99  14:15 FAX 423 755 1910     PROVIDENT LAW-LT     ☒015

## EXHIBIT IV
## KEY ACTIVITIES

Transition planning efforts related to the merger continue to occupy much of the time of management. Four teams completed their recommendations relating to field investigations, vendor relations, quality assurance and training, and claim settlements. The two remaining teams (DI claim process and structure) will present their recommendations to the scoping team during the week of November 16. This will conclude individual DI activity for this particular stage of the transition planning process.

In October, 128 claims totaling $31.4 million were reviewed in roundtable discussions. Appropriate actions were agreed upon and initiated. Individual disability claim representatives have also participated in the review of over 24 LTD cases during the month and will be following up on agreed actions.

The following claim investigations and management activities were reported for October:

| | |
|---|---|
| Independent Medical Exams | 130 |
| Medical Referrals | 376 |
| Surveillances | 70 |
| Referrals to Rehab | 44 |
| Field Referrals | 479 |
| Medical Records Ordered | 1,222 |

Rehabilitation results: Five of 24 completed referrals (21%) were successfully handled for a net reserve reduction of $.5 million, bringing the year-to-date total of reserves reduced through Rehab reviews and activities to $10.1 million.

The Quality Assurance area audited 47 files in October and the results maintained the overall 85% accuracy rate. Additionally, the auditors trained all claim reps on processing claims with the Disability Annuity Supplement, and presented a session to the Field Reps on Objectification Training. The new hires are being released to their permanent unit assignments on November 15.

Field Investigators completed 353 referrals, a 5% decline from the previous 9 month average. This decline was influenced by a week long training session conducted in the Home Office.

All field investigative personnel and selected Home Office staff from both Paul Revere and Provident met during the week of October 7 - 11 for a joint training session. Some of the focal points were: Interviewing Techniques, Managing Surveillance, Recommended "Best Practices", Moot Court Exercise, Legal Update, and case presentations. Evaluations of all the sessions provide that the overall meeting was a great success. With 1 being low, and 10 high, scores for the twelve sessions evaluated rated from 5.3 to 9.3, with three sessions rating 9.2 to 9.3, five sessions 8.0 to 8.7 and four sessions from 5.3 to 7.4.

Phone calls continued to increase as the Central Support Unit answered 19,329 calls in October, up 22% from the previous 9 months average of 15,100. Of that number, 94% were answered within 45 seconds and 2.6% were abandoned, exceeding our goals in each category.

A data clean-up initiative has been undertaken to correct social security numbers, blank date fields and other data which could impact the calculation of reserves.

PROV 02573