# ATTACHMENT

## "F"

ATTACHMENT "F"

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

---

# CONFIDENTIAL

## PROVIDENT LIFE AND ACCIDENT INSURANCE COMPANY ("PROVIDENT" OR THE "COMPANY") INDIVIDUAL DISABILITY LINE OF BUSINESS REENGINEERING PROJECT

LeBoeuf, Lamb, Greene & MacRae, L.L.P.

GSCONF 27.1146



GSCONF 27.1147

TABLE OF CONTENTS

Page

OVERVIEW ............................................... 1

SUMMARY OF RECOMMENDATIONS .......................... 4

I.  REHABILITATION (Provident Initiative 1.4) ............... 24
    A.  Enforcement of provisions under Own Occupation policies .. 25
    B.  Rehabilitation provisions of the 338 Loss of Earnings
        Policy ............................................. 29
    C.  Creation of mandatory rehabilitation wording for new
        policies ........................................... 32

II. ISSUES RELATING TO CLAIMS OTHER THAN MENTAL
    AND NERVOUS CLAIMS (Provident Initiatives 2.4 and 2.5) .... 36
    A.  Claims management, investigations and settlements ...... 37
        1.  Discussion of relevant policy wording ............ 37
        2.  Settlements:  practices and procedures, including
            investigations and audits ...................... 39
            (a)  Initial handling of claim ................. 39
            (b)  Action plans ............................. 42
            (c)  Document retention ....................... 43
            (d)  Cost/benefit analysis for claims handling ..... 44
            (e)  Claims decisions ......................... 45
        3.  Resources ................................... 51
            (a)  Staff ................................... 51
            (b)  Systems ................................. 52
        4.  Training ..................................... 53
        5.  Law Department involvement ................... 54
    B.  Litigation ........................................ 58
        1.  Issues ...................................... 58
            (a)  Current management of IDI Policy litigation .. 58
            (b)  Preparing and defending depositions ......... 60
            (c)  Jurisdictional specific issues ................ 61
            (d)  Confidentiality .......................... 61
            (e)  Privilege ................................ 62
            (f)  Actions by Company ....................... 62
            (g)  Litigation management ..................... 63
        2.  Resources ................................... 66
            (a)  Staff ................................... 66
            (b)  Systems ................................. 66

Page

III.   ISSUES RELATING TO MENTAL AND NERVOUS CLAIMS
       (Provident Initiative 1.4) ............................  70

       A.   Claims, management, investigations and settlements ......  72
            1.   Practices and procedures ......................  73
                 (a) Initial handling of claim ....................  74
                 (b) Action plans ..............................  78
            2.   Resources ...................................  78
            3.   Training ....................................  79
            4.   Law Department involvement ...................  80
       B.   Psych Unit as a pilot program for Claims Department .....  81

IV.    POLICY WORDING (Provident Initiatives 3.2) ..............  82

       A.   Coverage benefits ...............................  84
            1.   Renewal conditions ...........................  84
            2.   Rehabilitation benefits ........................  86
            3.   Cost of living adjustment benefits ...............  87
       B.   Exclusions and defenses .........................  88

V.     POSSIBLE REINSURANCE OR PRODUCT OPTIONS TO
       EASE FINANCIAL BURDEN OF OWN OCCUPATION
       POLICIES (Provident Initiative 1.2) ...................  92
       A.   Reinsurance ....................................  92
            1.   Indemnity ...................................  92
            2.   Assumption ..................................  94
       B.   Product options .................................  94
            1.   Product conversion or "add on" possibilities ........  94

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

## OVERVIEW

Provident has requested that LeBoeuf and Tillinghast advise the Company in connection with the Company's reengineering of its individual disability business. The project involves a global review of the business from product design and distribution through the disposition of claims. Distribution issues, however, are not discussed in this report. The project also considers options for reinsuring the business and the possibility of developing policyholder incentives to convert certain policies to another product or to "add on" profitable riders to existing products that will generate additional revenues. Although LeBoeuf and Tillinghast are generating separate reports, we have relied on each other's expertise in developing work product.

Individual disability premiums comprised more than one-half of Provident's total premium revenue in 1993. Business written since the early 1980s has eroded profitability of the individual disability line because of inordinately generous policy terms, including terms limiting Provident's ability to cancel or reprice the business. Provident has twice increased reserves on this business. Rating agencies have responded negatively to these adverse developments.



LeBoeuf, Lamb, Greene & MacRae, L.L.P.                    Page 1

GSCOMF 27.''50

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

Provident has also suffered high expense ratios on the business, which should be reduced through recent restructuring, including the centralization and consolidation of certain operations. These changes should help stem losses, but the Company recognizes that additional work must be undertaken. New products must afford flexibility to address changing societal factors and must be priced to generate profits. The distribution system must be streamlined to maximize compliance initiatives and control expenses. We are working with the Company to resolve legal issues relating to this aspect of the reengineering project.

In order to further improve its capital position, Provident may also consider reinsuring all or portions of the individual disability line on a basis that could provide acceptable pricing risk to a reinsurer.

The following report addresses the legal and business implications of the reengineering program in the order in which we were asked to address identified initiatives.[1] The document first summarizes our Recommendations under headings set forth in the Table of Contents.

---

[1]    Statements in this report regarding Company practices are based on interviews with management, staff and in-house lawyers, as well as a review of selected relevant files.

LeBoeuf, Lamb, Greene & MacRae, L.L.P.                    Page 2

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

Thereafter, the Recommendations are repeated in context following relevant discussion in Sections I through V.

GSCONF 27.1193

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

## SUMMARY OF RECOMMENDATIONS

I.    REHABILITATION (Provident Initiative 1.4)

A.    Enforcement of provisions under Own Occupation policies

**Recommendation I.A.1:** Test voluntary rehabilitation under in force Own Occupation Policies pursuant to a separate agreement with the insured. This will effectively convert the voluntary provision to a mandatory provision under the separate agreement. While we acknowledge that Own Occupation Policies do not lend themselves to mandated rehabilitation, rehabilitation for Own Occupation policyholders should be tested to evaluate its effectiveness as a claims management tool. It is reasonable to assume that a legitimate claimant would want to be restored to his or her occupation. Therefore, a claim by an insured who rejects the benefit may merit more diligent investigation. Once the insured elects to participate, the insured will have at least a "good faith" obligation and at best a contractually binding obligation to continue in the program in order to receive benefits.

**Recommendation I.A.2:** Employ qualified professionals to design rehabilitation programs in conjunction with the insured. Participation of professionals with the insured in the design of a rehabilitation program is essential to avoid allegations that the quality of the program was deficient (did not meet reasonable professional standards). Thus, Provident must invest in professionals who will design and operate rehabilitation programs that will support enforceability when challenged.

**Recommendation I.A.3:** Do not attempt to mandate rehabilitation based on "care and attendance of physician" clauses in Own Occupation or other IDI Policies.

GPPPUF 27.1154

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

SUMMARY OF RECOMMENDATIONS continued ...

B.   Rehabilitation provisions of the 338 Loss of Earnings
     Policy

**Recommendation I.B.1:** Develop a program that encourages insureds to participate in rehabilitation under Loss of Earnings Policy 338. Once the insured agrees to participate in rehabilitation, the insured should be deemed to have a contractual obligation pursuant to the Rehabilitation section of this Policy, as well as a "good faith" obligation to continue in the program in order to receive benefits. Similar obligations would attach under the Recommendations in Sections I.A.1 and 2, above.

**Recommendation I.B.2:** Do not attempt to mandate rehabilitation based on the rehabilitation or the "care and attendance of physician" clauses in this policy.

C.   Creation of mandatory rehabilitation wording for new
     policies

**Recommendation I.C.1:** Create a mandatory rehabilitation provision for all general IDI Policies (other than own occupation policies).

**Recommendation I.C.2:** We recommend the following draft mandatory rehabilitation provision for possible future use in Provident's IDI policies.

The "Covered Loss" section should state:

> If after examination and evaluation by professionals selected by the Company it is determined that a program of Occupational Rehabilitation would help you return to work in a Reasonable Occupation, you must participate and continue to participate in such a program as set forth in the Rehabilitation section of this Policy in order to receive and to continue to receive Monthly Benefits under this Policy.

GSCONF 27.1155

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

SUMMARY OF RECOMMENDATIONS continued ...

The "Rehabilitation" section should state:

<u>Total Disability</u> - Your participation in a program of Occupational Rehabilitation will not, of itself, be considered recovery from Total Disability, but if recommended, your participation in an Occupational Rehabilitation Program will be required as set forth in the Covered Loss and Rehabilitation sections of this Policy.

<u>Approved Occupational Rehabilitation Program</u> - At any time after you submit a claim, we have the right at our expense to have you participate in reasonable medical, vocational and psychological evaluations and periodic reevaluations by professionals selected by the Company to determine whether a program of Occupational Rehabilitation would help you return to work in a Reasonable Occupation. Such a program might include, but not be limited to, a program of vocational, psychological, and/or medical services intended to help you return to work in a Reasonable Occupation. If it is determined that a program of Occupational Rehabilitation, as approved by us, would help you return to work in a Reasonable Occupation, your participation in such a program is required in order to receive continued Monthly Benefits under the Policy, and based upon reevaluation as set forth herein, the Company may require you continue to participate in such a program until such time as experts selected by the Company determine that the program of Occupational Rehabilitation has enabled you to return to work or cannot further advance your ability to return to work in a Reasonable Occupation.

<u>Rehabilitation Program Expense</u> - We will pay for the reasonable costs of the Approved Occupational Rehabilitation Program which are not otherwise



GSF____

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

SUMMARY OF RECOMMENDATIONS continued ...

covered by any other source of benefits available to you including health insurance, workers' compensation, or any public fund or program. We will not pay more than the Maximum Amount for Rehabilitation Program Expense as provided in this Policy.

Loss of Benefits - If recommended, you must participate in the Approved Occupational Rehabilitation Program in order to receive continued Monthly Benefit payments. If at any time you refuse to participate in the Approved Occupational Rehabilitation Program as set forth in this Policy, your Monthly Benefit payments will cease.[2]

Recommendation I.C.3: Develop systems and retain qualified professionals to monitor and create quality rehabilitation programs.

_____

[2]    The Definitions section of Policy 338 should contain definitions of "Reasonable Occupation," "Occupational Rehabilitation" and all other capitalized terms.

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

SUMMARY OF RECOMMENDATIONS continued ...

II.   ISSUES RELATING TO CLAIMS OTHER THAN MENTAL AND
      NERVOUS CLAIMS (Provident Initiatives 2.4 and 2.5)

   A.   Claims management, investigations and settlements

      1.   Discussion of relevant policy wording[3]

         Recommendation II.A.1:  Track policy wording disputes.
Claims must be tracked to identify allegations of ambiguous language
and to insure the enforceability of conditions for payment of benefits.
Judicial decisions relevant to these issues should be tracked by the
Law Department.

         Recommendation II.A.2:  Policy 335 interpretation of
"work" should not be construed to mean any work.  Since "work" is
not defined in IDI Policies, a decision to deny may nonetheless be
reasonable, since the use of the word "work" in the policy in question
can be tied to the Own Occupation coverages thereunder.  Legal
research on the law in the state where the claim arises will be
necessary to determine whether denial is reasonable.  Past practice
must also be evaluated to determine whether it would undermine the
foregoing Recommendation.

      2.   Settlements:  practices and procedures, including
           investigations and audits

         (a)  Initial handling of claim

         Recommendation II.A.2(a) 1:  Assign the largest and most
difficult claims to the most experienced and skilled adjusters.  This
may require adjusters to develop areas of specialization, and will
require greater input from senior adjusters or managers at the
inception of the claim.

---

[3]     See also Section IV, below.

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

SUMMARY OF RECOMMENDATIONS continued ...

**Recommendation II.A.2(a) 2**: Assign new claims based on claimant's current residence, not alphabetically or based on where the contract was executed. The claim should be handled at the outset by an adjuster experienced in the jurisdiction from which the claim emanates, particularly in those jurisdictions where there is "bad faith" liability and punitive damages.

**Recommendation II.A.2(a) 3**: Utilize field examiners, whenever practical, to call immediately on claimants, gather information and visual impressions, and gain the goodwill that will come from immediate and direct contact. Every effort should also be made to access the branch offices for information on the claimant and avenues to investigate.

**Recommendation II.A.2(a) 4**: Train Zone Managers to handle claims consistently. There can be no divergence of methodologies.

(b) **Action plans**

**Recommendation II.A.2(b) 1**: Institute formal action plans to ensure that claims are being actively investigated and analyzed, and to ensure uniform claims handling among the regional claims groups. To facilitate consistent methodologies create a standard form "action plan" for claims files. These action plans should be amended over time as warranted.

**Recommendation II.A.2(b) 2**: Assess at the outset the degree of supervision necessitated by a claim. Each action plan should be coded in a manner that facilitates determining the amount of input required from a supervisor.

(c) **Document retention**

**Recommendation II.A.2(c) 1**: Create a uniform document retention policy that governs which claims handling materials should be included in the claims file once they are no longer needed in the ordinary course of business. There should also be a document

GSCONF 27.1159

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

SUMMARY OF RECOMMENDATIONS continued ...

retention policy for information stored electronically. (Retention may also be governed by certain insurance regulatory requirements.)

### (d) Cost/benefit analysis for claims handling

**Recommendation II.A.2(d) 1:** Track the costs of outside services utilized for particular types of claims or particular issues.

### (e) Claims decisions

**Recommendation II.A.2(e) 1:** Upon opening a file, review the file and document the issues addressed, as well as the reasons for the decision to grant or deny the claim. The review can be addressed to the Law Department in the event of a denial, with a request for legal advice in order to obtain attorney-client protection.

**Recommendation II.A.2(e) 2:** Permit litigation counsel to gain direct knowledge of claims investigations and the status of claims files through written summaries or, if needed, through direct communication with claims personnel immediately after the complaint is filed. Follow-up meetings would also benefit both sides.

**Recommendation II.A.2(e) 3:** Require that the Law Department attorney assigned to the Claims Department (see subsection 5 below) be involved in potentially questionable decisions to grant or deny claims. In jurisdictions where there is a higher risk of "bad faith" allegations and punitive damage awards, a Law Department litigator with expertise in this area may also need to be consulted. This will add to the quality of decisions, promote uniformity, and help prevent unwarranted litigation.

**Recommendation II.A.2(e) 4:** Eliminate the scrub process. It is unwise from a potential litigation standpoint, and its benefits can be more efficiently achieved through Mr. Mohney's proposals.

**Recommendation II.A.2(e) 5:** Integrate investigative functions. We believe that claims investigations flow appropriately from claims management and, therefore, that the Claims Department

LeBoeuf, Lamb, Greene & MacRae, L.L.P.                    Page 10

GSCONF 27.1160

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

SUMMARY OF RECOMMENDATIONS continued ...

should have responsibility for claims investigations. If the Claims Department assumes responsibility for claims investigations, a member of the Law Department should be physically located in the Claims Department to direct sensitive investigations (such as claims likely to result in litigation) to protect attorney-client and/or work product privileges.[4]

This does not mean, however, that privilege will always attach nor would this be the case if the Law Department had exclusive responsibility for claims investigations.

**Recommendation II.A.2(e) 6**: Do not assign litigation responsibilities to attorneys advising the Claims Department on investigations. This will enable the Claims Department attorney to make objective claims decisions without fear of being assigned the litigation.

**Recommendation II.A.2(e) 7**: Revise claims adjustor compensation and performance review criteria to achieve goals that promote expeditious and thorough investigations.

**Recommendation II.A.2(e) 8**: Develop a claims investigation manual. The manual should outline proper procedures and legal requirements and should contain, among other things, a form to be completed before an investigation may be closed.

**Recommendation II.A.2(e) 9**: Internal Audit should conduct independent periodic audits of the Claims Department. The Claims Department should also review its own practices and procedures.

---

[4]     The presence of a lawyer in the Claims Department is recommended for additional reasons discussed below.

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

SUMMARY OF RECOMMENDATIONS continued ...

### 3. Resources

#### (a) Staff

**Recommendation II.A.3(a) 1:** Provide additional management and legal support to the Claims Department until claims personnel have developed necessary expertise. This should be a short-term investment for which outside consultants or outside counsel with established expertise could be utilized.

**Recommendation II.A.3(a) 2:** Add additional accounting, rehabilitation and other relevant professional expertise to the Claims Department.

#### (b) Systems

**Recommendation II.A.3(b) 1:** Develop systems that track critical information and reports that are "user friendly." Systems should also be useful for training. The new system should develop information that bridges systems needed by the Law Department. Before any system is adopted those involved with the day-to-day management of claims, claims investigations, rehabilitation and litigation should review the proposed system with systems experts.

For example, the system should track claims disputes generated pursuant to specific policy wording, outcomes attributable to specific claims investigators or other personnel, denials, specific aspects of investigations, etc. Litigation systems could also utilize such tracking. This would enable the Company to better evaluate the effectiveness of policy wordings, claims management and litigation outcomes, all of which are related.

### 4. Training

**Recommendation II.A.4. 1:** Create a Training Department responsible for organizing regularly scheduled and methodologically consistent training of Claims Department personnel by staff experts, representatives of the Law Department and outside consultants,

GSCOMP 27.1162

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

SUMMARY OF RECOMMENDATIONS continued ...

including experienced outside counsel.[8] Managers need to be kept informed of legal and practical developments relevant to claims handling, such as problems related to the products sold, bad faith and punitive damage claims arising from claims mismanagement, medical issues and rehabilitation programs. Training on issues pertinent to the most troublesome jurisdictions must be made available to staff handling such claims. Notwithstanding the justifiable concern about exposure to bad faith and punitive damage suits, claims manuals and written materials need to be produced and regularly updated to enable Claims Department personnel to perform their responsibilities.

Such materials should provide a road map for staff; they need not and should not contain exorbitant detail. Written claims training materials, including the manual should stress the need for claims representatives to work to professional standards with the key standard being the exercise of fair and informed judgement. Exercise of judgement taken after appropriate investigation and analysis should be stressed.

Recommendation II.A.4. 2: Subject all claims adjusters to deposition training before their first deposition.

5.   Law Department involvement

Recommendation II.A.5. 1: Require lawyers to be more proactive and involved in difficult claims coverage issues. An attorney respected by the Claims Department, who is knowledgeable and experienced in claims and governing law, should be assigned to serve the Claims Department. A paralegal should also be assigned to the Claims Department. This assignment would also cover the claims investigation and training functions discussed above.

Recommendation II.A.5. 2: Develop a brief and memoranda bank on the enforceability of the Company's policy

---

[8]    Outside counsel can be asked to provide this service at no charge to the Company.

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

SUMMARY OF RECOMMENDATIONS continued ...

wordings in various jurisdictions and on problems that regularly arise from certain policy wordings. Recommend policy wording revisions where patterns are detected.

Recommendation II.A.5.3: Proactively develop strategies to address special issues such as AIDS.

Recommendation II.A.5.4: Create a data bank of memoranda and briefs for the Claims Department and local counsel. Continue to identify issues and memoranda along the lines set forth above as training tools for claims personnel.

Recommendation II.A.5.5: Litigators and the attorney assigned to the Claims Department should develop formats to determine when a file is ready for denial and possible litigation. This should relate to the action plan discussed in subsection 2(b) above.

B.    Litigation

    1.    Issues

        (a)    Current management of IDI Policy litigation

Recommendation II.B.1(a)1: Overcome the reluctance to use paralegals. Legal assistants should be hired and trained for IDI Policy litigation matters. They can economically and efficiently handle routine discovery and procedural matters, thus freeing lawyers to provide additional assistance to the Claims Department and to deal with more sophisticated legal problems.

        (b)    Preparing and defending depositions

Recommendation II.B.1(b)1: Utilize in-house attorneys to prepare and defend witnesses at depositions where the circumstances warrant. Systems must be adopted to ensure that this procedure is economical and does not impair outside counsel's ability to represent the Company.

LeBdeuf, Lamb, Greene & MacRae, L.L.P.                    Page 14

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

SUMMARY OF RECOMMENDATIONS continued ...

(c)  Jurisdictional specific issues

**Recommendation II.B.1(c) 1:** Employ litigators to provide "second opinions" on difficult claims in the most troublesome jurisdictions. Outside counsel may also be used for this purpose. Counsel handling coverage opinions should generally not be assigned the litigation if coverage is denied. There may be exceptions to this rule with certain outside counsel with whom Provident has valued relationships. If counsel recommends denial and also handles the litigation, alternative fee arrangements should be considered that would take into account outside counsel's favorable opinion on denial.

(d)  Confidentiality

**Recommendation II.B.1(d) 1:** Seek a confidentiality order at the beginning of litigation protecting Provident documents and testimony. When a case is settled, every effort should be made to include a confidentiality provision. Although such efforts may not always be successful, it is worthwhile to pursue confidentiality.

(e) Privilege

**Recommendation II.B.1(e) 1:** Maintain a file on jurisdictions in which "advice of counsel" is a defense, and rely on that defense where appropriate.

(f) Actions by Company

**Recommendation II.B.1(f) 1:** Identify and explore with claims personnel the most egregious fraudulent claims by insureds, and consider taking action against those insureds and perhaps their attending physicians.

GSCOMP 27.1165

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

SUMMARY OF RECOMMENDATIONS continued ...

### (g)  Litigation management[6]

**Recommendation II.B.1(g) 1:**  Only utilize attorneys with IDI expertise to manage IDI Policy litigation. This will require freeing up time of those attorneys through the reallocation of resources.

**Recommendation II.B.1(g) 2:**  Prepare a summary of facts and issues before a file is sent to outside counsel in order to save outside attorney time and expense. Caution must be exercised to maintain attorney-client privilege. The file should also include briefs and memoranda from the data bank discussed below.

**Recommendation II.B.1(g) 3:**  Require outside counsel to provide an action plan and regular updates to that plan. The in-house attorney responsible for the file should review the plan and provide feedback to outside counsel.

**Recommendation II.B.1(g) 4:**  Utilize paralegals and outside counsel to respond to discovery demands, prepare witnesses, and to draft affidavits for dispositive motions. Although the use of outside counsel may appear to increase costs, a better prepared outside counsel should ultimately produce better results.

**Recommendation II.B.1(g) 5:**  Conduct a cost/benefit analysis of all ongoing litigation, which considers the precedential value of litigating, as well as dollar costs.

**Recommendation II.B.1(g) 6:**  Pursue alternative fee arrangements with outside counsel.

---

[6]  The first three Recommendations in this section apply with equal, if not greater force, to troublesome jurisdictions.

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

**SUMMARY OF RECOMMENDATIONS** continued ...

2.   Resources

(a)   Staff

**Recommendation II.B.2(a) 1:**  Devote four attorneys and two paralegals full time to IDI Policy litigation and claims related issues.  This would include the attorney assigned to the Claims Department.  Mr. Love should be assigned to directly manage litigation files, and to interact with claims personnel and the attorney assigned to the Claims Department, and Messrs. Griffin and Echerd should spend 100% of their time on IDI matters.

(b)   Systems

**Recommendation II.B.2(b) 1:**  Centralize and store legal analyses and forms.

**Recommendation II.B.2(b) 2:**  Track the cost of in-house management of IDI Policy litigation.

**Recommendation II.B.2(b) 3:**  Coordinate the development of systems with the Claims Department and Systems experts.  Do not develop new systems independently.  Certain reports will be available only to the Law Department, but coordination is essential.  Future tracking should correlate data for evaluating outcomes, such as success or liability with respect to specific types of denials, policy wording interpretations, etc.

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

SUMMARY OF RECOMMENDATIONS continued ...

III.   ISSUES RELATING TO MENTAL AND NERVOUS CLAIMS
       (Provident Initiative 1.4)

   A.   Claims, management, investigations and settlements

       **Recommendation III.A:** Continue to vigorously change
"corporate culture". Make the adjuster – not the attending physician
– the expert on the claimant's condition, the proper treatment and
how those aspects of a claim are connected to the insurance policy at
issue. Build upon these changes to use the "subjective" nature of
mental and nervous claims to the Company's advantage. Like other
claims, this cannot be done unless and until claims are properly
handled from commencement until closing.

       1.   Practices and procedures

       **Recommendation III.A.1:** Continue to prioritize the Psych
Unit's current mission to review high value claims subject to
reevaluation. To the extent that reevaluation of claims creates
settlement or appropriate denials, their review can achieve the best
financial results for the Company.

       (a)   Initial handling of claim

       **Recommendation III.A.1(a) 1:** Ensure that adjusters are
well versed in details of jurisdiction where there is greater exposure
to "bad faith" liability and punitive damages and encourage adjusters
to discuss bad faith issues with adjusters in the claims department
well versed in the relevant jurisdictions and/or lawyers to stay up to
date on bad faith developments.

       **Recommendation III.A.1(a) 2:** Formalize the system by
which each new claim is reviewed at the weekly round-robin meeting.

       **Recommendation III.A.1(a) 3:** Continue to stress activities
or tasks when determining the proper claimload for adjusters.

GSCONP 27.1168

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

SUMMARY OF RECOMMENDATIONS continued ...

**Recommendation III.A.1(a) 4:** Continue training adjusters and MSWs to proactively intervene in the claimant's situation as quickly as possible to determine the validity of the claimant's condition and the proposed course of treatment.

**Recommendation III.A.1(a) 5:** Utilize field examiners whenever practical to call immediately on claimants and train field examiners in appropriate aspects of mental and nervous claims.

**Recommendation III.A.1(a) 6:** Identify attending physicians connected with falsified claims and refer to legal department for appropriate action.

**(b) Action plans**

**Recommendation III.A.1(b) 1:** Continue to use and upgrade action plans.

**2.    Resources**

**Recommendation III.A.2. 1:** Carefully evaluate the proper psych consultant/adjuster ratio and ensure effectiveness of the relationship. Often pilot programs show success because they are more easily managed and supervised due to their limited size. Keep the positive characteristics of the small Psych Unit as it enlarges.

**Recommendation III.A.2.2:** Continue to consolidate data and develop acceptable forms for use by all adjusters involved in mental and nervous claims.

**Recommendation III.A.2. 3:** Use and evaluate IME referral companies until such time as the Company establishes its own list of IMEs.

GSCOMP 27.1169

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

SUMMARY OF RECOMMENDATIONS continued ...

### 3.  Training

**Recommendation III.A.3.1:** Establish a formal training program in conjunction with the efforts commenced by the claims department.

### 4.  Law Department involvement

**Recommendation III.A.4.1:** Integrate new lawyer assigned to claims department to perform the same tasks for the Psych Unit.

**Recommendation III.A.4.2:** Develop memoranda bank on mental and nervous tests as applied to Provident's policies in various jurisdictions.

**Recommendation III.B.1.1:** Use the Psych Unit as a pilot program to establish other specialized and prioritized claims units and consider having a separate unit to look at lower value more routine claims or those higher value claims not subject to investigation because the claimant is cle rly entitled to benefits.

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

SUMMARY OF RECOMMENDATIONS continued ...

## IV. POLICY WORDING (Provident Initiatives 3.2)

**Recommendation IV.1:** Institute systems to track policy wordings and to detect ambiguous or overly generous policy provisions.

**Recommendation IV.2:** Institute regular modes of communication between policy drafters and claims, legal and marketing personnel to ensure that drafters receive regular feedback on in-force wordings.

**Recommendation IV.3:** Institute systems to track judicial decisions relevant to the Company's policy wordings so that policy wordings can be adjusted proactively to avoid unintended benefit payments in future policies.

### A. Coverage benefits

#### 1. Renewal conditions

**Recommendation IV.A.1. 1:** Discontinue guaranteed lifetime renewals. If offered, renewal benefits after the age 65 should be limited to a set age.

**Recommendation IV.A.1. 2:** Limit guaranteed renewal or premium benefits to age 65.

#### 2. Rehabilitation benefits

**Recommendation IV.A.2. 1:** Institute a mandatory rehabilitation clause in all general (non-occupationally based) IDI products.



PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

SUMMARY OF RECOMMENDATIONS continued ...

3.   Cost of living adjustment benefits

**Recommendation IV.A.3. 1:**  Do not offer a floor on the COLA option.  Inflationary adjustments should not exceed increases in the actual Consumer Price Index.

B.   Exclusions and defenses

**Recommendation IV.B.1:**  Explicitly provide for a broad, lifetime fraud defense.  The defense should appear in a separate clause to avoid ambiguity and to give the defense greater prominence.

**Recommendation IV.B.2:**  Exclude coverage for losses associated with the suspension or loss of license.  This could be expressed as a _per se_ exclusion or could be tied to mental and nervous claims.

**Recommendation IV.B.3:**  Exclude coverage for losses associated with business failures or losses.  This could be expressed as a per se exclusion or could be tied to mental and nervous claims.

**Recommendation IV.B.4:**  Exclude losses attributable to self inflicted injuries.

**Recommendation IV.B.5:**  Exclude losses attributable to the commission of a crime (felony crime exclusion).

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

SUMMARY OF RECOMMENDATIONS continued ...

## V. POSSIBLE REINSURANCE OR PRODUCT OPTIONS TO EASE FINANCIAL BURDEN OF OWN OCCUPATION POLICIES (Provident Initiative 1.2)

### A. Reinsurance

#### 1. Indemnity

**Recommendation VI.A.1. 1:** Reinsure all or a portion of IDI Policies under terms that allow pricing flexibility and recognition of possible reserve deterioration at a later date. This could be accomplished through the issuance of a note or preferred shares by a non-insurance subsidiary of the reinsurer to Provident. The note repayment or share redemption would be tied to the performance of the business reinsured.

#### 2. Assumption

**Recommendation VI.A.2. 1:** Consider an assumption reinsurance transaction only if Provident plans to exit the individual disability business.

### B. Product options

#### 1. Product conversion or "add on" possibilities

**Recommendation VI.B.1. 1:** Develop profitable "add on" riders that could be sold to own occupation policyholders. Although a conversion product would be ideal, it is impractical to believe that own occupation policyholders could be induced to convert their policies for less generous policies.



---

LeBoeuf, Lamb, Greene & MacRae, L.L.P.                                    Page 23



GSCONF 27.1174

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

## DISCUSSION

### I.    REHABILITATION (Provident Initiative 1.4)

*Overview*

       This section discusses the utility of existing rehabilitation provisions under Provident Individual Disability Policies ("IDI Policies" or "IDI Policy") and the use of mandatory rehabilitation provisions in new IDI Policies. We recommend that existing Rehabilitation provisions be employed as a claims management tool. We cannot recommend, however, that any language in current IDI Policies be relied upon to mandate rehabilitation. Our concern is underscored by the fact that there is little law on this subject and that even explicit mandatory rehabilitation provisions may not be enforceable under all state insurance laws.

       We also recommend that Provident incorporate mandatory rehabilitation provisions in all its non-occupationally based products. Any future mandatory rehabilitation program, however, must be crafted to satisfy state insurance laws, meet the highest professional standards and be designed to restore the insured's earning capabilities. In jurisdictions that permit mandatory rehabilitation, new policies could (under reasonable medical standards) tie rehabilitation to the payment of benefits.

044870

LeBoeuf, Lamb, Greene & MacRae, L.L.P.                          Page 24

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

A.   Enforcement of provisions under Own Occupation policies

Current IDI Policies contain four types of voluntary

rehabilitation provisions.  The following rehabilitation provision appears in

Policy 338-Own Occupation.

> We will consider paying for a program of occupational rehabilitation after Total Disability benefits have been paid for 12 months for a Period of Disability.  You must notify us in writing that you want to participate in such a program.
>
> The extent of our role will be determined by written agreement with you.  Generally, we will pay for the reasonable expenses you incur for training or education which is not otherwise covered under health care insurance, workers' compensation or any other public fund or program.
>
> A program of occupational rehabilitation must be designed with a reasonable expectation of helping you return to work in Your Occupation, as defined in this policy.  Your participation in a program of occupational rehabilitation will not of itself be considered a recovery from Total Disability.

LeBoeuf, Lamb, Greene & MacRae, L.L.P.

GSCOMP 27.1175

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

The following rehabilitation provision appears in Policies 334 and 335:[7]

Total Disability - Your participation in a program of occupational rehabilitation will not of itself be considered a recovery from Total Disability.

Expense - If, during a period of Total Disability, you participate in a program of occupational rehabilitation which we approve, we will pay for certain expenses you incur. That is, we will pay for the reasonable cost of training and education which is not otherwise covered under health care insurance, workers' compensation or any public fund or program. But, we will not pay more than the Maximum Amount for Rehabilitation Expense shown on Page 3.

A program of occupational rehabilitation must be designed to help you return to work and be:

1.    a formal program of rehabilitation at an accredited graduate school, college or business school, or at a licensed vocational school;

2.    a recognized program operated by the federal or a state government; or

3.    any other professionally planned rehabilitation program of training or education.

---

[7]    Policy 284, which is a combined own occupation/any occupation policy, contains the same rehabilitation provisions.

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

The following rehabilitation provision appears in Policy 337B:

Total Disability - Your participation in a program of occupational rehabilitation will not of itself be considered a recovery from Total Disability.

Expense - If, during a period of Total Disability, you notify us in writing that you want to participate in a program of occupational rehabilitation, we will consider paying for certain expenses you incur. Generally, we will pay for the reasonable cost of training and education which is not otherwise covered under health care insurance, workers' compensation or any public fund or program.

A program of occupational rehabilitation must be designed to help you return to work and be:

1.    a formal program of rehabilitation at an accredited graduate school, college or business school, or at a licensed vocational school;

2.    a recognized program operated by the federal or a state government; or

3.    any other professionally planned rehabilitation program of training or education.

The payment of disability benefits cannot be tied to mandatory rehabilitation under these provisions. Provident could, however, offer rehabilitation as a separate benefit under these policies, pursuant to a separate agreement. The receipt of additional benefits pursuant to a separate agreement could be conditioned upon the insured's good faith participation in the agreed upon rehabilitation program. Failure to agree to

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

the additional benefit or to participate in a program after agreeing to do so would justify more careful scrutiny of the claim. Refusal to participate after agreeing to do so under a separate agreement could justify denial of continuing benefits on the grounds that the insured breached the terms of the separate agreement.[8]

The restrictive language in the own occupation policies which affords coverage to an insured even if his or her skills could be equally employed in a sub-specialty (e.g. the surgeon who could utilize a medical degree in another sub-specialty) limits the Company's ability to provide rehabilitation which could result in a reduction of benefits. However, rehabilitation should be tested under these policies to evaluate its effectiveness as a claims management tool. The Company will then weigh costs against any savings gained from such a program. Since an investment in rehabilitation expertise will be made for other IDI Policies that provide for rehabilitation, Provident may find a rehabilitation effort for own occupation business a worthwhile experiment.

Recommendation I.A.1: Test voluntary rehabilitation under in force Own Occupation Policies pursuant to a separate agreement with the insured. This will effectively convert the voluntary provision to a

---

[8]    Insurance regulatory requirements will govern the permissibility and enforceability of such agreements.

LeBoeuf, Lamb, Greene & MacRae, L.L.P.                    Page 28

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

mandatory provision under the separate agreement. While we acknowledge that Own Occupation Policies do not lend themselves to mandated rehabilitation, rehabilitation for Own Occupation policyholders should be tested to evaluate its effectiveness as a claims management tool. It is reasonable to assume that a legitimate claimant would want to be restored to his or her occupation. Therefore, a claim by an insured who rejects the benefit may merit more diligent investigation. Once the insured elects to participate, the insured will have at least a "good faith" obligation and at best a contractually binding obligation to continue in the program in order to receive benefits.

Recommendation I.A.2: Employ qualified pr~fessionals to design rehabilitation programs in conjunction with the insured. Participation of professionals with the insured in the design of a rehabilitation program is essential to avoid allegations that the quality of the program was deficient (did not meet reasonable professional standards). Thus, Provident must invest in professionals who will design and operate rehabilitation programs that will support enforceability when challenged.

Recommendation I.A.3: Do not attempt to mandate rehabilitation based on "care and attendance of physician" clauses in Own Occupation or other IDI Policies. (See discussion in section B, immediately below.)

B.    Rehabilitation provisions of the 338 Loss of Earnings Policy

The following rehabilitation provision appears in Policy 338-Loss of Earnings. Under the heading "Benefits" in the "Rehabilitation" section, the policy states:

> If a medical determination indicates that a program of occupational rehabilitation would help you return to work in a Reasonable Occupation, we will participate in a program approved by us in advance.

CSCONF 27.1179

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

Generally, we will pay for the reasonable cost of
appropriate training or education which is not otherwise
covered under health care insurance, workers'
compensation or any other public fund or program. We
will continue to pay for the program as long as it
continues to help you return to work in a Reasonable
Occupation.

Your participation in the program will not of itself be
considered a recovery from Injuries or Sickness; however,
if we agree to pay for the program and you refuse to
participate in it, Monthly Benefit payments will end.

The "Covered Loss" section of Policy 338-Loss of Earnings
policy, under Benefits, contains the following statement:

3.      If we agree to pay for a program of occupational
        rehabilitation, you must participate in the program
        for benefits to continue.

The language under this "Covered Loss" section may be deemed
to be ambiguous by a court faced with interpreting whether the language
mandates that an insured participate in rehabilitation at the Company's
request. The policy wording, "if we agree to pay," suggests that the insured
is expected to request payment for rehabilitation or that the insured's
participation is premised upon a bilateral agreement between the insured
and the Company. Similar language appears in the "Rehabilitation" section
of Policy 338, under "Benefits." Therefore, we view the provision as being
voluntary and as requiring continued participation only after the insured



LeBoeuf, Lamb, Greene & MacRae, L.L.P.                           Page 30

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

opts for rehabilitation. Until new policies containing unambiguous mandatory rehabilitation requirements are filed with states, Provident should strongly encourage insureds to seek rehabilitation under this policy in an effort to trigger the mandatory aspect of the language.

We have also considered whether policy provisions requiring the insured to be under the care and attendance of a physician could be relied upon to require the insured to participate in a rehabilitation program. Such provisions are commonly found in disability policies and are recognized by the various state insurance codes and regulations, as well as in case law, for the traditional purpose of requiring medical attention for the disabling condition. We have concluded, however, that these provisions cannot be relied upon to compel the insured to participate in a rehabilitation program. The absence of a body of case law on mandatory rehabilitation means that policy language must be clear and unambiguous on the issue in order to lay a good foundation for enforceability. We believe it unlikely that a court would construe "care and attendance of physician" language broadly enough to mandate rehabilitation.

Recommendation I.B.1: Develop a program that encourages insureds to participate in rehabilitation under Loss of Earnings Policy 338. Once the insured agrees to participate in rehabilitation, the insured should be deemed to have a contractual obligation pursuant to the Rehabilitation section of this Policy, as well as a "good faith" obligation to continue in the

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

program in order to receive benefits.  Similar obligations would attach under the Recommendations in Sections I.A.1 and 2, above.

Recommendation I.B.2:  Do not attempt to mandate rehabilitation based on the rehabilitation or the "care and attendance of physician" clauses in this policy.

C.    Creation of mandatory rehabilitation wording for new policies

We have found no meaningful authority which permits us to opine on the enforceability of mandatory rehabilitation provisions. Nonetheless, we believe that such a requirement should be enforceable.  The general rule is that absent a reasonable policy provision, an insured need not undergo rehabilitation or vocational retraining as a condition of eligibility for benefits.  3 Bertram Harnett & Irving L Lesnik, The Law of Life and Health Insurance § 8.06[6] (1993).  See also, Pistorius v. Prudential Ins. Co. of Am, 187 Cal. Rptr. 660 (Cal. Ct. App. 1981); Conway v. Boston Edison Co., 745 F. Supp. 773 (D. Mass. 1990).  However, nothing in these authorities suggests that reasonable mandatory rehabilitation provisions are unenforceable.

We have concluded that an express mandatory rehabilitation provision in new policies (which is approved by the relevant Insurance Department and is reasonable and consistent with pertinent standards of medical practice) should be viewed as beneficial to policyholders and should

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

be upheld, if challenged. As a collateral benefit, such programs may also discourage those with fraudulent intent from purchasing a Provident policy.

We emphasize again that state insurance laws, regulations and bulletins must be considered in developing mandatory rehabilitation programs.

Finally, caution should be exercised in the development of a mandatory rehabilitation provision. Such a provision should not include undue restrictions which may cause courts to invalidate the provision on the grounds that it is inconsistent with the insured's reasonable expectations, or is unfair or violative of public policy.

Recommendation I.C.1: Create a mandatory rehabilitation provision for all general IDI Policies (other than own occupation policies).

Recommendation I.C.2: We recommend the following draft mandatory rehabilitation provision for possible future use in Provident's IDI policies.

The "Covered Loss" section should state:

If after examination and evaluation by professionals selected by the Company it is determined that a program of Occupational Rehabilitation would help you return to work in a Reasonable Occupation, you must participate and continue to participate in such a program as set forth in the Rehabilitation section of this Policy in order to receive and to continue to receive Monthly Benefits under this Policy.

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

The "Rehabilitation" section should state:

Total Disability - Your participation in a program of Occupational Rehabilitation will not, of itself, be considered recovery from Total Disability, but if recommended, your participation in an Occupational Rehabilitation Program will be required as set forth in the Covered Loss and Rehabilitation sections of this Policy.

Approved Occupational Rehabilitation Program - At any time after you submit a claim, we have the right at our expense to have you participate in reasonable medical, vocational and psychological evaluations and periodic reevaluations by professionals selected by the Company to determine whether a program of Occupational Rehabilitation would help you return to work in a Reasonable Occupation. Such a program might include, but not be limited to, a program of vocational, psychological, and/or medical services intended to help you return to work in a Reasonable Occupation. If it is determined that a program of Occupational Rehabilitation, as approved by us, would help you return to work in a Reasonable Occupation, your participation in such a program is required in order to receive continued Monthly Benefits under the Policy, and based upon reevaluation as set forth herein, the Company may require you continue to participate in such a program until such time as experts selected by the Company determine that the program of Occupational Rehabilitation has enabled you to return to work or cannot further advance your ability to return to work in a Reasonable Occupation.

Rehabilitation Program Expense - We will pay for the reasonable costs of the Approved Occupational Rehabilitation Program which are not otherwise covered by any other source of benefits available to you including health insurance, workers' compensation, or any public fund or program. We will not pay more than the

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

Maximum Amount for Rehabilitation Program Expense as provided in this Policy.

Loss of Benefits - If recommended, you must participate in the Approved Occupational Rehabilitation Program in order to receive continued Monthly Benefit payments. If at any time you refuse to participate in the Approved Occupational Rehabilitation Program as set forth in this Policy, your Monthly Benefit payments will cease.[9]

Recommendation I.C.3: Develop systems and retain qualified professionals to monitor and create quality rehabilitation programs. (See discussion in Recommendation I.A.2.)

---

[9]   The Definitions section of Policy 338 should contain definitions of "Reasonable Occupation," "Occupational Rehabilitation" and all other capitalized terms.



GSCONF 27.1186

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

II.    ISSUES RELATING TO CLAIMS OTHER THAN MENTAL AND
NERVOUS CLAIMS (Provident Initiatives 2.4 and 2.5)

*Overview*

We have interviewed those involved in claims management,

claims investigations, and litigation, including representatives of the Law

Department.

The Claims Department has already commenced initiatives to

implement "best industry practices" in claims handling.  Best industry

practices require skilled staff and professionals to review and investigate

claims.  Also required is daily involvement of lawyers skilled in disability

issues.  Best industry practices require that staff and management remain

current on relevant medical and legal issues.  This can be achieved through

structured training programs, efficient systems and the availability of

written materials that provide "road maps" for staff on claims practices.

The Claims Department is in the process of developing tracking

systems, training claims staff to develop specific expertise, and improving

investigative and accounting functions.  Mental and nervous disease claims

functions (discussed below) will be handled by specialists, as will certain

other claims.  The Claims Department cannot do it all and handle claims

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

effectively. Other resources within Provident must be allocated to the implementation of best industry practices.

## A.    Claims management, investigations and settlements

*Overview*

Currently, no systems exist that would enable us to determine whether Provident has a history of paying deniable claims or making overpayments as a result of inadequate financial evaluation. It is, therefore, difficult to comment on coverage, denial or settlement strategies. We have reviewed sufficient data, however, to offer a somewhat "intuitive" response to the issue. We believe the Company could be more aggressive in defending policy wordings against unreasonable interpretations or in disputing questionable claims. But, this cannot be done unless and until (i) the investigation is thorough and complete, (ii) law in the relevant jurisdiction has been considered and (iii) claims practices reflect "best industry practices."

## 1.    Discussion of relevant policy wording[10]

Section I of this document discussed policy wording relevant to rehabilitation. This subsection discusses in force policy wording as it affects

---

[10]    See also Section IV, below.

GSCONF 27.1188

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

settlements, denials and other aspects of claims handling.  We have reviewed those sections of IDI Policies most likely to generate disputes.  No system currently exists to provide data on this basis.  The Claims Department has provided background on policy wordings that have most frequently generated disputes.  A system capable of tracking disputes and outcomes arising from policy wording is critical to proper evaluation of policy wording disputes and to the development of new policy wordings.  This system should also track relevant judicial decisions in various states pertinent to the language in dispute.

Recommendation II.A.1:  Track policy wording disputes.  Claims must be tracked to identify allegations of ambiguous language and to insure the enforceability of conditions for payment of benefits.  Judicial decisions relevant to these issues should be tracked by the Law Department.  (See also subsection 3, below)

Following is an example of a policy wording issue that has generated disputes affecting settlements and denials.  Policy 335 states that a rehabilitation program paid for by the Company "must be designed to help you return to work."  Because the policy does not define "work" an insured has recently sought benefits for training in a completely new occupation.

Recommendation II.A.2:  Policy 335 interpretation of "work" should not be construed to mean any work.  Since "work" is not defined in IDI Policies, a decision to deny may nonetheless be reasonable, since the use of the word "work" in the policy in question can be tied to the Own Occupation coverages thereunder.  Legal research on the law in the state

LeBoeuf, Lamb, Greene & MacRae, L.L.P.                                    Page 38

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

where the claim arises will be necessary to determine whether denial is reasonable. Past practice must also be evaluated to determine whether it would undermine the foregoing Recommendation.

### 2. Settlements: practices and procedures, including investigations and audits[11]

Practices and Procedures. The standard of "best industry practices" has been discussed above. These practices will foster methodologically consistent claims handling.

### (a) Initial handling of claim

Provident receives approximately 500 new claims per month, either by telephone to an "800" number or by mail. These new claims are immediately assigned alphabetically (according to the insured's surname) and on the basis of where the contract was signed. Therefore, adjusters responsible for claims, regardless of expertise, receive assignments according to place of execution of the contract. (Claims arising from a block of business acquired by Provident are assigned to a separate claims group.)

The system of assigning cases based on the jurisdiction where the contract was signed does not account for the mobility of insureds. For example, if the contract was signed in New York, but the insured has since

---

[11]    These issues require the utilization of interdepartmental synergies and relate directly to training and the involvement of the Law Department, discussed below.

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

moved to California and filed a claim, an adjuster in the North region would be assigned the claim, even though litigation was more likely to be filed in California, and the claims handling practices would be scrutinized under California bad faith law.

Additionally, the system of assigning cases alphabetically and by place of execution of the contact does not take into account the size of the claim and the difficulty of the issues presented, and may result in less skilled or experienced adjusters handling claims with considerable exposure.

Recommendation II.A.2(a) 1:  Assign the largest and most difficult claims to the most experienced and skilled adjusters.  This may require adjusters to develop areas of specialization, and will require greater input from senior adjusters or managers at the inception of the claim, as discussed below.

Recommendation II.A.2(a) 2:  Assign new claims based on claimant's current residence, not alphabetically or based on where the contract was executed. The claim should be handled at the outset by an adjuster experienced in the jurisdiction from which the claim emanates, particularly in those jurisdictions where there is "bad faith" liability and punitive damages.

Adjusters are trained to investigate claims right away, and to obtain as much information (medical, employment, and other) as possible starting with the first conversation with the insured.  This is very good procedure.  However, there is some question as to whether the fifteen field claim examiners in the three regions are being properly utilized at the

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

earliest stage of a claim, and permitted broad enough scope to be effective. A particular reluctance to utilize field examiners seems to exist in the "acquisitions" claims group.

Recommendation II.A.2(a) 3: Utilize field examiners, whenever practical, to call immediately on claimants, gather information and visual impressions, and gain the goodwill that will come from immediate and direct contact. Every effort should also be made to access the branch offices for information on the claimant and avenues to investigate.

After a claim is assigned, adjusters are supposed to review each claim with the senior adjuster in their unit, or with the manager if necessary, to establish a plan of action and strategy. Senior adjusters and managers are generally aware of all new claims, but there has not been a formal system for bringing supervisors up to date quickly on new claims.

Recently, there has been more sharing of information among the managers of the various units, and even among the various regions, because the claims operations have become more centralized. However, despite the centralization of claims handling, the system remains somewhat divided because of the zone manager structure. We were informed during interviews that each zone manager has an individualistic approach to claims handling. This must be corrected.

Recommendation II.A.2(a) 4: Train Zone Managers to handle claims consistently. There can be no divergence of methodologies.

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

(b)    **Action plans**

The first meeting between the adjuster and a senior adjuster or manager to discuss a claim triggers a responsibility to establish an "action plan" for each claim file. Since Mr. Mohney only recently implemented this requirement, none of the files we reviewed contained a written plan, and there was little indication in the files that adjusters were following a formal, predetermined plan with set deadlines. Based on the intermittent activity in some of the files we reviewed, it may be that in the past adjusters were responding more to the "scrub" process than to any pre-established procedure for day-to-day handling of claims.

Ralph Mohney advised us that action plans must now be written, contain set timetables, and require regularly scheduled follow-up and interaction with the senior adjuster or the manager to ensure that the action plan is being met. The action plan will ultimately be stored electronically, and will contain checklists and information on common procedures and areas of investigation for particular claims in particular jurisdictions.

Recommendation II.A.2(b) 1: Institute formal action plans to ensure that claims are being actively investigated and analyzed, and to ensure uniform claims handling among the regional claims groups. To facilitate consistent methodologies create a standard form "action plan" for claims files. These action plans should be amended over time as warranted.
~ NTA 19

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

There is also no formal system for determining the degree of involvement required of senior adjusters and managers. Managers and senior adjusters historically became involved in determining which cases will require their continued involvement on a fairly ad hoc basis.

Recommendation II.A.2(b) 2: Assess at the outset the degree of supervision necessitated by a claim. Each action plan should be coded in a manner that facilitates determining the amount of input required from a supervisor.

(c)    **Document retention**

There are no uniform procedures in the Claims Department governing whether any claims handling materials can be disposed of in the ordinary course of business. For example, claims personnel are not sure whether "post-it" yellow tabs with handwriting, which they affixed to particular sections of the claims file, could be removed after they had served their purpose. Similarly, claims personnel are unsure whether their out-dated notes or "scribblings" are required to be included in the claims file. Apparently, they have received conflicting advice on this issue.

There is also no document retention policy for electronic information. Because our recommendations anticipate that more information will be stored electronically, a policy must be developed to ensure that documents are only retained for so long as they are useful in the

LeBoeuf, Lamb, Greene & MacRae, L.L.P.                                    Page 43

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

ordinary course of business, and are not unnecessarily subject to litigation discovery.

**Recommendation II.A.2(c) 1**: Create a uniform document retention policy that governs which claims handling materials should be included in the claims file once they are no longer needed in the ordinary course of business. There should also be a document retention policy for information stored electronically. (Retention may also be governed by certain insurance regulatory requirements.)

### (d)   Cost/benefit analysis for claims handling

There is little effort to budget the expense of handling a claim, either when it is first received or as the claims process unfolds. The Claims Department generally believes that although an emphasis is placed on investigation and analysis, their expense ratio is still less than their competitors. There is, however, no formal way to compare the cost of handling a particular claim with its result or its precedential value. While an informal approval system exists for most outside services, including surveillance by outside firms and independent medical examinations by doctors, no system tracks these expenditures for comparison and analysis. Approval is also necessary for seeking legal counsel from outside lawyers, or seeking financial advice from an outside accountant.

**Recommendation II.A.2(d) 1**: Track the costs of outside services utilized for particular types of claims or particular issues.

245510

LeBoeuf, Lamb, Greene & MacRae, L.L.P.                           Page 44

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

(e)    Claims decisions

All decisions to grant or deny a claim are reviewed by the senior adjuster and/or the manager of each unit. AVPs review the cases with larger exposure, or that have already involved a substantial dispute. However, the files that we reviewed often did not set forth the reasons for granting or denying the claim, nor did they contain an analysis of the issues that were investigated, analyzed, and resolved.

Recommendation II.A.2(e)1: Upon opening a file, review the file and document the issues addressed, as well as the reasons for the decision to grant or deny the claim. The review can be addressed to the Law Department in the event of a denial, with a request for legal advice in order to obtain attorney-client protection.

There may be jurisdictions where these summaries would be discoverable in litigation, and would be misused by plaintiffs' lawyers. If there is any question as to whether the summaries are privileged, there should be an alternative procedure for communication between outside counsel and claims personnel shortly after the complaint is filed. This procedure will ensure that outside counsel is fully aware of the relevant issues and areas for productive discovery and analysis, and will reduce outside counsel's start-up time and expense with the file.

There should also be a procedure for follow-up communications between outside counsel and claims personnel, regardless of whether

GSCONF 27 1156

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

summaries are used. Claims personnel whom we interviewed advised that

they were often not consulted by litigators until they were being prepared

for their depositions in a litigation. More interaction at earlier stages

should ensure that outside counsel is pursuing theories that will be

consistent with the testimony of the claims witness at deposition, and has

the added advantage of training claims personnel about the litigation

process and how their claims handling will be scrutinized in that process.

Recommendation II.A.2(e) 2: Permit litigation counsel to gain
direct knowledge of claims investigations and the status of claims files
through written summaries or, if needed, through direct communication
with claims personnel immediately after the complaint is filed. Follow-up
meetings would also benefit both sides.

The Claims Department believes that many of the more difficult

claims are denied only after review at the weekly meetings with the Law

Department, and no benefits are ever terminated unless reviewed by

lawyers (except for termination as a result of death or return to work). As

described below, however, the Law Department thinks that it is infrequently

involved in actual claims decisions, and more often counsels solely on legal

issues or on whether additional investigation is necessary.

Recommendation II.A.2(e) 3: Require that the Law Department
attorney assigned to the Claims Department (see subsection 5 below) be
involved in potentially questionable decisions to grant or deny claims. In
jurisdictions where there is a higher risk of "bad faith" allegations and
punitive damage awards, a Law Department litigator with expertise in this

ICT410

LeBoeuf, Lamb, Greene & MacRae, L.L.P.                                    Page 46

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

area may also need to be consulted. This will add to the quality of decisions, promote uniformity, and help prevent unwarranted litigation.

Some of those we interviewed thought that the quarterly "scrub" process for claims files was useful. It encouraged the closing of files where there was a legitimate basis, but where the adjuster or management had not focused due to the press of other work. The problem with the "scrub" is that it requires a huge amount of time and resources, diverts the entire Claims Department from the day-to-day handling of files for an extended period, and often results in closing files that would have closed anyway in the next quarter. It also may encourage, as noted above, a more intermittent approach to handling claims overall. The Claims Department does not track whether more litigation results from claims closed during the scrub process.

In Ralph Mohney's view, the quarterly "scrub" can be eliminated if claims are more closely followed on a day-to-day basis. He believes that there is an "optimal point" for resolution of every claim, and that adjusters must become more effective in determining what that best point is, and acting upon it on a regular basis.

Mr. Mohney also believes that the day-to-day approach will be easier to implement if the current excessive claim load per adjuster is lightened (they each handle more than 200 claims, as opposed to a range of

GST410

LeBoeuf, Lamb, Greene & MacRae, L.L.P.                    Page 47

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

140-150 at their competitors), the staff is better trained and follows stricter

action plans, and material input (derived from training, action plans,

systems and other such enhancements) is obtained on a regular basis.

While achieving this new plan, Mr. Mohney expects to have a six-person

unit looking at 2,000 files over the next quarter, and to put together a case

management plan for each file.

Recommendation II.A.2(e) 4:  Eliminate the scrub process.  It is
unwise from a potential litigation standpoint, and its benefits can be more
efficiently achieved through Mr. Mohney's proposals.

Investigations.  There are currently three separate units

involved in investigations.  One of these units is under the Law

Department.  Another, consisting of field investigators, is assigned to the

Claims Department.  Internal Audit also conducts certain policyholder fraud

investigations and we have been informed that this unit has recently

conducted an audit of the Claims Department.  All three Departments

believe that claims investigations should be under the leadership of one

Department in order to facilitate coordination, training, accountability, and

responsibility.  We concur.

The Law Department believes that by placing investigators

under its supervision, files will be afforded greater protection from

discovery.  We agree.  However, the Claims Department questions whether

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

the Law Department has ample resources or incentives to satisfy the investigatory requirements of the Claims Department that result in prudent but aggressive claims management. Such lack of resources could prompt Law Department attorneys to favor coverage, if the lawyers are already burdened with more litigation than they can handle effectively.

The privilege concern discussed above could be addressed by having a member of the Law Department and a paralegal physically located in the Claims Department available exclusively to that Department. That attorney could direct investigations where it is important to preserve privileged information. The attorney would not direct every investigation.

Recommendation II.A.2(e) 5: Integrate investigative functions. We believe that claims investigations flow appropriately from claims management and, therefore, that the Claims Department should have responsibility for claims investigations. If the Claims Department assumes responsibility for claims investigations, a member of the Law Department should be physically located in the Claims Department to direct sensitive investigations (such as claims likely to result in litigation) to protect attorney-client and/or work product privileges.[12]

This does not mean, however, that privilege will always attach nor would this be the case if the Law Department had exclusive responsibility for claims investigations.

Recommendation II.A.2(e) 6: Do not assign litigation responsibilities to attorneys advising the Claims Department on

---

[12]    The presence of a lawyer in the Claims Department is recommended for additional reasons as discussed below.

GSCONF 27.1200

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

investigations. This will enable the Claims Department attorney to make objective claims decisions without fear of being assigned the litigation.

With respect to investigations, the compensation of certain Claims Department personnel appears, at least in the past, to have been tied to goals which encouraged adjusters to take on more claims than they could handle effectively or that emphasized the closing of files over the thorough investigation of claims. If this system remains in place it must be revised.

Recommendation II.A.2(e) 7: Revise claims adjustor compensation and performance review criteria to achieve goals that promote expeditious and thorough investigations.

There is no manual that provides a legal and practical "road map" to adjustors. The absence of such guidelines impairs the ability of management to maintain consistent standards.

Recommendation II.A.2(e) 8: Develop a claims investigation manual. The manual should outline proper procedures and legal requirements and should contain, among other things, a form to be completed before an investigation may be closed.

Audits. Claims handling audits should be part of Provident's general compliance program. Much like investigations, claims handling audits have been conducted by more than one Department e.g., the Law Department and Internal Audit.

LeBoeuf, Lamb, Greene & MacRae, L.L.P.

GSCONF 27.1201

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

**Recommendation II.A.2(e) 9**: Internal Audit should conduct independent periodic audits of the Claims Department. The Claims Department should also review its own practices and procedures.

### 3.    Resources

#### (a)    Staff

*Legal and other professionals*. Adequate staff is required to fulfill goals of "best industry practices." In addition to legal expertise, other professional expertise is required for excellent claims management, e.g., CPAs, rehabilitation experts, professional investigators, etc.

*Outside consultants*. Where it is too costly to retain certain professionals as employees, utilize outside consultants with appropriate expertise.

*Experienced personnel*. Mr. Mohney needs more claims-handling staff, and staff who have more experience. One-half of his current staff has less than one-and-a-half years of experience. Although this will increase the cost of claims handling, an improvement in effectiveness would lead to better practices. The inexperience of the current staff is based largely on the fact that, when the claims handling function was centralized, it was necessary to build almost an entirely new staff in Chattanooga.

**Recommendation II.A.3(a) 1**: Provide additional management and legal support to the Claims Department until claims personnel have developed necessary expertise. This should be a short-term investment for

LeBoeuf, Lamb, Greene & MacRae, L.L.P.                    Page 51

GSCONF 27.1202

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

which outside consultants or outside counsel with established expertise could be utilized.

Recommendation II.A.3(a) 2: Add additional accounting, rehabilitation and other relevant professional expertise to the Claims Department.

### (b) Systems

Comprehensive statistics concerning various aspects of claims and outcomes are currently inadequate. Management is unable to track trends, quantify difficulties or identify opportunities in order to properly allocate resources. The issue is not more reports, but the availability of information that management can and will use. Action is currently being taken in this area.

Recommendation II.A.3(b) 1: Develop systems that track critical information and reports that are "user friendly." Systems should also be useful for training. The new system should develop information that bridges systems needed by the Law Department. Before any system is adopted those involved with the day-to-day management of claims, claims investigations, rehabilitation and litigation should review the proposed system with systems experts.

For example, the system should track claims disputes generated pursuant to specific policy wording, outcomes attributable to specific claims investigators or other personnel, denials, specific aspects of investigations, etc. Litigation systems could also utilize such tracking. This would enable the Company to better evaluate the effectiveness of policy wordings, claims management and litigation outcomes, all of which are related.

CERTIFIED

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

4.    Training

Training, as noted above, is an essential component of "best industry practices." Training of claims personnel is recognized by those we interviewed as requiring substantial enhancement. Most of the training is "on-the-job" and claims managers often do not teach completely uniform claims handling practices. The fact that there is no detailed claims manual increases the significance of training.

There is no structured regular training program beyond weekly meetings conducted by the Law Department to review specific files, although the Law Department does provide other training on an ad hoc basis. This function provides a form of training, but more is needed.

Recommendation II.A.4. 1:  Create a Training Department responsible for organizing regularly scheduled and methodologically consistent training of Claims Department personnel by staff experts, representatives of the Law Department and outside consultants, including experienced outside counsel.[13] Managers need to be kept informed of legal and practical developments relevant to claims handling, such as problems related to the products sold, bad faith and punitive damage claims arising from claims mismanagement, medical issues and rehabilitation programs. Training on issues pertinent to the most troublesome jurisdictions must be made available to staff handling such claims. Notwithstanding the justifiable concern about exposure to bad faith and punitive damage suits, claims manuals and written materials need to be produced and regularly

---

[13]    Outside counsel can be asked to provide this service at no charge to the Company.

LeBoeuf, Lamb, Greene & MacRae, L.L.P.                    Page 53

GSCONF 27.1203

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

updated to enable Claims Department personnel to perform their responsibilities.

Such materials should provide a road map for staff; they need not and should not contain exorbitant detail. Written claims training materials, including the manual should stress the need for claims representatives to work to professional standards with the key standard being the exercise of fair and informed judgement. Exercise of judgement taken after appropriate investigation and analysis should be stressed.

None of the claims adjusters with whom we spoke had any deposition experience. Before they are subjected to their first deposition, all claims adjusters should at the very least attend a deposition training seminar, be subjected to a mock deposition, or should be more closely integrated in the litigation process so that they have a better understanding of the issues likely to be raised at a deposition. Knowledge of the deposition process will also likely lead to improved claims handling practices.

Recommendation II.A.4. 2: Subject all claims adjusters to deposition training before their first deposition.

5.    Law Department involvement

The Law Department's involvement in claims settlements, investigations, audits and training should be significant. Even if the Law Department does not assume leadership responsibility for any of these efforts, its involvement is essential. Thus, recommendations made in this section are pertinent to sections discussed above.

CSC5510

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

The Law Department serves the Claims Department as follows:

a.  handles all claims that result in litigation (215 presently pending cases), with settlement authority residing in the Claims Department;

b.  conducts legal audits of the Claims Department (on a non-exclusive basis);

c.  tracks and reports on legislation (on a non-exclusive basis);

d.  reports important developments, e.g. "Point of Law" newsletter;

e.  meets with the Claims Department twice weekly to discuss and review specific problem files. Medical Department and Underwriting Department representatives are often present at these meetings;

f.  provides some training to the Claims Department (both formal and informal). This latter function has diminished with the increase of litigation and the strain on the attorneys responsible for the litigation.

Representatives of the Claims Department commented that the Law Department provides advice when asked. The Law Department believes that it lacks resources to commit to initiating daily involvement in advising the Claims Department. The Law Department perceives its role as being available to give generic legal advice, including some training, but not to initiate claims specific advice on a regular basis. (The recommendations made below are pertinent to training functions discussed in section 2 above.)

014760

LeBoeuf, Lamb, Greene & MacRae, L.L.P.                                    Page 55

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

Recommendation II.A.5. 1:  Require lawyers to be more proactive and involved in difficult claims coverage issues.  An attorney respected by the Claims Department, who is knowledgeable and experienced in claims and governing law, should be assigned to serve the Claims Department.  A paralegal should also be assigned to the Claims Department.  This assignment would also cover the claims investigation and training functions discussed above.

The Law Department is regularly asked to review the same issues arising from claims under IDI Policies.  Many of these issues relate to payment or coverage questions arising from ambiguous or deficient policy wordings.  The Law Department should track issues for frequency of occurrence and develop positions, as well as recommend policy wording to address repeat problems.

Recommendation II.A.5. 2:  Develop a brief and memoranda bank on the enforceability of the Company's policy wordings in various jurisdictions and on problems that regularly arise from certain policy wordings.  Recommend policy wording revisions where patterns are detected.

The Law Department should also remain current on emerging issues that could affect the coverages offered by the Company as well as the Company's ability to manage claims.  An example of such an issue would have been planning to address AIDs underwriting and claims as the magnitude of the AIDs problem started to become apparent.  Such planning would have involved whether to require and take the lead on testing for the presence of the HIV virus and application questions, organizing regulatory

LeBoeuf, Lamb, Greene & MacRae, L.L.P.

Page 56

GSCONF 27.1206

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

and legislative lobbying, and the consideration of special issues arising from claims.

The Law Department should assign special issues to an attorney who would monitor general news periodicals, industry specific periodicals, legislative initiatives, case law decisions and general underwriting trends and alert and advise underwriting and claims operations on how to deal with such issues.

**Recommendation II.A.5. 3**: Proactively develop strategies to address special issues such as AIDS.

**Recommendation II.A.5. 4**: Create a data bank of memoranda and briefs for the Claims Department and local counsel. Continue to identify issues and memoranda along the lines set forth above as training tools for claims personnel.

Advice concerning preparation of files for litigation. Our review of litigation files indicated that further investigation was required after denial of coverage. This could jeopardize the Company's case.

**Recommendation II.A.5. 5**: Litigators and the attorney assigned to the Claims Department should develop formats to determine when a file is ready for denial and possible litigation. This should relate to the action plan discussed in subsection 2(b) above.

GSCONF 27.1207

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

B.    Litigation

*Overview*

Effective control and management of IDI Policy litigation requires a Law Department that encourages the efficient use of attorneys' time to manage litigation and that assists in claims review and training. Resources could also be applied to obtain better information to track IDI Policy litigation costs and benefits. In addition to what is currently being done, there are other efforts that the Law Department could undertake to enhance the services it provides in these areas.

1.    Issues

(a)    Current management of IDI Policy litigation

Attorneys

Fount Love supervises the attorneys who manage IDI Policy litigation on a day-to-day basis. Mr. Griffin and Mr. Echerd are experienced disability lawyers who handle the majority of the individual disability litigation files, particularly the more difficult cases. They estimate that forty percent of their time is dedicated to managing this litigation, and forty percent is spent meeting or talking by telephone with claims personnel on legal issues arising out of IDI claims. The rest of their time is spent attending to other Law Department matters. Al Pitner, Associate Counsel,

037110

LeBoeuf, Lamb, Greene & MacRae, L.L.P.                                    Page 58

GSCONF 27.1208

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

Ed Nanney, Senior Counsel, and Leaba Cash manage the remaining IDI
Policy litigation files, but have substantial responsibilities in other
litigation areas as well.

### Legal Assistants

There are two legal assistants in Mr. Love's litigation group
whose time is well spent responding to the more than 900 subpoenas per
year that are served on Provident. They also handle simple procedural
matters, such as cases where Provident is improperly joined as a party, and
respond to routine document requests.

The legal assistants have little or no time to work on IDI Policy
litigation and there seems to be some reluctance to use legal assistants for
those tasks. Nonetheless, well-trained paralegals could do "paper discovery"
(including responding to interrogatories and producing documents) in more
than 50% of the individual disability cases.

**Recommendation II.B.1(a) 1**: Overcome the reluctance to use
paralegals. Legal assistants should be hired and trained for IDI Policy
litigation matters. They can economically and efficiently handle routine
discovery and procedural matters, thus freeing lawyers to provide additional
assistance to the Claims Department and to deal with more sophisticated
legal problems.



---

LeBoeuf, Lamb, Greene & MacRae, L.L.P.                    Page 59

GSCONF 27.1209

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

(b)    Preparing and defending depositions

As part of their litigation management function, Messrs. Griffin and Echerd work closely with claims managers and adjusters, usually preparing them for depositions or for their trial testimony, and defending many of these witnesses at depositions held in Chattanooga. This application of resources has several benefits: first, it provides for consistent testimony in depositions on "patterns and practices" within the Claims Department. Second, it provides a level of comfort for adjusters (particularly less-experienced adjusters) who are more comfortable working with in-house lawyers. Third, it is cost-efficient as it cuts down on outside lawyer travel to Chattanooga to defend depositions. However, efforts must be made to increase the ability of the Law Department to devote time to this important function.

To reduce costs, in-house lawyers must examine whether there is any duplication of effort with outside counsel that can be eliminated (i.e., the cost of two lawyers covering preparation of the same deposition). A system must also be established to ensure that the relevant facts that are developed in these depositions of Provident witnesses are delivered to outside counsel, and that they have some opportunity to assess the strength of Provident's witnesses for trial. Also, if the case does go to trial, there

GSCONF 27.1210

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

must be a system to ensure that Company witnesses become comfortable

with outside counsel.

Recommendation II.B.1(b) 1: Utilize in-house attorneys to prepare and defend witnesses at depositions where the circumstances warrant. Systems must be adopted to ensure that this procedure is economical and does not impair outside counsel's ability to represent the Company.

### (c) Jurisdictional specific issues

Law Department litigators should join the attorney assigned to

the Claims Department in evaluating decisions to deny benefits in

particularly troublesome jurisdictions.

Recommendation II.B.1(c) 1: Employ litigators to provide "second opinions" on difficult claims in the most troublesome jurisdictions. Outside counsel may also be used for this purpose. Counsel handling coverage opinions should generally not be assigned the litigation if coverage is denied. There may be exceptions to this rule with certain outside counsel with whom Provident has valued relationships. If counsel recommends denial and also handles the litigation, alternative fee arrangements should be considered that would take into account outside counsel's favorable opinion on denial.

### (d) Confidentiality

Claims personnel advised us that plaintiffs' lawyers used

Provident deposition transcripts and other materials from other cases

against them when they were testifying, hoping to establish inconsistencies

in the Company's patterns and practices.

014760

GSCONF 27.1211

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

**Recommendation II.B.1(d) 1**: Seek a confidentiality order at the beginning of litigation protecting Provident documents and testimony. When a case is settled, every effort should be made to include a confidentiality provision. Although such efforts may not always be successful, it is worthwhile to pursue confidentiality.

### (e) Privilege

Claims personnel advised us that they did not normally rely on legal advice from counsel as a specific defense in their depositions. There are jurisdictions where reliance on the specific advice of legal counsel can be a defense to a claim for bad faith or punitive damages. This would require waiving applicable privileges, but procedures for seeking legal advice could be structured to avoid unnecessary exposure in the event that the privilege was waived.

**Recommendation II.B.1(e) 1**: Maintain a file on jurisdictions in which "advice of counsel" is a defense, and rely on that defense where appropriate.

### (f) Actions by Company

Claims personnel advised us that they often spent considerable time and resources establishing that a disability claim was not only unworthy of coverage, but also fraudulent. In those cases, the Company has been damaged by either the actions of the insured, or even by the actions of an attending physician if that physician participated in the insured's

GSCOMP 27.1212

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

misconduct. The Company could have a claim for relief against the insured, and perhaps the attending physician in those situations.

> **Recommendation II.B.1(f) 1:** Identify and explore with claims personnel the most egregious fraudulent claims by insureds, and consider taking action against those insureds and perhaps their attending physicians.

### (g) Litigation management[14]

When litigation is commenced, Mr. Love assigns the case to one of several attorneys in the Law Department. Messrs. Griffin and Echerd receive the majority of the cases, especially those which seem to pose the most difficult issues, but a fairly large number of cases are in the hands of attorneys with far less experience in disability matters.

Further efficiency can be achieved if the disability litigation files are assigned only to those attorneys who specialize in such matters, and not dispersed among various attorneys. If the Claims Department decides to create "specialty" teams for particular issues, litigation files should be assigned to the attorneys who specialize in that area.

> **Recommendation II.B.1(g) 1:** Only utilize attorneys with IDI expertise to manage IDI Policy litigation. This will require freeing up time of those attorneys through the reallocation of resources.

---

[14] The first three Recommendations in this section apply with equal, if not greater force, to troublesome jurisdictions.

GSCONF 27.1213

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

The in-house attorney managing a particular matter copies and ships to outside counsel the relevant files from the Claim and Underwriting Departments, and the relevant policy. Sometimes a summary of the facts and the issues on each case for outside counsel is prepared, but such a summary did not appear in most of the files.

Recommendation II.B.1(g) 2: Prepare a summary of facts and issues before a file is sent to outside counsel in order to save outside attorney time and expense. Caution must be exercised to maintain attorney-client privilege. The file should also include briefs and memoranda from the data bank discussed below.

Outside counsel should be required to provide a written action plan and budget at the start of each engagement. This may increase the initial cost in each case, but it will reduce overall costs by defining expenses to be incurred, the potential benefits to be achieved, the overall exposure in each litigation, and permit the Company to track better the progress (or lack of progress) in each case. It will also help avoid surprises in any litigation.

Recommendation II.B.1(g) 3: Require outside counsel to provide an action plan and regular updates to that plan. The in-house attorney responsible for the file should review the plan and provide feedback to outside counsel.

The Law Department handles most of the "defensive" discovery, responding to plaintiff's interrogatories and requests for production of documents, as well as preparing Provident witnesses for depositions and

GSCONF 27.1214

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

trial. The Law Department also drafts affidavits for dispositive motions, and reviews and edits briefs on those motions.

Recommendation II.B.1(g) 4: Utilize paralegals and outside counsel to respond to discovery demands, prepare witnesses, and to draft affidavits for dispositive motions. Although the use of outside counsel may appear to increase costs, a better prepared outside counsel should ultimately produce better results.

Each case is handled on its own merits. Although most cases are settled prior to trial, some cases are tried when the odds of success are good or if the case otherwise warrants a full adjudication. Provident has generally been successful in its litigation. Most of the files we reviewed were concluded for relatively small sums, and there were only two "bad faith" settlements of any significance, and no verdicts against the Company.

Recommendation II.B.1(g) 5: Conduct a cost/benefit analysis of all on-going litigation, which considers the precedential value of litigating, as well as dollar costs.

There are several well-accepted methods to reduce the overall cost of Provident's outside counsel in IDI Policy litigation, while continuing to receive good service and achieve superior results. Provident should request their regular counsel and other reputable attorneys in each jurisdiction to submit proposals to handle all of its IDI Policy litigation in a particular area for a fixed fee, a blended rate, or a volume discount off regular rates. Selection of counsel who submit proposals can be based not

GSCONF 27.1215

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

only on the lowest bid, but on other factors such as their experience, reputation, and willingness to be a long-term "partner" with Provident. Provident should also explore the possibility of asking outside counsel to share in the results achieved, gaining a bonus for results over a certain average, and suffering a pay-back for less-than-expected results.

Recommendation II.B.1(g) 6: Pursue alternative fee arrangements with outside counsel.

## 2.   Resources

### (a)   Staff

To increase attorney involvement with claims-handling practices, in addition to reallocating Law Department resources, it may be necessary to hire an additional lawyer with individual disability expertise, and two paralegals.

Recommendation II.B.2(a) 1: Devote four attorneys and two paralegals full time to IDI Policy litigation and claims related issues. This would include the attorney assigned to the Claims Department. Mr. Love should be assigned to directly manage litigation files, and to interact with claims personnel and the attorney assigned to the Claims Department, and Messrs. Griffin and Echerd should spend 100% of their time on IDI matters.

### (b)   Systems

Provident must dramatically improve its litigation systems and streamline its procedures. As noted above, precedent files should be established that include briefs and memoranda of law, forms for particular

GSCONF 27.1216

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

jurisdictions, legal advice and/or opinions from outside counsel, and information gathered on legal developments and trends. These will help reduce costs for outside counsel, educate and focus claims personnel, permit paralegals to access and use materials, and ensure consistency of approach. Despite concern regarding discoverability risks, it is our view that effective litigation management cannot be achieved without this information.

**Recommendation II.B.2(b) 1:** Centralize and store legal analyses and forms.

It was also difficult to tell how much time was devoted by in-house lawyers to each file, and the benefits that were achieved in litigation relative to litigation costs. To track the amount of time in-house counsel spend on litigation files, the Law Department should begin a system of generally recording their time. This will help measure the cost of litigation.

**Recommendation II.B.2(b) 2:** Track the cost of in-house management of IDI Policy litigation.

The Law Department tracks information on litigation in the following ways. First, on a monthly basis it reports on cases closed and the amount spent compared to the potential contract exposure, giving a settlement factor. This report contains the number of cases which had bad faith exposure. Also, there is a comparison of new cases to closed cases and a trend of cases over a twelve-month period. Included is a listing of each case

AP5410

GSCONF 27.1217

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

closed by the Law Department and an individual fact sheet on each case. New cases are also listed by department to compare types of cases opened and closed. This information could be converted into quarterly, semi-annual or annual reports to show trends in litigation.

The Law Department has in the past provided reports as requested on the number of suits involving a particular policy series, such as the 334 or 335 policies or report the numbers of suits over a number of years for each product.

The Law Department is able to track litigation by specific condition, by occupation of the insured, by state, by length of litigation by age of litigation and even by the plaintiff's attorney or results in particular courts.

Fees and expenses are tracked by law firm, case and state. This information can be used to report detail such as the amount spent on California claims involving physicians claiming disability from depression.

The Law Department does not currently have access to Disability Operations databases to be able to pick up information on total numbers of claims not in litigation or total numbers of outstanding policies altogether in order to make comparisons of trends in litigation to the overall Disability Operations mix. The Law Department tracking system and

GSCONF 27.1218

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

database are totally separate from Disability Operations.  Disability

Operations does have information on all cases coded "Litigation" and are

advised of every case settled or closed and the results.  These figures are

used by Disability Operations to calculate litigation reserves.  The Law

Department is currently exploring new software packages designed

specifically for law departments at major companies and comparing them

with current capability.

Recommendation II.B.2(b) 3: Coordinate the development of
systems with the Claims Department and Systems experts.  Do not develop
new systems independently.  Certain reports will be available only to the
Law Department, but coordination is essential.  Future tracking should
correlate data for evaluating outcomes, such as success or liability with
respect to specific types of denials, policy wording interpretations, etc.

GSCONF 27.1220

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

## III.  ISSUES RELATING TO MENTAL AND NERVOUS CLAIMS
### (Provident Initiative 1.4)

*Overview*

New systems are already in place to deal with mental and nervous claims. We have discussed mental and nervous claims and the new systems with those responsible for claims management, investigation and litigation. We have also conferred with the outside consultants retained by Provident to evaluate mental and nervous claims. These discussions have supplemented and expanded upon our overall claims review in connection with Section II above.

As expected, the observations and recommendations set forth in Section II apply equally to mental and nervous claims. The development of systems, use of expert personnel, establishing a training program, and the proactive use of lawyers all need to be further integrated into the mental and nervous claims area. We do not repeat here the subject matters covered by recommendations made in Section II, but where appropriate supplement those recommendations.

As the Company has provided particular attention to mental and nervous claims for over one year, the recently established "Psych Unit" is



GSCONF 27.1221

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

already on its way towards understanding what resources and commitment are needed to establish "best industry practices" in claims handling.

*Background*

Approximately 20% of Provident's claims involve psychiatric diagnosis. By 1994, Provident (and others in the industry) recognized the enormous growth in mental and nervous claims (particularly among professionals) and began to grapple with potential solutions. For the first time, Provident retained a Masters of Social Work ("MSW") to provide medical expertise to adjusters reviewing mental and nervous claims. In addition to retaining a second MSW during 1994, a variety of initiatives were undertaken to improve Provident's methodology in handling these claims. Pilot programs were organized, adjusters were chosen to work on mental and nervous claims based on skill, aptitude and interest and numerous other ideas were evaluated. In short, 1994 became a "learning year" for the staff dedicated to mental and nervous claims and established the clear need for professional resources and better training to handle the mental and nervous claims.

As a result, Provident retained consultant, Psychiatric Disability Consultants Inc. ("PDC") to provide on-going advice in connection with a claims audit and to help Provident establish mental and nervous claims

GSCONF 27.1222

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

systems. Provident also established the "Psych Unit" which will eventually be responsible for all mental and nervous claims. This type of allocation of resources and expertise can insure that Provident establishes and maintains the best industry practices for mental and nervous claims.

A.    Claims, management, investigations and settlements

*Overview*

Consistent with our findings in Section II above, no system currently exists that will enable us to provide an evaluation of whether Provident has a history of paying deniable claims or making overpayments.

Although not unique, mental and nervous claims do present more opportunity for "subjective evaluation." In the past, if the claimant and his/her attending physician reported that the claimant suffered from a mental disorder, the Company typically paid the claim. It is our view, and this is supported through our discussions with claims personnel, that this subjective evaluation was relied upon by the Company and adjusters to avoid making difficult decisions regarding mental and nervous claims. Moreover, when the claimant and the attending physician are defining the condition and treatment, the claimant views the Company as merely reviewing an established condition rather than working together with the claimant to evaluate the condition and to develop a program of treatment to

---

LeBoeuf, Lamb, Greene & MacRae, L.L.P.                    Page 72

GSCONF 27.1223

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

return the claimant to work as soon as possible.  This historical perspective leads us to conclude that it is likely that the Company could have been more aggressive in defending mental and nervous claims.

This "corporate culture" is in the process of changing.  Psych Unit claims personnel now understand that the same subjectivity that led the Company to pay benefits can be used to the Company's advantage in adjusting and closing a claim if proper claims practices are employed.

Recommendation III.A.: Continue to vigorously change "corporate culture".  Make the adjuster – not the attending physician – the expert on the claimant's condition, the proper treatment and how those aspects of a claim are connected to the insurance policy at issue.  Build upon these changes to use the "subjective" nature of mental and nervous claims to the Company's advantage.  Like other claims, this cannot be done unless and until claims are properly handled from commencement until closing.

1.    Practices and procedures

*Overview of Psych Unit*

In the final quarter 1994, the claims department established the Psych Unit, which will eventually be responsible for all mental and nervous claims.  The Psych Unit is currently responsible for 125 of the total 1700 mental and nervous claims.  The 125 claims are made up of higher value claims, complicated claims or claims subject to reevaluation.  As each claim is closed or reevaluated for "no action" it is returned to the claims

GSCONF 27.1224

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

department which is still responsible for the remaining mental and nervous claims.

The Psych Unit is currently staffed with 2 adjusters and 2 MSW's. Each adjuster has a low caseload of 50-60 cases. As it acquires more staff, the Psych Unit will be responsible for more claims, consistent with a lower caseload per adjuster.

**Recommendation III.A.1:** Continue to prioritize the Psych Unit's current mission to review high value claims subject to reevaluation. To the extent that reevaluation of claims creates settlement or appropriate denials, their review can achieve the best financial results for the Company.

### (a) Initial handling of claim

The cases are assigned alphabetically to the two current adjusters. Given the size of the unit, this assignment system appears reasonable since such a small unit is easily supervised. As more staff is added, this assignment system may have to be reevaluated. And, in the interim, mental and nervous adjusters must be made aware of bad faith and other issues peculiar to California and certain other states.

**Recommendation III.A.1(a) 1:** Ensure that adjusters are well versed in details of jurisdiction where there is greater exposure to "bad faith" liability and punitive damages and encourage adjusters to discuss bad faith issues with adjusters in the claims department well versed in the relevant jurisdictions and/or lawyers to stay up to date on bad faith developments.

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

Starting in February, each new claim will be discussed in a once-weekly round-robin meeting of the Psych Unit. We believe this is an excellent technique for establishing an early intervention into the claim as well as an action plan with the benefit of the views of a variety of experienced and knowledgeable people. This also provides an excellent ongoing training/education program for those involved.

**Recommendation III.A.1(a) 2:** Formalize the system by which each new claim is reviewed at the weekly round-robin meeting.

Adjusters in the Psych Unit have a lower caseload in two respects. First, they are responsible for fewer claims files – approximately 50-60 each. Second, the number of claims assigned to each adjuster is reviewed by the amount of intervention or activities necessary to properly adjust the claim. Proactive intervention in a complicated mental and nervous claim requires performance of numerous tasks by the adjuster. Thus, it is not only the number of claims but the number of tasks per claim that must be reviewed to determine a proper adjuster claimload.

**Recommendation III.A.1(a) 3:** Continue to stress activities or tasks when determining the proper claimload for adjusters.

Adjusters are being trained to provide an immediate proactive interventionist approach to mental and nervous claims. Adjusters and psychological consultants are now discussing mental and nervous claims

87111

LeBoeuf, Lamb, Greene & MacRae, L.L.P.                    Page 75

CSCONF 27.1226



PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

immediately with claimants and treating physicians and trying to thoroughly review a claim at an early stage. Because the passage of time often cements the view of claimants and treating physicians, this proactive approach will prevent some claims from becoming a "situational" claim where the claimant has lost his job or lost her clients and is no longer employed. We believe this is the critical process in properly handling mental and nervous as well as other subjective claims.

Early intervention into subjective claims informs the claimant that the Company is aware of the claimant's condition and will pay benefits if appropriate. It also requires the claimant to provide positive demonstration of his/her condition and lets the claimant know that the Company is likely to continue to evaluate the claimant's environment and condition.

Immediate intervention with the treating physician is designed to demonstrate the adjuster's expertise regarding the claimant's particular condition and to determine the appropriate medical treatment for the claimant and an accepted medical standard for the expected duration of the claimant's condition. These procedures also inform the claimant's and treating physician's communities about the proactive and aggressive nature of the Company's claims handling practices.

SERPIO

LeBoeuf, Lamb, Greene & MacRae, L.L.P.                                    Page 76

GSCONF 27.1227

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

<u>Recommendation III.A.1(a) 4</u>:  Continue training adjusters and MSWs to proactively intervene in the claimant's situation as quickly as possible to determine the validity of the claimant's condition and the proposed course of treatment.

For the reasons discussed in Section II above, proper utilization of field examiners is necessary for early intervention with claimants through field visits.  In mental and nervous claims, field examiners can be of even more use in helping to understand the vocational aspects of a claim. Visiting with the claimant and trying to understand why a particular mental condition prevents a claimant from performing the tasks associated with their vocation should be part of the Company's new approach to managing mental and nervous claims.

This approach will require additional training for field examiners and, depending on the Company's commitment to field examiner participation in claims, more staff as well.

<u>Recommendation III.A.1(a) 5</u>:  Utilize field examiners whenever practical to call immediately on claimants and train field examiners in appropriate aspects of mental and nervous claims.

Proactive intervention in mental and nervous claims provides an opportunity to recognize poorly defined treatment programs or the lack of objective testing which may be signs of exaggerated or falsified claims.



LeBoeuf, Lamb, Greene & MacRae, L.L.P.                    Page 77

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

**Recommendation III.A.1(a) 6:** Identify attending physicians connected with falsified claims and refer to legal department for appropriate action.

### (b) Action plans

We have seen the Psych Unit's action plans in use and believe that files are better organized and prepared for future activities necessary to deal with claims follow-up.

**Recommendation III.A.1(b) 1:** Continue to use and up-grade action plans.

### 2. Resources

The Psych Unit has recently hired two additional adjusters and is interviewing for one senior adjuster.

Realizing the successes created by retaining MSW's, the Psych Unit maintains psychological consultants to aid each claims adjuster. Currently, the ratio is one psych consultant per adjuster. It is expected that with the expansion of the Psych Unit, this ratio will grow to one psych consultant per four adjusters. The close relationship between psych consultants and adjusters is critical and permits a transfer of knowledge and skills. The psych consultants still have to advise adjusters who have mental and nervous claims outside the unit until such time as the Psych Unit has responsibility for all mental and nervous claims.

LeBoeuf, Lamb, Greene & MacRae, L.L.P.

GSCONF 27.1229

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

Recommendation III.A.2. 1: Carefully evaluate the proper psych consultant/adjuster ratio and ensure effectiveness of the relationship. Often pilot programs show success because they are more easily managed and supervised due to their limited size. Keep the positive characteristics of the small Psych Unit as it enlarges.

There are a variety of form letters and questionnaires used by the Company in connection with mental and nervous claims. The Psych Unit has recognized this potential inconsistency and is seeking to consolidate all form letters, questionnaires and other diagrammatic materials into a case data base for both the Psych Unit and claims department.

Recommendation III.A.2. 2: Continue to consolidate data and develop acceptable forms for use by all adjusters involved in mental and nervous claims.

The Company is not familiar with physicians in all regions competent to conduct Independent Medical Examinations ("IME").

Recommendation III.A.2. 3: Use and evaluate IME referral companies until such time as the Company establishes its own list of IMEs.

3.    Training

Training is currently performed on an ad hoc basis by senior staff and outside consultants. Because the unit is small, and its work specialized, this is probably an effective method of training for the short

LeBoeuf, Lamb, Greene & MacRae, L.L.P.                                Page 79

.GSCONF 27.1230

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

term. As the size of the unit grows, more formalized training will be required.

Recommendation III.A.3. 1: Establish a formal training program in conjunction with the efforts commenced by the claims department.

### 4. Law Department involvement

Our discussions with personnel in the Psych Unit lead us to conclude that there is an underutilization of the law department in connection with mental and nervous claims, and personnel seem to be going directly to the Law Department when they do seek legal views. This can be attributed to the focus on new systems and the historical ad hoc use of lawyers to aid in claims review and decisions. As noted in Section II.A.5, use of lawyers can be critical to claim evaluation and privilege issues.

Recommendation III.A.4. 1: Integrate new lawyer assigned to claims department to perform the same tasks for the Psych Unit.

Mental and nervous claims present among the more difficult coverage evaluations.

Recommendation III.A.4. 2: Develop memoranda bank on mental and nervous tests as applied to Provident's policies in various jurisdictions.

GSCONF 27.1231

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

B.    <u>Psych Unit as a pilot program for Claims Department</u>

The measures employed by the Psych Unit can be exported to the claims department, particularly for review of other types of "subjective" claims, such as pain related claims. If successful, this environment, which creates a caseload that allows a trained, specialized adjuster the time to perform the amount of tasks necessary to proactively provide early intervention to a claim in close consultation with staff medical experts should be recreated for other types of claims. In addition, the notion of prioritizing claims by value and number of tasks puts the Company's resources towards those claims that can have the greatest financial affect on the Company.

<u>Recommendation III.B.1.1</u>: Use the Psych Unit as a pilot program to establish other specialized and prioritized claims units and consider having a separate unit to look at lower value more routine claims or those higher value claims not subject to investigation because the claimant is clearly entitled to benefits.

GSCONF 27.1232

WORKING

CONFIDENTIAL

GSCONF 27.1233

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

## IV.  POLICY WORDING (Provident Initiatives 3.2)

*Overview*

Drafting effective policy wording is a function of balancing regulatory requirements, marketing concerns and profit.  The insurer must balance the incentive to provide generous coverage terms for marketing purposes against the need to make a profit and comply with regulatory provisions.  Once the proper balance has been achieved, the company must then draft clear and unambiguous policy language that reflects the intended coverage.  Failing to properly balance the relevant concerns or to clearly reflect the balance achieved will necessarily diminish overall product profitability.

The following discussion aims to provide the Company with suggestions for improving the clarity and profitability of its current IDI policy wordings.  Though the Company greatly improved its policy wordings as reflected in the 338 Loss of Earnings and 338 Own Occupation products, we believe current market conditions provide a unique opportunity for the Company to further tighten and clarify its IDI policy provisions.  We recommend that the company take advantage of this opportunity.

At the outset, we note that the Company lacks the systems necessary to monitor and draft effective policy wordings.  For example, the

LeBoeuf, Lamb, Greene & MacRae, L.L.P.

GRCONF 27.1234

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

company lacks systems to monitor and detect ambiguous and/or overly generous policy provisions.  In addition, no regular lines of communication exist between policy drafters and marketing, legal or claims personnel.  This gap in regular communication deprives policy drafters of valuable feedback about in-force wordings;[16] the current system provides ad hoc feedback at best.

**Recommendation IV.1:**  Institute systems to track policy wordings and to detect ambiguous or overly generous policy provisions.

**Recommendation IV.2:**  Institute regular modes of communication between policy drafters and claims, legal and marketing personnel to ensure that drafters receive regular feedback on in-force wordings.

We also recommend that the Company develop systems to track judicial decisions relevant to its policy wordings so that it can proactively adjust policy language to avoid unintended benefit payments.

**Recommendation IV.3:**  Institute systems to track judicial decisions relevant to the Company's policy wordings so that policy wordings can be adjusted proactively to avoid unintended benefit payments in future policies.

---

[16]    It is imperative, however, that policy drafters maintain the strictest of independence from these other departments.

LeBoeuf, Lamb, Greene & MacRae, L.L.P.                                    Page 83

GSCONF 27.1235

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

A.    Coverage benefits

In the early to mid-1980s, Provident liberalized its IDI coverage benefits in reaction to market conditions and to garner increased market share.  Driven by marketing interests, the liberalization of benefits resulted in overly generous coverage terms and benefits.  When combined with minimal defenses and exclusions, changing societal norms and inadequate pricing, overly generous terms resulted in the diminished profitability of Provident's IDI book of business.

With the 338 products,[16] Provident came a long way in tightening coverage benefits and clarifying ambiguous policy wordings. While we do not recite those improvements here, we note below several recommendations for further revision.

1.    Renewal conditions

The 338 products come in two versions: Non-Cancelable and Guaranteed Renewable.  The Non-Cancelable version guarantees renewals and premiums to age 65 or for five years whichever is later.  Under the

---

[16]    We note that none of Provident's professional IDI products offers a combined own occupation/ general occupation option.  From a business prospective, Provident may wish to consider offering such a combined product in addition to or instead of an extended own occupation product such as the 338 Own Occupation product.

LeBoeuf, Lamb, Greene & MacRae, L.L.P.                          Page 84

GSCONF 27.1236

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

Guaranteed Renewable version, renewals are guaranteed to age 65 or for

five years whichever is later, but premiums may increase by class.[17]  In

both versions, life long renewals are guaranteed as long as the insured

continues to work full time.   If continued beyond the later of age 65 or five

years, renewal premiums are those in effect at the time of renewal for a

person of like age; all other rating characteristics relate back to the

initiation of the policy.

   We view the provision of life long renewal benefits as an overly

generous benefit provision.  The risk of a disabling condition in the years

following age 65 far out ways the marketing value of providing such a

benefit.  We recommend that Provident discontinue provisions offering

guaranteed life long renewal benefits.

   Recommendation IV.A.1. 1:  Discontinue guaranteed lifetime
renewal benefits.  If offered, renewal benefits after the age 65 should be
limited to a set age.

   In addition, we question the prudence of offering guaranteed

renewal benefits and premiums to applicants beyond the age of 65.  While

we recognize the issue to be more of an underwriting than a policy wording

concern, we note that both versions of the 338 Loss of Earnings product and

---

[17]   Should immediately seek regulatory approvals of class premium increases.

---

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

the Own Occupation product provide guaranteed renewals to age 65 <u>or for five years whichever is later</u>. Implicit in the statement is the possibility of providing coverage to an applicant who will attain age 65 <u>before</u> five years have passed (i.e. - applicants over the age of 61). Provident is effectively setting itself up to subsidize retirement through such IDI products. We recommend that the company not offer guaranteed renewals or premiums beyond age 65. Though we have not conducted a market wide survey, we note that several competitors do not offer such benefits.

<u>Recommendation IV.A.1. 2</u>: Limit guaranteed renewal or premium benefits to age 65.

### 2.    Rehabilitation benefits

As discussed in the opening section of this report, we recommend that Provident institute a mandatory rehabilitation clause in all general (non-occupationally based) products. As discussed more fully there, we believe such a provision will not only result in savings, but will be useful as a claims management tool. <u>See</u> <u>supra</u> Section I for a more detailed discussion and a sample rehabilitation provision.

<u>Recommendation IV.A.2. 1</u>: Institute a mandatory rehabilitation clause in all general (non-occupationally based) IDI products.

We note here again, that the current rehabilitation clause in the 338 Loss of Earnings Product cannot be recommended to mandate

LeBoeuf, Lamb, Greene & MacRae, L.L.P.                    Page 86

GSCONF 27.1238

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

rehabilitation. As written, that clause could be construed only to require the insured's participation in rehabilitation once the insured has requested that Provident agree to provide such benefits.

### 3.    Cost of living adjustment benefits

Cost of Living Adjustment options ("COLA") are offered in both the 338 Loss of Earnings product and the Own Occupation product. The COLA option allows the policyholder to ensure that future benefit payments keep pace with inflation. If chosen, benefit payments are automatically adjusted to reflect inflation as measured by the Consumer Price Index.

In its current form, however, the COLA option contains a floor which will automatically increase benefits by 4% even though actual inflation may be below 4%. Such a floor is unrelated to the need to protect against inflation and may actually increase the purchasing power of benefits in years in which inflation is less than 4%. We view such a benefit as an overly generous provision and recommend that Provident discontinue the floor in future wordings.

Recommendation IV.A.3. 1: Do not offer a floor on the COLA option. Inflationary adjustments should not exceed increases in the actual Consumer Price Index.

GSCONF 27.1239

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

**B.**    **Exclusions and defenses**

Concurrent with the provision of overly generous policy conditions, Provident stripped its IDI products of most exclusions and defenses as evidenced by the 334 and 335 products.  As mentioned earlier, these products were market driven and lacked even the most basic fraud defenses.  The stripping of exclusions not only deprived claims handlers of their ability to manage spurious claims, but consequently contributed to the payment of innumerable and unintended benefits.

Both versions of the 338 currently provide the following exclusions and defenses:

Exclusions

-losses caused by war or act of war
-losses associated with normal pregnancy or childbirth
-benefits payable during periods of incarceration
-losses associated with specifically named conditions

**Defenses**

-may void the policy or deny benefits based on misstatements in the application during the first two years after inception, excluding fraudulent misstatements

014793

LeBoeuf, Lamb, Greene & MacRae, L.L.P.                                    Page 88

GSCONF 27.1240

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

-may reduce or deny benefits for losses starting during the first two years after inception if related to a non-excluded, preexisting condition or injury

While an improvement from prior products, further revisions are necessary.

First, we note that the fraud defense could be made more explicit. The only discussion of a fraud defense occurs in a provision limiting defenses based on misrepresentation as follows:

### TIME LIMIT ON CERTAIN DEFENSES

1. After two years from the Effective Date of this policy, no misstatements, except fraudulent misstatements, made by you in the application for this policy will be used to void the policy or to deny a claim for loss that starts after the end of such two year period.

We recommend that all future IDI policies contain an explicit and broad provision limiting benefits and providing for termination for fraudulent conduct on the part of the insured, whether perpetrated in the application or otherwise. Such a provision will avoid any ambiguity, give greater prominence to the defense and will provide claims handlers greater flexibility in managing spurious claims. It may also act as a deterrent to fraud.

<u>Recommendation IV.B.1</u>: Explicitly provide for a broad, lifetime fraud defense. The defense should appear in a separate clause to avoid ambiguity and to give the defense greater prominence.



---

LeBoeuf, Lamb, Greene & MacRae, L.L.P.                                      Page 89

GSCONF 27.1261

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

Furthermore, based on our discussions with claims personnel and our review of claims and litigation files, we noted several instances where additional exclusions or defenses would enhance Provident's ability to manage spurious claims.  For instance, we noted that many dubious claims arise from circumstances that place an insured in difficult financial circumstances, such as the loss of a professional license or a business failure.  We noted that such claims were usually made under the pretense of a mental or nervous disability.  We recommend that Provident incorporate exclusions to address such situations.

Recommendation IV.B.2:  Exclude coverage for losses associated with the suspension or loss of license.  This could be expressed as a per se exclusion or could be tied to mental and nervous claims.

Recommendation IV.B.3:  Exclude coverage for losses associated with business failures or losses.  This could be expressed as a per se exclusion or could be tied to mental and nervous claims.

Lastly we note that both versions of the 338 lack a number of standard exclusions that would help tighten policy provisions and help avoid the payment of unintended or overly generous benefits.  We recommend that future wordings exclude benefits for losses associated with self inflicted injuries or the commission of a crime.

Recommendation IV.B.4:  Exclude losses attributable to self inflicted injuries.

785910

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

Recommendation IV.B.5: Exclude losses attributable to the commission of a crime (felony crime exclusion).

In all instances, it must be noted that all policy wording revisions must pass applicable regulatory muster before being offered to the public.

GSCONF 27.1243

014796

V. REINSURANCE
AND PRODUCT
OPTIONS

GSCONF 27.1244

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

V.   POSSIBLE REINSURANCE OR PRODUCT OPTIONS TO EASE
FINANCIAL BURDEN OF OWN OCCUPATION POLICIES
(Provident Initiative 1.2)

A.   Reinsurance

1.   Indemnity

Once Tillinghast completes its valuation study, Provident could decide to cede all or a portion of IDI Policies on an indemnity reinsurance basis.  If pricing is an impediment to such a transaction, flexibility can be achieved through a payment formula tied to performance through the issuance of instruments by one of the reinsurer's non-insurance subsidiaries. The latter structure could be crafted, as described below, to satisfy financial reinsurance regulatory limitations.

The reinsurance structure would be as follows.  Reinsurer prices the reserves at Y.  Provident prices the reserves at X, which is less than Y. For the purpose of this discussion assume the difference between X and Y is $250 million.  Provident could purchase a $250 million note from a non-insurance affiliate of the reinsurer.  Repayment of the note would be tied to a formula relating to the performance of the ceded business.  Provident would acquire an asset, i.e., the note.  The note would be rated.  Based on prior experience, a note issued by a highly rated reinsurer's parent or affiliate should receive an investment grade rating, despite the repayment

GSCONF 27.1245

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

formula. The reinsurer would be at risk for reserve deterioration exceeding the amount of the note. This structure has been achieved in other transactions.

The benefit to Provident would be immediate surplus enhancement with the risk of non-payment of the note, e.g., reserve deterioration, extended to a time when Provident may be in a better position to absorb the loss. Provident would also be relieved of the risk of reserve deterioration exceeding the amount of the note.

The reinsurance could be packaged in one or two transactions. Two transactions would involve first what has been referred to as the "Old Block", and second, the more profitable products. Reinsurance of the more profitable products could operate as an inducement to the reinsurer to reinsure the "Old Block". The reinsurance could also be packaged in a single transaction.

**Recommendation VI.A.1. 1:** Reinsure all or a portion of IDI Policies under terms that allow pricing flexibility and recognition of possible reserve deterioration at a later date. This could be accomplished through the issuance of a note or preferred shares by a non-insurance subsidiary of the reinsurer to Provident. The note repayment or share redemption would be tied to the performance of the business reinsured.

GSCONF 27.1246

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

2.    <u>Assumption</u>

If Provident is going to remain in the individual disability business, an assumption transaction does not seem appropriate. The assuming insurer would affectively control Provident's in force client base, since the essence of an assumption transaction relieves the cedent of its obligations under the reinsured contracts and the assuming insurer controls the business in its own name. We doubt that Provident would see this as a viable market solution.

<u>Recommendation VI.A.2. 1</u>:  Consider an assumption reinsurance transaction only if Provident plans to exit the individual disability business.

B.    <u>Product options</u>

1.    <u>Product conversion or "add on" possibilities</u>

We have concluded that the only product, if any, that could induce holders of in force non-cancelable own occupation policies to convert would be one which provides similar "give aways" to policyholders. Accordingly, a conversion option does not afford a feasible solution to ease the financial burden of own occupation policies.

Provident could develop "add on" options (riders) for the own occupation policies that could generate revenues and, hopefully, profits that would be netted against losses on this block of business. Such riders could

---

PRIVILEGED & CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
WORK PRODUCT

provide long term care, life or retirement annuity benefits. Since Provident

is restructuring its distribution to market all individual products through

one channel, such "add ons" should flow from this marketing effort.

Recommendation VI.B.1.1: Develop profitable "add on" riders
that could be sold to own occupation policyholders. Although a conversion
product would be ideal, it is impractical to believe that own occupation
policyholders could be induced to convert their policies for less generous
policies.