# EXHIBIT

# “1”

EXHIBIT “1”

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **BETTY BULLARD** | **)** | |
| | **)** | |
| **Plaintiff,** | **)** | |
| | **)** | |
| **v.** | **)** | |
| | **)** | **CASE NO.** |
| **UNUMPROVIDENT CORPORATION;** | **)** | |
| **UNUM LIFE INSURANCE COMPANY** | **)** | **CV-2:05-cv-1217-MEF** |
| **OF AMERICA, et al.,** | **)** | |
| | **)** | |
| **Defendants.** | **)** | |

# SUPPLEMENT TO PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

COMES NOW the Plaintiff, Betty Bullard, and files this Supplement based on the deposition testimony of Bonita Connally, Defendant's Lead Disability Specialist (Lead DBS) who handled Plaintiff's claim for disability benefits and on the newly discovered evidence produced at Ms. Connally's deposition.

In her deposition, Connally admits that she had the sole authority to approve Plaintiff's claim for benefits, that insufficient information was obtained prior to Defendants' denial of Plaintiff's claim for benefits, and that additional medical records were necessary to properly assess Plaintiffs condition but that despite these deficiencies, she went ahead and denied Plaintiff's claim for benefits.

## DISCUSSION

Bonita Connally was the Lead Disability Specialist (Lead DBS) who worked on the disability claim Bullard submitted to Defendant. *See* Attachment "A" Connally Depo at pg. 36. Connally stated in her deposition testimony that additional records should have

been obtained before the Defendant decided not to pay Bullard's disability claim. *See* Attachment "A" Connally Depo pgs. 67-68, 95, 109, 157. Connally also testified that more effort should have been taken to assess the restrictions and limitations assigned by Bullard's attending physicians. *See* Attachment "A" Connally Depo pg. 134. Connally testified that although it is her responsibility, as Lead DBS, to order the Disability Specialist (DBS) working on the claim to investigate further, she did not do so with Bullard's claim. *See* Attachment "A" Connally Depo pg. 108.

Connally further testified that although it is the Defendant's responsibility to ensure that every medical condition attributed to a claimant should be investigated, all of Bullard's indicated medical conditions were not investigated or even identified prior to the denial of her claim. *See* Attachment "A" Connally Depo pgs. 82-84. Connally testified that despite her request to the DBS handling Bullard's claim to request the medical information from Bullard's medical providers, such a request was never made prior to the Defendant's denial of her claim. *See* Attachment "A" Connally Depo pgs. 191-192, 211.

The above-cited testimony provides evidence of the Defendant's bad faith denial of Plaintiff's claim for disability. Defendant did not fully investigate Plaintiff's claim prior to its denial, rather it arbitrarily and in bad faith refused to pay Plaintiff's disability claim. This testimony also provides evidence of Defendant's intent to not give Plaintiff's claim a good faith review and decision, as well as evidence of conspiracy amongst all of Defendant's employees who reviewed Plaintiff's claim.

Lastly, Connally admitted that the Defendant and Bullard's employer, the Annuity Board, had entered into a performance agreement regarding the Defendant's handling of

the Annuity Board's employee's claims. *See* Attachment "A" Connally Depo pgs. 208-209. This performance agreement applied stringent standards to the time allowed for the Defendant to review claims submitted by the Annuity Board employees. *Id.* Connally testified that the Defendant was over these mandated time standards in its review of Bullard's claim and that this tardiness would require the Defendant to refund a portion of the Annuity Board's paid premiums. *Id.* Additionally on November 28, 2006, the day Ms. Connally's deposition was to begin (and a month after Plaintiff was required to provide her response to the Motion for Summary Judgment), Defendants produced 163 pages of additional materials including an e-mail from Ms. Connally stating that the Defendants haven't performed well in handling Plaintiff's claim and "we [UnumProvident] are going to pay for the errors". *See* Attachment "B".

Connally's testimony and the emails regarding the performance agreement provides evidence of Defendant's fraud. Defendant had no intent to honor its duty to provide Plaintiff with a good faith review of any future disability claims when it issued her disability policy. Defendant's intent, rather, was to honor the terms of its performance agreement with Plaintiff's employer, as is evidenced by its hasty denial of her claim, rather than a good faith review, in an effort to meet the time standards imposed by the performance agreement.

## CONCLUSION

In light of this newly discovered evidence, summary judgment is clearly inappropriate in this case. Plaintiff has asserted claims of breach of contract, bad faith, fraud, suppression, misrepresentation, and conspiracy against Defendants. Connally's deposition and emails provide evidence of each of these claims. Connally's testimony

presents evidence of breach of contract and bad faith by outlining the numerous ways that Defendant denied Plaintiff's claim for benefits without conducting the good faith investigation required by an insurer.  Connally's testimony further presents evidence of Defendant's fraud by disclosing its practice and manner of its bad faith denial of claims without proper investigation in an effort to meet time standards imposed by its performance agreements.  Connally's testimony outlines the suppression and misrepresentation the Defendant engaged in by failing to inform Plaintiff that if it fell behind time standards in its evaluation of her claim, it would be arbitrarily denied without adequate information in an effort to meet its contractual time standards.  Finally, Connally's deposition provides evidence of conspiracy, in that two UnumProvident employees (who claim to be acting on behalf of both Defendants) entered false information in Plaintiff's claim file in an effort to give the appearance that a good faith investigation of her claim was conducted when, in fact, it was not.

Plaintiff therefore respectfully requests this Court DENY Defendants' Motions for Summary Judgment.

          Respectfully submitted,

           /s/ Thomas O. Sinclair
          Thomas O. Sinclair (SIN018)
          One of the Attorneys for Plaintiff

OF COUNSEL:
Thomas O. Sinclair (SIN018)
Jenifer Champ Wallis (WAL191)
Campbell, Waller & Poer, L.L.C.
2100-A SouthBridge Parkway, Suite 450
Birmingham, AL 35209
(205).803-0051
Fax:  (205).803-0053
E-mail:  tsinclair@cwp-law.com
E-mail:  jwallis@cwp-law.com

CERTIFICATE OF SERVICE

I hereby certify that on January 5, 2007 I electronically filed the foregoing pleading with the Clerk of the court using the CM/ECF system which will send notifications of such filing to the following:

dfink@handarendall.com
hmorrissette@handarendall.com
jjohnson@handarendall.com

/s/Thomas O. Sinclair
Thomas O. Sinclair (SIN018)

# ATTACHMENT

# "A"

ATTACHMENT "A"

33

Bonita Connally - Direct by Mr. Sinclair

remember her last name.
Q Sheldon?
A No. It was for one month. And then in may Of 2004, I began reporting to Terry Parker and I reported to Terry until September of '04.
Q When you made the move?
A Correct.
Q Okay. All right. I know that's a branch off of Dallas and y'all just handle group claims out there?
A In the UnumProvident office?
Q Yes.
A They don't handle claims there.
Q They don't handle claims there?
A No, sir.
Q What do they do there?
A It's a Dallas field office. It's a sales and service support office.
Q Okay. Okay. Are you telling me you've moved into sales and service out in Dallas?
A No, sir.
Q Okay. Let's back up. Who do you report to now from September of '04 to present?
A From September of '04 when I left with Terry Parker, in October of '04, I reported to Dan

34

Bonita Connally - Direct by Mr. Sinclair

Vatt. In 2005 I reported to Brian Porter and right now I am drawing a complete blank. Give me just a second.
Q Okay.
A Meg Murray Nutz.
Q Do you need that spelled? Meg Murray Nutz?
A Meg Murray Nutz.
MR. MORRISSETTE: Is that M-E-T-S.
A N-U-T-Z, I think.
Q Okay. Where is Ms. Nutz?
A She's in the Chattanooga -- she's in the Chattanooga office.
Q Okay. And what is her job title?
A She is a director.
Q Okay. What -- please tell me they still call them impairment units.
A No, sir.
Q Okay. What do they call it now?
A We're aligned by the sales office regions now, so it's different regions.
Q They went back to regions?
A Yes.
Q It took them 15 years to get away from it. Now they've gone back to regions. Okay. Tell

35

Bonita Connally - Direct by Mr. Sinclair

me what region are you in?
A I believe it is southeast.
MR. MORRISSETTE: You're referring to currently?
Q What region are you currently in?
A Southeast.
Q I don't mean like physically today. I mean like your director is director of the southeast region; is that right?
A We handle claims out of the Atlanta sales office, so southeast sales region.
Q Okay. What office do you go to on a regular basis?
A The Chattanooga office.
Q Okay. You went back to Dallas and then came back to Chattanooga?
A That's correct.
Q Okay. All right. When did that happen?
A When did --
Q You came back here?
A -- I come back to Chattanooga? Last week.
Q Last week permanently?
A Yes.

36

Bonita Connally - Direct by Mr. Sinclair

Q Well, welcome home. No wonder Henry was so agreeable to having your deposition taken here. I thought he was just being a nice guy.
MR. MORRISSETTE: I told you if you waited two weeks, we'd move it.
Q Okay. All right. So you're back here now and you are still lead DBS?
A Yes.
Q What were you doing out in the sales and service office in Dallas?
A I was still a lead disability specialist. I was still handling claims and I was a technical resource for them. I had a special arrangement --
Q Okay.
A -- working remote.
Q Okay. I'm just going to let it go. At this point, I can't -- did you work remotely on this claim?
A No, sir.
Q Okay. All right. They've now redone the impairment units and taken it down into regions. How many regions are there?
A I don't know.
Q Okay. You're definitely in the

Bonita Connally - Direct by Mr. Sinclair 65

A Correct.
Q Okay. Is he still with the company?
A I don't believe so.
Q Do you know where he went?
A I don't know.
Q Okay. Do you recall who the RN was that reviewed this file?
A It was Pam McMillan.
Q Is she still with the company?
A Yes, she is.
Q Okay. Okay. See, the reason I asked about reviewing all of the medical records is because the language caught me and I thought, okay, maybe she's -- in this note here at 177, maybe you were saying you reviewed the RN and OSP review, but what you're telling me, I guess, is that you actually reviewed all the medical records themselves?
A It's very likely I looked at all the medical records, but my determination was based on the medical professionals' conclusion. So I looked at the records. Pam McMillan looked at the records, who was the nurse, and commented and then Dr. Vatt, who was the professional, the medical professional looked at the records and commented. And because

Bonita Connally - Direct by Mr. Sinclair 66

I'm not a medical professional, I have to defer to their expertise.
Q Okay. Okay. Well, let me ask you, the way this thing is stacked, can you tell which records you actually looked at?
A It should have been the medical information received in the file before August 18th of 2004.
Q And if I'm looking at this the right way and they were in reverse Bates numbering, that's everything from UACL1 back to UACL170?
A Yes, sir.
Q Okay. So that was essentially -- let me -- he'll object to this if I don't stop and say okay. The documents that are Bates numbered UACL1 through 170, those documents are the claim file that you're referring to when you say you reviewed the file prior to making this decision on August 18th, 2004?
MR. MORRISSETTE: Object to the form.
A That's correct.
Q Okay. All right. All right. So let me ask you to tell me do you think first off that the company did a good job up to August 18th, 2004, the company, UnumProvident had done a good job

Bonita Connally - Direct by Mr. Sinclair 67

in investigating this claim?
A I believe so.
Q If you believe they hadn't --
A Then yes, I think we had done a good job of investigating the claim.
Q Okay. As you looked back on it in your review yesterday or did before and sitting here today, do you wish you had maybe investigated it a little bit more?
A Yes.
Q Tell me what you would have gotten.
A Additional records from, I believe, it's Dr. Paul, the rheumatologist. Those did not appear to be in the file, after the telephone conversation referenced UACL00145.
Q And this was a physician to a physician? You're talking about -- I'm sorry. Say that number again.
A It's UACL00145. It's a phone call documentation between Mr. Estrada and Ms. Bullard.
Q I'm sorry. I thought you were referring to another phone call.
All right. So you feel like looking back on it, obviously you felt like on August 18th, 2004, you felt like that was the

Bonita Connally - Direct by Mr. Sinclair 68

right decision to make to deny the claim?
A Yes, sir.
Q Okay. But looking back on it today, do you think maybe you should have gotten some more records because of some of the things that Ms. Bullard conveyed to Mr. Estrada as reflected in the memorandum here?
A Yes.
MR. MORRISSETTE: Object to the form.
Q At UACL145 to 148?
A Yes.
Q Okay. All right. You think maybe additional records from Dr. Paul. Anything else that you think maybe you would have wanted in addition to what you had?
A Not that I can see looking at it right now.
Q Okay. How long did you spend looking at this claim file yesterday? Was it yesterday or the day before?
A Yesterday and the day before.
MR. MORRISSETTE: Objection. Asked and answered.
A Day two.
Q Okay. The past couple of days you've

Bonita Connally - Direct by Mr. Sinclair 81

A Yes.
Q Okay.
A We do have one additional attending physician statement. It's page UACL00038.
Q Okay. Were there medical records attached to this claim?
A Yes.
Q Okay. All right. I'll tell you what's let's do so I can keep track. Go ahead. What number were you referring to?
A UACL00038.
Q Three eight. Okay.
A This is still identifying the diagnoses.
Q Got you. Nothing but numbers.
A Right. He provides quite a few diagnosis codes, which I would have to take a look at the ICD9 book right now to see or Pam's review, Ms. McMillan.
Q The problem is she doesn't actually give ICD9 codes in her review.
A Right. She doesn't give the codes in the review. He does say in this -- or she does say, Rachel McKinney does say she's got the extreme fatigue, which we've referenced already, ulcerative

Bonita Connally - Direct by Mr. Sinclair 82

colitis, anxiety with panic attacks.
Q There's one, two, three, four, five, six ICD9 codes in there?
A Correct.
Q Okay. When you were doing your review prior to your decision in August of 2004, you indicated you reviewed everything in the claim file up to that date; is that correct?
A Yes.
Q Would you have pulled out the ICD9 book and looked up these ICD codes?
A Probably not.
Q Would you have done anything to make sure that each one of these codes had been identified in the claim file?
A I don't remember that I would. I would have looked at -- underneath that, he says see attached, Dr. McKinney she says and includes her records. So I would have reviewed her office notes.
Q Okay. But as far as particular codes written out here on UACL38, you wouldn't have made sure that somebody had looked up each one of those and investigated each one of those conditions?
A Yeah. I don't know. I don't see in the file that that was done.

Bonita Connally - Direct by Mr. Sinclair 83

Q Would that have been part of your responsibilities?
MR. MORRISSETTE: Object to the form.
A I don't know necessarily that looking up the specific codes would be.
Q Okay.
A But normally it was something that I did. I can't say for sure that I did it in this case.
Q Okay. Do you have a lot of people who list out just number ICD9 codes under the diagnosis? Does that happen a lot in group files?
MR. MORRISSETTE: Object to the form.
A It happens sometimes. The form actually asks that they include the ICD9 numbers. Normally when they put it, they'll put the diagnosis and the number.
Q The company actually likes to have an ICD9 versus this person's stomach hurts. You actually want to have a particular diagnosis given for a condition, right?
A Yeah.
Q Okay. Would it be -- would it be the company's responsibility to make sure that every condition listed by the attending physicians is

Bonita Connally - Direct by Mr. Sinclair 84

investigated --
MR. MORRISSETTE: Object to the form.
Q -- prior to making a decision on the claim?
MR. MORRISSETTE: Object to the form.
A Yes.
Q Okay. Any more attending physician forms that you see in this initial -- in this initial claim submission? I think you've got them all, but --
A I don't think so.
Q Okay. Here we go. Here is a way, I think, to do it. We've been looking at the initial claim packet. Is that a way to put it?
A That would be fine.
Q Okay. What would you refer to it as?
A Just the initial claim forms.
Q Okay. And it includes the attending physician statement, employer's statement, claimant's statement and any additional attachments included with those forms?
A Yes.
Q Okay. You were -- we started out, I think, around UACL22 and we went all the way back to UACL58. Now, you tell me if I've got that right

Bonita Connally - Direct by Mr. Sinclair 93

had to come to you with their recommendations?
A No.
Q You wouldn't have known how many files -- I mean, how many benefit specialists, how many people did you have who came to you for review of their recommendations on claims?
A I don't remember, but I can look.
Q Okay. That's what this is all about here. As a matter of fact, let's talk about specifically. I'm going to hand you the documents that they have produced to me this morning. Tell me which one of the Bates numbers you're looking at.
A Okay. This is UAMSSUPP00162. It's from May of 2004 and there are four disability benefit specialists --
Q Okay.
A -- that would have been working with me.
MR. MORRISSETTE: I want to also say on those flow charts, we're going to mark those confidential in the confidentiality agreement. I did not get a chance to stamp them.
MR. SINCLAIR: Why don't you go ahead and take a look -- yeah, here take a look. Give me the Bates numbers.

Bonita Connally - Direct by Mr. Sinclair 94

MR. MORRISSETTE: 163 through 142.
MR. SINCLAIR: Okay. We provide notice under the terms of the agreement. We challenge the designation.
MR. MORRISSETTE: I would appreciate it if you would send me that in writing please. I'll be glad to send you the designating --
MR. SINCLAIR: Same, same.
BY MR. SINCLAIR:
Q All right. So you had three -- no, four DBSs who reported to you in May of 2005. Strike that. I said it the wrong way, didn't I? I got into that report thing that you guys up there at UnumProvident do.
All right. You had four DBSs who had to come to you for review of their recommendations?
A Correct.
Q Okay. How many claims on average in May of 2005 did those DBSs carry?
A I don't remember.
Q Okay. Would you have been -- would you have been one of the personnel responsible for overseeing their work on a daily basis or just when they came to interact with you --
MR. MORRISSETTE: Object to the form.

Bonita Connally - Direct by Mr. Sinclair 95

Q -- in May of 2004?
A I would be available when they came with questions when they had recommendations on a file and then also I would be able to pull a listing of the claims that they currently had.
Q Got you. Managerial reports. Mr. Smith went over that with me. I do remember that.
MR. MORRISSETTE: Object to the form.
Q Okay. All right. So this thing gets assigned to Brandon Estrada and he's in charge of investigating the claim --
A Yes.
Q -- is that right? Okay. Do you think he did a thorough job of investigating this claim?
MR. MORRISSETTE: Object to the form.
A I don't know. I think he could have obtained Dr. Paul's records.
Q You're right. It's a little broad, isn't it? I need to ask it a little bit differently.
Do you think he gathered all available information on every condition this young lady had?
MR. MORRISSETTE: Object to the form.
A No.

Bonita Connally - Direct by Mr. Sinclair 96

Q Okay. I think we've narrowed down the conditions. You tell me if I miss any. Strike that. You tell me if I fail to list one that you're aware of after reviewing this file. Okay?
A Okay.
Q We have pain in the ankles, colitis, depression, sleep apnea, unspecified rash, TMJ, fatigue, anxiety, fibromyalgia, catalepsy, narcolepsy, hypersomnia with sleep apnea, something called MPOS and there was one physician who did nothing but list ICD9 codes. Do you want me to read through those ICD9 -- you wouldn't be able to identify them either.
A No.
Q Have I listed all the conditions that you were aware of at the time you made your decision in August of 2004?
A Did you include ulcerative colitis.
Q I believe I did. Any others?
A I would have seen everything that was in the file at the time and based on looking at it right now, I don't see any others.
Q Okay. Let's turn back to UACL145, if we can. You actually pointed this document out earlier. It's the phone memo. It's the -- I think

Bonita Connally - Direct by Mr. Sinclair 105

Dr. Vatt. The reason this came up was because you indicated to me that you didn't just review Dr. Vatt's review or the RN review. You reviewed the entire file before you made this decision?

A That's correct.

Q Okay. So do you feel like you had enough information in this file when you reviewed all of these conditions to assess whether or not this lady was disabled under the policy?

A Yes, deferring to the physicians' expertise.

Q Okay. Do you feel like -- earlier you indicated to me that there was one particular doctor that you feel like at this point maybe you should have gotten in contact with and investigated further.

MR. MORRISSETTE: Object to the form.

A Yes.

Q Do you recall that?

A I do.

Q And that was, I think, in connection -- well, do you recall what he did?

A He was a rheumatologist.

Q Rheumatologist. Okay. So except for those -- well, let's flip to his because that was

Bonita Connally - Direct by Mr. Sinclair 106

one of the attending physician statements, correct?

A No.

Q Oh, that was the phone call?

A Correct.

Q Okay. All right. What in this phone call memorandum made you think that you should be -- at this point, you should have maybe followed up with this particular attending physician? If you would, identify what it is in here that made you make that statement.

A Can you give me the page of the file documentation?

Q I'm sorry. It's page 145.

A Okay. With her indicating she had her rheumatologist, she was seeing a rheumatologist in this review and that she had arthritis indicated, that was -- that was the reason that I think maybe we should have also requested records from Dr. Paul.

Q Okay. So Dr. Paul -- where are you seeing that?

A It's at the very bottom after Dr. Rachel McKinney, general practitioner, it says Dr. Donna Paul, rheumatologist.

Q Okay. I see what you're talking about.

A But also when she had the attending

Bonita Connally - Direct by Mr. Sinclair 107

physician's statements completed, she didn't provide one to Dr. Paul. So I don't know if that was because she doesn't feel she had a rheumatological disabling condition or Dr. Paul came on after she initially filed her claim.

Q And you didn't know the answer to those when you made the decision in August of 2004, right?

A Correct.

Q Okay. Let me ask you, does -- do you feel like in your role, you had the duty to investigate the claim?

MR. MORRISSETTE: Object to the form.

A I don't know that it was an investigative duty because normally that was handled by the disability benefit specialist and because the physician didn't indicate additional records were needed.

Q Okay. So I think --

A That's probably why we didn't go after anything additional.

Q I can tell why you furrowed your brow then because I asked it the wrong way. You as the consultant weren't responsible for investigating a claim; is that right?

A That's correct.

Bonita Connally - Direct by Mr. Sinclair 108

Q Okay. The disability benefit specialist, in this case, Mr. Estrada would have had that duty to investigate the claim?

A That's correct.

Q Then he -- once he had gathered the documents and materials would send that for an RN review and, if necessary, an OSP review, correct?

A Yes.

Q Okay. And then after the claim had been investigated by Mr. Estrada, the nurse had summarized the medical records and the on-site physician had provided his view of the claimed medical conditions, it would then come to you for your determination?

A That's correct.

Q Okay. Would you in the course of your duties as a consultant at this point in this claim in August of 2004, would you be responsible for telling a disability benefit specialist that he had to go and investigate further?

A Yes.

Q Okay. Did you feel like or did you tell that to Mr. Estrada in August of 2004?

A I don't see in the file where I did.

Q So you felt like the company had a

Bonita Connally - Direct by Mr. Sinclair 109

sufficient amount of information to make the determination without any further investigation?
A Yes.
Q But looking back on it, you would like to have additional information from Dr. Paul, the rheumatologist?
A That's correct.
Q Okay. Well, do you feel like you had sufficient information to assess the effects of her colitis?
A I don't know. Let me take a look at what the physician said.
Q Okay. I see what you're saying. You relied upon Dr. Vatt?
A That's correct.
Q Okay.
A Because I'm not a medical professional.
Q Okay.
A Any type of medical conclusion would come from either the nurse or the on-site physician.
Q Medical conclusion -- I'm sorry.
A No. That's okay.
Q Okay. Medical conclusion based upon the materials in the file?
A Yes.

Bonita Connally - Direct by Mr. Sinclair 110

Q But the on-site physicians don't have the authority to go direct the DBS to gather additional records. They can recommend it, but they can't actually tell them to go do that, correct?
A That's correct.
Q Okay. Because of the claim structure of the department -- well, strike that.
As the structure of the Chattanooga large case team was set up, there were people who interacted with one another, for example, you and Mr. Estrada and your role was superior to his insofar as you had the authority to make the determination, he did not, but he didn't directly report to you in a managerial capacity, correct?
A That's correct.
Q And the same would hold true for the physicians at this point in time in August of 2004. The physicians didn't report to you, correct?
A That's correct.
Q And the RNs didn't report to you?
A That's correct.
Q Their reporting structure was different from Mr. Estrada's?
A Yes.
Q All right. So it was Mr. Estrada's

Bonita Connally - Direct by Mr. Sinclair 111

responsibility to make sure that there was sufficient information in the file for the RN and OSP to assess each one of those conditions that we've discussed about Ms. Bullard?
A Yes.
Q Okay. All right. Let's flip -- let's flip to that physician review you were talking about, 166.
A Okay.
Q Okay. Now, let's talk about, if we can, the way that these OSPs were conducted at this time.
A Okay.
Q It is true, is it not, that the entire claim file was not marched down to the OSP for review?
MR. MORRISSETTE: Object to the form.
A They had access to the entire file on Navilink.
Q On Navilink?
A Correct.
Q When this particular review was completed, was the Navilink change-over completed?
A I don't understand the question.
Q There was actually a transition period

Bonita Connally - Direct by Mr. Sinclair 112

to Navilink, correct?
A That's correct.
Q Okay. And I thought that that had not been completed up until the middle of last year. Was it completed in August of 2004?
MR. MORRISSETTE: Object to the form.
A I don't know when it was completed. For this claim, based on its received date, it was always on Navilink. So there was not a paper component to this file.
Q So everything in this file was maintained in an electronic form. Let me ask you, how do you trigger an OSP review? Does it only follow an RN review?
A Yes, it does.
Q Okay. So there is a structure that's set out how you're supposed to take the claim first and either do a walk-in or ask for a formal review with the RN, correct?
A That's correct.
Q Okay. So I guess we were going to the OSP review in order to discuss your basis for the decision and you indicated -- and it appears that we've got to start at the RN review, right?
A That's correct.

Bonita Connally - Direct by Mr. Sinclair 133

just her or Dr. McKinney? Object to the form.
Q Do you understand the question as I posed it?
A No.
Q Okay. You told me that at the 164 when you stated, quote, recommend confer with OSP for further clarification, end quote, that the reason for your request for the OSP clarification was that you wanted an on-site physician to assess the restrictions and limitations that were assigned to Ms. Bullard. Do you remember giving me that statement?
A Yes.
Q What restrictions and limitations was the OSP going to assess if there were none assigned by the attending physicians?
A I don't know.
Q What restrictions and limitations did Mr. Estrada --
MR. MORRISSETTE: Object to the form. Where are you saying there were no restrictions and limitations?
MR. SINCLAIR: She's got it so far. She understands.
MR. MORRISSETTE: Object to the form.

Bonita Connally - Direct by Mr. Sinclair 134

I think you're misstating what the file says.
BY MR. SINCLAIR:
Q Let me ask you this way. As you sit here today, do you think somebody should have made an additional effort to find out what restrictions and limitations these physicians were assigning?
MR. MORRISSETTE: Object to the form.
A Yes.
Q Okay. Let's go on to 166, which I think -- oh, you know what. Wait a minute. You tried to straighten me out on this a minute ago. The RN review starts at about 165 and she indicates activity, updated medical records received. I think she's summarizing medical records there. Is that what that indicates to you?
A It just says we received additional records since she looked at the file last, previous reviews were dated 7/30 and 8/12.
Q Okay. So do you want to go back and look at the 7/30 review and 8/12 review and we'll see if we can't --
MR. MORRISSETTE: Where were you looking?
A For the 7/30 review. Page UACL00129.
Q Okay. Okay. This is going to be the

Bonita Connally - Direct by Mr. Sinclair 135

initial assessment by the RN, right? Okay. Let me ask that a different way. The claims manual talks about how you're to seek guidance as DBS from the on-site medical personnel RN through a walk-in if you need additional guidance on how to proceed with a claim. Do you remember seeing that in the claims manual?
A Yes.
Q Okay. This is what he's doing here, correct? This is where Mr. Estrada is going in to see Nurse McMillan and essentially just providing her with the initial claim, 50 pages of claim form, right? At this point, he hasn't made any medical records requests. He's written her a couple of letters to indicate that they are assessing it. You know what they did, they made a medical records request. I see that. Let me restate that question because that's not a fair assessment.
This is the first review she's talking about that she did on the file. It said the 7/30 review. It says here that she reviewed certain medical records. Can you tell exactly what medical records she reviewed?
A It says medical records from Dr. Richardson, sleep disorders medicine, 1998 to

Bonita Connally - Direct by Mr. Sinclair 136

2004.
Q Okay. I'm sorry. That's UACL129. It says down there, 5/17/04, repeat colonoscopy, reported to indicate colitis worse. Do you see where she says that in her review?
A Yes.
Q Okay. Do you know what doctor was treating her for colitis?
A I don't know.
Q Okay. Look down at the bottom of that sentence. This is why I wanted us to flip back here. You see that last sentence down there?
A Yes.
Q It actually agrees with what I think you've told me. It says, quote, need updated treatment notes, diagnostic test results and specific restrictions and limitations from all treating physicians. Now, that didn't happen, did it?
MR. MORRISSETTE: Object to the form.
A I don't see where everything was received.
Q Do you see where the requests were made?
A I don't see any requests made between

Bonita Connally - Direct by Mr. Sinclair 157

A Not based on this statement.

Q Does the statement provide any assessment of restrictions and limitations assigned by attending physicians with ulcerative colitis as the basis for those restrictions and limitations?

A No.

Q Okay. Next sentence, there's mention of having surgery on her feet with placement of screws. Related records have not been provided. Arthritis work-up was reported to be negative. Okay. Let's take that statement. Do you think that from that statement Dr. Vatt was indicating that somebody should go get some medical records on that particular medical condition?

MR. MORRISSETTE: Object to the form.

A No.

Q As you look back on it today, do you think maybe getting additional medical records on the potential for additional surgery on her feet was something that should have been done?

MR. MORRISSETTE: Object to the form.

A With the arthritis and that would have been Dr. Paul.

Q Okay. In that statement from Dr. Vatt, is there any indication of his assessment of the

Bonita Connally - Direct by Mr. Sinclair 158

restrictions and limitations assigned by the attending physicians on account of the foot and ankle pains that she was suffering?

A I don't see any.

Q Okay. Next sentence, claimant is on a number of medications. This raises the question of polypharmacy and drug interaction contributing to reported symptoms. Does that indicate to you maybe somebody is going to have to do another review of the file with a different specialty maybe to consider the effect of all these medications on her cognitive abilities?

MR. MORRISSETTE: Object to the form.

A I don't know. I don't think I considered that at the time.

Q Okay. You initially sent this for an OSP review for clarification on the restrictions and limitations assigned by the attending physicians. And I think we've found that when you look now at Dr. Vatt's clarification, does he actually clarify restrictions and limitations for specific conditions at any point in his statements found at 169 and 170?

A No.

Q All right. And 171 is your decision and I think we -- you know, we got through the first

Bonita Connally - Direct by Mr. Sinclair 159

sentence. It only took us about three hours. I'll see if I can't speed this up.

Medical information confirms -- medical information provided confirms that claimant has multiple conditions. We've gone through all those conditions that you're aware of, correct?

A Yes.

Q Okay. However, the only physician indicating she is unable to work is treating her for sleep apnea. Records -- okay. We've already covered that. We couldn't find restrictions. We already covered the restrictions and limitations question. So I'll just leave off with that. Next sentence, records do not document a change in her condition. Okay. Is there anything in the policy that requires her condition to change?

A No.

Q Treatment for sufficient R&Ls which would preclude her from working in on occupation. That's what OO means, right?

A That's correct.

Q Okay. I do know that the policy requires treatment, right?

A It does require them to be under appropriate care.

Bonita Connally - Direct by Mr. Sinclair 160

Q Right. Is the burden on the claimant to document the restrictions and limitations?

MR. MORRISSETTE: Object to the form.

A I would have to take a look at the policy for this particular one. I do think it's the responsibility of, in this case, Unum Life Insurance Company of America to request the information and go after the information that's out there.

Q Okay.

A We ask that the claimants assist us, but I wouldn't say that it's their responsibility.

Q Let me ask you, we talked about ERISA earlier. Now, I know in the claims manual they give you training on bad faith and requirements of different states. Have you had any training of any sort, whether OJT, informal training or formal training through manuals, regarding the duty of an insurance company to investigate claims?

MR. MORRISSETTE: Object to the form.

A I'm not sure.

Q Okay. Are you familiar with ERISA and the requirements under ERISA?

A With some of them.

Q Okay. Under ERISA, is a person responsible for providing the documents to

Bonita Connally - Direct by Mr. Sinclair 189

A Okay.
Q Do you recognize that document?
A Yes, I do.
Q All right. Remember how we were talking earlier about the little note that I couldn't figure out about the multidisciplinary something in the file --
A Yes.
Q -- that's the successor to the round table forums. Looking at UAMSSUPP17, does that refresh your recollection about whether or not a multidisciplinary review was performed on this file?
A It does. And again, I think it was just misspoke. I think it was a typo because I don't recall a multidisciplinary being done on this particular claim.
Q This is from you to the nurse, Pam McMillan. She's seeing Brandon Estrada, on August 13th, 2004, it states, quote, please let me know if you need a referral for full clinical review. End quote. Let me ask you what that means?
A If she needed a referral for a full clinical review, a different type of activity sent to her in Navilink.
Q Versus a walk-in review?

Bonita Connally - Direct by Mr. Sinclair 190

A Yes.
Q Any other types of reviews?
A Not that I can think of.
Q Quote, we did the MDM this week on the following claims and determined that we need additional review from the OSP. End quote. And it lists Betty Bullard there. And you think both you and Brandon miscategorized this?
A I think so, yes.
Q You only did 12 MDMs the entire time you were with UnumProvident, correct?
A That's correct.
Q It doesn't sound like a common enough occurrence so that it would be something you would miscategorize?
A At the time, we were going through changes in our procedures with the nurses also and we had triage and we had previously had MDM. So I do believe that it was a typo.
Q So both you and Brandon made the same typo on the same file?
A I believe so, yes.
Q Okay. And Ms. McMillan responds to you the same day, good service, a few minutes later and says, I'm going to try to do them as walk-ins and

Bonita Connally - Direct by Mr. Sinclair 191

take them to the doc on Monday?
A Yes.
Q That's what she said in response?
A That's what she says.
Q Okay. Let me ask you to look at UAMSSUPP16 and ask you if you can identify this -- I'm sorry, 16 and 15 and ask if you can identify those documents.
A Yes.
Q Okay. Please tell me what those two pages are.
A It is an E-mail with an attachment of an aging MUP list over 45 days sent to -- sent to Brandon Estrada, Roberta Young, Christina Floyd, Susan Neal and Karen Shock. It's the same type of list before. This is dated August 12th. So this is roughly a week prior.
Q Okay. And just like before, there's a spread sheet that's attached to that E-mail and do you see Ms. Bullard's claim listed there?
A Yes, I do.
Q Okay. It indicates that, once again, the DBS is Brandon Estrada, general med unit, status is undecided, policyholder is newly with the Southern Baptist Convention, claimant's name is

Bonita Connally - Direct by Mr. Sinclair 192

Betty W. Bullard, gives her social and states it's been pending for 64 days and under the status indicates meds pending, follow-up for 8/27?
A Yes.
Q It didn't wait until 8/27 though, did it?
A No, it did not.
Q Why not?
A I don't know. I can guess that the meds we had requested came in before 8/27.
Q You send out these lists once a week to your claims handlers, to your DBSs?
A I don't remember how often I did, but at the time probably.
Q Why do you say at the time?
A When I was a consultant in 2004 --
Q Okay.
A -- I believe that's what we were doing.
Q But they didn't actually get files -- I mean, do you remember me asking you earlier today whether or not you knew how many files these people had?
A Right.
Q And you indicated you really didn't know?

Bonita Connally - Direct by Mr. Sinclair 205

BY MR. SINCLAIR:

Q Take a look at what's been marked as UAMSSUPP9 provided to me today.
A Okay.
Q Can you identify that document?
A Yes, I can.
Q Do you remember that document?
A I don't remember.
Q Do you remember there being a problem with the servicing of this large block of business from the Annuity Board?
A I don't remember.
Q Okay. Have you seen that document prior to coming here today since you authored it? Let me be more specific. Have you seen that document at any point in time since July 26th, 2004?
A I don't believe so.
Q Okay. Why do you say you don't believe so?
A I don't remember seeing it.
Q Okay. All right. Let's march through this, if we can. This is from you, authored by you to Mr. Estrada and copying Terry Parker. The subject line is priority activity for the Annuity

Bonita Connally - Direct by Mr. Sinclair 206

Board and it's dated July 26th, 2004, which is about three weeks, maybe four -- well, strike that.
Priority activity for the Annuity Board, quote, good afternoon, on Friday morning, I reviewed the AB. Is that Annuity Board?
A Yes.
Q Claim for Betty Bullard with Pam and Barbara. End quote. Who is Pam and Barbara?
A Pam is Pam McMillan and Barbara is Barbara Berke. She's the vocational specialist that was working with the team at the time.
Q Okay. Where in the file is it reflected that you sat down with a vocational person and a nurse at the same time to review this file?
A I don't know. I'll need to take a look.
Q Sure.
A What is the date of that?
Q Oh, I'm sorry.
A That's okay.
Q July 26th, 2004.
A On document UACL00080, it's a note to file. It says review of claim with Pam, RN, and Barbara, voc.
Q Okay. I do remember this now. This is

Bonita Connally - Direct by Mr. Sinclair 207

the document that reflects that there was the subject line on UACL80 is MDM review?
A Yes.
Q Are there any records reflecting what went on at that meeting, who was present at the meeting?
A Just that documentation.
Q Just this. And this is actually a note to the file created by you as an activity for Brandon Estrada; is that correct?
MR. MORRISSETTE: Object to the form.
A It's a claim documentation to the file.
Q Okay. So it's not an activity?
A Correct. It's not an activity.
Q Okay. All right. Review of claim with Pam, RN, and Barbara, Voc, the only APs, attending physicians?
A Attending physician, yeah, either attending physician or attending physician statements.
Q The only attending physician statements that are providing R&Ls, that is providing R&Ls to her abilities is her primary care physician, PCP?
A Yes.
Q She indicates multiple treating

Bonita Connally - Direct by Mr. Sinclair 208

physicians to include a mental health professional. At this time we need complete medical records from each of the physicians noted on her claim form. After same, consider full file review. Did you get all the medical records from each one of her attending physicians and treating physicians?
MR. MORRISSETTE: On her claim file, object to the form.
A I don't think so.
Q Okay. All right. Thank you.
Back to UAMSSUPP9. Okay. How about I have you read the middle paragraph?
A Okay. The middle paragraph?
Q I'm sorry. The second one.
A Okay. In review of this file, I can tell you now we're going to pay for the errors under the performance agreement. The initial letter was sent in June. There's been no action taken on the file per my review on Friday. We've missed our 30 day compliance letter as the activity was canceled and the 45-day activity for initial liability. Our tolling letter is still pending and past due.
Q Is this bringing back some of what happened with this file for you?
MR. MORRISSETTE: Object to the form.

Bonita Connally - Direct by Mr. Sinclair 209

A Not really.

Q Okay. All right. First off, first word that jumps out at me, performance agreement. What are you referring to?

A The Annuity Board -- I do not remember what the exact agreement was, but they did have a performance agreement in place just indicating we were going to satisfy certain standards. If we didn't, when I say pay, I mean truly financially we would owe them money at the end of the year.

Q Really?

A Yes.

Q You would have to pay them back some of the premium?

A That is correct.

Q What were the performance requirements?

A I don't remember.

Q This is an actual document that you're talking about now, right?

A I think so.

MR. SINCLAIR: Henry, have y'all produced this and I've missed it?

MR. MORRISSETTE: Don't know.

Q Okay. All right. What errors were you referring to?

Bonita Connally - Direct by Mr. Sinclair 210

A That E-mail was referring to missing the compliance dates, missing the follow-up dates that he should have had on the file.

Q Hence your E-mails with his 45-day MUPS that immediately followed this July 26, 2004 E-mail?

A Yes.

Q Okay. Thirty-day compliance letter, what is that?

A That's the letter that we send to the claimant if we haven't been able to make a decision by 30 days just to let them know what we're still needing on the file.

Q He didn't send out the 30-day compliance letter, did he? Wait. Let me ask that question again. I can probably save you some time. He didn't send out the 30-day compliance letter within the 30-day time period he was supposed to send it out, did he?

MR. MORRISSETTE: Object to the form.

A No.

Q And the activity was canceled. What does that mean?

A It means he canceled the activity.

Q He just decided he didn't want to play that game or -- strike that. Forget it.

Bonita Connally - Direct by Mr. Sinclair 211

Okay. The 45-day activity for initial liability or tolling letter is still pending and now past due. That's the MUPS?

A Correct.

Q Okay. This is you talking via E-mail to Brandon Estrada, quote, please ensure that before you leave today, you have requested the medical information from all the providers through medical records. End quote. I would have been a whole lot easier on you today if I had had this. You were telling him right here exactly what you've told me here today?

MR. MORRISSETTE: Object to the form.

Q Did he do what you told him to do here? Did he go out and get all the medical information from all the medical providers through medical records?

A No.

MR. MORRISSETTE: Object to the form.

Q Quote, you should also call Lou at the Annuity Board and let her know you are awaiting additional medical information as this claim is 50 days old and she will be calling you soon, end quote. Who is Lou?

A Lou, I do not remember her last name.

Bonita Connally - Direct by Mr. Sinclair 212

She was the human resource contact at the Annuity Board that we got information from.

Q Okay. Is this refreshing your recollection about this file at all?

A Not really.

Q Okay. Was it a fairly common occurrence for somebody to cancel an activity --

MR. MORRISSETTE: Object to the form.

Q -- like the 45-day period?

A Not -- no.

Q Because that's something they stress in training, right?

A Yes.

Q As a matter of fact, the training manuals, which they haven't produced in this case, stresses a great deal?

MR. MORRISSETTE: Object to the form.

A I don't know about the manuals.

Q I know. Somebody stood over your shoulder and told you about what it said. I know. I got that earlier.

Okay. I have no idea what this report is. Take a look at UAMSSUPP7 and tell me if you can identify that document.

A No. It lists the claims specialist as

# ATTACHMENT

# "B"

ATTACHMENT "B"

**From:** Estrada, Brandon R
**Sent:** Monday, July 26, 2004 3:54 PM
**To:** Connally, Bonita K
**Subject:** RE: Priority activity for the annuity board

I will have it completed by the end of the day.

-----Original Message-----
**From:** Connally, Bonita K
**Sent:** Monday, July 26, 2004 3:53 PM
**To:** Estrada, Brandon R
**Cc:** Parker, Terri L
**Subject:** Priority activity for the annuity board

Good afternoon. On Friday morning, I reviewed the AB claim for Betty Bullard with Pam and Barbara. There is multiple APS forms in the file. However, we do not have sufficient medical documentation to support any type of disability.

In review of this file, I can tell you now that we are going to pay for the errors under the performance agreement. The initial letter was sent in June, but there has been no action taken on the file until my review on Friday. We have missed our 30 day compliance letter as the activity was cancelled and the 45 day activity for IL or tolling letter is still pending and past due.

Please ensure that before you leave today you have requested the medical information from all the providers through medical records. You should also call Lou at the Annuity Board and let her know you are awaiting additional medical information as this claim is 50 days old and she will be calling you soon. It is also imperative that you call and make contact with the cx. The only physician indicating that she is unable to work is her PCP.

Bonita Connally
Disability Benefits Consultant
Chattanooga, TN
Phone: 423-294-2332

UAMSSUPP00009