# ATTACHMENT

## "A"

ATTACHMENT "A"

Bonita Connally - Direct by Mr. Sinclair

1  remember her last name.
2  Q      Sheldon?
3  A      No.  It was for one month.  And then in
4  may Of 2004, I began reporting to Terry Parker and I
5  reported to Terry until September of '04.
6  Q      When you made the move?
7  A      Correct.
8  Q      Okay.  All right.  I know that's a
9  branch off of Dallas and y'all just handle group
10 claims out there?
11 A      In the UnumProvident office?
12 Q      Yes.
13 A      They don't handle claims there.
14 Q      They don't handle claims there?
15 A      No, sir.
16 Q      What do they do there?
17 A      It's a Dallas field office.  It's a
18 sales and service support office.
19 Q      Okay.  Okay.  Are you telling me you've
20 moved into sales and service out in Dallas?
21 A      No, sir.
22 Q      Okay.  Let's back up.  Who do you
23 report to now from September of '04 to present?
24 A      From September of '04 when I left with
25 Terry Parker, in October of '04, I reported to Dan

Bonita Connally - Direct by Mr. Sinclair

1  Vatt.  In 2005 I reported to Brian Porter and right
2  now I am drawing a complete blank.  Give me just a
3  second.
4  Q      Okay.
5  A      Meg Murray Nutz.
6  Q      Do you need that spelled?  Meg Murray
7  Nutz?
8  A      Meg Murray Nutz.
9  MR. MORRISSETTE:  Is that M-E-T-S.
10 A      N-U-T-Z, I think.
11 Q      Okay.  Where is Ms. Nutz?
12 A      She's in the Chattanooga -- she's in
13 the Chattanooga office.
14 Q      Okay.  And what is her job title?
15 A      She is a director.
16 Q      Okay.  What -- please tell me they
17 still call them impairment units.
18 A      No, sir.
19 Q      Okay.  What do they call it now?
20 A      We're aligned by the sales office
21 regions now, so it's different regions.
22 Q      They went back to regions?
23 A      Yes.
24 Q      It took them 15 years to get away from
25 it.  Now they've gone back to regions.  Okay.  Tell

Bonita Connally - Direct by Mr. Sinclair

1  me what region are you in?
2  A      I believe it is southeast.
3  MR. MORRISSETTE:  You're referring to
4  currently?
5  Q      What region are you currently in?
6  A      Southeast.
7  Q      I don't mean like physically today.  I
8  mean like your director is director of the southeast
9  region; is that right?
10 A      We handle claims out of the Atlanta
11 sales office, so southeast sales region.
12 Q      Okay.  What office do you go to on a
13 regular basis?
14 A      The Chattanooga office.
15 Q      Okay.  You went back to Dallas and then
16 came back to Chattanooga?
17 A      That's correct.
18 Q      Okay.  All right.  When did that
19 happen?
20 A      When did --
21 Q      You came back here?
22 A      -- I come back to Chattanooga?  Last
23 week.
24 Q      Last week permanently?
25 A      Yes.

Bonita Connally - Direct by Mr. Sinclair

1  Q      Well, welcome home.  No wonder Henry
2  was so agreeable to having your deposition taken
3  here.  I thought he was just being a nice guy.
4  MR. MORRISSETTE:  I told you if you
5  waited two weeks, we'd move it.
6  Q      Okay.  All right.  So you're back here
7  now and you are still lead DBS?
8  A      Yes.
9  Q      What were you doing out in the sales
10 and service office in Dallas?
11 A      I was still a lead disability
12 specialist.  I was still handling claims and I was a
13 technical resource for them.  I had a special
14 arrangement --
15 Q      Okay.
16 A      -- working remote.
17 Q      Okay.  I'm just going to let it go.  At
18 this point, I can't -- did you work remotely on this
19 claim?
20 A      No, sir.
21 Q      Okay.  All right.  They've now redone
22 the impairment units and taken it down into regions.
23 How many regions are there?
24 A      I don't know.
25 Q      Okay.  You're definitely in the

65

1    A        Correct.
2    Q        Okay. Is he still with the company?
3    A        I don't believe so.
4    Q        Do you know where he went?
5    A        I don't know.
6    Q        Okay. Do you recall who the RN was
7    that reviewed this file?
8    A        It was Pam McMillan.
9    Q        Is she still with the company?
10   A        Yes, she is.
11   Q        Okay. Okay. See, the reason I asked
12   about reviewing all of the medical records is
13   because the language caught me and I thought, okay,
14   maybe she's -- in this note here at 177, maybe you
15   were saying you reviewed the RN and OSP review, but
16   what you're telling me, I guess, is that you
17   actually reviewed all the medical records
18   themselves?
19   A        It's very likely I looked at all the
20   medical records, but my determination was based on
21   the medical professionals' conclusion. So I looked
22   at the records. Pam McMillan looked at the records,
23   who was the nurse, and commented and then Dr. Vatt,
24   who was the professional, the medical professional
25   looked at the records and commented. And because

66

1    I'm not a medical professional, I have to defer to
2    their expertise.
3    Q        Okay. Okay. Well, let me ask you, the
4    way this is stacked, can you tell which
5    records you actually looked at?
6    A        It should have been the medical
7    information received in the file before
8    August 18th of 2004.
9    Q        And if I'm looking at this the right
10   way and they were in reverse Bates numbering, that's
11   everything from UACL1 back to UACL170?
12   A        Yes, sir.
13   Q        Okay. So that was essentially -- let
14   me -- he'll object to this if I don't stop and say
15   okay. The documents that are Bates numbered UACL1
16   through 170, those documents are the claim file that
17   you're referring to when you say you reviewed the
18   file prior to making this decision on August 18th,
19   2004?
20            MR. MORRISSETTE: Object to the form.
21   A        That's correct.
22   Q        Okay. All right. All right. So let
23   me ask you to tell me do you think first off that
24   the company did a good job up to August 18th,
25   2004, the company, UnumProvident had done a good job

67

1    in investigating this claim?
2    A        I believe so.
3    Q        If you believe they hadn't --
4    A        Then yes, I think we had done a good
5    job of investigating the claim.
6    Q        Okay. As you looked back on it in your
7    review yesterday or did before and sitting here
8    today, do you wish you had maybe investigated it a
9    little bit more?
10   A        Yes.
11   Q        Tell me what you would have gotten.
12   A        Additional records from, I believe,
13   it's Dr. Paul, the rheumatologist. Those did not
14   appear to be in the file, after the telephone
15   conversation referenced UACL00145.
16   Q        And this was a physician to a
17   physician? You're talking about -- I'm sorry. Say
18   that number again.
19   A        It's UACL00145. It's a phone call
20   documentation between Mr. Estrada and Ms. Bullard.
21   Q        I'm sorry. I thought you were
22   referring to another phone call.
23            All right. So you feel like looking
24   back on it, obviously you felt like on
25   August 18th, 2004, you felt like that was the

68

1    right decision to make to deny the claim?
2    A        Yes, sir.
3    Q        Okay. But looking back on it today, do
4    you think maybe you should have gotten some more
5    records because of some of the things that
6    Ms. Bullard conveyed to Mr. Estrada as reflected in
7    the memorandum here?
8    A        Yes.
9            MR. MORRISSETTE: Object to the form.
10   Q        At UACL145 to 148?
11   A        Yes.
12   Q        Okay. All right. You think maybe
13   additional records from Dr. Paul. Anything else
14   that you think maybe you would have wanted in
15   addition to what you had?
16   A        Not that I can see looking at it right
17   now.
18   Q        Okay. How long did you spend looking
19   at this claim file yesterday? Was it yesterday or
20   the day before?
21   A        Yesterday and the day before.
22            MR. MORRISSETTE: Objection. Asked and
23   answered.
24   A        Day two.
25   Q        Okay. The past couple of days you've

81

Bonita Connally - Direct by Mr. Sinclair

1  A        Yes.
2  Q        Okay.
3  A        We do have one additional attending
4  physician statement. It's page UACL00038.
5  Q        Okay. Were there medical records
6  attached to this claim?
7  A        Yes.
8  Q        Okay. All right. I'll tell you what's
9  let's do so I can keep track. Go ahead. What
10 number were you referring to?
11 A        UACL00038.
12 Q        Three eight. Okay.
13 A        This is still identifying the
14 diagnoses.
15 Q        Got you. Nothing but numbers.
16 A        Right. He provides quite a few
17 diagnosis codes, which I would have to take a look
18 at the ICD9 book right now to see or Pam's review,
19 Ms. McMillan.
20 Q        The problem is she doesn't actually
21 give ICD9 codes in her review.
22 A        Right. She doesn't give the codes in
23 the review. He does say in this -- or she does say,
24 Rachel McKinney does say she's got the extreme
25 fatigue, which we've referenced already, ulcerative

82

Bonita Connally - Direct by Mr. Sinclair

1  colitis, anxiety with panic attacks.
2  Q        There's one, two, three, four, five,
3  six ICD9 codes in there?
4  A        Correct.
5  Q        Okay. When you were doing your review
6  prior to your decision in August of 2004, you
7  indicated you reviewed everything in the claim file
8  up to that date; is that correct?
9  A        Yes.
10 Q        Would you have pulled out the ICD9 book
11 and looked up these ICD codes?
12 A        Probably not.
13 Q        Would you have done anything to make
14 sure that each one of these codes had been
15 identified in the claim file?
16 A        I don't remember that I would. I would
17 have looked at -- underneath that, he says see
18 attached, Dr. McKinney she says and includes her
19 records. So I would have reviewed her office notes.
20 Q        Okay. But as far as particular codes
21 written out here on UACL38, you wouldn't have made
22 sure that somebody had looked up each one of those
23 and investigated each one of these conditions?
24 A        Yeah. I don't know. I don't see in
25 the file that that was done.

83

Bonita Connally - Direct by Mr. Sinclair

1  Q        Would that have been part of your
2  responsibilities?
3           MR. MORRISSETTE: Object to the form.
4  A        I don't know necessarily that looking
5  up the specific codes would be.
6  Q        Okay.
7  A        But normally it was something that I
8  did. I can't say for sure that I did it in this
9  case.
10 Q        Okay. Do you have a lot of people who
11 list out just number ICD9 codes under the diagnosis?
12 Does that happen a lot in group files?
13          MR. MORRISSETTE: Object to the form.
14 A        It happens sometimes. The form
15 actually asks that they include the ICD9 numbers.
16 Normally when they put it, they'll put the diagnosis
17 and the number.
18 Q        The company actually likes to have an
19 ICD9 versus this person's stomach hurts. You
20 actually want to have a particular diagnosis given
21 for a condition, right?
22 A        Yeah.
23 Q        Okay. Would it be -- would it be the
24 company's responsibility to make sure that every
25 condition listed by the attending physicians is

84

Bonita Connally - Direct by Mr. Sinclair

1  investigated --
2           MR. MORRISSETTE: Object to the form.
3  Q        -- prior to making a decision on the
4  claim?
5           MR. MORRISSETTE: Object to the form.
6  A        Yes.
7  Q        Okay. Any more attending physician
8  forms that you see in this initial -- in this
9  initial claim submission? I think you've got them
10 all, but --
11 A        I don't think so.
12 Q        Okay. Here we go. Here is a way, I
13 think, to do it. We've been looking at the initial
14 claim packet. Is that a way to put it?
15 A        That would be fine.
16 Q        Okay. What would you refer to it as?
17 A        Just the initial claim forms.
18 Q        Okay. And it includes the attending
19 physician statement, employer's statement,
20 claimant's statement and any additional attachments
21 included with those forms?
22 A        Yes.
23 Q        Okay. You were -- we started out, I
24 think. around UACL22 and we went all the way back to
25 UACL58. Now, you tell me if I've got that right

93

Bonita Connally - Direct by Mr. Sinclair

1  had to come to you with their recommendations?
2  A  No.
3  Q  You wouldn't have known how many
4  files -- I mean, how many benefit specialists, how
5  many people did you have who came to you for review
6  of their recommendations on claims?
7  A  I don't remember, but I can look.
8  Q  Okay. That's what this is all about
9  here. As a matter of fact, let's talk about
10  specifically. I'm going to hand you the documents
11  that they have produced to me this morning. Tell me
12  which one of the Bates numbers you're looking at.
13  A  Okay. This is UAMSSUPP00162. It's
14  from May of 2004 and there are four disability
15  benefit specialists --
16  Q  Okay.
17  A  -- that would have been working with
18  me.
19  MR. MORRISSETTE: I want to also say on
20  those flow charts, we're going to mark those
21  confidential in the confidentiality agreement. I
22  did not get a chance to stamp them.
23  MR. SINCLAIR: Why don't you go ahead
24  and take a look -- yeah, here take a look. Give me
25  the Bates numbers.

94

Bonita Connally - Direct by Mr. Sinclair

1  MR. MORRISSETTE: 163 through 142.
2  MR. SINCLAIR: Okay. We provide notice
3  under the terms of the agreement. We challenge the
4  designation.
5  MR. MORRISSETTE: I would appreciate it
6  if you would send me that in writing please. I'll
7  be glad to send you the designating --
8  MR. SINCLAIR: Same, same.
9  BY MR. SINCLAIR:
10  Q  All right. So you had three -- no,
11  four DBSs who reported to you in May of 2005.
12  Strike that. I said it the wrong way, didn't I? I
13  got into that report thing that you guys up there at
14  UnumProvident do.
15  All right. You had four DBSs who had
16  to come to you for review of their recommendations?
17  A  Correct.
18  Q  Okay. How many claims on average in
19  May of 2005 did those DBSs carry?
20  A  I don't remember.
21  Q  Okay. Would you have been -- would you
22  have been one of the personnel responsible for
23  overseeing their work on a daily basis or just when
24  they came to interact with you --
25  MR. MORRISSETTE: Object to the form.

95

Bonita Connally - Direct by Mr. Sinclair

1  Q  -- in May of 2004?
2  A  I would be available when they came
3  with questions when they had recommendations on a
4  file and then also I would be able to pull a listing
5  of the claims that they currently had.
6  Q  Got you. Managerial reports.
7  Mr. Smith went over that with me. I do remember
8  that.
9  MR. MORRISSETTE: Object to the form.
10  Q  Okay. All right. So this thing gets
11  assigned to Brandon Estrada and he's in charge of
12  investigating the claim --
13  A  Yes.
14  Q  -- is that right? Okay. Do you think
15  he did a thorough job of investigating this claim?
16  MR. MORRISSETTE: Object to the form.
17  A  I don't know. I think he could have
18  obtained Dr. Paul's records.
19  Q  You're right. It's a little broad,
20  isn't it? I need to ask it a little bit
21  differently.
22  Do you think he gathered all available
23  information on every condition this young lady had?
24  MR. MORRISSETTE: Object to the form.
25  A  No.

96

Bonita Connally - Direct by Mr. Sinclair

1  Q  Okay. I think we've narrowed down the
2  conditions. You tell me if I miss any. Strike
3  that. You tell me if I fail to list one that you're
4  aware of after reviewing this file. Okay?
5  A  Okay.
6  Q  We have pain in the ankles, colitis,
7  depression, sleep apnea, unspecified rash, TMJ,
8  fatigue, anxiety, fibromyalgia, catalepsy,
9  narcolepsy, hypersomnia with sleep apnea, something
10  called MPOS and there was one physician who did
11  nothing but list ICD9 codes. Do you want me to
12  read through those ICD9 -- you wouldn't be able to
13  identify them either.
14  A  No.
15  Q  Have I listed all the conditions that
16  you were aware of at the time you made your decision
17  in August of 2004?
18  A  Did you include ulcerative colitis.
19  Q  I believe I did. Any others?
20  A  I would have seen everything that was
21  in the file at the time and based on looking at it
22  right now, I don't see any others.
23  Q  Okay. Let's turn back to UACL145, if
24  we can. You actually pointed this document out
25  earlier. It's the phone memo. It's the -- I think

1  Dr. Vatt. The reason this came up was because you
2  indicated to me that you didn't just review
3  Dr. Vatt's review or the RN review. You reviewed
4  the entire file before you made this decision?
5  A    That's correct.
6  Q    Okay. So do you feel like you had
7  enough information in this file when you reviewed
8  all of these conditions to assess whether or not
9  this lady was disabled under the policy?
10  A    Yes, deferring to the physicians'
11  expertise.
12  Q    Okay. Do you feel like -- earlier you
13  indicated to me that there was one particular doctor
14  that you feel like at this point maybe you should
15  have gotten in contact with and investigated
16  further.
17          MR. MORRISSETTE:   Object to the form.
18  A    Yes.
19  Q    Do you recall that?
20  A    I do.
21  Q    And that was, I think, in connection --
22  well, do you recall what he did?
23  A    He was a rheumatologist.
24  Q    Rheumatologist. Okay. So except for
25  those -- well, let's flip to his because that was

1  one of the attending physician statements, correct?
2  A    No.
3  Q    Oh, that was the phone call?
4  A    Correct.
5  Q    Okay. All right. What in this phone
6  call memorandum made you think that you should be --
7  at this point, you should have maybe followed up
8  with this particular attending physician? If you
9  would, identify what it is in here that made you
10  make that statement.
11  A    Can you give me the page of the file
12  documentation?
13  Q    I'm sorry. It's page 145.
14  A    Okay. With her indicating she had her
15  rheumatologist, she was seeing a rheumatologist in
16  this review and that she had arthritis indicated,
17  that was -- that was the reason that I think maybe
18  we should have also requested records from Dr. Paul.
19  Q    Okay. So Dr. Paul -- where are you
20  seeing that?
21  A    It's at the very bottom after
22  Dr. Rachel McKinney, general practitioner, it says
23  Dr. Donna Paul, rheumatologist.
24  Q    Okay. I see what you're talking about.
25  A    But also when she had the attending

1  physician's statements completed, she didn't provide
2  one to Dr. Paul. So I don't know if that was
3  because she doesn't feel she had a rheumatological
4  disabling condition or Dr. Paul came on after she
5  initially filed her claim.
6  Q    And you didn't know the answer to those
7  when you made the decision in August of 2004, right?
8  A    Correct.
9  Q    Okay. Let me ask you, does -- do you
10  feel like in your role, you had the duty to
11  investigate the claim?
12          MR. MORRISSETTE:   Object to the form.
13  A    I don't know that it was an
14  investigative duty because normally that was handled
15  by the disability benefit specialist and because the
16  physician didn't indicate additional records were
17  needed.
18  Q    Okay. So I think --
19  A    That's probably why we didn't go after
20  anything additional.
21  Q    I can tell why you furrowed your brow
22  then because I asked it the wrong way. You as the
23  consultant weren't responsible for investigating a
24  claim; is that right?
25  A    That's correct.

1  Q    Okay. The disability benefit
2  specialist, in this case, Mr. Estrada would have had
3  that duty to investigate the claim?
4  A    That's correct.
5  Q    Then he -- once he had gathered the
6  documents and materials would send that for an RN
7  review and, if necessary, an OSP review, correct?
8  A    Yes.
9  Q    Okay. And then after the claim had
10  been investigated by Mr. Estrada, the nurse had
11  summarized the medical records and the on-site
12  physician had provided his view of the claimed
13  medical conditions, it would then come to you for
14  your determination?
15  A    That's correct.
16  Q    Okay. Would you in the course of your
17  duties as a consultant at this point in this claim
18  in August of 2004, would you be responsible for
19  telling a disability benefit specialist that he had
20  to go and investigate further?
21  A    Yes.
22  Q    Okay. Did you feel like or did you
23  tell that to Mr. Estrada in August of 2004?
24  A    I don't see in the file where I did.
25  Q    So you felt like the company had a

109

Bonita Connally - Direct by Mr. Sinclair

1   sufficient amount of information to make the
2   determination without any further investigation?
3   A       Yes.
4   Q       But looking back on it, you would like
5   to have additional information from Dr. Paul, the
6   rheumatologist?
7   A       That's correct.
8   Q       Okay.  Well, do you feel like you had
9   sufficient information to assess the effects of her
10  colitis?
11  A       I don't know.  Let me take a look at
12  what the physician said.
13  Q       Okay.  I see what you're saying.  You
14  relied upon Dr. Vatt?
15  A       That's correct.
16  Q       Okay.
17  A       Because I'm not a medical professional.
18  Q       Okay.
19  A       Any type of medical conclusion would
20  come from either the nurse or the on-site physician.
21  Q       Medical conclusion -- I'm sorry.
22  A       No.  That's okay.
23  Q       Okay.  Medical conclusion based upon
24  the materials in the file?
25  A       Yes.

110

Bonita Connally - Direct by Mr. Sinclair

1   Q       But the on-site physicians don't have
2   the authority to go direct the DBS to gather
3   additional records.  They can recommend it, but they
4   can't actually tell them to go do that, correct?
5   A       That's correct.
6   Q       Okay.  Because of the claim structure
7   of the department -- well, strike that.
8           As the structure of the Chattanooga
9   large case team was set up, there were people who
10  interacted with one another, for example, you and
11  Mr. Estrada and your role was superior to his
12  insofar as you had the authority to make the
13  determination, he did not, but he didn't directly
14  report to you in a managerial capacity, correct?
15  A       That's correct.
16  Q       And the same would hold true for the
17  physicians at this point in time in August of 2004.
18  The physicians didn't report to you, correct?
19  A       That's correct.
20  Q       And the RNs didn't report to you?
21  A       That's correct.
22  Q       Their reporting structure was different
23  from Mr. Estrada's?
24  A       Yes.
25  Q       All right.  So it was Mr. Estrada's

111

Bonita Connally - Direct by Mr. Sinclair

1   responsibility to make sure that there was
2   sufficient information in the file for the RN and
3   OSP to assess each one of those conditions that
4   we've discussed about Ms. Bullard?
5   A       Yes.
6   Q       Okay.  All right.  Let's flip -- let's
7   flip to that physician review you were talking
8   about, 166.
9   A       Okay.
10  Q       Okay.  Now, let's talk about, if we
11  can, the way that these OSPs were conducted at this
12  time.
13  A       Okay.
14  Q       It is true, is it not, that the entire
15  claim file was not marched down to the OSP for
16  review?
17          MR. MORRISSETTE:  Object to the form.
18  A       They had access to the entire file on
19  Navilink.
20  Q       On Navilink?
21  A       Correct.
22  Q       When this particular review was
23  completed, was the Navilink change-over completed?
24  A       I don't understand the question.
25  Q       There was actually a transition period

112

Bonita Connally - Direct by Mr. Sinclair

1   to Navilink, correct?
2   A       That's correct.
3   Q       Okay.  And I thought that that had not
4   been completed up until the middle of last year.
5   Was it completed in August of 2004?
6           MR. MORRISSETTE:  Object to the form.
7   A       I don't know when it was completed.
8   For this claim, based on its received date, it was
9   always on Navilink.  So there was not a paper
10  component to this file.
11  Q       So everything in this file was
12  maintained in an electronic form.  Let me ask you,
13  how do you trigger an OSP review?  Does it only
14  follow an RN review?
15  A       Yes, it does.
16  Q       Okay.  So there is a structure that's
17  set out how you're supposed to take the claim first
18  and either do a walk-in or ask for a formal review
19  with the RN, correct?
20  A       That's correct.
21  Q       Okay.  So I guess we were going to the
22  OSP review in order to discuss your basis for the
23  decision and you indicated -- and it appears that
24  we've got to start at the RN review, right?
25  A       That's correct.

133

Bonita Connally - Direct by Mr. Sinclair

1  just her or Dr. McKinney?  Object to the form.
2  Q        Do you understand the question as I
3  posed it?
4  A        No.
5  Q        Okay.  You told me that at the 164 when
6  you stated, quote, recommend confer with OSP for
7  further clarification, end quote, that the reason
8  for your request for the OSP clarification was that
9  you wanted an on-site physician to assess the
10  restrictions and limitations that were assigned to
11  Ms. Bullard.  Do you remember giving me that
12  statement?
13  A        Yes.
14  Q        What restrictions and limitations was
15  the OSP going to assess if there were none assigned
16  by the attending physicians?
17  A        I don't know.
18  Q        What restrictions and limitations did
19  Mr. Estrada --
20           MR. MORRISSETTE:  Object to the form.
21  Where are you saying there were no restrictions and
22  limitations?
23           MR. SINCLAIR:  She's got it so far.
24  She understands.
25           MR. MORRISSETTE:  Object to the form.

134

Bonita Connally - Direct by Mr. Sinclair

1  I think you're misstating what the file says.
2  BY MR. SINCLAIR:
3  Q        Let me ask you this way.  As you sit
4  here today, do you think somebody should have made
5  an additional effort to find out what restrictions
6  and limitations these physicians were assigning?
7           MR. MORRISSETTE:  Object to the form.
8  A        Yes.
9  Q        Okay.  Let's go on to 166, which I
10  think -- oh, you know what.  Wait a minute.  You
11  tried to straighten me out on this a minute ago.
12  The RN review starts at about 165 and she indicates
13  activity, updated medical records received.  I think
14  she's summarizing medical records there.  Is that
15  what that indicates to you?
16  A        It just says we received additional
17  records since she looked at the file last, previous
18  reviews were dated 7/30 and 8/12.
19  Q        Okay.  So do you want to go back and
20  look at the 7/30 review and 8/12 review and we'll
21  see if we can't --
22           MR. MORRISSETTE:  Where were you
23  looking?
24  A        For the 7/30 review.  Page UACL00129.
25  Q        Okay.  Okay.  This is going to be the

135

Bonita Connally - Direct by Mr. Sinclair

1  initial assessment by the RN, right?  Okay.  Let me
2  ask that a different way.  The claims manual talks
3  about how you're to seek guidance as DBS from the
4  on-site medical personnel RN through a walk-in if
5  you need additional guidance on how to proceed with
6  a claim.  Do you remember seeing that in the claims
7  manual?
8  A        Yes.
9  Q        Okay.  This is what he's doing here,
10  correct?  This is where Mr. Estrada is going in to
11  see Nurse McMillan and essentially just providing
12  her with the initial claim, 50 pages of claim form,
13  right?  At this point, he hasn't made any medical
14  records requests.  He's written her a couple of
15  letters to indicate that they are assessing it.  You
16  know what they did, they made a medical records
17  request.  I see that.  Let me restate that question
18  because that's not a fair assessment.
19           This is the first review she's talking
20  about that she did on the file.  It said the 7/30
21  review.  It says here that she reviewed certain
22  medical records.  Can you tell exactly what medical
23  records she reviewed?
24  A        It says medical records from
25  Dr. Richardson, sleep disorders medicine, 1998 to

136

Bonita Connally - Direct by Mr. Sinclair

1  2004.
2  Q        Okay.  I'm sorry.  That's UACL129.  It
3  says down there, 5/17/04, repeat colonoscopy,
4  reported to indicate colitis worse.  Do you see
5  where she says that in her review?
6  A        Yes.
7  Q        Okay.  Do you know what doctor was
8  treating her for colitis?
9  A        I don't know.
10  Q        Okay.  Look down at the bottom of that
11  sentence.  This is why I wanted us to flip back
12  here.  You see that last sentence down there?
13  A        Yes.
14  Q        It actually agrees with what I think
15  you've told me.  It says, quote, need updated
16  treatment notes, diagnostic test results and
17  specific restrictions and limitations from all
18  treating physicians.  Now, that didn't happen, did
19  it?
20           MR. MORRISSETTE:  Object to the form.
21  A        I don't see where everything was
22  received.
23  Q        Do you see where the requests were
24  made?
25  A        I don't see any requests made between

157

1  A        Not based on this statement.
2  Q        Does the statement provide any
3  assessment of restrictions and limitations assigned
4  by attending physicians with ulcerative colitis as
5  the basis for those restrictions and limitations?
6  A        No.
7  Q        Okay. Next sentence, there's mention
8  of having surgery on her feet with placement of
9  screws. Related records have not been provided.
10 Arthritis work-up was reported to be negative.
11 Okay. Let's take that statement. Do you think that
12 from that statement Dr. Vatt was indicating that
13 somebody should go get some medical records on that
14 particular medical condition?
15         MR. MORRISSETTE:  Object to the form.
16 A        No.
17 Q        As you look back on it today, do you
18 think maybe getting additional medical records on
19 the potential for additional surgery on her feet was
20 something that should have been done?
21         MR. MORRISSETTE:  Object to the form.
22 A        With the arthritis that would have
23 been Dr. Paul.
24 Q        Okay. In that statement from Dr. Vatt,
25 is there any indication of his assessment of the

158

1  restrictions and limitations assigned by the
2  attending physicians on account of the foot and
3  ankle pains that she was suffering?
4  A        I don't see any.
5  Q        Okay. Next sentence, claimant is on a
6  number of medications. This raises the question of
7  polypharmacy and drug interaction contributing to
8  reported symptoms. Does that indicate to you maybe
9  somebody is going to have to do another review of
10 the file with a different specialty maybe to
11 consider the effect of all these medications on her
12 cognitive abilities?
13         MR. MORRISSETTE:  Object to the form.
14 A        I don't know. I don't think I
15 considered that at the time.
16 Q        Okay. You initially sent this for an
17 OSP review for clarification on the restrictions and
18 limitations assigned by the attending physicians.
19 And I think we've found that when you look now at
20 Dr. Vatt's clarification, does he actually clarify
21 restrictions and limitations for specific conditions
22 at any point in his statements found at 169 and 170?
23 A        No.
24 Q        All right. And 171 is your decision
25 and I think we -- you know, we got through the first

159

1  sentence. It only took us about three hours. I'll
2  see if I can't speed this up.
3          Medical information confirms -- medical
4  information provided confirms that claimant has
5  multiple conditions. We've gone through all those
6  conditions that you're aware of, correct?
7  A        Yes.
8  Q        Okay. However, the only physician
9  indicating she is unable to work is treating her for
10 sleep apnea. Records -- okay. We've already
11 covered that. We couldn't find restrictions. We
12 already covered the restrictions and limitations
13 question. So I'll just leave off with that. Next
14 sentence, records do not document a change in her
15 condition. Okay. Is there anything in the policy
16 that requires her condition to change?
17 A        No.
18 Q        Treatment for sufficient R&Ls which
19 would preclude her from working in on occupation.
20 That's what OO means, right?
21 A        That's correct.
22 Q        I do know that the policy
23 requires treatment, right?
24 A        It does require them to be under
25 appropriate care.

160

1  Q        Right. Is the burden on the claimant
2  to document the restrictions and limitations?
3          MR. MORRISSETTE:  Object to the form.
4  A        I would have to take a look at the
5  policy for this particular one. I do think it's the
6  responsibility of, in this case, Unum Life Insurance
7  Company of America to request the information and go
8  after the information that's out there.
9  Q        Okay.
10 A        We ask that the claimants assist us,
11 but I wouldn't say that it's their responsibility.
12 Q        Let me ask you, we talked about ERISA
13 earlier. Now, I know in the claims manual they give
14 you training on bad faith and requirements of
15 different states. Have you had any training of any
16 sort, whether OJT, informal training or formal
17 training through manuals, regarding the duty of an
18 insurance company to investigate claims?
19         MR. MORRISSETTE:  Object to the form.
20 A        I'm not sure.
21 Q        Okay. Are you familiar with ERISA and
22 the requirements under ERISA?
23 A        With some of them.
24 Q        Okay. Under ERISA, is a person
25 responsible for providing the documents to

189

Bonita Connally - Direct by Mr. Sinclair

1  A       Okay.
2  Q       Do you recognize that document?
3  A       Yes, I do.
4  Q       All right. Remember how we were
5  talking earlier about the little note that I
6  couldn't figure out about the multidisciplinary
7  something in the file --
8  A       Yes.
9  Q       -- that's the successor to the round
10 table forums. Looking at UAMSSUPP17, does that
11 refresh your recollection about whether or not a
12 multidisciplinary review was performed on this file?
13 A       It does. And again, I think it was
14 just misspoke. I think it was a typo because I
15 don't recall a multidisciplinary being done on this
16 particular claim.
17 Q       This is from you to the nurse, Pam
18 McMillan. She's seeing Brandon Estrada, on August
19 13th, 2004, it states, quote, please let me know if
20 you need a referral for full clinical review. End
21 quote. Let me ask you what that means?
22 A       If she needed a referral for a full
23 clinical review, a different type of activity sent
24 to her in Navilink.
25 Q       Versus a walk-in review?

190

Bonita Connally - Direct by Mr. Sinclair

1  A       Yes.
2  Q       Any other types of reviews?
3  A       Not that I can think of.
4  Q       Quote, we did the MDM this week on the
5  following claims and determined that we need
6  additional review from the OSP. End quote. And it
7  lists Betty Bullard there. And you think both you
8  and Brandon miscategorized this?
9  A       I think so, yes.
10 Q       You only did 12 MDMs the entire time
11 you were with UnumProvident, correct?
12 A       That's correct.
13 Q       It doesn't sound like a common enough
14 occurrence so that it would be something you would
15 miscategorize?
16 A       At the time, we were going through
17 changes in our procedures with the nurses also and
18 we had triage and we had previously had MDM. So I
19 do believe that it was a typo.
20 Q       So both you and Brandon made the same
21 typo on the same file?
22 A       I believe so, yes.
23 Q       Okay. And Ms. McMillan responds to you
24 the same day, good service, a few minutes later and
25 says, I'm going to try to do them as walk-ins and

191

Bonita Connally - Direct by Mr. Sinclair

1  take them to the doc on Monday?
2  A       Yes.
3  Q       That's what she said in response?
4  A       That's what she says.
5  Q       Okay. Let me ask you to look at
6  UAMSSUPP16 and ask you if you can identify this --
7  I'm sorry, 16 and 15 and ask if you can identify
8  those documents.
9  A       Yes.
10 Q       Okay. Please tell me what those two
11 pages are.
12 A       It is an E-mail with an attachment of
13 an aging MUP list over 45 days sent to -- sent to
14 Brandon Estrada, Roberta Young, Christina Floyd,
15 Susan Neal and Karen Shock. It's the same type of
16 list before. This is dated August 12th. So this
17 is roughly a week prior.
18 Q       Okay. And just like before, there's a
19 spread sheet that's attached to that E-mail and do
20 you see Ms. Bullard's claim listed there?
21 A       Yes, I do.
22 Q       Okay. It indicates that, once again,
23 the DBS is Brandon Estrada, general med unit, status
24 is undecided, policyholder is newly with the
25 Southern Baptist Convention, claimant's name is

192

Bonita Connally - Direct by Mr. Sinclair

1  Betty W. Bullard, gives her social and states it's
2  been pending for 64 days and under the status
3  indicates meds pending, follow-up for 8/27?
4  A       Yes.
5  Q       It didn't wait until 8/27 though, did
6  it?
7  A       No, it did not.
8  Q       Why not?
9  A       I don't know. I can guess that the
10 meds we had requested came in before 8/27.
11 Q       You send out these lists once a week to
12 your claims handlers, to your DBSs?
13 A       I don't remember how often I did, but
14 at the time probably.
15 Q       Why do you say at the time?
16 A       When I was a consultant in 2004 --
17 Q       Okay.
18 A       -- I believe that's what we were doing.
19 Q       But they didn't actually get files -- I
20 mean, do you remember me asking you earlier today
21 whether or not you knew how many files these people
22 had?
23 A       Right.
24 Q       And you indicated you really didn't
25 know?

205

Bonita Connally - Direct by Mr. Sinclair

BY MR. SINCLAIR:

1  BY MR. SINCLAIR:
2  Q       Take a look at what's been marked as
3  UAMSSUPP9 provided to me today.
4  A       Okay.
5  Q       Can you identify that document?
6  A       Yes, I can.
7  Q       Do you remember that document?
8  A       I don't remember.
9  Q       Do you remember there being a problem
10 with the servicing of this large block of business
11 from the Annuity Board?
12 A       I don't remember.
13 Q       Okay. Have you seen that document
14 prior to coming here today since you authored it?
15 Let me be more specific. Have you seen that
16 document at any point in time since July 26th,
17 2004?
18 A       I don't believe so.
19 Q       Okay. Why do you say you don't believe
20 so?
21 A       I don't remember seeing it.
22 Q       All right. Let's march through
23 this, if we can. This is from you, authored by you
24 to Mr. Estrada and copying Terry Parker. The
25 subject line is priority activity for the Annuity

206

Bonita Connally - Direct by Mr. Sinclair

1  Board and it's dated July 26th, 2004, which is
2  about three weeks, maybe four -- well, strike that.
3         Priority activity for the Annuity
4  Board, quote, good afternoon, on Friday morning, I
5  reviewed the AB. Is that Annuity Board?
6  A       Yes.
7  Q       Claim for Betty Bullard with Pam and
8  Barbara. End quote. Who is Pam and Barbara?
9  A       Pam is Pam McMillan and Barbara is
10 Barbara Berke. She's the vocational specialist that
11 was working with the team at the time.
12 Q       Okay. Where in the file is it
13 reflected that you sat down with a vocational person
14 and a nurse at the same time to review this file?
15 A       I don't know. I'll need to take a
16 look.
17 Q       Sure.
18 A       What is the date of that?
19 Q       Oh, I'm sorry.
20 A       That's okay.
21 Q       July 26th, 2004.
22 A       On document UACL00080, it's a note to
23 file. It says review of claim with Pam, RN, and
24 Barbara, voc.
25 Q       Okay. I do remember this now. This is

207

Bonita Connally - Direct by Mr. Sinclair

1  the document that reflects that there was the
2  subject line on UACL80 is MDM review?
3  A       Yes.
4  Q       Are there any records reflecting what
5  went on at that meeting, who was present at the
6  meeting?
7  A       Just that documentation.
8  Q       Just this. And this is actually a note
9  to the file created by you as an activity for
10 Brandon Estrada; is that correct?
11        MR. MORRISSETTE: Object to the form.
12 A       It's a claim documentation to the file.
13 Q       Okay. So it's not an activity?
14 A       Correct. It's not an activity.
15 Q       Okay. All right. Review of claim with
16 Pam, RN, and Barbara, Voc, the only APs, attending
17 physicians?
18 A       Attending physician, yeah, either
19 attending physician or attending physician
20 statements.
21 Q       The only attending physician statements
22 that are providing R&Ls, that is providing R&Ls to
23 her abilities is her primary care physician, PCP?
24 A       Yes.
25 Q       She indicates multiple treating

208

Bonita Connally - Direct by Mr. Sinclair

1  physicians to include a mental health professional.
2  At this time we need complete medical records from
3  each of the physicians noted on her claim form.
4  After same, consider full file review. Did you get
5  all the medical records from each one of her
6  attending physicians and treating physicians?
7         MR. MORRISSETTE: On her claim file,
8  object to the form.
9  A       I don't think so.
10 Q       Okay. All right. Thank you.
11        Back to UAMSSUPP9. Okay. How about I
12 have you read the middle paragraph?
13        Okay. The middle paragraph?
14 Q       I'm sorry. The second one.
15 A       Okay. In review of this file, I can
16 tell you now we're going to pay for the errors under
17 the performance agreement. The initial letter was
18 sent in June. There's been no action taken on the
19 file per my review on Friday. We've missed our 30
20 day compliance letter as the activity was canceled
21 and the 45-day activity for initial liability. Our
22 tolling letter is still pending and past due.
23 Q       Is this bringing back some of what
24 happened with this file for you?
25        MR. MORRISSETTE: Object to the form.

209

Bonita Connally - Direct by Mr. Sinclair

1   A        Not really.
2   Q        Okay. All right. First off, first
3   word that jumps out at me, performance agreement.
4   What are you referring to?
5   A        The Annuity Board -- I do not remember
6   what the exact agreement was, but they did have a
7   performance agreement in place just indicating we
8   were going to satisfy certain standards. If we
9   didn't, when I say pay, I mean truly financially we
10  would owe them money at the end of the year.
11  Q        Really?
12  A        Yes.
13  Q        You would have to pay them back some of
14  the premium?
15  A        That is correct.
16  Q        What were the performance requirements?
17  A        I don't remember.
18  Q        This is an actual document that you're
19  talking about now, right?
20  A        I think so.
21          MR. SINCLAIR: Henry, have y'all
22  produced this and I've missed it?
23          MR. MORRISSETTE: Don't know.
24  Q        Okay. All right. What errors were you
25  referring to?

210

Bonita Connally - Direct by Mr. Sinclair

1   A        That E-mail was referring to missing
2   the compliance dates, missing the follow-up dates
3   that he should have had on the file.
4   Q        Hence your E-mails with his 45-day MUPS
5   that immediately followed this July 26, 2004 E-mail?
6   A        Yes.
7   Q        Okay. Thirty-day compliance letter,
8   what is that?
9   A        That's the letter that we send to the
10  claimant if we haven't been able to make a decision
11  by 30 days just to let them know what we're still
12  needing on the file.
13  Q        He didn't send out the 30-day
14  compliance letter, did he? Wait. Let me ask that
15  question again. I can probably save you some time.
16  He didn't send out the 30-day compliance letter
17  within the 30-day time period he was supposed to
18  send it out, did he?
19          MR. MORRISSETTE: Object to the form.
20  A        No.
21  Q        And the activity was canceled. What
22  does that mean?
23  A        It means he canceled the activity.
24  Q        He just decided he didn't want to play
25  that game or -- strike that. Forget it.

211

Bonita Connally - Direct by Mr. Sinclair

1          Okay. The 45-day activity for initial
2   liability or tolling letter is still pending and now
3   past due. That's the MUPS?
4   A        Correct.
5   Q        Okay. This is you talking via E-mail
6   to Brandon Estrada, quote, please ensure that before
7   you leave today, you have requested the medical
8   information from all the providers through medical
9   records. End quote. I would have been a whole lot
10  easier on you today if I had had this. You were
11  telling him right here exactly what you've told me
12  here today?
13          MR. MORRISSETTE: Object to the form.
14  Q        Did he do what you told him to do here?
15  Did he go out and get all the medical information
16  from all the medical providers through medical
17  records?
18  A        No.
19          MR. MORRISSETTE: Object to the form.
20  Q        Quote, you should also call Lou at the
21  Annuity Board and let her know you are awaiting
22  additional medical information as this claim is 50
23  days old and she will be calling you soon, end
24  quote. Who is Lou?
25  A        Lou, I do not remember her last name.

212

Bonita Connally - Direct by Mr. Sinclair

1   She was the human resource contact at the Annuity
2   Board that we got information from.
3   Q        Okay. Is this refreshing your
4   recollection about this file at all?
5   A        Not really.
6   Q        Okay. Was it a fairly common
7   occurrence for somebody to cancel an activity --
8          MR. MORRISSETTE: Object to the form.
9   Q        -- like the 45-day period?
10  A        Not -- no.
11  Q        Because that's something they stress in
12  training, right?
13  A        Yes.
14  Q        As a matter of fact, the training
15  manuals, which they haven't produced in this case,
16  stresses a great deal?
17          MR. MORRISSETTE: Object to the form.
18  A        I don't know about the manuals.
19  Q        I know. Somebody stood over your
20  shoulder and told you about what it said. I know.
21  I got that earlier.
22          Okay. I have no idea what this report
23  is. Take a look at UAMSSUPP7 and tell me if you can
24  identify that document.
25  A        No. It lists the claims specialist as

# ATTACHMENT

## "B"

ATTACHMENT "B"

**From:** Estrada, Brandon R
**Sent:** Monday, July 26, 2004 3:54 PM
**To:** Connally, Bonita K
**Subject:** RE: Priority activity for the annuity board

I will have it completed by the end of the day.

-----Original Message-----
**From:** Connally, Bonita K
**Sent:** Monday, July 26, 2004 3:53 PM
**To:** Estrada, Brandon R
**Cc:** Parker, Terri L
**Subject:** Priority activity for the annuity board

Good afternoon. On Friday morning, I reviewed the AB claim for Betty Bullard with Pam and Barbara. There is multiple APS forms in the file. However, we do not have sufficient medical documentation to support any type of disability.

In review of this file, I can tell you now that we are going to pay for the errors under the performance agreement. The initial letter was sent in June, but there has been no action taken on the file until my review on Friday. We have missed our 30 day compliance letter as the activity was cancelled and the 45 day activity for IL or tolling letter is still pending and past due.

Please ensure that before you leave today you have requested the medical information from all the providers through medical records. You should also call Lou at the Annuity Board and let her know you are awaiting additional medical information as this claim is 50 days old and she will be calling you soon. It is also imperative that you call and make contact with the cx. The only physician indicating that she is unable to work is her PCP.

Bonita Connally
Disability Benefits Consultant
Chattanooga, TN
Phone: 423-294-2332

UAMSSUPP00009