IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| BETTY BULLARD | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | CASE NO. |
| UNUMPROVIDENT CORPORATION; | ) | |
| UNUM LIFE INSURANCE COMPANY | ) | CV-2:05-cv-1217-MEF |
| OF AMERICA, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

COMES NOW the Plaintiff, Betty Bullard, and files this Motion for Partial Summary Judgment as to Plaintiff's claims for breach of contract and bad faith. This motion is supported by the deposition testimony of Bonita Connally, Defendants' Lead Disability Specialist (Lead DBS) who handled Plaintiff's claim for disability benefits, and on the newly discovered evidence produced by the Defendants on November 29, 2006; January 16, 2007; and January 17, 2007. Plaintiff had no knowledge of this newly discovered evidence until recently due to Defendants' erroneous assertion that Defendants' production was complete as of April 2006. *See* Attachment U, Counsel's Correspondence dated April 25, 2006.

In an email written by Connally on July 26, 2004 and not produced by Defendants until November 29, 2006, Connally states that Defendants "are going to pay" for their tardiness in deciding Plaintiff's claim due to a performance agreement Defendants have with Plaintiff's employer mandating that they decide claims within 30 days. *See*

Attachment A, Email written by Connally.  The performance agreement that Connally's email references requires the Defendants to complete certain actions within forty calendar days of the date the Defendants receive a long term disability claim by an employee of Plaintiff's employer.  *See* Attachment Q.  Plaintiff's long-term disability claim was filed in May 2004 and stamped as received by Defendants' Claims Unit on April 06, 2004.  *See* Attachment E, Disability Claim and Attending Physician Statements.  Pursuant to the performance agreement, Defendants were required to either process Plaintiff's claim for payment and mail her a check, deny her claim or request additional information within forty calendar days of their receipt of Plaintiff's claim.

Connally's email dated July 26, 2004 notes that despite Plaintiff's claim for benefits being over 40 days old, no action has been taken on her file and that the Defendants will therefore "pay for the errors under the performance agreement." Attachment A.  Brandon Estrada, the Disability Benefits Specialist assigned to Plaintiff's claim responded that he "will have it completed by the end of the day."  Attachment A.  Estrada clearly did not complete Plaintiff's claim by the end of the day, as is illustrated by Connally's email dated August 6, 2004, showing that medical records were still needed on Plaintiff's claim.  *See* Attachment T.  Estrada responded that he would send a tolling letter regarding Plaintiff's claim for benefits because "all medical needs to be retrieved."  Attachment T.  Estrada never sent a tolling letter or requested the needed medical records.  Rather, Plaintiff's claim for benefits was, in bad faith and breach of contract, deemed noncompensable on August 18, 2004.  *See* Attachment P.

In her deposition testimony, Connally admits that she was the person with authority to make a determination on Plaintiff's claim, that she felt additional

2

investigation was needed, and that it was her duty to tell a Disability Benefits Specialist to investigate a claim further. *See* Attachment B, Connally Depo. at 57, 67-68, 95-96, 107-108. Despite these admissions, Connally did not tell the Disability Benefits Specialist investigating Plaintiff's claim to investigate further. *See* Attachment B, Connally Depo. at 107-108. Connally further admits that it is the Defendants' "responsibility to make sure that every condition listed by the attending physicians is investigated prior to making a decision on the claim" and that the Defendants did not gather "all available information on every condition" the Plaintiff had prior to denying her claim. Attachment B, Connally Depo. at 83-84, 95-96. Connally's emails and deposition testimony therefore provide direct evidence of the Defendants' bad faith handling of Plaintiff's claim for benefits, as they did not even investigate every condition listed by Plaintiff's attending physicians prior to their decision to deny her claim.

Defendants' tardy production of Plaintiff's insurance policy provides additional evidence of their bad faith in handling Plaintiff's claim, by showing that Plaintiff's claim for benefits was assessed and denied **based on the wrong policy**. *See* Attachment C, Insurance policy produced by Defendants January 16, 2007; and Attachment V, Correspondence dated January 15, 2007. Therefore the Defendants not only failed to investigate all of Plaintiff's medical conditions but they failed to even assess her claim pursuant to the correct policy provisions.

The policy originally produced by Defendants is a "Group Benefits – Economy Plan" policy. The correct policy, produced by Defendants on January 16, 2007, is a "Group Benefits – Standard Plan" policy. Although Defendants have asserted that there is no material difference between the two policies, the Standard Plan policy, held by

3

Plaintiff, contains a Disability Plus Rider that the Economy Plan policy does not. *See* Attachment C, pgs BULLLTDAP41-42. This Disability Plus Rider provides additional benefits to a claimant who is receiving benefits under the LTD plan and loses "the ability to safely and completely perform 2 activities of daily living without another person's assistance or verbal cueing". Attachment C, pg BULLLTDAP41. The correct policy therefore provides <u>more</u> benefits than the policy originally provided by Defendants.

The correct policy, produced on January 16, 2007, also provides a shorter elimination period. The elimination period determines how long the claimant must be disabled before she is entitled to receive benefits. Pursuant to the originally produced policy, Ms. Bullard was required to show that she was disabled for a period of 180 days. Pursuant to the correct policy, produced on January 16, 2007, Ms. Bullard was only required to show that she was disabled for a period of 90 days before she was entitled to receive benefits. *See* Attachment C, pg BULLLTDAP30.

As is discussed fully *infra*, Defendants failed to adequately investigate Plaintiff's claim for benefits and denied her claim in bad faith and in breach of the insurance contracts.

### I. NARRATIVE SUMMARY OF UNDISPUTED FACTS

Plaintiff Betty Bullard purchased a long-term disability insurance policy ("LTD policy") and a life insurance policy with the Defendants through her employer, the Annuity Board of the Alabama Baptist Convention ("the Annuity Board"). *See* Attachment C, Insurance Policies; Attachment D, Bullard Depo. at 52-55. Unbeknownst to Plaintiff, the Annuity Board and the Defendants had entered into a "Disability Programs Side Agreement" that imposed strict time standards on the Defendants'

4

adjudication of claims for benefits filed by the Annuity Board's employees. *See* Attachment Q, Disability Programs Side Agreement. This Agreement imposes strict monetary penalties on the Defendants if they do not meet its mandated time standards in adjudicating (paying or denying) claims for benefits filed by the Annuity Board's employees, such as Plaintiff. *See* Attachment Q.

Plaintiff's LTD policy purports to provide "financial protection for [the insured] by paying a portion of [the insured's] income while [he/she] is disabled." *See* Attachment C, pg B@G-LTD-1. The LTD policy provides that a person is deemed "disabled" when, as a result of injury or sickness, she is "limited from performing the material and substantial duties" of her regular occupation and has a 20% or more loss in her indexed monthly earnings. *See* Attachment C, pg LTD-BEN-1. The policies define "sickness" as "an illness or disease." *See* Attachment C, pg GLOSSARY-5. Furthermore, Plaintiff's LTD policy contains a "Disability Plus Rider" that provides a monthly benefit when she loses "the ability to safely and completely perform 2 activities of daily living without another person's assistance or verbal cueing" or has "a deterioration or loss in intellectual capacity and need[s] another person's assistance or verbal cueing for [her own] protection or for the protection of others." The LTD policy is an "own occupation" policy whereby the Defendants must measure the Plaintiff's ability to perform in her regular occupation, not merely any occupation in the economy. *See* Complaint at ¶ 16, Attachment C, pgs LTD-CLM-1 & LTD-BEN-1.

When Defendants issued Bullard the LTD and life insurance policies, she was employed by the Annuity Board as an administrative assistant. *See* Complaint at ¶ 15. As an administrative assistant, Plaintiff's duties included preparing office correspondence

5

and materials, maintaining financial records, serving as a point of contact for guests via telephone and in person, maintaining a database, attending officer conferences/events, and other assigned duties. *See* Exhibit F, Secretary Job Description. In carrying out these duties, Plaintiff was required to lift heavy boxes and stand often, sit at a desk for approximately 80 percent of her 40-hour workweek, and often perform typing duties. *See* Attachment D, Bullard Depo. at pgs 133-134, 143-146. Plaintiff continued working for the Annuity Board as an administrative assistant until she was forced to cease working due to the debilitating illnesses and diseases that serve as the basis of her May 2004 claim for benefits to Defendants. *See* Complaint at ¶ 19; Attachment D, Bullard Depo. at 169-170.

Plaintiff has been diagnosed with arthritis, fibromyalgia, cataplexy narcolepsy, hypersomnia with sleep apnea, ulcerative colitis, and degenerative disk disease. *See* Attachment E, Attending Physician Statements; Attachment D, Bullard Depo. pgs 250, 254, 259, 261; Attachment B, Connally Depo. pgs 103-104, 154, 126. Plaintiff's illnesses have required her to endure many surgical procedures, including diskectomies, cervical fusions, and foot surgery. *See* Attachment D, Bullard Depo. at 245, 250. Plaintiff requires additional future surgeries that she cannot currently afford. *See* Attachment D, Bullard Depo. at 257.

Plaintiff's illnesses make it difficult for her to stay awake, cause her great pain, discomfort, fatigue, dizziness, difficulty with concentration, and require her to stay close to restroom facilities. *See* Attachment D, Bullard Depo. at 145, 169-170, 172-173, 177-178, 192-196, 214. As a result of her illnesses and resulting symptoms, Plaintiff is

unable to work in her own occupation as an administrative assistant or any other full-time employment. *See Id.*; Attachment E, Attending Physician Statements.

In May 2004, Plaintiff filed a long-term disability claim on her disability and life insurance policies. *See* Attachment E, Disability Claim and Attending Physician Statements. In support of her claim, Plaintiff included four (4) Attending Physician's Statements. *Id.* The Attending Physician's Statement completed by Dr. Reuben C. Richardson lists his diagnoses of cataplexy narcolepsy and hypersomnia with sleep apnea and indicates that, based on his diagnoses alone, Plaintiff cannot be released to return to work in any occupation. *Id.* The Attending Physician's Statement completed by Dr. Rachel M. McKinney lists multiple diagnoses and indicates that, based on her diagnoses alone, Plaintiff "will be unable to return" to work. *Id.* Defendants did not conduct an in-person, independent physician review and do not dispute Plaintiff's Attending Physicians' diagnoses. *See* Attachment B, Connally Depo. at pg 126.

On August 18, 2004, a disability consultant for Defendant recommended the claim be closed based upon incomplete medical documentation, and on August 19, 2004, Plaintiff's claim for disability benefits and life insurance premium waiver was deemed noncompensable and was closed. *See* Attachment B, Connally Depo. at pgs 186-187; Attachment P, Connally's email and spreadsheet. (UAMSSUPP00018-19). Defendants admit that they have a duty to ensure that every condition listed by a physician is investigated prior to the determination of a claim for benefits. *See* Attachment B, Connally Depo. at pgs 83-84. However, Plaintiff's claim was denied despite the fact that Defendants never bothered to even look up the ICD-9 codes provided by her attending physicians that identified her specific diagnoses in the Attending Physician's Statements

7

submitted with her claim. *See* Attachment E, Attending Physician's Statements; and Attachment B, Connally Depo. at pg 82.

Defendants notified Plaintiff by letter dated September 1, 2004, of their denial of her claim for disability benefits and subsequently notified her by letter dated September 9, 2004, that she was denied waiver of life insurance premiums. *See* Attachment F, Claim Denial Letter; and Attachment K, Appellate Denial Letter. Plaintiff appealed the denial of her claim for benefits through the administrative appeals process provided by her policies. *See* Attachment G, Notice of Appeal.

On October 25, 2004, Dr. Rachel M. McKinney sent a letter to Defendants in which she stated that Plaintiff "is permanently unable to perform [a] full-time job of any kind secondary to her multiple medical conditions." *See* Attachment H, McKinney Letter to Defendants. Thereafter, Defendants's Senior Clinical Consultant, Latisha L. Toney, RN, noted upon her review of Plaintiff's claim file that Plaintiff's documentation "would indicate a reasonable expectation of some functional loss." *See* Attachment I, Toney Medical Response. Dr. Susy Vergot, Defendants's Medical Director, also noted upon her review of Plaintiff's claim file that "[s]ome functional loss is supported with [Plaintiff's] individual conditions." *See* Attachment J, Vergot's Clinical Review.

Despite Plaintiff's numerous diagnoses, limitations, and doctors' written recommendations that Plaintiff not return to any form of work, Defendants notified Plaintiff by letter dated April 6, 2005, of their decision to uphold their denial of her claim for disability benefits. *See* Attachment K, Appellate Review Denial Letter. Defendants thereafter notified Plaintiff by letter that, pursuant to the multi-state settlement agreement executed by Defendant, they were required to offer a Claim Reassessment Process related

8

to their denial of her claim for benefits. *See* Attachment L, Claim Reassessment Letter. This multi-state settlement agreement referenced in the letter was part of a 47 jurisdiction investigation of UnumProvident, that revealed numerous deficiencies in its claims handling process and required UnumProvident to change the way in which it processed claims. *See* Attachment M, Report of the Targeted Multistate Market Conduct Examination.

On May 9, 2005, Plaintiff's employer, Alabama Baptist Convention, wrote a letter in which it expressed its disagreement with Defendants's decision to deny Plaintiff's disability claim and in support of the Plaintiff's attending physician's assertions that she was incapable of returning to work. *See* Attachment N, Alabama Baptist Convention Letter. The Alabama Department of Rehabilitation Services determined that Plaintiff "has permanent disabilities that will prevent her from returning to work." *See* Attachment O, ADRS Letter. The ADRS further noted "there is no expected improvement for her conditions anytime in the immediate future" and that her "disabilities prevent her from working on a regular and continuing basis and from performing any substantial gainful activity." *Id.*

Plaintiff instituted this action on November 15, 2005, against UnumProvident and Unum Life Insurance Company, based upon their wrongful denial of her claim for benefits.

## II. DISCUSSION

Plaintiff has asserted claims of breach of contract, bad faith, fraud, misrepresentation and conspiracy against the Defendants. Plaintiff now moves for partial

9

summary judgment as to her claims of breach of contract and bad faith based on newly produced evidence and the deposition testimony of Bonita Connally.

## A.  BAD FAITH

Defendants are liable for bad faith.  An insurer is liable for an abnormal bad faith failure to investigate an insurance claim when "(1) … the insurer failed to properly investigate the claim or to subject the results of the investigation to a cognitive evaluation and review; and (2) … the insurer breached the contract for insurance coverage with the insured when it refused to pay the insured's claim." *National Ins. Ass'n v. Sockwell*, 829 So. 2d 111, 131 (Ala. 2002).  Plaintiff discusses how Defendants breached the insurance contracts in section II.B. of this brief, *infra*.  Defendants have admitted, through the testimony of its employee, Bonita Connally, that they failed to properly investigate Betty Bullard's claim for benefits.

Bonita Connally was the Defendants' Lead Disability Specialist (Lead DBS) who worked on Bullard's claim for benefits.  *See* Attachment B, Connally Depo at pg. 36.  On July 26, 2004, two months after Bullard had filed her claim for benefits, Connally wrote an email to colleagues working with her on Bullard's claim that states, in pertinent part, as follows:

> In review of [Bullard's] file, I can tell you now that we are going to pay for the errors under the performance agreement.  The initial letter was sent in June, but there has been no action taken on the file until my review on Friday.  We have missed our 30 day compliance letter as the activity was cancelled and the 45 day activity for IL or tolling letter is still pending and past due.

Attachment A.

This email specifically states that on July 26, 2004, "no action" was taken on Plaintiff's file during the three months it was pending since its submission in May 2004.

10

Furthermore, on August 6, 2004, Brandon Estrada, Defendants' Disability Benefits Specialist, sent an email stating that a "tolling letter" was going to be sent to Plaintiff because "all medical needs to be retrieved." *See* Attachment T, August 6 Email. (UAMSSUPP00011). Despite Defendants' complete and total lack of action on Plaintiff's claim, as of July 26, 2004, and the Defendants' determination that Bullard's medical records needed to be retrieved on August 6, 2004, Defendants made the determination to deny her claim on August 18, 2004. *See* Attachment P, Connally's email and spreadsheet. (UAMSSUPP00018-19); Attachment B, Connally Depo pgs 186-187.

Connally stated in her deposition testimony that additional records should have been obtained before the Defendants decided not to pay Bullard's disability claim. *See* Attachment B, Connally Depo pgs 67-68, 95, 109, 157. Connally also testified that more effort should have been taken to assess the restrictions and limitations assigned by Bullard's attending physicians. *See* Attachment B, Connally Depo pg. 134. Connally further testified that although it is her responsibility, as Lead DBS, to order the Disability Specialist (DBS) working on the claim to investigate further, she did not do so with Bullard's claim. *See* Attachment B, Connally Depo pg. 108.

Connally further testified that although it is the Defendants' responsibility to ensure that every medical condition indicated by or attributed to a claimant should be investigated, all of Bullard's indicated medical conditions were not investigated or even identified prior to the denial of her claim. *See* Attachment B, Connally Depo pgs. 82-84. Connally testified that despite her request to the DBS handling Bullard's claim to request the medical information from Bullard's medical providers, such a request was never

made prior to the Defendants' denial of her claim.  *See* Attachment B, Connally Depo. pgs 191-192, 211.

The above-cited testimony provides evidence of the Defendants' bad faith denial of Plaintiff's claim for disability.  Defendants admittedly did not properly investigate Plaintiff's claim prior to its denial.  Defendants are therefore liable for bad faith.  *See National Ins. Ass'n v. Sockwell*, 829 So. 2d 111, 131 (Ala. 2002)

In Connally's deposition testimony, she reveals the true reason for Defendants' bad faith denial of Plaintiff's claim: the performance agreement between Defendants and Plaintiff's employer.  The Defendants and Plaintiff's employer, the Annuity Board, had entered into a performance agreement regarding the Defendants' handling of the Annuity Board's employee's claims.  *See* Attachment B, Connally Depo pgs. 208-209; Attachment Q, Disability Programs Side Agreement.[1]  This performance agreement applies stringent standards to the time allowed for the Defendants to review claims submitted by the Annuity Board employees.  *Id.*  The agreement specifically provides that "UNUM shall be subject to the Performance Standards set forth in Attachment C." Certain penalties for failure of UNUM to meet the Performance Standards may be payable to the Annuity Board pursuant to Attachment C.  *See* Attachment Q, ¶ 7.

The pertinent sections of these Performance Standards provide as follows:

2. **Claims Processing – Long-term Disability.**  UNUM shall administer long-term disability claims for benefits under the Insurance Contracts pursuant to the following:

a. Performance Standard:  At least ninety-five percent (95%) of all long-term disability claims for benefits made pursuant to an Insurance Contract will be processed for payment, denial or request for additional information, and checks for payment or other appropriate communication mailed by first class mail within forty (40) calendar days of the date the

---

[1] Despite numerous requests for this document, the Defendants refused to produce it until January 15, 2006.

    complete claim (or the last item to complete the initial claim) is delivered … to UNUM's Chattanooga Customer Care Center.

    b. <u>Measurement</u>: Performance shall be measured annually from UNUM's claims turnaround reports, to be provided by UNUM to the Annuity Board within forty-five (45) calendar days from the end of each calendar quarter. Performance shall be measured by dividing the number of complete long-term disability claims for benefits made pursuant to the Insurance Contracts processed within forty (40) calendar days of receipt by the total number of complete long-term disability claims received.

    c. <u>Penalty</u>: Any penalty shall be reviewed and assessed annually at the end of an Audit Period (as defined below). Failure to meet this Performance Standard shall result in a penalty equal to $500 multiplied by the number of long-term disability claims that would bring UNUM up to the 95% Performance Standard.

Attachment Q, ¶ C.2.a-c.

Connally's deposition evidences that the Defendants' employees were not only aware of these time standards but were motivated by them in their assessment of Plaintiff's claim. Connally testified that during the course of her evaluation of Plaintiff's claim, she was aware that the Defendants were over these mandated time standards in the review of Bullard's claim and that this tardiness would require the Defendants to refund a portion of the Annuity Board's paid premiums. *Id.* Connally's email illustrates this fact, stating that the Defendants haven't performed well in handling Plaintiff's claim and "we [UnumProvident] are going to pay for the errors". *See* Attachment A.

Connally's testimony and the emails regarding the performance agreement provide evidence of Defendants' bad faith in its determination and denial of Plaintiff's claims and the reason for Defendants' bad faith. Defendants, and therefore its employees who assessed Plaintiff's claims, had a contractual duty to meet the time standards imposed by the performance agreement. Defendants, however, also had a contractual

13

duty and a duty of good faith to Plaintiff, both of which they breached in its determination of her claims for benefits.

## B. BREACH OF CONTRACT

Defendants contracted with Plaintiff to provide her with an LTD insurance policy and a life insurance policy. The terms of the contract provide that "[t]his long term disability plan provides financial protection for you by paying a portion of your income while you are disabled." *See* Attachment C, Insurance Policies. The terms of the contract further provide that a person is deemed "disabled" when, as a result of injury or sickness, she is "limited from performing the material and substantial duties" of <u>her regular occupation</u> and has a 20% or more loss in her indexed monthly earnings. *See* Attachment C, pg LTD-BEN-1. The policies define "sickness" as "an illness or disease." *See* Attachment C, pg GLOSSARY-5. The LTD policy is an "own occupation" policy whereby the Defendants must measure the Plaintiff's ability to perform in her regular occupation, not merely any occupation in the economy. *See* Complaint at ¶ 16, Attachment C, pgs LTD-CLM-1 & LTD-BEN-1. The policy defines "regular occupation" as "the occupation you are routinely performing when your disability begins."

When the terms of an insurance contract are plain and unambiguous, the terms of the contract must be applied. *See State Farm Fire & Cas. Co. v. Slade*, 747 So. 2d 293 (Ala. 1999). The insurance contract language, quoted above, plainly and unambiguously provides that the Defendants will provide payment to Plaintiff if she cannot perform the material and substantial duties of her regular job as a secretary due to disability.

Plaintiff has been diagnosed with arthritis, fibromyalgia, cataplexy narcolepsy, hypersomnia with sleep apnea, ulcerative colitis, and degenerative disk disease. *See* Attachment E, Attending Physician Statements; Attachment D, Bullard Depo at 250, 254, 259, 261; Attachment B, Connally Depo. pgs 103-104, 154, 126. Plaintiff provided Defendants with evidence of these numerous diagnoses by submitting Attending Physicians' Statements in support of her claim for benefits. Attachment E, Attending Physician Statements. Plaintiff's illnesses make it difficult for her to stay awake, cause her great pain and discomfort, fatigue, dizziness, difficulty with concentration, render her unable to type for more than a few minutes at a time, require her to often change between sitting, standing up and laying down, and require her to stay close to restroom facilities. *See* Attachment D, Bullard Depo. at 145, 169-170, 172-173, 177-178, 192-196, 214.

The material and substantial duties of Plaintiff's occupation as an administrative assistant required her to lift heavy boxes and stand often, sit at a desk for approximately 80 percent of her 40-hour workweek, often perform typing duties, and endure the symptoms of her colitis without nearby restroom facilities. *See* Attachment B, Bullard Depo. at pgs 133-134, 143-146. Plaintiff's material and substantial duties as a secretary mirror the duties of a secretary in the national economy, as is evidenced by the definition of secretary: "a person employed to handle correspondence, keep files, and do clerical work for another person or an organization." American Heritage Dictionary of the English Language (Fourth Ed. 2000). The Eleventh Circuit has routinely employed the American Heritage Dictionary when construing an insurance policy in accordance to its ordinary meaning. *See Giddens v. Equitable Life Assur. Soc. of U.S.*, 445 F.3d 1286, 1292-1293 (11th Cir. 2006).

Furthermore, Defendants cannot assert that Plaintiff was capable of returning to work in a different occupation because Plaintiff's Attending Physicians found her unable to return to work in <u>any</u> occupation. *See* Attachment E, Attending Physician Statements; Attachment S, Letter From Dr. McKinney to Defendants. The Defendants were also notified by the Alabama Department of Rehabilitation Services that Plaintiff's "disabilities prevent her from working on a regular and continuing basis and from performing <u>any substantial gainful activity</u>." Attachment O, Letter from ADRS.

Plaintiff clearly met the definition of disability as defined in the plain language of the contract and the Defendants breached that contract by failing to provide her benefits.

**C. THE RELATIONSHIP OF UNUM LIFE INSURANCE COMPANY OF AMERICA AND UNUMPROVIDENT CORPORATION**

Defendants have repeatedly asserted that Unum Life Insurance Company of America and UnumProvident Corporation are two separate entities and that all claims against UnumProvident should be dismissed because it had no contractual relationship with Plaintiff. *See* Doc. No. 20, ¶ 4-9. Defendants have also asserted that these two allegedly separate entities maintain a separate corporate existence and have separate boards of directors. *See* Doc. No. 20, ¶ 9. Plaintiff finds it necessary to address this argument herein due to the recent production of Susan Roth's deposition, which fully illustrates the extent to which UnumProvident and Unum Life are one and the same entity. *See* Attachment R, Roth Deposition March 2006.[2]

Susan Roth is currently UnumProvident's Vice President, Corporate Secretary and Assistant General Counsel and an officer and Corporate Secretary of Unum Life. *See*

---

[2] Despite numerous requests for Ms. Roth's prior depositions on this topic (the first such request served on Defendants November 14, 2005 – request for production No. 35), Defendants refused to produce this deposition until <u>January 18, 2007</u>.

16

Attachment R, pgs 0043-0044.  Roth has held these positions in both companies since 1999.  *Id.*  Roth has testified that Unum Life has no employees.  *See* Attachment R, Roth Deposition March 2006, pgs 0039-40, 0053-0054.  Roth further testified that since the general services agreement was executed in 2000, merging UnumProvident and Unum Life, UnumProvident has provided customer service for Unum Life.  *See* Attachment R, pgs 0052-0053.  Not only does UnumProvident provide Unum Life's customer service, UnumProvident's employees sell Unum Life's insurance policies.  *See* Attachment R, pg 0054.  Unum Life has no employee policies or manuals because there are no employees.  *See* Attachment R, pg 0062.  Unum Life is owned entirely by UnumProvident.  *See* Attachment R, pg 0060-0061.

UnumProvident's argument that it cannot be held liable for its actions in adjustments in the claims made on Unum Life Insurance policies has already been rejected by Judge Dement.  *See* Attachment S, *Anderson v. Unum Life Ins. Co. of America, d/b/a Unum Provident Corp.*, 414 F.Supp.2d 1079 (M.D. Ala. 2006).  In *Anderson*, a case in which the plaintiff also claimed breach of contract and bad faith denial of a claim for benefits, the Court cited evidence of the service agreement between Unum Life and UnumProvident, the fact that all claims handlers on her claim identified themselves as UnumProvident employees, and the fact that the appeal letter directed her to make her appeal request to UnumProvident.  The Court concluded "that the only finding which the evidence supports is a finding that UnumProvident [rather than Unum Life] had autonomous control over the decision regarding Anderson's eligibility for benefits under the policy."  *Anderson*, 414 F.Supp.2d at 1099.

Plaintiff has presented this Court with numerous items of evidence, in addition to the three items of evidence the Court relied on in *Anderson*, in making its determination that UnumProvident was the responsible party for the decision regarding the plaintiff's eligibility for benefits. Because Plaintiff has extensively briefed this issue to the Court in a prior pleading, Plaintiff hereby incorporates by reference Doc. No. 23 and Doc. No. 24, Plaintiff's Opposition to UnumProvident's Motion for Summary Judgment and the attachments in support thereof.

## **CONCLUSION**

In light of this newly discovered evidence that was withheld by Defendants, Plaintiff is clearly entitled to partial summary judgment as to her claims of breach of contract and bad faith. Defendants' Lead DBS admitted that they did not even bother to identify Plaintiff's numerous diagnoses, much less investigate each diagnoses in good faith. Defendants' Lead DBS testified that she decided Plaintiff's claims were noncompensable <u>before</u> receiving all necessary medical documents. Defendants clearly did not have enough information to conduct a good faith review of Plaintiff's claims. The information Defendants had at the time of the denial of Plaintiff's claim was: multiple diagnoses of illnesses and disease and multiple doctors stating that Plaintiff could not return to work.

"[I]t is the insurer's duty to marshal all of the facts pertinent to its denial – before denying the claim – if the insurer wishes to rely upon those facts as a defense to a claim of bad faith." *National Ins. Ass'n v. Sockwell*, 829 So. 2d 111, 131 (Ala. 2002). "Once the bad faith has occurred, once the duty to use good faith in considering insurance claims has been breached, the insurance company cannot later seek to justify its denial by

18

gathering information which it should have had in the first place." *Aetna Life Ins. Co. v. Lavoie*, 505 So. 2d 1050, 1053 (Ala. 1987). Defendants should therefore be limited to citing and relying on only those facts that it had before it <u>at the time it denied Plaintiff's claim</u> in its opposition to Plaintiff's motion for partial summary judgment.

Plaintiff therefore respectfully requests this Court GRANT Plaintiff's Motion for Partial Summary Judgment Finding Defendants Liable for Breach of Contract and Bad Faith.

                                                              Respectfully submitted,

                                                              /s/ Jenifer Champ Wallis
                                                            Jenifer Champ Wallis (WAL191)
                                                            One of the Attorneys for Plaintiff

OF COUNSEL:
Thomas O. Sinclair (SIN018)
Jenifer Champ Wallis (WAL191)
Campbell, Waller & Poer, L.L.C.
2100-A SouthBridge Parkway, Suite 450
Birmingham, AL 35209
(205).803-0051
Fax: (205).803-0053
E-mail: tsinclair@cwp-law.com
E-mail: jwallis@cwp-law.com

## CERTIFICATE OF SERVICE

      I hereby certify that on February 5, 2007 I electronically filed the foregoing pleading with the Clerk of the court using the CM/ECF system which will send notifications of such filing to the following:

dfink@handarendall.com
hmorrissette@handarendall.com
jjohnson@handarendall.com

      /s/Jenifer Champ Wallis
      Jenifer Champ Wallis (WAL191)