# ATTACHMENT

# "D"

ATTACHMENT "D"

**LEGALINK, A MERRILL COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 1

```
1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE MIDDLE DISTRICT OF ALABAMA
3              NORTHERN DIVISION
4
5    CASE NUMBER:  2:05-CV-1217-MEF
6    Betty Bullard,
7          Plaintiff,
8          vs.
9    UnumProvident Corporation, et al.,
10         Defendants.
11
12       S T I P U L A T I O N
13       IT IS STIPULATED AND AGREED by and
14   between the parties through their respective
15   counsel, that the deposition of Betty
16   Bullard may be taken before Sara Mahler,
17   CSR, at the offices of Beasley, Allen, Crow,
18   Methvin, Portis & Miles, at 272 Commerce
19   Street, Montgomery, Alabama 36103, on the
20   8th day of March, 2006.
21
22       DEPOSITION OF BETTY BULLARD
23              46798
```

Page 2

```
1        IT IS FURTHER STIPULATED AND
2    AGREED that the signature to and the reading
3    of the deposition by the witness is not
4    waived, the deposition to have the same
5    force and effect as if full compliance had
6    been had with all laws and rules of Court
7    relating to the taking of depositions.
8        IT IS FURTHER STIPULATED AND
9    AGREED that it shall not be necessary for
10   any objections to be made by counsel to any
11   questions except as to form or leading
12   questions, and that counsel for the parties
13   may make objections and assign grounds at
14   the time of the trial, or at the time said
15   deposition is offered in evidence, or prior
16   thereto.
17       IT IS FURTHER STIPULATED AND
18   AGREED that the notice of filing of the
19   deposition by the Commissioner is waived.
20
21       * * * * * * * * * * * * *
22
23
```

Page 3

```
1        * * * * * * * * * * * * *
2             I N D E X
3           EXAMINATION
4                              PAGE
5    By Mr. Fink ........................ 8
6    By Mr. Sinclair ................... 361
7        EXAMINATION CONTINUED
8                              PAGE
9    By Mr. Fink ....................... 365
10       DEFENDANT'S EXHIBITS
11                             PAGE
12   Ex. 1 - Notice of deposition ....... 22
13   Ex. 2 - A copy of the complaint .... 48
14   Ex. 3 - A copy of the LTD 111604
15        long-term policy ......... 49
16   Ex. 4 - A copy of life insurance
17        policy number 552580 ..... 51
18   Exs. 4.1 and 4.2 - 9/1 and 9/9/04
19        letters to Ms. Young ..... 61
20   Ex. 4.3 - 4/6/05 letter to
21        Ms. Bullard .............. 62
22   Ex. 4.4 - 2/22/05 letter to
23        Mr. Vergot from
```

Page 4

```
1        Dr. McKinney ............. 63
2    Ex. 4.5 - 3/7/05 letter to
3        Ms. Bullard from Unum
4        Life ................... 65
5    Ex. 4.6 - 3/4/05 fax letter from
6        Ms. Bullard to Unum
7        Life ................... 65
8    Ex. 4.7 - 7/22/02 office note
9        from Ms. Whitesell ...... 102
10   Ex. 4.8 - 6/17/04 Clinical
11        Interview Report from
12        Mr. Downs ............... 103
13   Ex. 4.9 - 1/7/03 annual salary
14        report .................. 105
15   Ex. 5 - 3/25/04 claim form for
16        disability benefits ..... 106
17   Ex. 5.1 - 10/25/04 letter from
18        Ms. McKinney ............ 123
19   Ex. 6 - A copy of the employer's
20        statement ............... 125
21   Ex. 7 - State Board of Missions
22        job description ......... 131
23   Ex. 8 - Attending Physician's
```

1 (Pages 1 to 4)

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 49

1          marked for identification
2          purposes.)
3      Q.    Okay. Let me ask you to take
4 a look at what I've marked as Exhibit 2 to
5 your complaint. It's a copy of your
6 complaint that you filed in this case. Have
7 you seen that before?
8      A.    Yes.
9      Q.    In paragraph eleven of that
10 complaint, you state that you were employed
11 by ABSBC, that's the Annuity Board of the
12 Southern Baptist Convention; correct?
13      A.    Yes.
14          (Defendant's Exhibit 3 was
15          marked for identification
16          purposes.)
17      Q.    You say: You were employed by
18 ABSBC at all times relevant hereto.
19 Plaintiff obtained a long-term disability
20 policy and life insurance policy during her
21 period of employment with ABSBC.
22          ABSBC files no documents with
23 Department of Labor, et cetera. Regarding

Page 50

1 those two policies referenced there, the
2 long-term disability policy and the life
3 insurance policy, if you flip over in your
4 complaint to paragraph seventy-one, they are
5 more particularly identified as: Policies
6 numbered LTD 11604 and life 552580.
7          What I'm going to do is show
8 you Exhibit 3, which is a long-term
9 disability policy baring policy number
10 111604, and ask you if that's the disability
11 policy to which you refer in your complaint?
12 That's not a trick. I haven't snuck any
13 extra pages in there or anything. That's as
14 I received it.
15          MR. SINCLAIR: You're not
16 going to be able to identify every page of
17 it.
18      A.    I was just trying to get to
19 them.
20          MR. SINCLAIR: Can't you just
21 answer his question?
22      A.    That's what I was looking for.
23          MR. SINCLAIR: Do you know

Page 51

1 what the question was?
2      A.    Could you repeat it.
3      Q.    (By Mr. Fink) I just want to
4 confirm that that's the policy you referred
5 to in your complaint?
6      A.    Yes.
7      Q.    And what I really want to do
8 is make sure you're not going to say: Oh,
9 no, no, no, this isn't what I'm talking
10 about at all. I meant some other thing.
11          (Defendant's Exhibit 4 was
12          marked for identification
13          purposes.)
14      Q.    Same thing with Exhibit 4.
15 This is a life insurance policy, and it
16 bears the number 552580, which I'll
17 represent to you are the same numbers
18 referenced in paragraph seventy-one of your
19 complaint. Is that the life insurance
20 policy which you refer in your complaint?
21      A.    Yes.
22      Q.    Okay. Who paid the premiums
23 on these policies?

Page 52

1      A.    I did.
2      Q.    You paid them out of your own
3 pocket?
4      A.    They came out of my salary.
5      Q.    Okay. How did that work? Was
6 there a payroll deduction?
7      A.    I'm not sure how they -- They
8 present it to us as part of our package.
9      Q.    Uh-huh.
10      A.    And, I mean, it is told that
11 it's part -- You know, we don't get our
12 salary, especially the secretaries, it's not
13 a high salary. So this is something that is
14 offered to us. Kind of it compensates
15 because it's something that we all want and
16 need. And it's kind of a compensation
17 toward not having as much of a salary.
18      Q.    Okay.
19      A.    It's a package.
20      Q.    I'm going to jump ahead on my
21 exhibits here, in light of your answer, and
22 I'm going to show you Exhibit 6, which is an
23 Employment Statement that was submitted to

13 (Pages 49 to 52)

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 53

1  Unum Life by your employer. And there on
2  question number six it indicates that a
3  hundred percent of the premiums are paid by
4  the employer.
5       A.    Well, but to us --
6            MR. SINCLAIR:  Let him ask a
7  question and then answer his question.
8            THE WITNESS:  Okay.  I'm
9  sorry.
10      Q.    Do you see where I'm talking
11 about there on number six, on Exhibit 6?
12      A.    Yes.
13      Q.    Do you contend that that's
14 inaccurate?
15      A.    In the way it's represented to
16 me, it is part of my salary.  It comes --
17      Q.    Okay.  But you're not -- It's
18 not your testimony that you actually had to
19 pay either on a weekly or a monthly basis
20 that you had to write a check for the
21 premium for either the disability or life
22 insurance?
23      A.    No.

Page 54

1       Q.    Nor is it your understanding
2  that there was a specified amount through a
3  payroll deduction that was taken out of your
4  check to cover those premiums?
5       A.    No.
6       Q.    You just understood it to be a
7  benefit of your employment; correct?
8       A.    Correct.
9       Q.    Okay.
10      A.    But because of this, it means
11 my salary is not as much as if I was not
12 getting the benefits.  If I was not taking
13 this, then my salary would be more.  So I
14 consider it really is part of my salary.
15      Q.    Okay.  Did you ever receive
16 any documentation from the Annuity Board
17 that stated that?
18      A.    We always -- Every year we are
19 given, and it shows in one section where if
20 we -- you know, with the benefits as part of
21 our package, as part of our salary, what it
22 entails, what the bottom line is, and if we
23 were not getting those benefits what it

Page 55

1  would be.
2       Q.    Okay.  Did you have the option
3  of electing disability and life insurance or
4  declining?
5       A.    I understood I did.
6       Q.    Okay.  Were you ever -- Did
7  you ever receive any documentation that said
8  you had that option?
9       A.    I had to sign saying that I
10 wanted it.  So I assumed if I didn't sign --
11      Q.    Were you ever given any
12 documentation that told you that your salary
13 would increase if you decided not to have
14 these coverages?
15      A.    I don't recall having
16 documentation, being told that other than
17 the -- I'm not sure what they call it, every
18 year that they give us stating, like I said,
19 it shows the two.
20      Q.    Did you keep those?  Do you
21 still have them?
22      A.    I'm not sure.  I believe I do.
23 Could we take a break.

Page 56

1       Q.    Absolutely.
2            (Off-the-Record discussion
3            was held.)
4       Q.    Do you recall when Unum Life
5  began providing coverage to employees of the
6  Annuity Board at the Southern Baptist
7  Convention?
8       A.    No.
9       Q.    Do you know when Unum Life
10 provided that coverage prior to the
11 effective dates noted on these policies,
12 January, 2001 on Exhibit 4, and January,
13 2002 on Exhibit 3?
14      A.    Could you say that again?
15      Q.    Sure.  Do you know whether
16 Unum Life provided either disability or life
17 insurance coverage to employees of the
18 Annuity Board prior to, let's just say
19 January of 2001?
20      A.    Yes.
21      Q.    You believe they did?
22      A.    Yes.
23      Q.    Okay.  Do you recall whether

14 (Pages 53 to 56)

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 101

1   name?
2       A.     L-A-B-O-V-I-T-Z.
3       Q.     It says: You answered
4   multiline phone, typed invoices and general
5   correspondence, made photocopies and
6   performed other office duties?
7       A.     Correct.
8       Q.     What other office duties did
9   you perform?
10      A.     Just like filling in work
11  reports on ledgers. Gosh, I don't recall
12  all the other things.
13      Q.     When you left that job, you
14  went to work for the State Convention;
15  correct?
16      A.     Correct.
17      Q.     How did you come to get your
18  job at the State Convention?
19      A.     A friend.
20      Q.     A friend who already worked
21  there?
22      A.     Well, she had worked there
23  previously.

Page 102

1       Q.     Okay. Why did she leave?
2       A.     I'm not sure.
3       Q.     Did you take her place?
4       A.     No. She had been gone for
5   years.
6          (Defendant's Exhibit 4.7
7          was marked for
8          identification purposes.)
9       Q.     Okay. Exhibit 4.7 is a
10  7/22/02, office note from Janise H.
11  Whitesell. And it notes there on the first
12  page, it says: She is a single mom who
13  notes that she has two jobs. Did you
14  have --
15      A.     What date is this?
16      Q.     '02. 7/22/02.
17      A.     That is probably when I had
18  just started with Sylvan.
19      Q.     Sylvan. Okay. Since your
20  employment with the State Convention, have
21  you held any jobs, aside from your temporary
22  position that you've already described with
23  Sylvan Learning centers?

Page 103

1       A.     No.
2       Q.     Okay. Janise Whitesell was a
3   doctor who used to practice in
4   Dr. McKinney's office; correct?
5       A.     Dr. McKinney took her place
6   when she moved to Georgia.
7       Q.     Dr. Whitesell moved to Georgia
8   and Dr. McKinney took her place?
9       A.     Correct.
10      Q.     And you began seeing
11  Dr. McKinney at that point?
12      A.     Correct.
13         (Defendant's Exhibit 4.8
14         was marked for
15         identification purposes.)
16      Q.     Okay. And Exhibit 4.8 is a
17  Clinical Interview Report from Allen Downs.
18  Is Allen Downs your therapist, or was he
19  your therapist?
20      A.     He was.
21      Q.     Are you still seeing him?
22      A.     No.
23      Q.     When did you last see him?

Page 104

1       A.     It's probably been six months.
2       Q.     Six months?
3       A.     Or so.
4       Q.     Do you not plan to see him
5   again?
6       A.     Not at this time. I can't --
7   I really cannot afford because I have to pay
8   a co-pay. There's just certain things I
9   cannot afford.
10      Q.     Okay. Is there any other
11  reason that you're not continuing to see
12  Allen Downs?
13      A.     No.
14      Q.     Okay. Under vocational
15  history, and we've certainly got a better
16  covering now that we've got your resume, he
17  lists: Waitress, retail, sewing factory,
18  grocery store, insurance, secretarial,
19  receptionist, usher at Shakespeare Theater
20  and Sylvan.
21      A.     Okay. When he's talking about
22  waitress, that was -- I think I was thirteen
23  years old when I did that.

26 (Pages 101 to 104)

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 133

1   those type conferences.
2       Q.    Okay.  And you said that
3   involved heavy lifting of boxes and a lot of
4   standing?
5       A.    Yes.
6       Q.    Were you expected to lift the
7   heavy boxes?
8       A.    Yes.
9       Q.    Okay.  When did you last
10  assist with one of those conferences that
11  involved heavy lifting of boxes and a lot of
12  standing?
13      A.    I didn't make the one for, as
14  I recall, the legislative prayer luncheon in
15  2004, and I didn't go to it.  It was
16  probably 2002, was the last one that I --
17  Because I was not able to go to the ones in
18  2003 and 4.
19      Q.    Okay.  Did they send someone
20  else in your stead or did they just get
21  along without you?
22      A.    Got along without me.
23      Q.    Any other duties, aside from

Page 134

1   those listed here?
2       A.    No.
3       Q.    At the bottom, under work
4   environment, it says:  This position is full
5   time and requires forty hours of work
6   weekly.  A minimum of eighty percent of the
7   work day is spent seated at a desk.  Is that
8   accurate?
9       A.    It really is, because phones,
10  also.
11      Q.    Is there a more accurate
12  number than eighty?  It says:  A minimum of
13  eighty.  Was it ninety, ninety-five percent?
14      A.    Some of the times, yes, it
15  could be ninety or so, at least, because a
16  lot of it was not only typing, but phones.
17          (Defendant's Exhibit 8 was
18           marked for identification
19           purposes.)
20      Q.    Okay.  Let me show you Exhibit
21  8.  This is a compilation of Attending
22  Physician's Statements that were submitted
23  with your claim.  Have you seen those

Page 135

1   before?
2          (Off-the-Record discussion
3           was held.)
4       A.    Yes.
5       Q.    Okay.  Were you aware that
6   Dr. Thornbury had submitted an Attending
7   Physician's Statement in relation to your
8   claim?
9       A.    Yes.
10      Q.    Okay.  That's the first page
11  on here.  Were you aware that he noted that
12  you were released to work in your occupation
13  and that he listed no specific restrictions
14  or limitations?
15      A.    Yes.
16      Q.    Were you aware -- Well, let me
17  ask you before I get to there.  This
18  references Blue Cross Blue Shield.  And that
19  was, of course, your carrier through the
20  Convention; correct?
21      A.    Yes.
22      Q.    Your medical carrier.  The
23  second page is from Dr. Reuben Richardson.

Page 136

1   He's your sleep disorder specialist; right?
2       A.    Correct.
3       Q.    Before I get too far,
4   Thornbury is an orthopedist; right?
5       A.    Correct.
6       Q.    Sleep disorder specialist,
7   Reuben C. Richardson.  Were you aware that
8   he had also filled out a form?
9       A.    Yes.
10      Q.    Were you aware that he listed
11  no restrictions or limitations?
12      A.    There's another form later
13  that's different.
14      Q.    That was submitted after your
15  claim was submitted?
16      A.    Right.
17      Q.    Okay.  He references CUNA
18  Mutual Group for credit union, indicating
19  that he had completed forms regarding your
20  request for benefits under that?
21      A.    Yes.
22      Q.    Coverage?
23      A.    Yes.  We gave forms from each

34 (Pages 133 to 136)

Page 141

1  seeking disability benefits from either a
2  private disability insurer or from Social
3  Security?
4      A.    At this time?
5      Q.    Yes, ma'am.
6      A.    No.
7      Q.    Okay.  You've already
8  confirmed that, aside from your job at
9  Sylvan Learning Center, you have not worked
10 at all since May 31, 2004?
11     A.    Correct.
12     Q.    Since your job with the
13 Alabama State -- excuse me, the Annuity
14 Board of the Southern Baptist Convention,
15 have you applied for or pursued any other
16 jobs other than your Sylvan Learning Center
17 job?
18     A.    I think I answered that
19 before.
20     Q.    And your answer was no;
21 correct?
22     A.    Yes.
23     Q.    Have you been told by anyone

Page 142

1  that you can return to work at the Annuity
2  Board?
3      A.    No.
4      Q.    Have you been told by anyone
5  that you can't return to work at the Annuity
6  Board?
7      A.    No.  Wait.  Could you restate
8  that.
9      Q.    You've just not been told
10 either way?
11     A.    Are you talking about Annuity
12 Board, itself, stating that I can't come
13 back or are you talking about doctors
14 stating that I can't come back?
15     Q.    I meant -- I'm sorry.  I mean,
16 anyone at the Annuity Board telling you
17 that.
18     A.    No.  They have not said.
19     Q.    Taking a look back at Exhibit
20 7, which includes a list of the essential
21 duties and responsibilities of the State
22 Missions Board secretary.  And just, for the
23 Record, clarify for me this Annuity Board of

Page 143

1  the Southern Baptist Convention versus State
2  Missions Board.  What's the relationship
3  between those two, if you know?
4      A.    The Annuity Board is the
5  Annuity Board for all the Conventions in all
6  the states, you know.  The State Board of
7  Missions, the State Convention is just for
8  Alabama, this one.  There's one for
9  different states, and this one, the one that
10 I worked for, is the Convention for Alabama.
11     Q.    Okay.
12     A.    But the Annuity Board is over
13 all of them.
14     Q.    Exhibit 7, down under
15 qualifications, it mentions keyboard skills.
16 I assume that included typing?
17     A.    Yes.
18     Q.    Was that on a personal
19 computer?
20     A.    Yes, sir.
21     Q.    A regular keyboard?
22     A.    Just regular.
23     Q.    Not like a typewriter?  It was

Page 144

1  a keyboard for a computer; correct?
2      A.    Correct.
3      Q.    Okay.  How much of your day
4  did you actually spend typing on that
5  keyboard?
6      A.    It varied.
7      Q.    Was there such a thing as an
8  average day?
9      A.    No.  Not really.
10     Q.    Some days it was ten percent,
11 some days it was ninety percent?
12     A.    Yes.  I mean, it just really
13 varied because of what was going on at the
14 time.
15     Q.    What things were going on at
16 the time that caused it to vary so greatly?
17     A.    If we were in the process of
18 setting up meetings or had meetings
19 scheduled, I might spend more time on the
20 phone.  But if we were just starting to
21 prepare, we might be sending out a lot more
22 letters and literature, and I would be doing
23 a lot more typing, preparing for the --

36 (Pages 141 to 144)

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 145

1    Q.    Did your sickness or any of
2  your injuries keep you from typing?
3         MR. SINCLAIR: Go ahead. I'm
4  sorry.
5    A.    Arthritis. Well, arthritis
6  and the neck.
7    Q.    Okay.
8    A.    Arthritis and the neck, the
9  back and neck, because it made it hurt worse
10 from using my hands and arms.
11   Q.    Did it actually keep you from
12 typing or did it cause you pain while you
13 were typing?
14   A.    Well, it was enough pain that
15 if there was times -- Well, it caused a lot
16 of pain while I was typing.
17   Q.    Okay. Under -- Well, we've
18 covered that. You've told me a little bit
19 about your office environment. Was there a
20 kitchen or a break area nearby?
21   A.    No.
22   Q.    Okay. You said that you often
23 ate lunch with secretaries. Did you leave

Page 146

1  the building to eat lunch?
2    A.    No. But it was -- We were on
3  the second floor and it was in the basement.
4    Q.    Okay. There was a break area
5  in the basement?
6    A.    In the basement. Not nearby.
7    Q.    Were there restroom facilities
8  nearby, near your desk?
9         MR. SINCLAIR: Object to the
10 form.
11   A.    I have -- What do you mean by
12 nearby?
13   Q.    Well, you tell me. How close
14 were the closest restroom facilities that
15 you were allowed to use?
16   A.    It was like a hall and a half
17 of a hall away. Almost two halls away.
18   Q.    Okay. By two halls away,
19 describe for me what you mean. You had to
20 go down a hall and make an L and go another
21 half a hall?
22   A.    Correct.
23   Q.    Okay. Do you know, roughly,

Page 147

1  how many feet or yards that would have been
2  from your office area?
3    A.    Oh, gosh. I'm not good with
4  measurements like that. I'm really not
5  sure.
6         MR. SINCLAIR: Are you at a
7  stopping point?
8         MR. FINK: Yes. We can stop.
9         (Recess taken.)
10   Q.    (By Mr. Fink) We're right back
11 after lunch. And as your attorney just
12 pointed out, I'll probably ask you what
13 medication you just took.
14   A.    Adderall.
15   Q.    Adderall. And what do you
16 take Adderall for, Ms. Bullard?
17   A.    Narcolepsy.
18   Q.    Okay. Just before lunch we
19 were looking at Exhibit 7, which is a job
20 description of a secretary with the State
21 Board of Missions. And it lists -- It says
22 seven, but, actually there are eight,
23 because seven is duplicated, or the numeral

Page 148

1  seven is duplicated, essential duties and
2  responsibilities. Are these the material
3  and substantial duties of a secretary with
4  the State Board of Missions?
5         MR. SINCLAIR: Objection to
6  the form.
7    A.    I believe I had answered it
8  before that with the exception of, you know,
9  the events that I have to do more standing
10 and heavy lifting.
11   Q.    When you're getting -- You
12 said when you're getting ready for
13 conferences three to four times a year.
14   A.    And work at conferences. And
15 we actually go in and work at conferences.
16   Q.    But you said you haven't done
17 that in 2003 or 2004?
18   A.    I think that's correct. If I
19 remember correctly.
20   Q.    All right. What I'd like you
21 to do is, I'd like to talk about each one of
22 these eight items, each of these eight
23 duties, and ask you what you actually did in

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

Page 153

1 maybe half your time preparing office
2 correspondence. Did you include in that
3 half time, preparing correspondence relating
4 to conferences?
5     A.    No.
6     Q.    Okay. What I'm saying is,
7 there may be some overlap here. Let's just
8 take it and maybe after we go through them
9 all and you explain to me a little more what
10 they are, you'll be able to give me a better
11 idea of how much time you actually spent on
12 each of them.
13         Number three: Prepare a
14 weekly requisitions in keeping with office
15 accounting -- or accounting office
16 guidelines and maintain financial records
17 for the office. Is that something you did
18 on a weekly basis?
19     A.    Yes.
20     Q.    What exactly did that involve?
21     A.    Any purchases made by our
22 office or the directors's associates. We
23 would have to see -- We would type up a

Page 154

1 requisition and make copies to them for
2 those receipts.
3     Q.    You'd ask for reimbursement --
4 You'd prepare, basically, reimbursement
5 requests for monies spent?
6     A.    Correct.
7     Q.    Okay.
8     A.    Or for it to be taken out of
9 our account to be paid.
10     Q.    How much time did you spend
11 performing that weekly function?
12     A.    It's really hard to say
13 because it varies. It depends -- Some weeks
14 we might have hardly anything. Some weeks
15 we have -- I might take a half a day.
16     Q.    Okay. So, anywhere from no
17 time during the week to perhaps as much as
18 half a weekday?
19     A.    Correct.
20     Q.    Okay. Using that type of
21 parameter, can we go back to number two, and
22 give me some feel for how much time you
23 spent preparing for conferences? Sometimes

Page 155

1 it was no time during the week; right?
2     A.    Pretty much. And then other
3 times we might have two conferences coming
4 up in the same week and, you know, there
5 would be a lot of time spent.
6     Q.    Okay.
7     A.    It's just --
8     Q.    Serve as point of contact for
9 guests entering the office, by telephone or
10 in person. You did that on a daily basis;
11 correct?
12     A.    Correct.
13     Q.    You took phone calls and you
14 greeted people when they walked into the
15 office; right?
16     A.    Correct.
17     Q.    Can you assign any time period
18 for something like that. Let's talk about
19 telephone first. How often did you spend on
20 the telephone, just answering the phone?
21     A.    Again, that could vary
22 greatly. I mean, it would be hard to put
23 the time because --

Page 156

1     Q.    Did you field calls for
2 Mr. Baker and Mr. Mizzell?
3     A.    Mainly for Mr. Baker.
4     Q.    Okay. Was it a situation like
5 in my office where the phone just rings off
6 the hook constantly?
7     A.    It can, yes.
8     Q.    Okay. And I guess it depends
9 on a specific inquiry of the specific call
10 as to how much time each of those calls
11 took. They may only take a minute, they may
12 take longer; correct?
13     A.    A lot of his took a lot of
14 time because he was part time in the office,
15 and, therefore, I tried to help fulfill a
16 lot of things for him.
17     Q.    Okay. Was he part -- Was he
18 retired?
19     A.    No. He was also a pastor.
20 And so he just worked part time.
21     Q.    Number five is: Assist in
22 preparing materials for meetings that are
23 office related. Does that relate to what

39 (Pages 153 to 156)

Page 169

1  your house?
2      A.    Eight or nine miles.
3      Q.    How long did it take you to
4  get there in the morning?
5      A.    With traffic, thirty minutes.
6      Q.    Looking at those duties that
7  you've told me about on Exhibit 7, are you
8  able to perform any of those duties today?
9  Let's just go through them.  Number one:
10  Prepare office correspondence as directed by
11  the office director and associates?
12      A.    I would not be able to type.
13      Q.    Can you type at all?
14      A.    Not enough, not near enough,
15  no.  I mean, I could a type very small -- I
16  really don't know.  I haven't tried since
17  I've been gone.
18      Q.    But you maintain that you
19  couldn't?
20      A.    But I had got to that point
21  that I was not able to function enough to
22  stay awake, to stay out of the bathroom, you
23  know, the pain in my hands, my neck, all of

Page 170

1  it together.  I got to the point I could not
2  do it.
3      Q.    Do you have a computer at your
4  home?
5      A.    I have one, yes.
6      Q.    Do you use it?
7      A.    Not for typing.  My son and I
8  both use it for, like, e-mails sometimes, I
9  mean, just to check, but not a lot of typing
10  or anything like that.  But my son uses it
11  more than I do.
12      Q.    How much time a day do you
13  spend on it?
14      A.    Oh, gosh.  I probably don't
15  spend fifteen minutes.
16      Q.    Okay.  Do you have a modem or
17  do you have a faster connection than that?
18      A.    Yes.  It is does -- My son had
19  a modem put in, yeah.  I had a dial up, but
20  when he was there he had a modem.
21      Q.    Do you have, like, Comcast?
22  Do you have DSL?  Do you know what you have?
23      A.    I mean, it's through Knology.

Page 171

1  It's a DSL type of thing.
2      Q.    And you use it about fifteen
3  minutes a day, to check e-mails you said?
4      A.    Yeah.  My daughter might send
5  me something, you know, or, like, she sends
6  me pictures, you know.  She sent me two
7  pictures last night.
8      Q.    You don't spend time surfing
9  the Internet?
10      A.    Oh, no.
11      Q.    Back to the duties.  Prepare
12  for conferences related to the office that
13  include material preparation and promotion.
14  Are you able to do that, as you sit here
15  today?
16      A.    Excuse me.  Which number?
17      Q.    Number two.
18      A.    No, I would not be able to
19  type and put together the packets and things
20  that I did.
21      Q.    Why couldn't you do that?
22      A.    Because of standing and
23  lifting, and a lot of these packets we're

Page 172

1  talking might have a hundred pieces in it.
2  And you'd have to, you know, be able to pick
3  up and put it all in there and do this for a
4  while, and stand for a long period of time.
5      Q.    A hundred pieces of paper?
6      A.    Yes.
7      Q.    Number three:  Prepare weekly
8  requisitions in keeping with accounting
9  office guidelines and maintaining financial
10  records for the office.  Could you do that
11  today?
12      A.    Again, the typing would be
13  hard.
14      Q.    It would be hard, but could
15  you do it?
16      A.    I do not think I could do it,
17  no, I do not.
18      Q.    Anything else, aside from the
19  typing, that would keep you from performing
20  that duty?
21      A.    The copy on that one might be
22  bad.
23      Q.    Number four:  Serve as a point

43 (Pages 169 to 172)

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 169

1  your house?
2      A.    Eight or nine miles.
3      Q.    How long did it take you to
4  get there in the morning?
5      A.    With traffic, thirty minutes.
6      Q.    Looking at those duties that
7  you've told me about on Exhibit 7, are you
8  able to perform any of those duties today?
9  Let's just go through them.  Number one:
10  Prepare office correspondence as directed by
11  the office director and associates?
12      A.    I would not be able to type.
13      Q.    Can you type at all?
14      A.    Not enough, not near enough,
15  no.  I mean, I could a type very small -- I
16  really don't know.  I haven't tried since
17  I've been gone.
18      Q.    But you maintain that you
19  couldn't?
20      A.    But I had got to that point
21  that I was not able to function enough to
22  stay awake, to stay out of the bathroom, you
23  know, the pain in my hands, my neck, all of

Page 170

1  it together.  I got to the point I could not
2  do it.
3      Q.    Do you have a computer at your
4  home?
5      A.    I have one, yes.
6      Q.    Do you use it?
7      A.    Not for typing.  My son and I
8  both use it for, like, e-mails sometimes, I
9  mean, just to check, but not a lot of typing
10  or anything like that.  But my son uses it
11  more than I do.
12      Q.    How much time a day do you
13  spend on it?
14      A.    Oh, gosh.  I probably don't
15  spend fifteen minutes.
16      Q.    Okay.  Do you have a modem or
17  do you have a faster connection than that?
18      A.    Yes.  It is does -- My son had
19  a modem put in, yeah.  I had a dial up, but
20  when he was there he had a modem.
21      Q.    Do you have, like, Comcast?
22  Do you have DSL?  Do you know what you have?
23      A.    I mean, it's through Knology.

Page 171

1  It's a DSL type of thing.
2      Q.    And you use it about fifteen
3  minutes a day, to check e-mails you said?
4      A.    Yeah.  My daughter might send
5  me something, you know, or, like, she sends
6  me pictures, you know.  She sent me two
7  pictures last night.
8      Q.    You don't spend time surfing
9  the Internet?
10      A.    Oh, no.
11      Q.    Back to the duties.  Prepare
12  for conferences related to the office that
13  include material preparation and promotion
14  Are you able to do that, as you sit here
15  today?
16      A.    Excuse me.  Which number?
17      Q.    Number two.
18      A.    No, I would not be able to
19  type and put together the packets and things
20  that I did.
21      Q.    Why couldn't you do that?
22      A.    Because of standing and
23  lifting, and a lot of these packets we're

Page 172

1  talking might have a hundred pieces in it.
2  And you'd have to, you know, be able to pick
3  up and put it all in there and do this for a
4  while, and stand for a long period of time.
5      Q.    A hundred pieces of paper?
6      A.    Yes.
7      Q.    Number three:  Prepare weekly
8  requisitions in keeping with accounting
9  office guidelines and maintaining financial
10  records for the office.  Could you do that
11  today?
12      A.    Again, the typing would be
13  hard.
14      Q.    It would be hard, but could
15  you do it?
16      A.    I do not think I could do it,
17  no, I do not.
18      Q.    Anything else, aside from the
19  typing, that would keep you from performing
20  that duty?
21      A.    The copy on that one might be
22  bad.
23      Q.    Number four:  Serve as a point

43 (Pages 169 to 172)

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 173

1   of contact for guests entering the office by
2   telephone or in person.  Could you do that?
3        A.    I would not be able to sit and
4   hold the phone like I did before.
5        Q.    Okay.  What would prevent you
6   from sitting and holding the phone?
7        A.    My back, my hips, the
8   arthritis in my back and hips and
9   degenerative joints in my back and hips.
10        Q.    Okay.  How do you spend most
11   of your day presently?  Do you spend it in a
12   seated position?  Do you stand?  Do you
13   alternate a good bit?
14        A.    I alternate a lot.
15        Q.    Okay.  If you had to say, I
16   mean, there are only so many positions you
17   can be in, you could be standing, sitting,
18   or, I guess, lying down.  Would you agree
19   with me on that?
20        MR. SINCLAIR:  Objection to
21   the form.
22        A.    Yes.
23        Q.    In a twenty-four hour period,

Page 174

1   how much time do you say you spend lying
2   down?
3        A.    It varies, again, because I'm
4   up and down, even during the night.  I might
5   -- I mean --
6        Q.    I understand that,
7   Ms. Bullard, I mean, that's a fairly simple
8   thing to say, you know:  I spend so many
9   hours lying down or I spend so many hours
10   sitting or standing.
11        And my question remains:  If
12   you had to give an answer, how many hours,
13   roughly, do you spend, in a twenty-four hour
14   day, in a lying down position?
15        MR. SINCLAIR:  She already
16   gave the answer to that.  She didn't know.
17        Q.    Do you lie down to sleep?
18        A.    Excuse me?
19        Q.    Do you lie down to sleep?
20        A.    When I try to sleep, yes.
21        Q.    How many hours a day do you
22   lie down and try to sleep?
23        A.    Again, that varies.

Page 175

1        Q.    Do you spend half your day
2   lying in bed?
3        A.    No.
4        Q.    Okay.  Do you spend a third of
5   your bed lying in bed?
6        A.    No, I would not say a third.
7        Q.    Less than a third?
8        A.    Probably.  I'm up and down,
9   I'm in the recliner, I'm in the bed, I'm
10   walking, I'm standing.
11        Q.    Do you think you spend more or
12   less than a third of your day standing,
13   which would include walking?
14        A.    Again, it would vary, but it
15   would be hard to say.
16        Q.    Okay.  I can appreciate that
17   it would be hard to say.  But if you had to
18   say more or less than eight hours a day in
19   an average day, how much time do you spend
20   standing, more or less than eight hours?
21        A.    Less.
22        Q.    Would you say more or less
23   than four hours?

Page 176

1        A.    Less.
2        Q.    Less than four hours standing.
3   Would you say more or less than two --
4        A.    Are you talking about -- You
5   said walking, also.  I'm trying --
6        Q.    Including standing, too, and I
7   include walking.
8        A.    I would still say it would be
9   less than four hours.
10        Q.    Okay.  Could you say that it
11   would be more or less than two hours?
12        A.    No.  It would be more than
13   that.  Again, it's going to vary.
14        Q.    I understand.  With regard to
15   sitting, would you say you spend more or
16   less than eight hours a day in a seated, as
17   opposed to a lying position?
18        A.    Less than eight hours.  It
19   varies.  I really cannot put -- on this.  I
20   mean --
21        Q.    You feel on a balance on an
22   average day you spend less than eight hours
23   sitting?

44 (Pages 173 to 176)

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 177

1   A.   You know, when I hurt, if I'm
2   hurting when I'm sitting, I get up and walk
3   around. It just varies. I don't count the
4   time. I do what I feel like I have to do at
5   the time.
6       Q.   Do you have wide fluctuations
7   in a given day or a week as to the amount of
8   pain that you're experiencing?
9       A.   A wide?
10      Q.   Yes, ma'am.
11          MR. SINCLAIR: Go ahead. You
12  already picked that up. Objection to the
13  form.
14      A.   Can you specify what you mean
15  by wide?
16      Q.   Sure. You said that if you're
17  in pain, it may affect it. Are you in
18  constant pain?
19      A.   Yes.
20      Q.   Okay. Does your pain vary
21  from day to day?
22      A.   Some.
23      Q.   Okay. How much does it vary,

Page 178

1   from what to what?
2       A.   Some days it could -- It could
3   be a wide range sometimes. Sometimes it can
4   be excruciating, sometimes I can manage to
5   get comfortable for just a few minutes at a
6   time, and some days I can't manage to get
7   comfortable at all.
8       Q.   Okay. On those days when you
9   can get comfortable for a period of time, do
10  you spend less time lying down?
11      A.   I would say yes.
12      Q.   On those days where you have
13  excruciating pain, are you spending your
14  whole day in bed?
15      A.   No.
16      Q.   Okay. You're still getting up
17  and performing activities?
18      A.   I'm trying to move around. I
19  try everything.
20      Q.   Do your activities change a
21  lot from day to day?
22      A.   Again, that varies. It's
23  going to vary.

Page 179

1       Q.   Do you remember the Social
2   Security report that you filled out about
3   your activities of living? There you took
4   an average; right?
5       A.   I don't remember that, I mean,
6   exactly. I mean, I answered their questions
7   the way they asked them.
8       Q.   You got pretty specific about
9   what you did in a given day. Do you
10  remember that? And what I'm asking you is
11  what you do in a given day?
12          How much of your time do you
13  spend lying, versus, sitting, versus
14  standing? And I understand that it may vary
15  from day to day, and that there will be some
16  variations, but what I'm asking you for is,
17  on average, how much of your time you spend
18  in a given day lying down, how much of your
19  time you spend in a given day, in a seated
20  position, and how much of your time you
21  spend in a given day standing?
22          MR. SINCLAIR: Don't guess,
23  but if you know, please answer.

Page 180

1       A.   I don't know.
2       Q.   My point is that no one would
3   know better than you.
4       A.   But, again, because it varies,
5   I can't put that kind of a specific.
6       Q.   Okay. Let's talk about
7   yesterday, March the 7th of 2006. What did
8   you do -- What time did you -- Well, let's
9   start at midnight or twelve o'clock in the
10  morning, were you in your bed at twelve
11  o'clock yesterday morning?
12      A.   Twelve o'clock a.m. in the
13  morning?
14      Q.   Yes, ma'am. Let's use 12:01
15  to make it easier. 12:01 a.m. on March the
16  7th, were you in bed?
17      A.   You know I really don't look
18  at the clock. I mean, I am up and down.
19      Q.   I understand.
20      A.   I don't know.
21      Q.   Did you arise at some point
22  yesterday morning from a sleep?
23      A.   Yes. I arose several times

45 (Pages 177 to 180)

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 189

1  do, but it never happens. And sometimes I
2  might not sleep at all. I may be up more
3  than I'm sleeping. And until, like I say,
4  maybe five o'clock, I may ease off and I may
5  fall asleep and, therefore, I may not get up
6  until nine or ten o'clock. Because I
7  finally got eased off enough that I did
8  sleep. But that happens on occasion.
9      I don't always get up at seven
10  o'clock. I don't have a set time when I'm
11  -- you know, if I don't have to. When I'm
12  just -- I just -- If I can ease off enough
13  and fall asleep, I fall asleep. If I wake
14  up and I hurt, I get up.
15      Q.   Back to trying to get some
16  idea of what you do in an average day, let's
17  look at the past month. And let me ask you
18  how many times you typically -- Strike that.
19      In the last month, do you
20  leave -- have you left the house an average
21  of more than one time a day?
22      A.   Leave the house?
23      Q.   Yes.

Page 190

1      A.   There's a lot of times I don't
2  leave the house maybe one or two times a
3  week. A lot of days I never leave the house
4  unless I walk out to the get the mail or,
5  you know, walk in the yard to just walk
6  around for a minute. Get some air, but as
7  far as going somewhere.
8      Q.   Going somewhere sometimes.
9  You only go somewhere one or two times a
10  week?
11      A.   Correct. Most of the time I
12  don't --
13      Q.   Most of the time you only go
14  somewhere one or two times a week?
15      A.   Yes.
16      Q.   And where do you go those one
17  or two times a week?
18      A.   To the grocery store, the post
19  office, occasionally I do have --
20      Q.   Doctor's office visits?
21      A.   Yeah. I have the doctor's
22  office visits.
23      Q.   Is there anywhere that you

Page 191

1  regularly go, aside from the grocery store
2  or the post office or the doctor's visits?
3      A.   No. On occasion, I might go
4  get something to eat with a friend for an
5  hour, just to eat, but that doesn't --
6  That's very rare. I don't go to church
7  anymore because I can't sit through the
8  service.
9      Q.   When did you last regularly
10  attend church services?
11      A.   It's probably been three years
12  since I was regular.
13      Q.   Okay. What church did you
14  attend?
15      A.   Pinedale Baptist Church.
16      Q.   Are you still a member there?
17      A.   Yes.
18      Q.   Okay. Do you ever run out and
19  grab something to eat by yourself?
20      A.   No.
21      Q.   How often do you eat out with
22  a friend?
23      A.   Maybe once a month, at the

Page 192

1  most. It's not very often.
2      Q.   Who do you go out and eat
3  with?
4      A.   It varies. Someone that I
5  used to work with, someone from the church.
6      Q.   In the last year, that you can
7  recall, who have you gone out to eat with?
8      A.   Names?
9      Q.   Yes, ma'am.
10      A.   Well, let's see. I've went
11  out with Joanne Farmer.
12      Q.   Okay.
13      A.   I went out with Annette
14  Sutton. She's retired from the program.
15      Q.   Anyone else that you can
16  recall?
17      A.   Yes. I'm sorry. Is that what
18  you said, is that all I could recall?
19      Q.   That's all you can recall?
20      A.   Yes.
21      Q.   Okay. We were talking about
22  your duties, and I was asking you whether or
23  not you could perform these today. We had

48 (Pages 189 to 192)

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 193

1 gotten up to number four. So let me go
2 forward with number five: Assist in
3 preparing materials for meetings that are
4 office related. Could you still do that
5 today?
6     A.     No.
7     Q.     And why not?
8     A.     Because, again, there would be
9 a lot of standing and lifting, making the
10 packets. And these are the things that they
11 take with them. It would be a lot of
12 standing and lifting.
13     Q.     How much lifting did you have
14 to do?
15     A.     We did a good bit.
16     Q.     What exactly were you lifting?
17 You mentioned a hundred sheets of paper;
18 right?
19     A.     Right. We would do packets
20 with those. We would put them in the boxes.
21 They may have -- You know, sometimes they
22 may have a thirty-people conference.
23 Sometimes they may have seventy or a

Page 194

1 hundred, and we would have to prepare
2 materials for all of them, packets. And we
3 would have to lift that and have boxes of
4 envelopes and things that we would have to
5 move.
6     Q.     That's, roughly, a hundred
7 sheets of paper right there?
8     A.     Uh-huh.
9     Q.     Is that, roughly, what you put
10 in a packet?
11     A.     We have at times. Some of
12 them aren't that big, but a lot of them are.
13     Q.     Okay. And that's about
14 three-quarters of an inch to an inch.
15     A.     And we've -- A lot of times we
16 have to take them and have them -- And we
17 bind them because they wouldn't fit in the
18 folders.
19     Q.     Okay. And you're not
20 contending that you'd be incapable of
21 lifting a hundred sheets of paper at a time?
22     A.     No. I'm saying that we would
23 have it spread out and you'd have to stand

Page 195

1 and collate and put it all together in a
2 certain -- and you'd have to do that, you
3 know, a hundred times or fifty times.
4     Q.     So, it's the walking to take a
5 sheet from this stack, a sheet from this
6 stack and a sheet from this stack that
7 caused you the problem?
8         MR. SINCLAIR: Objection to
9 the form.
10     A.     The standing and the walking.
11 The reaching, the lifting.
12     Q.     As far as the lifting it, it
13 wasn't the weight of the lift that you
14 contend -- you say would have prevented you
15 from performing that task, it was the mere
16 act of reaching over to pick something up;
17 is that what you're referring to?
18         MR. SINCLAIR: Objection to
19 the form.
20     A.     Well, the weight could be
21 because as you box -- you're fixing the
22 packages, you're putting them in a box and
23 you have to move the boxes to fix another

Page 196

1 box.
2     Q.     Okay. Did you have people in
3 the office to assist with lifting, runners
4 and things of that nature?
5     A.     No.
6     Q.     Okay. No assistance for that
7 purpose?
8     A.     There were two maintenance men
9 that if it were a piece of furniture or a
10 heavy piece, they would, but as far as
11 boxes, and things like that, no.
12     Q.     Okay. Number six: Maintain a
13 database. Could you do that today?
14     A.     No.
15     Q.     And why not?
16     A.     Typing. There's a lot of
17 typing. And it's like that injury kind of
18 with that.
19     Q.     And you contend that your
20 arthritis in your back and neck problems
21 would prevent you from typing; correct?
22     A.     Correct. My hands, neck,
23 back.

49 (Pages 193 to 196)

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 213

1  is.
2      A.    Moon.
3      Q.    Is it Moon?
4      A.    Yes.
5      Q.    Who is Dr. Moon?
6      A.    He was another GP that --
7  around the time of Karst. I just -- Well,
8  to be honest, the reason that Karst --
9  Dr. Karst smoked, and I could smell smoke.
10  That's one reason. And I was looking for a
11  doctor. I tried Dr. Moon, but he found
12  Dr. Whitesell and then Dr. McKinney.
13      Q.    You said Dr. Karst smoked?
14      A.    Yes. And I had never saw him
15  smoke, but you could smell smoke on him, and
16  that just bothered me. To have my doctor to
17  smell like smoke.
18          MR. SINCLAIR: It doesn't
19  bother you if your lawyer smells that way,
20  does it?
21          THE WITNESS: No.
22      Q.    How about Dr. Moon, why did
23  you stop seeing him?

Page 214

1      A.    Like I said, I was trying
2  doctors. I had tried him, but then someone
3  recommended Dr. Whitesell. And when I went
4  to her, I liked her better, so I stayed with
5  her.
6      Q.    The second page of that says:
7  You've had headaches, jaw pain, neck pain,
8  ear pain and face pain for twenty years;
9  right?
10      A.    At that time, yes, but this
11  has been a while. It's longer now.
12      Q.    Longer now?
13      A.    Because this was in '98.
14      Q.    It says: At that point the
15  pain was pretty much constant; right?
16      A.    Yes.
17      Q.    You filled out this form,
18  didn't you?
19      A.    Yes.
20      Q.    The second page?
21      A.    Yes.
22      Q.    Is everything on here
23  accurate, or was it accurate at the time you

Page 215

1  filled it out?
2      A.    Yes.
3          (Defendant's Exhibit 16
4          was marked for
5          identification purposes.)
6      Q.    Okay. Exhibit 16 is a
7  7/28/03, office note from Dr. McKinney. It
8  says halfway through: The patient has also
9  been recently diagnosed with ulcerative
10  colitis by Dr. Jackson per her. We do not
11  have anything back from him yet.
12          However, she is on Asacol 400
13  milligram, two PO TID. She states that she
14  is unhappy with the care she has gotten at
15  his office, as she tried to make a follow-up
16  appointment to get more information about
17  ulcerative colitis and was not allowed to
18  schedule an appointment.
19          She states that she was told
20  that she had ulcerative colitis by his
21  receptionist and was unable to ask any
22  questions to him about this.
23          The patient also states that

Page 216

1  she has worsening nausea with eating, and
2  will occasionally have right, upper quadrant
3  abdominal pain after eating. Have I read
4  that correctly?
5      A.    Yes.
6      Q.    What is ulcerative colitis?
7      A.    It's inflammation of the
8  colon. It's --
9      Q.    Is the Dr. Jackson that you
10  refer to there Alto Jackson, Junior?
11      A.    It is.
12      Q.    Did he ever -- Did you ever
13  speak to him further about his diagnosis of
14  ulcerative colitis?
15      A.    No.
16      Q.    Okay. Is he the only one who
17  has ever diagnosed you with ulcerative
18  colitis?
19      A.    No. I had another colonoscopy
20  by a Dr. Anderson and he said the same.
21      Q.    In the documents that were
22  produced by your attorney, there's a
23  document from Dr. A. L. Jackson, Junior

54 (Pages 213 to 216)

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 245

```
1        Q.    Barranco?
2        A.    Uh-huh.
3        Q.    B-A-R-R-A-N-C-O?
4        A.    Uh-huh.
5        Q.    How many times have you seen
6  Dr. Barranco?
7        A.    One time.
8        Q.    Any other gastroenterologist
9  that you've seen in the last two years?
10       A.    No.
11             (Defendant's Exhibit 20
12             was marked for
13             identification purposes.)
14       Q.    Exhibit Number 20.  This is a
15 patient history from Dr. Paul.  Did you fill
16 that out in June of 2004?  Is that your
17 signature and handwriting?
18       A.    Yes.
19       Q.    Where it asks if you have an
20 orthopedic surgeon, you list in addition to
21 Richardson a Dr. Ryan.  And a Patrick Ryan
22 whom you -- who did your neck surgery?
23       A.    Yes.
```

Page 246

```
1        Q.    And his office is here in
2  Montgomery; correct?
3        A.    Correct.
4        Q.    And you're still seeing him as
5  needed?
6        A.    As needed.
7        Q.    Okay.  This also references a
8  Dr. Jakes.  We talked about him?
9        A.    Yes.
10       Q.    The same Jakes?
11       A.    Yes.
12       Q.    Okay.  Have you seen a
13 Dr. Roger Kemp?
14       A.    Yes.
15       Q.    Who is that?
16       A.    Pain management doctor.
17       Q.    When did you start seeing
18 Roger Kemp?
19       A.    I finally went to him -- I
20 went maybe once or twice.  Dr. McKinney, I
21 believe it was, sent me to him.  But I
22 started also seeing Dr. Paul right after
23 that.  And he was giving me injections in my
```

Page 247

```
1  back and she -- Dr. Paul asked that I quit
2  that because we were going to start the
3  Remicade, and she didn't want me having the
4  injections.
5        Q.    When did you last see
6  Dr. Kemp?
7        A.    I don't remember the date.
8  It's been a year, two years.  It's been a
9  while.
10       Q.    Do you think Exhibit 20 is
11 about the time you first started seeing
12 Dr. Paul, since that's when you filled out a
13 patient history form?
14       A.    Yes.
15       Q.    Would that have been about the
16 time you stopped seeing Dr. Kemp?
17       A.    Yes.
18             MR. SINCLAIR:  Are you
19 guessing?
20             THE WITNESS:  Yes.  I'm
21 guessing, but, I mean, you know, just --
22       Q.    That makes sense, based on
23 what you've just told me; correct?
```

Page 248

```
1        A.    It would have been close to
2  that time, somewhere around that time.
3        Q.    Sure.  And his records
4  obviously would show exactly when you last
5  saw him.  I'm just trying to get some feel.
6        We've talked about Dr. Mark
7  Anderson, too; right?
8        A.    Yes.
9        Q.    And he's the -- Is he a
10 gastro?
11       A.    Yes.
12       Q.    Okay.  When did you last see
13 him?
14       A.    It's been about -- As I
15 remember, about two years, a year and a
16 half, two years.
17       Q.    You don't plan to see him
18 again?
19       A.    No.
20       Q.    We've talked about a whole lot
21 of doctors and treatment providers.
22       A.    Yes.
23       Q.    Any others that you can recall
```

62 (Pages 245 to 248)

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 245

1   Q.   Barranco?
2   A.   Uh-huh.
3   Q.   B-A-R-R-A-N-C-O?
4   A.   Uh-huh.
5   Q.   How many times have you seen
6   Dr. Barranco?
7   A.   One time.
8   Q.   Any other gastroenterologist
9   that you've seen in the last two years?
10  A.   No.
11       (Defendant's Exhibit 20
12       was marked for
13       identification purposes.)
14  Q.   Exhibit Number 20.  This is a
15  patient history from Dr. Paul.  Did you fill
16  that out in June of 2004?  Is that your
17  signature and handwriting?
18  A.   Yes.
19  Q.   Where it asks if you have an
20  orthopedic surgeon, you list in addition to
21  Richardson a Dr. Ryan.  And a Patrick Ryan
22  whom you -- who did your neck surgery?
23  A.   Yes.

Page 246

1   Q.   And his office is here in
2   Montgomery; correct?
3   A.   Correct.
4   Q.   And you're still seeing him as
5   needed?
6   A.   As needed.
7   Q.   Okay.  This also references a
8   Dr. Jakes.  We talked about him?
9   A.   Yes.
10  Q.   The same Jakes?
11  A.   Yes.
12  Q.   Okay.  Have you seen a
13  Dr. Roger Kemp?
14  A.   Yes.
15  Q.   Who is that?
16  A.   Pain management doctor.
17  Q.   When did you start seeing
18  Roger Kemp?
19  A.   I finally went to him -- I
20  went maybe once or twice.  Dr. McKinney, I
21  believe it was, sent me to him.  But I
22  started also seeing Dr. Paul right after
23  that.  And he was giving me injections in my

Page 247

1   back and she -- Dr. Paul asked that I quit
2   that because we were going to start the
3   Remicade, and she didn't want me having the
4   injections.
5   Q.   When did you last see
6   Dr. Kemp?
7   A.   I don't remember the date.
8   It's been a year, two years.  It's been a
9   while.
10  Q.   Do you think Exhibit 20 is
11  about the time you first started seeing
12  Dr. Paul, since that's when you filled out a
13  patient history form?
14  A.   Yes.
15  Q.   Would that have been about the
16  time you stopped seeing Dr. Kemp?
17  A.   Yes.
18       MR. SINCLAIR:  Are you
19  guessing?
20       THE WITNESS:  Yes.  I'm
21  guessing, but, I mean, you know, just --
22  Q.   That makes sense, based on
23  what you've just told me; correct?

Page 248

1   A.   It would have been close to
2   that time, somewhere around that time.
3   Q.   Sure.  And his records
4   obviously would show exactly when you last
5   saw him.  I'm just trying to get some feel.
6   We've talked about Dr. Mark
7   Anderson, too; right?
8   A.   Yes.
9   Q.   And he's the -- Is he a
10  gastro?
11  A.   Yes.
12  Q.   Okay.  When did you last see
13  him?
14  A.   It's been about -- As I
15  remember, about two years, a year and a
16  half, two years.
17  Q.   You don't plan to see him
18  again?
19  A.   No.
20  Q.   We've talked about a whole lot
21  of doctors and treatment providers.
22  A.   Yes.
23  Q.   Any others that you can recall

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

Page 253

1 through any treatment that you've been
2 provided?
3    A.    No.
4    Q.    Okay.  How about your
5 ulcerative colitis?  Do you contend that
6 that, standing alone, prevents you from
7 performing the duties of a secretary?
8    A.    I think that has improved with
9 Remicade.
10    Q.    Okay.  So, you wouldn't say
11 that your ulcerative colitis alone keeps you
12 from performing the duties of a secretary?
13    A.    Not alone.
14    Q.    And that basically caused you
15 to -- required for you to take frequent
16 bathroom breaks; correct?
17    A.    Correct.  Which you're also in
18 pain, a lot of pain.  It's hard to
19 concentrate when you're cramping and have a
20 lot of pain.  But you also have to stay
21 close to a bathroom and you're there a lot.
22    Q.    But you feel that's pretty
23 well managed right now with medication;

Page 254

1 correct?
2    A.    Correct.
3    Q.    Do you still have regular
4 flares, even on the medication?
5    A.    Yes.
6    Q.    How often do you have flares?
7    A.    Could I change it?
8    Q.    Yes.
9    A.    I felt like that this is
10 flares, but Dr. Barranco, the doctor I just
11 saw, seems to think that what I'm feeling
12 now, that the colitis is better, what I'm
13 feeling is just a spastic colon.  I did have
14 blood, a lot of blood, and that it was
15 harder to determine that that was the
16 diverticulitis at the time or the colitis.
17    Q.    Okay.  Do you contend that
18 your diverticulitis, standing alone,
19 prevents you from performing the duties of a
20 secretary?
21    A.    Not standing alone.
22    Q.    Okay.  Are your problems with
23 diverticulitis better on medication?

Page 255

1    A.    The diet -- I mean, watching,
2 you know, what I eat and taking a fiber-type
3 medicine.  And then when I have flare-ups,
4 they give me antibiotics.  Yes, if I do all
5 of that, it's better.
6    Q.    Okay.  How about your problems
7 with high blood pressure?  Do you contend
8 that the problems with high blood pressure
9 prevent you from performing the duties of a
10 secretary?
11    A.    Not alone.
12    Q.    Okay.  Do they play any role
13 in the combinations of that?  What problems
14 do you have with high blood pressure?
15    A.    I have high blood pressure.
16 I'm on medication for it.
17    Q.    How does that affect your
18 ability to perform the duties of a
19 secretary?
20       MR. SINCLAIR:  Objection to
21 the form.
22    A.    Because you can -- I mean, I
23 even had to leave work one day and go to the

Page 256

1 doctor's office because -- and they had to
2 give me nitroglycerin and things because you
3 could have a heart attack, I mean, it had
4 gotten so high.
5    Q.    Okay.  Is that something you
6 are able to control with medication and
7 treatment?
8    A.    I had been, but just Monday,
9 it was high again.  Lately it has been
10 erratic.  It's been high with medication.
11    Q.    You mentioned surgery on the
12 neck for herniated disks.  You've had
13 surgery; correct?
14    A.    Yes, on the neck.
15    Q.    Do you contend that your neck
16 problems, standing alone, prevent you from
17 performing the duties of a secretary?
18    A.    Not alone.
19    Q.    Did you have improvement with
20 your neck problems following the surgery?
21    A.    To an extent, yes.
22    Q.    What problems do you presently
23 have with your neck?

64 (Pages 253 to 256)

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 257

1    A.    I still have some stiffness
2  and soreness, which is hard to determine if
3  it's just, you know -- I'm -- Probably both,
4  TMJ and the disk.
5    Q.    Okay.  Do you presently plan
6  any surgeries for either your neck problems
7  or for your TMJ?
8    A.    The neck has actually -- The
9  surgery that they have done has been done.
10 But the TMJ, like I said, the insurance will
11 not pay for it.
12   Q.    If you could afford it, would
13 you do it?
14   A.    Yes.
15   Q.    How about your feet problems?
16 Do you your feet problems, standing alone,
17 prevent you from performing the duties of a
18 secretary?
19   A.    Not standing alone.
20   Q.    What problems do you presently
21 have with your feet that might preclude you
22 from performing secretarial duties?
23   A.    I can't stand very long.  You

Page 258

1  know, it -- I can't walk a lot.  I can't do
2  stairs.  I mean, like I said, alone it
3  wouldn't, but, you know --
4    Q.    Where you worked, you were on
5  the second floor?
6    A.    Yes.
7    Q.    Did you have an elevator?
8    A.    Yes.
9    Q.    Two bulging disks in back that
10 hurt.
11   A.    But, now, from the last test
12 they did, there's four.
13   Q.    Okay.  You've got four bulging
14 disks?
15   A.    Basically degenerative disk
16 disease.
17   Q.    Has any doctor recommended
18 surgery?
19   A.    Not yet.  They would prefer,
20 with arthritis, you know, to not do that if
21 we can --
22   Q.    What treatment are you getting
23 for that presently?

Page 259

1    A.    I have a back brace that I
2  alternate, I can use.  I --
3    Q.    Are you wearing one now?
4    A.    I am.
5    Q.    Okay.
6    A.    I have a Tens Machine.
7    Q.    Is that an electric impulse?
8    A.    Right.  I have one of those at
9  home that I use.
10   Q.    How often do you use that?
11   A.    Several times a day.  And I
12 alternate and use heat and sometimes ice, I
13 alternate.
14   Q.    Who prescribed the Tens Unit;
15 is that Dr. Paul?
16   A.    Yes.
17   Q.    Arthritis.  Do your problems
18 with arthritis, standing alone, prevent you
19 from performing the duties of a secretary?
20   A.    Yes.  I have real bad
21 arthritis in my hips and in my hands, and,
22 you know, a lot of my joints.  But my hips,
23 that's one of the reasons, between my back

Page 260

1  and the hips, to sit for a very long time, I
2  cannot sit.  And, of course, my hands.
3  Typing, It's just gotten very hard.  I just
4  cannot hold out to type.
5    Q.    So, you contend that the
6  arthritis alone prevents you from performing
7  the duties of a secretary?
8    A.    I think it does, yes.
9    Q.    How about the two bulging
10 disks in your back, I didn't ask you that,
11 do those, standing alone, prevent you?
12   A.    Four.
13   Q.    Four.  Excuse me.  Do those,
14 standing alone, prevent you from performing
15 your duties of a secretary?
16        MR. SINCLAIR:  When you say
17 contend -- I'm sorry.  This is your
18 deposition, I don't mean to butt in.  You
19 can ask her if she's contending that,
20 because I don't want her getting into saying
21 whether or not she's medically capable of
22 it.
23        MR. FINK:  Sure.  I don't mind

65 (Pages 257 to 260)

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

Page 261

1 asking her that.
2 Q. (By Mr. Fink) Do you contend
3 that the four bulging disks in your back
4 presently prevent you from performing the
5 duties of a secretary, standing alone?
6 A. That, I don't know.
7 Q. Do you contend that your
8 problems with bursitis, standing alone,
9 prevent you from performing the duties of a
10 secretary?
11 A. Not standing alone.
12 Q. What problems -- Well, what is
13 bursitis, first of all, in your own words?
14 A. It's an inflammation of the
15 bursa. It's like a tendon. That's what I
16 understand it is. They call it the bursa.
17 Q. It's in your right shoulder?
18 A. Well, you have them in -- But
19 that's where the main -- that I've had the
20 injections for was in my right.
21 Q. Who's treating you for that?
22 A. The pain management doctors
23 had treated me. Dr. Kemp, I believe it was,

Page 262

1 or Dr. Peden. It might have been Dr. Peden.
2 But, again, since the Remicade, she doesn't
3 want me having injections.
4 Q. Have your problems with your
5 bursitis improved since the Remicade?
6 A. Some.
7 Q. Have your problems with your
8 bulging disks in your back improved since
9 the Remicade?
10 A. No. I can't tell any
11 difference in that.
12 Q. Have the problems with your
13 feet improved since the Remicade?
14 A. I can't tell a difference with
15 that.
16 Q. Have your problems with your
17 arthritis improved?
18 A. Some. Not much.
19 Q. TMJ. Do you contend that your
20 problems with TMJ prevent you from
21 performing the duties of a secretary?
22 A. Not alone.
23 Q. Okay. And TMJ -- TMJ is

Page 263

1 actually the joint; right?
2 A. Yes.
3 Q. And it's the disorder of the
4 TMJ that causes you trouble; correct?
5 A. Correct.
6 Q. When did you last seek
7 treatment for a disorder of your TMJ?
8 A. Whenever it was I saw
9 Dr. Farha and Dr. -- the oral surgeon.
10 Q. Foy?
11 A. Yes. Those doctors, because,
12 you know, they had determined -- Dr. Farha
13 said it was too far -- my joints were too
14 far gone for the mouth pieces to help. He
15 couldn't help me anymore. And then the
16 insurance wouldn't pay for the surgery, I
17 didn't see him anymore.
18 Q. Fibromyalgia. Do you contend
19 that your problems with fibromyalgia prevent
20 you from performing your duties of a
21 secretary?
22 A. Not alone.
23 Q. Do you contend that all of

Page 264

1 these problems in combination prevent you
2 from performing the duties of a secretary?
3 A. Yes.
4 Q. The afore mentioned problems
5 are for physical disability; right?
6 A. Yes.
7 Q. You don't claim that you're
8 mentally incapable of performing the duties
9 of your occupation as a secretary; correct?
10 MR. SINCLAIR: Objection to
11 the form. Answer to the best of your
12 ability.
13 MR. FINK: I thought we had a
14 stipulation on that, that she doesn't
15 contend that her -- or that she's mentally
16 incapable of performing the duties of her
17 occupation as a secretary and that her
18 claims are for physical problems?
19 MR. SINCLAIR: Would lack of
20 ability to concentrate fall within what
21 you're asking her about?
22 MR. FINK: Well, if she
23 contends that her lack of ability to

66 (Pages 261 to 264)