IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| BETTY BULLARD, | § | |
| Plaintiff, | § | |
| vs. | § | CASE NO. |
| | | CV-2:05-cv-1217-MEF |
| UNUMPROVIDENT CORPORATION;<br>UNUM LIFE INSURANCE COMPANY<br>OF AMERICA, et al., | § | |
| | § | |
| Defendants. | § | |
| | § | |

## EVIDENTIARY SUBMISSIONS IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendants UnumProvident Corporation and Unum Life Insurance Company of America hereby file the following Evidentiary Submissions in Support of their Opposition to Plaintiff's Motion for Partial Summary Judgment:

1.  Excerpts from Deposition of Betty Bullard taken on March 8, 2005 (pages 11-18, 82-84, 87-91, 102, 132-133, 135, 143-146, 205, 210-211, 251-252, 256, 259, 262, 263-274);

2.  Personnel Manual for Missions Support Personnel for the State Board of Missions Alabama Baptist Convention (pp. 8-9);

3.  Excerpt from Deposition of Dr. Richardson taken on January 22, 2007 (page 54);

4.  2005 W-2 Form of Plaintiff;

5.  Declaration of Dr. Susy L.L. Vergot; and

6.  Plaintiff's Objection to Defendants' Third Request for Production of Documents to Plaintiff.

Respectfully submitted,

*s/Henry T. Morrissette*
HENRY T. MORRISSETTE (MORRH7622)
DOUGLAS W. FINK (FINKD3798)
Attorneys for Defendants
UnumProvident Corporation and
Unum Life Insurance Company of America

OF COUNSEL:

HAND ARENDALL, L.L.C.
Post Office Box 123
Mobile, Alabama  36601
Phone: (251) 432-5511
Fax:    (251) 694-6375

## CERTIFICATE OF SERVICE

I hereby certify that on this day, **February 19, 2007**, I electronically filed the foregoing pleading with the Clerk of the Court using the CM/ECF system which will send notifications of such filing to the following:

tsinclair@cwl-law.com

*s/Henry T. Morrissette*

585934

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


CASE NUMBER:  2:05-CV-1217-MEF

Betty Bullard,

　　　　Plaintiff,

　　　　vs.

UnumProvident Corporation, et al.,

　　　　Defendants.


S T I P U L A T I O N

IT IS STIPULATED AND AGREED by and
between the parties through their respective
counsel, that the deposition of Betty
Bullard may be taken before Sara Mahler,
CSR, at the offices of Beasley, Allen, Crow,
Methvin, Portis & Miles, at 272 Commerce
Street, Montgomery, Alabama 36103, on the
8th day of March, 2006.


DEPOSITION OF BETTY BULLARD

46798

**#1**

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

1          Q.      Can you just read that into

2     the Record so I'll have it?

3          A.      3298395.

4          Q.      Is your current home address

5     still 4001 Tiffany, T-I-F-F-A-N-Y, Drive in

6     Montgomery?

7          A.      It is.

8          Q.      What's the zip code there?

9          A.      36110.

10          Q.      And you have no current work

11     address, as I understand it?

12          A.      Correct, but --

13          Q.      When you were employed with

14     the Annuity Board of the Southern Baptist

15     Convention, your work address was 2001 East

16     South Boulevard?

17          A.      Correct.

18          Q.      Go ahead.

19          A.      You had asked -- Could you

20     repeat the question about the address, for

21     the work address.

22          Q.      Right.  I'm sorry.  Do you

23     presently have a work address?

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 12

1          A.       I have one day a week that I
2      work.

3          Q.       Okay.

4          A.       At Sylvan Learning Center, and
5      it's Zelda Road.  I cannot remember the
6      number on it.

7          Q.       That's Zelda Road, Z-E-L-D-A?

8          A.       It is.

9          Q.       Here in Montgomery?

10         A.       It is.

11         Q.       What day do you work at Sylvan
12     Learning Center?

13         A.       On Saturdays.

14         Q.       Okay.  How many hours do you
15     work on Saturdays?

16         A.       Eight to eight and a half.  It
17     varies.

18         Q.       Okay.  Eight hours to eight
19     and a half hours?

20         A.       Yes.

21         Q.       What time do you normally
22     start in the morning?

23         A.       Eight o'clock.

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 13

1    Q.    Okay.  What do you do for

2  Sylvan Learning Centers on Saturday?

3    A.    I proctor their Prometric --

4  Thompson Prometric Test.  I just have to

5  watch cameras as they are testing on

6  computers.

7    Q.    Let me ask you a little bit

8  more about that.  You said at Thompson?

9    A.    Thompson Prometric.

10    Q.    Prometric Test.  What is a

11  Thompson Prometric Test?  Is it a computer

12  test?

13    A.    It's a computer test.

14    Q.    Okay.  What does it test?

15    A.    They have several hundred

16  tests that they can learn.

17    Q.    Okay.  All of the disciplines,

18  math, reading, English, all that, it's just

19  a computer-given test?

20    A.    It's for, like, a graduate

21  school, your doctor schools, all kind of

22  different tests.

23    Q.    Do you have involvement with

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 14

1    any of the, I guess I'll call them students,

2    the test takers?

3         A.      Just as they come in and

4    leave.  They have to sign in and out and

5    that's it.

6         Q.      Okay.  Are you there to answer

7    questions should they need assistance?

8         A.      No.

9         Q.      Is there someone else there to

10   perform that function?

11        A.      Yes.

12        Q.      Okay.  How long have you been

13   working Saturdays at the Sylvan Learning

14   Center?

15        A.      I don't recall exactly how

16   long it's been.  It's been -- Let me think

17   just a moment.  -- probably a couple of

18   years.

19        Q.      You've been doing that since

20   you worked at the Annuity Board; correct?

21        A.      I have to supplement what

22   little I'm getting now.  It's not enough for

23   me to -- since I do not get paid for the

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 15

1    disability and I'm not able to work full

2    time or more hours than that.

3           Q.      Okay.

4           A.      I have to have something to be

5    able to keep my house and have food to eat.

6           Q.      Let me ask you this.  Do your

7    tax -- Do you file tax returns?

8           A.      I do.

9           Q.      Would they reflect when you

10   first began working at the Sylvan Learning

11   Center?

12          A.      Well, they reflect what I did,

13   you know, that year.

14          Q.      Yes, ma'am.

15          A.      Uh-huh.

16          Q.      So, we could tell from those

17   when you started working there?  You said

18   you think it's been a couple of years?

19          A.      Uh-huh.

20          Q.      You think it was also -- You

21   think you began working there while you

22   worked for the Annuity Board at Southern

23   Baptist Convention?

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 16

1        A.        I started right before I
2  started being sick.  I still had a child at
3  home.  I'm a single parent.
4        Q.        Okay.
5        A.        And I had started trying to
6  supplement some then.  And then, even though
7  my doctor doesn't want me to do this, it's
8  against, I still feel that I have to do as
9  much -- But it takes me, like, two days to
10  get over it after I work it.  And my doctor
11  does not want me doing it.  But, again, I
12  feel I have to hang on to that because I
13  will not make it without it.
14              MR. SINCLAIR:  Just answer his
15  questions.  Okay?
16              THE WITNESS:  Okay.
17        Q.        Have you, since you started
18  working at Sylvan Learning Center,
19  consistently worked approximately eight to
20  eight and a half hours per week?
21        A.        Most of the time.
22        Q.        Okay.  Have you ever worked
23  less than that?

Page 17

1     A.      No.

2     Q.      Have you ever worked more than

3   eight to eight and a half hours per week?

4     A.      Very occasionally.

5     Q.      Very occasionally?

6     A.      Very rare.

7     Q.      Very rare?

8     A.      But on occasion, I have.

9     Q.      How many times would you say?

10  Fifty-two weeks in a year, how many of those

11  weeks might you have worked more than eight

12  to eight and a half hours per week?

13    A.      Three or four.

14    Q.      Okay.  And would you pull a

15  double shift, work two days during those?

16    A.      No.  I might work another half

17  day.

18    Q.      All right.  Okay.  Tell me

19  specifically what you do from the time that

20  you arrive at the Sylvan Learning Center on

21  Saturday mornings around eight o'clock until

22  the time you leave there at the end of your

23  shift.

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 18

1       A.      I greet the examinees as they
2   come in, have them sign in.  Take them --
3   You know, show them where the computer room
4   is.  After everyone is in then I, like I
5   said, I watch the monitors.  I can -- As
6   they are taking the test to make sure they
7   aren't cheating on them.
8       Q.      You watch them from a
9   different room?
10      A.      I do.
11      Q.      Okay.  Do you check their IDs
12  or anything when they come?
13      A.      I do, against the roster.
14      Q.      Do you typically work with
15  someone else?
16      A.      Yes.
17      Q.      With whom do you typically
18  work?
19      A.      Bob Taffett or -- I mean,
20  other employees there.
21      Q.      Other employees at Sylvan
22  Learning Center.  Do y'all team up to
23  proctor these tests?

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 82

1    of absence with the Convention?

2        A.      It would be more, at this

3    point, of a charity.  I really -- They are

4    still paying me a partial sum of my salary

5    and paying the insurance, my health

6    insurance, more out of the respect of -- I

7    can't work.  I don't have a spouse.  I don't

8    have no other way of being -- of supporting

9    myself.  And so, really, at this point, it's

10   more out of charity, because, be in mind,

11   what they had to do.

12       Q.      Have they paid you

13   continuously since you stopped working there

14   in May of 2004?

15       A.      Yes.  Again, the last several

16   months have been more out of charity because

17   I did not get paid from the disability and I

18   couldn't -- I can't work a full-time job.  I

19   can't work even a part-time job.  I should

20   not be working what I am currently working,

21   but I have to.

22       Q.      How much do you presently

23   receive from the Convention on a monthly

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 83

1    basis?

2            A.      Before taxes, roughly, a

3    thousand dollars.

4            Q.      And what does that equate to

5    after you pay your taxes?

6            A.      About eight.

7            Q.      You get a check for, roughly,

8    eight hundred dollars a month.

9            A.      Twice a month.  Four hundred

10   each check.

11           Q.      Four hundred each check for a

12   total of eight hundred a month?  So,

13   basically, each check is for five hundred

14   dollars, your taxes are taken out of that,

15   and it equates to four hundred dollars

16   biweekly, or, roughly, eight hundred dollars

17   a month?

18           A.      Correct.

19           Q.      In addition to that sum of

20   money, you also receive benefits from the

21   Convention; correct?

22           A.      Health insurance.

23           Q.      Okay.  Do they continue to pay

Page 84

1    premiums on your disability and life

2    insurance?

3        A.    It's my understanding that no.

4    I mean, since this -- they did not approve

5    the disability and it did not go through, I

6    do not have either of those insurances.

7        Q.    So it's your understanding

8    they discontinued that coverage?

9        A.    Correct.

10        Q.    So, the only benefit, as you

11    understand it, that you receive from them in

12    addition to the compensation is the health

13    insurance coverage through Blue Cross Blue

14    Shield?

15        A.    Correct.

16        Q.    Do you still have any coverage

17    through CUNA?

18        A.    No.

19        Q.    Okay.  For how long have you

20    received a thousand dollars a month from the

21    Convention?

22        A.    I don't recall.  I believe it

23    may be since May of '85.

**LEGALINK, A MERRILL COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 87

1    Q.    Do you recall how much sick

2    leave was donated to you by other employees

3    of the Convention?

4                    (Off-the-Record discussion

5                    was held.)

6    A.    No.

7    Q.    Ms. Bullard, one of the

8    documents that your attorney provided us,

9    Bates labeled BULL 0856, which is a letter

10   from the Alabama Baptist State Convention to

11   you dated May 24, 2005, in which the writer,

12   W. Robert DuBois states that:  When you met

13   with Dr. Lance recently, he indicated that

14   your salary and benefits would continue

15   through May 31, 2005.

16                    In light of your application

17   status for disability coverage, Dr. Lance

18   has approved the following extensions.  It

19   says:  Number one, there's a garnishment

20   applied each pay period to your SBOM

21   compensation.  SBOM is State Board of

22   Missions; correct?

23   A.    Correct.

Page 88

1          Q.          What garnishment is he

2     referring to there?  He says:  As of today,

3     there's a balance of eight hundred fifty-six

4     dollars on that garnishment.  Do you recall

5     that?

6          A.          I had the Chapter 13, and that

7     was what was owed.

8          Q.          You filed for Chapter 13

9     bankruptcy back in 2001?

10         A.          Yes.

11         Q.          And in order to get discharged

12    as you were, I believe in 2005 --

13         A.          Yes.

14         Q.          -- you had to pay off the

15    amounts that you owed thereunder; correct?

16         A.          Yes.

17         Q.          And their letter goes on to

18    state:  The SBOM will retire that obligation

19    immediately.  Did they pay that on your

20    behalf?

21         A.          Yes.

22         Q.          Is there -- Do you have an

23    obligation to refund that money to them?

Page 89

1        A.      No.

2        Q.      It further states into

3   paragraph number two that:  A stipend of one

4   thousand dollars will be paid to you until

5   December 31, 2005 or you are approved for

6   Social Security disability.  Obviously,

7   we're beyond December 31, 2005, and you're

8   still receiving that stipend; correct?

9        A.      Yes.

10       Q.      Have you received either

11  written or verbal information indicating to

12  you that that will end at some point certain

13  in the future?

14       A.      Not specific time, no.

15       Q.      Okay.  Have you received any

16  indication that they will continue to pay

17  that for an indefinite period?

18       A.      No.

19       Q.      It also states in paragraph

20  number three that your single coverage Blue

21  Cross medical insurance will remain in

22  effect until December 31, 2005 or until you

23  are approved for Social Security disability.

**LEGALINK, A MERRILL COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 90

1             And, again, you told us that

2    you were denied Social Security disability;

3    correct?

4             A.      Correct.

5             Q.      But you further told us that

6    the Convention is continuing to provide your

7    single coverage Blue Cross medical coverage

8    to date; correct?

9             A.      Correct.

10            Q.      I'll ask you the same question

11   about that as I did about the thousand

12   dollar stipend.  Do you have any information

13   indicating that that Blue Cross coverage

14   will continue to be paid by the Convention

15   for a -- or until a certain date in the

16   future?

17            A.      No.

18            Q.      You just haven't had any

19   discussions with them about that?

20            A.      No.

21            Q.      Okay.  I asked you if you've

22   ever filed suit.  You've now told me about

23   the bankruptcy.

**LEGALINK, A MERRILL COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 91

1       A.      Sorry.

2       Q.      Have there been any other

3   suits that you've filed?

4       A.      In forever or for a certain

5   period of time.

6       Q.      Well, forever.  You filed --

7   Did you file both divorce actions?

8       A.      Well, the first one, I did.

9   The second one was kind of a --

10      Q.      Mutual?

11      A.      -- mutual, yeah.

12      Q.      Okay.  And then you filed the

13  bankruptcy.  Have you ever filed any other

14  legal action?

15      A.      Yes.  I wasn't thinking

16  bankruptcy as a legal.  I know it is.  I'm

17  sorry.  I just didn't have that.  The -- My

18  first divorce, my attorney then recommended

19  that I --

20          MR. SINCLAIR:  Wait.  Don't

21  repeat what an attorney tells you to do.

22          THE WITNESS:  Correct.  Okay.

23          MR. SINCLAIR:  Answer his

**LEGALINK, A MERRILL COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 102

1        Q.        Okay.  Why did she leave?

2        A.        I'm not sure.

3        Q.        Did you take her place?

4        A.        No.  She had been gone for

5    years.

6                          (Defendant's Exhibit 4.7

7                          was marked for

8                          identification purposes.)

9        Q.        Okay.  Exhibit 4.7 is a

10   7/22/02, office note from Janise H.

11   Whitesell.  And it notes there on the first

12   page, it says:  She is a single mom who

13   notes that she has two jobs.  Did you

14   have --

15       A.        What date is this?

16       Q.        '02.  7/22/02.

17       A.        That is probably when I had

18   just started with Sylvan.

19       Q.        Sylvan.  Okay.  Since your

20   employment with the State Convention, have

21   you held any jobs, aside from your temporary

22   position that you've already described with

23   Sylvan Learning centers?

Page 132

1      A.     When we had conferences, we

2    would have out-of-town conferences, and

3    therefore, we went for these conferences,

4    there was lifting, heavy lifting, you know,

5    of boxes and a lot of standing.

6      Q.     How often did you have

7    conferences?

8      A.     Three to four times a year, of

9    this type conference.

10     Q.     What type conference are we

11   to?

12     A.     Where it would be out of the

13   building.

14     Q.     Where would they typically be

15   held?

16     A.     In Shocco Springs Conference

17   Center in Talladega, Alabama.

18     Q.     Is that where most of them

19   were held?

20     A.     Yes.  And our office also was

21   responsible or the legislative prayer

22   luncheon, which we would have that here, but

23   out of the  building.  Again, it was one of

Page 133

1   those type conferences.

2          Q.      Okay.  And you said that

3   involved heavy lifting of boxes and a lot of

4   standing?

5          A.      Yes.

6          Q.      Were you expected to lift the

7   heavy boxes?

8          A.      Yes.

9          Q.      Okay.  When did you last

10  assist with one of those conferences that

11  involved heavy lifting of boxes and a lot of

12  standing?

13         A.      I didn't make the one for, as

14  I recall, the legislative prayer luncheon in

15  2004, and I didn't go to it.  It was

16  probably 2002, was the last one that I --

17  Because I was not able to go to the ones in

18  2003 and 4.

19         Q.      Okay.  Did they send someone

20  else in your stead or did they just get

21  along without you?

22         A.      Got along without me.

23         Q.      Any other duties, aside from

Page 135

1    before?

2                    (Off-the-Record discussion

3                    was held.)

4         A.    Yes.

5         Q.    Okay.  Were you aware that

6    Dr. Thornbury had submitted an Attending

7    Physician's Statement in relation to your

8    claim?

9         A.    Yes.

10        Q.    Okay.  That's the first page

11   on here.  Were you aware that he noted that

12   you were released to work in your occupation

13   and that he listed no specific restrictions

14   or limitations?

15        A.    Yes.

16        Q.    Were you aware -- Well, let me

17   ask you before I get to there.  This

18   references Blue Cross Blue Shield.  And that

19   was, of course, your carrier through the

20   Convention; correct?

21        A.    Yes.

22        Q.    Your medical carrier.  The

23   second page is from Dr. Reuben Richardson.

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 143

1    the Southern Baptist Convention versus State

2    Missions Board.  What's the relationship

3    between those two, if you know?

4         A.    The Annuity Board is the

5    Annuity Board for all the Conventions in all

6    the states, you know.  The State Board of

7    Missions, the State Convention is just for

8    Alabama, this one.  There's one for

9    different states, and this one, the one that

10   I worked for, is the Convention for Alabama.

11        Q.    Okay.

12        A.    But the Annuity Board is over

13   all of them.

14        Q.    Exhibit 7, down under

15   qualifications, it mentions keyboard skills.

16   I assume that included typing?

17        A.    Yes.

18        Q.    Was that on a personal

19   computer?

20        A.    Yes, sir.

21        Q.    A regular keyboard?

22        A.    Just regular.

23        Q.    Not like a typewriter?  It was

Page 144

1    a keyboard for a computer; correct?

2          A.      Correct.

3          Q.      Okay.  How much of your day

4    did you actually spend typing on that

5    keyboard?

6          A.      It varied.

7          Q.      Was there such a thing as an

8    average day?

9          A.      No.  Not really.

10         Q.      Some days it was ten percent,

11   some days it was ninety percent?

12         A.      Yes.  I mean, it just really

13   varied because of what was going on at the

14   time.

15         Q.      What things were going on at

16   the time that caused it to vary so greatly?

17         A.      If we were in the process of

18   setting up meetings or had meetings

19   scheduled, I might spend more time on the

20   phone.  But if we were just starting to

21   prepare, we might be sending out a lot more

22   letters and literature, and I would be doing

23   a lot more typing, preparing for the --

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 145

1        Q.       Did your sickness or any of

2    your injuries keep you from typing?

3                 MR. SINCLAIR:  Go ahead.  I'm

4    sorry.

5        A.       Arthritis.  Well, arthritis

6    and the neck.

7        Q.       Okay.

8        A.       Arthritis and the neck, the

9    back and neck, because it made it hurt worse

10   from using my hands and arms.

11       Q.       Did it actually keep you from

12   typing or did it cause you pain while you

13   were typing?

14       A.       Well, it was enough pain that

15   if there was times -- Well, it caused a lot

16   of pain while I was typing.

17       Q.       Okay.  Under -- Well, we've

18   covered that.  You've told me a little bit

19   about your office environment.  Was there a

20   kitchen or a break area nearby?

21       A.       No.

22       Q.       Okay.  You said that you often

23   ate lunch with secretaries.  Did you leave

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

Page 146

1    the building to eat lunch?

2        A.        No.  But it was -- We were on

3    the second floor and it was in the basement.

4        Q.        Okay.  There was a break area

5    in the basement?

6        A.        In the basement.  Not nearby.

7        Q.        Were there restroom facilities

8    nearby, near your desk?

9                  MR. SINCLAIR:  Object to the

10   form.

11       A.        I have -- What do you mean by

12   nearby?

13       Q.        Well, you tell me.  How close

14   were the closest restroom facilities that

15   you were allowed to use?

16       A.        It was like a hall and a half

17   of a hall away.  Almost two halls away.

18       Q.        Okay.  By two halls away,

19   describe for me what you mean.  You had to

20   go down a hall and make an L and go another

21   half a hall?

22       A.        Correct.

23       Q.        Okay.  Do you know, roughly,

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 205

1      A.      I was trying to make myself

2    remember.

3      Q.      On the next page of this

4    exhibit he states:  I recommended a

5    maxillomandibular for correction of sleep

6    apnea, depending on her current endoces.

7    Did you ever have a maxillomandibular

8    advancement for correction of sleep apnea?

9      A.      No.  Because the insurance

10   would not pay for it.

11     Q.      Blue Cross Blue Shield would

12   not pay for it?

13     A.      Right.  Because I had to have

14   orthodontic work.  And they will not pay for

15   orthodontic work on adults.  We asked for

16   exceptions.  All of these doctors, all three

17   of them wrote letters, and I wrote a letter

18   asking for exceptions, explaining that it

19   wasn't for -- you know, what it was for,

20   that it wasn't for cosmetic reasons, but

21   they still would not do it.  I could not

22   afford to have it.

23     Q.      Okay.  How long have you had

Page 210

1    lost the forty pounds he references earlier?

2          A.      Correct.

3          Q.      This note also references a

4    John Peden, P-E-D-E-N.  Who is Dr. Peden?

5          A.      He's -- Well, he was.  He's

6    retired.  But he was -- Oh, gosh, a surgeon

7    that I was sent to the first time about my

8    neck.  At that time he did not feel like it

9    was ready for surgery, but he would give me

10   injections in the neck.

11         Q.      When did you last see him?

12         A.      It's been -- I don't remember

13   the day.  It's been -- I don't know.  It's

14   been four or five years.  He was -- It was

15   before my surgery because I probably had the

16   surgery in '98.  So it probably was, like,

17   '96 or '97.

18         Q.      You had neck surgery in '98?

19         A.      Yes.

20         Q.      And who performed that?

21         A.      It's in the -- Dr. -- I'm

22   sorry.  I can't remember his name.

23         Q.      Dr. Ryan?  Patrick Ryan?

Page 211

1        A.     Yes, Dr. Ryan.

2        Q.     Have you seen him since the

3 surgery?

4        A.     I've been back once or twice

5 with my back.

6        Q.     Have you seen Dr. Patrick Ryan

7 in the last year?

8        A.     No, not in the last year.

9        Q.     How about in the last two

10 years?

11       A.     I think I did see him maybe at

12 the beginning of the year before.  It's been

13 a while, but I don't remember the exact

14 date.

15       Q.     Exhibit 14 also references a

16 Rachelle Janush, J-A-N-U-S-H.  Who is that?

17       A.     She was a -- I'm not sure what

18 Dr. -- I don't know what type of doctor she

19 would be.  Dr. Richardson sent me to her for

20 the fibromyalgia and the pain.  She did the

21 trigger-point injections?

22       Q.     When did you last see her?

23       A.     It's been a long time.  It's

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 251

1  pins are, my foot is sinking in.

2      Q.      Okay.  Do you contend that

3  each of these problems that I've just read

4  off to you from your claim forms presently

5  prevent you from performing the duties of a

6  secretary?

7          MR. SINCLAIR:  Is the

8  question, does she contend each one

9  individually does?

10     Q.      Do you contend that each of

11 these problems presently prevent you from

12 performing the duties of a secretary?

13         MR. SINCLAIR:  Objection to

14 the form.

15     Q.      Okay.  Let me just -- I'll ask

16 it separately, and then I'll ask you if --

17 combined or a combination deal.  Do you

18 contend that your narcolepsy, standing

19 alone, prevents you from performing the

20 duties of a secretary?

21     A.      It's getting closer to that.

22 I think it's age, and the medicine doesn't

23 work as well.  It's hard for me to say, but

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 252

1    I feel that it's getting close to.

2           Q.     Do you feel that your

3    narcolepsy is a progressive problem?

4           A.     I do.

5           Q.     Has it gotten worse in the

6    last five years?

7           A.     Yes.

8           Q.     How about sleep apnea?  Do you

9    feel that your problems with sleep apnea

10   prevent you from performing your duties as a

11   secretary?

12          A.     Yes.  Because I'm not getting

13   proper sleep.  I'm not going into the

14   correct cycles, therefore, I'm very tired.

15   I'm very -- It makes me ache and hurt and I

16   can't concentrate.

17          Q.     Do you contend that your

18   problems with sleep apnea are progressive

19   and have gotten worse in the last five

20   years?

21          A.     Yes.

22          Q.     Have you seen any improvement

23   in either your narcolepsy or sleep apnea

Page 256

1   doctor's office because -- and they had to

2   give me nitroglycerin and things because you

3   could have a heart attack, I mean, it had

4   gotten so high.

5        Q.     Okay.  Is that something you

6   are able to control with medication and

7   treatment?

8        A.     I had been, but just Monday,

9   it was high again.  Lately it has been

10  erratic.  It's been high with medication.

11       Q.     You mentioned surgery on the

12  neck for herniated disks.  You've had

13  surgery; correct?

14       A.     Yes, on the neck.

15       Q.     Do you contend that your neck

16  problems, standing alone, prevent you from

17  performing the duties of a secretary?

18       A.     Not alone.

19       Q.     Did you have improvement with

20  your neck problems following the surgery?

21       A.     To an extent, yes.

22       Q.     What problems do you presently

23  have with your neck?

Page 259

1          A.      I have a back brace that I

2     alternate, I can use.  I --

3          Q.      Are you wearing one now?

4          A.      I am.

5          Q.      Okay.

6          A.      I have a Tens Machine.

7          Q.      Is that an electric impulse?

8          A.      Right.  I have one of those at

9     home that I use.

10          Q.      How often do you use that?

11          A.      Several times a day.  And I

12     alternate and use heat and sometimes ice, I

13     alternate.

14          Q.      Who prescribed the Tens Unit;

15     is that Dr. Paul?

16          A.      Yes.

17          Q.      Arthritis.  Do your problems

18     with arthritis, standing alone, prevent you

19     from performing the duties of a secretary?

20          A.      Yes.  I have real bad

21     arthritis in my hips and in my hands, and,

22     you know, a lot of my joints.  But my hips,

23     that's one of the reasons, between my back

Page 262

1    or Dr. Peden.  It might have been Dr. Peden.

2    But, again, since the Remicade, she doesn't

3    want me having injections.

4            Q.      Have your problems with your

5    bursitis improved since the Remicade?

6            A.      Some.

7            Q.      Have your problems with your

8    bulging disks in your back improved since

9    the Remicade?

10           A.      No.  I can't tell any

11   difference in that.

12           Q.      Have the problems with your

13   feet improved since the Remicade?

14           A.      I can't tell a difference with

15   that.

16           Q.      Have your problems with your

17   arthritis improved?

18           A.      Some.  Not much.

19           Q.      TMJ.  Do you contend that your

20   problems with TMJ prevent you from

21   performing the duties of a secretary?

22           A.      Not alone.

23           Q.      Okay.  And TMJ -- TMJ is

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 263

1      actually the joint; right?

2           A.      Yes.

3           Q.      And it's the disorder of the

4      TMJ that causes you trouble; correct?

5           A.      Correct.

6           Q.      When did you last seek

7      treatment for a disorder of your TMJ?

8           A.      Whenever it was I saw

9      Dr. Farha and Dr. -- the oral surgeon.

10          Q.      Foy?

11          A.      Yes.  Those doctors, because,

12     you know, they had determined -- Dr. Farha

13     said it was too far -- my joints were too

14     far gone for the mouth pieces to help.  He

15     couldn't help me anymore.  And then when the

16     insurance wouldn't pay for the surgery, I

17     didn't see him anymore.

18          Q.      Fibromyalgia.  Do you contend

19     that your problems with fibromyalgia prevent

20     you from performing your duties of a

21     secretary?

22          A.      Not alone.

23          Q.      Do you contend that all of

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 264

1    these problems in combination prevent you

2    from performing the duties of a secretary?

3         A.    Yes.

4         Q.    The afore mentioned problems

5    are for physical disability; right?

6         A.    Yes.

7         Q.    You don't claim that you're

8    mentally incapable of performing the duties

9    of your occupation as a secretary; correct?

10              MR. SINCLAIR:  Objection to

11   the form.  Answer to the best of your

12   ability.

13              MR. FINK:  I thought we had a

14   stipulation on that, that she doesn't

15   contend that her -- or that she's mentally

16   incapable of performing the duties of her

17   occupation as a secretary and that her

18   claims are for physical problems?

19              MR. SINCLAIR:  Would lack of

20   ability to concentrate fall within what

21   you're asking her about?

22              MR. FINK:  Well, if she

23   contends that her lack of ability to

Page 265

1  concentrate is a product of pain resulting

2  from her physical problems, then I guess

3  not, but that's for her to answer.

4          MR. SINCLAIR:  Okay.

5      Q.     (By Mr. Fink) Do you

6  contend -- The only thing that I've seen

7  that looks like it might be related to a

8  mental problem is lack of ability to

9  concentrate.

10     A.     Yes.

11     Q.       Your attorney has already

12  specifically stipulated that you're not

13  claiming that depression prevents you from

14  performing the duties of a secretary.

15          What I want to know is, if you

16  claim to being mentally incapable of

17  performing the duties of your occupation as

18  a secretary?

19     A.     But are you including in that

20  not being able to concentrate and focus

21  because of the --

22     Q.       If you contend that your

23  ability to concentrate or focus is related

Page 266

1   to your physical pain, then I guess your

2   attorney and I could agree that that's a

3   physical problem.

4              MR. SINCLAIR:  Yes.

5        Q.    On the other hand, if you

6   contend --

7        A.    Right.  And that's what I --

8              MR. SINCLAIR:  Wait.  We're on

9   the same page.  Okay?

10             THE WITNESS:  Okay.

11             MR. FINK:  I thought we were.

12  I just wanted to clear that up.

13             MR. SINCLAIR:  Let's make --

14  Well, we've stipulated to it, that she's got

15  no mental condition that she's claiming that

16  serves as a basis for any claim against the

17  company.

18             MR. FINK:  Okay.

19             MR. SINCLAIR:  And I think

20  what you're asking, and the reason I'm

21  confused, and I think she's getting a little

22  off track, too, because I know, like,

23  narcolepsy and lack of sleep will cause you

Page 267

1    not to be able to concentrate, and that's

2    what she's getting at.  But your question --

3          Q.     (By Mr. Fink) You're claiming

4    that your problems are physical as opposed

5    to mental?

6          A.     Yes.

7          Q.     Okay.  I will then continue to

8    ride on our prior stipulation.  I haven't

9    asked you these --

10                      (Off-the-Record discussion

11                      was held.)

12         Q.     (By Mr. Fink) Ms. Bullard, you

13   said that Dr. Reuben Richardson diagnosed

14   you with narcolepsy and sleep apnea.  The

15   treatment that you're presently receiving

16   for the narcolepsy consists of medication

17   alone; correct?

18         A.     Correct.

19         Q.     And for the sleep apnea, the

20   C-pap alone, or are you receiving medication

21   for sleep apnea as well?

22         A.     Not -- Antidepressants are

23   supposed to help with the sleep apnea, also.

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 268

1    And I take that, and that's really about it.

2    I mean, I tried the C-pap.  I've tried -- I

3    think it's about five different masks.

4         Q.    And you said your problems

5    with narcolepsy and sleep apnea have gotten

6    worse since May of 2004?

7         A.    Yes.

8         Q.    And you're currently seeing

9    Dr. Richardson alone for narcolepsy and

10   sleep apnea?

11        A.    Yes.

12        Q.    With regard to ulcerative

13   colitis, you've said it's gotten slightly

14   better on the Remicade; right?

15        A.    Yes.

16        Q.    And are you currently seeing

17   anyone other than Dr. McKinney for your

18   ulcerative colitis?

19        A.    I saw Dr. Barranco.

20        Q.    I'm sorry.  Dr. McKinney and

21   Dr. Barranco?

22        A.    No, that's it.

23        Q.    And you don't intend to see

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 269

1    anyone else for that problem presently, do

2    you?

3            A.      No.

4            Q.      Okay.  Your high blood

5    pressure, does Dr. McKinney manage that?

6            A.      Yes.

7            Q.      Anyone else?

8            A.      Dr. Paul, you know, checks it,

9    but she would let Dr. McKinney.

10   Dr. McKinney is the one that recommended --

11   prescribed the medicine for it.  And she

12   would be the one to --

13           Q.      Back to your colitis.  Is

14   Remicade the only treatment that you're

15   presently receiving for that?

16           A.      I take the tablet that -- It's

17   a generic brand now, of what's listed.  I

18   still take it.  It's, like, two, three times

19   a day.

20           Q.      Okay.  Your diverticulitis, is

21   that controlled by Dr. McKinney and

22   Dr. Barranco, also?

23           A.      Yes.

Page 270

```
 1          Q.      No one else?
 2          A.      No.
 3          Q.      Has that gotten better or
 4    worse since May of 2004?
 5          A.      I would say it's about the
 6    same.
 7          Q.      How about your neck and back
 8    problems?  Are you seeing anyone, aside from
 9    Dr. Daniel Thornbury, for those problems?
10          A.      Now, I don't see him for the
11    neck and back.
12          Q.      Okay.  What do you see
13    Dr. Thornbury for?
14          A.      My feet.
15          Q.      Your feet only?
16          A.      Feet.  Uh-huh.
17          Q.      Okay.  Have your problems with
18    your feet gotten worse since May of 2004?
19          A.      Yes.
20          Q.      What treatment are you
21    receiving from Dr. Thornbury for your feet?
22          A.      Nothing right now.  I don't
23    want to go through the surgery or anything
```

Page 271

1    right now.   I'm just not up to it.

2            Q.      Okay.   And you're seeing

3    Dr. Paul for your neck and back problems; is

4    that correct?

5            A.      Well, and Dr. Patrick -- I

6    can't remember the name.

7            Q.      Patrick Ryan?

8            A.      Yes.   Patrick Ryan.

9            Q.      Are you seeing anyone else,

10   aside from Dr. Paul and Dr. Ryan, for your

11   neck and back problems?

12           A.      No.

13           Q.      And the treatment that's

14   currently -- that you currently receive for

15   those is medication only?

16           A.      I take a -- Excuse me.   Let me

17   go back.   Dr. Paul has worked with that,

18   too.   She is the one that has prescribed the

19   braces and the Tens Machine.   And she has

20   worked with that.   And so the three of them.

21           Q.      Any -- Okay.   The three of

22   them being Dr. Paul, Dr. Patrick Ryan --

23           A.      And Dr. McKinney.

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 272

1           Q.       -- And Dr. McKinney?   And,

2      basically, what you're receiving is the Tens

3      Unit, the neck brace and medication in the

4      form of treatment?

5           A.       Yes.

6           Q.       And have your problems with

7      your neck and your back gotten worse since

8      May of 2004?

9           A.       Yes.   My back especially.

10          Q.       Okay.   Arthritis?

11          A.       Yes.

12          Q.       You're presently seeing

13     Dr. Paul for your arthritis; correct?

14          A.       Yes.

15          Q.       Have your problems with

16     arthritis gotten worse since May of 2004?

17          A.       Yes.

18          Q.       What treatment are you

19     currently receiving for your arthritis,

20     other than the Remicade?

21          A.       Medication.

22          Q.       Other medication, including --

23          A.       Anti-inflammatory.

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 273

1      Q.     Okay.  What anti-inflammatory

2  do you presently take?

3      A.     They took Vioxx off the

4  market.  So, what's it called?  It's the --

5  I took Vioxx for years.  Celebrex, is it?

6      Q.     Okay.

7             MR. SINCLAIR:  You took Vioxx?

8             THE WITNESS:  Uh-huh.

9             MR. FINK:  Woke him right up,

10  didn't it?

11      Q.     Bursitis.  Have your problems

12  with bursitis gotten worse since May of

13  2004?

14      A.     No, I wouldn't say it's gotten

15  worse.

16      Q.     About the same?

17      A.     About the same.

18      Q.     Who are you presently seeing

19  for your problems with bursitis?

20      A.     Really, nobody right now,

21  because we have -- what they were doing were

22  injections.  And Dr. Paul wouldn't let me

23  have injections while I'm on Remicade.

**LEGALINK, A MERRILL COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 274

1    Q.    TMJ.  Have your problems with

2    TMJ gotten worse since May of 2004?

3    A.    Yes.

4    Q.    And you're -- Are you

5    presently seeing anyone, other than your

6    family practice doctor, for that?

7    A.    No.  Because there's really

8    nothing to be done.

9    Q.    Fibromyalgia.  Who are you

10   presently seeing for that, Thornbury?

11   A.    No.  Dr. Richardson -- Really,

12   like I said, the medications, are the only

13   thing that we're doing with that right now

14   because the trigger-point injections weren't

15   helping.

16   Q.    What medication is

17   Dr. Richardson giving you for fibromyalgia?

18   A.    He has given me an

19   antidepressant and an anti-inflammatory that

20   I was already on.  You know, he said that

21   should help, too.

22   Q.    Okay.  You may have told me

23   this.  Forgive me.  Who first diagnosed you

# PERSONNEL MANUAL

## FOR
## MISSIONS SUPPORT PERSONNEL
## OF
## THE STATE BOARD OF MISSIONS
### Alabama Baptist Convention

**Rick Lance, Executive Director**

**Approved by**
**The State Board of Missions**
**January 1, 2000**

BULL1492

65, the coverage reduces to 65% and remains unchanged until retirement.

(2) Dependent Life Insurance - Spouse, $5,000 and $5,000 on each unmarried dependent child to age 19 or to age 25 if a full-time student.

(3) Accident Insurance, $25,000 - $200,000 is based on salary. Coverage for employees who work beyond age 65 is reduced to 65% beginning January 1 after the sixty-fifth birthday. The amount remains at 65% until retirement. Coverage is cancelled at retirement.

(4) Long term Disability - During total disability the plan provides 60% of salary/housing following a three-month waiting period. If Social Security disability benefits are approved, the two benefits are coordinated to equal 60%.

b. Medical Insurance

Medical insurance is provided for employees and their dependents. Single, dependent children are covered to age 19 or to age 25 if full time students. For active employees who work beyond age 65, the Board's medical insurance carrier will be primary for as long as State Board of Missions employment continues.

Sponsored coverage is available for single dependents who are 19 years old, no longer a student, or are age 25 and still a full time student, or have graduated but do not have other coverage available. The cost of sponsored dependent coverage is reimbursed to the State Board of Missions by the employee or the dependent.

Consolidated Omnibus Budget Reconciliation Act (COBRA) coverage is available for terminated employees. The initial application is prepared by the former employer (SBOM); then coverage is arranged between the terminated employee and the Board's medical insurance carrier. Premium notices are mailed directly to the terminated employee who pays directly to the Board's medical insurance carrier. The cost is charged to the individual. Employees should study the description of coverage for information on covered procedures, non-covered procedures, or conditions, deductibles, and any co-insurance payment.

At age 62 or beyond medical/dental insurance is provided for the retiree and his/her dependents in accordance with the "Retirement Benefits" set out above.

NOTE: All insurance coverage begins on the first day of employment.

c. Cancer Insurance

A cancer insurance and intensive care plan is available to all employees with the American Family Life Assurance Company. This is optional and employees pay the full premium for this coverage. The premium may be through payroll deduction. Details concerning this coverage may be provided by AFLAC to each employee in a separate summary.

5. Employee Leave Time

a. Vacation

Vacation time for employees of the State Board of Missions is computed as follows:

**Missions support personnel** with less than five years employment with the State Board of Missions are entitled to two weeks  (10 working days) paid vacation.   After five years of employment, **Missions Support Personnel** are entitled to three weeks  (15 working days) paid vacation.

Vacation time accrues each January 1, and is calculated on a calendar year basis.Vacation time during the first and last year of employment will be determined on a prorated basis by percentage of the year employed.

Vacation days are not accruable beyond December 31 of each year, and no cash payments in lieu of vacation are made for any unused vacation days. Vacations are scheduled with the approval of Office director and the Executive **Director**. Employees are encouraged to take vacation at the most appropriate time for the work load in the office.

b. Holidays

Holidays are set by the State Board of Missions.  The days listed below are observed annually by all employees:

New Year's Day
Memorial Day
Independence Day
Labor Day
Thanksgiving Day and day following
Christmas Holidays (one week)

**Missions Support Personnel** are entitled to take for their birthday one working day, the day to be approved by the office director.

NOTE: Any additional holidays shall be determined and set by the **Executive Director in consultation with the Personnel Committee chairperson.**

# FREEDOM COURT REPORTING

1   IN THE UNITED STATES DISTRICT COURT

2   FOR THE MIDDLE DISTRICT OF ALABAMA

3   NORTHERN DIVISION

4

5   CASE NUMBER:  2:05-cv-1217-MEF

6   BETTY BULLARD,                    COPY

7          Plaintiff,

8          VS.

9   UNUMPROVIDENT CORPORATION; UNUM LIFE

10  INSURANCE COMPANY OF AMERICA; GENEX

11  SERVICES, INC.,

12         Defendants.

13         S T I P U L A T I O N

14         IT IS STIPULATED AND AGREED by

15  and between the parties through their

16  respective counsel, that the video

17  deposition of Reuben C. Richardson, M.D.

18  may be taken before RENA' MESSICK LANIER,

19  Court Reporter and Notary Public for the

20  State of Alabama at Large, at the offices

21  of Dr. Richardson at 300 Taylor Road,

22  Suite 400, Montgomery, Alabama  36117, on

23  the 22nd day of January, 2007.

# FREEDOM COURT REPORTING    54

```
1    (pointing).

2         A.      Could I get to you repeat

3    the question and make sure I'm answering

4    what you --

5         Q.      Sure.

6         Q.      -- want?

7         Q.      Sure.  It says:  Has patient

8    been released to his or her occupation,

9    and you struck no.  And then it says in

10   any occupation, and you struck no.

11              Did you mean to strike no

12   there?

13        A.      No.  I meant that I had not

14   restricted her at that point.

15        Q.      Okay.  So in your opinion,

16   at this point you felt that she could work

17   either in her own occupation or in any

18   occupation, correct?

19        A.      Retrospectively, she

20   couldn't have been a truck driver.  She

21   couldn't have been an airline pilot.

22   There are a number of things she could not

23   have done.
```

| a Control number | 22222 | Void ☐ | OMB No. 1545-0008 | | |
|---|---|---|---|---|---|

| b Employer identification number (EIN) | | 1 Wages, tips, other compensation | 5615.00 | 2 Federal income tax withheld | 72.00 |
|---|---|---|---|---|---|
| 63-0928451 | | | | | |
| c Employer's name, address, and ZIP code | | 3 Social security wages | 5615.00 | 4 Social security tax withheld | 348.13 |
| L.N.& T. INC. | | 5 Medicare wages and tips | 5615.00 | 6 Medicare tax withheld | 81.42 |
| 2640 ZELDA RD. | | | | | |
| MONTGOMERY, AL 36107 | | 7 Social security tips | | 8 Allocated tips | |
| d Employee's social security number | | 9 Advance EIC payment | | 10 Dependent care benefits | |
| 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 | | | | | |
| e Employee's name, address, and ZIP code | | 11 Nonqualified plans | | 12a See instructions for box 12 | |
| BETTY W        BULLARD | | 13 Statutory employee ☐  Retirement plan ☐  Third-party sick pay ☐ | | 12b | |
| 4001 TIFFANY DR | | 14 Other | | 12c | |
| MONTGOMERY, AL 36110 | | | | 12d | |

| 15 State | Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| AL | 215787 | 5615.00 | 44.37 | | | |

Form **W-2** Wage and Tax Statement

**2005**

Copy 1—For State, City, or Local Tax Department
Copy D—For Employer.

Department of the Treasury—Internal Revenue Service

For Privacy Act and Paperwork Reduction
Act Notice, see back of Copy D.

SLC00010
Bullard v Unum

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| BETTY BULLARD, | § | |
| Plaintiff, | § | |
| | | CASE NO. |
| vs. | § | |
| | | CV-2:05-cv-1217-MEF |
| UNUMPROVIDENT CORPORATION; | § | |
| UNUM LIFE INSURANCE COMPANY | | |
| OF AMERICA, et al., | § | |
| Defendants. | § | |

## DECLARATION OF SUSY L.L. VERGOT

I, Dr. Susy L.L. Vergot, state the following:

1.     My name is Dr. Susy L.L. Vergot, D.O.  I am over the age of nineteen years and competent to make this Declaration.  I have personal knowledge of the matters set forth below.

2.     I am employed as a Medical Consultant with UnumProvident Corporation.  A true and accurate copy of my Curriculum Vitae setting forth my qualifications is attached hereto as Exhibit A.

3.     As part of the administration of the claim filed by Betty Bullard on the Unum Life policy, I reviewed the medical records in her claim file, and identified reasonable restrictions and limitations that would be appropriate based on those medical records.  A copy of my February 2, 2005 report is attached hereto as Exhibit B.

4.     I sent a letter to Dr. Rachel McKinney seeking her opinion as to these restrictions and limitations.

5.     I reviewed additional information, including a February 22, 2005 response by Dr. McKinney concerning my letter regarding Ms. Bullard's restrictions and limitations.    That

additional review supported the opinions set forth in my February 2, 2005 review concerning Ms. Bullard's restrictions and limitations.

6.      Following the submission of additional medical records from Dr. Donna Paul, I reviewed the file once again. A copy of my report is attached hereto as Exhibit C.

7.      While Ms. Bullard's medical records reflected some loss of functional capacity, I continued to maintain that the restrictions and limitations relating to her medical conditions as set forth in my February 2, 2005 review are appropriate. Indeed, it was and is my opinion that Ms. Bullard could still work within the restrictions and limitations set forth in my previous reviews.

8.      I have now reviewed additional medical records provided to me through counsel, including the following records: Dr. George Bradford, Dr. Kenneth Farha, Dr. Albert T. Foy, Dr. Roger Kemp,  Dr. Patrick Ryan, Kirklin Clinic, Dr. Rachel McKinney, Alabama Orthopaedic Specialists, PA (Dr. Daniel Thornbury), Dr. Robert Brinson, Dr. Alto Jackson, Dr. Michael Karst, Dr. Robert Moon, Dr. Donna Paul, and Dr. Reuben Richardson.

9.      Based on my review of those records, it is my professional opinion that plaintiff could continue to function and work within the restrictions and limitations set forth in my original report dated February 2, 2005.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February _16_, 2007.

DR. SUSY L.L. VERGOT, D.O.

## CURRICULUM VITAE

**SUSY L.L. VERGOT, D.O.**
**UnumProvident Corporation**
**1 Fountain Square**
**Chattanooga, TN 37402**
**June 30, 2003**

## CAREER HISTORY

| | |
|---|---|
| 9/01 - present | UnumProvident Corporation<br>VP, Medical Director |
| 5/02 – present | Bradley Memorial Hospital, Emergency Med. Dept. Staff<br>Cleveland, Tennessee |
| 4/01 – present | Medical Director of Emergency Medicine,<br>North Georgia Regional Hospital,<br>Elijay, Georgia |
| 10/99 – 4/01 | E.R. Director<br>Rhea Medical Center, Dayton, Tennessee |
| 12/93 – 5/00 | Solo Practice Urgent Care<br>Park Place Clinic, Calhoun, Georgia |
| 2/97 – 12/98 | E.R. Staff Physician<br>Hutcheson Medical Center, Ft. Oglethorpe, Georgia<br>James H. Creel, M.D., Director |
| 1992 – 1997 | Part-time E.R. Staff Physician<br>Berrien General Hospital, Berrien Center, Michigan |
| 1991 – 1994 | Urgent Care Staff Physician<br>Physician's Care, Chattanooga, Tennessee<br>Joseph Sentef Jr., M.D., Director |
| 1991 – 1993 | Gordon Hospital, Calhoun, Georgia |
| | Occupational Health Medical Director     1992 – 1993<br>E. R. Staff Physician                                  1991 – 1993 |
| 1990 – 1992 | E. R. Staff Physician<br>Okmulgee General Hospital, Okmulgee, Oklahoma |



EXHIBIT

**A**

UNUM00170
Bullard v Unum

## EDUCATION

| | |
|---|---|
| 1998 | Family Practice Certification, AOA |
| 1989 – 1990 | General Internship, Tri-County Hospital, Dallas, Texas |
| 1989 | D.O. University of Health Sciences, College of Osteopathic Medicine, Kansas City, Missouri |
| 1985 | B.S.N., Andrews University, Berrien Springs, Michigan |
| 1974 | A.D. Lake Michigan College, Benton Harbor, Michigan |

## CERTIFICATIONS

| | |
|---|---|
| 1997 – present | ACLS Provider |
| 1993 – present | ATLS Provider |
| 1993 – present | PALS |
| 1990 – present | NEONATAL ACLS |

## SPECIAL AWARDS

| | |
|---|---|
| 1989 | Upjohn Achievement Award: Exemplary leadership, chosen by president of University of Health Services, Kansas City, Missouri |
| 1989 | Distinguished Service Award: Selected by the graduating medical class |
| 1985 – 1989 | Medical Class President: Four years |

## MEDICAL LICENSES

| | | |
|---|---|---|
| 9/92 | State of Michigan (escrow) | #5101011905 |
| 9/91 | State of Georgia | #91-7895 |
| 9/91 | State of Tennessee | #000854 |
| 2/91 | State of Texas (escrow) | #H8961 |
| 8/90 | State of Indiana (escrow) | #02001190 |

UNUM00171
Bullard v Unum

As of 2/2/05, "I have reviewed all medical and clinical evidence provided to me by Company personnel bearing on the impairment(s) which I am by training and experience capable to assess  Please see other reviews.  This is an appeal review including additional records.

Betty Bullard is a 49 year old secretary with a DOD of 5/22/04 for ankle and foot pain, cataplexy and narcolepsy, hypersomnia and sleep apnea.

> Restrictions Per AP(s): 04-09-04 APS completed by
> Dr. Thornbury indicated R & L's as none, activity as
> tolerated. No R & L's provided by Dr. Richardson,
> Sleep disorder specialist. 03-29-04 APS completed by
> Dr. Foy, Orthodontics indicated R & L's as none. 04-
> 01-04 APS completed by Dr. McKinney, Family
> Medicine, indicated R & L's as unable to adequately
> do her job secondary to extreme fatigue, ulcerative
> colitis and anxiety with panic attacks.

ANALYSIS:

Ms. Bullard is noted to be 5' 6" tall, weighing 170 pounds, and historically having an anterior fusion of the C-spine.  The claimant has the current co-morbid conditions:

COLITIS:  Ms. Bullard's Colitis as of 5/17/04 was noted to be slightly worse though-being treated with Asaco.  A 9/04 colonosclpy was interpreted as having erythema, edema, and mulrple erosion in the sigmoid colon and Diverticulosis.

ARTHRITIS:  AC degenerative arthritis of the right shoulder is noted by ortho Dr. Well's on 5/12/04.  C-spine ROM is decreased.  Swelling and tenderness were noted in the small joints of the hands in 9/04.  By 10/04, Remicade was suggested as further arthritic medication.-

LUMBAR DEGENERATION:  Ms. Bullard has underwent facet blocks MRI of the Lumbar Spine had the following positive findings:
* L2-3 mild dehydration, mild paracentral disc buldge with out significant stenosis
* L3-4  mild dehydration, fissure in the disc annulus, and a central disc buldge without signifigant stenosis
* L4-5  disc dehydration , tiny fissures and buldge in the disc annulus with very mild lateral stenosis bilaterally
* L5-S1  disc dehydration, central buldge without stenosis

SLEEP APNEA:  As of  7/15/04 was doing well on 10 cm CPAP for her sleep apnea.

FOOT/ANKLE PAIN:  claimant reports having screws put in her feet.  Record note 2/04 improving swelling and ankle pain and nalleolar trains to replace a boot  brace on the left ankle.

Normal testing includes:

EXHIBIT

B

1   Chest CT
2   Stress test
3   9/10/04 bilateral hip MRI

**Referral Questions:**

**1) Does the clinical data support a loss of functional capacity that would impose restrictions and limitations?**

**2) If so, what are appropriate restrictions and limitations?**

**3) Please provide a clinical basis for your conclusions.**

## ANSWERS/CONCLUSIONS:

1. Yes. Some functional loss is supported with the individual conditions above and the co-morbid diagnosis considered together as a whole person.

2. Reasonable R/L's for the above noted diagnses/conditions would be:
- avoid repetative bending/twisting at the waist
- avoid prolong standing/walking
- change position as needed for comfort
- avoid above the shoulders work
- close and readily available restroom facilities
- occasional lifiln up to 20 pounds
- frequent lifting up to 10 pounds
- no lifitng above shoulders
- avoid lifting while bending at the waist
- avoid fine articulate movements of the hands when arthritis flares in hands


Susy L.L. Vergot. DO
VP MEDICAL DIRECTOR
BOARD CERTIFIED FAMILY PRACTICE



**Medical Response**

---

**Claimant: Betty Bullard**
**SS#: 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**
**Referral date: 3/15/05**
**Date Completed: 3/25/05**

## CLINICAL DATA REVIEWED:

I have reviewed all medical and clinical evidence provided to me by Company personnel bearing on the impairments which I am by training and experience capable to assess.

## CLINICAL SUMMARY:

**Dr. Donna Paul – Rheumatology:**
6/1/04 – Initial visit – Reported history with many years of pain, diagnosed with ulcerative colitis in 2003. Little response to therapies. Exam found abdominal tenderness, tremulousness and telangiectasis to the face. Bilateral TMJ pain and crepitus, MCP I with 1+ swelling bilaterally, PIP II with swelling at 2, PIP III at 2 and PIP IV at 2. Bilateral knee crepitus with mild deformity, R>L and halux valgus on right foot. Apparent listing of tender points to multiple locations. Impressions of inflammatory polyarthritis, ulcerative colitis, fibromyalgia, telangiectasis, OA of knees and low back pain status post back surgery. CRP elevated at 11 (0-4.9) and sed rate elevated at 21 (0-20).
9/2/04 – Continued to report 2 hours of AM stiffness, several diarrhea stools a day, fatigue, fever, chills and mucosal ulcers. Tenderness and swelling to both hands and wrists on exam. Multiple tender points named. Begin Remicade therapy. Neutrophil cytoplasmic Ab, IgG 1:32 (<1:16).
10/14/04 – Pain all over, stiffness in AM, swelling in feet, knees and hands. Exam with tender trochanters – full range.
1/14/05 – First Remicade treatment on 1/10. Right fingers with swelling and tenderness, shoulder pain with full range. Decreased cervical rotation, spinal tenderness.
3/3/05 – Pain severe to point of tears to arm, backs and joints. Some response to Remicide. Hand swelling. Diarrhea and abdominal pain improved. Ulcerative colitis responded "beautifully". Exam with tenderness and swelling to fingers, wrists, toes, valgus knees, tenderness lateral/medial epicondyles. Multiple tender points. Increase Durabac and begin Neurontin. Back brace and TENS.

## RESTRICTIONS AND LIMITATIONS:

9/3/04 – Dr. Paul – rheumatology – "No gripping, grasping, bending, pushing, pulling, climbing, standing > 30 minutes at a time or sitting > 45 minutes at a time. No lifting > 5-10 pounds". Diagnoses of ulcerative colitis, inflammatory arthritis and right shoulder arthritis. 5'5"1/2 inches and 230 pounds.



EXHIBIT
**C**

---

**Claimant Name: Betty W Bullard        Claim #: 1358453**

**CONCLUSIONS:**
I will defer conclusions and answers to Dr. Vergot, who has reviewed this file on two previous occasions.

**SIGNATURE BLOCK:**
Laura Godwin RN
Senior Clinical Consultant
3/25/05

As of 3/29/05, I have reviewed all medical and clinical evidence provided to me by Company personnel bearing on the impairment(s) which I am by training and experience capable to assess   Please see other reviews.  This is an appeal review including additional records.

Please see the 3/25/05 clinical review from Missy Godwin,RN.  After reviewing the file, I find this review an accuarate summary of the medical records.

**QUESTIONS:  Does the clinical data support a loss of functional capacity that would impose R/L's?**

Yes.  Please see my 2/2/05 review.  Ms. Bullard is having a flare with a sed rate slightly elevated at 21 and an elevated CRP of 11.  Swelling and tenderness of the hand joints is noted along with 6 stoold a day.
  Reasonable R/L's for the above noted diagnses/conditions would be:
- avoid repetitive bending/twisting at the waist
- avoid prolong standing/walking
- change position as needed for comfort
- avoid above the shoulders work
- close and readily available restroom facilities
- occasional lifting up to 20 pounds
- frequent lifting up to 10 pounds
- no lifting above shoulders
- avoid lifting while bending at the waist
- avoid fine articulate movements of the hands during this arthritis flares of the hands

There has been improvement with new treatment regime as of the 3/3/05 notes, but flare symptoms are still noted.

Susy L. L. Vergot, DO
VP Medical Director
Board Certified Family Practice
Licensed in TN., GA.
Unum Provident Corp.

2

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| **BETTY BULLARD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.:** |
| | ) | **2:05-1217-MEF** |
| | ) | |
| **UNUMPROVIDENT CORPORATION;** | ) | |
| **UNUM LIFE INSURANCE COMPANY** | ) | |
| **OF AMERICA;** | ) | |
| **GENEX SERVICES, INC.;** | ) | |
| | ) | |
| **Defendants.** | ) | |

## PLAINTIFF'S OBJECTION TO DEFENDANTS'
## THIRD REQUEST FOR PRODUCTION OF DOCUMENTS TO PLAINTIFF

Comes now the Plaintiff, Betty Bullard, and without waiving any objections, provides the following responses to the defendants' requests. Since the defendants have already taken Ms. Bullard's deposition and asked these very same questions and even asked them again in their most recent discovery requests, the discovery seems duplicative at best. That said, in an effort to display Plaintiff's good faith efforts in the discovery process, the following responses are provided.

1.       I have already given you folks everything I can find from the Social Security office on my claim. Objection is offered to this discovery request on the basis of the request itself is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible or relevant evidence to this action. Objection is furthered offered to this request to the extent it seeks information pertaining to claims not encompassed within this lawsuit given the defendants' insistence that Social Security disability decisions have absolutely no bearing on the defendants' determination of disability. In fact, the defendants have stated on numerous occasions that Social Security disability determinations are irrelevant to the defendants' determination of liability under the terms of the group policy such as the one at issue. Therefore, this request is not reasonably calculated to lead to the discovery of admissible or relevant evidence in this matter. Plaintiff further objects to this request given the defendants' insistence that their determination of this claim was made upon the documents before the defendant at the

1

time of the defendants' decision.  Further, in an effort to assist the defendants in recognizing the unnecessary nature of this request, the plaintiff has already produced documents pertaining to this disability claim that the plaintiff filed with the Social Security Disability Determination office. Because, statistically, over 95% of persons Ms. Bullard's age are denied on their first claim attempt with Social Security, Ms. Bullard has not-appealed the original determination.

In an effort to exhibit good faith, Plaintiff will execute the request if it is modified to include production to her attorneys at the same time.  Defendants also need to re-word the authorization.  It appears to be broad enough to authorize production of all Plaintiff's social security records.  It just needs to authorize production of Plaintiff's recently filed disability claim.

Respectfully submitted,

_____
Thomas O. Sinclair
Attorney for Plaintiff

OF COUNSEL:
Thomas O. Sinclair (SIN018)
Jenifer Champ Wallis (WAL191)
**Campbell, Waller & Poer, LLC**
2100-A SouthBridge Parkway, Suite 450
Birmingham, AL 35209
(205) 803-0051
Fax:  (205) 803-0053
tsinclair@cwp-law.com
jwallis@cwp-law.com

2

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing has been served on the following counsel of record by U. S. Mail, postage prepaid, and properly addressed on December 13th, 2006.

Douglas W. Fink
Henry T. Morrissette
HAND ARENDALL, L.L.C.
Post Office Box 123
Mobile, Alabama 36601

John S. Johnson
HAND ARENDAL, L.L.C.
1200 Park Place Tower
2001 Park Place North
Birmingham, Alabama 35203

OF COUNSEL

3